No. 17-11009

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

MARNIKA LEWIS, et al.,

*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, et al.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

_____

## PLAINTIFFS-APELLANTS' OPENING BRIEF

_____

Barbara J. Chisholm, Esq.
Eric P. Brown, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
bchisholm@altber.com
ebrown@altber.com

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201
Telephone: (205) 591-7238
jblacksher@ns.sympatico.ca

*[Additional Counsel on Inside Cover]*

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham, AL 35209
Telephone: (205) 320-2882
still@votelaw.com

U. W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, AL 35222
Telephone: (205) 837-2898
clemonu@bellsouth.net

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Telephone: (205) 488-1226
jwhatley@whatleykallas.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Telephone: (212) 627-8100
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
Telephone: (202) 230-4096
carlsonmjj@yahoo.com

*Attorneys Carlson, Stroup, Whatley, and the firms of Quinn, Connor, Weaver, Davies, & Rouco, and Altshuler Berzon LLP are Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries.*

*Attorneys Blacksher, Clemon, Still, and the firm of Quinn, Connor, Weaver, Davies, & Rouco are counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Rep. Louise Alexander, Rep. Marika Coleman-Evans, Sen. Priscilla Dunn, Rep. Juandalynn Given, Rep. Mary Moore, Oliver Robinson, Rep. John Rogers, Sen. Rodger Smitherman, and William Muhammad.*

## PLAINTIFFS-APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1, Plaintiffs-Appellants hereby state that no Plaintiff-Appellant has any parent corporation or issues shares to the public.  Pursuant to Eleventh Circuit Rules 26.1-1 and 28-1(b), Plaintiffs-Appellants hereby certify that, to the best of their knowledge, the following individuals and entities have an interest in the outcome of this appeal:

1.  Adams, Antoin – Plaintiff-Appellant.

2.  Alabama Legislative Black Caucus – Plaintiff-Appellant.

3.  Alabama State Conference of the National Association for the Advancement of Colored People – Plaintiff-Appellant.

4.  Alexander, Louise – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

5.  Bandy, George – Member of the Alabama Legislative Black Caucus.

6.  Bell, William A. – Mayor of Birmingham, AL, Defendant-Appellee.

7.  Blacksher, James U. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof.

8.  Boyd, Barbara – Member of the Alabama Legislative Black Caucus.

9.  Bracy, Napoleon – Member of the Alabama Legislative Black Caucus.

10. Brasher, Andrew Lynn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

i

11. Brown, Eric P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

12. Buskey, James – Member of the Alabama Legislative Black Caucus.

13. Carlson, Mary Joyce – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

14. Chisholm, Barbara J. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

15. City of Birmingham, Alabama – Defendant-Appellee.

16. Clarke, Adline – Member of the Alabama Legislative Black Caucus.

17. Clemon, U.W. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof.

18. Coleman, Linda – Member of the Alabama Legislative Black Caucus.

19. Coleman-Evans, Merika – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

20. Connor, Glen M. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

21. Daniels, Anthony – Member of the Alabama Legislative Black Caucus.

22. Davies, George N. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

23. Davis, James W. – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

ii

24.    Drummond, Barbara – Member of the Alabama Legislative Black Caucus.

25.    Dunn, Priscilla – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

26.    England, Chris – Member of the Alabama Legislative Black Caucus.

27.    Figures, Vivian – Member of the Alabama Legislative Black Caucus.

28.    Forte, Berry – Member of the Alabama Legislative Black Caucus.

29.    Fullerton, Fredric – Counsel for Defendants-Appellees the City of Birmingham and Mayor William A. Bell.

30.    Givan, Juandalynn – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

31.    Greater Birmingham Ministries – Plaintiff-Appellant.

32.    Grimsley, Dexter – Member of the Alabama Legislative Black Caucus.

33.    Hall, Laura – Member of the Alabama Legislative Black Caucus.

34.    Hollis, Rolanda – Member of the Alabama Legislative Black Caucus.

35.    Holmes, Alvin – Member of the Alabama Legislative Black Caucus.

36.    Howard, Ralph – Member of the Alabama Legislative Black Caucus.

37.    Jackson, Thomas – Member of the Alabama Legislative Black Caucus.

38.    Knight, Jr., John – Member of the Alabama Legislative Black Caucus.

39.    Lawrence, Kayla – Counsel for Defendants-Appellees the City of Birmingham and Mayor William A. Bell.

iii

40.    Lawrence, Kelvin – Member of the Alabama Legislative Black Caucus.

41.    Lewis, Marnika – Plaintiff-Appellant.

42.    Marshall, Steve – Attorney General of Alabama, Defendant-Appellee.

43.    McCampbell, A.J. – Member of the Alabama Legislative Black Caucus.

44.    McClammy, Thad – Member of the Alabama Legislative Black Caucus.

45.    Moore, Mary – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

46.    Parker, William Glenn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

47.    Rogers, John – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

48.    Ross, Quinton – Member of the Alabama Legislative Black Caucus.

49.    Rouco, Richard P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

50.    Sanders, Hank – Member of the Alabama Legislative Black Caucus.

51.    Scott, Rod – Member of the Alabama Legislative Black Caucus.

52.    Singleton, Bobby – Member of the Alabama Legislative Black Caucus.

53.    Smitherman, Rodger – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

54.    State of Alabama – Defendant-Appellee.

iv

55.     Still, Edward – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof.

56.     Stroup, Robert H. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

57.     Warren, Pebblin – Member of the Alabama Legislative Black Caucus.

58.     Whatley, Joe R. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument should be heard in this appeal, which raises important questions regarding the constitutionality of an Alabama statute under the Fourteenth and Fifteenth Amendments, as well as whether that statute complies with the non-discrimination principles of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. §10301.  This appeal is also important because it presents fundamental questions regarding the pleading standard applied to claims of intentional discrimination, standing to challenge allegedly unconstitutional self-executing state laws, and whether the Eleventh Amendment immunizes Alabama from claims under the Voting Rights Act.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................ vi

TABLE OF AUTHORITIES ....................................................................x

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION .......................................................................xvi

STATEMENT OF THE ISSUES .................................................................1

STATEMENT OF THE CASE ...................................................................2

    I.     FACTUAL BACKGROUND ...........................................................4

          A.    Birmingham's Efforts to Raise the Minimum Wage Addressed Significant Racial Disparities in Workers' Wages ..........................................................................4

          B.    In Response to Birmingham's Minimum Wage Ordinance, the State Legislature Removed All Local Power to Regulate Minimum Wages...........................................6

    II.    PROCEDURAL HISTORY...............................................................9

    III.   STANDARD OF REVIEW ..........................................................10

SUMMARY OF THE ARGUMENT....................................................12

ARGUMENT .............................................................................15

    I.     The District Court Erred in Holding Plaintiffs Failed to Adequately Allege Equal Protection Violations ...............................15

          A.    The District Court Failed to Apply the Correct Legal Standard and to Consider Relevant Allegations in Assessing Plaintiffs' Equal Protection Claim........................15

1.    The District Court Ignored the Legal Standard Governing Fourteenth Amendment Claims of Intentional Discrimination ..............................................16

2.    Applying the *Arlington Heights* Factors, Plaintiffs Have Plausibly Pled Facts Sufficient to Support a Finding of Intentional Racial Discrimination ................20

B.    Plaintiffs Have Adequately Pled a Claim Under the Political Process Doctrine .......................................................27

II.    Act 2016-18 Impermissibly Impinges the Rights of African-American Voters Under the Voting Rights Act ....................34

A.    Congress Intended Section 2 of the Voting Rights Act to Encompass State Action Such as That at Issue Here ...........34

B.    Plaintiffs Have Pled Facts Sufficient to Support a Claim Under Section 2 of the Voting Rights Act ....................39

III.    The District Court Erred in Holding There Are Jurisdictional Impediments to Plaintiffs' Claims ..............................46

A.    Plaintiffs Have Standing to Assert Their Claims .....................46

1.    Plaintiffs Have Suffered an Injury-in-Fact ....................46

2.    Plaintiffs' Injury is Traceable to Defendants' Conduct .........................................................47

3.    Plaintiffs' Injuries are Redressable ...............................52

B.    Alabama Is Not Entitled to Eleventh Amendment Immunity on Plaintiffs' Voting Rights Act Claim ...................54

CONCLUSION ..............................................................................56

CERTIFICATE OF COMPLIANCE ...............................................58

viii

CERTIFICATE OF SERVICE...............................................................................59

ix

# TABLE OF AUTHORITIES

**Cases**

*Adinolfe v. United Tech. Corp.,*
  768 F.3d 1161 (11th Cir. 2014) .................................................................. 47

*Air Evac EMS, Inc. v. Texas, Dept. of Ins.,*
  851 F.3d 507 (5th Cir. 2017) .................................................................... 49

*Allen v. State Board of Elections,*
  393 U.S. 544 (1969) .................................................................................. 36

*Allen v. Wright,*
  468 U.S. 737 (1984) .................................................................................. 51

*Alvarez v. Attorney General of Florida,*
  679 F.3d 1257 (11th Cir. 2012) ................................................................ 11

*Animal Legal Defense Fund, Inc. v. Glickman,*
  154 F.3d 426 (D.C. Cir. 1998) ................................................................. 52

*\*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..........................................................................*passim*

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................11, 18

*Bennett v. Spear,*
  520 U.S. 154 (1997) .................................................................................. 50

*Board of Trustees of the University of Alabama v. Garrett,*
  531 U.S. 356 (2001) .................................................................................. 55

*Browning-Ferris Industies of Alabama v. Alabama Department of*
  *Environmental Management,*
  799 F.2d 1473 (11th Cir. 1986) ................................................................ 53

*Burger King v. Weaver,*
  169 F.3d 1310 (11th Cir. 1999) ................................................................ 15

*Burton v. City of Belle Glade,*
  178 F.3d 1175 (11th Cir. 1999) ................................................................ 27

*Central Alabama Fair Housing Center v. Magee,*
  835 F.Supp.2d 1165 (M.D. Ala. 2011) ................................................23, 24

*Citizens for Equal Protection v. Bruning,
  455 F.3d 859 (8th Cir. 2006)................................................................ 49

Dekom v. New York,
  No. 12-cv-1318, 2013 WL 3095010 (E.D.N.Y. Jun. 18, 2013)........................ 56

Dillard v. Chilton County Commission,
  495 F.3d 1324 (11th Cir. 2007) .......................................................... 47

*Dillard v. Crenshaw County,
  831 F.2d 246 (11th Cir. 1987)........................................................38, 39

Doe v. Pryor,
  344 F.3d 1282 (11th Cir. 2003)........................................................53, 54

Ex Parte Young,
  209 U.S. 123 (1908)....................................................................49, 50

Focus on the Family v. Pinellas Suncoast Transportation Authority,
  344 F.3d 1263 (11th Cir. 2003) .......................................................... 48

Frank Krasner Enterprises, Ltd. v. Montgomery County, MD,
  401 F.3d 230 (4th Cir. 2005)............................................................. 51

Garza v. County of Los Angeles,
  918 F.2d 763 (9th Cir. 1990)............................................................. 20

Grizzle v. Kemp,
  634 F.3d 1314 (11th Cir. 2011) .......................................................... 49

Hall v. Louisiana,
  983 F.Supp.2d 820 (M.D. La. 2013) ...................................................... 55

Harris v. Ivax Corp.,
  182 F.3d 799 (11th Cir. 1999)........................................................10, 12

Holder v. Hall,
  512 U.S. 874 (1994)...................................................................... 35

Hunt v. Cromartie,
  526 U.S. 541 (1999)....................................................................16, 33

Hunter v. Erickson,
  393 U.S. 385 (1969)...................................................................... 28

Hunter v. Underwood,
  471 U.S. 222 (1985)....................................................................17, 22

xi

*I.L. v. Alabama,
    739 F.3d 1273 (11th Cir. 2014) ................................................................ *passim*

Jeffers v. Clinton,
    740 F.Supp. 585 (E.D. Ark. 1990) ..................................................... 26

Johnson v. DeSoto,
    72 F.3d 1556 (11th Cir. 1996) .......................................................... 40

Johnson v. Governor of the State of Florida,
    405 F.3d 1214 (11th Cir. 2005), *cert. denied*, 546 U.S. 1015 (2005) ............... 40

League of Women Voters of N.C. v. North Carolina,
    769 F.3d 224 (4th Cir. 2014), *cert. denied*, 135 S.Ct. 1735 (2015) .................. 40

Loggerhead Turtle v. County Council,
    148 F.3d 1231 (11th Cir. 1998) ........................................................ 48

*Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ..........................................................46, 47, 53

Mhany Management, Inc. v. County of Nassau,
    819 F.3d 581 (2d Cir. 2016) ...........................................................24, 45

*Mixon v. State of Ohio,
    193 F.3d 389 (6th Cir. 1999) ........................................................... 55

Morse v. Republican Party of Virginia,
    517 U.S. 186 (1996) ..................................................................35, 55

Mulhall v. UNITE HERE Local 355,
    618 F.3d 1279 (11th Cir. 2010) .......................................................53, 54

North Carolina State Conference, NAACP v. McCrory,
    831 F.3d 204 (4th Cir. 2016) ..........................................................*passim*

Obergefell v. Hodges,
    135 S.Ct. 2584 (2015) ................................................................. 49

Ohio State Conference of NAACP v. Husted,
    768 F.3d 524 (6th Cir. 2014) .......................................................... 41

Parker v. Scrap Metal Processors, Inc.,
    386 F.3d 993 (11th Cir. 2004) ......................................................... 47

Perez v. Abbott,
    __ F.Supp.3d __, 2017 WL 1787454 (W.D. Tex. May 2, 2017) .................... 19

xii

*Phillips v. Snyder*,
  836 F.3d 707 (6th Cir. 2016)................................................................ 36

*Presley v. Etowah County Commission*,
  502 U.S. 491 (1992)..............................................................34, 35, 37, 38

*Randall v. Scott*,
  610 F.3d 701 (11th Cir. 2010) ............................................................ 11

*Reaves v. U.S. Dept. of Justice*,
  355 F.Supp.2d 510 (D.D.C. 2005)....................................................... 55

*Reitman v. Mulkey*,
  387 U.S. 369 (1967)........................................................................28, 29

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997)........................................................................16, 37

*San Diego County Gun Rights Committee v. Reno*,
  98 F.3d 1121 (9th Cir. 1996)............................................................... 51

*\*Schuette v. Coalition to Defend Affirmative Action*,
  134 S.Ct. 1623 (2014) ............................................................1, 13, 29, 34

*Seminole Tribe of Florida v. Florida*,
  517 U.S. 44 (1996)............................................................................. 55

*Shelby County v. Holder*,
  133 S.Ct. 2617 (2013) ....................................................................... 34

*Solomon v. Liberty County*,
  899 F.2d 1012 (11th Cir. 1990)........................................................... 42

*Southern Christian Leadership Conference of Alabama v. Sessions*,
  56 F.3d 1281 (11th Cir. 1995)............................................................. 43

*Speaker v. U.S. Department of Health and Human Services*,
  623 F.3d 1371 (11th Cir. 2010)........................................................24, 26

*Thornburg v. Gingles*,
  478 U.S. 30 (1986)........................................................13, 37, 40, 42

*Underwood v. Hunter*,
  730 F.2d 614 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985)............................. 19

*United States v. Jones*,
  57 F.3d 1020 (11th Cir. 1995)............................................................. 36

xiii

*United States v. McGregor*,
  824 F.Supp.2d 1339 (M.D. Ala. 2011) ......................................................... 44

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ............................................................... *passim*

*Verity v. Scott*,
  2014 WL 3053171 (M.D. Fla. July 7, 2014) .................................................. 55

*\*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ............................................................................ *passim*

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................................... 47

*Washington v. Davis*,
  426 U.S. 229 (1976) ...................................................................................... 17

*\*Washington v. Seattle School District, No. 1*,
  458 U.S. 457 (1982) ............................................................................ *passim*

*White v. State of Alabama*,
  867 F.Supp. 1519 (M.D. Ala. 1994) .............................................................. 55

*Wilson v. Arkansas Department of Human Services*,
  850 F.3d 368 (8th Cir. 2017) ........................................................................ 18

*Young Apartments, Inc. v. Town of Jupiter, FL*,
  529 F.3d 1027 (11th Cir. 2008) ................................................................ 17, 21

**Federal Statutory Authorities**

28 U.S.C. §1291 ............................................................................................. xiv

28 U.S.C. §1331 ............................................................................................. xiv

28 U.S.C. §1343 ............................................................................................. xiv

42 U.S.C. §1983 ................................................................................................. 1

\*52 U.S.C. §10301 .................................................................................... *passim*

52 U.S.C. §10302 ................................................................................................ x

52 U.S.C. §10304 ........................................................................................ 35, 36

**Alabama Statutory Authorities**

\*Alabama Act No. 2016-18 ........................................................................ *passim*

Ala. Code §36-15-1 .................................................................................... 49

Birmingham City Ordinance No. 15-124 (Aug. 18, 2015) ......................... 4

Birmingham City Ordinance No. 16-28 (Feb. 23, 2016) .......................... 5

**Rules and Regulations**

Fed. R. App. P. 4 ........................................................................................ x

Fed. R. Civ. P. 8 ....................................................................................... 11

Fed. R. Civ. P. 12 .................................................................................... 10

Fed. R. Civ. P. 25 ...................................................................................... 1

**Constitutional Provisions**

U.S. Const., amend. XI ........................................................................ 3, 9, 14

U.S. Const., amend. XIII ............................................................................. 3, 9

U.S. Const., amend. XIV ........................................................................ 1, 3, 12

U.S. Const., amend. XV ......................................................................... 1, 3, 10

Ala. Const., art. IV, sec. 89 ..................................................................... 22

Ala. Const., art. V, sec. 137 .................................................................... 49

**Legislative Materials**

S. Rep. No. 94-295 (1975) ....................................................................... 55

S. Rep. No. 97-417 (1982) ........................................................... 27, 28, 29, 45

Ala. HB 27 (2015) ...................................................................................... 6

Ala. HB 495 (2015) .................................................................................... 6

Ala. HB 174 (2016) .............................................................................. *passim*

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331 and

28 U.S.C. §1343(a)(3) & (4), and 52 U.S.C. §10302 because this matter arises

under the Fourteenth and Fifteenth Amendments to the United States Constitution

and the Voting Rights Act of 1965.

The district court entered final judgment on February 1, 2017, and Plaintiffs-

Appellants filed the Notice of Appeal on March 2, 2017.  This Court has appellate

jurisdiction under 28 U.S.C. §1291.  Plaintiffs-Appellants' appeal is timely under

Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

(1)    Whether Plaintiffs-Appellants (hereinafter "Plaintiffs") plausibly alleged that Defendants intentionally discriminated on the basis of race by barring, pursuant to Alabama Act No. 2016-18 ("Act 2016-18"), the City of Birmingham from increasing the legally required minimum wage, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. §1983, and whether the district court erred in wholly disregarding the complaint's detailed allegations of racial discrimination and failing to apply the factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and the Political Process Doctrine as explained in *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457 (1982), and *Schuette v. Coalition to Defend Affirmative Action*, 134 S.Ct. 1623 (2014).

(2)    Whether Plaintiffs plausibly alleged claims that Act 2016-18 violates Section 2 of the Voting Rights Act of 1965 ("VRA"), as amended, 52 U.S.C. §10301, and the Fifteenth Amendment.

(3)    Whether Section 2 of the VRA constitutes a waiver of sovereign immunity such that Plaintiffs may maintain a claim under Section 2 against the State of Alabama and the Alabama Attorney General.[1]

---

[1] Steve Marshall was recently appointed Alabama Attorney General and is "automatically substituted as a party." FRCP 25(d).

1

(4)    Whether the Plaintiff minimum wage employees, African-American legislators, African-American Birmingham voters, and organizations representing them have Article III standing to assert their federal constitutional and statutory claims against the State Attorney General and the City of Birmingham.

## STATEMENT OF THE CASE

This appeal challenges the district court's pleading-stage dismissal of Plaintiffs' constitutional and federal statutory claims challenging the Alabama Uniform Minimum Wage and Right-to-Work Act, Ala. Act No. 2016-18.  In direct response to Birmingham's adoption of an Ordinance raising the minimum wage for workers in the city, Act 2016-18 strips local officials in Birmingham and other Alabama cities of power to regulate minimum wages and transfers all control to legislators elected by the statewide majority-white electorate.

Act 2016-18 is the latest in a long history of Alabama state actions that deprive African-Americans of the opportunity to effectively participate in the political process in the state by removing power from local African-American majorities in favor of a white-dominated state government.  In this case, the state removed the ability of Birmingham, with a population that is 73% African-American, to regulate minimum wages and benefits – a power of great significance to the city's African-American community, which is disproportionately represented

2

among the low-wage workers who would directly benefit from Birmingham's effort to raise the minimum wage.

Plaintiffs assert that Act 2016-18 violates fundamental rights of Birmingham citizens, and other citizens of majority-black municipalities in Alabama, secured by the Fourteenth and Fifteenth Amendments to the United States Constitution and the Voting Rights Act of 1965.[2]  In dismissing this action at the pleading stage, the district court failed to identify, let alone apply, the correct legal standards governing Plaintiffs' claims and thus ignored the detailed allegations in Plaintiffs' amended complaint (hereinafter "complaint") of intentional racial discrimination and the discriminatory racial impacts of Act 2016-18.  The district court also wrongly held that Plaintiffs lack standing to bring their claims, and broke new ground in holding that the Voting Rights Act of 1965 does not abrogate state sovereign immunity under the Eleventh Amendment.  For all of these reasons, the district court's decision must be reversed.

---

[2] Plaintiffs do not pursue on appeal their claims under the Thirteenth Amendment or the Privileges and Immunities Clause of the Fourteenth Amendment.

3

## I.    FACTUAL BACKGROUND

### A.    Birmingham's Efforts to Raise the Minimum Wage Addressed Significant Racial Disparities in Workers' Wages.

Alabama's three largest cities are majority-African-American.  Birmingham is Alabama's largest city and has a population that is 73% African-American. ER048.[3]  More than 30% of Birmingham's residents live below the poverty line.[4] Approximately 19% of all Birmingham workers earn less than $10.10/hour. ER047.  Of hourly wage earners in Birmingham, 37% of African-American workers earn $10.10/hour or less, while only 27% of white hourly wage workers fall below the same threshold.  ER047-48.  On average, white wage earners in Birmingham earn $1.41 more per hour than African-American wage earners. ER047.

In 2015 and 2016, the Birmingham City Council, a body composed of nine elected councilors, all but two of whom were African-American, took steps to address the low wages and poverty persistent in the city.  First, on April 21, 2015, the Council unanimously passed a resolution asking the State Legislature to raise the minimum wage to $10/hour across Alabama.  ER066.  When the majority-

---

[3] Excerpts of record, cited as "ER###," are included in the Appendix filed herewith.

[4] U.S. Census Bureau, Birmingham, AL, Community Facts, available at: https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkm b (last visited June 5, 2017).

4

white state legislature refused to take action, on August 18, 2015, the Birmingham City Council adopted Ordinance No. 15-124, which raised the minimum wage for Birmingham workers to $8.50/hour, effective July 1, 2016, and then to $10.10/hour, effective July 1, 2017.  ER067.  Ordinance 15-124 went into effect on August 30, 2015.  ER067-68.

In response to fears that the State Legislature intended to quash Birmingham's efforts to raise the minimum wage for its residents, on February 23, 2016, the Birmingham City Council adopted another minimum wage law, Ordinance No. 16-28.  ER069-70.  Ordinance No. 16-28 was signed into law the next day and raised the minimum wage for employees within Birmingham to $10.10/hour, effective February 24, 2016.  ER070.  The Ordinance also provided annual adjustments of Birmingham's minimum wage, pegged to increases in the cost of living, as measured by the relevant U.S. Department of Labor Consumer Price Index.  ER122.

Birmingham's City Council made several findings supporting the ordinance, including that because "[p]overty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our economy."  ER121; *see also* ER070.

At the time it adopted its Ordinances, Birmingham was the only political subdivision in Alabama to raise its minimum wage above the federal floor of $7.25/hour.  ER047.  It remains so today.

**B.      In Response to Birmingham's Minimum Wage Ordinance, the State Legislature Removed All Local Power to Regulate Minimum Wages.**

When Birmingham took steps to raise the minimum wage, the Alabama Legislature responded with legislation to strip the city of its power to do so. ER067.  Although the Alabama Legislature had previously been indifferent to the issue, as Birmingham began to push for raising the minimum wage, a Representative representing a suburban majority-white area introduced HB 495 in the Alabama Legislature.  ER067.  HB 495 sought to prevent any municipality from requiring employers to pay wages, or to provide leave or vacation pay, not required by federal or state law.  *Id.*  HB 495 was pending when the legislative session ended in June 2015.  *Id.*

After Birmingham passed its initial minimum wage law, the state legislature took steps during a special legislative session to block the law.  ER068.  HB 27, introduced on September 8, 2015, by a legislator representing a majority-white constituency, sought to prevent Birmingham and other cities from raising the minimum wage.  HB 27's sponsor stated that he was "shocked" that Birmingham

6

could raise the minimum wage for its residents. *Id.* HB 27 did not pass during the special session. *Id.*

The bill that became Act 2016-18, HB 174, combined features of HB 495 and HB 27, and was introduced on February 9, 2016. ER068-69. In order to stop Birmingham's ordinance from taking effect, the leadership of the House of Representatives fast-tracked HB 174, holding only a short public hearing on February 11, 2016, and voting the bill out of the Committee on State Government by a vote of 10-3. *Id.* On February 16, 2016, just seven days after it had been introduced, HB 174 passed the full House of Representatives by a vote of 71-31 and was sent to the Senate. ER069. Both votes were highly racially polarized, with all those voting in favor being white legislators, and all of the African-American legislators voting against. *See infra* at 26.

The Alabama Senate also fast-tracked HB 174, passing the bill through the assigned Senate committee in approximately 36 hours, without adequate notice or allowing public comment. ER070. The full Senate approved the bill in a racially-polarized 23-12 roll call vote on February 25, 2016, a day after Birmingham's Ordinance was signed by the Mayor. *Id.* The bill was delivered to Governor Robert Bentley the same day as Senate approval, and it was signed by the Governor approximately ninety minutes after passage in the Senate. ER070-71. Alabama thus introduced, passed and enacted the bill that would become Act 2016-

7

18 in an extraordinary sixteen days.  Having shown no interest in any statewide minimum wage legislation, the Legislature and Governor responded swiftly and directly to Birmingham's own effort to raise its minimum wage.

Act 2016-18 makes sweeping changes to the regulation of the employment relationship in Alabama.  Most relevant for purposes of this appeal, it provides:

> A county, municipality, or any other political subdivision of this state shall not enact or administer any ordinance, policy, rule, or other mandate requiring an employer to provide any employee, class of employees, or independent contractor with any employment benefit, including, but not limited to, paid or unpaid leave, vacation, wage, or work schedule, that is not required by state or federal law....

ER113.  The Act extinguished Birmingham's minimum wage law, expressly providing: "Any ordinance, policy, rule, or other mandate of a county, municipality, or any other political subdivision of this state that is inconsistent with this section is void."  *Id.*; *see also* ER117 ("Legislature hereby occupies and preempts the entire field of regulation in this state touching in any way upon ... the wages ... provided by an employer to an employee").

Section 6 of Act 2016-18 explains the Legislature's avowed intent:

> The purpose of this section is to establish within the Legislature complete control over regulation and policy pertaining to . . . the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor in order to ensure that such regulation and policy is applied uniformly throughout the state.

ER116.

8

Act 2016-18 unquestionably targeted Birmingham's recent minimum wage Ordinance. Birmingham was the only "political subdivision" in the state that had adopted a minimum wage above the federal floor. ER047.

## II.    PROCEDURAL HISTORY

Two Birmingham low-wage workers and two public interest organizations, filed this lawsuit on April 28, 2016, alleging that Act 2016-18 was racially discriminatory. ER016-37. After Defendants moved to dismiss the initial complaint, Plaintiffs filed an amended complaint on June 30, 2016. ER038. Defendants moved to dismiss the amended complaint, arguing both that the district court lacked jurisdiction over Plaintiffs' claims and that those claims were not adequately pled.

The district court dismissed Plaintiffs' claims with prejudice, and granted Defendants judgment as a matter of law. ER139-64, ER165. The district court held that it did not have jurisdiction to hear Plaintiffs' VRA claim against the State of Alabama because the VRA did not abrogate Eleventh Amendment state sovereign immunity. ER155-58. The district court further held that Plaintiffs lack standing to sue the Alabama Attorney General, the Mayor of Birmingham, and the

9

City of Birmingham, reasoning that Act 2016-18 had no effect on individual worker Plaintiffs' wages.  ER147-51.[5]

The district court also held that Plaintiffs failed to allege sufficient facts to support their claims, including their claims of race discrimination under the Equal Protection Clause of the Fourteenth Amendment, and violations of Section 2 of the VRA and the Fifteenth Amendment.  ER151-55, ER158-63.  In so holding, the district court relied on the mistaken premise that, so long as the Legislature articulated a legitimate explanation for Act 2016-18, no factual allegations would be sufficient to support an inference of intentional discrimination or discriminatory effect.  ER159, ER163.  Because the district court failed to identify, let alone apply, the governing legal standards, its decision also ignored the numerous factual allegations in the complaint supporting Plaintiffs' claims.  The district court's order did not explain the basis for dismissing Plaintiffs' claims with prejudice.  ER165.

Plaintiffs timely filed a notice of appeal on March 2, 2016.  ER166.

## III.    STANDARD OF REVIEW

This Court reviews the dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) de novo.  *Harris v. Ivax Corp.*, 182 F.3d 799, 802 (11th Cir. 1999).

---

[5] The district court also dismissed Plaintiffs' claims against Mayor Bell in his official capacity as duplicative of those against the City of Birmingham.  ER0143-ER0144.  Plaintiffs do not challenge the dismissal of Mayor Bell on appeal.

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces *does not* require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (internal quotation marks omitted); *see also Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010) (same).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this means a pleading must do more than "'formulaic[ly] recit[e] ... the elements of a cause of action,'" this pleading standard does not require that a plaintiff demonstrate *probable* success. *See id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of th[e] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. This is because, at the pleading stage, courts "are required to accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Alvarez v. Atty. Gen. of Fla.*, 679 F.3d 1257, 1261 (11th Cir. 2012).

11

When a district court dismisses a complaint with prejudice on the ground that the proposed amendment would be futile, such a conclusion is also reviewed de novo. *Harris*, 182 F.3d at 802.

## SUMMARY OF THE ARGUMENT

In dismissing this action, the district court wrongly closed the door on an important civil rights issue without providing Plaintiffs the opportunity to develop a factual record supporting the detailed allegations of their complaint. The district court made several mistakes in doing so.

First, the district court made two critical errors in assessing Plaintiffs' Equal Protection claim. Contrary to the Supreme Court's instruction, *see Iqbal*, 556 U.S. at 675, the district court failed to identify the legal standard governing the claim – the multi-factor *Arlington Heights* test that the Supreme Court has established for assessing claims of intentional race discrimination. As a result of this error, the district court disregarded the complaint's detailed factual allegations relevant under the *Arlington Heights* standard, *see infra* at 20-27, and instead wrongly asserted that Plaintiffs made only a single "conclusory allegation, unsupported by any specific factual allegations" concerning intentional discrimination. ER159.

Second, the district court failed to identify or apply the legal standard governing Plaintiffs' Fourteenth Amendment claim under the Political Process Doctrine. The Political Process Doctrine, explained in *Washington v. Seattle Sch.*

12

*Dist. No. 1*, 458 U.S. 457 (1982), and *Schuette v. Coalition to Defend Affirmative Action*, 134 S.Ct. 1623 (2014), prohibits states from altering the procedures of government in ways that are likely to be used to encourage infliction of injury by reason of race. The district court wholly ignored the allegations in Plaintiffs' complaint supporting their claim that this is exactly what Act 2016-18 does. Indeed, the district court mistakenly found that Plaintiffs made no allegations that the Act targeted a policy that primarily benefited African Americans, ER163, despite specific allegations to that effect. *See infra* at 30-33.

Third, with respect to Plaintiffs' claim under VRA Section 2, the district court held that Section 2 does not cover state action such as Act 2016-18 and, thus, failed to consider whether Plaintiffs had alleged sufficient facts to support this claim. The district court was wrong in holding that Section 2 does not apply here. By both its plain language, and as explained in its legislative history, Section 2 extends to cover circumstances such as those described in the complaint, where members of a protected class have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. §10301(b). Under the applicable legal standards, including those identified in *Thornburg v. Gingles*, 478 U.S. 30 (1986), Plaintiffs have alleged facts more than sufficient to support a finding that Act 2016-18's disparate

13

racial effects are linked to historical conditions producing discrimination in violation of Section 2. *See infra* at 39-45.

Fourth, the district court wrongly held that Plaintiffs lack standing to bring claims against all Defendants but the State of Alabama. Plaintiffs' injuries-in-fact – economic losses and unequal treatment under the law – are irrefutable. These injuries are fairly traceable to the conduct of the Attorney General and the City of Birmingham, most notably the Attorney General's official statements regarding the preemption of Birmingham's minimum wage law (and his authority to opine on the constitutionality of state laws) and Birmingham's non-enforcement of its Ordinance as a result of Act 2016-18. Further, Plaintiffs' requested relief makes it more likely that Plaintiffs' injuries will be redressed. *See infra* at 46-54.

Finally, the district court broke with established jurisprudence to hold that the VRA does not abrogate Eleventh Amendment state sovereign immunity. Yet the plain language and, indeed, the very purpose of the VRA indicate that Congress intended to abrogate state sovereign immunity. Since the VRA's enactment more than 50 years ago, private litigants have sued states for violations of the VRA. Nothing in the district court's analysis reveals anything that prior state defendants or courts have overlooked, and the district court cites no case that reached its conclusion.

14

Ultimately, the district court's decision should be reversed because

Plaintiffs' complaint more than satisfies the "plausibility" threshold required by the

Supreme Court. *Iqbal*, 556 U.S. at 678. It was further error for the district court to

dismiss the amended complaint *with prejudice* because the court failed to make the

requisite findings to support such a dismissal. *See Burger King v. Weaver*, 169

F.3d 1310, 1320 (11th Cir. 1999).

## ARGUMENT

**I.    The District Court Erred in Holding Plaintiffs Failed to Adequately Allege Equal Protection Violations.**

**A.    The District Court Failed to Apply the Correct Legal Standard and to Consider Relevant Allegations in Assessing Plaintiffs' Equal Protection Claim.**

The district court's evaluation of Plaintiffs' Equal Protection claim covers

just over one page of its Opinion, ER158-59,[6] and failed to acknowledge the multi-

factor *Arlington Heights* test the Supreme Court has established for assessing

claims of intentional race discrimination, or to apply that test to the detailed factual

allegations supporting Plaintiffs' claims of intentional racial discrimination.

Instead, the district court held that an Equal Protection claim can never be

plausible where the government defendant has asserted a legitimate motive for the

complained-of action, unless perhaps plaintiffs demonstrate racial discrimination

---

[6] Much of the same analysis is repeated at ER161-62 without further development.

15

by the "clearest proof."  ER159, ER162.  Such a standard is clearly in error, and would render it near impossible for civil rights plaintiffs ever to plead claims of intentional discrimination.

> **1.    The District Court Ignored the Legal Standard Governing Fourteenth Amendment Claims of Intentional Discrimination.**

Although *Iqbal* cautions courts to begin their analysis by "taking note of the elements a plaintiff must plead to state a claim, and discuss[ing] the ... [doctrinal] principles implicated by the complaint," 556 U.S. at 675, the district court here failed entirely to recognize the legal framework governing Plaintiffs' claims for intentional discrimination.  "Outright admissions of impermissible racial motivation are infrequent and Plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016) (en banc) ("In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence.").  Thus, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

The Supreme Court has characterized the disproportionate impact of the challenged action as an "'important starting point' for assessing discriminatory intent." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997) (quoting

16

*Arlington Heights*, 429 U.S. at 266); *see also Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1045 (11th Cir. 2008) (same).  In addition to this starting point, the Supreme Court has identified a nonexhaustive list of factors that may support a finding of intentional discrimination, including: the "historical background of the decision," the "specific sequence of events" leading to the decision, procedural or substantive "departures from the normal" sequence, and "legislative or administrative history."  *I.L. v. Alabama*, 739 F.3d 1273, 1286 (11th Cir. 2014) (quoting *Arlington Heights*, 429 U.S. at 266–68 (internal quotation marks omitted)).  Discriminatory purpose "may often be inferred from the totality of the relevant facts."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Ultimately, Plaintiffs need not show that racial discrimination was the "sole[]" or "primary" motive for the challenged action, just that it was "*a* motivating factor."  *Arlington Heights*, 429 U.S. at 265-66 (emphasis added). "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."  *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

The district court's analysis in this case stands in stark contrast to the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" called for by Supreme Court precedent.  *Arlington Heights*, 429 U.S. at

17

266. The district court reasoned, wrongly, that "an equal protection claim is not plausible where there is an obvious alternative explanation for the conduct other than intentional discrimination," and that where "there are legitimate reasons supporting the legislature's decision, only the clearest proof [of illicit motive] will suffice." ER0159, ER0162 (internal quotation marks omitted). By adopting this reasoning at the pleading stage, the district court essentially held that it did not matter what allegations Plaintiffs pled because the state's avowed interest in uniformity would necessarily trump any inference of intentional discrimination that could be drawn from Plaintiffs' complaint and would legitimate Act 2016-18. But "requiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges ... would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject." *Wilson v. Ark. Dept. of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (internal citation and quotation marks omitted). In similar circumstances, the Fifth Circuit declined to apply this "clearest proof" standard to the voting rights context. *Veasey*, 830 F.3d at 230 n.12.

Even if the Legislature's motivations for Act 2016-18 were in part legitimate, which the district court presumed, that would not mandate dismissal of Plaintiffs' claims. Indeed, this Court has *rejected* the proposition that "a permissible purpose will always defeat an impermissible motive." *Underwood v.*

18

*Hunter*, 730 F.2d 614, 617 n.7 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985); *see also Veasey*, 830 F.3d at 231 ("No one questions the legitimacy of . . . [the State's stated purpose]. The disagreement centers on whether SB 14 was passed with impermissible motives as well."). Especially at the pleading stage, where plaintiff's allegations must be taken as true, it is error for a court to accept without question an alternative explanation of motive. *See Underwood*, 730 F.2d at 617 n.7.

The district court also remarkably required that Plaintiffs allege facts showing that particular legislators acted with discriminatory motives. It stated: "Without specific factual allegations of an intent to discriminate on the part of any particular legislators, Plaintiffs' equal protection claims fail." ER0159. The district court's standard is baffling not only because of its departure from the *Arlington Heights* test, but also because courts regularly refuse to infer discriminatory intent based on statements of individual legislators. *See, e.g., N.C. State Conf. NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016); *Veasey*, 830 F.3d at 234. As a three-judge district court in Texas recently explained, to prove intentional discrimination "Plaintiffs ... need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race." *Perez v. Abbott*, __ F.Supp.3d __, 2017 WL 1787454, at *58 (W.D. Tex. May 2, 2017); *accord Garza v. County of*

19

*Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kosinski, J., concurring and dissenting).

The standard applied by the district court in this case bears no resemblance to four decades of Supreme Court and Eleventh Circuit jurisprudence governing claims of intentional racial discrimination.

> **2.    Applying the *Arlington Heights* Factors, Plaintiffs Have Plausibly Pled Facts Sufficient to Support a Finding of Intentional Racial Discrimination.**

The district court believed that the sole allegation in Plaintiffs' complaint relevant to their assertion of intentional racial discrimination is the statement: "Defendant's actions constitute intentional discrimination on the basis of race." ER159 (quoting ER081).  Had the district court identified the proper standard for evaluating claims of intentional discrimination, however, it would have understood that the complaint alleged numerous facts going to the very factors that the Supreme Court and Eleventh Circuit have found important for such an analysis.

*First*, as explained above, the "starting point" for an inquiry into discriminatory intent is an assessment of whether the challenged action has a disparate racial impact.  *See supra* at 16 (citing *Reno*, 520 U.S. at 489).  Although the district court claimed Plaintiffs made no factual allegations "indicat[ing] that Act 2016-18 has a discriminatory effect," ER161, the complaint asserts just such a disparate racial impact and alleges specific facts in support:

20

> The legislature's pre-emption of the Birmingham wage law adversely impacted black workers.  On average, white wage earners in Birmingham earn $1.41 more per hour than black wage earners. While 37% of black wage workers in Birmingham earn wages of $10.10 or less, only 27% of white wage workers earn at or below that level.

ER047-48.  Plaintiffs further alleged: "The persons denied the benefits of the Birmingham minimum wage legislation are predominantly African-American. Approximately 32% of Birmingham's African-American residents had annual earnings below what they could have earned had the minimum wage ordinance become effective."  ER081; *see also* ER073 ("The enactment of HB 174 resulted in approximately 40,000 low wage workers in Birmingham being denied a wage increase; the vast majority of these workers are African-American.").

Moreover, Birmingham, whose minimum wage law was the motivation and target of Act 2016-18, is 73% African-American, whereas Alabama is overall 26% African-American.  ER048.  That Act 2016-18, although facially neutral, "bears more heavily on one race than another," *Young Apts.*, 529 F.3d at 1045, is undeniable and is certainly supported by Plaintiffs' allegations.

*Second*, both this Court and the Supreme Court have held that the "historical background of the decision" may support claims of intentional racial discrimination.  *I.L.*, 739 F.3d at 1286 (citing *Arlington Heights*, 429 U.S. at 266-68).  Here, the complaint recounts a history replete with efforts to maintain white supremacy in Alabama and, "in particular[,] ... [the] suppression of local black

majorities through imposition of white control by state government."  ER049; *see*

*generally* ER049-66 (recounting history of intentional race discrimination in

structure and function of Alabama government).  Among other things, the

complaint explains that Alabama's 1901 Constitution – the source of the state

supremacy clause undergirding the state Legislature's actions to bar local

regulation to benefit black-majority cities[7] – was motivated by a desire "to

establish white supremacy in this State."  ER055 (quoting *Hunter v. Underwood*,

471 U.S. 222, 229 (1985)).[8]  This history of vesting control in the white-dominated

state Legislature reinforces Plaintiffs' contention that the purpose of Act 2016-18

was discriminatory and the Act intended to strip majority-black cities such as

Birmingham of their ability to legislate for the benefit of their residents.

The complaint further recounts more recent historical background that

provides context for Act 2016-18's removal of authority from local black

majorities.  Particularly with respect to Birmingham, it describes the 2015 state

reconstitution of the profitable and powerful Birmingham Water Board, which, as a

---

[7] *See* Ala. Const. art. IV, sec. 89 ("The legislature shall not have power to authorize any municipal corporation to pass any laws inconsistent with the general laws of this state.").

[8] This Court has recognized "Alabama's deep and troubled history of racial discrimination."  *I.L.*, 739 F.3d at 1288; *accord McCrory*, 831 F.3d at 223 ("Although we recognize its limited weight, . . . North Carolina's pre-1965 history of pernicious discrimination informs our inquiry.") (internal citation omitted).

22

result of state legislative action, is now "the *only* municipal water board in Alabama whose governance . . . must be shared with neighboring cities and counties, all of which are majority-white." ER064 (emphasis added).[9]

The complaint also describes legislative redistricting in 2010 and 2012, which in both intent and purpose, diluted the voting power of black voters. ER062-63. Further, the complaint identifies a 2011 federal district court decision finding "substantial evidence of racial animus [by the State Legislature]" in the adoption of a law targeting undocumented immigrants. ER065-66 (citing *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F.Supp.2d 1165, 1191-94 (M.D. Ala. 2011), *vacated on other grounds by* 2013 WL 2372302 (11th Cir. 2013)). The complaint explains that thirteen of the state legislators who sponsored that immigration bill were also sponsors of Act 2016-18, and that two specific Representatives whose "race-based statements were reviewed by the Court in *Magee*, were also sponsors" of Act 2016-18. ER066.[10]

Accordingly, Plaintiffs have alleged a historical, but on-going, pattern of Alabama legislative action taken with racially discriminatory purpose to racially

---

[9] The most recent episode in which the state Legislature targeted Birmingham is the removal of Birmingham's, and only Birmingham's, power to set City Council members' salaries. *See* Ala. Act 2017-275, available at http://arc-sos.state.al.us/cgi/actdetail.mbr/detail?year=2017&act=%20275&page=bill.

[10] In just the past month, white legislators have disparaged their African-American colleagues by circulating racially-charged emails, *see, e.g.*, Mike Cason, "Email referencing monkeys angers black Alabama legislators," AL.com (May 17, 2017).

discriminatory effect.  At this stage, these allegations must be taken as true and every possible inference drawn in Plaintiffs' favor.  *Speaker v. U.S. Dept. of Health and Human Servs.*, 623 F.3d 1371, 1380 (11th Cir. 2010).  These allegations of a history of racial discrimination by the Alabama Legislature are probative of intent under both Supreme Court and Eleventh Circuit precedent.  *See Arlington Heights*, 429 U.S. at 267; *I.L.*, 739 F.3d at 1286.  There is no excuse for the district court's failure even to acknowledge these allegations.

*Third*, the "specific sequence of events" leading to the decision can shed light on whether legislative action was taken with a discriminatory purpose.  *I.L.*, 739 F.3d at 1286 (citing *Arlington Heights*, 429 U.S. at 267).  Here, the complaint explains that Act 2016-18 was fast-tracked specifically in order to block the City of Birmingham from raising the minimum wage within the city, which is 73% black.  ER048, ER067-70.  Moreover, the extreme haste with which Act 2016-18 was passed, *see* ER070 and *supra* at 7-8, "strongly suggests an attempt to avoid in-depth scrutiny," and is evidence of discriminatory intent.  *McCrory*, 831 F.3d at 228; *see also Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 607-08 (2d Cir. 2016) ("oddness and abruptness" of timing of city ordinance supported finding of race-based animus).

*Fourth*, the adoption of Act 2016-18 involved significant "departures from the normal procedural sequence [that] also might afford evidence that improper

24

purposes are playing a role." *Arlington Heights*, 429 U.S. at 267.  In particular, the complaint alleges: "The Alabama legislative committees considering HB 174 deviated from normal practices with respect to the consideration of legislation by, inter alia, failing to give the public proper information on the scheduling of hearings, failing to allow public testimony at the Senate hearing, and by rushing the bill to final votes and the Governor's signature after years of indifference to the issue." ER083.  The district court wholly failed to consider these allegations.

*Fifth*, the complaint's allegations concerning Act 2016-18's legislative history, and its specific allegations that the Act's stated purpose was pretextual, support an inference that the Act was adopted for racially discriminatory purposes. *See I.L.*, 739 F.3d at 1286 (legislative history relevant factor in assessing intent). In particular, the complaint states:

> [C]ontrary to the assertions of Act 2016-18's supporters that passage of a minimum wage ordinance would be detrimental to Birmingham residents, economic studies show that increasing the minimum wage to $10.10 would not result in job loss or economic instability. *The Legislature cited no economic studies in support of its position and instead relied on stereotypes about race and other pretexts to justify its actions....*

ER083 (emphasis added).  Similarly, the complaint alleges:

> Defendants' assertions of the need for uniformity in application of minimum wage requirements throughout Alabama are pretextual, in light of the Legislature's history of less favorable treatment of predominantly African-American jurisdictions in the Legislature's granting of economic development authority to local jurisdictions ... and in light of the Legislature's acceptance of non-uniformity in other

25

areas of economic regulation, including but not limited to the sales tax.

ER082-83.  Rather than credit these allegations, as it was required to do, *Speaker*, 623 F.3d at 1380, the district court simply ignored them.

*Sixth*, the complaint raised allegations of profound racial polarization in the Alabama Legislature with respect to Act 2016-18.  At the time the Act was passed, the Alabama House of Representatives had 27 black members, of a total of 105 members.  Yet, all 53 of HB 174's sponsors were white.  ER069.  All 10 HB 174 supporters in the House Committee on State Government were white.  *Id.*  The final vote in the House of Representatives was 71-31.  *Id.*  All 71 members of the House voting in favor of the bill were white; all 27 black Representatives voted against the bill.  *Id.*  In the Senate, HB 174 passed by a vote of 23-12.  ER070.  All 23 Senators voting in favor of the bill were white; all seven African-American members of the Senate voted against the bill.  ER071.[11]

---

[11] Although voting among the general electorate in Alabama is also racially polarized, as the amended complaint alleges, ER048, this near-categorical polarization *within the Alabama Legislature* is striking.  *Cf. Jeffers v. Clinton*, 740 F.Supp. 585, 616 (E.D. Ark. 1990) (Eisele, J., dissenting) (fact black legislators voted for statutes made it less likely that statutes were enacted with discriminatory intent).

The complaint thus provided specific factual allegations going to every one of the *Arlington Heights* factors.[12]  Taken together, there is no question that Plaintiffs' detailed factual allegations meet their burden at the pleading stage to demonstrate that their claims are "plausible."  *Iqbal*, 556 U.S. at 678; *see also McCrory*, 831 F.3d at 233 ("Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context.").

### B.    Plaintiffs Have Adequately Pled a Claim Under the Political Process Doctrine.

The Political Process Doctrine prohibits states from altering the procedures of government in ways that are likely to encourage infliction or prevent redress of injury by reason of race.  Although this is the very essence of Plaintiffs' challenge to Act 2016-18, and the complaint is replete with supporting allegations, the district court incorrectly asserted that Plaintiffs made no allegations that Act 2016-18 targeted "a policy or program that inures primarily to the benefit of the [racial]

---

[12] Because the *Arlington Heights* analysis is also used to determine the presence of discriminatory purpose in the Fifteenth Amendment context, Plaintiffs have also adequately pled a violation of the Fifteenth Amendment's prohibition on discriminatory voting practices.  *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir. 1999) ("To establish a violation of . . . the Fifteenth Amendment, [Plaintiffs] must show that the [state action] . . . had a discriminatory purpose and effect."); *see also infra* at 34-39 (Act 2016-18 implicates voting rights).

27

minority." *See* ER163.  Plaintiffs' discrimination claim under the Political Process Doctrine is fully supported by the complaint's allegations.

The clearest articulation of the Political Process Doctrine is found in *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982).[13]  There, after Seattle had implemented a busing plan to desegregate its public schools, Washington passed a ballot initiative that effectively blocked the busing plan by establishing a general rule forbidding local school districts from assigning students to any school except that geographically closest to their residence.  458 U.S. at 462.  Although the Washington statute was written in facially neutral terms, there was no question that it was "directed solely at desegregative busing in general, and at the Seattle [desegregation] Plan in particular."  458 U.S. at 463.

In striking down the Washington statute, the Court explained that the Fourteenth Amendment prohibits political structures that "subtly distort[] governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation."  *Id.* at 467.  The Court held the Washington statute unconstitutional because it "expressly require[d] those

---

[13] The Doctrine's origins lie in a handful of earlier cases, most notably *Hunter v. Erickson*, 393 U.S. 385 (1969), in which the Court held a city charter amendment that "ma[de] it more difficult" to enact legislation barring housing discrimination created a racial classification.  *Id.* at 393; *see also Reitman v. Mulkey*, 387 U.S. 369, 380-81 (1967) (striking down state constitutional amendment prohibiting legislative interference with owner' prerogative to decline to sell or rent residential property on any basis).

championing school integration to surmount a considerably higher hurdle than persons seeking comparable legislative action.... [T]he community's political mechanisms are modified to place effective decisionmaking authority over a racial issue at a different level of government." *Id.* at 474.  Although the state law in *Seattle* was facially neutral, the Court considered the context and history of the busing debate and concluded that the law incorporated a *de facto* racial classification, explaining "it is enough that minorities may consider busing for integration to be 'legislation that is in their interest.'" *Id.* at 474 (quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring)).

The Supreme Court most recently considered the Political Process Doctrine in *Schuette v. Coalition to Defend Affirmative Action*, 134 S.Ct. 1623 (2014), a challenge to a Michigan constitutional amendment prohibiting affirmative action in public education, employment and contracting.  The plurality opinion, authored by Justice Kennedy and joined by Justices Roberts and Alito, rejected a broad reading of *Seattle* that would subject to strict scrutiny *any* restructuring of the political process making it more difficult for minorities to enact policies in their interest. *Id.* at 1624.

The *Schuette* plurality opinion nonetheless expressly declined to overrule *Seattle*, instead distinguishing it (as well as *Hunter* and *Reitman*, *see supra* n.13) as cases "in which the political restriction in question was *designed to be used, or was*

29

*likely to be used, to encourage infliction of injury by reason of race*." 134 S.Ct. at 1638 (emphasis added). The Michigan ban, the plurality explained, did not involve a restriction on the ability of a political subdivision to enact laws addressing past or on-going racial discrimination. *Id.*; *accord* 134 S.Ct. at 1649 (Breyer, J., concurring) (noting that case involving a program "designed to remedy" discrimination would present "different questions which may demand different answers").

The district court's analysis of Plaintiffs' Political Process Doctrine claim, and the allegations in support thereof, is based on an erroneous understanding of the doctrine. Unlike the Michigan law at issue in *Schuette*, this case *does* "involve a reordering of the *political* process" in that it "involve[s] the movement of decisionmaking from one political level to another." *Id.* at 1650 (Breyer, J., concurring) (emphasis in original). Further, Act 2016-18 is exactly the type of law that the Political Process Doctrine was designed to address. Through a facially neutral removal of local government power to regulate the minimum wage, Act 2016-18 targets the majority-black city of Birmingham and "modif[ies] "the community's political mechanisms ... to place effective decisionmaking authority over a racial issue at a different level of government." *Seattle*, 458 U.S. at 474. The complaint alleged as much, summarizing the facts supporting Plaintiffs' Political Process Doctrine claim as follows:

30

Act 2016-18 preempts a city ordinance that primarily inured to the benefit of Birmingham's African-American community. Moreover, Birmingham's African-American community (as the organizational Plaintiffs can attest to) strongly considered the ordinance to be in their interest. Indeed, as noted above, the City Council passed multiple ordinances accelerating the provisions of the wage ordinance in an effort to prevent the State from nullifying the ordinance and usurping all authority to regulate and set policy pertaining to wages, leave or other employment benefits.

The State's adoption of Act 2016-18 violates the Fourteenth Amendment's equal protection guarantee because it placed all decision-making authority regarding wages, leave or other employment benefits at the State level rather than leaving such authority to the City. The intent to uniquely burden the ability of Plaintiffs to obtain employment-related ordinances that Birmingham's African-American community strongly favored motivated the decision to give the State Legislature "complete control" over regulation and policy pertaining to wages, leave or other employment benefits.

ER084-85. Of course, to the extent Defendants contend that the minimum wage is not a racialized issue, given the complaint's allegations, that is not a conclusion the district court could permissibly draw as a matter of law. The complaint includes specific allegations regarding the racial issues inherent in Birmingham's move to raise the minimum wage, as well as the racialized nature of the decision to strip the City of authority to regulate minimum wages.

For example, with respect to the procedural effects of Act 2016-18, the complaint alleges: "Act 2016-18 reverses a scheme of local control by citizens of Birmingham over the power to enact minimum wages and other terms and conditions of employment in their municipality by transferring that power from the

31

city council elected by the majority-black Birmingham electorate to the Legislature elected by the majority-white state electorate." ER074; *see also* ER049 ("Today, black political power still has its greatest influence at the local levels of government."); *see also* ER048 (African-Americans are 26% of Alabama's total population and 73% of Birmingham's population; African-Americans are 27.79% of registered voters in Alabama and 78.58% of registered voters in Birmingham); ER074-75 ("Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control."); ER074 (African-Americans face higher barriers to participation in state-level Alabama politics).

Additionally, with respect to the substantive effects of Act 2016-18, as explained above, the complaint alleges that raising the minimum wage in Birmingham, and across Alabama, is largely a racial issue and that raising wages in Birmingham would assist in closing the racial wage gap linked to Alabama's history of slavery and state-sponsored discrimination. *See supra* at 20-21 (explaining racial wage gap and citing ER047-48, ER073, ER081).[14] As the complaint explains, "Act 2016-18 prohibits the majority-black electorate of the

---

[14] Additionally, the extreme racial polarization in the Alabama Legislature's passage of Act 2016-18, *see supra* at 26, demonstrates the degree to which the minimum wage and employment regulation issues were understood in racial terms.

32

City of Birmingham from exercising their electoral power over local government and the right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama." ER075.

Finally, the district court misunderstood the Political Process Doctrine claim to require "pro[of] that the law was 'motivated by a racial purpose or object,' or is unexplainable on grounds other than race.'" ER163 (quoting *Hunt*, 526 U.S. at 546). To the contrary, the defining feature of the Political Process Doctrine is that it permits courts to find that a facially neutral law manifests a *de facto* racial classification and, thus, that Plaintiffs in such cases need not prove discriminatory intent. As the Court noted in *Seattle*, "[w]e have not insisted on a particularized inquiry into motivation in all equal protection cases." 458 U.S. at 485. This is because:

> [W]hen the political process or the decisionmaking mechanism used to *address* racially conscious legislation – and only such legislation – is singled out for peculiar and disadvantageous treatment, the governmental action plainly rests on distinctions based on race.... And when the State's allocation of power places unusual burdens on the ability of racial groups to enact legislation specifically designed to overcome the 'special condition' of prejudice, the governmental action seriously curtails the operation of those political processes ordinarily to be relied upon to protect minorities.

33

*Id.* at 485-86 (emphasis in original) (internal quotation marks and citation omitted); *see also Schuette*, 134 S.Ct. at 1647 (Scalia, J., concurring).[15]

The complaint raises numerous, specific factual allegations supporting a finding that "the political restriction in question was designed to be used, or was likely to be used, to encourage infliction of injury by reason of race," *Schuette*, 134 S.Ct. at 1638, and it was error for the district court to disregard these allegations and dismiss Plaintiffs' claim.

## II.   Act 2016-18 Impermissibly Impinges the Rights of African-American Voters Under the Voting Rights Act.

### A.   Congress Intended Section 2 of the Voting Rights Act to Encompass State Action Such as That at Issue Here.

Plaintiffs pled facts sufficient to support their claim that Act 2016-18 violates Section 2 of the VRA, but the district court never considered those allegations because it erroneously held that the Act does not implicate rights protected by the VRA.  ER151-55.

The district court based its holding primarily on *Presley v. Etowah County Commission*, 502 U.S. 491 (1992), in which the Supreme Court considered the scope of *Section 5* of the VRA.  Prior to the Supreme Court's recent decision in *Shelby County v. Holder*, 133 S.Ct. 2617 (2013), Section 5 required covered

---

[15] Regardless, as described above, *see supra* at 20-27, Plaintiffs have alleged sufficient facts to support a finding that Act 2016-18 was motivated by a racially discriminatory purpose.

jurisdictions to seek preclearance from the federal government of changes to any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 52 U.S.C. §10304(a). In *Presley*, the Court noted four categories of changes that had previously been found to trigger preclearance under Section 5, but noted that "the four typologies [are not] exhaust[ive]." 570 U.S. at 502. It went on to reason that "changes in the routine organization and functioning of government," and changes that "affect only the distribution of power among officials" without a "direct relation to, or impact on, voting" are not covered by Section 5. 502 U.S. at 504, 506. Extending Section 5's onerous "federal supervision" to such changes would prevent the efficient function of state and local government in a way Congress did not intend. *Id.* at 504, 507.

The district court applied *Presley* to Plaintiffs' Section 2 claim, reasoning: "Although the *Presley* decision addressed the scope of Section 5 of the Voting Rights Act, its analysis applies with equal force because the same phrase is embodied in both sections." ER151 (citing *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996), and *Holder v. Hall*, 512 U.S. 874 (1994)).

The district court, however, was wrong in asserting that the relevant language of Sections 2 and 5 is the same. Where Section 5 applies to any "voting qualification or prerequisite to voting, or standard, practice, or procedure *with respect to voting*," 52 U.S.C. §10304(a) (emphasis added), Section 2 applies to any

35

"voting qualification or prerequisite to voting, or standard, practice, or procedure." *Id.* §10301(a). Section 2 does not contain the "with respect to voting" modifier of Section 5.[16] There are many ways in which a standard or practice may abridge the right to vote. *See Allen v. State Bd. of Elec.*, 393 U.S. 544, 566-67 (1969) (language "[i]ndicative of an intention to give the act the broadest possible scope"); *United States v. Jones*, 57 F.3d 1020, 1024 (11th Cir. 1995) (broadly defining "standard, practice, [and] procedure"). Indeed, unlike Section 5, Section 2 provides that "the totality of the circumstances" must be considered to determine whether a violation has occurred, and the relevant statutory inquiry focuses on whether members of a protected class have "less opportunity than other members of the electorate to *participate in the political process* and to elect representatives of their choice." *Id.* §10301(b) (emphasis added).

The VRA's legislative history further demonstrates that Section 2's broad coverage of "standard[s], practice[s], or procedure[s]" that abridge the right to vote was intended to cover state action such as Act 2016-18. The Senate Report on the 1982 amendments to the VRA explains: "[Practices that] operate, designedly or otherwise, to minimize or cancel out the voting strength and political effectiveness

---

[16] For this reason, *Phillips v. Snyder*, 836 F.3d 707 (6th Cir. 2016), upon which the district court relied, ER154-55, is in error when it asserts that the "language [of §5 is] indistinguishable from that of §2." 836 F.3d 707 at 720-21.

of minority groups, are an impermissible denial of the right to have one's vote fully count, just as much as outright denial of access to the ballot box."  S. Rep. No. 97-417 at 28 (1982).[17]  Section 2 encompasses "practices, which, while episodic and not involving permanent structural barriers, result in the denial of access to any phase of the electoral process for minority group members."  *Id.* at 30.  Section 2's requirement that political processes be "equally open to participation," 52 U.S.C. §10301(b), "extends beyond formal or official bars to registering and voting, or to maintaining a candidacy" and "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality.'"  S. Rep. No. 97-417 at 30 (quoting *White v. Regester*, 412 U.S. 755, 760-70 (1973)).

Thus, *Presley*'s Section 5 holding does not foreclose Plaintiffs' Section 2 claim.  Although the *Presley* Court declined to extend Section 5 to all reallocations of governmental power, its reasons for doing so were largely prudential, 502 U.S. at 504-07, and the onerous preclearance requirements of Section 5 do not apply in the Section 2 context, where the plaintiff bears the burden of proving a violation of the statute.  *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 477-80 (discussing

---

[17] This Senate Report is "the authoritative source for legislative intent" on the 1982 amendments.  *Gingles*, 478 U.S. at 43 n.7.

37

differences between Sections 2 and 5).[18]  The *Presley* Court acknowledged that

"[g]overnmental action decreasing the power of local officials could carry with it a

potential for discrimination against those who represent racial minorities at the

local level," 502 U.S. at 505-06, and cautioned that "[n]othing we say implies that

the conduct at issue in these cases is not actionable under a different remedial

scheme." *Id.* at 509.

This Court has previously held that the allocation of power among elected

officials can give rise to a violation of Section 2.  In *Dillard v. Crenshaw County*,

831 F.2d 246 (11th Cir. 1987), this Court considered a remedy proposed by the

defendant county after its at-large system of electing county commissioners was

found to violate Section 2.  The district court rejected the county's proposal to have

five members elected from districts and a chairperson elected at-large, finding that

it too would violate Section 2.  *Id.* at 247-48.  On appeal, this Court remanded,

holding that the chairperson's powers were not sufficiently defined in the county's

proposal to determine if the proposal violated Section 2.  *Id.* at 250-51.  In other

words, this Court held that a particular method of election may, or may not, violate

Section 2 depending on what powers are assigned to certain elected officials.  *Id.*

---

[18] In *Reno*, the Supreme Court held that "a violation of §2 is not grounds in and of itself for denying preclearance under §5," 520 U.S. at 48, meaning that Section 2 is in some respects broader than Section 5.  Accordingly, the district court's reliance on language in prior Supreme Court decisions suggesting that the two sections are coextensive is misplaced.  *See* ER0151-52.

38

In particular, this Court explained that were too much power to be assigned to the chairperson, the other commissioners "would have their voting strength and influence diluted" in violation of Section 2.  *Id.* at 253.

Plaintiffs' claim that Act 2016-18 is a practice that denies the majority-black citizens of Birmingham equal access to the political process, and "minimize[s] ... the voting strength and political effectiveness" of African-Americans in Birmingham, falls within the scope of Section 2.  *See* S. Rep. No. 97-417 at 28 (1982).

### B.    Plaintiffs Have Pled Facts Sufficient to Support a Claim Under Section 2 of the Voting Rights Act.

Because the district court improperly construed the scope of Section 2 of the VRA, it never considered the sufficiency of Plaintiffs' allegations in support of that claim.  As detailed below, Plaintiffs' complaint alleges that removal of the power to regulate the minimum wage from Birmingham officials, and vesting that power with the State Legislature, denies the majority-black citizens of Birmingham equal access to the political process by which an issue of especial importance to them (because of high poverty rates and racial disparities in income) is determined. These allegations satisfy the "plausibility" standard.  *See Iqbal*, 556 U.S. at 678.

The Voting Rights Act was enacted in recognition of the fact that, notwithstanding the anti-discrimination protections of the Fourteenth and Fifteenth Amendments, "state legislatures have too often found facially race-neutral ways to

39

deny African Americans access to the franchise." *McCrory*, 831 F.3d at 215.  In order to prove a violation of Section 2, Plaintiffs must show that the challenged action has discriminatory results.  *Johnson v. DeSoto*, 72 F.3d 1556, 1561-64 (11th Cir. 1996).  "Recognizing the subtle ways that states often denied racial minorities the right to vote, in 1982, Congress amended Section 2 of the Voting Rights Act so that a plaintiff could establish a violation without proving discriminatory intent." *Johnson v. Governor of the State of Fla.*, 405 F.3d 1214, 1227 (11th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1015 (2005).

The inquiry into whether Act 2016-18 "results in a denial or abridgement" of black Birmingham citizens' voting rights under Section 2 should follow the two-part framework derived from the Supreme Court's decision in *Gingles*, and adopted by the Fourth, Fifth, and Sixth Circuits for such cases.  Under this test:

> [1] [T]he challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, [and]

> [2] [T]hat burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*Veasey*, 830 F.3d at 244 (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), cert. denied, 135 S.Ct. 1735 (2015);

40

*Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014), *vacated on other grounds by* 2014 WL 10384647 (6th Cir. 2014)).

With respect to the first prong, as explained above, the amended complaint includes numerous allegations that "plausibly" support Plaintiffs' assertion that Act 2016-18 discriminatorily burdens black citizens of Birmingham by stripping cities of their longstanding power to regulate wages and other aspects of the employment relationship within their borders. *See supra* at 4-9, 21. In response to Birmingham's decision to raise the minimum wage, the Act removes the power to regulate that issue and vests it exclusively at the level of state government, where black voters have significantly less opportunity to participate in the political process. The barriers to effective participation are a function both of the relative proportion of black voters in the two jurisdictions, *see* ER048, and of Alabama's long history of "[the] suppression of local black majorities through imposition of white control by state government." ER049; *see also* ER049-65 (recounting history).

This burden is of especial significance in the context of regulation of wages and working conditions because, as the complaint alleges, "[t]he legislature's pre-emption of the Birmingham wage law adversely impacted black workers." ER047; *see also* ER047-48 (racial wage gap); ER073 ("vast majority of workers denied benefit of Birmingham law are African-American"); ER081 (approximately one-

41

third of Birmingham's African-American residents earn less than they would under the ordinance).

To assess the second prong, the "link between the disparate burden imposed and social and historical conditions produced by discrimination," courts look to the factors articulated in the Senate Report accompanying the 1982 amendments to the VRA and adopted by the Supreme Court in *Gingles*. *Veasey*, 830 F.3d at 245-46 (listing nine factors) (citing *Gingles*, 478 U.S. at 36-37). Although each of the Senate Report factors is potentially relevant, "plaintiffs are not required to prove any particular number of the listed factors, and ... other factors not listed might be probative in some cases, because the results test examines the totality of the circumstances." *Solomon v. Liberty County*, 899 F.2d 1012, 1016 (11th Cir. 1990) (en banc). Here, Plaintiffs' allegations go directly to each of the relevant Senate Report factors.[19]

1. *Any history of official discrimination that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.* The complaint thoroughly describes the historical practice of "suppression of local black majorities through imposition of white control by state government," ER049, and gives numerous examples, including several from

_____

[19] Because this case does not concern at-large or district election methods or candidate slating processes, Senate Report factors 3 and 4 are not relevant here. *See* 478 U.S. at 37.

42

the past five years, *see, e.g.*, ER062-63 (2012 redistricting plan), ER064-65 (Birmingham water board takeover), ER065-66 (statements by legislators). This factor should not be in question, given that this Court has recognized "Alabama's deep and troubled history of racial discrimination." *I.L.*, 739 F.3d at 1288; *accord Veasey*, 830 F.3d at 257 ("[E]ven long-ago acts of official discrimination give context to the analysis.").

2. *Voting in elections of the state or political subdivision is racially polarized.* The complaint alleges not just that voting is racially polarized in Alabama, ER048, but specific facts demonstrating the degree of polarization, ER048 (only two African-Americans elected to statewide office since Reconstruction), ER049 ("Today, black political power still has its greatest influence at the local levels of government."). *See also Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1298-99 (11th Cir. 1995) (Hatchett, J., dissenting) ("[W]hen considering vote dilution claims in Alabama, federal courts have *always* found racially polarized voting."). Moreover, the near-categorical racial polarization in the Alabama Legislature's votes on Act 2016-18 is significant evidence of the Act's link to historical discrimination. *See supra* at 26.

5. *Members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health,*

43

*which hinder their ability to participate effectively in the political process.* The complaint alleges specific facts demonstrating the effects of discrimination in employment and, in particular, the existence of a significant racial wage gap. ER047.

6. *Political campaigns have been characterized by overt or subtle racial appeals.* From the opening statement of the 1901 Alabama Constitutional Convention, which explained that delegates' purpose was "to establish white supremacy" in the state, ER055, to redistricting in 2010 and 2012 that sought to dilute the power of black voters, ER062-63, the complaint contains numerous examples of explicit racial appeals in Alabama politics. *See also United States v. McGregor*, 824 F.Supp.2d 1339, 1345-47 (M.D. Ala. 2011) (describing white legislators' overt and subtle attempts to depress black voter turnout).

7. *The extent to which members of the minority group have been elected to public office in the jurisdiction.* The complaint alleges that only two African-Americans have been elected to statewide office in Alabama since Reconstruction. ER048.

8. *A significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.* The complaint alleges that the Birmingham ordinance was introduced and adopted only after "the Birmingham City Council unanimously passed a resolution asking the state

44

Legislature to raise the minimum wage to $10 per hour across the state." ER066. The complaint further alleges that "[p]rior to this resolution, the State legislature had failed to take any action to establish a statewide minimum wage law and had, in fact, been indifferent to efforts to establish such a law." ER067; *see also* ER047, ER073, ER081 (minimum wage issue is of especial importance to the African-American community).

9. *Policy underlying the state's use of the challenged standard, practice or procedure is tenuous.* The stated purpose of Act 2016-18 is to achieve statewide uniformity in the minimum wage and labor/employment regulation. ER082. But this purpose is belied by the State Legislature's prior indifference to the minimum wage issue, ER067, as well as its willingness to grant economic development authority to local jurisdictions, ER082-83, and to accept deviation in local sales taxes, *id.* The haste with which Act 2016-18 was adopted and the Legislature's failure to follow procedural requirements, *see supra* at 24-25, also suggest that the stated policy behind the Act is pretext. *See McCrory*, 831 F.3d at 228; *Mhany Mgmt.*, 819 F.3d at 607-08.

With these extensive, detailed allegations – none of which the district court addressed in its decision – Plaintiffs have plausibly alleged that removal of Birmingham officials' power to regulate the minimum wage denies the majority-

45

black citizens of Birmingham equal access to the political process concerning this important issue.  *See Iqbal*, 556 U.S. at 678.

**III.  The District Court Erred in Holding There Are Jurisdictional Impediments to Plaintiffs' Claims.**

**A.  Plaintiffs Have Standing to Assert Their Claims.**

The district court held that all three elements of the standing analysis – injury-in-fact, traceability/causation, and redressability – are absent with respect to Defendants Mayor Bell, the City of Birmingham, and the State Attorney General, and that Plaintiffs thus lack standing to pursue their claims against those Defendants.  ER0144-51.[20]  The district court failed properly to apply basic legal principles when it concluded that Plaintiffs lack standing.

**1.  Plaintiffs Have Suffered an Injury-in-Fact.**

The district court's injury-in-fact analysis conflates that element with the traceability/causation element of the standing analysis.  *See* ER0147.  A plaintiff has suffered an injury-in-fact if the asserted injury is "(a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  Here, the individual Plaintiffs have alleged that they are employed in Birmingham at wages that are less than what they would be making

---

[20] Plaintiffs' standing to assert claims against the State of Alabama is not at issue.

had Act 2016-18 not been adopted.  ER040.  "Economic harm ... [is a] well-established injur[y]-in-fact under federal standing jurisprudence."  *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014).  The individual plaintiffs also assert they have suffered a "denial[] of equal treatment" under the law, in particular with respect to their voting rights and participation in the political process, which is also sufficient to confer standing.  *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007).[21]

### 2.    Plaintiffs' Injury is Traceable to Defendants' Conduct

The district court also wrongly held that Plaintiffs had not demonstrated that their injury is "fairly traceable" to Defendants' conduct.  ER147-48.  The district court reasoned that Act 2016-18 and Defendants' actions have no effect on the wages payable to employees in Birmingham, ER146-48, but that is illogical and contrary to allegations of the complaint.  *See Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice … [to establish standing].").

---

[21] Although only one plaintiff need demonstrate standing, *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 n.10 (11th Cir. 2004), Plaintiffs Alabama NAACP, Greater Birmingham Ministries, and Alabama Legislative Black Caucus have also suffered cognizable injuries-in-fact.  Each alleges that it has members or represents constituents harmed by Act 2016-18, and each alleges that its mission also confers standing to pursue the amended complaint's claims.  ER040- ER043; *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) (organization may have standing based on injury to itself or its members).

47

Plaintiffs' injuries are a result of the Attorney General's conduct.  Even apart from his general responsibilities as Alabama's chief law enforcement officer, the Attorney General issued press releases indicating to Birmingham employers that they would not have to comply with the city's minimum wage law, ER044, and declined to exercise his statutory authority to inform the Legislature that Act 2016-18 is unlawful.  *See Focus on the Family v. Pinellas Suncoast Trans. Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be fairly traceable to that action for standing purposes."); *Loggerhead Turtle v. County Council*, 148 F.3d 1231, 1251 n.23 (11th Cir. 1998) ("[N]o authority even remotely suggests that proximate cause applies to the doctrine of standing.").

As Plaintiffs alleged, the Attorney General "has broad common law and statutory powers to direct and oversee all litigation, civil or criminal, which concerns the interest of the state of Alabama."  ER043; *see also* ER044.  In particular, he is charged with "giv[ing] his ... opinion ... on any question of law connected with the interests of the state," Ala. Code §36-15-1(1)(a), and "as to any question of law connected with the duties of [certain] county or city officers," *id.* §36-15-1(1)(b); *see also* Ala. Const. §137 ("The attorney-general ... shall perform such duties as may be prescribed by law.").  Further, the Attorney General "may carefully examine all of the general statutes now in force ... as to their clarity and

48

constitutional validity," Ala. Code §36-15-1(7), and may report to the Governor and State Legislature "pointing out the laws or parts of laws of Alabama which have been held invalid by courts of last resort." *Id.* §36-15-1(8). The Attorney General's actions, including his failure to act, with respect to Act 2016-18 are sufficient for standing purposes.

This case is remarkably similar to *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 135 S.Ct. 2584 (2015). In that case, plaintiffs challenged a Nebraska constitutional amendment rendering same-sex marriages and civil unions invalid in the state. There, as here, the law "[did] not require affirmative enforcement by any state official; it function[ed] as a barrier to the government action that [plaintiffs] desire[d]." *Id.* at 864. But, as is also the case here, the Nebraska law gave the Governor and Attorney General "broad powers to enforce the State's constitution and statutes." *Id.* In particular, the Eighth Circuit pointed to the Attorney General's power to issue opinions on the legality of state laws potentially in conflict with the challenged constitutional amendment as evidence of his "power[] . . . [to] polic[e] compliance." *Id.* The court concluded that this was sufficient to

49

establish "some connection" with the challenged law for purposes of Article III standing. *Id.* (citing *Ex Parte Young*, 209 U.S. 123, 157 (1908)).[22]

Plaintiffs' injury is also a direct result of Birmingham's compliance with Act 2016-18. But for Act 2016-18, Birmingham would be enforcing its minimum wage ordinance, ER045, which the Ordinance assigns city officials power to do, ER124, and Plaintiffs would be receiving higher wages. ER045, 073. Because Act 2016-18 directs Birmingham, and other political subdivisions, "not [to] enact or administer any ordinance ... requiring an employer to provide any employee ... any employment benefit, including ... wage[s] ... that is not required by state or federal law," ER113, cities such as Birmingham have primary responsibility for implementing Act 2016-18, and, under state law, have no choice but to do so. For purposes of causation, this is sufficient. *See generally Bennett v. Spear*, 520 U.S. 154, 171 (1997) (burden of alleging injury is "fairly traceable" to defendant and redressable is "relatively modest at [pleading] stage"). In every case in which a

---

[22] "[C]ourts recognize the significant overlap between Article III jurisdiction, *Ex Parte Young*, and equitable relief." *Air Evac EMS, Inc. v. Texas, Dept. of Ins.*, 851 F.3d 507, 520 (5th Cir. 2017). For example, in *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011), this Court held that the Georgia Secretary of State was a proper defendant for a lawsuit challenging a state statute disqualifying individuals related to local school administrators from serving on school boards. This was so by virtue of the Secretary's general authority to enforce election laws, even though, under Georgia law, the Secretary lacked the power to "qualify or challenge candidates for local boards of education or certify the results of those elections." *Id.* at 1319.

government official is sued for implementing an unlawful state law, the defendant official did not promulgate the challenged law, and may or may not agree with it as a matter of policy, but is nonetheless a proper defendant by virtue of their role in causing the harm. *See Ex Parte Young*, 209 U.S. 123 (1908).

Here, the district court's remarkable insistence that Act 2016-18 has no connection to Plaintiffs' injury is based on the mischaracterization of this case as involving an injury "depend[ent] on the unfettered choices made by independent actors not before the courts." ER148. The district court relied on *Frank Krasner Enterprises, Ltd. v. Montgomery County, MD*, 401 F.3d 230 (4th Cir. 2005), but that case is inapposite. There, a plaintiff gun show promoter and exhibitor lacked standing to challenge a county law denying public funding to gun show venues, in part because the withholding of funding from the non-party venue has only a potential, indirect effect on the prices plaintiffs would be charged. *Id.* at 236.[23] By contrast, Act 2016-18 did not merely realign incentives such that injury to

---

[23] The same is true of *Allen v. Wright*, 468 U.S. 737 (1984), and *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), cited by the district court. ER147-48. In *Allen*, the Court held that plaintiffs claiming injuries arising from segregated schools were unable to show that, absent tax-exempt status for private schools, white students would have attended public schools. 468 U.S. at 758. In *Gun Rights Committee*, the court found, on the facts of that case, that it was "sheer speculation" that the challenged statute had a significant impact on weapons prices. 98 F.3d at 1130. Here, no such speculation is required for there is no question that Plaintiffs would be entitled to higher wages but for Act 2016-18.

Plaintiffs became more likely.  Rather, Act 2016-18 *extinguished an existing legal obligation* to pay Plaintiffs higher wages.  To be sure, Birmingham employers currently have the choice to pay Plaintiffs any amount above the federal minimum wage, and if they choose to pay Plaintiffs what Plaintiffs would have been entitled to under the Birmingham Ordinance then Plaintiffs would suffer no economic harm.[24]  But the path those employers have chosen – to pay less than that amount, ER040 – is available to them *only because Act 2016-18 makes it legally possible*. *See Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 442 (D.C. Cir. 1998) (en banc) ("[T]he Supreme Court ... ha[s] repeatedly found causation where a challenged government action *permitted* the third party conduct that allegedly caused a plaintiff injury, when that conduct would have otherwise been illegal.").

### 3.    Plaintiffs' Injuries are Redressable

Plaintiffs seek, *inter alia*, declaratory relief confirming the unlawfulness of Act 2016-18, as well as injunctive relief directing the Attorney General to give notice to Alabama legislators and the public of the same, and directing the City of Birmingham to enforce the city's minimum wage Ordinance.  ER085-86.  The district court was simply incorrect when it held that "nothing this court could order [the] Attorney General or the City Defendants to do will affect Plaintiffs' wages."

---

[24] Standing based on economic harm cannot be defeated by the speculative possibility that some third-party may voluntarily choose to make plaintiffs whole, otherwise, such standing would never exist.

ER149. In fact, the district court is empowered to grant each element of relief requested and together they make it "likely" that Plaintiffs' injuries – the economic harm of lower wages and the inherent harm in unequal treatment – will be redressed.[25] *See Lujan*, 504 U.S. at 560; *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) ("Redressability is established ... when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." (internal quotation marks omitted)). Indeed, declaratory relief is available because Act 2016-18's constitutionality is "fit ... for judicial decision" and Plaintiffs will suffer the "hardship" of lower wages if consideration is withheld. *Browning-Ferris Indus. of Ala. v. Ala. Dept. of Environ. Mgmt.*, 799 F.2d 1473, 1475-76 (11th Cir. 1986).

*Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003), cited by the district court, ER0148-49, does not require a different result. In that case, the Alabama Attorney General had already conceded that the challenged statute was unconstitutional under Supreme Court precedent. 344 F.3d at 1285. It was only on the basis of this concession that this Court concluded: "An injunction preventing the Attorney General from enforcing a statute that he concedes cannot be enforced would do

---

[25] A declaration that Act 2016-18 is unlawful and unenforceable will also redress the harm of unequal treatment.

53

nothing to change the result ...." *Id.* Here, by contrast, a declaratory judgment from a federal court, coupled with an authoritative opinion from the Alabama Attorney General and renewed enforcement efforts by the City of Birmingham, would "significant[ly] increase the likelihood" that Birmingham employers would comply with their legal obligations under the city's minimum wage Ordinance and that Plaintiffs' injuries would thereby be redressed. *Mulhall*, 618 F.3d at 1290.[26]

**B.    Alabama Is Not Entitled to Eleventh Amendment Immunity on Plaintiffs' Voting Rights Act Claim.**

The district court broke new ground in holding that states may not be sued under Section 2 of the Voting Rights Act of 1965 because the statute does not abrogate state sovereign immunity. ER0155-58. For more than 50 years, plaintiffs have sued the states for violations of the VRA and nothing about the district court's analysis reveals anything that prior state defendants or courts have overlooked.

---

[26] Similarly, unlike cases cited by the district court where redress depended on the unpredictable actions of a third-party, *see* ER149, Birmingham's Ordinance, which, if not voided by Act 2016-18, would give individual workers the right to enforce it through a civil action, has already been enacted. ER123. If employers do not comply with their legal obligations under the Ordinance following a declaration that Act 2016-18 is unlawful and action by the Attorney General, this requested relief would "significant[ly] increase the likelihood" that Plaintiffs will be able successfully to enforce their right to a higher wage. *Mulhall*, 618 F.3d at 1290.

54

In the VRA, Congress made its intent to abrogate state sovereign immunity "unmistakably clear in the language of the statute." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56 (1996). By its terms, Section 2 prohibits denial or abridgement of the right to vote "by any State or political subdivision." 52 U.S.C. §10301(a). Further, "'the existence of the private right of action under Section 2 ... has been clearly intended by Congress since 1965.'" *Morse*, 517 U.S. at 232 (quoting S. Rep. 97-417 at 30). Lest there be any doubt, the 1975 amendments to the VRA incorporated language referring to "aggrieved persons," indicating that the remedies available to private litigants under the VRA are coextensive with those of the Attorney General (against whom the states may assert no Eleventh Amendment immunity). *Id.* at 233 (citing S. Rep. No. 94-295 at 39-40 (1975)).

Numerous courts have held that Section 2 abrogates state sovereign immunity. *See, e.g.*, *Mixon v. State of Ohio*, 193 F.3d 389, 398 (6th Cir. 1999) ("With respect to whether Congress intended to abrogate the States' sovereign immunity under the Voting Rights Act, we believe the language and purpose of the statute indicate an affirmative response."); *Verity v. Scott*, 2014 WL 3053171, at *6 (M.D. Fla. July 7, 2014); *Hall v. Louisiana*, 983 F.Supp.2d 820, 829-30 (M.D. La. 2013); *Dekom v. New York*, No. 12-cv-1318, 2013 WL 3095010, at *10 (E.D.N.Y. Jun. 18, 2013); *Reaves v. U.S. Dept. of Justice*, 355 F.Supp.2d 510, 515-16 (D.D.C. 2005); *White v. State of Alabama*, 867 F.Supp. 1519, 1540 (M.D. Ala. 1994),

55

*vacated on other grounds by* 74 F.3d 1058 (11th Cir. 1996).[27]  By contrast, the district court did not cite any case in which a court held that the VRA does not abrogate states' Eleventh Amendment immunity.  ER0155-58.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.

Respectfully submitted,

Dated:  June 5, 2017

_____
Barbara J. Chisholm

Barbara J. Chisholm, Esq.
Eric P. Brown, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
bchisholm@altber.com
ebrown@altber.com

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201
Telephone: (205) 591-7238
jblacksher@ns.sympatico.ca

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham, AL 35209
Telephone: (205) 320-2882
still@votelaw.com

U. W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, AL 35222
Telephone: (205) 837-2898
clemonu@bellsouth.net

---

[27] In *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Supreme Court unfavorably compared the Americans with Disabilities Act, which it held *not* to abrogate state sovereign immunity, with the VRA, which it noted "was a valid exercise of Congress' enforcement power under §5 of the Fifteenth Amendment." *Id.* at 373-74.

56

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Direct: (205) 488-1226
jwhatley@whatleykallas.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Telephone: (212) 627-8100
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
Telephone: (202) 230-4096
carlsonmjj@yahoo.com

*Attorneys Carlson, Stroup, Whatley, Still, and the firms of Quinn, Connor, Weaver, Davies, & Rouco, and Altshuler Berzon LLP are Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries.*

*Attorneys Blacksher, Clemon, Still, and the firm of Quinn, Connor, Weaver, Davies, & Rouco are counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Rep. Louise Alexander, Rep. Marika Coleman, Sen. Priscilla Dunn, Rep. Juandalynn Givan, Rep. Mary Moore, Oliver Robinson, Rep. John Rogers, Sen. Rodger Smitherman, and William Muhammad.*

57

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B)(i), because this brief contains 12,899 words, excluding

the parts of the brief exempted by 11th Cir. R. 32-4.

Dated:  June 5, 2017                          /s/ Barbara J. Chisholm
                                              BARBARA J. CHISHOLM
                                              ALTSHULER BERZON LLP
                                              177 Post Street, Suite 300
                                              San Francisco, CA  94108
                                              Tel:   (415) 421-7151
                                              Fax:   (415) 362-8064
                                              cpitts@altber.com

58

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter.  On that same date, I caused physical copies of the foregoing BRIEF OF PLAINTIFFS-APELLANTS to be filed with the Clerk of Court and served upon the following counsel by U.S. First Class Mail:

Andrew Brasher
James W. Davis
William Glenn Parker, Jr.
State of Alabama Attorney General's Office
501 Washington Ave
PO BOX 300152
Montgomery, AL 36130-0152
*Counsel for Defendants-Appellees State of Alabama and Alabama Attorney General Steve Marshall*

Fredric L. Fullerton, II
Kayla S. Lawrence
City of Birmingham Law Department
710 N 20th Street, Fl. 6
Birmingham, AL 35203
*Counsel for Defendants-Appellees City of Birmingham and Mayor Bell*

Dated:  June 5, 2017

　　　/s/ Sally Mendez　　　　
　　　　Sally Mendez

59