No. 17-11009

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

_____

MARNIKA LEWIS, et al.,

*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, et al.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

_____

### PLAINTIFFS-APELLANTS' APPENDIX

_____

Barbara J. Chisholm, Esq.
Eric P. Brown, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
bchisholm@altber.com
ebrown@altber.com

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201
Telephone: (205) 591-7238
jblacksher@ns.sympatico.ca

*[Additional Counsel on Inside Cover]*

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham, AL 35209
Telephone: (205) 320-2882
still@votelaw.com

U. W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, AL 35222
Telephone: (205) 837-2898
clemonu@bellsouth.net

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Telephone: (205) 488-1226
jwhatley@whatleykallas.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Telephone: (212) 627-8100
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
Telephone: (202) 230-4096
carlsonmjj@yahoo.com

*Attorneys Carlson, Stroup, Whatley, and the firms of Quinn, Connor, Weaver, Davies, & Rouco, and Altshuler Berzon LLP are Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries.*

*Attorneys Blacksher, Clemon, Still, and the firm of Quinn, Connor, Weaver, Davies, & Rouco are counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Rep. Louise Alexander, Rep. Marika Coleman, Sen. Priscilla Dunn, Rep. Juandalynn Givan, Rep. Mary Moore, Oliver Robinson, Rep. John Rogers, Sen. Rodger Smitherman, and William Muhammad.*

**TABLE OF CONTENTS**

| DESCRIPTION | DIST. CT. DKT. | PAGE NUMBER |
|---|---|---|
| District Court Docket | N/A | ER001 |
| Complaint for Declaratory and Injunctive Relief | 1 | ER016 |
| Amended Complaint | 18 | ER038 |
| Answer of Defendant City of Birmingham | 27 | ER090 |
| Exhibit A to Defendants' Motion to Dismiss (News Articles Concerning Minimum Wage Ordinance) | 30-1 | ER104 |
| Exhibit B to Defendants' Motion to Dismiss (Alabama Uniform Minimum Wage & Right-to-Work Act) (Act 2016-18) | 30-2 | ER110 |
| Exhibit C to Defendants' Motion to Dismiss (City of Birmingham Minimum Wage Ordinance No. 16-28) | 30-3 | ER121 |
| Declaration of Lisa R. Hadley in Support of Opposition to Motion to Dismiss | 40-1 | ER125 |
| Memorandum Opinion | 52 | ER139 |
| Order of Dismissal | 53 | ER165 |
| Notice of Appeal | 54 | ER166 |

i

Dkt.

# U.S. District Court
## Northern District of Alabama (Southern)
## CIVIL DOCKET FOR CASE #: 2:16-cv-00690-RDP

Lewis et al v. Bentley et al
Assigned to: Judge R David Proctor
Case in other court: Eleventh Circuit, 17-11009-B
Cause: 42:1983 Civil Rights Act

Date Filed: 04/28/2016
Date Terminated: 02/01/2017
Jury Demand: None
Nature of Suit: 950 Constitutional - State
Statute
Jurisdiction: Federal Question

**Plaintiff**

**Marnika Lewis**                           represented by **George N Davies**
QUINN CONNOR WEAVER DAVIES &
ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: gdavies@qcwdr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glen M Connor**
QUINN CONNOR WEAVER DAVIES &
ROUCO
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: gconnor@qcwdr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Joyce Carlson**
1100 New York Avenue NW Suite 500 West
Washington, DC 20005
(202) 230-4096
Email: carlsonmjj@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
QUINN CONNOR WEAVER DAVIES &
ROUCO LLP
Two North Twentieth Street

ER0001

2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: rrouco@qcwdr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert H Stroup**
LEVY RATNER PC
80 Eighth Ave., 8th Floor
New York, NY 10011
212-627-8100
Fax: 212-627-8182
Email: rstroup@levyratner.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe R Whatley , Jr**
WHATLEY KALLAS LLP
2001 Park Place North Suite 1000
Birmingham, AL 35203
205-488-1200
Fax: 800-922-4851
Email: jwhatley@whatleykallas.com
*ATTORNEY TO BE NOTICED*

**W Edward Still**
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy STE 161-304
Birmingham, AL 35209
205-320-2882
Fax: 205-320-2882
Email: Still@votelaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Antoin Adams**                                    represented by  **George N Davies**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glen M Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Joyce Carlson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert H Stroup**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe R Whatley , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **National Association for the Advancement of Colored People** | represented by | **George N Davies** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Glen M Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Joyce Carlson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert H Stroup**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe R Whatley , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Greater Birmingham Ministries** | represented by | **George N Davies** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glen M Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mary Joyce Carlson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert H Stroup**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe R Whatley , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marika Coleman**                    represented by **James Uriah Blacksher**
JAMES U. BLACKSHER, ATTORNEY
P O Box 636
Birmingham, AL 35201
205-591-7238
Fax: 866-845-4395
Email: jblacksher@ns.sympatico.ca
*ATTORNEY TO BE NOTICED*

**U W Clemon**
U.W. Clemon, LLC
5202 Mountain Ridge Pkwy
Birmingham, AL 35222
205-837-2898
Email: Clemonu@bellsouth.net
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER0004

Richard P Rouco
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Rogers**                                    represented by    **James Uriah Blacksher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**U W Clemon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Priscilla Dunn**                                  represented by    **James Uriah Blacksher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**U W Clemon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Juandalynn Givan**                               represented by    **James Uriah Blacksher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**U W Clemon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Louise Alexander**                     represented by   **James Uriah Blacksher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**U W Clemon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**William Muhammad**                     represented by   **James Uriah Blacksher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**U W Clemon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rodger Smitherman**                     represented by   **James Uriah Blacksher**
(See above for address)
*ATTORNEY TO BE NOTICED*

**U W Clemon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**W Edward Still**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard P Rouco**
(See above for address)
*ATTORNEY TO BE NOTICED*

ER0006

**Plaintiff**

**Oliver Robinson**                        represented by   **James Uriah Blacksher**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **U W Clemon**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **W Edward Still**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Richard P Rouco**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alabama Legislative Black Caucus**       represented by   **James Uriah Blacksher**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **U W Clemon**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **W Edward Still**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Richard P Rouco**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Moore**                             represented by   **James Uriah Blacksher**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **U W Clemon**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **W Edward Still**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Richard P Rouco**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

ER0007

**Defendant**

**Robert J. Bentley**
*in his Official Capacity as Governor of the*
*State of Alabama*

represented by **David B Byrne , Jr**
STATE OF ALABAMA OFFICE OF THE
GOVERNOR
Chief Legal Advisor
600 Dexter Avenue Ste NB-05
Montgomery, AL 36130
334-242-7120
Email: david.byrne@governor.alabama.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James W Davis**
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8440
Email: jimdavis@ago.state.al.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luther J Strange , III**
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
PO Box 300152
Montgomery, AL 36130-0152
334-242-7401
Fax: 334-242-4891
Email: lstrange@ago.state.al.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William G Parker , Jr**
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
PO Box 300152
Montgomery, AL 36130-0152
334-242-7997
Fax: 334-353-8440
Email: wparker@ago.state.al.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Luther J Strange, III**
*in his Official Capacity as Attorney General*
*of the State of Alabama*

represented by **George N Davies**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luther J Strange , III**
(See above for address)

ER0008

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William G Parker , Jr**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**State of Alabama, The**　　　　　　　represented by　**William G Parker , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Birmingham, City of, The**　　　　　represented by　**Frederic L Fullerton , II**
CITY OF BIRMINGHAM
Legal Department
710 North 20th Street
Room 600
Birmingham, AL 35203
205-254-2369
Fax: 205-254-2502
Email: flfulle@ci.birmingham.al.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kayla Shardae Lawrence**
CITY OF BIRMINGHAM LAW
DEPARTMENT
710 North 20th Street, Ste. 600
Birmingham, AL 35203
205-254-2369
Email: kayla.lawrence@birminghamal.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**William A. Bell, Sr.**　　　　　　　represented by　**Frederic L Fullerton , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kayla Shardae Lawrence**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/28/2016 | 1 | COMPLAINT against Robert J. Bentley, Luther J Strange, III, filed by Marnika Lewis, National Association for the Advancement of Colored People, Greater Birmingham Ministries, Antoin Adams.(MRR, ) (Entered: 04/28/2016) |
| 04/28/2016 | 2 | Request for service by certified mail filed by Antoin Adams, Greater Birmingham Ministries, Marnika Lewis, National Association for the Advancement of Colored People. |

ER0009

| | | |
|---|---|---|
| | | (MRR, ) (Entered: 04/28/2016) |
| 04/28/2016 | 3 | NOTICE REGARDING CONSENT (MRR, ) (Entered: 04/28/2016) |
| 04/28/2016 | | Filing Fee: Filing fee $ 400, receipt_number 1126-2612782 (B4601070790). (Rouco, Richard) (Entered: 04/28/2016) |
| 05/02/2016 | 4 | Summons Issued as to Robert J. Bentley, Luther J Strange, III, sent via certified mail (MRR, ) (Entered: 05/02/2016) |
| 05/05/2016 | 5 | MOTION for Admission Pro Hac Vice by Antoin Adams, Greater Birmingham Ministries, Marnika Lewis, National Association for the Advancement of Colored People. (Attachments: # 1 Exhibit 1 Statement, # 2 Exhibit 2 Certificate of Good Standing)(Rouco, Richard) (Entered: 05/05/2016) |
| 05/05/2016 | 6 | MOTION for Admission Pro Hac Vice by Antoin Adams, Greater Birmingham Ministries, Marnika Lewis, National Association for the Advancement of Colored People. (Attachments: # 1 Exhibit 1 Statement, # 2 Exhibit 2 Certificate of Good Standing)(Rouco, Richard) (Entered: 05/05/2016) |
| 05/05/2016 | | PHV Fee paid: $ 50, receipt number 1126-2617246 (B4601071083). (Rouco, Richard) Modified on 6/3/2016 (MRR, ). (Entered: 05/05/2016) |
| 05/05/2016 | | PHV Fee paid: $ 50, receipt number 1126-2617249 (B4601071084). (Rouco, Richard) Modified on 6/3/2016 (MRR, ). (Entered: 05/05/2016) |
| 05/05/2016 | 7 | SUMMONS Returned Executed Robert J. Bentley served on 5/5/2016 (no date entered on green card, court's file stamp date used), answer due 5/26/2016. (MRR, ) (Entered: 05/05/2016) |
| 05/09/2016 | 8 | SUMMONS Returned Executed Luther J Strange, III served on 5/5/2016, answer due 5/26/2016. (MRR, ) (Entered: 05/09/2016) |
| 05/11/2016 | 9 | ORDER- The motions for Mary Joyce Carlson and Robert H. Stroup to appear pro hace vice for the pltfs (Docs 5 , 6 ) are GRANTED. Signed by Magistrate Judge Staci G Cornelius on 5/11/16. (MRR, ) (Entered: 05/11/2016) |
| 05/26/2016 | 10 | MOTION to Dismiss & Supporting Brief by Robert J. Bentley, Luther J Strange, III. (Attachments: # 1 Exhibit A - Ala. Act No. 2016-18)(Parker, William) (Entered: 05/26/2016) |
| 05/27/2016 | 11 | TEXT ORDER: The defendants have filed a motion to dismiss. (Doc. 10 ). The plaintiffs are ORDERED to respond within fourteen (14) days of the entry of this order. The response SHALL be limited to thirty (30) pages. The defendants' reply, if any, SHALL be filed within seven days of the plaintiffs' response and SHALL be limited to ten (10) pages. Signed by Magistrate Judge Staci G Cornelius on 5/27/16. (MRR, ) (Entered: 05/27/2016) |
| 05/27/2016 | 12 | **ORDER** - Pursuant to the General Order For Referral of Civil Matters to the United States Magistrate Judges of the Northern District of Alabama, dated January 2, 2015, the parties are **REQUIRED** to enter an election regarding the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) no later than **July 12, 2016**. In the absence of consent by all parties, the Clerk is hereby **DIRECTED** to reassign the case to a district judge without further order after **July 12, 2016**. A telephone status conference is hereby **SET for 10:30 on June 27, 2016**. The parties are **DIRECTED** to call **877-336-1831** to access the telephone conference. The access code is **2778178**. The telephone conference will be cancelled if all forms are submitted twenty-four hours in advance. Signed by Magistrate Judge Staci G Cornelius on 5/27/16. (MRR, ) Modified on 6/1/2016 (MRR, ). (Entered: 05/27/2016) |
| | | |
| | | |

| | | |
|---|---|---|
| 06/02/2016 | 13 | Notice of Reassignment- Because the parties have not unanimously consented to the dispositive jurisdiction by a Magistrate Judge, the above styled civil action has been randomly reassigned to the Honorable R. David Proctor. Please use case number **2:16-cv-690-RDP** on all subsequent pleadings. (MRR, ) (Entered: 06/02/2016) |
| 06/02/2016 | 14 | NOTICE- The status conference set for June 27, 2016 is CANCELLED. (MRR, ) (Entered: 06/02/2016) |
| 06/03/2016 | 15 | Unopposed MOTION for Enlargement of Time to Respond to 10 Motion to Dismiss and/or Amend Plaintiffs' Complaint by Marnika Lewis. (Rouco, Richard) (Entered: 06/03/2016) |
| 06/07/2016 | 16 | **TEXT ORDER** - This matter is before the court on Plaintiffs' Unopposed Motion for Enlargement of Time to Respond to Motion to Dismiss and/or Amend Plaintiffs' Complaint. 15 . The Motion 15 is **GRANTED**. Plaintiffs **SHALL** respond to Defendants' Motion to Dismiss or amend the Complaint **on or before July 1, 2016**. Defendants may reply and/or respond to an amended Complaint **on or before July 22, 2016**. Signed by Judge R David Proctor on 6/7/2016. (AVC) (Entered: 06/07/2016) |
| 06/23/2016 | 17 | INITIAL ORDER - with appendices attached. Signed by Judge R David Proctor on 6/23/2016. (AVC) (Entered: 06/23/2016) |
| 06/30/2016 | 18 | AMENDED COMPLAINT against Luther J Strange, III, The State of Alabama, The City of Birmingham, William A. Bell, Sr, filed by Marnika Lewis, Greater Birmingham Ministries, National Association for the Advancement of Colored People, Antoin Adams, Marika Coleman, John Rogers, Priscilla Dunn, Juandalynn Givan, Louise Alexander, William Muhammad, Rodger Smitherman, The State of Alabama, Oliver Robinson, Alabama Legislative Black Caucus, Mary Moore.(Rouco, Richard) (Entered: 06/30/2016) |
| 06/30/2016 | 19 | Summons Issued as to William A. Bell, Sr, The City of Birmingham, The State of Alabama; mailed certified mail. (AVC) (Entered: 06/30/2016) |
| 07/01/2016 | 20 | **TEXT ORDER** -This matter is before the court on Plaintiffs' Amended Complaint. 18 In light of the Amended Complaint, Defendant's Motion to Dismiss 10 is DENIED WITHOUT PREJUDICE because it is directed at what is no longer the operative Complaint. Defendants may renew any applicable arguments in response to the Amended Complaint. Signed by Judge R David Proctor on 7/1/2016. (AVC) (Entered: 07/01/2016) |
| 07/05/2016 | 21 | SUMMONS Returned Executed William A. Bell, Sr; Birmingham, City of, The served on 7/1/2016, answer due 7/22/2016. (AVC) (Entered: 07/05/2016) |
| 07/06/2016 | 22 | NOTICE of Appearance by W Edward Still on behalf of Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Mary Moore, William Muhammad, Oliver Robinson, John Rogers, Rodger Smitherman (Still, W) (Entered: 07/06/2016) |
| 07/07/2016 | 23 | SUMMONS Returned Executed State of Alabama, The served (green card not dated). (AVC) (Entered: 07/07/2016) |
| 07/14/2016 | 24 | Opposed MOTION to Stay or Extend Rule 26(f) Deadlines by State of Alabama, The, Luther J Strange, III. (Parker, William) (Entered: 07/14/2016) |
| 07/15/2016 | 25 | **TEXT ORDER** - This matter is before the court on Defendants' (Opposed) Motion to Stay and Extend Rule 26(f) Deadlines. 24 . Plaintiffs **SHALL** respond to the Motion **on or before July 22, 2016**; Defendants may reply **on or before July 27, 2016**. Signed by Judge R David Proctor on 7/15/2016. (AVC) (Entered: 07/15/2016) |
| 07/18/2016 | 26 | Partially Opposed MOTION for Modification of Scheduling Order (Doc# 25) by Antoin Adams, Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla |

ER0011

| | | |
|---|---|---|
| | | Dunn, Juandalynn Givan, Greater Birmingham Ministries, Marnika Lewis, Mary Moore, William Muhammad, National Association for the Advancement of Colored People, Oliver Robinson, John Rogers, Rodger Smitherman. (Still, W) (Entered: 07/18/2016) |
| 07/19/2016 | 27 | ANSWER to 18 Amended Complaint, by Birmingham, City of, The.(Fullerton, Frederic) (Entered: 07/19/2016) |
| 07/19/2016 | 28 | MOTION to Dismiss by William A. Bell, Sr. (Fullerton, Frederic) (Entered: 07/19/2016) |
| 07/19/2016 | 29 | **TEXT ORDER** - This matter is before the court on Plaintiffs' Partially Opposed Motion for Modification of Scheduling Order. 26 . The Motion 26 is **GRANTED IN PART**. Plaintiffs **SHALL** respond to the State Defendants' (Opposed) Motion to Stay and Extend Rule 26(f) Deadlines 24 **on or before July 29, 2016**; Defendants may reply **on or before August 3, 2016**. In relation to Mayor Bell's Motion to Dismiss 28 filed July 19, 2016, and the anticipated Motion(s) by the State Defendants, the parties are **DIRECTED** to confer and, to the extent that they desire a briefing schedule other than that set forth in Exhibit B, they should submit an agreed upon proposed briefing schedule on those motions. Signed by Judge R David Proctor on 7/19/2016. (AVC) (Entered: 07/19/2016) |
| 07/22/2016 | 30 | MOTION to Dismiss the Amended Complaint & Initial Submission in Response to Exhibit B of the Court's Order by State of Alabama, The, Luther J Strange, III. (Attachments: # 1 Exhibit A - News Articles2, # 2 Exhibit B - Ala Act 2016-18 - Alabama Uniform Minimum Wage & Right-to-Work Act, # 3 Exhibit C - City of Birmingham Minimum Wage Ordinance No. 16-28, # 4 Exhibit D - Ala. Democratic Conf. v. Strange) (Parker, William) (Entered: 07/22/2016) |
| 07/26/2016 | 31 | Joint MOTION to Modify Briefing Schedule by State of Alabama, The, Luther J Strange, III. (Parker, William) (Entered: 07/26/2016) |
| 07/27/2016 | 32 | **TEXT ORDER** - This matter is before the court on the parties' Joint Motion to Modify Briefing Schedule. 31 . The Motion 31 is **GRANTED**. With regard to the two Motions to Dismiss pending before the court, (1) Mayor Bells Motion to Dismiss 28 and (2) the State Defendants Motion to Dismiss 30 , **on or before Friday, August 19, 2016**, Plaintiffs **SHALL** respond to both motions. On or before Friday, September 2, 2016, Defendants may reply. Signed by Judge R David Proctor on 7/26/2016. (AVC) (Entered: 07/27/2016) |
| 07/29/2016 | 33 | RESPONSE in Opposition to 24 Motion to Stay or Extend Rule 26(f) Deadlines filed by Marnika Lewis. (Rouco, Richard) (Entered: 07/29/2016) |
| 08/02/2016 | 34 | REPLY Brief filed by Defendants State of Alabama, The, Luther J Strange, III re: 24 Opposed MOTION to Stay or Extend Rule 26(f) Deadlines filed by State of Alabama, The, Luther J Strange, III. (Davis, James) (Entered: 08/02/2016) |
| 08/08/2016 | 35 | REPORT of Rule 26(f) Planning Meeting. (Parker, William) (Entered: 08/08/2016) |
| 08/10/2016 | 36 | ORDER -The Opposed Motion to Stay and Extend Rule 26(f) Deadlines 24 is GRANTED. The parties' obligations under Rule 26(f) SHALL run from the date of a decision on Defendants' pending Motions to Dismiss. Signed by Judge R David Proctor on 8/9/2016. (AVC) (Entered: 08/10/2016) |
| 08/18/2016 | 37 | **TEXT ORDER** - This matter is before the court on an informal request for a modification of the parties' briefing schedule on the pending Motions to Dismiss. The request is **GRANTED**. On or before **August 24, 2016**, Plaintiffs **SHALL** respond to both motions. On or before **September 7, 2016**, Defendants may reply. Signed by Judge R David Proctor on 8/18/2016. (KAM, ) (Entered: 08/18/2016) |
| 08/23/2016 | 38 | **TEXT ORDER** -This matter is before the court on an informal request from Plaintiffs' counsel for an extension of the page limit on briefs in response to Defendants' Motions to |
| | | |

ER0012

| | | |
|---|---|---|
| | | Dismiss! The court understands that the request is unopposed. The request is GRANTED. By agreement of the parties, Plaintiffs' responsive brief may contain up to forty-five (45) pages. Signed by Judge R David Proctor on 8/23/2016.(AVC) (Entered: 08/23/2016) |
| 08/24/2016 | 39 | **TEXT ORDER**- This matter is before the court on an informal request from Plaintiffs' counsel for an extension of the page limit on briefs in response to Defendants' Motions to Dismiss. The court understands that the request is unopposed. The request is **GRANTED**. By agreement of the parties, Plaintiffs' responsive brief may contain up to forty-five (45) pages. Signed by Judge R David Proctor on 8/24/2016. (AVC) (Entered: 08/24/2016) |
| 08/24/2016 | 40 | Opposition 28 , 30 Motions to Dismiss the Amended Complaint filed by Antoin Adams, Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Greater Birmingham Ministries, Marnika Lewis, Mary Moore, William Muhammad, National Association for the Advancement of Colored People, Oliver Robinson, John Rogers, Rodger Smitherman. (Attachments: # 1 Exhibit A Declaration of Lisa R. Handley)(Rouco, Richard) (Entered: 08/24/2016) |
| 09/02/2016 | 41 | Unopposed Motion to Extend Filing Deadline and Page Limit by State of Alabama, The, Luther J Strange, III. (Parker, William) (Entered: 09/02/2016) |
| 09/02/2016 | 42 | **TEXT ORDER**-This matter is before the court on Defendants' Unopposed Motion to Extend Filing Deadline and Page Limit.. 41 The Motion 41 is **GRANTED**. Defendants' reply **SHALL** be filed on or before **September 21, 2016**, and may contain up to twenty (20) pages. Signed by Judge R David Proctor on 9/2/2016. (AVC) (Entered: 09/02/2016) |
| 09/21/2016 | 43 | REPLY Brief filed by State of Alabama, The, Luther J Strange, III. (Parker, William) (Entered: 09/21/2016) |
| 09/26/2016 | 44 | MOTION for Leave to Respond to Defendants' Citation of Intervening Case Law filed by Antoin Adams, Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Greater Birmingham Ministries, Marnika Lewis, Mary Moore, William Muhammad, National Association for the Advancement of Colored People, Oliver Robinson, John Rogers, Rodger Smitherman. (Blacksher, James) (Entered: 09/26/2016) |
| 09/28/2016 | 45 | **TEXT ORDER -**The two Motions to Dismiss pending before the court, (1) Mayor Bell's Motion to Dismiss 28 and (2) the State Defendants' Motion to Dismiss 30 are now fully briefed. The Motions are SET for oral argument at 2:00 p.m. on Wednesday, October 26, 2016. in Courtroom 7A of the Hugo L. Black United States Courthouse, 1729 5th Avenue North, Birmingham, Alabama. Signed by Judge R David Proctor on 9/28/2016. (AVC) (Entered: 09/28/2016) |
| 10/27/2016 | | Minute Entry for proceedings held before Judge R David Proctor: Motion Hearing held on 10/26/2016 re 28 MOTION to Dismiss filed by William A. Bell, Sr. and 30 MOTION to Dismiss the Amended Complaint & Initial Submission in Response to Exhibit B of the Court's Order filed by Luther J Strange, III, State of Alabama, The. The motions will be taken under submission and a separate order will be entered by the court. (Court Reporter Leah Turner.) (KLL) Modified on 4/12/2017 (KLL, ). (Entered: 10/27/2016) |
| 10/28/2016 | 46 | Unopposed MOTION to File Supplemental Briefs Regarding the Applicable Pleading Standard by Antoin Adams, Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Greater Birmingham Ministries, Marnika Lewis, Mary Moore, William Muhammad, National Association for the Advancement of Colored People, Oliver Robinson, John Rogers, Rodger Smitherman. (Rouco, Richard) (Entered: 10/28/2016) |
| 10/28/2016 | 47 | **TEXT ORDER**- This matter is before the Court on Plaintiffs' Unopposed Motion to File Supplemental Briefs Regarding the Applicable Pleading Standard. 46 The Motion 46 is |

ER0013

| | | |
|---|---|---|
| | | **GRANTED.** Plaintiffs' supplemental brief is due on or before November 9, 2016. The State Defendants may file supplemental briefing on or before November 16, 2016. Supplemental briefs SHALL be limited to five pages. Signed by Judge R David Proctor on 10/28/2016. (AVC) (Entered: 10/28/2016) |
| 11/02/2016 | 48 | **TEXT ORDER**-This matter is before the court on an informal request for an extension of the deadlines for Supplemental Briefs Regarding the Applicable Pleading Standard. The court understand that the request is unopposed. The request is **GRANTED**. Plaintiffs' supplemental brief is due **on or before November 14, 2016**. The State Defendants may file supplemental briefing **on or before November 21, 2016**. Supplemental briefs **SHALL** be limited to five pages. Signed by Judge R David Proctor on 11/2/2016. (AVC) (Entered: 11/02/2016) |
| 11/10/2016 | 49 | NOTICE of Change of Firm Affiliation by Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Mary Moore, William Muhammad, Oliver Robinson, John Rogers, Rodger Smitherman. (Clemon, U) (Entered: 11/10/2016) |
| 11/14/2016 | 50 | SUPPLEMENTAL Brief on Application of IQBAl/Twombly. (Rouco, Richard) (Entered: 11/14/2016) |
| 11/21/2016 | 51 | RESPONSE to 50 Plaintiffs' Supplemental Brief on Application of Iqbal/Twombly filed by State of Alabama, The, Luther J Strange, III. (Parker, William) (Entered: 11/21/2016) |
| 02/01/2017 | 52 | MEMORANDUM OPINION. Signed by Judge R David Proctor on 1/31/2017. (AVC) (Entered: 02/01/2017) |
| 02/01/2017 | 53 | ORDER OF DISMISSAL-In accordance with the Memorandum Opinion 52 , Dfts' Motions to Dismiss 28 and 30 are GRANTED. Pltfs' claims against all Dfts are DISMISSED WITH PREJUDICE. Signed by Judge R David Proctor on 1/31/2017. (AVC) (Entered: 02/01/2017) |
| 03/02/2017 | 54 | NOTICE OF APPEAL as to 52 Memorandum Opinion, 53 Order Dismissing Case by Antoin Adams, Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman, Priscilla Dunn, Juandalynn Givan, Greater Birmingham Ministries, Marnika Lewis, Mary Moore, William Muhammad, National Association for the Advancement of Colored People, Oliver Robinson, John Rogers, Rodger Smitherman. Filing fee $ 505, receipt number 1126-2798137. (Attachments: # 1 Exhibit Docket Report, # 2 Exhibit Memorandum Opinion, # 3 Exhibit Order of Dismissal)(Rouco, Richard) (Entered: 03/02/2017) |
| 03/02/2017 | 57 | USCA Appeal Fees received $505.00 Receipt# B4601078385 re 54 Notice of Appeal. (AVC) (Entered: 03/03/2017) |
| 03/03/2017 | 55 | NOTICE of transmittal letter to the 11th Circuit Court of Appeals (KAM, ) (Entered: 03/03/2017) |
| 03/03/2017 | 56 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 54 Notice of Appeal,, (KAM, ) (Entered: 03/03/2017) |
| 03/09/2017 | 58 | USCA Case Number 17-11009-B and Notification for 54 Notice of Appeal,, filed by John Rogers, Louise Alexander, Marika Coleman, Rodger Smitherman, Alabama Legislative Black Caucus, Mary Moore, Oliver Robinson, National Association for the Advancement of Colored People, Marnika Lewis, Priscilla Dunn, Juandalynn Givan, William Muhammad, Antoin Adams, Greater Birmingham Ministries. (JLC) (Entered: 03/09/2017) |
| 03/13/2017 | 59 | TRANSCRIPT REQUEST by Antoin Adams, Greater Birmingham Ministries, Marnika Lewis, National Association for the Advancement of Colored People (Rouco, Richard) |
| | | |

ER0014

| | | |
|---|---|---|
| 03/17/2017 | 60 | TRANSCRIPT REQUEST - Court Reporter Acknowledgment filed by Leah S. Turner (KAM) (Entered: 03/22/2017) |
| 04/10/2017 | 61 | Transcript of Proceedings held on 10/26/2016, before Judge R. David Proctor. Court Reporter/Transcriber Leah S. Turner, Telephone number (256) 656-8239. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 5/1/2017. Redacted Transcript Deadline set for 5/11/2017. Release of Transcript Restriction set for 7/9/2017. (AVC) (Entered: 04/10/2017) |
| 04/10/2017 | 62 | NOTIFICATION THAT TRANSCRIPT HAS BEEN FILED IN DISTRICT COURT. (AVC) (Entered: 04/10/2017) |

**PACER Service Center**

**Transaction Receipt**

05/24/2017 11:13:39

| PACER Login: | | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:16-cv-00690-RDP |
| Billable Pages: | 15 | Cost: | 1.50 |

1

FILED
2016 Apr-28  AM 09:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### (Southern Division)

| | |
|---|---|
| Marnika Lewis, Antoin Adams,<br>Alabama State Conference of<br>the National Association For the<br>Advancement of Colored People,<br>and Greater Birmingham Ministries,<br><br>    Plaintiffs,<br>vs.<br><br>Robert J. Bentley, in his Official Capacity<br>as Governor of the State of Alabama;<br>and Luther J. Strange, III, in his Official<br>Capacity as Attorney General of<br>the State of Alabama;<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Come now the Plaintiffs, by and through counsel and complain against the Defendants, as follows:

### INTRODUCTION

1.     In August, 2015, the City Council of Birmingham and itsits Mayor decided, on the basis of the economic and social welfare interests of the City's residents, to increase the minimum wage above the federally mandated minimum of $7.25 per hour for employees employed by employers within the City.  City Council President Johnathan Austin stated when the ordinance was first passed in August of 2015, "We're just trying to do what we think is best

ER0016

for our citizens and our workers".[1] And as city councilor LaShunda Scales said, "We can't have a progressive city and low wage jobs."[2]

2.      The passage of the Birmingham minimum wage ordinance, which would have raised the minimum wage to $10.10 per hour, was a move by the elected officials of the City in the interest of Birmingham's predominately African-American workforce to lift them out of poverty.

3.      The City of Birmingham, Alabama is the largest municipality in the state, with a population that is approximately 74% African-American.  Approximately 32% of its African-American residents have earnings below the federal poverty level. African-American residents' per capita income averages under $16,000 per year.  All those with earnings below the poverty level, as well as others, would have benefited by implementation of the minimum wage ordinance.

4.      Deliberately unresponsive and openly hostile to the economic needs of minorities, several white legislators proposed a bill nullifying Birmingham's minimum wage ordinance during a special session in 2015.  Because of the limits on a special session, the Legislature did not act upon the proposed legislation.  However, the first order of business in the new session was to revoke and nullify Birmingham's minimum wage ordinance.  The passage of a statute abrogating Birmingham's "minimum wage" ordinance is the most recent example of the State Legislature denying a predominantly African-American local government and its residents of the right to determine what is best for their community.

---

[1] AL.com, Birmingham City Council Votes to Raise Minimum Wage, http://www.al.com/news/birmingham/index.ssf/2015/08/birmingham_minimum_wage_increa.html, August 18, 2015.
[2] *Id*.

ER0017

5.     In its haste to override Birmingham's minimum wage ordinance, the Legislature disregarded even the very limited procedural protections that existed against State intrusion into local affairs.   In uncharacteristic fashion, and contrary to its normal practices, the State Legislature passed the so-called "Alabama Uniform Minimum Wage and Right To Work Act" (hereinafter "HB 174") in a little over a week after its first reading and the Governor signed the bill within two hours after it reached his desk.[3]

6.     The Plaintiffs bring this action to remedy current harms arising from the denial of equal protection under the law.   The enactment of HB 174 (a sweeping statute nullifying Birmingham's minimum wage ordinance and pre-empting any local regulation of matters touching upon private sector employment) is the most recent chapter in a long history of the Alabama State Legislature discriminating against predominantly African-American communities; a history that traces its origins to the 1901 Constitution.   Though the Voting Rights Act enabled African-American communities to elect at the local level representatives of their choosing, this ability to elect has not resulted in policies responsive to the needs of these communities.

7.     The Plaintiffs' Complaint asserts claims under the Fourteenth Amendment's equal protection clause.   The Plaintiffs complain that the State Legislature's decision to nullify Birmingham's minimum wage ordinance was racially motivated and that this legislation disproportionately impacts African-American residents of Birmingham who work in the city. Second, the Plaintiffs complain that the State Legislature's nullification of Birmingham's minimum wage ordinance and pre-emption of any local ordinance or regulation related to private sector employment relies on the 1901 Constitution's concentration of power at the State level

---

[3] Westlaw provisionally cites HB 174 as Ala. Code § 41-30-1.

ER0018

and its denial of local autonomy (i.e. home rule). The delegates who drafted and voted for the 1901 Constitution concentrated power at the State level for the express purpose of denying predominantly African-American communities local control over matters affecting these communities. They did so expressly upon racial grounds. Finally, the pre-emption of any and all ordinances or regulations related to private sector employment uniquely burdens predominantly African-American communities. As a result of HB 174, African-Americans must now petition the State Legislature for any legislation related to private sector employment, even if the proposed legislation would only affect employment within their city. The State's Legislature removal of the entire area of private sector employment from the reach of local government is precisely the type of burden that the drafters of the 1901 Constitution imposed on predominantly African-American communities. Moreover, HB 174's sweeping preemption clause creates a vacuum because it does not substitute Birmingham's ordinance with a state law, a fact which indicates that the intent of the Legislature was to alter the political process and maintain control over predominantly African-American communities interested in passing minimum employment standards.

## PARTIES

8.     The Plaintiff Marnika Lewis is twenty-three years old and a resident of the City of Birmingham. Ms. Lewis is African-American and a single mother of a five year old son. She is currently employed at Moe's Restaurant on 5th Avenue South in Birmingham. She has been employed at Moe's for approximately three years. She earns $7.75 per hour and since beginning work at Moe's she has received one 25-cent per hour raise about one and a half years ago. Ms. Lewis makes approximately $270 per week and her annual income is less than $14,000. Despite working close to a full-time schedule, Ms. Lewis cannot afford her basic needs without public

ER0019

assistance.  She receives Supplemental Nutrition Assistance Program ("SNAP") benefits to cover food costs.   Ms. Lewis relies on Jefferson County Committee for Economic Opportunity's ("JCCEO") energy assistance program to heat her home.  Ms. Lewis does not receive any health benefits from Moe's and depends on the University of Alabama-Birmingham's low-income clinics for her family's healthcare needs.  She cannot afford the cost of childcare.  Instead Ms. Lewis is forced to rely on a network of friends and family to care for her son when she is at work.  This ad hoc system often leaves her son without a caregiver. The raise in the minimum wage by the city of Birmingham would have helped Ms. Lewis afford daycare for her son and provide additional income to allow her to return to school.

9.     The Plaintiff, Antoin Adams is an African American,  twenty-three years old and a resident of the City of Birmingham.  Mr. Adams has been employed at Hardees at 5113 Airport Highway in Birmingham, AL for approximately four months.  He earns $7.25 per hour and his annual income is less than $10,556.  Prior to working at Hardee's, Mr. Adams worked at Wal-Mart.  He receives no health benefits and must pay for medical treatment out-of-pocket. Mr. Adams suffers from chronic asthma and must regularly go to the hospital for breathing treatments.  He is unable to afford his basic living expenses without government assistance.  Mr. Adams received SNAP benefits until last month and he currently lives in Section 8 housing. The raise in the minimum wage by the city of Birmingham would have helped Mr. Adams afford food and household items. It would also allow him to save for college. Mr. Adams wants to become a computer technician but cannot afford to attend college on his current salary.

10.     Organizational Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the

5

ER0020

oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans.  Eliminating the racial wage gap is a key focus of the Alabama NAACP. To that end, it advocates for a living wage in low paying industries where workers of color are disproportionately represented and especially concentrated.

The Alabama NAACP is composed of 48 branches across the state of Alabama, including the Metro Birmingham branch.  The Alabama NAACP has significant membership in the City of Birmingham and many of those members will be directly impacted and harmed by HB 174.

The Alabama NAACP has standing to challenge HB 174 on behalf of its members.  As a result of HB 174, a number of the Alabama NAACP's members were deprived of a living wage without constitutional notice.  HB 174 also distorted the political process for Alabama NAACP's members and denied them equal protection of the law.

11.     Organizational Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama area. GBM is a multi-faith, multi-racial organization that provides emergency services for people in need. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people.

12.     The Defendant Robert J. Bentley is the Governor of the State of Alabama and is charged with responsibility for upholding the Alabama Constitution and executing state law.  He approves and signs into law bills enacted by the legislature. He is named in his official capacity.

13.     The Defendant Luther J. Strange, III is the Attorney General for the State of Alabama and its chief legal officer.  He advises various state, county and city officials regarding

ER0021

questions of law connected with the performance of their duties.  He is named in his official capacity.

14.     Defendants' actions in support of the pre-emption of Birmingham's minimum wage ordinance were taken under color of state law and in violation of 42 U.S.C. § 1983 and the equal protection clause of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION

15.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. §1983 and 28 U.S.C. § 1331 (federal question).

## STATEMENT OF FACTS

16.     On April 21, 2015, the Birmingham City Council unanimously passed a resolution asking the state Legislature to raise the minimum wage to $10 per hour across the state.  City Councilman, Jay Roberson, in speaking in favor of the resolution stated that "their advocacy on increasing the minimum wage to $10 an hour in Alabama is an economic issue that will benefit all, . . . I hope the city of Birmingham and the business community will respectfully adhere to this great economic boost for all hard working employees which hopefully will become law in the near future."[4]

17.     Almost simultaneously with the rally and the passage of the Birmingham City Council's resolution calling for an increase in the minimum wage, Representative Arnold Mooney (a white representative from the 43rd District-Shelby) introduced bill HB 495 in the Alabama Legislature.  HB 495 sought to prevent any municipality from requiring that employers provide wages, paid or unpaid leave, and/or vacation pay that is not required by federal or state

---

[4]Birmingham City Council Endorses Campaign to Raise Minimum Wage, http://www.al.com/news/birmingham/index.ssf/2015/04/birmingham_city_council_endors_1.html, April 21, 2015.

7

ER0022

law.   HB 495 did not advance out of the Alabama House of Representatives and further consideration was postponed when the legislative session ended in early June 2015.

18.   On August 18, 2015, the Birmingham City Council unanimously passed, with one abstention, Ordinance 15-124 that would raise the minimum wage for employees working in the city to $8.50 per hour as of July 1, 2016 and $10.10 per hour on July 1, 2017.  The ordinance was published and went into effect on August 30, 2015.  (Ordinance 15-24 attached as Exhibit 1 hereto). The ordinance received wide spread approval among Birmingham's African-American residents, which comprise approximately seventy-three (73) percent of Birmingham's population.

19.   In reaction to the Birmingham City Council's ordinance increasing the minimum wage, on or about September 8, 2015, at the beginning of Alabama Legislature's second special legislative session of 2015, Alabama House District 47 Representative David Faulkner, (a white representative of the Birmingham suburb of Mountain Brook),[5] introduced bill HB 27 that prevents cities such as Birmingham from raising the minimum wage.  Faulkner stated that he was "shocked" that the city could raise the minimum wage for its residents.[6]  Birmingham was the only city or governmental entity in the state to have passed a minimum wage ordinance at the time of Senator Faulkner's introduction of HB 27.

20.   There was no public notice of the bill or an opportunity for hearing, and HB 27 did not advance through the Legislature during the second special session.

---

[5] According to recent United States census figures, Mountain Brook is approximately 98% white and its median income of approximately $130,000.00 is more than six times higher than that of Birmingham.

[6] Alabama Lawmakers Consider Bill to Block City Minimum Wages, http://www.al.com/news/index.ssf/2015/09/alabama_lawmakers_consider_bil.html, September 9, 2015.

ER0023

21.     Undeterred by the lack of passage of HB 27, Representative Faulkner on February 9, 2016, the third day of the 2016 legislative session of the Alabama Legislature, introduced  HB 174 which combined Representative Mooney's HB 495 introduced in April of 2015 and Representative Faulkner's HB 27 introduced in September of 2015.  HB 174, referred to as the "Alabama Uniform Minimum Wage and Right-To-Work Act," (hereinafter HB 174 or the Act) sought to block and declare void Birmingham's minimum wage ordinance passed in August of 2015.  The fifty-three sponsors of HB 174 in the House (all of them white) squarely targeted Birmingham and its minimum wage ordinance as Birmingham was the only city or public entity in the state of Alabama that had raised its minimum wage above that required by federal law.  No Alabama law provides for a minimum wage, nor did the supporters of HB 174 include any state-wide minimum wage within its provisions. The leadership of the House of Representatives fast-tracked HB 174 in the House which held a short public hearing on the bill on February 11, 2016 and voted it out of the Committee on State Government by a vote of 10-3.  All ten supporters of the bill in the House Committee were white.

22.     On February 16, 2016, the House of Representatives approved the bill 71-31 and sent it to the Alabama Senate. All members of the House voting in favor of the bill were white; all twenty-seven African-American Representatives voted against the bill.

23.     While the State Legislature was acting to prevent implementation of the Birmingham minimum wage ordinance, on February 9, 2016, the Birmingham City Council adopted Ordinance 16-25 to make the minimum wage increase effective on March 1, 2016. Mayor William Bell signed Ordinance 16-25 on February 16, 2016 and it was published and became effective on February 19, 2016.  Accordingly, Ordinance 16-25 went into effect as of that date.  (City of Birmingham Ordinance 16-25 attached as Exhibit 2 hereto).

ER0024

24. On February 23, 2016, the Birmingham City Council adopted Ordinance 16-28 entitled "An Ordinance Relating to Minimum Wage to Be Paid to Employees by Employers in the City of Birmingham." Among the reasons the City Council adopted Ordinance 16-28, like ordinances 15-124 and 16-25, was because "Poverty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our [Birmingham] economy." (City of Birmingham Ordinance 16-28 attached as Exhibit 3 hereto).

25. Ordinance 16-28 moved the effective date of the minimum wage increase to February 24, 2016 and increased the minimum wage to $10.10. The City Council acted to move up the date of the minimum wage increase because the white supporters of HB 174 in the Alabama state Legislature were fast-tracking HB 174 in an attempt to have it pass before the first wage increase provided in Birmingham's August 18, 2015 Ordinance took effect.

26. Birmingham Mayor William Bell signed Ordinance 16-28 on February 24, 2016. Publication of the ordinance in the Birmingham News was set for Sunday, February 28, 2016.

27. The Alabama State Senate, led by Senator Jabo Waggoner (a white senator representing the Birmingham suburb of Vestavia Hills), fast-tracked HB 174 in approximately 36 hours through the Senate Committee on Governmental Affairs and the Senate passed the bill on a 23-12 roll call vote on February 25, 2016. All Senators voting in favor were white; all six African-American members of the Senate voted against passage. The bill was delivered to Governor Robert Bentley on February 25 and it was signed by the Governor approximately ninety minutes after its passage in the Senate.

10

ER0025

28. One specific provision of this new law renders null and void any municipal or county minimum wage ordinance enacted prior to passage of HB 174. This retroactive nullification of wage ordinances applied only to the City of Birmingham. Section 110 of the Alabama Constitution provides, in relevant respects, that a general law affecting only one municipality at the time of enactment must comply with the notice provisions of Section 106.

29. The notice provisions of Alabama Constitution Section 106 require, *inter alia*, that before a special, private or local law shall be passed, it must be published in the local newspaper for four consecutive weeks in the county or counties affected by the law.

30. The Alabama House of Representatives and the State Senate failed and refused to provide the notice required by Section 106 of the Constitution in an effort to keep Ordinance 16-28 from becoming effective.

31. The passage of HB 174 by the Alabama Legislature fits a historical pattern of legislation that discriminates against African Americans and thwarts the efforts of African-Americans in the state of Alabama who seek to improve their economic and social well-being. The enactment of HB 174 resulted in approximately 40,000 low wage workers in Birmingham being denied a wage increase.

32. State Senator Slade Blackwell, (a white senator from the wealthy Birmingham suburb of Mountain Brook) stated in support of the legislation and in opposition to the Birmingham ordinance that increases in the minimum wage especially hurt young people from poorer families who may not have easy access to trendy internships at colleges and private companies to build their skill set and resume. Since HB 174 was targeted only at Birmingham, which is predominately African-American and many of whose residents live below the poverty line, this statement by Senator Blackwell, was directed at the poor, African American residents

11

ER0026

of the city of Birmingham.  This statement, and others by white legislators, invoked racial stereotyping to justify denial of a living wage to African-American residents of the city of Birmingham.

33.   In contrast to Birmingham's 32% of African-Americans living below the federal poverty level, only 2.57% of Mountain Brook's residents (97.2% white) lived below the federal poverty level.

34.   Just before the final vote, State Senator Bill Hightower, (a white businessman and real estate investor from Mobile), spoke in support of the bill saying "we should lower the minimum wage," and later posted on his Twitter account his claim that "raising the minimum wage hurts the poor."

35.   Sen. Dick Brewbaker, (a white senator from Montgomery) said he was concerned about the bill generally, and speculated that "Montgomery would probably follow suit," if Birmingham's wage ordinance was allowed to stand.

36.   Montgomery is approximately 57% African-American and after Birmingham, has the second highest concentration of African-Americans among Alabama's large cities.

### History of Alabama's 1901 Constitution and its Present day Effects

37.   By almost any measure, the 1901 Constitution with its retention of local control in the hands of the State Legislature is aberrational. With over 700 amendments, Alabama's 1901 Constitution is uniformly regarded as the longest State constitution in the United States, almost forty times longer than the United States Constitution. The length of the 1901 Constitution is a consequence of the limited home rule the Constitution affords to counties and municipal corporations, requiring the Legislature and the voters to adopt amendments dealing with local

ER0027

affairs. More than 500 of the approximately 772 amendments to the 1901 Constitution pertain to a specific county or municipality.

38. The delegates to the 1901 constitutional convention adopted a constitution that concentrates legislative power at the State level. The convention's president John Knox openly acknowledged the racially discriminatory purpose animating the consolidation of power at the state level: "After the war, by force of Federal bayonets, the negro was placed in control of every branch of our Government. Inspired and aided by unscrupulous white men, he wasted money, created debts, increased taxes until it threatened to amount to confiscation of our property. While in power, and within a few years, he increased our State debt from a nominal figure to nearly thirty million dollars." Referring to blacks as having the "lowest ... intelligence and moral preceptions [sic] of all the races," constitutional convention president John B. Knox confidently commenced the 1901 constitutional convention by proclaiming that "[t]here is in the white man an inherited capacity for government, which is wholly wanting in the negro."

39. Convention reports of the 1901 constitutional convention establish that the convention delegates adopted and retained the home rule restrictions in part because of a desire to discriminate against the State's African-American population and to prevent African-American citizens from exercising control over local governments where they constituted a majority of the population. Indeed, the 1901 Constitution maintained and expanded home rule restrictions previously adopted in the 1875 Constitution. The 1875 Constitution (referred to as the "Redeemer" Constitution) followed on the heels of an electoral victory by the Democratic Party in 1874. The Democrats campaigned on a slogan of "white supremacy" and claimed to have "redeemed" Alabama from "black rule" and restored white supremacy by capturing the office of Governor and control of both houses of the Legislature in the 1874 state elections.

13

ER0028

*Knight v. Alabama,* 787 F.Supp. 1030, 1070-71 (N.D. Ala. 1991), *aff 'd in part and rev 'd in part,* 14 F.3d 1534 (11th Cir. 1994). Once in power, the Democrats convened a constitutional convention and adopted the so-called "1875 Redeemer Constitution" which severely restricted the power of local and state government.

40.    In *United States of America v. State of Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966), the U.S Government challenged a poll tax provision contained in Alabama's Constitution. The provision had been added to Alabama's Constitution during the 1901 Convention. A majority of the three judge panel considering this challenge found that racial discrimination motivated the inclusion of a poll tax provision. Writing for the majority Judge Rives made the following finding: "The Journals of the Convention leave absolutely no doubt as to what the delegates of the white citizens of Alabama wished the Convention to accomplish:

> '* * * We want the white man who once voted in the state and controlled it to vote again. We want to see that old condition restored. Upon that theory we took the stump in Alabama having pledged ourselves to the white people upon the platform that we would not disfranchise a single white man if you trust us to frame an organic law for Alabama, but it is our purpose, it is our intention, and here is our registered vow to disfranchise every Negro in the state and not a single white man." 252 F. Supp. at 98.

41.    In rejecting the State's position that the discriminatory motives behind the original enactment of the 1901 Constitution could not be imputed to the State some sixty-five years after adoption, Judge Rives noted that "from the Constitutional Convention in 1901 to the present [i.e 1966], the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society. Statutes, cases and the statements of its Governors demonstrate that the State's resistance to the rights of Negroes to equal treatment continued even after the Congress and the Supreme Court of the United States had expressly declared that the State's action was unconstitutional." 252 F. Supp. at 101.

ER0029

42.     In *Dillard v. Crenshaw County*, (a Voting Rights Act challenging use of at-large districts), Judge Thompson observed that any doubt about the State's Legislature's motivation in adopting such election systems is dispelled by the undisputed fact that such "systems were created in the midst of the state's unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." 640 F. Supp. 1347, 1357 (M.D. Ala. 1986).

43.     Speaking directly about the 1901 Constitution, Judge Thompson made the following findings: "There can be little question but that a major purpose of the 1901 Convention was to disenfranchise black persons. As the Supreme Court recently commented in another case, expert testimony "showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. ... The delegates to the all-white convention were not secretive about their purpose." *Hunter v. Underwood,* 471 U.S. 222, 229, 105 S.Ct. 1916, 1920–21, 85 L.Ed.2d 222 (1985). The 1901 Constitution contained so many different voter qualifications that by 1909 all but approximately 4,000 of the nearly 182,000 black persons of voting age in Alabama had been removed from the rolls of eligible voters. *Bolden [v. City of Mobile],* 542 F.Supp. [1050] at 1063 & n. 10." 640 F. Supp. At 1358.

44.      By pre-empting Birmingham from enacting employment related ordinances that respond to the needs of the individual Plaintiffs and the African-American individuals the organizational Plaintiffs represent, the state of Alabama has deliberately burdened the ability of Plaintiffs to effectuate meaningful change aimed at eliminating the vestiges of *de jure* race discrimination. These vestiges include, but are not limited to, significant disparities in unemployment rates among racial groups, significant disparities in levels of income and wealth among racial groups, significant disparities in home ownership amount racial groups, significant

ER0030

disparities in educational attainment and significant disparities in poverty rates among racial groups. *See generally*, Regina Moorer, Inequality in Alabama: A County-Level Analysis (2012). Given that African-American communities have no effective representation at the state wide level (e.g. there are no African American state wide elected officials) and the state Legislature is a product of racially polarized voting and racial gerrymandering, the Plaintiffs have no political recourse to address these vestiges of *de jure* discrimination at the state wide level.

45.     As a result of HB 174, the state of Alabama retroactively nullified the Plaintiffs' right to receive a minimum wage of $10.10.  In order to restore that right, the Plaintiffs now have to persuade the state Legislature to raise the minimum wage to $10.10 as opposed to persuading a local government.

46.     HB 174 also contains a provision designed to invoke the 1901 Constitution's restrictions on home rule.  Section 6(c) of the Act provides in relevant part that "the authority of a municipality to regulate . . . the wages, leave or other benefits provided by an employer to an employee, class of employees or independent contractor shall not be inferred from proprietary authority, home rule status or other inherent or general power."  Reliance on the 1901 Constitution's limitations and/or deprivation of home rule (e.g. Article IV, Section 44) to deny decision-making authority to the predominantly African-American community and to entrench racial disparities in income, among other things, taints the enactment of HB 174 with racial animus.

47.     The home rule restrictions embodied in the 1901 Constitution and Alabama case law, which the Legislature utilized to enact HB 174, have disparately impacted economic development opportunities in counties and municipalities that are predominantly African-American.  In addition to the racial disparities noted above, counties with majority white

16

ER0031

populations have successfully secured authority from the Legislature to govern local affairs more often than African-American counties and the counties with majority white population have secured twice as many constitutional amendments granting local authority than predominantly African-American counties.

## COUNT I

(**1901 Constitution's Deprivation of Home Rule Violates the
Fourteenth Amendment's Equal Protection Clause)**

48.    The 1901 Constitution expressly and as interpreted by the Alabama Supreme Court grants municipalities very limited autonomy to legislate over matters directly affecting their residents.

49.    As noted above, the inclusion of restrictions on local government autonomy and the centralization of power at the State level in the 1901 Constitution was racially motivated.  It is well established that the delegates to the 1901 constitutional convention purposefully deprived local governments of any meaningful authority in order to discriminate against African-American citizens.

50.    Section 6 (a) of HB 174 expressly provides that the purpose of the Act is to establish within the Legislature complete control over regulation and policy pertaining to wages, leave or other employment benefits provided by an employer to an employee, class of employees or independent contractor.

51.    The State Legislature's exercise of "complete control" and its preemption of any local ordinance regulating wages, leave or other employment benefits can be traced to the 1901 Constitution's centralization of power at the State level and its intent to deprive predominantly

17

ER0032

African-American communities of local autonomy on the basis of racially discriminatory motives.

52.     The State Legislature's exercise of "complete control" over regulation and policy pertaining to wages, leave or other employment benefits disproportionately impacts African American employees (like the Plaintiffs) who work and reside in the City of Birmingham.

53.     HB 174 violates the Fourteenth Amendment's equal protection guarantee because (a) the exercise of complete control over regulation and policy pertaining to wages, leave or other employment benefits can be directly traced to provisions in the racially discriminatory 1901 Constitution that deprives African-American citizens (through their locally-elected representatives) the right to regulate such matters of central concern to their daily lives; (b) such provisions that grant exclusive authority to the State Legislature to override any and all local ordinances are vestiges of race discrimination and (c) HB 174 disproportionately impacts African American residents who live and work in the City of Birmingham.

## COUNT II

### (Racially-Motivated Enactment of HB 174 Violates the Equal Protection Clause of the United States Constitution)

54.     The Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

55.     Defendants' actions constitute intentional discrimination on the basis of race contrary to the Fourteenth Amendment.

56.     The persons denied the benefits of the Birmingham minimum wage legislation are predominantly African-American.  Approximately 32% of Birmingham's African-American residents had annual earnings below what they could have earned had the minimum wage

ER0033

ordinance become effective.  The Alabama Legislature's enactment of H.B. 174 denies the City of Birmingham the opportunity to obtain the same economic opportunities for its residents as is presently available to predominantly white communities throughout Alabama.

57.     For example, the City of Mountain Brook, home of the sponsor of HB 174, with 97.2% of its residents white, has less than 3% of its residents with annual earnings below the federal poverty level.  Additional support for HB 174 came from Senator Waggoner, a white senator representing Vestavia Hills -- a city that is 94.2% white and has only 3.1% of its residents living below the poverty line. Unlike these predominantly white communities, there was a substantial need for a minimum wage law in Birmingham, and the likely beneficiaries of the Birmingham ordinance were, predominantly, African-American.

58.     Defendants' assertions of the need for uniformity in application of minimum wage requirements throughout Alabama are pretextual, in light of the Legislature's history of less favorable treatment of predominantly African-American jurisdictions in the Legislature's granting of economic development authority to local jurisdictions (See Will Parker, "Still Afraid Od "Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 are Unconstitutional," 57 Ala. L. Rev. 545 (Winter 2005)) and in light of the Legislature's acceptance of non-uniformity in other areas of economic regulation, including but not limited to the sales tax.  Defendants' departure from procedural norms to obtain passage of HB174 also evidences discriminatory intent.

59.     Further, contrary to the assertions of the HB 174's supporters that passage of a minimum wage ordinance would be detrimental to Birmingham residents, economic studies show that enactment of a minimum wage would not have resulted in job loss or economic

ER0034

instability. The Legislature cited no economic studies in support its position and instead relied on stereotypes about race and other pretexts to justify its actions.

60.     The State Legislature also disregarded procedural requirements related to legislation that affects only a single municipality at the time of enactment. The State did not provide requisite notice to citizens of Birmingham before enacting a provision that nullified the City's wage ordinance.  At the time of HB 174's enactment, Birmingham was the only city to have enacted an ordinance affected by HB 174.  Disregarding these procedural notice provisions supports the inference of improper discriminatory motive.

## COUNT III

### (Equal Protection Claim Based on Political Process Doctrine)

61.     Additionally and separately from the equal protection harm that can be traced to the 1901 Constitution's discriminatory refusal to grant municipal home rule, HB 174 violates the Fourteenth Amendment's equal protection clause because it <u>specifically targeted</u> an ordinance that Birmingham's African-American community and their City Council strongly supported.

62.     HB 174 preempts a city ordinance that primarily inured to the benefit of Birmingham's African-American community.  Moreover, Birmingham's African-American community (as the organizational Plaintiffs can attest to) strongly considered the ordinance to be in their interest. Indeed, as noted above, the City Council passed multiple ordinances accelerating the provisions of the wage ordinance in an effort to prevent the State from nullifying the ordinance and usurping all authority to regulate and set policy pertaining to wages, leave or other employment benefits.

ER0035

63.     The State's adoption of HB 174 violated the Fourteenth Amendment's equal protection guarantee because it placed all decision-making authority regarding wages, leave or other employment benefits at the State level rather than the leaving such authority to the City. The intent to uniquely burden the ability of Plaintiffs to obtain employment-related ordinances that Birmingham's African-American community strongly favored motivated the decision to give the State Legislature "complete control" over regulation and policy pertaining to wages, leave or other employment benefits.

64.     Moreover, Defendants' actions as alleged herein have violated 42 U.S.C. § 1983 and the equal protection clause of the Fourteenth Amendment to the United States Constitution by placing special burdens on racial minorities within the governmental process.

**PRAYER FOR RELIEF**

**WHERFORE,** plaintiffs respectfully pray that this Court will grant them the following relief:

(A)     A declaratory judgment that the 1901 Constitution's deprivation of local self-governance over matters affecting primarily municipal residents violates the rights of Plaintiffs and (the members of the organizational Plaintiffs) guaranteed under the Equal Protection Clause of the Fourteenth Amendment and further declaring that Birmingham's wage ordinance constitutes a lawful exercise of municipal authority;

(B)     A declaratory judgment that HB 174 violates the rights of Plaintiffs and (the members of the organizational Plaintiffs) guaranteed under the Equal Protection Clause of the Fourteenth Amendment;

(C)     An injunction prohibiting defendants, their departments, officers, agents, attorneys, employees and those acting in concert with them or at their direction from enforcing

21

the provisions of HB 174 and/or taking any action to prevent Birmingham's wage ordinance from taking effect;

    (D)    An award of their costs incurred in prosecuting this action, including an award of attorneys' fees and expenses, pursuant to 42 U.S.C. § 1988.

    (E)    Such other and further equitable relief as the Court may deem just and equitable.

/s/ Richard P. Rouco<br/>Richard P. Rouco

**OF COUNSEL:**

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
**QUINN, CONNOR, WEAVER,**
 **DAVIES & ROUCO LLP**
2 – 20TH Street North, Suite 930
Birmingham, Alabama  35203
Telephone: 205-870-9989
Facsimile: 205-803-4143
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Tel. (212) 627-8100
Fax (212) 627-8182
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
Mary Joyce Carlson
1100 New York Avenue, N.W.. Suite 500 West.
Washington, DC 20005
(202) 230-4096
carlsonmjj@yahoo.com

22

18

USCA11 Case: 17-11009    Document: 35    Date Filed: 06/05/2017    Page: 44 of 185

Case 2:16-cv-00690-RDP   Document 18   Filed 06/30/16   Page 1 of 52

USCA11 Case: 17-11009   Document: 35   Date Filed: 06/05/2017   Page: 45 of 185

FILED
2016 Jun-30  PM 01:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARNIKA LEWIS, ANTOIN ADAMS,
ALABAMA STATE CONFERENCE OF
THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, GREATER BIRMINGHAM
MINISTRIES, ALABAMA LEGISLATIVE
BLACK CAUCUS, LOUISE
ALEXANDER, MARIKA COLEMAN,
PRISCILLA DUNN, JUANDALYNN
GIVAN,  MARY MOORE, OLIVER
ROBINSON, JOHN ROGERS, RODGER
SMITHERMAN, and WILLIAM
MUHAMMAD,

Case No.2:16-cv-690-RDP

        Plaintiffs,

   v.

THE STATE OF ALABAMA,  THE CITY
OF BIRMINGHAM, LUTHER J.
STRANGE, III, in his official capacity as
Attorney General, and WILLIAM A. BELL,
SR., in his official capacity as Mayor of
Birmingham,

        Defendants.

## AMENDED COMPLAINT

Pursuant to F.R.C.P. Rule 15(a)(1) and the Court's June 7, 2016 Order, the

Plaintiffs' amend their complaint to add parties and claims as follows:

ER0038

## I.    INTRODUCTION:

This is an action for a declaratory judgment that Act 2016-18, titled the Alabama Uniform Minimum Wage and Right-to-Work Act (a.k.a. HB 174 or Act 2016-18), violates the rights of Birmingham citizens and the citizens of other majority-black municipalities guaranteed by the Constitution and laws of the United States, and for preliminary and permanent injunctions requiring the defendant City of Birmingham to enforce Ordinance No. 16-28, relating to the minimum wage to be paid to employees by employers in the City of Birmingham, Alabama.

Act 2016-18 has the purpose and effect of transferring control over minimum wages and all matters involving private sector employment in the City of Birmingham from municipal officials elected by a majority-black local electorate to legislators elected by a statewide majority-white electorate.  It perpetuates an official policy of political white supremacy that has been maintained in Alabama since it became a state in 1819, whereby white control is preserved by state government over the governing bodies of majority-black counties, cities, and educational institutions.

Thus Act 2016-18 violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States. Further, Act 2016-18 was enacted with the intent

2

ER0039

of discriminating against the people who live and work in the City of Birmingham on the basis of race, contrary to the Fourteenth Amendment to the United States Constitution.

## II.   PARTIES

1.   Plaintiffs Marnika Lewis and Antoin Adams are African-American citizens of the United States who are registered voters in the City of Birmingham. Each of them is employed in the City of Birmingham at wages that are less than $10.10 per hour.

2.   Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans. Eliminating the racial wage gap is a key focus of the Alabama NAACP. To that end, it advocates for a living wage in low paying industries where workers of color are disproportionately represented and especially concentrated.  The Alabama NAACP is composed of 48 branches across the state of Alabama, including the Metro Birmingham branch. The Alabama NAACP has significant membership in the City of Birmingham and many of those members will be directly impacted and harmed

3

ER0040

by ACT 2016-18. One member is Jaime Chrishon. Ms. Chrishon is an African-American woman who resides in City of Birmingham. She has lifetime membership to the NAACP. Ms. Chrishon is employed as a crewmember at Popeye's located on Messer Airport Highway. She earns $7.25 per hour. As a result of HB 174, Ms. Chrishon will not receive the pay increase guaranteed under Ordinance 16-28.

3. The Alabama NAACP also has standing to challenge Act 2016-18 on its own behalf. Act 2016-18, has deprived Birmingham residents of their democratically adopted minimum wage increase. As a result, the Alabama NAACP will be forced to divert time, money, and personnel to educating African-American workers about the law and its impact.

4. Organizational Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama, area. GBM is a multi-faith, multi-racial organization that provides emergency services for people in need. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people. A central goal of GBM is the pursuit of social justice in the governance of Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. Toward

4

ER0041

that end, GBM regularly engages in efforts to register, educate, and increase turnout among African-American voters, as well as low-income voters in general. GBM has participated in lawsuits to vindicate these democratic principles.

5.     GBM has standing to sue on behalf of its members. GBM counts Christian, Muslim, and Jewish faith communities among its members, as well as individual temples, churches, and mosques, including New Pilgrim Baptist Church. African-American individuals from GBM congregations have been harmed as a result of Act 2016-18.

6.     GBM also has standing to sue on its own behalf.  GBM has a number of poverty relief programs that support working families and individuals in the city of Birmingham including its utility assistance program, food assistance program, clothes closet, Christmas drive, and a homeless shelter.  As the result of Act 2016-18, GBM has had to divert resources to these programs to respond to poverty created by low wages.

7.     Plaintiff Alabama Legislative Black Caucus (hereafter "ALBC") is an unincorporated political organization of African Americans elected to the Alabama Legislature.  Every member of the ALBC is a citizen of the United States and registered voter in Alabama elected from a majority-black House or Senate district. Each of them represents one or more majority-black political subdivisions of the State of Alabama.

ER0042

8.     Plaintiffs Louise Alexander, Merika Coleman, Juandalynn Givan, Mary Moore, Oliver Robinson and John Rogers are African-American members of the Alabama House of Representatives and members of the ALBC. Representatives Alexander, Coleman, Givan, Moore and Rogers are members of the Jefferson County House Delegation.  Plaintiffs Givan, Moore Robinson and Rogers are registered voters in the City of Birmingham.

9.     Plaintiffs Priscilla Dunn and Rodger Smitherman are African-American members of the Alabama Senate and members of the ALBC. Senators Dunn and Smitherman are also members of the Jefferson County Senate Delegation.  Plaintiff Smitherman is a registered voter in the City of Birmingham.

10.     Plaintiff William Muhammad is a citizen of the United States and an African-American registered voter in the City of Birmingham.

11.     Defendant State of Alabama is sued in its own name with respect to Plaintiffs' claims under § 2 of the Voting Rights Act, 52 U.S.C. § 10301. Congress has abrogated the State's Eleventh Amendment immunity in civil actions brought to enforce the rights guaranteed by the Voting Rights Act.

12.     Defendant Luther J. Strange, III is the Attorney General for the State of Alabama and its chief legal officer.  The Attorney General has broad common law and statutory powers to direct and oversee all litigation, civil or criminal, which concerns the interest of the State of Alabama. This includes litigation in

6

ER0043

federal court "in any case in which the state may be interested in the result." He is named in his official capacity.

13.     Strange has advised numerous persons, including governmental and non-governmental actors, regarding the enforcement of the Birmingham wage ordinance and the effect of the State's passage of the wage preemption law. For example, in February, 2016, prior to the effective date of the ordinance, Strange advised Birmingham businesses, through a press release, that "despite the terms of the ordinance, they will have a reasonable time to prepare to comply, [with the Birmingham ordinance]" and expressed his opinion that the ordinance "does not provide a reasonable time for employers to prepare to comply." He also advised that "the Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham."

14.     Regarding the State's powers with respect to the Birmingham minimum wage ordinance, Strange also opined publicly, through a spokesperson, that "the Legislature has the authority to preempt local ordinances, even those that are already in effect."

15.     Strange is also charged under Alabama law with reviewing statutes passed by the Alabama legislature for their constitutional validity and to make a report to the Governor and the Chairman of the Judiciary Committees of the House and Senate of the laws or parts of laws which have been held invalid by courts of

ER0044

last resort.

16.     The City of Birmingham is a municipality of the State of Alabama whose Mayor and Council are elected by a majority-black local electorate.  The City of Birmingham is not enforcing Ordinance 16-28 because of Act 2016-18.

17.     William A. Bell, Sr., is sued in his official capacity as Mayor of the City of Birmingham.  Defendant Bell, acting through the Legal Department or other city agency, has the duty to take appropriate steps to enforce Ordinance No. 16-28, and under the Mayor-Council Act of 1955, as amended by Ala. Act No. 2016-277, he has the duty to "enforce all laws and ordinances."  Mayor Bell has not acted to enforce Ordinance 16-28 because of Act 2016-18.

18.     The City of Birmingham and Mayor Bell are named as defendants only for the purpose of providing complete relief among the parties with respect to the claims raised herein.

### III.    JURISDICTION & VENUE

19.     This Court has jurisdiction of the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1343(c) and 52 U.S.C. § 10302, to redress the deprivation of Plaintiffs' rights guaranteed by the Voting Rights Act, 42 U.S.C. § 1983, and the Thirteenth, Fourteenth, and Fifteenth Amendments.

20.     Venue of this action lies in the Middle District of Alabama pursuant to U.S.C. § 1391(b).

ER0045

## IV.   STATEMENT OF FACTS

21.   On August 18, 2015, the Birmingham City Council, relying on its broad authority under the Mayor-Council Act of 1955, as amended, adopted Ordinance No. 15-124, raising the minimum wage in the City of Birmingham effective July 1, 2016.

22.   On February 9, 2016, the third day of the 2016 Regular Session of the Alabama Legislature, HB 174 was introduced, sponsored by 61 white House members, including 8 of the 10 members of the Jefferson County Local Delegation elected from majority-white districts.

23.   On February 16, 2016, HB 174 passed the House, 71 to 31, and was sent to the Senate.  All 27 black House members voted no, including all 8 black members of the Jefferson County House Delegation.  Of the 10 white members of the Jefferson County House Delegation, 9 voted yes and 1 was absent.

24.   On February 19, 2016, the Birmingham City Council adopted Ordinance No. 16-25, which changed the effective date for raising the minimum wage to March 1, 2016.

25.   On February 23, 2016, the Birmingham City Council adopted Ordinance No. 16-28, which changed the effective date for raising the minimum wage to $10.10 on February 24, 2016, and provided that the minimum wage must be raised each year to match the increase in cost of living.

ER0046

26.     On February 25, 2016, the Senate passed HB 174, 23 to 11, and sent it to the Governor, who signed it as Act 2016-18 that same day.  All 7 black senators voted no, including all 3 black members of the Jefferson County Senate Delegation. All 5 white members of the Jefferson County Senate Delegation voted yes.

27.     Act 2016-18 prohibits any political subdivision from raising the minimum wage or mandating any other terms and conditions of employment beyond what is required by state or federal law.  The City of Birmingham is the only political subdivision in Alabama to have regulated the minimum wage.  Since there is no minimum wage in Alabama law, the federal minimum wage of $7.25 per hour now governs the City of Birmingham.

28.     In Alabama, 6.8% of 1,125,00 hourly workers earn at or below the minimum wage of $7.25.

29.     According to statistics compiled by the National Employment Law Project, roughly 19% of Birmingham workers - 40,000 people - earn less than $10.10.

30.     The legislature's pre-emption of the Birmingham wage law adversely impacted black workers.  On average, white wage earners in Birmingham earn $1.41 more per hour than black wage earners.   While 37% of black wage workers in Birmingham earn wages of $10.10 or less, only 27% of white wage workers

ER0047

earn at or below that level. Statewide, the wage gap between white and black workers is even greater than in Birmingham, with white wage workers earning, on average, $2.12 more than black wage workers for each hour worked.

31.    According to U.S. Census estimates for 2016, blacks or African Americans constitute 26% of Alabama's total population of 4,779,736. Blacks or African Americans are 73% of Birmingham's total population of 212,237.

32.    According to the 2010 census, blacks or African Americans were 24.86% of the voting-age population in Alabama, while they were 70.04% of the voting-age population in the City of Birmingham.

33.    According to the 2010 census, blacks or African Americans were 27.79% of registered voters in Alabama, while they were 78.58% of registered voters in the City of Birmingham.

34.    Voting is racially polarized in Alabama statewide and at the local government level.

35.    In the Legislature there are 27 majority-black (voting age) House districts and 8 majority-black Senate districts, but there are no African Americans elected to statewide office. Oscar Adams, elected to the Alabama Supreme Court in 1982 and 1988, and Ralph Cook, elected to the Alabama Supreme Court in 1994, are the only African Americans since Reconstruction to be elected to statewide office in Alabama history.

11

ER0048

36.     Today, black political power still has its greatest influence at the local levels of government.  There are 12 majority-black (total population) counties in Alabama, all located in the Black Belt: Sumter, Greene, Hale, Marengo, Perry, Dallas, Wilcox, Lowndes, Montgomery, Macon, Bullock, and Barbour.

37.     According to the 2000 census there are 2 majority-black municipalities over 100,000 people in Alabama, Birmingham and Montgomery, 2 majority-black municipalities between 25,000 and 100,000 people, Bessemer and Prichard, and 67 majority-black municipalities with fewer than 25,000 people.

38.     Act 2016-18 perpetuates Alabama's *de jure* policy of white supremacy, in particular its suppression of local black majorities through imposition of white control by state government.

39.     Before the Civil War, white supremacy was maintained through slavery, which was guaranteed by the 1819 Constitution.  Even free blacks could not vote; the 1819 Constitution, the 1861 Secession Constitution, and even the 1865 Presidential Reconstruction Constitution all restricted the franchise to white males.  State law made educating blacks, slave or free, a criminal offense.

40.     The antebellum constitutions guaranteed popular election of county officials.  Disfranchised slave majorities were tied to the land as cheap laborers, who enabled whites in the Black Belt counties to become the wealthiest citizens in the nation.

ER0049

41.    Many non-slaveholding whites in the northern counties could not compete with the slave economy and were reduced to subsistence farming. Their support of slavery and, eventually, secession was contrary to the economic interests of the overwhelming majority of white Alabamians and was the first example of Alabama's official policy of white supremacy benefitting the wealthy at the expense of the working classes.

42.    Because the 1819 Constitution apportioned seats in the Legislature based on white population, the white counties outside the Black Belt initially had majority control, and they enacted slave taxes and other taxes on wealth to fund state and local government. The white yeomanry paid virtually no taxes. But in the last antebellum decade representatives of the Black Belt gained more legislative power and began replacing the slave tax with land taxes that non-slaveholding whites had to pay.

43.    At the end of the Civil War, Congressional Reconstruction began in 1867, which, protected by the federal army, temporarily disfranchised former Confederate officials, enfranchised blacks, and gave Republicans control of Alabama government. Black men, mostly from the Black Belt, were elected to the Legislature and county offices, but white Republicans (carpetbaggers and scalawags) exercised control over both state and local governments.

44.    The Reconstruction Legislature greatly increased land taxes to pay for

13

ER0050

public schools and other services for a citizenry that now included freedmen.  This tax burden fell on white landowners, who bitterly resented paying for the education of blacks.  Many white subsistence farmers could not afford the property taxes and lost their land.  The hardships and humiliations of the Reconstruction era became embedded in white memory, and resentment of federal rule remains part of Alabama's political culture today.

45.    When white Conservative Democrats regained control of state government in the 1874 election, they "redeemed" Alabama from "black rule" and enacted the repressive 1875 Redeemer Constitution.  The 1875 constitutional convention was controlled by Black Belt planters and representatives of railway, mining, and financial interests (known in Alabama as the Bourbon Aristocracy and Big Mules).  They placed provisions in the 1875 Constitution designed to prevent coalitions of blacks and whites from ever again using their electoral majorities to raise their taxes or interfere with their ability to maintain a cheap labor force to work on their plantations and in their mines.  Chief among these constitutional provisions were restraints on home rule, on the ability of county and municipal governments to raise their own revenues or to regulate their local economies.  The white counties were persuaded to ratify these terms against their own interests when the Democratic Party drew the color line and invoked white supremacy.

46.    The 1875 Redeemer Constitution did not disfranchise blacks for fear

ER0051

of federal enforcement of the Fifteenth Amendment.  So Black Belt whites devised both legal and extra-legal methods for controlling their overwhelming black majorities.  The legal means included enacting statutes that removed local electoral control of many Black Belt county governments, giving the Governor authority to appoint those county officials.  The extra-legal means were the use of violence and economic intimidation to control the votes of black sharecroppers, and outright fraudulent stuffing of ballot boxes.  Black Belt whites "voted" their black majorities in support of white Democratic candidates both to maintain their control of the Legislature and locally to prevent their land from being taxed.

47.    Racially segregated schools made it possible for Black Belt whites to appropriate and redirect to their white schools the state school revenues apportioned to their black schools.  Because the Black Belt white schools needed little local school revenue, Black Belt politicians succeeded in defeating efforts by other white county legislators to raise constitutional millage caps on local funding for their white schools.  In this way the funding mechanisms supporting *de jure* school segregation in Alabama helped suppress the wages and economic opportunities of both black and white workers throughout Alabama.

48.    Alabama's policy of white control of schools educating black students, whose purpose, according to Senator John Tyler Morgan, was to combat the danger that "education would spoil a good plow-hand," succeeded until the

15

ER0052

1970s, when, in response to federal court-ordered desegregation, whites in the Black Belt counties left their public schools en masse, leaving behind virtually all-black student bodies.

49.    In 1975, under the sponsorship of newly-elected black legislators, the two historically black state universities, Alabama State University (ASU) and Alabama A&M University (AAMU) were able to obtain their own governing boards.  *Knight v. Alabama*, 787 F.Supp. 1030, 1139-40 (N.D. Ala. 1991), aff'd in relevant part, 14 F.3d 1534 (11th Cir. 1994).

50.    As the court noted in *Knight v. Alabama*, "Since Alabama became a state, it has maintained through a variety of historical circumstances a steadfast policy of imposing white control over the public education of black people.  This racially motivated policy was crucial to the regime of white supremacy for two purposes:  (1) to make sure the content, values and style of blacks' education prepared them for subordinate roles in society, and (2) to ensure that white persons would never be forced to submit to the authority of black persons.  African Americans have always understood that their educational opportunities depended on the extent to which they could gain a measure of control over their own institutions, and that their ability to combat the policy of white control directly depended on the extent to which black citizens could gain a share of effective political power.  Among the earliest achievements of blacks elected as a result of

16

ER0053

the 1965 Voting Rights Act and federal court legislative reapportionment decrees were creation of independent, majority-black boards for ASU and AAMU and corresponding increases in their state appropriations." *Id.* at 1052. Public education, however, was not the only area of African American life the Legislature sought to dominate and preempt local efforts of improvement.

51.     The most notorious method Black Belt whites and the Legislature they dominated used to control their black majorities and to keep them on the land as cheap labor was the brutal convict leasing and peonage system that began during Radical Reconstruction and continued well into the twentieth century. Black men and women were rounded up and convicted of vagrancy or breaking their labor contracts, then were leased out to farmers and mining companies. The revenues from convict leases helped compensate for the property taxes landowners were evading and provided over one-third the operating budgets of both state and county governments, who competed with each other to capture and convict the most black prisoners. White workers outside the Black Belt had their wages suppressed by convict lease competition, but they did not have the political power to oppose the Bourbons and Big Mules and could not bring an end to the convict lease system, which only ended in the 1920s.

52.     In the 1890s the Bourbon/Big Mule alliance again drew the color line and used state government to undermine interracial coalitions of working men,

17

ER0054

both in the agrarian Populist and Greenback Parties and in urban centers where labor unions became active.  In particular, the United Mineworkers of America, known as UMW District 20, successfully organized black and white mine workers in Birmingham, breaking the segregation line.

53.    In 1901, Alabama adopted a new Constitution was adopted that would fully disfranchise almost all black citizens – and many poor whites as well.  The 1901 Alabama Constitution retained the 1875 Constitution's restrictions on local taxation and other home rule powers and added a set of provisions aimed at disfranchising blacks: a cumulative poll tax, a literacy test, a property ownership requirement, and a list of crimes tailored to disqualify blacks.

54.    The avowed purpose of the 1901 Constitution was made clear by John B. Knox, Chairman of the Constitutional Convention: "And what is it that we want to do?  Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State."  *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (quoting 1 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901, to September 3rd, 1901, p. 8 (1940)).

55.    Working class whites supported disenfranchising blacks, but they understood they and their children also would be disfranchised by the 1901 Constitution.  So many white counties voted against ratification, and the new constitution would have failed had it not been for Black Belt whites, who for the

18

ER0055

last time fraudulently voted their black majorities, effectively making them vote to disfranchise themselves.

56.    The suffrage restrictions in the 1901 Constitution had their desired effect.  In 1900 there were 181,000 registered black male voters; in 1903 there were fewer than 5,000.  In the first election held after enactment of the 1901 Constitution, overall voter turnout declined by 38% (the white turnout by 19%, black voting by 96%).

57.    During the first sixty-five years of the twentieth century, when blacks in Alabama were disfranchised, the Legislature allowed all-white electorates in many counties and cities to restore single-member district elections for their local governing bodies.  But as the number of black voters gradually increased after World War II, the Legislature switched back to at-large election of local officials and adopted other laws to preserve white control of black majorities, such as anti-single-shot voting and numbered place laws, and the racial gerrymandering of the City of Tuskegee, which the Supreme Court struck down in *Gomillion v. Lightfoot* (1960).

58.    In 1957, out of fear that blacks were gaining too much political power in the Black Belt, Macon County Senator Sam Engelhardt, Jr., who was also the President of the Alabama White Citizens Council, sponsored Amendment 132 to the Alabama Constitution, which authorized the Legislature to abolish Macon

19

ER0056

County. The *Birmingham News* reported:

> **Segregationists Win:** Alabama Votes Macon County Abolition;
> Election Follows Tuskegee Boycott
>
> Birmingham, Ala. Dec. 18 [1957.] Alabama voters yesterday authorized the Legislature to abolish Macon County rather than see it come under Negro domination. The County may now be abolished by legislative act and its territory added to adjoining counties where whites are in the majority.

After the passage of the constitutional amendment, legislators in the neighboring counties were unable to agree on a division and parceling out of Macon County, because none wanted to increase his county's percentage of black voters.

59.    In 1960, before Congress passed the Voting Rights Act, only 13.7% of voting age blacks were registered to vote in Alabama, and in 1965 there were only six black elected officials anywhere in the state.

60.    Bloody Sunday in Selma made Alabama the cradle of the Voting Rights Act of 1965.  Under Governor George C. Wallace, Alabama resisted enforcement of the Voting Rights Act, particularly as it began to empower black majorities at the local level.

61.    Little progress was made providing black voters equal access to election of their county and municipal governing bodies until 1982, when Judge Virgil Pittman, on remand from the Supreme Court in *City of Mobile v. Bolden*, found purposeful discrimination behind the laws requiring at-large election of

20

ER0057

Mobile city officials, and Congress amended the Voting Rights Act to outlaw election methods that resulted in dilution of black voting strength regardless of invidious intent.

62.   The Voting Rights Act may have had its greatest impact on Alabama through *Dillard v. Crenshaw County,* a statewide defendant class action begun in 1985 alleging that the use of at-large elections in 192 political subdivisions from sixty-one of Alabama's sixty-seven counties violated Section 2 of the Voting Rights Act as it was amended in 1982.  By the year 2000, black elected officials had achieved close to representational parity on county commissions, county school boards, and city councils in Alabama, reflecting the black voting age population of 22.7% in the state.

63.   By 2010, when the last *Dillard* cases were dismissed, there were 757 black local elected officials.  In the legislature there were twenty-seven majority-black House districts and eight majority-black Senate districts, but there were no African Americans elected to statewide office. Today, black political power still has its greatest influence at the local levels of government.

64.   The price Black Belt whites had demanded and received in 1901 in return for abandoning their captive black vote was continuing control of the Legislature.  The apportionment of legislative seats in the 1901 Constitution itself was malapportioned in favor of the Black Belt counties.  And for the next sixty-

21

ER0058

five years, representatives of the Black Belt beat back efforts by conservative Governors like Frank Dixon and populist Governors like Jim Folsom to get the Legislature to comply with its constitutional duty to reapportion seats among counties after every decennial census. Reapportionment occurred only after urban leaders in Birmingham and Mobile persuaded the U.S. Supreme Court in *Reynolds v. Sims* (1964) to proclaim the Fourteenth Amendment right to one person, one vote and order the Alabama Legislature to apportion seats in the House and Senate based on substantial population equality.

65. The 1901 Constitution solidified control of the Legislature by the Black Belt/Big Mule alliance, and "Bourbon rule" of Alabama would continue well into the 1980s. The disenfranchisement of poor whites as well as blacks prevented any reoccurrence of a populist, interracial political opposition to Alabama's employer-friendly, anti-union, low-wage, and low-property tax policies.

66. The 1901 Constitution also entrenched white legislative control of local governments. Since adoption of the 1875 "Redeemer" Alabama Constitution, the state has denied home rule to its counties in order to "guarantee[] the maintenance of white supremacy in majority-black counties." *Knight v. Alabama*, 458 F.Supp.2d 1273, 1284-85 (N.D. Ala.), aff'd 476 F.3d 1219 (11th Cir.), cert. denied, 551 U.S. 1146 (2007). The real legislatures of counties and cities are the members of their county legislative delegations, the House members and Senators

22

elected by voters in each county.  Under the informal rule of "local courtesy," the entire Legislature will routinely enact any local bill pertaining solely to one county or city so long as the affected county's local delegation agrees to it.

67.    As a consequence of the retention of these powers at the state level, majority black governments have historically been denied and continue to be denied opportunities to pursue local economic development on the same basis as majority white governments.   (See Will Parker, "Still Afraid of Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 are Unconstitutional," 57 Ala. L. Rev. 545, 562 (Winter 2005):

> "black counties received increased power to engage in economic development at a slower rate than white counties. Only three of the first twelve counties to get relief from the restraint embodied in section 94 were black counties. Next, more than half of white counties have secured constitutional amendments allowing them to carry on such government functions as drainage control, fire protection, and sewage removal; meanwhile, only one third of black counties have secured similar authority. Finally, of the first twenty-one counties to receive constitutional permission regarding county officials' retirement plans, only two were black."

68.    Though the City of Birmingham as a result of the Mayor Council Act of 1955 has much greater power than counties under Alabama law, the same pattern of majority white State government preempting and controlling local governance on account of race applies to the adoption of HB 174.

69.    Voters in the majority-black Black Belt counties did not elect

23

ER0060

candidates of their choice to represent them in the Legislature until after the 1983 special election ordered by a federal court. Preparing for the inevitable, Governor George C. Wallace used the popularity of his segregationist policies to help white Black Belt representatives enact and obtain ratification of Amendment 325, in 1972, and Amendment 373, in 1978, that to this day restrict the ability of black-elected tax assessors to assess valuable farm and timber land for property tax purposes above the artificially low levels the amendments set out in the Alabama Constitution. Amendments 325 and 373 have left the nearly all-black public schools in the Black Belt bereft of local school funding.

70.    Before they left office, the white legislators representing majority-black Greene County, exercising their local courtesy powers, passed Act No. 1983-507, which transferred the power to appoint members of the Greene County Racing Commission from the Greene County legislative delegation, elected by Greene County voters, to the Governor, elected by the majority-white statewide electorate. A three-judge federal court struck down Act 1983-507 for having failed to obtain preclearance under Section 5 of the Voting Rights Act. *Hardy v. Wallace*, 603 F.Supp. 174 (N.D. Ala. 1985) (three-judge court).

71.    Local black electorates lost protection against legislative acts that cause retrogression in their electoral power when the U.S. Supreme Court ruled in *Shelby County v. Holder* (2013), that the coverage formula in Section 4 of the

24

ER0061

Voting Rights Act was unconstitutional. Although Alabama's Shelby County brief claimed there were no longer barriers to blacks' voting rights, Alabama did not renounce its historical policy of preserving white control of local majority-black electorates.

72.   Until 1974, when the first federal court-ordered single-member districts were used to elect legislators, seats in the Alabama House and Senate were apportioned to each county on the basis of its relative population, and only residents of each county voted for their local delegation. *Reynolds v. Sims* held that the integrity of county boundaries must give way to one person, one vote, but only so far as necessary to reach substantial population equality among House and Senate districts.   In each redistricting after the 1980 census the single-member districts drawn by the Legislature have increasingly ignored county boundaries. The House and Senate redistricting plans enacted in 2012, which currently are pending review by a three-judge district court in Montgomery, split the boundaries of 50 of Alabama's 67 counties.   Each county split creates additional non-residents of the county who vote for members of the county local delegation and dilutes the voting strength of county residents.   The Legislature has used county splits to preserve white control over many majority-black counties and cities.

73.   A particularly telling example of the use of county boundary splits to maintain white control of local governments concerns Birmingham and Jefferson

25

ER0062

County. To comply with one person, one vote, fourteen House districts could be drawn for Jefferson County, none of them crossing the county boundaries and nine of the fourteen (64%) majority-black. Six Senate districts could be drawn for Jefferson County, three of them majority-black, with only one majority-white Senate district crossing the county boundary. Instead, the Legislature in 2012 enacted plans that place Jefferson County in eighteen House districts, only eight (44%) of them majority-black. All of the majority-black House districts lie entirely inside Jefferson County, but six of the ten majority-white districts cross into six other majority-white counties.

74. The 2012 Senate plan puts Jefferson County in eight districts, three majority-black and five majority-white. All three of the majority-black Senate districts lie entirely inside Jefferson County, but all five of the majority-white districts cross the Jefferson County boundary to include parts of eleven other majority-white counties.

75. Altogether, 155,279 nonresidents vote for members of Jefferson County's House delegation, and 428,101 people residing in other majority-white counties vote for members of the Jefferson County Senate delegation.

76. The legislative redistricting plan enacted by the Legislature after the 2000 census had put nine majority-white and nine majority-black districts in the Jefferson County House Delegation, which, operating by majority vote, prevented

26

ER0063

representatives of majority-white districts from approving bills opposed by the representatives of majority-black districts.   But after filibuster-proof white Republican majorities were elected to both Houses in 2010, over the objections of black legislators, one majority-black House district was moved out of Jefferson County and was replaced by a majority-white district, which gave representatives of the white members of the Jefferson County House Delegation the ability to ignore the opposition of black members.

77.   Last year, over the objections of black members, the white members of the Jefferson County Delegation procured passage of Act 2015-164, which gave municipalities and counties purchasing services from the Birmingham Water Works Board authority to appoint representatives to that Board.   Under general Alabama law, the power to appoint municipal water board members is reserved exclusively to the municipality's council.   The City of Birmingham's water board operates one of the most profitable water systems in Alabama and has been a valuable asset providing economic development for the citizens of Birmingham. Act 2015-164 made Birmingham's water board, which was subject to the control of its majority-black electorate, the only municipal water board in Alabama whose governance now must be shared with neighboring cities and counties, all of which are majority-white.   In this way, the Legislature, elected by a statewide white majority, diluted the power of a majority-black municipal electorate to exercise

ER0064

control over its own water board.

78.     The Birmingham water board takeover act (Act 2015-164), like Act 2016-18, altered the voting power of Birmingham residents by removing from their elected representatives and transferring to the majority white state decision-makers authority to control local economic welfare and development policy previously resting within their authority.

79.     The continuing racial nature of Alabama's legislative decision-making was noted by the Court in *United States v. McGregor*, 824 F.Supp.2d 1339-1345-47 (M.D. Ala., 2011), where the Court, in considering the motives of white legislators with respect to their opposition to placing a gambling referendum on the ballot, concluded that their motives, as reflected in tape recordings of their conversations with "other influential Republican legislative allies" were overtly racial, referring to black voters in racially derogatory terms and "singl[ing] out African-Americans for mockery and racial abuse."  The Court further stated "that political exclusion through racism remains a real and enduring problem in this State."

80.     In 2011, the Alabama legislature adopted a comprehensive immigration law described by its co-sponsors as "designed to reduce the number of illegal aliens in the state."  They sought to do so by attacking "every aspect of an illegal immigrant's life," … "so they will deport themselves."  *Cent. Ala. Fair*

ER0065

*Hous. Ctr. v. Magee*, 835 F.Supp.2d 1165, 1182 & n.14 (M.D. Ala. 2011), vacated on other grounds 2013 WL 2372302 (11th Cir. 2013).  The Court in *Magee* enjoined portions of the 2011 immigration law, concluding that there was substantial evidence of racial animus, including legislators using "illegal immigrant as a code for Latino or Hispanic" and making "comments that reflect popular stereotypes about Mexicans and explicit distinctions along the lines of race and national origin."  *Magee*, 835 F.Supp.2d at 1192-94 and nn. 20-21.

81.    At least thirteen of the House sponsors of HB-174, the bill enacted into law as Act 2016-18, were also sponsors of HB-56, the House version of the sweeping immigration bill passed in 2011.  Representatives Kerry Rich and Micky Ray Hammon, whose race-based statements were reviewed by the Court in *Magee*, *supra*, were also among the co-sponsors of HB-174.  The leader of the House, Speaker Mike Hubbard, also co-sponsored both bills.

### Passage of Act 2016-18 (HB 174)

82.    As recounted above, on April 21, 2015, the Birmingham City Council unanimously passed a resolution asking the state Legislature to raise the minimum wage to $10 per hour across the state.  City Councilman, Jay Roberson, in speaking in favor of the resolution stated that "their advocacy on increasing the minimum wage to $10 an hour in Alabama is an economic issue that will benefit all, . . . I hope the City of Birmingham and the business community will respectfully adhere

29

ER0066

to this great economic boost for all hard working employees which hopefully will become law in the near future."[1]

83.    Prior to this resolution, the State legislature had failed to take any action to establish a statewide minimum wage law and had, in fact, been indifferent to efforts to establish such a law.

84.    Almost simultaneously with the rally and the passage of the Birmingham City Council's resolution calling for an increase in the minimum wage, Representative Arnold Mooney (a white representative from the 43rd District-Shelby) introduced bill HB 495 in the Alabama Legislature.  HB 495 sought to prevent any municipality from requiring that employers provide wages, paid or unpaid leave, and/or vacation pay that is not required by federal or state law.  HB 495 did not advance out of the Alabama House of Representatives and further consideration was postponed when the legislative session ended in early June 2015.

85.    On August 18, 2015, the Birmingham City Council unanimously passed, with one abstention, Ordinance 15-124 that would raise the minimum wage for employees working in the city to $8.50 per hour as of July 1, 2016, and $10.10 per hour on July 1, 2017.  The ordinance was published and went into effect on

---

[1]Birmingham City Council Endorses Campaign to Raise Minimum Wage, http://www.al.com/news/birmingham/index.ssf/2015/04/birmingham_city_council_endors_1.html, April 21, 2015.

30

August 30, 2015. The ordinance received wide spread approval among Birmingham's African-American residents, which comprise approximately seventy-three (73) percent of Birmingham's population, and as noted above, approximately 78.5 percent of registered voters in the City.

86.     In reaction to the Birmingham City Council's ordinance increasing the minimum wage, on or about September 8, 2015, at the beginning of the Legislature's second special legislative session of 2015, Alabama House District 47 Representative David Faulkner, (a white representative of the Birmingham suburb of Mountain Brook),[2] introduced bill HB 27 that prevents cities such as Birmingham from raising the minimum wage.  Faulkner stated that he was "shocked" that the city could raise the minimum wage for its residents.[3] Birmingham was the only city or governmental entity in the state to have passed a minimum wage ordinance at the time of Senator Faulkner's introduction of HB 27.

87.     There was no public notice of the bill or an opportunity for hearing, and HB 27 did not advance through the Legislature during the second special session.

88.     Undeterred by the lack of passage of HB 27, Representative Faulkner

---

[2] According to recent United States census figures, Mountain Brook is approximately 98% white and its median income of approximately $130,000.00 is more than six times higher than that of Birmingham.

[3]   Alabama Lawmakers Consider Bill to Block City Minimum Wages, http://www.al.com/news/index.ssf/2015/09/alabama_lawmakers_consider_bil.html, September 9, 2015.

ER0068

on February 9, 2016, the third day of the 2016 regular session of the Alabama Legislature, introduced  HB 174 which combined Representative Mooney's HB 495 introduced in April of 2015 and Representative Faulkner's HB 27 introduced in September of 2015.  HB 174 sought to block and declare void Birmingham's minimum wage ordinance passed in August of 2015.  The fifty-three sponsors of HB 174 in the House (all of them white) squarely targeted Birmingham and its minimum wage ordinance as Birmingham was the only city or public entity in the state of Alabama that had raised its minimum wage above that required by federal law.  No Alabama law provides for a minimum wage, nor did the supporters of HB 174 include any state-wide minimum wage within its provisions or encourage favorable consideration of such. The leadership of the House of Representatives fast-tracked HB 174 in the House, which held a short public hearing on the bill on February 11, 2016, and voted it out of the Committee on State Government by a vote of 10-3.  All ten supporters of the bill in the House Committee were white.

89.    On February 16, 2016, the House of Representatives approved the bill 71-31 and sent it to the Alabama Senate. All members of the House voting in favor of the bill were white; all twenty-seven African-American Representatives voted against the bill.

90.    On February 23, 2016, the Birmingham City Council adopted Ordinance 16-28 entitled "An Ordinance Relating to Minimum Wage to Be Paid to

32

ER0069

Employees by Employers in the City of Birmingham."   Among the reasons the City Council adopted Ordinance 16-28, like Ordinances 15-124 and 16-25, was because "Poverty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our [Birmingham] economy."

91.    Ordinance 16-28 moved the effective date of the minimum wage increase to February 24, 2016 and increased the minimum wage to $10.10.  The City Council acted to move up the date of the minimum wage increase because the white supporters of HB 174 in the Alabama Legislature were fast-tracking HB 174 in an attempt to have it pass before the first wage increase provided in Birmingham's Ordinance took effect.

92.    Birmingham Mayor William Bell signed Ordinance 16-28 on February 24, 2016.  Upon information and belief, the Ordinance was published in the Birmingham News on Sunday, February 28, 2016.

93.    The Alabama State Senate, led by Senator Jabo Waggoner (a white senator representing the Birmingham suburb of Vestavia Hills who had also sponsored the unconstitutional immigration bill), fast-tracked HB 174 in approximately 36 hours through the Senate Committee on Governmental Affairs and the Senate passed the bill on a 23-12 roll call vote on February 25, 2016.  The

ER0070

Committee did not provide adequate notice of any hearing on the proposed bill, and did not permit public comment on HB 174. All Senators voting in favor were white; all seven African-American members of the Senate voted against passage. The bill was delivered to Governor Robert Bentley on February 25 and it was signed by the Governor approximately ninety minutes after its passage in the Senate.   Thus, the legislature, which had shown no interest in a minimum wage bill previously, passed and delivered the bill to the Governor for his signature within sixteen days of its introduction.

94.    One specific provision of this new law renders null and void any municipal or county minimum wage ordinance enacted prior to passage of HB 174. This retroactive nullification of wage ordinances applied only to the City of Birmingham.   Section 110 of the Alabama Constitution provides, in relevant respects, that a general law affecting only one municipality at the time of enactment must comply with the notice provisions of Section 106.

95.    The notice provisions of Alabama Constitution Section 106 require, *inter alia*, that before a special, private or local law shall be passed, it must be published in the local newspaper for four consecutive weeks in the county or counties affected by the law.

96.    The Alabama House of Representatives and the State Senate failed and refused to provide the notice required by Section 106 of the Constitution in an

34

ER0071

effort to keep Birmingham Ordinance 16-28 from becoming effective.

97.   State Senator Slade Blackwell, (a white senator from the wealthy Birmingham suburb of Mountain Brook) stated in support of the legislation and in opposition to the Birmingham ordinance that increases in the minimum wage especially hurt young people from poorer families who may not have easy access to trendy internships at colleges and private companies to build their skill set and resume.  Since HB 174 was targeted only at Birmingham, which is predominately African-American and many of whose residents live below the poverty line, this statement by Senator Blackwell, was directed at the poor, African-American residents of the City of Birmingham.  This statement, and others by white legislators, invoked racial stereotyping to justify denial of a living wage to African-American residents of the City of Birmingham.

98.   In contrast to Birmingham's 32% of African-Americans living below the federal poverty level, only 2.57% of Mountain Brook's residents (97.2% white) are below the federal poverty level.

99.   Just before the final vote, State Senator Bill Hightower, (a white businessman and real estate investor from Mobile), spoke in support of the bill saying "we should lower the minimum wage," and later posted on his Twitter account his claim that "raising the minimum wage hurts the poor."

100.   Sen. Dick Brewbaker, (a white senator from Montgomery) said he

ER0072

was concerned about the bill generally and speculated that "Montgomery would probably follow suit," if Birmingham's wage ordinance was allowed to stand. Brewbaker, too, was a sponsor of the 2011 race-based immigration act.

101.   Montgomery is approximately 57% African-American and after Birmingham, has the second highest concentration of African-Americans among Alabama's large cities.

102.   The passage of HB 174 by the Alabama Legislature fits a historical pattern of legislation that discriminates against African Americans and thwarts the efforts of African-Americans in the state of Alabama who seek to improve their economic and social well-being. The enactment of HB 174 resulted in approximately 40,000 low wage workers in Birmingham being denied a wage increase; the vast majority of these workers are African-American.

103.   The Defendant City of Birmingham has not taken any steps to enforce Ordinance 16-28.   The individual Plaintiffs Marnika Lewis and Antoin Adams currently work in the City of Birmingham and are paid less than $8.50 per hour. Such wage rate violates the provisions of Ordinance 16-28.

## COUNT I

### Violation of § 2 of the Voting Rights Act: Results Standard

104.   The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

36

ER0073

105.   Act 2016-18 is a standard, practice, or procedure which results in the denial or abridgement of the right of citizens of Birmingham to vote on account of their race, in violation of § 2 of the Voting Rights of 1965, as amended, 52 U.S.C. § 10301.

106.   Act 2016-18 reverses a scheme of local control by citizens of Birmingham over the power to enact minimum wages and other terms and conditions of employment in their municipality by transferring that power from the city council elected by the majority-black Birmingham electorate to the Legislature elected by the majority-white state electorate.

107.   The political processes leading to nomination or election in the State of Alabama, as opposed to the City of Birmingham, are not equally open to participation by African Americans, who have less opportunity than other members of the electorate to participate in the statewide political process and to elect representatives of their choice.

## COUNT II

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Equal Protection Clause.

108.   The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

109.   Act 2016-18 perpetuates Alabama's official policy of ensuring that

ER0074

the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control.

110. Act 2016-18 prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government and the right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama.

111. Thus Act 2016-18 denies black citizens of Birmingham equal protection of the law in violation of the Equal Protection Clause of Section 1 of the Fourteenth Amendment to the Constitution of the United States.

## COUNT III

**Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Privileges or Immunities Clause.**

112. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

113. Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control.

114. Act 2016-18 prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government and the

ER0075

right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama.

115.    Thus Act 2016-18 violates the Privileges or Immunities Clause of Section 1 of the Fourteenth Amendment to the Constitution of the United States, which guarantees that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.

## COUNT IV

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Fifteenth Amendment.

116.    The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

117.    Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control.

118.    Act 2016-18 prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government and the right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama.

39

ER0076

119.    Thus Act 2016-18 denies or abridges the right to vote of black United States Citizens of Birmingham on account of their race, color, or previous condition of servitude and violates the Fifteenth Amendment to the Constitution of the United States.

## COUNT V

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Thirteenth Amendment.

120.    The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

121.    Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control, and its corresponding official policy, originating in African slavery, of suppressing the political power of citizens of the United States, both black and white, to increase their incomes and to develop their local economies.

122.    Thus Act 2016-18 is a badge or vestige of slavery and violates the Thirteenth Amendment to the Constitution of the United States.

## COUNT VI

### Vestiges of *de jure* Racial Segregation in Violation of the Equal Protection Clause

123.    The factual allegations contained in the preceding paragraphs are

40

ER0077

realleged as if set out fully herein.

124.   Act 2016-18 perpetuates vestiges of Alabama's policy of *de jure* racial segregation and violates the Equal Protection Clause of Section 1 of the Fourteenth Amendment.  Alabama has failed its affirmative constitutional duty to eliminate all such vestiges of *de jure* segregation.

125.   First and foremost, Act 2016-18 is a vestige of Alabama's *de jure* policy of segregating its African-American citizens in state and local electorates. Under its policy of electoral segregation, Alabama has either completely disfranchised its black citizens, has sought to exclude black voters from its political subdivisions, has sought to submerge black voters in majority-white, at-large election systems, has sought to crack or pack black populations in single-member districts, has sought to segregate black and white voters in separate political parties, and has sought to segregate and minimize the political influence of legislators and local officials elected by black majorities.

126.   All of these *de jure* policies of electoral segregation were intended, and are still intended, to preserve white control over black voters.

127.   Alabama has an affirmative constitutional duty to eliminate to the extent practicable all vestiges of its *de jure* policies of racial segregation.  But Alabama has taken no steps to eradicate vestiges of segregation that have not been mandated by federal courts or federal executive actions.

41

128.   Instead, Alabama continues to evade its duty to eliminate vestiges of segregation and continues to enact laws that have both the purpose and effect of perpetuating its policy of electoral segregation.  Act 2016-18 is only the latest example of this continuing violation of the rights of all black citizens of Alabama to equal protection of the laws.

129.   Act 2016-18 also perpetuates vestiges of *de jure* school segregation in Jefferson County.  Utilizing Alabama general laws that facilitate the creation of separate municipal school systems, some of which were enacted for the purpose of evading desegregation, eight municipal public school systems have split from the Jefferson County and City of Birmingham school systems to evade federal desegregation mandates: Homewood, Hoover, Leeds, Midfield, Mountain Brook, Tarrant, Trussville, and Vestavia Hills.  The City of Gardendale currently is also seeking federal court permission to create its own municipal public school system. Every time one of these municipal school systems breaks away from Jefferson County and City of Birmingham systems they remove valuable public funding and other resources, particularly political resources, from the urban schools they left behind, leave black inner-city students in less well funded and more racially segregated schools.

130.   Most of the minimum wage workers the City of Birmingham's Ordinance 16-28 will benefit attended or will attend the increasingly segregated

42

ER0079

schools in Birmingham and surrounding Jefferson County.  The Mayor and Council of Birmingham were responding to these citizens who elected them to represent their economic interests, including increasing their school revenues.  Act 2016-18, however, was enacted by the white legislators who represent residents of the breakaway school districts, who no longer have a direct interest in revenues for Birmingham schools or for the financial success of Birmingham students.  To the contrary, these white legislators disproportionately represent Birmingham employers who reside in the breakaway suburban school systems and who perceive Birmingham's minimum wage ordinance as being contrary to their interests.  Thus the lack of responsiveness to the needs of Birmingham's minimum wage workers by the sponsors of Act 2016-18 is a vestige of Alabama's *de jure* policies of both political and school segregation.

## COUNT VII

### Intentional Racial Discrimination in Violation of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

131.  The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

132.  Act 2016-18 was enacted for the invidious purpose and with the racially discriminatory intent of denying the majority-black electorate of the City of Birmingham the ability to regulate the minimum wages and other terms and

43

ER0080

conditions of employment within their municipality.   It has its intended discriminatory effect on Birmingham's black citizens.

133.   Thus Act 2016-18 violates § 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301; the Thirteenth Amendment; the Privileges or Immunities Clause and the Equal Protection Clauses of the Fourteenth Amendment; and the Fifteenth Amendment.

## COUNT VIII

### Racially-Motivated Enactment of Act 2016-18 Violates the Equal Protection Clause of the Fourteenth Amendment

134.   The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

135.   Defendants' actions constitute intentional discrimination on the basis of race contrary to the Fourteenth Amendment.

136.   The persons denied the benefits of the Birmingham minimum wage legislation are predominantly African-American.   Approximately 32% of Birmingham's African-American residents had annual earnings below what they could have earned had the minimum wage ordinance become effective.   The Alabama Legislature's enactment of Act 2016-18 denies the City of Birmingham the opportunity to obtain the same economic opportunities for its residents as is presently available to predominantly white communities throughout Alabama.

ER0081

137.   As noted above, pre-emption of the Birmingham wage law adversely impacted black workers.  On average, white wage earners in Birmingham earn $1.41 more per hour than black wage earners.   While 37% of black wage workers in Birmingham earn wages of $10.10 or less, only 27% of white wage workers earn at or below that level.  Statewide, the wage gap between white and black workers is even greater than in Birmingham, with white wage workers earning, on average, $2.12 more than black wage workers for each hour worked.

138.   Further, the City of Mountain Brook, home of the sponsor of Act 2016-18, with 97.2% of its residents white, has less than 3% of its residents with annual earnings below the federal poverty level.  Additional support for Act 2016-18 came from Senator Waggoner, a white senator representing Vestavia Hills -- a city that is 94.2% white and has only 3.1% of its residents living below the poverty line. Unlike these predominantly white communities, there was a substantial need for a minimum wage law in Birmingham, and the likely beneficiaries of the Birmingham ordinance were, predominantly, African-American.

139.   Defendants' assertions of the need for uniformity in application of minimum wage requirements throughout Alabama are pretextual, in light of the Legislature's history of less favorable treatment of predominantly African-American jurisdictions in the Legislature's granting of economic development authority to local jurisdictions (See Will Parker, "Still Afraid Od "Negro

45

ER0082

Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 are Unconstitutional," 57 Ala. L. Rev. 545, 562 (Winter 2005)) and in light of the Legislature's acceptance of non-uniformity in other areas of economic regulation, including but not limited to the sales tax. Defendants' departure from procedural norms to obtain passage of HB 174 also evidences discriminatory intent. The Alabama legislative committees considering HB 174 deviated from normal practices with respect to the consideration of legislation by, inter alia, failing to give the public proper information on the scheduling of hearings, failing to allow public testimony at the Senate hearing, and by rushing the bill to final votes and the Governor's signature after years of indifference to the issue.

140. Further, contrary to the assertions of Act 2016-18's supporters that passage of a minimum wage ordinance would be detrimental to Birmingham residents, economic studies show that increasing the minimum wage to $10.10 would not result in job loss or economic instability. The Legislature cited no economic studies in support of its position and instead relied on stereotypes about race and other pretexts to justify its actions. White majority local and county governments have not been subjected to such limitations upon their powers of governance.

141. The State Legislature also disregarded procedural requirements related to legislation that affects only a single municipality at the time of

46

ER0083

enactment. The State did not provide requisite notice to citizens of Birmingham before enacting a provision that nullified the City's wage ordinance.  At the time of Act 2016-18's enactment, Birmingham was the only city to have enacted an ordinance affected by Act 2016-18.   Disregarding these procedural notice provisions supports the inference of improper discriminatory motive.

## COUNT IX

### Equal Protection Claim Based on Political Process Doctrine

142.   Additionally and separately from the claims asserted above, Act 2016-18 violates the Fourteenth Amendment's equal protection clause because it specifically targeted an ordinance that Birmingham's African-American community and their City Council strongly supported.

143.   Act 2016-18 preempts a city ordinance that primarily inured to the benefit of Birmingham's African-American community.  Moreover, Birmingham's African-American community (as the organizational Plaintiffs can attest to) strongly considered the ordinance to be in their interest. Indeed, as noted above, the City Council passed multiple ordinances accelerating the provisions of the wage ordinance in an effort to prevent the State from nullifying the ordinance and usurping all authority to regulate and set policy pertaining to wages, leave or other employment benefits.

144.   The State's adoption of Act 2016-18 violates the Fourteenth

47

ER0084

Amendment's equal protection guarantee because it placed all decision-making authority regarding wages, leave or other employment benefits at the State level rather than leaving such authority to the City.  The intent to uniquely burden the ability of Plaintiffs to obtain employment-related ordinances that Birmingham's African-American community strongly favored motivated the decision to give the State Legislature "complete control" over regulation and policy pertaining to wages, leave or other employment benefits.

145.   Moreover, Defendants' actions as alleged herein have violated 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by placing special burdens on racial minorities within the governmental process.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiffs pray the Court will enter orders as follows:

A.   A judgment declaring that Act 2016-18 violates the rights of citizens of the City of Birmingham and other municipalities governed by black voter majorities guaranteed by § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

B.   Directing Defendant  Luther J. Strange, III to give notice to Alabama legislators and to members of the public that Act 2016-18 contravenes §

48

2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

C.  Preliminary and permanent injunctions ordering defendants City of Birmingham and/or the Mayor Bell to enforce City of Birmingham Ordinance 16-28.

D.   Awarding Plaintiffs their reasonable costs and attorneys' fees, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310.

E.  Granting such other and further relief as the Court deems equitable and just.

<table>
<tr><td>/s/ <em>Richard P. Rouco</em><br>Richard P. Rouco</td><td>/s/ <em>James U. Blacksher</em><br>James U. Blacksher</td></tr>
</table>

**OF COUNSEL:**

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
  DAVIES & ROUCO LLP
2 – 20TH Street North, Suite 930
Birmingham, Alabama  35203

Telephone: 205-870-9989
Facsimile: 205-803-4143
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

**OF COUNSEL:**

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201
phone: 205-591-7238
fax: 866-845-4395
jblacksher@ns.sympatico.ca

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham AL 35209
205-320-2882
still@votelaw.com

ER0086

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Tel. (212) 627-8100
Fax (212) 627-8182
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W..
Suite 500 West
Washington, DC 20005
(202) 230-4096
carlsonmjj@yahoo.com

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Direct:        1-205-488-1226
Facsimile:    1-800-922-4851
Email:     jwhatley@whatleykallas.com

*Attorneys for Plaintiffs Marnika Lewis,
Antoin Adams, Alabama State
Conference of the National Association
for the Advancement of Colored
People, and Greater Birmingham
Ministries*

U.W. Clemon, Esq.
WHITE ARNOLD AND DOWD
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
205-323-3124
UWClemon@whitearnolddowd.com

*Attorneys for Alabama Legislative
Black Caucus, Rep. Louise Alexander,
Rep. Marika Coleman, Sen. Priscilla
Dunn, Rep Juandalynn Givan, Rep.
Mary Moore, Rep. Oliver Robinson,
Rep. John Rogers, Sen. Rodger
Smitherman, and William Muhammad*

ER0087

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2016, I filed a true and correct copy of the

foregoing via the Court's CM/ECF system, which will notify and serve the

following:

David B. Byrne, Jr.
State of Alabama
Office of the Governor
Alabama State Capitol
600 Dexter Avenue, Suite NB-05
Montgomery, Alabama  36130

James W. Davis
William G. Parker, Jr.
Office of Attorney General
501 Washington Avenue
Montgomery, Alabama  36130

/s/ Richard P. Rouco
Richard P. Rouco

ER0088

**DEFENDANTS TO BE SERVED BY CERTIFIED MAIL:**

The State of Alabama
c/o Governor Robert J. Bentley
Office of the Governor
600 Dexter Avenue
Montgomery, Alabama  36130

The City of Birmingham
c/o Mayor William A. Bell, Sr.
City Hall, Third Floor
710 20th Street North
Birmingham, AL  35203

William A. Bell, Sr.
City Hall, Third Floor
710 20th Street North
Birmingham, AL  35203

ER0089

27

FILED

2016 Jul-19  AM 07:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**MARNIKA LEWIS, ANTOIN ADAMS,**
**ALABAMA STATE CONFERENCE OF**
**THE NATIONAL ASSOCIATION FOR**
**THE ADVANCEMENT OF COLORED**
**PEOPLE, GREATER BIRMINGHAM**
**MINISTRIES, ALABAMA LEGISLATIVE**
**BLACK CAUCUS, LOUISE ALEXANDER,**
**MARIKA COLEMAN, PRISCILLA DUNN,**
**JUANDALYNN GIVAN, MARY MOORE,**
**OLIVER ROBINSON, JOHN ROGERS,**        **Case No.2:16-cv-690 RDP**
**RODGER SMITHERMAN, and**
**WILLIAM MUHAMMAD,**
        **Plaintiffs,**

**v.**

**THE STATE OF ALABAMA,**
**THE CITY OF BIRMINGHAM,**
**LUTHER J. STRANGE, III, in his official**
**capacity as Attorney General,**
**and WILLIAM A. BELL, SR.,**
**in his official capacity as Mayor of Birmingham,**
        **Defendants.**

---

## ANSWER OF DEFENDANT CITY OF BIRMINGHAM

---

The Defendant, the City of Birmingham ("City"), Alabama, a municipal corporation existing under the laws of the State of Alabama, by and through its attorneys of record, in the above entitled cause and in Answer to the Complaint heretofore filed says as follows:

1

ER0090

# INTRODUCTION

The Defendant does not contest that this is an action for a declaratory judgment that Act 2016-18, titled the Alabama Uniform Minimum Wage and Right-to-Work Act (a.k.a. HB 174 or Act 2016-18), violates the rights of Birmingham citizens and the citizens of other majority-black municipalities guaranteed by the Constitution and laws of the United States, and for preliminary and permanent injunctions requiring the defendant City of Birmingham to enforce Ordinance No. 16-28, relating to the minimum wage to be paid to employees by employers in the City of Birmingham, Alabama.

Defendant lacks sufficient information either to admit or deny the remaining allegations set forth in the Introduction of the Complaint; therefore, Defendant denies them.

# PARTIES

1. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 1 of the Complaint; therefore, Defendant denies them.

2. Defendant admits the allegations set forth in Paragraph 2 regarding NAACP. Defendant lacks sufficient information either to admit or deny the allegations regarding Jaime Chrishon set forth in Paragraph 2 of the Complaint; therefore, Defendant denies them.

3. Defendant admits the allegations set forth in Paragraph 3.

4. Defendant admits the allegations set forth in Paragraph 4.

5. Defendant admits the allegations set forth in Paragraph 5.

6. Defendant admits the allegations set forth in Paragraph 6.

7. Defendant admits the allegations set forth in Paragraph 7.

8. Defendant admits the allegations set forth in Paragraph 8.

9. Defendant admits the allegations set forth in Paragraph 9.

10. Defendant lacks sufficient information either to admit or deny the allegations

2

ER0091

set forth in Paragraph 10 of the Complaint; therefore, Defendant denies them.

11.     Defendant admits the allegations set forth in Paragraph 11.

12.     Defendant admits the allegations set forth in Paragraph 12.

13.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 13 of the Complaint; therefore, Defendant denies them.

14.     Defendant admits the allegations set forth in Paragraph 14.

15.     Defendant admits the allegations set forth in Paragraph 15.

16.     Defendant admits the allegations set forth in Paragraph 16.

17.     Defendant admits the allegations set forth in Paragraph 17.

18.     Defendant admits the allegations set forth in Paragraph 18 that the City of Birmingham and Mayor Bell are named as defendants only for the purpose of providing complete relief among the parties with respect to the claims raised herein.

## JURISDICTION & VENUE

19.     Defendant admits the allegations set forth in Paragraph 19.

20.     Defendant denies the allegations set forth in Paragraph 20.

## STATEMENT OF FACTS

21.     Defendant admits the allegations set forth in Paragraph 21.

22.     Defendant admits the allegations set forth in Paragraph 22.

23.     Defendant admits the allegations set forth in Paragraph 23.

24.     Defendant admits the allegations set forth in Paragraph 24.

25.     Defendant admits the allegations set forth in Paragraph 25.

ER0092

26.     Defendant admits the allegations set forth in Paragraph 26.

27.     Defendant admits the allegations set forth in Paragraph 27.

28.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 28 of the Complaint; therefore, Defendant denies them.

29.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 29 of the Complaint; therefore, Defendant denies them.

30.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 30 of the Complaint; therefore, Defendant denies them.

31.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 31 of the Complaint; therefore, Defendant denies them.

32.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 32 of the Complaint; therefore, Defendant denies them.

33.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 33 of the Complaint; therefore, Defendant denies them.

34.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 34 of the Complaint; therefore, Defendant denies them.

35.     Defendant admits the allegations set forth in Paragraph 35.

36.     Defendant admits the allegations set forth in Paragraph 36.

37.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 37 of the Complaint; therefore, Defendant denies them.

38.     Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 38 of the Complaint; therefore, Defendant denies them.

39.     Defendant admits the allegations set forth in Paragraph 39.

40.     Defendant admits the allegations set forth in Paragraph 40.

41.     Defendant admits the allegations set forth in Paragraph 41.

ER0093

42.     Defendant admits the allegations set forth in Paragraph 42.

43.     Defendant admits the allegations set forth in Paragraph 43.

44.     Defendant admits the allegations set forth in Paragraph 44.

45.     Defendant admits the allegations set forth in Paragraph 45.

46.     Defendant admits the allegations set forth in Paragraph 46.

47.     Defendant admits the allegations set forth in Paragraph 47.

48.     Defendant admits the allegations set forth in Paragraph 48.

49.     Defendant admits the allegations set forth in Paragraph 49.

50.     Defendant admits the allegations set forth in Paragraph 50.

51.     Defendant admits the allegations set forth in Paragraph 51.

52.     Defendant admits the allegations set forth in Paragraph 52.

53.     Defendant admits the allegations set forth in Paragraph 53.

54.     Defendant admits the allegations set forth in Paragraph 54.

55.     Defendant admits the allegations set forth in Paragraph 55.

56.     Defendant admits the allegations set forth in Paragraph 56.

57.     Defendant admits the allegations set forth in Paragraph 57.

58.     Defendant admits the allegations set forth in Paragraph 58.

59.     Defendant admits the allegations set forth in Paragraph 59.

60.     Defendant admits the allegations set forth in Paragraph 60.

61.     Defendant admits the allegations set forth in Paragraph 61.

ER0094

62.     Defendant admits the allegations set forth in Paragraph 62.

63.     Defendant admits the allegations set forth in Paragraph 63.

64.     Defendant admits the allegations set forth in Paragraph 64.

65.     Defendant admits the allegations set forth in Paragraph 65.

66.     Defendant admits the allegations set forth in Paragraph 66.

67.     Defendant admits the allegations set forth in Paragraph 67.

68.     Defendant admits the allegations set forth in Paragraph 68.

69.     Defendant admits the allegations set forth in Paragraph 69.

70.     Defendant admits the allegations set forth in Paragraph 70.

71.     Defendant admits the allegations set forth in Paragraph 71.

72.     Defendant admits the allegations set forth in Paragraph 72.

73.     Defendant admits the allegations set forth in Paragraph 73.

74.     Defendant admits the allegations set forth in Paragraph 74.

75.     Defendant admits the allegations set forth in Paragraph 75.

76.     Defendant admits the allegations set forth in Paragraph 76.

77.     Defendant admits the allegations set forth in Paragraph 77.

78.     Defendant admits the allegations set forth in Paragraph 78.

79.     Defendant admits the allegations set forth in Paragraph 79.

80.     Defendant admits the allegations set forth in Paragraph 80.

81.     Defendant admits the allegations set forth in Paragraph 81.

ER0095

## Passage of Act 2016-18(HB 174)

82.    Defendant admits the allegations set forth in Paragraph 82.

83.    Defendant admits the allegations set forth in Paragraph 83.

84.    Defendant admits the allegations set forth in Paragraph 84.

85.    Defendant admits the allegations set forth in Paragraph 85.

86.    Defendant admits the allegations set forth in Paragraph 86.

87.    Defendant admits the allegations set forth in Paragraph 87.

88.    Defendant admits the allegations set forth in Paragraph 88.

89.    Defendant admits the allegations set forth in Paragraph 89.

90.    Defendant admits the allegations set forth in Paragraph 90.

91.    Defendant admits the allegations set forth in Paragraph 91.

92.    Defendant admits the allegations set forth in Paragraph 92.

93.    Defendant admits the allegations set forth in Paragraph 93.

94.    Defendant admits the allegations set forth in Paragraph 94.

95.    Defendant admits the allegations set forth in Paragraph 95.

96.    Defendant admits the allegations set forth in Paragraph 96.

97.    Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 97 of the Complaint; therefore, Defendant denies them.

98.    Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 98 of the Complaint; therefore, Defendant denies them.

99.    Defendant admits the allegations set forth in Paragraph 99.

ER0096

100. Defendant admits the allegations set forth in Paragraph 100.

101. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 101 of the Complaint; therefore, Defendant denies them.

102. Defendant admits the allegations set forth in Paragraph 102.

103. Defendant admits the allegations set forth in Paragraph 103.

## COUNT I
### Violation of §2 of Voting Rights Act: Results Standard

104. Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

105. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 105 of the Complaint; therefore, Defendant denies them.

106. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 106 of the Complaint; therefore, Defendant denies them.

107. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 107 of the Complaint; therefore, Defendant denies them.

## COUNT II
### Perpetuation of Alabama's *de jure* Police of Maintaining White Control Over Black Majorities Violates the Equal Protection Clause

108. Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

109. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 109 of the Complaint; therefore, Defendant denies them.

110. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 110 of the Complaint; therefore, Defendant denies them.

111. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 111 of the Complaint; therefore, Defendant denies them.

ER0097

## COUNT III
### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Privileges or Immunities Clause.

112. Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

113. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 113 of the Complaint; therefore, Defendant denies them.

114. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 114 of the Complaint; therefore, Defendant denies them.

115. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 115 of the Complaint; therefore, Defendant denies them.

## COUNT IV
### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Fifteenth Amendment.

116. Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

117. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 117 of the Complaint; therefore, Defendant denies them.

118. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 118 of the Complaint; therefore, Defendant denies them.

119. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 119 of the Complaint; therefore, Defendant denies them.

## COUNT V
### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Thirteenth Amendment.

120. Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

9

ER0098

121.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 121 of the Complaint; therefore, Defendant denies them.

122.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 122 of the Complaint; therefore, Defendant denies them.

## COUNT VI
### Vestiges of *de jure* Racial Segregation in Violation of the Equal Protection Clause

123.   Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

124.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 124 of the Complaint; therefore, Defendant denies them.

125.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 125 of the Complaint; therefore, Defendant denies them.

126.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 126 of the Complaint; therefore, Defendant denies them.

127.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 127 of the Complaint; therefore, Defendant denies them.

128.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 128 of the Complaint; therefore, Defendant denies them.

129.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 129 of the Complaint; therefore, Defendant denies them.

130.   Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 130 of the Complaint; therefore, Defendant denies them.

## COUNT VII
### Intentional Racial Discrimination in Violation of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

131.   Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

10

ER0099

132. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 132 of the Complaint; therefore, Defendant denies them.

133. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 133 of the Complaint; therefore, Defendant denies them.

## COUNT VIII
### Racially-Motivated Enactment of Act 2016-18 Violates the Equal Protection Clause of the Fourteenth Amendment

134. Defendant adopts and realleges each preceding paragraph as if fully set forth herein.

135. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 135 of the Complaint; therefore, Defendant denies them.

136. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 136 of the Complaint; therefore, Defendant denies them.

137. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 137 of the Complaint; therefore, Defendant denies them.

138. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 138 of the Complaint; therefore, Defendant denies them.

139. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 139 of the Complaint; therefore, Defendant denies them.

140. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 140 of the Complaint; therefore, Defendant denies them.

141. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 141 of the Complaint; therefore, Defendant denies them.

## COUNT IX
### Equal Protection Claim Based on Political Process Doctrine

142. Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 142 of the Complaint; therefore, Defendant denies them.

11

ER0100

143.  Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 143 of the Complaint; therefore, Defendant denies them.

144.  Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 144 of the Complaint; therefore, Defendant denies them.

145.  Defendant lacks sufficient information either to admit or deny the allegations set forth in Paragraph 145 of the Complaint; therefore, Defendant denies them.

The Defendant reserves the right to amend the Answer and/or raise additional defenses which become known through the discovery process.

Respectfully submitted,

*/s/Fredric L. Fullerton, II*
Fredric L. Fullerton, II
Chief Assistant City Attorney

*/s/Kayla S. Lawrence*
Kayla S. Lawrence
Assistant City Attorney

City of Birmingham Law Department
600 City Hall, 710 North 20th Street
Birmingham, Alabama 35203
(205) 254-2369/(205) 254-2502 FAX

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2016 I electronically filed the foregoing with the Clerk of the Court using the e-filing system which will send notification to the following:

**George N Davies**
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203

12

ER0101

**Glen M Connor**
QUINN CONNOR WEAVER DAVIES & ROUCO
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203

**Mary Joyce Carlson**
1100 New York Avenue NW Suite 500 West
Washington, DC 20005

**Richard P Rouco**
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203

**Robert H Stroup**
LEVY RATNER PC
80 Eighth Ave., 8th Floor
New York, NY 10011

**U W Clemon**
WHITE ARNOLD & DOWD, P.C.
2025 Third Avenue North, Suite 500
Birmingham, AL 35203

**W Edward Still**
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy STE 161-304
Birmingham, AL 35209

**James Uriah Blacksher**
JAMES U. BLACKSHER, ATTORNEY
P O Box 636
Birmingham, AL 35201

**David B Byrne , Jr**
STATE OF ALABAMA OFFICE OF THE GOVERNOR

13

Chief Legal Advisor
600 Dexter Avenue Ste NB-05
Montgomery, AL 36130

**James W Davis**
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152

**Luther J Strange, III**
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
PO Box 300152
Montgomery, AL 36130-0152

**William G Parker , Jr**
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
PO Box 300152
Montgomery, AL 36130-0152

                              */s/Fredric L. Fullerton, II*
                              Of Counsel

14

ER0103

30-1

FILED
2016 Jul-22 PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA



org/WebModule/Donate.aspx?P=WEBSUS&PAGETYPE=PLG&CHECK=iQqVXxzafFGk537WRGa6cRiCxtaPReuSj



Listen Live · APR News & Classics
**Classical Music**

LOADING...

# Minimum Wage Bill May See House Vote, Alabama Names Failing Schools

By ALEX AUBUCHON (/PEOPLE/ALEX-AUBUCHON)  •  FEB 15, 2016

Twitter (http://twitter.com/intent/tweet?url=http%3A%2F%2Fwww.tinyurl.com%2Fzb5tzgk&text=Minimum%20Wage%20Bill%20May%20See%20



(http://mediad.publicbroadcasting.net/p/wual/files/styles/x_large/public/201303/Alabama_State_Capitol_Bui

*Alabama State Capitol*

CREDIT WIKIMEDIA

State lawmakers may vote today on a measure that would block cities from setting local minimum wages.

Last week, the Birmingham City Council voted to expedite the effective date of a planned minimum wage increase to March 1. Republican state Rep. David Faulkner of Mountain Brook filed a bill that would mandate uniform minimum wages in Alabama and void any local wage ordinances.

Alabama has no state minimum wage and uses the federal wage floor of $7.25.

Advocates for low-income workers say local governments are better suited to handle local wage regulations.

Proponents of the bill argue higher wages mean higher costs for employers and consumers and reduced job opportunities for low-wage workers.

City officials in Huntsville and Tuscaloosa say they're considering a vote to raise the minimum wage in their cities.

Schools across Alabama are still stinging from the news that the Alabama Department of Education is listing them as failing.

The final list included 76 schools earning a grade of "F" in the eyes of the state.

The department used different criteria for determining failing schools this year. The state only looked at last year's reading and math scores on the ACT Aspire test. That led to ten more schools than last year being included on the failing list.

ER0104

Dr. Clarence Sutton is the principal of Tuscaloosa's Central High School, included on this year's failing schools list. He says the school has made a lot of improvements that aren't being considered.

"In 2007-2008, our graduation rate was 50%. Now we're up to 82%. We have one of the first dual enrollment programs where the kids receive scholarships. ACT scores are increased. And just to see those improvements and see that not being considered is disappointing."

The Mobile County and Montgomery County school systems each had a dozen schools on this year's failing list. 21 schools in the Birmingham area were considered failing.

An Alabama researcher is behind a new study examining risk factors for stroke.

The report says African Americans are nearly three times more likely to have a stroke at the age of 45 than white people. That imbalance decreases over time until disappearing by age 85. The study also says in risk of a second stroke, race makes less difference.

Dr. George Howard is the lead author of the report. He also teaches at the University of Alabama at Birmingham. He says the study focused on Alabama and surrounding states.

"Our goal was to get half [our test patients] coming from what's called the stroke belt states which are North Carolina, South Carolina, Georgia, Tennessee, Alabama, Mississippi, Louisiana, and Arkansas."

Dr. Howard says the biggest risk factors contributing to strokes are smoking, diabetes, and high blood pressure. The study will be published tomorrow in the journal Neurology.

---

◯ **Listen**
3:12

---

*Alabama Public Radio's morning newscast for February 15.*

**TAGS:** MINIMUM WAGE (/TERM/MINIMUM-WAGE)

BIRMINGHAM CITY COUNCIL (/TERM/BIRMINGHAM-CITY-COUNCIL) BIRMINGHAM (/TERM/BIRMINGHAM)

HUNTSVILLE (/TERM/HUNTSVILLE) TUSCALOOSA (/TERM/TUSCALOOSA)

STATE REPRESENTATIVE DAVID FAULKNER (/TERM/STATE-REPRESENTATIVE-DAVID-FAULKNER)

ALABAMA DEPARTMENT OF EDUCATION (/TERM/ALABAMA-DEPARTMENT-EDUCATION)

ALABAMA FAILING SCHOOLS LIST (/TERM/ALABAMA-FAILING-SCHOOLS-LIST)

ER0105



(/)
rg/WebModule/Donate.aspx?P=WEBSUS&PAGETYPE=PLG&CHECK=iQqVXxzafFGk537WRGa6cRiCxtaFReuS)



Listen Live · APR News & Classics
**Classical Music**                    LOADING...

# Tuscaloosa Considers Minimum Wage Hike, Teachers May See Salary Increase

By **ALEX AUBUCHON (/PEOPLE/ALEX-AUBUCHON)** • JAN 25, 2016

**Twitter (http://twitter.com/intent/tweet?url=http%3A%2F%2Fwww.tinyurl.com%2Fh8wy7qq&text=Tuscaloosa%20Considers%20Minimum%20Wag**



(http://mediad.publicbroadcasting.net/p/wual/files/styles/x_large/public/201601/minimum_wage_rally.jpg)

*Demonstrators at Tuscaloosa City Hall*

Workers in the Tuscaloosa area could see their wages go up soon.

Mayor Walt Maddox and the city council plan to consider an ordinance that would hike the local minimum wage to $10.10 an hour. The proposal prompted a march down University Boulevard to City Hall on Martin Luther King Day. The group called for economic justice and a higher minimum working wage.

Deidre Stalnaker is the Communications Director for the City of Tuscaloosa. She says she's not entirely sure what impact the move will have on area businesses.

"As far as it how it would impact the city, I think that is an unknown right now. We don't know what kind of impact that could have immediately, short term, or in the long term, but we are for having a living wage for everyone who works in the city of Tuscaloosa."

A similar effort is underway in Huntsville. Birmingham's City Council voted to raise its minimum wage last year.

Some of Alabama's teachers could be seeing a pay raise soon, according to one Alabama senator.

Sen. Del Marsh recently told the Dothan Eagle there is an emerging consensus that education employees should receive a raise. However, the amount of the raise and how it should be administered has not been determined. The last time Alabama's teachers got a raise was in 2013, the same year their contributions to retirement increased.

ER0106

Educator salaries are a cause for concern among education advocates in Alabama. They argue stagnant pay will be a turn-off to people seeking a career in education.

The average pay for a teacher in Alabama is $48,720, well below the national average of $56,610. The starting salary for teachers in Alabama is $36,867.

In addition to a raise, lawmakers are considering establishing a non-tenure track for teachers. Those that opt out of tenure would see higher salaries, but less job security.

The University of Alabama football team culminated its 14 -1 season Saturday with a National Championship celebration in Tuscaloosa. APR's MacKenzie Bates attended the event and files this report.

Fans braved the freezing temperatures as early at eight a-m on the Walk of Champions to get a spot to celebrate the Crimson Tide's 16th National Championship. Alabama defeated Clemson 45-to-40 back on January 11th in Glendale, Arizona to win the College Football Playoff Title.

Coach Nick Saban says he could not be more proud of this team.

"And everybody helped everybody be accountable to do what they needed to so that we could improve and accomplish something of significance that will create a memory for the rest of all of our lives."

Saban was presented his fourth championship in seven years as Alabama's head coach.



**Listen**
3:17

*Alabama Public Radio's morning newscast for January 25, 2016.*

**TAGS:** <u>TUSCALOOSA (/TERM/TUSCALOOSA)</u>    <u>MINIMUM WAGE (/TERM/MINIMUM-WAGE)</u>

<u>TUSCALOOSA MAYOR WALT MADDOX (/TERM/TUSCALOOSA-MAYOR-WALT-MADDOX)</u>

<u>DEL MARSH (/TERM/DEL-MARSH)</u>    <u>TEACHER RAISES (/TERM/TEACHER-RAISES)</u>

<u>UNIVERSITY OF ALABAMA FOOTBALL (/TERM/UNIVERSITY-ALABAMA-FOOTBALL)</u>    <u>NICK SABAN (/TERM/NICK-SABAN)</u>

ER0107

Case 2:16-cv-90690-RDP   Document 35-1   Filed 07/22/16   Page 5 of 6
USCA11 Case: 17-11009     Document: 35     Date Filed: 06/05/2017     Page: 117 of 185

Alabama

# After Birmingham minimum wage increase, can it happen elsewhere? Tuscaloosa rally planned



Dozens gathered in Mountain Brook Tuesday, Sept. 15, 2015, to protest a bill by state Rep. David Faulkner, R-Mountain Brook, that would block a minimum wage increase approved by the Birmingham City Council. (Jon Reed | jreed@al.com)



By **Kelsey Stein | kstein@al.com**
**Email the author | Follow on Twitter**
on September 23, 2015 at 5:36 PM

The group that successfully lobbied for a minimum wage increase in Birmingham is organizing a rally Thursday in Tuscaloosa.

Cooks and cashiers will join with community allies from Raise Up Alabama to fight for a $15 wage and union rights for fast-food workers across the state. The rally is taking place Thursday at noon at McDonald's located at 2502 12th Street in Tuscaloosa.

Alabama, unlike some states, does not have a state minimum wage. The federal minimum wage of $7.25 an hour governs employers.

Last month, **the Birmingham City Council voted** to raise the minimum wage to $8.50 in July 2016 and again to $10.10 in July 2017.

In a news release, Raise Up Alabama organizers said they believe that, if victory is possible in Birmingham, it's possible in Tuscaloosa and across the state, too.

**MINIMUM WAGE IN ALABAMA**

Case 2:16-cv-90690-RDP   Document 36-1   Filed 07/22/16   Page 6 of 6

USCA11 Case: 17-11009     Document: 35     Date Filed: 06/05/2017     Page: 118 of 185

During the Alabama Legislature's second special session this month, Rep. David Faulkner, R-Mountain Brook, **proposed a bill** that would prevent cities and counties from setting a minimum wage for private employers. The Alabama House of Representatives debated the bill before **setting it aside for a recess without a vote.**

Faulkner said he filed the legislation in response to the decision in Birmingham, saying he believes the state needs uniformity instead of a patchwork of minimum wage laws.

Across the country, workers have been advocating minimum wage increases as part of the Fight for $15 campaign. Other cities like **Seattle** and **Los Angeles** have already enacted the $15 minimum wage.

In April, **a rally was held outside the McDonald's** on University Boulevard, followed by another event last month. The ralliers, dressed in red t-shirts, are part of the Fight for $15 movement, which seeks a $15 an hour wage for fast food workers.

Lawsuit claims state illegally blocked Birmingham minimum wage increase

What they're saying nationally about Alabama's minimum wage dispute

Raise the Wage will continue fight after state 'assault on the working poor'

Why Alabama lawmakers just killed Birmingham's minimum wage

Gov. Robert Bentley signs bill to block city minimum wages, voiding Birmingham ordinance

**All Stories**

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2016 Alabama Media Group. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Alabama Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

30-2

FILED

2016 Jul-22  PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

ACT #2016-____18____

HB174

173460-3

By Representatives Faulkner, Mooney, Hubbard, Faust, Gaston, Greer, Boothe, Polizos, Chesteen, Garrett, Carns, Drake, Wingo, Brown, Williams (P), Holmes (M), Fincher, Hammon, Baker, Shiver, Beckman, Moore (B), Clouse, Lee, Ainsworth, Whorton (I), Williams (JW), Rich, Pettus, Ledbetter, Whorton (R), Sanderford, Farley, Butler, Hill (M), Fridy, Weaver, Johnson (K), Nordgren, South, McMillan, Standridge, Beech, Hill (J), Wadsworth, Johnson (R), Hurst, Hanes, Collins, Rowe, Henry, Ball and Ingram

RFD: State Government

First Read: 09-FEB-16



FEB 25 2016
RECEIVED
GOVERNOR'S OFFICE

ER0110

HB174

ENROLLED, An Act,

Relating to prohibited practices relating to employer and employee relationships; to prohibit local governmental entities from requiring minimum leave, wages, or other benefits for employees, classes of employees, or independent contractors of employers; and to provide for the Alabama Uniform Minimum Wage and Right-to-Work Act to retain the exclusive authority of the state through the Legislature to regulate collective bargaining under federal labor laws, and wages, leave, and benefits provided by an employer to employees, classes of employees, and independent contractors.

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1. (a) This act shall be known and cited as the Alabama Uniform Minimum Wage and Right-to-Work Act.

Section 2. (a) For purposes of this act, the following words have the following meanings:

(1) DISCRIMINATION. An action by an employer or a distinction by an employer that adversely affects an employee or job applicant based on a group, class, or category to which that person belongs.

(2) EMPLOYEE. An individual employed in this state by an employer or a natural person who performs services for an employer for valuable consideration and does not include a self-employed independent contractor.

Page 1

ER0111

HB174

(3) EMPLOYER. A person engaging in any activity, enterprise, or business in this state employing one or more employees, or a person, association, or legal or commercial entity receiving services from an employee or independent contractor and, in return, giving compensation of any kind to such employee or independent contractor.

(4) FEDERAL LABOR LAWS. The National Labor Relations Act, compiled in 29 U.S.C.S., Section 151 et seq., and the Labor Management Relations Act, compiled in 29 U.S.C.S., Section 141 et seq., as amended, presidential executive orders, and federal administrative regulations relating to labor and management or employee and employer issues, and the United States Constitution, as amended.

(5) INDEPENDENT CONTRACTOR. A self-employed individual who does not meet the definition of employee, as provided in this act, but otherwise does meet the definition of independent contractor as defined by the Internal Revenue Service.

(6) LABOR PEACE AGREEMENT. An arrangement between a union and employer under which one or both entities agree to waive certain rights under federal law with regard to union organizing and related activity.

(7) MULTI-EMPLOYER ASSOCIATION. A bargaining unit composed of independent employers who associate together to negotiate jointly with one or more labor organizations

Page 2

ER0112

HB174

representing the employees of the independent employers within the bargaining unit.

(8) PROJECT LABOR AGREEMENT. A collective bargaining agreement with one or more labor unions that establishes the terms and conditions of employment for a specific construction project before employees are hired to work on such project.

(9) STATE. The State of Alabama and its agencies, departments, commissions, bureaus, and offices including, but not limited to, the Legislature.

(b) A county, municipality, or any other political subdivision of this state shall not enact or administer any ordinance, policy, rule, or other mandate requiring an employer to provide any employee, class of employees, or independent contractor with any employment benefit, including, but not limited to, paid or unpaid leave, vacation, wage, or work schedule, that is not required by state or federal law, and shall not require an employer to compensate an employee, class of employees, or independent contractor for any vacation or other form of leave for which state or federal law does not require the employee, class of employees, or independent contractor to be compensated.

(c) Any ordinance, policy, rule, or other mandate of a county, municipality, or any other political subdivision of this state that is inconsistent with this section is void.

Page 3

ER0113

HB174

Section 3. (a) A county, municipality, or any other political subdivision of this state shall not enact or administer any ordinance, rule, policy, or other mandate that creates requirements, regulations, or processes relating to labor peace agreements or similar agreements. Any ordinance, policy, rule, or other mandate of a county, municipality, or any other political subdivision of this state that is inconsistent with this section is void.

(b)(1) No law, rule, or ordinance shall impose any contractual, zoning, permitting, licensing, or other condition that requires any employer or employee to waive his or her rights under the National Labor Relations Act, compiled in 29 U.S.C.S. § 151 et seq.

(2) No law, rule, regulation, or ordinance shall require, in whole or in part, any employer or multi-employer association to accept or otherwise agree to any provisions that are mandatory or non-mandatory subjects of collective bargaining under federal labor laws, including, but not limited to, any limitations on an employer or multi-employer association's rights to engage in collective bargaining with a labor organization, to lock out employees, or to operate during a work stoppage; provided, this subsection shall not invalidate or otherwise restrict the state from requiring the use of project labor agreements to the extent permissible under federal labor laws.

Page 4

ER0114

HB174

(3) This subsection shall be interpreted and enforced in a manner that is consistent with the National Labor Relations Act, compiled in 29 U.S.C.S. § 151 et seq.

(4) Any agreement, contract, understanding, or practice, written or oral, implied or expressed, between any employer and any labor organization containing requirements in violation of this subsection is declared to be unlawful, null and void, and of no legal effect.

(5) An employer or employee may seek injunctive relief in the Circuit Court of Montgomery County for violations of the provisions of this section.

(c)(1) The state shall retain the exclusive authority to require an employer or multi-employer association to enter into a project labor agreement.

(2) This subsection does not prohibit an employer or any other person covered by the National Labor Relations Act, compiled in 29 U.S.C.S., Section 151, from entering into project labor agreements or engaging in any other activity protected by law. This subsection may not be interpreted to interfere with the labor relations of persons covered by the National Labor Relations Act.

(3) Relief that would interfere with the labor relations of persons covered by the National Labor Relations Act may not be granted under the provisions of this subsection.

ER0115

HB174

Section 4. Notwithstanding any provision of this act to the contrary, nothing in this act shall apply to those state employers or employees in state service as defined in Section 36-26-2, Code of Alabama 1975, or to public employers and employees of state or local educational institutions or systems, or to any ordinance, rule, policy, or other mandate enacted by a county, municipality, or political subdivision of this state relating specifically to public employees or a class or employees employed by or independent contractors hired by the county, municipality, or any other political subdivision.

Section 5. If a court determines that any portion of this act cannot be applied to a particular county, municipality, or other political subdivision of this state, this act shall remain in full force and effect for every other county, municipality, and other political subdivision of this state.

Section 6. (a) The purpose of this section is to establish within the Legislature complete control over regulation and policy pertaining to collective bargaining under federal labor laws or the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor in order to ensure that such regulation and policy is applied uniformly throughout the state.

Page 6

ER0116

HB174

(b) Except as otherwise provided in this act or as expressly authorized by a statute of this state, the Legislature hereby occupies and preempts the entire field of regulation in this state touching in any way upon collective bargaining under federal labor laws or the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor to the complete exclusion of any policy, ordinance, rule, or other mandate promulgated or enforced by any county, municipality, or other political subdivision of this state.

(c) The authority of a county, municipality, or other political subdivision of this state to regulate collective bargaining under federal labor laws or the wages, leave, or other benefits provided by an employer to an employee, class of employees, or independent contractor shall not be inferred from its proprietary authority, home rule status, or any other inherent or general power.

(d) Any existing policies, ordinances, rules, or other mandates promulgated or enforced contrary to the terms of this section are null and void, and any future policy, ordinance, rule, or other mandate shall comply with this section.

Section 7. The provisions of this act are severable. If any part of this act is declared invalid or

ER0117

HB174

unconstitutional, that declaration shall not affect the part which remains.

Section 8. This act shall become effective immediately following its passage and approval by the Governor, or its otherwise becoming law.

ER0118

HB174

_____
Speaker of the House of Representatives

_____
President and Presiding Officer of the Senate


House of Representatives

I hereby certify that the within Act originated in and was passed by the House 16-FEB-16.

Jeff Woodard
Clerk


_____

Senate        _____25-FEB-16_____        Passed


APPROVED _____

TIME _____3:48 pm  Feb 25, 2016_____

_____
GOVERNOR

Alabama Secretary Of State

Act Num....: 2016-18
Bill Num...: H-174

Recv'd 02/25/16   03:54pmSLF

Page 9

ER0119

## SENATE ACTION

**DATE:** 2-23  20 16
**RD 1 RFD** G-A

This Bill was referred to the Standing Committee of the Senate on G-A and was acted upon by such Committee in session and is by order of the Committee returned therefrom with a favorable report w/sub _____ w/eng sub _____ w/amd(s) _____ w/sub _____ by a vote of _____ yeas _____ nays _____ abstain _____ this 24 day of Feb 20 16
_____, Chairperson

**DATE:** 2-24
**RF** FAV  RD 2 ☑ CAL

I hereby certify that the Resolution as required in Section C of Act No. 81-889 was adopted and is attached to the Bill
HB 104  **YEAS** 21  **NAYS** 8

PATRICK HARRIS, Secretary

**DATE:** 2-25-16  RD 3 at length
**PASSED** ☑ **PASSED AS AMENDED**
**YEAS** 23  **NAYS** 11
And was ordered returned forthwith to the House

PATRICK HARRIS, Secretary

**DATE:**
INDEFINITELY POSTPONED  YEAS _____ NAYS _____

**DATE:**
RECONSIDERED  YEAS _____ NAYS _____

FURTHER SENATE ACTION (OVER)

## HOUSE ACTION G-A

**DATE:** 2-9  20 16
**RD 1 RFD** St. Govt

### REPORT OF STANDING COMMITTEE

This bill having been referred by the House to its standing committee on _____ was _____ acted upon by such committee in session, and returned therefrom to the House with the recommendation that it be Passed, w/amend(s) _____ w/sub _____ this _____ day of _____, 20___
_____, Chairperson

**DATE:** 2-11  20 16
**RF**  RD 2 CAL

**DATE:** _____ 20___
RE-REFERRED ☐   RE-COMMITTED ☐
Committee _____

I hereby certify that the Resolution as required in Section C of Act No. 81-889 was adopted and is attached to the Bill,
HB 104  **YEAS** 71  **NAYS** 28

JEFF WOODARD, Clerk

FURTHER HOUSE ACTION (OVER)

## SPONSOR / DIST. NO. 46

SPONSORS
28
29
30
31
32
33 Farley 15
34 Buttler 30
35
36 Friday 23
37 49
38 Kendryl
39 29
40 Sexton 16
41 McMillan 75
42 Stanley 34
43 Beech 65
44 Hill 30
45 Ingram-Sally 14
46 Johnson R 33
47 Hunt 3
48 Harris 23
49 Cook 8
50 Rowe 13
51 Henry 9
52 Beagle (10)
53 75

30-3

**Ordinance No: 16-28**

_____

*AN ORDINANCE RELATING TO MINIMUM WAGE TO BE PAID TO EMPLOYEES BY EMPLOYERS IN THE CITY OF BIRMINGHAM ALABAMA*

WHEREAS, Poverty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our economy; and

WHEREAS, at least 15 cities across the United States have increased their local minimum wage and many other cities have proposed increases; and

WHEREAS, the State of Alabama provides cities with broad authority to regulate matters implicating the city's police power, to provide for the safety, preserve the health, promote prosperity, and improve the morals, order and comfort and convenience of the inhabitants so long as such regulations are not inconsistent with the laws of the state;

WHEREAS, a minimum wage increase would reduce labor turnover, improve organizational efficiency, increase worker purchasing power in our local economy, and reduce reliance on social services; and

WHEREAS, the Council adopted Ordinance No. 16-25 on February 9, 2016 changing the minimum wage and making the change effective March 01, 2016; and now therefore

BE IT ORDAINED BY THE BIRMINGHAM CITY COUNCIL AS FOLLOWS: that Ordinance No. 16-25 be amended to change the effective date as follows:

**SECTION I:** New Ordinance Establishing Minimum Wage for Employers to Pay Employees in the Birmingham

**SECTION II:  BIRMINGHAM MINIMUM WAGE RATES**

A)  Definitions.

For purposes of this section, the following definitions shall apply:

1) "Employ" means to suffer or permit to work.

2)  "Employer"- means any individual, partnership, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, and shall include the City of Birmingham and its departments, divisions, and agencies, but  shall not include any other governmental entity which includes, for purposes of this Ordinance, any other unit of local government, the state government, and the government of the United States

ER0121

3)  "Employee" means any individual employed by an Employer and who performs at least twenty hours of work within a calendar year while physically present within the geographic boundaries of the city of Birmingham for an Employer.

4)  "Wage" means any fixed regular payment made on a regular basis, typically on an hourly, daily or weekly basis, made by an employer to an employee for work or services.

5)  "Minimum wage" includes all Wages, Commissions, Piece-Rate, and Bonuses received by the employee and shall be governed by the rates set forth in Section ll (B) (ii) of this ordinance.

6)  "Piece-Rate" means a price paid per unit of work.

7)  "Tip" means a verifiable sum to be presented by a customer as a gift or gratuity in recognition of some service performed for the customer by the employee receiving the tip.

8)  "Tipped Employee" means an Employee engaged in an occupation in which the Employee customarily and regularly receives more than $30 per month in Tips,

9) "Effective Date" shall have the meaning set forth in Section V of this ordinance.

**Wage Rates**

(i) Employers shall pay Employees no less than the applicable minimum wage rate provided for in this chapter for each hour worked within the geographic boundaries of the city of Birmingham.

(ii) The minimum wage rate shall be an hourly rate as follows:

(a) Beginning on February 24, 2016, $10.10 per hour;

(b) On July 01, 2017, and on each July 1 of each successive year thereafter; or in the alternative on the first day of the fiscal year, should such date change from its existing date of July 1st; the minimum wage rate from the previous year shall be increased by the increase, if any, in the cost of living. The increase in the cost of living shall be measured by the percentage increase, if any, as of July of the previous year over the level as of July of the year preceding that of the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPl-W) for the Southeast region, or its successor index as published by the U.S. Department of labor or its successor agency, with the amount of the minimum wage increase rounded to the nearest multiple of five cents. The Mayor shall designate an official within the City government to announce the adjusted rates by October 15, 2016, and each October 15 of each successive year thereafter, which shall be published in a bulletin announcing the adjusted rate for the upcoming year.  If the federal minimum wage as prescribed by 29

ER0122

U.S.C. sec 206(a) (l) is increased in excess of the minimum wage then in effect under this section, the minimum wage then in effect under this section shall be increased to the same amount as the federal minimum wage, effective on the same date as the increase in the federal minimum wage and shall be increased in accordance with this section thereafter.

Employers may consider tips as part of the wages of tipped employees, but such a tip credit may not exceed 50% of the minimum wage rate established pursuant to this Ordinance. Employers shall pay tipped employees a direct cash wage of not less than 50% percent of the minimum wage rate established pursuant to this Ordinance, provided that the combination of the cash wage paid directly by the Employer and tips received by the Tipped Employee totals no less than the minimum wage rate, with the difference being made up by the Employer. An employer who elects to use the tip credit must inform the affected employee in advance and must be able to show that the employee receives at least the minimum wage rate specified pursuant to this Ordinance when direct wages and tips are combined. The tips received by an Employee become the property of the Employee and may not be shared with the Employer, except that this provision does not preclude a valid tip pooling or sharing arrangement among employees who customarily and regularly receive tips.

**SECTION Ill:  ENFORCEMENT AND REMEDIES**

Any employer that fails to pay the minimum wage required under this chapter shall be required to pay the employee the unpaid wages together with an additional two times that amount as liquidated damages.

Any Employee who is paid less than the minimum wage established under this Ordinance may bring a civil cause of action against his/her Employer for the full amount of wages due from the Employer in any court of competent jurisdiction and, upon prevailing, shall be awarded any appropriate legal or equitable relief, including: unpaid wages and an additional two times that amount as liquidated damages; reinstatement; actual damages; civil penalties; and reasonable attorneys' fees and costs. An employee need not exhaust administrative remedies before bringing an action nor shall an investigation of an employer by the department or other law enforcement officer bar a person from bringing an action.

In addition to the civil remedies provided directly above, any Employer found to have violated any of the minimum wage provisions shall be subject to a civil penalty not to exceed $100 per day, per Employee who fails to receive the minimum wage as set forth in this chapter.  If a civil penalty is imposed pursuant to this section, a citation shall be issued which describes the violation which has occurred and states the penalty for the violation.  If, within fifteen (15) working days from the receipt of the citation, the affected party fails to pay the penalty imposed, the City of Birmingham shall initiate a civil action to collect the penalty. The civil action shall be taken in the court which has jurisdiction over the location in which the violation occurred.

Any Employer found to have violated any of the minimum wage provisions may be required to reimburse the City of Birmingham for any costs associated with its investigation of, and

enforcement measures against, the Employer.

It shall be unlawful for an Employer or any other party to discriminate in any manner or take adverse action against any person in retaliation for exercising rights protected under this Chapter. Rights protected under this Chapter include, but are not limited to: the right to file a complaint or inform any person about any party's alleged noncompliance with this Chapter; and the right to inform any person of his or her potential rights under this Chapter and to assist him or her in asserting such rights.  Protections of this Chapter shall apply to any person who mistakenly, but in good faith, alleges noncompliance with this Chapter. Taking adverse action against a person within ninety (90) days of the person's exercise of rights protected under this Chapter shall raise a rebuttable presumption of having done so in retaliation for the exercise of such rights.

The Legal Department or other city agency as designated by the Mayor are authorized to promulgate rules and regulations regarding the interpretation, application and enforcement of the ordinance and are authorized to receive any complaint regarding a possible or suspected violation of this Ordinance and further authorized to take appropriate steps to enforce this Ordinance including, regardless of whether there is a complaint, investigating any possible or suspected violation of this Ordinance.

In addition, where violations of this Chapter have been found by any judicial or administrative proceeding and where such violations have not been cured through compliance with the order/decision of the governmental entity determining same, City agencies or departments may, after notice and an opportunity for a hearing, revoke or suspend any registration certificates, permits or licenses held or requested by the Employer until such time as the violations of this Chapter are remedied.

**SECTION IV:  Severability**

If any subsection, sentence, clause or phrase of this article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance. The City Council hereby declares that it would have adopted this section, and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.

**SECTION V: EFFECTIVE DATE**

This Ordinance is hereby adopted this Twenty-Third, Day of February, 2016.

Adopted by the Council of the City of Birmingham on February 23, 2016.
A True Copy
Lee Frazier, City Clerk
Birmingham News  February 28, 2016

ER0124

40-1

EXHIBIT A - DECLARATION OF LISA R. HANDLEY

FILED

2016 Aug-24  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
(Southern Division)

Marnika Lewis, Antoin Adams,
Alabama State Conference of
the National Association For the
Advancement of Colored People,
and Greater Birmingham Ministries,

Plaintiffs,
vs.

Robert J. Bentley, in his Official Capacity
as Governor of the State of Alabama;
and Luther J. Strange, III, in his Official
Capacity as Attorney General of
the State of Alabama;

      Defendants.

DECLARATION OF DR. LISA R. HANDLEY

I, Lisa R. Handley, hereby declare as follows:

1. I have been retained by the law firm of Levy Ratner to determine whether voting in the State of Alabama is racially polarized and if the candidates preferred by black voters are usually defeated.

2. I have extensive experience as a redistricting consultant and expert.  I have advised numerous jurisdictions and other clients on voting rights and redistricting-related issues and served as an expert in dozens of redistricting and voting rights cases.  My clients have included scores of state and local jurisdictions, a number of national civil rights organizations, the U.S. Department of Justice, and such international organizations as the United Nations.  In addition, I have been actively involved in researching, writing and teaching on subjects relating to voting rights, including minority representation, electoral system design and redistricting.  I co-authored a book, *Minority Representation and the Quest for Voting Equality* (Cambridge University Press, 1992), and numerous articles, as well as co-edited a volume (*Redistricting in Comparative Perspective*, Oxford University Press, 2008) on these subjects.  I have taught several political science courses, both at the undergraduate and graduate level, related to representation and redistricting.  I hold a Ph.D. in political science from George Washington University.

3. I have been a principal of Frontier International Electoral Consulting, a firm specializing in electoral assistance to transitional and post-conflict democracies, since co-founding the company in 1998. I also act as an independent election consultant. In addition, I am currently a Visiting Research Academic at Oxford Brookes University in the United Kingdom.

4. My analysis of voting patterns by race in recent Alabama elections has led me to conclude that voting in the State of Alabama is racially polarized, with black voters and white voters consistently supporting different candidates. Black voters are quite cohesive in support of their candidates of choice, usually providing well over 80 percent of their votes for the black-preferred candidate in the general election. A large majority of white voters, on the other hand, usually support an opponent of the black-preferred candidate. The black-preferred candidate is inevitably defeated in the general election.

5. I analyzed recent statewide election contests to determine if voting is polarized. As is standard for this type of inquiry, I have analyzed voting patterns in election contests that included African American candidates. The following is a list of the federal and statewide contests in the State of Alabama since 2008 that included African American candidates:

*Recent Alabama Election Contests (2008-2016)*
*that included African American Candidates*

| Year | Election | Office | African American Candidate(s) |
|------|----------|--------|-------------------------------|
| 2008 | Democratic Presidential Primary | US President | Barack Obama |
| 2008 | Democratic Primary | US Senate | Vivian Figures |
|      |          |        | Johnny Swanson III |
| 2008 | General Election | US President | Barack Obama |
| 2008 | General Election | US Senate | Vivian Figures |
| 2010 | Democratic Primary | US Senate | Simone DeMoore |
| 2010 | Democratic Primary | Governor | Artur Davis |
| 2010 | General Election | Auditor | Miranda Joseph |
| 2012 | General Election | US President | Barack Obama |
| 2014 | General Election | Lieutenant Governor | James Field |
| 2014 | General Election | Secretary of State | Lula Albert-Kaigler |
| 2014 | General Election | Auditor | Miranda Joseph |
| 2016 | Democratic Primary | US Senate | Charles Nana |

2

6. This list does not include statewide judicial contests.  However, in the context of another investigation, I have analyzed recent judicial contests that included an African American candidate and found very similar voting patterns to those I uncovered in the statewide contests listed above:  voting was almost always racially polarized, and the black-preferred candidate inevitably lost the general election.

7. I used two standard statistical techniques to estimate voting patterns by race: two-equation bivariate ecological regression and ecological inference using a statistical package developed by Professor Gary King at Harvard called EI.  Bivariate ecological regression was the statistical method employed by the plaintiffs' expert, Professor Bernard Grofman, in *Thornburg v. Gingles,* 478 U.S. 30 (1986), the first  U.S. Supreme Court case to consider Amended Section 2 of the Voting Rights Act.  This statistical method has the benefit of the Court's approval and has been used in nearly every subsequent voting rights case.

8. The second technique I employed, ecological inference, was developed after the Court considered *Gingles* and was designed, in part, to address the issue of out-of-bounds estimates (estimates of the percent of votes that exceed 100 percent or are less than zero percent) which can arise in bivariate ecological regression analysis.  Ecological inference analysis has been introduced and accepted in numerous district court proceedings since its development.

9. Bivariate ecological regression involves applying ordinary least squared regression to determine if a pattern exists across voting units between the percentage black within the voting units (in this case, the percentage of registered voters who are black in each Alabama county) and the percentage of votes cast for each of the candidates.  Ecological inference, using the statistical package EI developed by Professor Gary King, incorporates the method of bounds and maximum likelihood statistics to produce estimates of voting patterns by race.   (For further explanation of bivariate ecological regression see Bernard Grofman, Lisa Handley and Richard Niemi, *Minority Representation and the Quest for Voting Equality* (Cambridge University Press, 1992).  See Gary King, *A Solution to the Ecological Inference Problem* (Princeton University Press, 1997) for a more detailed explanation of ecological inference.)

10. Table A, appended to this declaration, provides estimates of the percent of black and white voters who supported each candidate competing in recent biracial general election contests in the State of Alabama.  All seven of the recent general elections that included African American candidates were racially polarized. And the black-preferred African American candidate was defeated in every one of these contests.  In the 2008 general election for U.S. President, well over 95 percent of the black voters cast their ballots for Barack Obama; at least 80 percent of the white voters supported his Republican opponent, John McCain.  In the U.S. Senate race the same year, over 90 percent of the blacks voted for the African American candidate, Vivian Davis Figures, while white voters cast their ballots for her white opponent, Republican Jeff Sessions.  In

3

the 2010 election for auditor, the vast majority of black voters supported African American Miranda Joseph; the vast majority of white voters cast ballots for her white opponent, Republican Samantha Shaw.  The pattern for the 2012 presidential contest was identical to that of 2008: over 95 percent of black voters supported President Obama and over 80 percent of the white voters cast a vote for his Republican opponent, Mitt Romney.  In the most recent general election (2014), three African Americans ran for office: James Fields for Lieutenant Governor, Lula Albert-Kaigler for Secretary of State, and Miranda Joseph for Auditor.  These three Democratic candidates all received the overwhelming support of black voters, and all three were defeated by their white opponents, all of whom were supported by over 80 percent of the white voters.

11. Table B, appended to this declaration, provides estimates of voting patterns by race for the five biracial Democratic primary elections since 2008.  (Republican primaries were not examined because very few black voters participate in these primaries and reliable estimates would be difficult to produce.)  In the 2008 Democratic presidential primary, over 90 percent of the black voters cast their ballots for Barack Obama; the vast majority of white voters supported Hillary Clinton. In the democratic primary for U.S. Senate held in 2008, two African American candidates competed, Vivian Davis Figures and Johnny Swanson III, as well as one white candidate, Mark "No NCAA" Townsend.  Black voters strongly supported Figures, while white voters spread their votes out across the three candidates (the two estimation techniques vary on how much spread there was, in large part because white turnout in the democratic primary was quite low).  In the 2010 democratic primary, two African American candidates competed for statewide office: Simone DeMoore for U.S. Senate and Artur Davis for Governor.  The majority of both black and white voters in the Democratic primary for Governor voted for the white candidate, Ron Sparks, over Davis.  In the U.S. Senate contest, a strong majority of white voters favored white candidate William Barnes, while black voters split their votes between Barnes and DeMoore.  In the 2016 Democratic primary for U.S. Senate, over 65 percent of the white voters cast a vote for the white candidate, Ron Crumpton, while black voters appear to have split their votes between Crumpton and his African American opponent, Charles Nana.

12. Black voters are more likely to prevail in the Democratic primary than in the general election, but only if they vote in overwhelming percentages for their candidate of choice, as they did in the 2008 presidential primary for Obama and the 2008 primary for Figures. This is because African Americans now make up nearly half of the voters in the Democratic primary.  However, even if black voters succeed in nominating their candidate in the Democratic primary, that candidate is consistently defeated in the general election. In fact, despite overwhelming black support for their candidate of choice in general elections, the black-preferred African American candidate has been defeated in every statewide election in Alabama since at least as far back as 2008.  This is true not only of the elections examined in this declaration, but of the judicial contests I analyzed in the context of a separate investigation as well.

4

13. Because voting is racially polarized, black voters in the State of Alabama are successful at electing African American candidates of choice to office only in jurisdictions and legislative districts that have substantial black population percentages. In the Alabama State House, for example, all 27 of the African American state representatives are elected from districts with substantial black voting age population percentages, 26 from districts that are majority black and one from a district that is 47.2 percent black and 2.3 percent Hispanic in composition. Table C, appended to this declaration, provides the racial composition of the state house districts, sorted by percent black voting age population, and the race of the representatives elected to the districts.

14. All seven of the African American state senators are elected from state senate districts that are majority black in composition – no district that is majority white elects an African American to the state senate.  Table D, appended to this declaration, lists the racial composition of each of the senate districts, along with the race of the state senator of the district.

15. The City of Birmingham, Alabama is 73 percent black in total population.  It has nine city council districts, seven of which are majority black in composition.  All seven of the majority black districts elect African Americans to the city council; the two districts that are majority white elect whites to the city council.  Table E, appended to this declaration, lists the racial composition of each of the city council districts in the City of Birmingham as well as the race of the councilor who represents each district.

16. The vast majority of state legislative districts have substantial white majorities – only 27 percent of the state house districts and 23 percent of the state senate districts are majority or near majority black in composition.  In the City of Birmingham, however, black voters form the majority in 78 percent of the council districts.  Because voting in the State of Alabama is racially polarized, and only districts with substantial black population percentages provide black voters with the opportunity to elect their preferred candidates, black voters have less opportunity to elect their candidates of choice to the state legislature than to the Birmingham city council.

*I declare under penalty of perjury that the foregoing statements are true and correct.*

Signed this 15th day of August, 2016 in Potomac, Maryland.

Lisa R. Handley, Ph.D.

5

ER0129

**Table A: Voting Patterns by Race in Recent General Elections in the State of Alabama**

| General Elections Year and Contest | Race of Candidate | Party | Actual Percent of Votes (Turnout) | Estimated Percent of Blacks Voting for Candidate | | Estimated Percent of Whites Voting for Candidate | |
|---|---|---|---|---|---|---|---|
| | | | | Two-equation regression | Ecological Inference: King's EI | Two-equation regression | Ecological Inference: King's EI |
| **2008 General Election** | | | | | | | |
| **U.S. President** | | | | | | | |
| McCain | W | R | 60.4 | 4.3 | 4.7 | 80.0 | 83.6 |
| Obama | B | D | 38.8 | 96.0 | 95.2 | 18.9 | 15.3 |
| Nader | W | I | .3 | -.2 | .7 | .5 | .3 |
| Barr | W | I | .2 | 0 | .6 | .3 | .2 |
| Baldwin | W | I | .2 | -.1 | .5 | .3 | .2 |
| *Voting for office* | | | *73.3* | *72.7* | *72.0* | *73.5* | *72.1* |
| **U.S. Senate** | | | | | | | |
| Sessions | W | R | 63.4 | 8.8 | 8.2 | 82.5 | 84.8 |
| Figures | B | D | 36.6 | 91.2 | 91.7 | 17.5 | 15.2 |
| *Voting for office* | | | *71.9* | *71.3* | *69.6* | *72.2* | *70.7* |
| | | | | | | | |
| **2010 General Election** | | | | | | | |
| **Auditor** | | | | | | | |
| Shaw | W | R | 62.7 | 10.7 | 6.8 | 80.6 | 81.8 |
| Joseph | B | D | 37.3 | 89.3 | 93.3 | 19.4 | 18.3 |
| *Voting for office* | | | *54.6* | *54.3* | *56.2* | *54.6* | *54.1* |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

6

ER0130

| General Elections Year and Contest | Race of Candidate | Party | Actual Percent of Votes (Turnout) | Estimated Percent of Blacks Voting for Candidate | | Estimated Percent of Whites Voting for Candidate | |
|---|---|---|---|---|---|---|---|
| | | | | Two-equation regression | Ecological Inference: King's EI | Two-equation regression | Ecological Inference: King's EI |
| **2012 General Election** | | | | | | | |
| **U.S. President** | | | | | | | |
| Obama | B | D | 38.4 | 95.5 | 97.4 | 16.2 | 14.0 |
| Romney | W | R | 60.7 | 4.6 | 2.6 | 82.6 | 84.9 |
| Goode | W | I | .1 | -.1 | .9 | .2 | .1 |
| Johnson | W | I | .6 | 0 | 5.9 | .8 | .4 |
| Stein | W | I | .2 | 0 | .1 | .2 | .1 |
| *Voting for office* | | | *72.4* | *75.9* | *77.0* | *71.1* | *69.5* |
| | | | | | | | |
| **2014 General Election** | | | | | | | |
| **Lieutenant Governor** | | | | | | | |
| Fields | B | D | 36.7 | 92.1 | 85.1 | 18.0 | 17.0 |
| Ivey | W | R | 63.3 | 7.9 | 14.6 | 82.0 | 83.0 |
| *Voting for office* | | | *40.6* | *37.8* | *43.2* | *41.6* | *42.3* |
| **Secretary of State** | | | | | | | |
| Merrill | W | R | 64.3 | 4.8 | 8.0 | 84.9 | 86.3 |
| Albert-Kaigler | B | D | 35.7 | 95.2 | 92.0 | 15.1 | 13.6 |
| *Voting for office* | | | *39.7* | *37.7* | *42.5* | *40.4* | *40.9* |
| **Auditor** | | | | | | | |
| Zeigler | W | R | 63.0 | 4.7 | 9.6 | 83.0 | 84.5 |
| Joseph | B | D | 37.0 | 95.3 | 90.5 | 17.0 | 15.3 |
| *Voting for office* | | | *39.6* | *37.4* | *42.2* | *40.4* | *40.8* |

7

ER0131

**Table B: Voting Patterns by Race in Recent Democratic Primaries in the State of Alabama**

| Democratic Primaries Year and Contest | Race of Candidate | Party | Actual Percent of Votes (Turnout) | Estimated Percent of Blacks Voting for Candidate | | Estimated Percent of Whites Voting for Candidate | |
|---|---|---|---|---|---|---|---|
| | | | | Two-equation regression | Ecological Inference: King's EI | Two-equation regression | Ecological Inference: King's EI |
| **2008** | | | | | | | |
| **Presidential primary** | | | | | | | |
| Obama | B | D | 56.2 | 93.7 | 95.5 | 22.4 | 32.5 |
| Clinton | W | D | 41.8 | 5.9 | 3.9 | 74.2 | 64.2 |
| Biden | W | D | .2 | .2 | .7 | .2 | .3 |
| Edwards | W | D | 1.5 | 0 | 0 | 2.8 | 1.8 |
| Richardson | W | D | .2 | .1 | .7 | .3 | .2 |
| Dodd | W | D | .1 | .1 | .2 | .1 | .1 |
| *Voting for office* | | | *20.5* | *39.5* | *40.2* | *14.3* | *12.7* |
| | | | | | | | |
| **U.S. Senate** | | | | | | | |
| Figures | B | D | 63.7 | 81.8 | 79.8 | 32.1 | 53.3 |
| Swanson III | B | D | 22.0 | 13.5 | 14.6 | 37.0 | 27.2 |
| Townsend | W | D | 14.3 | 4.7 | 6.9 | 30.9 | 18.6 |
| *Voting for office* | | | *6.8* | *17.4* | *23.7* | *3.3* | *6.3* |
| | | | | | | | |
| **2010 Primary** | | | | | | | |
| **U.S. Senate** | | | | | | | |
| Barnes | W | D | 60.8 | 51.6 | 44.2 | 82.9 | 69.2 |
| DeMoore | B | D | 39.2 | 48.4 | 55.8 | 17.1 | 30.9 |
| *Voting for office* | | | *10.4* | *28.7* | *34.7* | *4.1* | *8.8* |
| | | | | | | | |

8

ER0132

| Democratic Primaries Year and Contest | Race of Candidate | Party | Actual Percent of Votes (Turnout) | Estimated Percent of Blacks Voting for Candidate | | Estimated Percent of Whites Voting for Candidate | |
|---|---|---|---|---|---|---|---|
| | | | | Two-equation regression | Ecological Inference: King's EI | Two-equation regression | Ecological Inference: King's EI |
| **Governor** | | | | | | | |
| Sparks | W | D | 62.3 | 53.5 | 53.6 | 87.1 | 69.8 |
| Davis | B | D | 37.7 | 46.5 | 46.6 | 12.9 | 30.7 |
| *Voting for office* | | | *12.5* | *35.9* | *43.1* | *4.4* | *11.1* |
| | | | | | | | |
| **2016 Primary** | | | | | | | |
| **U.S. Senate** | | | | | | | |
| Crumpton | W | D | 56.1 | 51.6 | 38.4 | 81.7 | 65.9 |
| Nana | B | D | 43.9 | 48.4 | 61.4 | 18.3 | 34.3 |
| *Voting for office* | | | *9.4* | *30.0* | *26.9* | *1.9* | *2.5* |

9

ER0133

**Table C: Racial Composition and Race of the State Representatives, Alabama State House Districts, sorted by Percent Black Voting Age Population (VAP)**

| State House District | Total VAP | NH Black VAP | Hispanic VAP | Percent Hispanic | Percent Black | Race of Representative |
|---|---|---|---|---|---|---|
| 59 | 33003 | 24516 | 1559 | 4.7% | 74.3% | B |
| 76 | 33757 | 24048 | 1433 | 4.2% | 71.2% | B |
| 55 | 35503 | 25064 | 1333 | 3.8% | 70.6% | B |
| 58 | 32590 | 22157 | 851 | 2.6% | 68.0% | B |
| 78 | 33683 | 22714 | 1539 | 4.6% | 67.4% | B |
| 57 | 34418 | 22702 | 583 | 1.7% | 66.0% | B |
| 67 | 33251 | 21856 | 214 | 0.6% | 65.7% | B |
| 60 | 35339 | 23209 | 851 | 2.4% | 65.7% | B |
| 71 | 34639 | 22314 | 547 | 1.6% | 64.4% | B |
| 77 | 35117 | 22545 | 761 | 2.2% | 64.2% | B |
| 99 | 33652 | 20888 | 582 | 1.7% | 62.1% | B |
| 72 | 34681 | 21460 | 405 | 1.2% | 61.9% | B |
| 69 | 34141 | 21111 | 727 | 2.1% | 61.8% | B |
| 68 | 33584 | 20762 | 356 | 1.1% | 61.8% | B |
| 82 | 36115 | 21841 | 747 | 2.1% | 60.5% | B |
| 103 | 32479 | 19545 | 855 | 2.6% | 60.2% | B |
| 19 | 34453 | 20725 | 1077 | 3.1% | 60.2% | B |
| 56 | 33823 | 20195 | 1219 | 3.6% | 59.7% | B |
| 98 | 33630 | 19493 | 427 | 1.3% | 58.0% | B |
| 32 | 34792 | 20069 | 955 | 2.7% | 57.7% | B |
| 52 | 36173 | 20694 | 2196 | 6.1% | 57.2% | B |
| 70 | 35473 | 20265 | 1269 | 3.6% | 57.1% | B |
| 97 | 33768 | 19157 | 503 | 1.5% | 56.7% | B |
| 83 | 33538 | 18625 | 1286 | 3.8% | 55.5% | B |
| 53 | 35041 | 18564 | 3587 | 10.2% | 53.0% | B |
| 54 | 35355 | 18563 | 1232 | 3.5% | 52.5% | W |
| 84 | 35583 | 18142 | 1632 | 4.6% | 51.0% | B |
| 85 | 33779 | 15949 | 769 | 2.3% | 47.2% | B |
| 90 | 35334 | 11629 | 321 | 0.9% | 32.9% | W |
| 89 | 35283 | 10800 | 1015 | 2.9% | 30.6% | W |
| 37 | 35437 | 9947 | 721 | 2.0% | 28.1% | W |
| 28 | 35588 | 9983 | 1319 | 3.7% | 28.1% | W |
| 75 | 34596 | 9382 | 624 | 1.8% | 27.1% | W |
| 66 | 35447 | 8699 | 681 | 1.9% | 24.5% | W |
| 65 | 34411 | 7941 | 266 | 0.8% | 23.1% | W |
| 3 | 35849 | 8215 | 630 | 1.8% | 22.9% | W |

10

ER0134

| State House District | Total VAP | NH Black VAP | Hispanic VAP | Percent Hispanic | Percent Black | Race of Representative |
|---|---|---|---|---|---|---|
| 74 | 36119 | 8028 | 874 | 2.4% | 22.2% | W |
| 33 | 35367 | 7026 | 535 | 1.5% | 19.9% | W |
| 8 | 34257 | 6366 | 3325 | 9.7% | 18.6% | W |
| 81 | 35891 | 6574 | 912 | 2.5% | 18.3% | W |
| 47 | 34968 | 6215 | 3002 | 8.6% | 17.8% | W |
| 61 | 34340 | 6001 | 883 | 2.6% | 17.5% | W |
| 38 | 34619 | 5930 | 511 | 1.5% | 17.1% | W |
| 6 | 35268 | 5985 | 1065 | 3.0% | 17.0% | W |
| 88 | 33534 | 5678 | 986 | 2.9% | 16.9% | W |
| 25 | 32435 | 5156 | 1080 | 3.3% | 15.9% | W |
| 101 | 35758 | 5635 | 987 | 2.8% | 15.8% | W |
| 80 | 34202 | 5366 | 941 | 2.8% | 15.7% | W |
| 93 | 35252 | 5521 | 1378 | 3.9% | 15.7% | W |
| 10 | 34878 | 5324 | 1743 | 5.0% | 15.3% | W |
| 31 | 35385 | 5388 | 703 | 2.0% | 15.2% | W |
| 35 | 34996 | 5314 | 878 | 2.5% | 15.2% | W |
| 91 | 34066 | 5120 | 1976 | 5.8% | 15.0% | W |
| 62 | 34421 | 4957 | 737 | 2.1% | 14.4% | W |
| 1 | 35951 | 5056 | 658 | 1.8% | 14.1% | W |
| 45 | 34685 | 4867 | 935 | 2.7% | 14.0% | W |
| 104 | 34437 | 4814 | 895 | 2.6% | 14.0% | W |
| 100 | 33250 | 4534 | 1067 | 3.2% | 13.6% | W |
| 64 | 34565 | 4650 | 754 | 2.2% | 13.5% | W |
| 40 | 35632 | 4699 | 1030 | 2.9% | 13.2% | W |
| 49 | 34295 | 4322 | 1991 | 5.8% | 12.6% | W |
| 63 | 39190 | 4896 | 1061 | 2.7% | 12.5% | W |
| 5 | 34435 | 4259 | 2055 | 6.0% | 12.4% | W |
| 15 | 34321 | 4242 | 529 | 1.5% | 12.4% | W |
| 86 | 35326 | 4362 | 836 | 2.4% | 12.3% | W |
| 4 | 34151 | 4178 | 1867 | 5.5% | 12.2% | W |
| 92 | 34899 | 4065 | 397 | 1.1% | 11.6% | W |
| 41 | 33802 | 3931 | 1141 | 3.4% | 11.6% | W |
| 36 | 35714 | 4028 | 735 | 2.1% | 11.3% | W |
| 79 | 38300 | 4247 | 1007 | 2.6% | 11.1% | vacant |
| 16 | 35211 | 3855 | 276 | 0.8% | 10.9% | W |
| 42 | 34185 | 3558 | 1488 | 4.4% | 10.4% | vacant |
| 96 | 34861 | 3507 | 762 | 2.2% | 10.1% | W |
| 44 | 34015 | 3357 | 560 | 1.6% | 9.9% | W |
| 73 | 33217 | 3245 | 2326 | 7.0% | 9.8% | W |

11

| State House District | Total VAP | NH Black VAP | Hispanic VAP | Percent Hispanic | Percent Black | Race of Representative |
|---|---|---|---|---|---|---|
| 105 | 33515 | 2887 | 773 | 2.3% | 8.6% | W |
| 50 | 34949 | 3006 | 543 | 1.6% | 8.6% | W |
| 87 | 35155 | 3007 | 942 | 2.7% | 8.6% | W |
| 21 | 35623 | 2876 | 661 | 1.9% | 8.1% | W |
| 102 | 33171 | 2499 | 710 | 2.1% | 7.5% | W |
| 94 | 35076 | 2636 | 1414 | 4.0% | 7.5% | W |
| 46 | 34210 | 2453 | 962 | 2.8% | 7.2% | W |
| 43 | 34247 | 2220 | 1896 | 5.5% | 6.5% | W |
| 13 | 34775 | 2072 | 755 | 2.2% | 6.0% | W |
| 48 | 34828 | 2036 | 1121 | 3.2% | 5.8% | W |
| 22 | 34826 | 1958 | 560 | 1.6% | 5.6% | W |
| 18 | 34775 | 1944 | 2654 | 7.6% | 5.6% | W |
| 51 | 34717 | 1849 | 989 | 2.8% | 5.3% | W |
| 39 | 35635 | 1811 | 622 | 1.7% | 5.1% | W |
| 95 | 37023 | 1570 | 2193 | 5.9% | 4.2% | W |
| 17 | 35160 | 1458 | 582 | 1.7% | 4.1% | W |
| 30 | 34651 | 1411 | 649 | 1.9% | 4.1% | W |
| 7 | 34547 | 1372 | 855 | 2.5% | 4.0% | W |
| 2 | 35725 | 1400 | 539 | 1.5% | 3.9% | W |
| 23 | 35625 | 1333 | 751 | 2.1% | 3.7% | W |
| 20 | 35371 | 1292 | 775 | 2.2% | 3.7% | W |
| 29 | 34708 | 1081 | 1540 | 4.4% | 3.1% | W |
| 14 | 35083 | 861 | 236 | 0.7% | 2.5% | W |
| 9 | 34332 | 643 | 814 | 2.4% | 1.9% | W |
| 34 | 34231 | 555 | 2442 | 7.1% | 1.6% | W |
| 27 | 35226 | 542 | 847 | 2.4% | 1.5% | W |
| 12 | 34821 | 526 | 1344 | 3.9% | 1.5% | W |
| 26 | 33195 | 488 | 5981 | 18.0% | 1.5% | W |
| 24 | 34430 | 504 | 2653 | 7.7% | 1.5% | W |
| 11 | 34144 | 159 | 1575 | 4.6% | 0.5% | W |

12

ER0136

**Table D: Racial Composition and Race of the State Senators, Alabama State Senate Districts, sorted by Percent Black Voting Age Population (VAP)**

| State Senate District | Total VAP | NH Black VAP | Hispanic VAP | Percent Hispanic | Percent Black | Race of Senator |
|---|---|---|---|---|---|---|
| 26 | 100770 | 73255 | 4068 | 4.0% | 72.7% | B |
| 33 | 100562 | 68483 | 1525 | 1.5% | 68.1% | B |
| 19 | 102515 | 64252 | 2306 | 2.2% | 62.7% | B |
| 23 | 101041 | 62312 | 835 | 0.8% | 61.7% | B |
| 24 | 105597 | 63084 | 2114 | 2.0% | 59.7% | B |
| 20 | 100569 | 59362 | 3498 | 3.5% | 59.0% | B |
| 28 | 104667 | 60734 | 3231 | 3.1% | 58.0% | W |
| 18 | 107866 | 60870 | 4970 | 4.6% | 56.4% | B |
| 7 | 106163 | 27732 | 4832 | 4.6% | 26.1% | W |
| 2 | 103950 | 25313 | 4285 | 4.1% | 24.4% | W |
| 25 | 104941 | 22815 | 2003 | 1.9% | 21.7% | W |
| 30 | 101741 | 21704 | 2477 | 2.4% | 21.3% | W |
| 22 | 104153 | 21559 | 1568 | 1.5% | 20.7% | W |
| 13 | 104115 | 20701 | 2037 | 2.0% | 19.9% | W |
| 27 | 109536 | 21364 | 3119 | 2.8% | 19.5% | W |
| 12 | 104034 | 19796 | 2657 | 2.6% | 19.0% | W |
| 31 | 106126 | 19585 | 3310 | 3.1% | 18.5% | W |
| 35 | 102042 | 17622 | 2793 | 2.7% | 17.3% | W |
| 6 | 105659 | 15501 | 4262 | 4.0% | 14.7% | W |
| 11 | 104053 | 14981 | 2126 | 2.0% | 14.4% | W |
| 15 | 101523 | 14598 | 3827 | 3.8% | 14.4% | W |
| 21 | 107852 | 15462 | 2631 | 2.4% | 14.3% | W |
| 29 | 105348 | 14548 | 3272 | 3.1% | 13.8% | W |
| 14 | 100331 | 13801 | 4999 | 5.0% | 13.8% | W |
| 3 | 104802 | 13603 | 6317 | 6.0% | 13.0% | W |
| 10 | 105593 | 12348 | 3681 | 3.5% | 11.7% | W |
| 34 | 102116 | 11930 | 2525 | 2.5% | 11.7% | W |
| 16 | 106423 | 11557 | 5290 | 5.0% | 10.9% | W |
| 1 | 104900 | 11243 | 2827 | 2.7% | 10.7% | W |
| 32 | 106974 | 7865 | 4480 | 4.2% | 7.4% | W |
| 5 | 104906 | 6689 | 1355 | 1.3% | 6.4% | W |
| 17 | 103333 | 5094 | 3528 | 3.4% | 4.9% | W |
| 8 | 105471 | 3401 | 4405 | 4.2% | 3.2% | W |
| 4 | 103955 | 1822 | 2809 | 2.7% | 1.8% | W |
| 9 | 103650 | 1488 | 8374 | 8.1% | 1.4% | W |

ER0137

**Table E: Racial Composition and Race of the City Council District, City of Birmingham, sorted by Percent Black Voting Age Population (VAP)**

| City Council District | Total Population | Total VAP | White VAP | Black VAP | Percent Black VAP | Race of City Council Representative |
|---|---|---|---|---|---|---|
| 9 | 23602 | 18176 | 1206 | 16633 | 91.5% | B |
| 4 | 23308 | 16952 | 1436 | 14865 | 87.7% | B |
| 8 | 23122 | 17586 | 1938 | 15147 | 86.1% | B |
| 7 | 23136 | 18111 | 2475 | 15011 | 82.9% | B |
| 6 | 22864 | 18358 | 2430 | 15136 | 82.4% | B |
| 5 | 24056 | 19098 | 4315 | 14282 | 74.8% | B |
| 1 | 24403 | 17786 | 4503 | 12801 | 72.0% | B |
| 2 | 24376 | 19702 | 10820 | 8137 | 41.3% | W |
| 3 | 23370 | 20777 | 13968 | 4631 | 22.3% | W |

14

ER0138

52

FILED

2017 Feb-01  AM 08:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARNIKA LEWIS, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-CV-690-RDP** |
| | } | |
| **ROBERT J. BENTLEY., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

This matter is before the court on (1) Defendant Mayor William A. Bell, Sr.'s Motion to Dismiss (Doc. # 28), and (2) the Motion To Dismiss filed by the State Of Alabama and Attorney General Strange (Doc. # 30).  The State Defendants' Motion has been fully briefed.  (Docs. # 40, 43, 44, 50 and 51).

At issue in this case is the tug of war between the State of Alabama and the City of Birmingham (and others) over the authority to establish a minimum wage.  Plaintiffs have painted this dispute as yet another chapter in Alabama's civil rights journey.  Defendants disagree and frame it as a simple matter of ensuring consistency in how employers operating within the state are treated.  After careful review, the court concludes there are fatal flaws affecting Plaintiffs' claims: (1) they have not sued the correct Defendants (*i.e.,* they have not included the appropriate characters in their "painting)," and this affects their standing to pursue certain of their claims; (2) they have failed to state a claim under Section 2 of the Voting Rights Act; (3) their Section 2 claim is also barred by the Eleventh Amendment; (4) their equal protection claim has not been plausibly pled; (5) their Thirteenth and Fifteenth Amendment

ER0139

claims necessarily fail; and (6) they are not entitled to go forward on their race discrimination or "political process" claims.

## I.     Background

For over a century, the Alabama courts have recognized that cities in Alabama are "mere creatures of the legislative power, established as political agencies for the more convenient administration of local government, with such powers . . . as the [legislature] may, from time to time, see fit to confer." *Hare v. Kennerly*, 3 So. 683, 684 (Ala. 1888) (citing *Meriwether v. Garrett*, 102 U.S. 472 (1880)). Alabama municipalities are subject to what is essentially a state version of the Supremacy Clause prohibiting them from "pass[ing] any laws inconsistent with the general laws of [the] state." Ala. Const. art. IV, § 89; *see also* Ala. Code § 11-45-1 (authorizing cities to "adopt ordinances" except as "inconsistent with the laws of the state").

The federally mandated minimum wage is currently $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Congress last adjusted the minimum wage in 2007. 29 U.S.C. § 206 (a). In April 2015, the Birmingham City Council adopted a resolution urging the Alabama Legislature to exceed the federal minimum wage on a statewide basis. (Doc. # 18, ¶ 82). When the Legislature did not act, the Birmingham City Council responded with a series of ordinances first enacting, and later expediting, a local minimum wage of its own. (Doc. #  18, ¶¶ 21, 24-25, 85, 90-92). Various state legislators then proposed bills that would require statewide adherence to the federal minimum wage. In the 2016 regular session -- just as Birmingham's ordinance was set to go into effect -- the Legislature enacted the Alabama Uniform Minimum Wage and Right-to-Work Act at issue in this lawsuit ("Act 2016-18" or "the Act"). *See* Ala. Act No. 2016-18, *provisionally codified* at Ala. Code §§ 25-7-40 *et seq*. The purpose of the Act was to "ensure that [labor] regulation and policy is applied uniformly throughout the state." Act No. 2016-18, § 6(a). The

2

ER0140

Act further establishes the Legislature's "complete control" over not only minimum wage policy, but also other issues such as "collective bargaining under federal labor laws," and "the wages, leave, or other employment benefits provided by an employer" to its employees. *Id.* The Act parallels similar legislation adopted in at least sixteen other states prohibiting localities from enacting their own minimum wage ordinances.

Plaintiffs principally allege that Act 2016-18 has the purpose and effect of transferring control over minimum wages and all matters involving private sector employment in the City of Birmingham from municipal officials elected by a majority-black local electorate to legislators elected by a statewide majority-white electorate. They further contend that Act 2016-18 was enacted with the intent of discriminating against the people who live and work in the City of Birmingham on the basis of race in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, as well as the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

The Amended Complaint names as Defendants the State of Alabama, Luther Strange in his official capacity as Attorney General, the City of Birmingham, and William Bell in his official capacity as Mayor of Birmingham. It contains the followings counts:

1.    Count I: Violation of § 2 of the Voting Rights Act: Results Standard

2.    Count II: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Equal Protection Clause.

3.    Count III: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Privileges or Immunities Clause.

4.    Count IV: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Fifteenth Amendment.

5.    Count V: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Thirteenth Amendment.

ER0141

6.      Count VI: Vestiges of *de jure* Racial Segregation in Violation of the Equal Protection Clause.

7.      Count VII: Intentional Racial Discrimination in Violation of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

8.      Count VIII: Racially-Motivated Enactment of Act 2016-18 Violates the Equal Protection Clause of the Fourteenth Amendment.

9.      Count IX: Equal Protection Claim Based on the Political Process Doctrine.

(Doc. # 18).

After careful review, and for the reasons stated below, the court concludes that Defendants are entitled to judgment as a matter of law on Plaintiffs' claims.

## II.      Standard of Review

The Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Intl. Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he

4

ER0142

plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 Fed. Appx. 136, 138 (11th Cir. 2011) (quoting *Am. Dental Assn. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Twombly*, 550 U.S. at 556. Further, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 682). If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 556.

## III.   Analysis

The court will first take up Mayor Bell's Motion, to which no opposition has been filed. The court will then address the overarching standing issues relevant to all claims in this case, examine each individual claim, and discuss the specific issues applicable to each of the claims.

### A.   Mayor Bell's Motion to Dismiss

In the Amended Complaint, Plaintiffs state:

5

ER0143

> The City of Birmingham and Mayor Bell are named as defendants only for the purpose of providing complete relief among the parties with respect to the claims raised herein.

(Doc. # 18 at ¶ 18). Plaintiffs have indicated that Mayor Bell is a party because he "has not acted to enforce Ordinance 16-28[1] because of Act 2016-18." (Doc. # 18 at ¶ 17).  Similarly, they have sued the City due to its non-enforcement of "Ordinance 16-28 because of Act 2016-18." (Doc. # 18 at ¶ 16).  Mayor Bell is only named in the Amended Complaint in his official capacity.  He seeks dismissal of the claims against him as duplicative of the claims against the City.  Plaintiffs have not opposed Mayor Bell's Motion.

"Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 690 n. 44 (1978)).  Thus, "[b]ecause suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly ... ." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Upon review, the court finds that Plaintiffs' claims against Mayor Bell are entirely duplicative of Plaintiffs' claims against the City. (Doc. # 18 at 8). Permitting Plaintiffs to pursue claims against both the City and Mayor Bell in his official capacity in this case would be redundant and needlessly confusing. *See Busby*, 931 F.2d at 776.  Therefore, Mayor Bell's Motion to Dismiss is due to be granted.

**B.**     **Plaintiffs Lack Article III Standing (All Counts Against Attorney General Strange, Mayor Bell and the City of Birmingham)**

Standing to sue is a doctrine rooted in the traditional understanding of the case or

---

[1] On August 18, 2015, the Birmingham City Council unanimously passed, with one abstention, Ordinance 15-124 that would raise the minimum wage for employees working in the city to $8.50 per hour as of July 1, 2016, and $10.10 per hour on July 1, 2017. Ordinance 16-28 moved the effective date of the minimum wage increase to February 24, 2016 and increased the minimum wage to $10.10.

6

ER0144

controversy requirement. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The doctrine delimits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. *Id.* (citing *Valley Forge Christ. College v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982); *Warth v. Sedlin*, 422 U.S. 490, 498-99 (1975)). To bring suit in federal court, a plaintiff must establish three elements as to each defendant: (1) an injury in fact—that is, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of—in other words, the injury must be fairly traceable to the challenged action of Defendants, and not the result of the independent action of some third party not before the court; and (3) a likelihood, as opposed to a merely speculative chance, that the injury will be redressed by a favorable decision of the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-62 (1992). "Failure to establish any one [of the three standing elements] deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002); *see also Delta Commercial Fisheries Association v. Gulf of Mexico Fishery Management Council*, 364 F.3d 269, 273 (5th Cir. 2004).

The Motion to Dismiss currently before the court was filed by the State of Alabama and Attorney General Strange. These Defendants argue that the conclusory allegations of the Amended Complaint do not show how Defendants' actions affected, or even could affect, Plaintiffs' pay.[2] The court addresses each standing element below.

---

[2] Moreover, Defendants assert that the City of Birmingham has not caused Plaintiffs any injury. Rather, this is a situation in which its city ordinance became inoperative as a result of Act 2018-18. Apparently recognizing these facts, Plaintiffs state that the City Defendants are included in the Amended Complaint "only" for purposes of the "relief" sought. (Doc. # 18, ¶ 18). Nonetheless, the City will be included in the court's analysis.

7

ER0145

### 1.      Element One: Injury-in-Fact

Plaintiffs contend that they -- and in the case of the organizational Plaintiffs, their members -- have suffered an injury in fact because they are being paid less than the minimum wage the City has adopted.  Injury-in-fact has been called the "[f]irst and foremost" of standing's three elements. *Spokeo, Inc*., 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). In *Spokeo,* the Supreme Court discussed the dual requirements of "particularization" and "concreteness" necessary to establish the "injury-in-fact" prong of Article III standing. 136 S.Ct. at 1548. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* Concreteness, meanwhile, refers to the realness of the injury. *Id.*

Plaintiffs argue that their allegations regarding the Attorney General's supervisory responsibilities regarding enforcement of Alabama laws (Doc. 18, ¶12), together with the very specific public role that they ascribe to him in advising businesses on both Act 2016-18 and the Birmingham ordinance (Doc. # 18, ¶¶ 13- 14), sufficiently show at this stage that the Attorney General has "some connection with enforcement of the provision at issue." (Doc. # 40 at 16). They also contend that the City's actions complying with state law under the terms of Act 2016-18 are a cause of the Plaintiffs' loss of wages coerced by the challenged statute. By complying with the Act, Plaintiffs argue, the City of Birmingham effectively "enforces" it and therefore has "some connection with the enforcement of the provision at issue." (*Id.*). Defendants respond that it is employers and the Alabama courts -- *i.e.,* parties not before this court -- who will decide whether the Act 2016-18 controls the wages payable to employees in the City of Birmingham. (Doc. # 43 at 8).

8

In *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), the Ninth Circuit denied standing to plaintiffs who alleged, among other things, that the Crime Control Act, which banned certain types of guns (but "grandfathered" in certain others) made the guns and ammunition the plaintiffs wished to purchase more expensive. *Id.* at 1124–30. Even assuming that the law restricted supply and that the purported economic injury was an "injury in fact," the *Reno* court found it to be a "fatal flaw" in the plaintiff's standing argument that "nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons." *Id.* at 1130. Rather, third parties such as weapon dealers and manufacturers broke the chain of causation by independently charging higher prices. *Id.* (citing *Lujan*, 504 U.S. at 560). There is a similar "fatal flaw" in Plaintiffs' standing argument here. To be sure, nothing prohibits employers from paying the minimum wage set forth in the city's ordinance (or more than the federal minimum wage). *Reno*, 98 F.3d at 1130. What the Alabama Legislature has decreed is that a municipality may not *require* a different minimum wage than that sanctioned by federal law. There is no plausible allegation here that implicates the Attorney General or the City Defendants with respect to any injury in fact suffered by Plaintiffs.

### 2.      Element Two: Traceability

But even if Plaintiffs could establish an injury in fact here, they still lack standing because they cannot meet the second standing element – traceability. In *Allen v. Wright*, 468 U.S. 737 (1984), the Supreme Court acknowledged that a certain group of plaintiffs, who were parents of black schoolchildren, had indeed stated an injury in fact (*i.e.,* a diminished chance for their children to receive a racially integrated education) but nevertheless found that the injury was not "fairly traceable" to the government's actions they challenged (*i.e.*, granting tax-exempt status to racially discriminatory public schools). *Id.* at 753, 756–58. Rather, the Supreme Court

9

held that the causal link between the plaintiffs' injury and defendant's actions was "highly indirect" and "attenuated at best" because the injury "'*results from the independent action of some third party not before the court.*'" *Id*. at 757 (quoting *Simon v. Eastern Ky. Welfare Rights Org*., 426 U.S. 26, 42 (1976)) (emphasis added). That is, the Court found the allegation that had the schools not been given tax-exempt status, white students would have attended public rather than private schools was wholly "speculative" *Id*. at 758.

"Cases after *Allen* have held that when a plaintiff is not the direct subject of government action, but rather when the asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, satisfying standing requirements will be 'substantially more difficult.'" *Frank Krasner Enterprises, Ltd. v. Montgomery Cty., MD*, 401 F.3d 230, 234 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562 (in turn quoting *Allen*, 468 U.S. at 758) (internal punctuation and citations omitted))). "This is so because, '[t]he existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."'" *Frank Krasner Enterprises, Ltd.*, 401 F.3d at 234 (quoting *Allen*, 468 U.S. at 758 (in turn quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.))). This rationale is fatal to Plaintiffs' standing arguments. The parties who are responsible for the passage of Act 2016-18 (which Plaintiffs contend delimited their wages) are not before this court.

### 3.   Element Three: Redressability

Defendants argue that another crucial defect in Plaintiffs' standing argument is that the Act 2016-18 will be in force regardless of any action this court may order Defendant Strange or the City Defendants to undertake.  The court agrees.  "Nothing the Attorney General could be

10

ordered to do or refrain from doing would redress the injuries [Plaintiffs] allege[].” *Doe v. Pryor*, 344 F.3d 1282, 1286 (11th Cir. 2003) (citing *Hope Clinic v. Ryan*, 249 F.3d 603, 605–06 (7th Cir.2001) (holding that the plaintiffs did not have standing to challenge state laws authorizing private suits for damages where only the state attorney general is named in the suit because “[the state attorney general] cannot cause the plaintiffs injury by enforcing the private-action statutes [and] any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors”)).   Where a defendant occupies a position having no duty at all with regard to an Act, he cannot not be properly made a party to a claim challenging the Act.  *Ex parte Young*, 209 U.S. 123, 158 (1908).

The case of *Fernandez v. Brock*, 840 F.2d 622 (9th Cir. 1988), is instructive.  As a subsequent Ninth Circuit panel (in a later opinion) observed, in *Fernandez*:

> plaintiffs were migrant workers seeking a court order to force the Secretary of Labor to establish regulations that might affect their eligibility for retirement benefits. However, because any increase in the benefits for which plaintiffs would be eligible was entirely contingent upon the actual content of the regulations the Secretary would ultimately establish, *as well as the actions of plaintiffs' private employer*, the court could not say with any degree of confidence that granting the plaintiffs their requested relief would benefit them.

*Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 985 (9th Cir.1994) (citing *Fernandez*, 840 F.2d at 626–28) (emphasis added).[3]

Similarly, here, as a matter of law and logic, nothing this court could order Attorney General Strange or the City Defendants to do will affect Plaintiffs’ wages. Plaintiffs’ employers set those wages, and it is the courts who will determine whether there is any violation of law with respect to the setting of those wages.  Therefore, Plaintiffs have failed to establish the

---

[3] The *Fernandez* court ultimately held that the plaintiffs had standing as a result of a “procedural injury” that existed apart from any reduction in benefits, and that would be redressed by requiring the Secretary to establish the desired regulations. *Fernandez*, 840 F.2d at 631.

ER0149

requisite elements of Article III standing as to Attorney General Strange and the City Defendants in this case.

At oral argument, the court posed this question:  who would be a proper defendant in this action?  Other than possibly Plaintiffs' current employers, the answer is quite obvious that the body which most directly "caused" Plaintiffs' alleged injury by enacting Act 2016-18, is the Alabama Legislature.  But, notably, this case does not involve a claim against the Alabama Legislature, and with good reason. Members of the legislature are entitled to absolute immunity from the types of claims asserted by Plaintiffs. "Legislative immunity has long been a fixture of our constitutional system. 'The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries.'" *Freedom from Religion Found., Inc. v. Saccone*, 894 F. Supp. 2d 573, 582 (M.D. Pa. 2012) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). In *Tenney*, the Supreme Court held that state legislators are immune from suit under § 1983 when "acting in the sphere of legitimate legislative activity." *Id*. at 376–77; *see also Bogan v. Scott–Harris*, 523 U.S. 44, 48–49 (1998) (explaining that "legislators were entitled to absolute immunity from suit at common law and that Congress did not intend the general language of § 1983 to impinge on a tradition so well grounded in history and reason") (internal citation and quotations omitted).

The relief sought in the Amended Complaint includes a request for injunctive relief directing the Attorney General to notify legislators and members of the public that the Act 2016-18 violates Section 2 of the VRA and the Thirteenth, Fourteenth and Fifteenth Amendments to the US Constitution[4], and ordering the City of Birmingham and Mayor Bell to enforce Ordinance 16-28.  These actions, according to Plaintiffs, would redress the wrongs caused by the

---

[4] For the reasons discussed below, however, the court finds that the Act does not violate these provisions.

ER0150

enforcement of 2016-18.   Despite Plaintiffs' creative attempts to plead around legislative immunity, Plaintiffs simply do not have Article III standing to pursue these claims against the Attorney General or the City Defendants.

### C.      The Voting Rights Act (Count I) is Not Implicated Here

Even if Plaintiffs' had Article III standing (and, to be clear, they do not), there is an alternative reason to dismiss the claim asserted in Count I: the conduct alleged in the Amended Complaint simply does not implicate Section 2 of the Voting Rights Act.  That section bans "all States and their political subdivisions from maintaining any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right ... to vote on account of race or color.'" *Reno v. Bossier Parish Sch. Bd*., 520 U.S. 471, 479 (1997) (quoting 42 U.S .C. § 1973(a) (emphasis omitted)). Section 2 "does not deal with every voting standard, practice, or procedure, but rather is limited to voting procedures that deny someone the right to vote." *Dougherty Cnty., Ga., Bd. of Ed. v. White*, 439 U.S. 32, 50 n. 4, (1978). To prevail, a plaintiff must demonstrate that "based on the totality of the circumstances, ... the political processes leading to ... election ... are not equally open to participation by [minority groups] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C.A. §10301  (formerly 42 U.S.C. §1973(b)).

In *Presley v. Etowah County Commission*, the Supreme Court examined the scope of the phrase "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" found in Section 5 of the Voting Rights Act. 502 U.S. 491 (1992).  Although the *Presley* decision addressed the scope of Section 5 of the Voting Rights Act, its analysis applies with equal force to Section 2 because the same phrase is embodied in both sections: "voting qualification or prerequisite to voting, or standard, practice, or procedure" with respect to voting. *Compare* 42 U.S.C. § 1973(a) *with* 42 U.S.C. § 1973c.  *See Morse v. Republican Party of*

ER0151

*Va.*, 517 U.S. 186, 209 (1996) (Stevens, J.) ("[C]hanges in practices within covered jurisdictions that would be potentially objectionable under § 2 are also covered under § 5."); *Holder v. Hall*, 512 U.S. 874, 882 (1994) (Kennedy, J.) ("[T]he coverage of §§ 2 and 5 is presumed to be the same."); *Bonilla v. City Council of City of Chi.*, 809 F.Supp. 590, 596 n. 3 (N.D. Ill. 1992) (noting that "[a]lthough *Presley* technically dealt with the scope of § 5 ..., it is equally applicable to § 2 because *Presley* defined the key terms in both sections").

This court has previously adopted the following summary of the *Presley* decision, authored by Chief Judge Watkins of the Middle District of Alabama:

> In *Presley*, the Supreme Court held that § 5 applies only to a change in a "standard practice or procedure" that has a "direct relation to, or impact on, voting." 502 U.S. at 506. The Court observed that it had recognized four types of changes that meet the "direct relation" test: Those that (1) "involved the manner of voting"; (2) "involve[d] candidacy requirements and qualifications"; (3) "concerned changes in the composition of the electorate that may vote for candidates for a given office" or (4) "affect[ed] the creation or abolition of an elective office." *Id.* at 502-03. "The first three categories involve changes in election procedures, while all the examples within the fourth category might be termed substantive changes as to which offices are elective." *Id.* at 503. *Presley* distinguished between changes in a standard, practice, or procedure directly affecting voting by the electorate and "changes in the routine organization and functioning of government." *Id*. at 504. While the latter changes may indirectly affect voting, they are not within the scope of § 5.

> The *Presley* plaintiffs argued that a transfer of duties among and away from elected officials pertaining to repairs and discretionary spending for road maintenance within two Alabama county commissions constituted "changes" that had a direct relation to voting and, thus, required preclearance. *See id.* at 493. The first alleged change took away the commissioners' discretion to allocate funds as needed in their districts and instead put all funds in a common account to be doled out based upon needs of the county as a whole. The second alleged change, which occurred within another county commission, transferred authority concerning road and bridge operations from the elected county commissioners to an appointed county engineer who answered to the commission. *See id*. at 497–99.

> The Supreme Court held that these changes did not fit within any of the four categories it had previously recognized as having a direct relation to voting. *See id*. at 503-08. The first alleged § 5 change "concern[ed] the internal operations of an elected body." *Id.* at 503. "Changes which affect only the

14

ER0152

distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506. The other alleged § 5 change also did not require preclearance because even if "the delegation of authority to an appointed official is similar to the replacement of an elected official with an appointed one" (fourth category), it did not "change[ ] an elective office to an appointive one." *Id.* at 506-07. Both before and after the change, the county voters could elect their county commissioners. And while the change resulted in a shift in the balance of authority through the creation of an appointed post, the commission "retain[ed] substantial authority, including the power to appoint the county engineer and to set his or her budget." *Id.* at 508. The Supreme Court concluded:

> Covered changes must bear a direct relation to voting itself. That direct relation is absent in both cases now before us. The changes in [the two county commissions] affected only the allocation of power among governmental officials. They had no impact on the substantive question whether a particular office would be elective or the procedural question how an election would be conducted. Neither change involves a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c.

*Id.* at 510.

*Barber v. Bice,* 44 F. Supp. 3d 1182 (N.D. Ala. 2014) *(quoting *Ford v. Strange*, 2013 WL 6804191, at *12-13 (M.D. Ala. Dec. 23, 2013), *aff'd*, 580 F. App'x 701 (11th Cir. 2014)). Similarly, here, there is no question that Act 2016-18 does not involve a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c.  Both before and after the Act, the Birmingham City voters were free to elect their city councilors. And while the Act may have resulted in a tangential shift in the balance of authority with regard to the setting of wages, the Birmingham City Council has nevertheless "retain[ed] substantial authority."

In *Ford,* city and county officials commenced an action against the Governor and the Attorney General for the State of Alabama claiming that State's elimination of gambling operations was a violation of their rights under the Voting Rights Act and constituted a violation

15

of their due process rights. 580 F. App'x at 709–10.  In addressing Plaintiffs' claims, the Eleventh Circuit stated:

> *Plaintiffs have not alleged injury to any cognizable "voting rights" for the simple reason that their "asserted basis for standing has nothing to do with voting." Abortion Rights Mobilization Inc. v. Baker (In re U.S. Catholic Conference)*, 885 F.2d 1020, 1028 (2d Cir.1989). Plaintiffs allege that Defendants undermined Amendment 744 several years after Plaintiffs had supported it. To the extent that Plaintiffs assert a "voting right" to the post-enactment enforcement of the laws that they vote for, their claims are "wholly insubstantial and frivolous." *Section 2 of the Voting Rights Act protects a right to equal-opportunity participation in the electoral process***.** *See Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). We find no authority for the proposition that it purports to protect a voter's interest in the post-enactment enforcement of the laws that he supports. *See, e.g*., 42 U.S.C. § 1973l (c)(1) (defining the words "vote" and "voting"). We consequently affirm the district court's dismissal of Count Two on jurisdictional grounds.

*Ford*, 580 F. App'x at 709–10 (emphasis added).  The Eleventh Circuit further held that "the connection between Defendants' alleged conduct and Plaintiffs' votes -- which were cast years earlier -- is simply too tenuous to establish "injury in fact" to any voting rights protected by either Section 2 of the Voting Rights Act or the Thirteenth, Fourteenth, or Fifteenth Amendments to the United States Constitution." *Id.*

Here, too, the operative votes electing Plaintiffs' local and statewide representatives were cast before the passage of the city ordinance and the Act.  Any connection between Defendants' conduct (which had nothing to do with the enactment of Act 2016-18), and their non-enforcement of Birmingham's ordinance, is simply too tenuous to establish an injury in fact to any voting rights.  That is, even if the States' Eleventh Amendment immunity had been abrogated with respect to a Section 2 claim, the "VRA § 2 does not apply, because this is not a case involving a voting qualification or prerequisite to voting or standard, practice, or procedure

ER0154

resulting in the denial of a right to vote." *Phillips v. Snyder*, 2016 WL 4728026, at *9 (6th Cir. Sept. 12, 2016).

Nor does the passage of Act 2016-18 touch, concern, or even relate to any of the recognized categories to which the VRA applies. *See Presley*, 502 U.S. at 506. Plaintiffs have not alleged any action by Defendants that (1) "involved the manner of voting"; (2) "involve[d] candidacy requirements and qualifications"; (3) "concerned changes in the composition of the electorate that may vote for candidates for a given office" or (4) "affect[ed] the creation or abolition of an elective office." *Id.* at 502-03.  At most, the Act 2016-18 removes one thimble-size slice of local authority.  There is no colorable assertion that passage of Act 2016-18 has had (or will have) any impact whatsoever on Plaintiffs' right to vote or cast an effective ballot. Under *Presley*, reallocations of government authority do not have the requisite relation to voting on which to base a VRA claim. *Presley*, 502 U.S. at 506. Plaintiffs' Section 2 claim in Count I is due to be dismissed.

### D.    Sovereign Immunity Bars Plaintiffs Claim under Section 2 of the VRA (Count I)

Even if Plaintiffs had Article III standing (and they do not), and even if Plaintiffs' claim was cognizable under Section 2 of the Voting Rights Act (and, again, it is not), their claims against the Attorney General and the State are still barred by the doctrine of Sovereign Immunity. A federal court's jurisdiction is limited "to the power conferred by the Constitution and federal statutes, and the party invoking the court's jurisdiction bears the burden of proving the existence of federal jurisdiction." *Lichtenberg v. Sec'y of the Navy*, 627 F. App'x 916, 917 (11th Cir. 2015) (citing *Bishop v. Reno*, 210 F.3d 1295, 1298 (11th Cir. 2000)).  The Eleventh Amendment deprives federal courts of the power to hear claims brought by parties against states, their agencies, or their officers, unless the state has waived its immunity or Congress has

ER0155

abrogated the state's immunity. U.S. Const. amend. XI.

Plaintiffs have not alleged any facts establishing that Alabama's sovereign immunity has been waived. A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Supreme Court has rejected a finding of a waiver of Eleventh Amendment immunity based on a general statement allowing suit against the state, even when the statement was coupled with an express agreement to obey a specific federal law. *Florida Dep't of Health and Rehabilitative Services v. Florida Nursing Home Ass'n*, 450 U.S. 147, 149–50 (1981) (per curiam) (statute allowing a state to "be sued" and promising to "abide by ... the Title XIX Medicaid Program" did not waive the state's immunity).

Therefore, the fundamental question becomes whether Congress abrogated the state's immunity in enacting the VRA. The standard for finding a valid abrogation is "stringent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56 (1996) (internal quotation marks omitted). And even where Congress has the power to abrogate state immunity (such as in this case here, when it has legislated under the Fourteenth and Fifteenth Amendments), it may do so "only by making its intention unmistakably clear in the language of the statute." *Id.* So, while Congress certainly had the power to abrogate state immunity when it passed the VRA, the key question is this: did it unmistakably make clear its intent to do so? The court concludes that it did not.

In reviewing the relevant portions of the VRA, the court cannot discern any implied, let alone unequivocally expressed, abrogation of sovereign immunity. Notably, when private plaintiffs sue under Section 2 of the VRA, they do so only through an "implied private right of action." *See, e.g., Ford v. Strange*, 580 Fed. App'x at 705 n.6 (citing *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996)). That is, the statute is silent not only as to the abrogation issue, but also as to whether it creates a private right of action. When statutory text is silent on the issue of

18

whether it abrogates sovereign immunity, that text is ambiguous. *See Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1321 (11th Cir. 2016). And ambiguity cuts no abrogation ice at all. "'To be effective the expression of Congressional intent [to abrogate sovereign immunity] must be a clarion call of clarity. *Ambiguity is the enemy of abrogation*.'" *Williams*, 839 F.3d at 1321 (quoting *Freemanville Water Systems v. Poarch Band of Creek Indians*, 563 F.3d 1205 (11th Cir. 2009)) (emphasis added). There simply is no "clarion call of clarity" found in Section 2's language which signals an abrogation of sovereign immunity. *Id.*

The court acknowledges that at least three courts have found that Congress has abrogated state sovereign immunity for claims arising under Section 2 of the Voting Rights Act. *See Mixon v. State of Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999); *Reaves v. United States DOJ*, 355 F.Supp.2d 510, 515 (D. D.C. 2005); and *Terrebonne Par. NAACP v. Jindal*, 154 F. Supp. 3d 354, 359 (M.D. La. 2015). But none of these decisions is binding on this court and they are not at all persuasive. *Terrebonne* relied on *Mixon* with little or no examination or analysis of that decision. 154 F. Supp. 3d at 359. And in *Mixon*, the Sixth Circuit's discussion of whether Congress had employed language abrogating states' immunity to these actions consisted of a single paragraph that did not even mention that the plaintiffs were proceeding under an *implied* right of action. *Mixon*, 193 F.3d at 398. Moreover, in *Mixon*, "the Ohio Attorney General ha[d] not [even] pressed the immunity question on appeal." 193 F.3d at 397. And *Reaves* addressed claims under Section 5 of the Voting Rights Act. *Reaves*, 355 F. Supp. 2d at 513. None of these decisions explains why Congress has unmistakably made clear that it was abrogating states' immunity.

But, even more importantly, each of the three decisions got it wrong not only because they failed to apply the stringent analysis (the proper standard required by *Seminole Tribe*, 517 U.S. at 56), but also because the application of such an analysis makes clear that Congress has

ER0157

not spoken on the issue of abrogation.  For illustration's sake, an example of an express abrogation of sovereign immunity is found in Title IX.  Title IX explicitly states, "[a] state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title IX." 42 U.S.C. § 2000d-7(a)(1).  Title IX was enacted in 1972.  So, it is readily apparent that, in 1972 and since, Congress knew precisely how to clearly and unmistakably announce the abrogation of sovereign immunity in this manner. The VRA has been amended a number of times since 1972, yet Congress has never added language to the Act indicating a clear intention to abrogate states' sovereign immunity. In light of this silence, this court is constrained by binding precedent to hold that the State Defendants' immunity was not abrogated with respect to any implied private right of action under Section 2 of the VRA.  *Williams*, 839 F.3d at 1321; *see Ford*, 580 Fed. App'x at 705 n.6.

**E.      Plaintiffs Have Not Adequately Alleged Any Equal Protection Violation (Counts II, VI and VIII)**

The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. This clause is commonly referred to as the equal protection clause and "is essentially a direction that all persons similarly situated should be treated alike." *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.*, 825 F.2d 367, 369 (11th Cir. 1987).  Equal protection claims arise from an individual's right not to be subjected to intentional discrimination at the hands of the government. *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1313-14 (11th Cir. 2006).

Where, as here, the claim is based on a facially neutral statute, an allegation of intentional discrimination is required. *E & T Realty v. Strickland*, 830 F.3d 1107, 11014 (11th Cir. 1987) ("The requirement of intentional discrimination prevents plaintiffs from bootstrapping all

20

misapplications of state law into equal protection claims."); *see Etherton v. City of Rainsville*, 2016 WL 5349206, at *4 (11th Cir. Sept. 26, 2016). Indeed, Plaintiffs seemingly conceded that allegations of intentional discrimination are required to state an equal protection claim when they state that Count I of the Amended Complaint under the VRA "is the one claim that does not require proof of racially discriminatory intent." (Doc. # 40 at 25-26).

Plaintiffs' Amended Complaint makes a conclusory allegation, unsupported by any specific factual allegations, that "Defendants actions constitute intentional discrimination on the basis of race." (Doc. # 18 at ¶ 135). But an equal protection claim is not plausible where there is an "obvious alternative explanation" for the conduct other than intentional discrimination. *Jabary v. City of Allen*, 547 F. App'x 600, 605 (5th Cir. 2013) (citing *Twombly*, 550 U.S. at 567). In such a circumstance, a plaintiff must "allege more by way of factual content to 'nudge' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570). Without specific factual allegations of an intent to discriminate on the part of any particular legislators, Plaintiffs' equal protection claims fail.

In light of the controlling *Twombly*/*Iqbal* standard, and the requirement that a Plaintiff allege intentional discrimination, Plaintiffs' allegations regarding vestiges of *de jure* discrimination fail to 'nudge' their claim equal protection claims across the line from conceivable to plausible. Therefore, these claims are due to be dismissed for this alternative reason.

## F.     Plaintiffs Have Conceded their Privileges and Immunities Claim (Count III)

Plaintiffs have expressly conceded that their claim under the Fourteenth Amendment's Privileges or Immunities Clause (Count III) is foreclosed by Supreme Court precedent. (Doc. # 40 at 53 ("the right to vote is not among the privileges or immunities of United States citizenship

21

protected by Section 1 of the Fourteenth Amendment. *Minor v. Happersett*, 88 U.S. 162 (1874)."). Therefore, Count III is due to be dismissed for this alternative reason.

### G.      The Fifteenth Amendment is Not Implicated (Count IV)

In Count IV, Plaintiffs assert a claim based on Alabama's alleged *de jure* policy of maintaining white control over local black majorities under of the Fifteenth Amendment.  That assertion lacks merit.

The Fifteenth Amendment provides that a citizen's right "to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. This claim is due to be dismissed for the same reasons that Plaintiffs' claim under the Voting Rights Act fails — "the connection between Defendants' alleged conduct and Plaintiffs' votes -- which were cast years earlier -- is simply too tenuous to establish 'injury in fact' to any voting rights protected by either section 2 of the Voting Rights Act or the [] Fifteenth Amendment[] … ." *Ford v. Strange*, 580 F. App'x at 710.  *See also Osburn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004) (affirming dismissal of Fifteenth Amendment claim where plaintiffs did not allege that they were denied any fundamental right in relation to voting). Therefore, Plaintiffs' Fifteenth Amendment claim is due to be dismissed for this alternative reason.

### H.      The Thirteenth Amendment is Not Implicated (Count V)

Plaintiff's claim under the Thirteenth Amendment advanced in Count V of the pleadings is similarly without merit.  The Thirteenth Amendment prohibits both slavery and involuntary servitude, except as punishment for a crime when an individual has been duly convicted. U.S. Const., amend. XIII, § 1. The Thirteenth Amendment reaches only slavery or involuntary servitude. Whatever may be otherwise said about their allegations in this case, Plaintiffs have not

22

claimed that they were forced into slavery or involuntary servitude. Plaintiffs are still entitled to be paid for the work they choose to perform at an amount at least equal to the federal minimum wage, and employers are of course free to pay them more.   Therefore, Plaintiffs' Thirteenth Amendment claim is without merit and is due to be dismissed for this alternative reason.

### I.        Intentional Race Discrimination (Count VII)

As an initial matter, because in their Count VII Plaintiffs assert multiple claims, it constitutes an example of "shotgun" style pleading which has been "repeatedly condemned" by the Eleventh Circuit. *See PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 806 n. 4 (11th Cir. 2010); *Davis v. Coca-Cola Bottling Co. Consol.,* 516 F.3d 955, 979 (11th Cir. 2008). Indeed, the Eleventh Circuit has stated that such pleadings "wreak havoc on the judicial system" and "divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Wagner v. First Horizon Pharma. Corp*., 464 F.3d 1273, 1279 (11th Cir. 2006); *see also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll*., 77 F.3d 364, 366 (11th Cir. 1996) (stating that multiple claims should be presented separately in adherence to Federal Rule of Civil Procedure 10(b)).  But that is not the only defect that plagues the allegations in this count.

Substantively, this count fails to present anything other than conclusory allegations. Plaintiffs have made no specific factual assertions which indicate that Act 2016-18 has a discriminatory effect.  On its very face, the Act applies statewide, prohibiting "[a]ny [local] ordinance, policy, rule, or other mandate" that is inconsistent with its prescribed, uniform minimum wage. Ala. Act No. 2016-18, § 2(b); *see also id.* § 6(d). "Absent discriminatory effect, judicial inquiry into legislative motivation is unnecessary, as well as undesirable." *Crawford v.*

23

*Bd. of Educ. of City of L.A.*, 458 U.S. 527, 544 n.31 (1982) (citation omitted) (equal protection case).

Where, as here, there are legitimate reasons supporting the legislature's decision, "only the clearest proof [of illicit motive] will suffice." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quotation marks omitted); *accord Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (requiring clearest-proof requirement); *see also McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987) (requiring judicial deference in the face of legitimate legislative reasons).  Because there are no specific factual allegations to support these conclusory, shotgun allegations, the claims asserted in Count VII are due to be dismissed for this alternative reason.

### J.        Political Process Doctrine (Count IX)

Under the so-called political process doctrine, states may not alter the procedures of government to target racial minorities. *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 134 S. Ct. 1623 (2014) (citing *Hunter v. Erickson*, 393 U.S. 385, 394 (1969) (Harlan, J. concurring)). The traditional equal protection analysis focuses on discriminatory intent. The political process doctrine, on the other hand, looks at the discriminatory results of government restructuring. The continued vitality of the political process doctrine as a whole is in question, s*ee Schuette*, 134 S. Ct. at 1653-54 (Sotomayor, J., dissenting); *Romer v. Evans*, 517 U.S. 620, 23-24, 632 (1996); however, that is not the dispositive point here.

Plaintiffs argue that the "political process" doctrine applies to "facially neutral" legislation that restructures the political process.  They contend that the court needs a factual record to decide whether the effect of the legislation particularly burdened or injured racial minorities by restructuring the political process and unduly restricting their ability to enact

ER0162

policies addressing racial disparities in employment. They further allege that Act 2016-18 suppresses black citizens' economic opportunities. And they argue that the election of African Americans to county legislative delegations has forced the Legislature to make changes to preserve white control over local governments.

Because Act 2016-18 is facially neutral, it will be subject to strict scrutiny review "only if it can be proved that the law was 'motivated by a racial purpose or object,' or is unexplainable on grounds other than race." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). Even in the view of the dissent in *Schuette*, there is no violation unless the challenged government action "has a racial focus, targeting a policy or program that 'inures primarily to the benefit of the [racial] minority.'" *Schuette*, 134 S. Ct. at 1659 (Sotomayor, J., dissenting) (quoting *Washington v. Seattle Sch. Dist*. No. 1, 458 U.S. 457, 472 (1982) (emphasis added)).

Here, the Act has no racial classifications and, on its face, calls for uniform economic policy throughout the state. Plaintiffs' political process claim makes nothing more than conclusory allegations, not supported by any alleged factual information, that the Act places a special burden on racial minorities. Thus, even to the extent the political process doctrine has continuing vitality (an issue this court need not decide here), the allegations of Plaintiffs' Amended Complaint fail to state such a claim. Therefore, Plaintiffs' political process claim is without merit and is due to be dismissed for this alternative reason.

## IV.    Conclusion

For all these reasons, the court concludes that Plaintiffs' claims are due to be dismissed and Defendants are entitled to judgment as a matter of law. A separate order will be entered.

ER0163

**DONE** and **ORDERED** this January 31, 2017.

                                                             **R. DAVID PROCTOR**
                                                UNITED STATES DISTRICT JUDGE

53

FILED
2017 Feb-01 AM 08:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MARNIKA LEWIS, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-CV-690-RDP** |
| | } | |
| **ROBERT J. BENTLEY., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## ORDER OF DISMISSAL

In accordance with the accompanying Memorandum Opinion, Defendants' Motions to Dismiss (Docs. # 28 and 30) are **GRANTED**. Plaintiffs' claims against all Defendants are **DISMISSED WITH PREJUDICE**.

Costs are taxed against Plaintiffs.

**DONE** and **ORDERED** this January 31, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

ER0165

54

FILED
2017 Mar-02  PM 12:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## +UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARNIKA LEWIS, et al.,** | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | **Case No.  2:16-cv-690-RDP** |
| **v.** | ) | |
| | ) | |
| **THE STATE OF ALABAMA,** | ) | |
| **et al.,** | ) | |
| | ) | |
| *Defendants*. | ) | |

## NOTICE OF APPEAL

Pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, notice is hereby given that all Plaintiffs in the above-named case hereby appeal to the United States Court of Appeals for the Eleventh Circuit from the Memorandum Opinion (Doc. 52) and Order (Doc. 53) entered February 1, 2017, granting the Motion of Defendants State of Alabama and Attorney General Strange (Doc. 30) to dismiss with prejudice all of Plaintiffs' claims, including all of Plaintiffs' claims against the non-movant City of Birmingham.

Date:  March 2, 2017

Respectfully submitted,

/s/ *Richard P. Rouco*                                        /s/ *James U. Blacksher*

ER0166

**OF COUNSEL:**

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, Alabama 35203
Telephone: 205-870-9989
Facsimile: 205-803-4143
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com


Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Tel. (212) 627-8100
Fax (212) 627-8182
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
(202) 230-4096
carlsonmjj@yahoo.com

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Direct: 1-205-488-1226
Facsimile: 1-800-922-4851
Email: jwhatley@whatleykallas.com

**OF COUNSEL:**

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201
phone: 205-591-7238
fax: 866-845-4395
jblacksher@ns.sympatico.ca

Edward Still, Esq.
EDWARD STILL LAW FIRM
LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham AL 35209
Phone: 205-320-2882
Fax: 877-264-5513
still@votelaw.com

U.W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, Alabama 35222
Phone: 205-837-2898
Fax: 205-241-3146
clemonu@bellsouth.net


***Attorneys for Alabama Legislative Black Caucus, Rep. Louise Alexander, Rep. Marika Coleman, Sen. Priscilla Dunn, Rep Juandalynn Givan, Rep. Mary Moore, Rep. Oliver Robinson, Rep. John Rogers, Sen. Rodger Smitherman, and William Muhammad***

2

*Attorneys for Plaintiffs Marnika Lewis,*
*Antoin Adams, Alabama State Conference*
*of the National Association for the*
*Advancement of Colored People, and*
*Greater Birmingham Ministries*

ER0168

## CERTIFICATE OF SERVICE

I certify that on this the 24th day of February, 2017, I filed the foregoing with the electronic court filing system for the United States District Court for the Northern District of Alabama and I served via electronic mail the following counsel of record:

Fredric Fullerton, II                           James W. Davis
Kayla Lawrence                                  William G. Parker, Jr.
City of Birmingham Law Department State of Alabama
600 City Hall                                   Office of Attorney General
710 North 20th Street                           501 Washington Avenue
Birmingham AL 35203                             Montgomery, AL 36130
flfulle@ci.birmingham.al.us                     jimdavis@ago.state.al.us
kayla.lawrence@birminghamal.gov                 wparker@ago.state.al.us


                                    /s/*Richard P. Rouco*

4

ER0169

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter. On that same date, I caused physical copies of the foregoing PLAINTIFFS-APPELLANTS' APPENDIX to be filed with the Clerk of Court, and to be served upon the following counsel by U.S. First Class Mail:

Andrew Brasher
James W. Davis
William Glenn Parker, Jr.
State of Alabama Attorney General's Office
501 Washington Ave
PO BOX 300152
Montgomery, AL 36130-0152
*Counsel for Defendants-Appellees State of Alabama and Alabama Attorney General Steve Marshall*

Fredric L. Fullerton, II
Kayla S. Lawrence
City of Birmingham Law Department
710 N 20th Street, Fl. 6
Birmingham, AL 35203
*Counsel for Defendants-Appellees City of Birmingham and Mayor Bell*

Date: June 5, 2017                          _____
                                                                Sally Mendez

1