No. 17-11009

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

_____

MARNIKA LEWIS, *et al.*,

*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, *et al.*,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

_____

## BRIEF OF AMICI CURIAE HISTORIANS SUSAN ASHMORE, WAYNE FLYNT, HASAN JEFFRIES, J. MORGAN KOUSSER, PEYTON McCRARY, AND PATRICIA SULLIVAN IN SUPPORT OF APPELLANTS SEEKING REVERSAL

_____

Pamela S. Karlan
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 725-4851
karlan@stanford.edu

Joyce White Vance
829 Linwood Road
Birmingham, AL 35222
Telephone: (205) 305-9511
joycevance4@gmail.com

Counsel for Amici Curiae

**AMICI CURIAE'S CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1, Amici hereby state that none of them has any parent corporation or issues shares to the public. Pursuant to Eleventh Circuit Rules 26.1-1 and 28-1(b), Amici hereby certify that, to the best of their knowledge, in addition to the individuals and entities listed in Plaintiffs-Appellants' Opening Brief the following individuals have an interest in the outcome of this appeal:

1. Ashmore, Susan        Amicus Curiae

2.  Flynt, J. Wayne      Amicus Curiae

3.  Jeffries, Hasan      Amicus Curiae

4. Karlan, Pamela S.     Counsel for Amici Curiae

5. Kousser, J. Morgan    Amicus Curiae

6. McCrary, Peyton       Amicus Curiae

7.  Sullivan, Patricia   Amicus Curiae

8.  Vance, Joyce White   Counsel for Amici Curiae

# TABLE OF CONTENTS

Certificate of Interested Persons ...............................................................i

Table of Authorities ............................................................................ iii

Identity and Interest of Amici Curiae ......................................................1

Statement of the Issue .........................................................................3

Summary of Argument .........................................................................3

Argument..........................................................................................5

I.      The District Court Erred in Failing to Recognize the Relevance of
        Plaintiffs' Allegations Regarding Alabama's Long History of Purposeful
        Racial Discrimination ..................................................................5

II.     Alabama Has a Long History of Restructuring Government Powers
        To Deny Decisionmaking Authority To Local Black Majorities and
        To Keep Its Black Citizens Economically Subordinated ...............................6

        A.      Alabama's Restrictions on Home Rule Originated in the State's
                Attempts To Prevent Black Citizens From Exercising Political
                Power at the Local Level..........................................................9

        B.      Alabama's Purposefully Discriminatory Restructuring of
                Governmental Decisionmaking Continued Into the
                Twentieth Century..............................................................13

        C.      The Parallels Between Alabama Act No. 2016-18 and Earlier
                State Actions To Restrict Black Political Power at the Local Level
                Support Plaintiffs' Allegations of Purposeful Discrimination............20

Conclusion .....................................................................................22

Certificate of Compliance ...................................................................23

Certificate of Service ........................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................6

*Bolden v City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982) ................................2

*Burton v. Hobbie,* 561 F. Supp. 1029 (M.D. Ala. 1983) (three-judge court) ..........16

*Dillard v. Crenshaw County,* 640 F. Supp. 1347 (M.D. Ala. 1986)............... 2, 8, 11

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) .................................... 7, 13, 14

*Gomillion v. Rutherford*, 6 Race Rel. L. Rep. 241 (M.D. Ala. 1961........................14

*Hardy v. Wallace*, 603 F. Supp. 174 (N.D. Ala. 1985)

   (three-judge court)........................................................... 16, 17, 18

*Hare v. Kennerly*, 3 So. 683 (Ala. 1888) .................................................21

*Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978) ....................................14

*Hunter v. Erickson*, 393 U.S. 385 (1969) .................................................8

*Hunter v. Underwood*, 471 U.S. 222 (1985).........................................................2, 7

*Johnson v. Governor of State of Florida*, 405 F.3d 1214 (11th Cir.),

   *cert. denied*, 546 U.S. 1015 (2005)....................................................7

*\*Knight v. Alabama*, 458 F. Supp. 2d 1273 (N.D. Ala. 2004) , *aff'd*, 476

   F.3d 1219 (11th Cir.), *cert. denied*, 551 U.S. 1146 (2007) ................ 8, 10, 11, 12

*Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991) , *aff'd in part,*

   *vacated in part, rev'd in part*, 14 F.3d 1534 (11th Cir. 1994)............................10

*Lynch v. Alabama*, 2011 U.S. Dist. LEXIS 155012 (N.D. Ala.

   Nov, 7, 2011), *aff'd in part, vacated in part, and remanded sub*

   *nom. I.L. v. Alabama*, 739 F.3d 1273 (11th Cir.), *cert. denied*,

   135 S. Ct. 53 (2014)................................................................................ *passim*

*Romer v. Evans*, 517 U.S. 620, 625 (1996) ........................................................5, 8

*Schnell v. Davis*, 81 F. Supp. 872 (S.D. Ala.) (three-judge court),

   *aff'd*, 336 U.S. 933 (1949) ...............................................................................7

*United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (three-judge court)...7

*United States v. Dallas County Comm'n,* 548 F. Supp. 875 (S.D. Ala. 1982),

   *aff'd in part, vacated in part, and rev'd in part*, 739 F.2d 1529

   (11th Cir. 1984)................................................................................................2

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S.

   252 (1977) ..................................................................................... 6, 20, 21

*Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982)..........................8

**Constitutional Provisions, Statutes, and Rules**

Ala. Code § 11-40-10.........................................................................................14

Ala. Const. Amend. No. 132...............................................................................13

Ala. Const. Amend. No. 406 ..............................................................................13

Ala. Const. Amend. No. 425............................................................................ 18, 19

Ala. Act No. 2016-18................................................................................. *passim*

Fed. R. App. P. 29(a)(4)(E)......................................................................................1

**Other Authorities**

Ashmore, Susan, Carry It On: The War on Poverty and the Civil Rights

    Movement in Alabama, 1964-1972 (2008).....................................................1, 15

*Extension of the Voting Rights Act: Hearings Before the Subcomm. on*

    *Civil & Constitutional Rights of the H. Comm. on the Judiciary*,

    97th Cong. (1981) ...................................................................................... 12, 17

Flynt, Wayne, Alabama in the Twentieth Century (2004) .......................................1

Flynt, Wayne, Alabama: History of a Deep South State (1994) ..............................1

Flynt, Wayne, *Alabama's Shame: The Historical Origins of the 1901*

    *Constitution*, 53 Ala. L. Rev. 67 (2001) ........................................................ 11, 12

Foner, Eric, Reconstruction – America's Unfinished Revolution:

    1863-1877 (1988).............................................................................................12

Jeffries, Hasan, Bloody Lowndes: Civil Rights and Black Power in Alabama's

    Black Belt (2009)................................................................................................2

Kousser, J. Morgan, Colorblind Injustice: Minority Voting Rights and the

    Undoing of the Second Reconstruction (1999) ...................................................2

Kousser, J. Morgan, The Shaping of Southern Politics: Suffrage Restriction

    and the Establishment of the One-Party South, 1880-1910 (1974)......................2

Letter from Acting Assistant Attorney General James P. Turner to Alabama

　　Assistant Attorney General Lynda K. Oswald (Jan. 31, 1994) ...........................19

McCrary, Peyton, *Alabama* in Quiet Revolution in the South: The Impact of the

　　Voting Rights Act, 1965-1990 (Chandler Davidson & Bernard Grofman eds.

　　1994) ...................................................................................................................11

McMillan,Malcolm Cook, Constitutional Development in Alabama,

　　1798-1901: A Study in Politics, the Negro, and Sectionalism (1955) ............9, 11

Parker, Will, *Still Afraid of "Negro Domination?": Why County Home Rule*

　　*Limitations in the Alabama Constitution of 1901 Are Unconstitutional*,

　　57 Ala. L. Rev. 545 (2005) ................................................................. 12, 18, 25

Sullivan, Patricia, Freedom Writer: The Letters of Virginia Foster Durr,

　　The Civil Rights Years (2003)..............................................................................3

Sullivan, Patricia, Lift Every Voice: The NAACP and the Foundation of the

　　Civil Rights Movement (2009) ..............................................................................3

Taper, Bernard, Gomillion Versus Lightfoot (1962)......................................... 13, 14

**IDENTITY AND INTEREST OF AMICI CURIAE[1]**

Susan Ashmore is Professor of History at Oxford College of Emory University and an Associated Professor in the Department of History at Emory College of Arts and Sciences.  Professor Ashmore is an American historian with a strong interest in the twentieth-century South.  She received her Ph.D. from Auburn University in 1999.  Her book, *Carry It On: The War on Poverty and the Civil Rights Movement in Alabama, 1964-1972* (2008), received the 2009 Francis Butler Simkins Award from the Southern Historical Association.

Wayne Flynt is Professor Emeritus of History at Auburn University.  He is the author or co-author of eleven books, including the prize-winning *Alabama in the Twentieth Century* (2004) and *Alabama: History of a Deep South State* (1994). He is Editor-in-Chief of the online *Encyclopedia of Alabama*.

Hasan Jeffries is Associate Professor of History at Ohio State University. After receiving his Ph.D. from Duke, he served as the Bankhead Fellow in the History Department at the University of Alabama. He is the author of *Bloody Lowndes: Civil Rights and Black Power in Alabama's Black Belt* (NYU Press

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici state that no party's counsel wrote this brief in whole or in part and that no person (other than counsel for amici) contributed money that was intended to fund preparing or submitting the brief.

2009), which received the 2010 Clinton Jackson Coley Award for the best book on local history from the Alabama Historical Association.

J. Morgan Kousser is William R. Kenan, Jr. Professor of History and Social Science at the California Institute Technology and the author of *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (1974) and *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (1999). He has served as an expert witness or consultant in fifty voting rights cases, including *Bolden v City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982), *Hunter v. Underwood*, 471 U.S. 222 (1985), and *United States v. Dallas County Comm'n,* 548 F. Supp. 875 (S.D. Ala. 1982), *aff'd in part, vacated in part, and rev'd in part*, 739 F.2d 1529 (11th Cir. 1984).

Peyton McCrary, now Professorial Lecturer in Law at George Washington University, worked on voting rights litigation in the Department of Justice from 1990 until his retirement in 2016, He testified as an expert historian in thirteen voting rights cases, including *Bolden v City of Mobile*, 542 F. Supp. 1050 (S.D. Ala. 1982), and *Dillard v. Crenshaw County,* 640 F. Supp. 1347 (M.D. Ala. 1986), while a history professor at the University of South Alabama. Dr. McCrary received his Ph.D. from Princeton University in 1972; he has published numerous law review and journal articles dealing with minority voting rights, as well as a prize-winning book on Reconstruction in Louisiana.

2

Patricia Sullivan is professor of history at the University of South Carolina and director of the History Center. She is a historian of United States history, with a strong interest in the American South. Her books include *Freedom Writer: The Letters of Virginia Foster Durr, The Civil Rights Years* (2003), based on the life and writings of the noted Alabamian civil rights activist (1903-1999), and *Lift Every Voice: The NAACP and the Foundation of the Civil Rights Movement* (2009).

Amici file this brief to assist the Court in understanding the historical background against which laws like Alabama Act No. 2016-18 should be understood.

All parties have consented to the filing of amicus briefs in this case.

## STATEMENT OF THE ISSUE

Whether the district court's decision dismissing the plaintiffs' complaint erroneously ignored the relevance of allegations regarding Alabama's long history of purposeful discrimination denying political autonomy to local black majorities in assessing whether plaintiffs' claims regarding purposeful discrimination have been properly pleaded.

## SUMMARY OF ARGUMENT

In their amended complaint, plaintiffs provided detailed factual allegations regarding Alabama's long history of restructuring governmental decisionmaking

3

authority for the purpose of disadvantaging its black citizens both politically and economically.  That history bears directly on the question whether Alabama Act No. 2016-18 was motivated in part by racially discriminatory purposes.  In dismissing plaintiffs' complaint for failure to state a claim, the district court erroneously ignored those allegations.

Since the end of Reconstruction, Alabama has repeatedly reshaped government powers to deny decisionmaking authority to local black majorities and to keep its black citizens economically subordinated.  In light of this history, the district court erred in assuming that Alabama's current restrictions on municipal lawmaking reflect a race-neutral practice.  To the contrary, the Alabama Constitution is built on a hostility to local decisionmaking born of a desire to reassert white supremacy in the face of black political participation and to prevent local black majorities from making decisions about governance, particularly when it comes to issues of economic justice.  This history has played out both during the period following Redemption in the 1870's and during the modern Civil Rights era.

The similarities between Alabama Act No. 2016-18 and these earlier efforts are sufficient to permit a plausible inference that, like prior, more transparent attempts to deny black citizens powers of self-government and economic advancement, the challenged Act violates equal protection principles.

4

**ARGUMENT**

**I.    The District Court Erred in Failing to Recognize the Relevance of Plaintiffs' Allegations Regarding Alabama's Long History of Purposeful Racial Discrimination**

The district court failed to apply the proper analytic framework to the question whether plaintiffs' amended complaint contains sufficient allegations of purposeful racial discrimination to survive a motion to dismiss. The court acknowledged that a central theory of plaintiffs' case is that when the Alabama Legislature stripped Birmingham of its authority to adopt its own minimum wage, the decision marked "another chapter in Alabama's civil rights journey." *Lewis v. Bentley*, 2017 WL 432464 *1 (N.D. Ala. Feb. 1, 2017). The court failed, however, to recognize the bearing of those earlier chapters on the question before it. As a result, the court mistakenly thought that plaintiffs' claims of intentional discrimination were "unsupported by any specific factual allegations," *id.* *11 (with respect to the claims of purposeful racial discrimination), and "not supported by any alleged factual information," *id.* *13 (with respect to the "political process" claim).

The district court could reach its conclusion that plaintiffs had failed the pleading standard only by ignoring the detailed account in the amended complaint, *see* Dkt. 18 ¶¶ 38-79, of Alabama's long history of "discriminatory restructuring of governmental decisionmaking," *Romer v. Evans*, 517 U.S. 620, 625 (1996), aimed

5

at disadvantaging its black citizens.  That history contributes to the plausibility of plaintiffs' allegations that when Alabama enacted Act No. 2016-18, one of the motivating factors was an intent to "perpetuat[e]" the "suppression of local black majorities through imposition of white control by state government," Dkt. 18 ¶ 38.

The district court's disregard of these allegations flouts the Supreme Court's declaration in *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252 (1977), that the "historical background" of the challenged decision "is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.  Determining whether a plaintiff has sufficiently pleaded a plausible claim of purposeful discrimination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  And Alabama's history, reflected in judicial experience, reveals a series of official actions designed to restrict the political power of the state's black citizens.  Under those circumstances, it was error for the district court to dismiss the plaintiffs' complaint.

## II.    Alabama Has a Long History of Restructuring Government Powers To Deny Decisionmaking Authority To Local Black Majorities and To Keep Its Black Citizens Economically Subordinated

Purposeful discrimination within the political process comes in many forms. Parts of Alabama's history of discrimination in the political process are well known.  Alabama repeatedly sought (and often succeeded in) the outright

exclusion of black citizens from the political process through facially neutral, but purposefully discriminatory means.  *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222 (1985 (offender disenfranchisement provision); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (deannexation); *Schnell v. Davis*, 81 F. Supp. 872 (S.D. Ala.) (three-judge court) (understanding test), *aff'd*, 336 U.S. 933 (1949); *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (three-judge court) (poll tax).

Indeed, excluding black citizens from any role in governance was the principal purpose of the 1901 Alabama Constitution – "the document that now governs the State of Alabama." *Lynch v. Alabama*, 2011 U.S. Dist. LEXIS 155012 *894 (N.D. Ala. Nov, 7, 2011), *aff'd in part, vacated in part, and remanded sub nom. I.L. v. Alabama*, 739 F.3d 1273 (11th Cir.), *cert. denied*, 135 S. Ct. 53 (2014). The Supreme Court has pointed to a statement by the president of the convention that adopted that Constitution that its goal was "to establish white supremacy in this State." *Hunter v. Underwood*, 471 U.S. at  229.[2]  Carrying out that purpose, Alabama "has consistently erected barriers to keep black persons from full and equal participation in the social, economic, and political life of the state." *Dillard*

---

[2] Alabama has done nothing to "eliminate[e]" the taint the express purposes of the 1901 Constitution casts on its current constitutional arrangements. *Compare, e.g.*, *Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1224 (11th Cir.) (finding that the reenactment in 1968, after discussions in which race played no role, of a potentially tainted 1868 offender disenfranchisement provision eliminated any potential taint), *cert. denied*, 546 U.S. 1015 (2005).

*v. Crenshaw County,* 640 F. Supp. 1347, 1360 (M.D.Ala.1986).  The Alabama legislature repeatedly "reshaped" local election systems "into more secure mechanisms for discrimination," *id.* at 1357, through a "century-long pattern and practice" of changing the rules "as needed to diminish black voting strength," *Dillard v. Baldwin County Bd. of Educ.,* 686 F. Supp. 1459, 1461 (M.D. Ala.1988). Ultimately, after the court concluded that the state's practices violated section 2 of the Voting Rights Act of 1965, now codified at 52 U.S.C. § 10301, more than 180 local jurisdictions within the state changed the way they elected local officials, *Dillard v. Baldwin County Bd. of Educ.,* 686 F. Supp. at 1461.

But not all purposeful discrimination in configuring the political process involves these kinds of exclusion.  The Supreme Court's decisions in *Hunter v. Erickson*, 393 U.S. 385 (1969), *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982), and *Romer* addressed a less well-known, but no less troubling, form of discrimination: responding to effective minority participation in political decisionmaking by abandoning local control and centralizing authority in bodies over which minority citizens have less influence. Alabama has a long history of engaging in this sort of discrimination, and Act 2016-18's withdrawal of Birmingham's power to improve the economic position of low-wage workers should be assessed in light of that history.

8

A.    **Alabama's Restrictions on Home Rule Originated in the State's Attempts To Prevent Black Citizens From Exercising Political Power at the Local Level**

The district court seemed to assume that Alabama's history of state legislative overrides of local legislation reflects a race-neutral practice akin to the role the Supremacy Clause plays in the relationship between the national government and the states. *See Lewis*, 2017 WL 432464 at *1. Not so. The Alabama Constitution reflects a hostility to local decisionmaking born of a desire to reassert white supremacy in the face of black political participation and to prevent local black majorities from making decisions about governance, particularly when it comes to issues of economic justice. As the leading study of constitutional development in Alabama put it, the state's "very strong antebellum tradition" of democracy at the county level was "sacrificed to 'white supremacy.'" Malcolm Cook McMillan, Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism 222 n.28 (1955).

During Reconstruction, black citizens participated widely in local governance throughout the Black Belt counties where most of the freedpeople then lived. In particular, the freedmen elected a wide range of black officials, including tax assessors who determined the tax bills for white-owned property and county commissioners who determined how to spend the revenue thus collected, which they often allocated to public education. *See Lynch*, 2011 U.S. Dist. LEXIS

9

155012 at \*786-\*790; *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1283 (N.D. Ala. 2004) ("*Knight III*"), *aff'd*, 476 F.3d 1219 (11th Cir.), *cert. denied*, 551 U.S. 1146 (2007).

Whites resisted this redistributive project, not only because of its direct economic impact, but also because, as part of the ideology of white supremacy, they believed that black people should be relegated to low-wage semi-skilled labor. *See Knight v. Alabama*, 787 F. Supp. 1030, 1046, (N.D. Ala. 1991) ("*Knight I*"), *aff'd in part, vacated in part, rev'd in part*, 14 F.3d 1534 (11th Cir. 1994).

In 1875, with the adoption of the "Redeemer Constitution," Alabama came back under white control. *Knight I*, 787 F. Supp. at 1070. White landowners and elected officials were "intent on ... using that new control to protect themselves from the possibility that the black majority in their counties would ever again be able to use that political power ... to tax them in a way that would force them as the property holders to cough up the funds, ... which would be used to the benefit of the majority of the people in the Black Belt who were black and essentially nonproperty holding." *Knight III*, 458 F. Supp.2d at 1283. The constitution they adopted reflected this opposition to economic and political advancement for Alabama's black citizens through a wide variety of provisions "designed to reduce the size of government and the services government provided." Wayne Flynt,

*Alabama's Shame: The Historical Origins of the 1901 Constitution*, 53 Ala. L. Rev. 67, 68 (2001).

There has been extensive litigation over the various restrictions on municipal and county taxation that the white Redeemers baked into the Constitution of 1875 and carried over into the Constitution of 1901. *See Lynch*, *supra*; *Knight III*, *supra*.

But the state went far further to ensure that even in areas where black citizens made up a majority of the population, they would exercise no control over government decisionmaking. Among other things, in 1876, the state legislature "eliminated elections altogether for county commissions in eight black-majority counties, authorizing the governor to appoint county commissioners" instead. Peyton McCrary *et al.*, *Alabama* in Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990, at 38, 42 (Chandler Davidson & Bernard Grofman eds. 1994); McMillan, *supra*, at 222; *see also Dillard v. Crenshaw County*, 640 F. Supp. at 1357-58.

In justifying this decision, a state legislator admitted that he "had always believed in the right of the people to select their own officers," but believed he had no other choice given that the "life, liberty and property of the Caucasians" were threatened by "the Negro and his cohorts." *Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil & Constitutional Rights of the H. Comm.*

11

*on the Judiciary*, 97th Cong. 2016-17 (1981) (statement of Professor J. Morgan Kousser).  In short, the Redeemers shared a commitment to "reducing the political power of blacks, and reshaping the South's legal system in the interests of labor control and racial subordination."  Eric Foner, Reconstruction – America's Unfinished Revolution: 1863-1877, at 588 (1988).

A "general hostility to home rule" was a central feature of the 1901 Constitution as well as the 1875 Constitution and it was "motivated at least in part by race" because "white control of the state government" provided "an important fall-back provision for guaranteeing the maintenance of white supremacy in majority black counties."  *Knight III*, 458 F. Supp.2d at 184-85; *see also* Will Parker, *Still Afraid of "Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 Are Unconstitutional*, 57 Ala. L. Rev. 545, 554-64 (2005).  "By stripping counties of home rule and centralizing power in Montgomery," the framers of the 1901 Constitution protected themselves against future economic populism because "powerful special interests would no longer have to worry about thousands of local elections."  Flynt, *Alabama's Shame*, *supra*, at 76.

The framers of the 1901 Constitution expressed the position that black citizens should be excluded from all participation in politics because African Americans were "incapable of self-government," *Lynch*, 2011 U.S. Dist. LEXIS

155012 at *906; *see also id.* at *900 (quoting the president of the convention saying that "[t]here is in the white man an inherited capacity for government which is wholly wanting in the negro").  Instead, the framers sought to create a constitutional order that would protect white wealth "from the kind of demands" that economically disadvantaged black citizens had been making, *id.* at 929.

### B. Alabama's Purposefully Discriminatory Restructuring of Governmental Decisionmaking Continued Into the Twentieth Century

Alabama experienced a second round of racially discriminatory political restructuring in response to rising minority political power during the Civil Rights Movement.  Here, too, the state sought to disable black citizens from effective participation in the political process.

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960), provides a textbook example. During the late 1950s, Alabama responded to increased black voter registration and political activism in the city of Tuskegee by revamping its political structure in two ways.  First, it amended the state constitution to authorize legislative abolition of Macon County, where Tuskegee was located.  Ala. Const. Amend. No. 132 (1957), *repealed by* Ala. Const. Amend. No. 406 (1982); *see also* Bernard Taper, Gomillion Versus Lightfoot 51 (1962).  Second, it enacted a statute – Local Act 140 – that redrew Tuskegee's municipal boundaries to remove all the black voters within the city "while not removing a single white voter or resident." *Gomillion*,

13

364 U.S. at 341.  Black voters remained subject to Tuskegee's policies under Alabama's police jurisdiction law, although they were now disenfranchised in municipal elections.  See Ala. Code § 11-40-10; *see also Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66-75 (1978) (discussing Alabama's police-jurisdiction policy).  "Though the ejected Negroes would still be able to vote in county, state, and national elections, there were not enough of them registered as voters to influence the political situation on any scene larger than the municipal one."  Taper, *supra*, at 15.

Faced with Local Act 140, the Supreme Court found it "inconceivable that guaranties imbedded in the Constitution" could be "manipulated out of existence" by being "cloaked in the garb of [political] realignment."  *Gomillion*, 364 U.S. at 345 (internal quotation mark omitted). It therefore reversed the dismissal of the black voters' constitutional challenge.  On remand, the district court held that Local Act 140 violated the Constitution because it was "solely concerned" with "putting the Negro citizens out of the municipal limits so as to deprive them of their municipal vote."  *Gomillion v. Rutherford*, 6 Race Rel. L. Rep. 241, 243 (M.D. Ala. 1961).

The same intertwined "motives of race and economics" that drove the Redeemers and the framers of the 1901 Constitution drove the mastermind behind the Tuskegee response, State Senator Sam Engelhardt of Macon County.  *Lynch*,

14

2011 U.S. Dist. LEXIS 155012 at *993.  Engelhardt told interviewers "that he was determined to preserve disfranchisement, because he assumed that if blacks got the right to vote, especially in his county and similar Black Belt counties, that they would gain control of the tax assessor's office and would raise the property tax on whites."  *Id.*  The district court in *Lynch* found that this "apprehension was directly traceable to the experiences of those Black Belt Planter elites who had 'redeemed' the state from 'Radical' Reconstruction rule in 1874, and the increased property taxes that funded African-American schools during that period."  *Id.* at *994.

A second example involves Alabama's response to the federal government's War on Poverty during the mid-1960's.  The federal Office of Economic Opportunity sought to fund local antipoverty efforts.  But despite the fact that "poverty undeniably engulfed" Alabama's majority-black counties, Governor George Wallace resisted the funding because the state could not control how the money would be spent, Susan Ashmore, Carry It On: The War on Poverty and the Civil Rights Movement in Alabama, 1964-72, at 186-87 (2008).  Later, the state worked to "pai[r] Black Belt counties with nearby counties that had larger white populations," apparently to dilute local black control over anti-poverty spending.  *Id.* at 269.  As with earlier efforts following Redemption, Alabama limited both black self-governance and black economic aspirations.

A third example involves the Greene County Racing Commission.  Greene County is overwhelmingly black and economically disadvantaged.  In 1975, the Alabama Legislature created the Greene County Racing Commission to oversee greyhound racing and wagering at a track to be operated within the county.  The enabling act gave the power to appoint the Commission's members to the delegation that represented Greene County in the Legislature.  "At that time all of the Greene County legislators were white."  *Hardy v. Wallace*, 603 F. Supp. 174, 175 (N.D. Ala. 1985) (three-judge court).  By the early 1980's, revenue from the track accounted for "63% of the total budget of Greene County" and the track was "also the major employer in the county."  *Id.* at 176.

In 1983, however, Alabama adopted a new legislative apportionment plan (after two earlier plans failed to receive preclearance because the State was unable to show that the plans had neither a racially discriminatory purpose nor a discriminatory effect).  *See Burton v. Hobbie,* 561 F. Supp. 1029, 1033 (M.D. Ala. 1983) (three-judge court).  In the new plan, Greene County was placed in "both a House and a Senate district likely to elect black candidates."  *Hardy*, 603 F. Supp. at 176.  Within three days of the district court's adoption of the new statewide apportionment, a bill was proposed (and enacted a few months later) to change the method of appointing members of the Racing Commission.  Appointment power was vested in the Governor instead.  As the three-judge court trenchantly observed,

16

"George C. Wallace, who was then and is now governor of Alabama, is white, as were all of Alabama's previous governors." *Id.*  The Department of Justice initially refused to preclear the change, explaining that "the facts surrounding the enactment of" the law transferring appointment power to the governor "strongly suggest[ed] that it was enacted with the purpose of reducing the voting strength of the black electorate in Greene County with regard to this particular governmental function," *id.* at 180 (reprinting the Department's letter).[3]  The three-judge court ultimately found the new law went far beyond the "ordinary or routine legislative modification of the duties or authority of elected officials," *id.* at 178 because it deprived the voters of Greene County of control over "an agency of unique importance" to county residents, *id.* at 179.[4]

The three-judge court in *Hardy* remarked on a point that other observers have perceived as well: the relative lack of success representatives from black communities have in getting beneficial local legislation passed.  In the case of the

---

[3] The Department of Justice subsequently withdrew its objection – not because it thought the change was nondiscriminatory, but because it concluded that the change did not directly affect voting.  *See Hardy*, 603 F. Supp. at 181.

[4] The Greene County alignment was not the only time that the Department of Justice blocked a reallocation of authority within Alabama.  Alabama also tried to make all municipal judgeships across the state into appointive rather than locally elected offices just as black voters were increasing their participation. The Department of Justice rejected this realignment under the Voting Rights Act. *Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil & Constitutional Rights of the H. Comm. on the Judiciary*, 97th Cong. 815 (1981) at 815 (report of Jane Reed Cox & Abigail Turner).

Racing Commission, "[t]he newly elected black legislators representing Greene County introduced legislation to repeal" the transfer of the appointment power, but the bill was never reported out of committee, and action that the three-judge court found "virtually without precedent" when it came to this sort of local legislation, *Hardy*, 603 F. Supp. at 176–77.  But more generally, majority-black counties have been less successful than their majority-white counterparts at persuading the State to authorize them to engage in economic development or in a wide range of governmental functions.  *See* Parker, *supra*, at 562.

A final example involves an amendment to the Alabama Constitution ratified in 1982.  *See* Ala. Const. Amend. No. 425, available at http://tinyurl.com/Ala-Am-425 (last visited June 7, 2017).  Because the Alabama Constitution limits the power of local governments, the state legislature enacts a substantial amount of local legislation.  The usual practice is for the local legislative delegation to propose local legislation and such legislation is conventionally uncontested on the floor (*Hardy* providing a notable exception).  Prior to the enactment of Amendment 425, constitutional amendments directed at only a single county followed a similar path: proposal by local legislative delegations, approval (generally with a fair amount of deference) by supermajorities in each house of the legislature, and submission to the voters.  *See* Letter from Acting Assistant Attorney General James P. Turner to Alabama

18

Assistant Attorney General Lynda K. Oswald at 1, 3 (Jan. 31, 1994), available at http://tinyurl.com/DOJ-425-Obj (last visited June 7, 2017) ("Turner Letter"). But Amendment 425 provided that a proposed local amendment could not be submitted to the voters unless it was also "unanimously approved by a local constitutional amendment commission composed of the governor, lieutenant governor, attorney general, secretary of state and speaker of the house of representatives." When Alabama finally submitted that provision for preclearance under section 5 of the Voting Rights Act (nearly a decade after its ratification and only after the Department of Justice had intervened), the Department objected. Its objection letter explained that Amendment 425 displaced the power that local legislative delegations over whom "black voters have substantial influence" had previously enjoyed in proposing local constitutional amendments in favor of a system where a commission "principally composed of officials elected in statewide elections where black voters exert less influence" had veto power. *Id.* at 3. The Department found that "a number of vetoes [had] been cast by the Commission against proposed local amendments" involving majority-black counties and it pointed to "allegations that, at least in part, the vetoes were racially motivated." *Id.*

19

**C.    The Parallels Between Alabama Act No. 2016-18 and Earlier State Actions To Restrict Black Political Power at the Local Level Support Plaintiffs' Allegations of Purposeful Discrimination**

The similarities between Alabama Act No. 2016-18 and earlier efforts by the state to strip local black majorities of their powers of self-government are palpable. Like the majority-African American Black Belt counties whose taxation and spending decisions prompted the Redeemers and the framers of the 1901 Constitution to strip localities of the powers they had previously possessed, Birmingham is a majority-black jurisdiction whose efforts at economic betterment for its low-wage workers have produced a backlash. Once again, state legislators representing white business and property owners have hastily enacted legislation to strip a majority-black community of its powers of home rule. Once again, the State has acted to keep black workers as cheap laborers who cannot expect their local government to protect their interests. *See Lynch*, 2011 U.S. Dist. LEXIS 155012 at *719. Accepting the plantiffs' detailed factual allegations about Alabama's history and about the other *Arlington Heights* factors regarding the passage of Act No. 2016-18 and drawing all the reasonable inferences therefrom, it is plausible to conclude that Act No. 2016-18 constitutes yet another example in the long "series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267.

20

The district court wrote that "[f]or over a century, the Alabama courts have recognized that cities in Alabama are "mere creatures of the legislative power, established as political agencies for the more convenient administration of local government, with such powers ... as the [legislature] may, from time to time, see fit to confer." *Lewis*, 2017 WL 432464 at *1 (quoting *Hare v. Kennerly*, 3 So. 683, 684 (Ala. 1888)). Had it paid more attention to the genesis of that principle, it would have acknowledged that Alabama's history on this point is not racially neutral. And it might have recognized *Hare* as a case arising out of a Redeemers' constitution that had at its core an antipathy to economic and political advancement for the State's black citizens.

To be sure, Alabama's long history of purposefully denying its black citizens political and economic power through the denial of governance at the local level in majority-black jurisdictions does not *prove*, by itself, that Act No. 2016-18 was enacted for a racially discriminatory purpose or that it constitutes a discriminatory restructuring of governmental decisionmaking. But because the Supreme Court has recognized this kind of historical evidence as relevant to the question whether a challenged government decision is infected by a discriminatory purpose, *see Arlington Heights*, 429 U.S. at 267, the amended complaint's extensive allegations about Alabama's history, especially when coupled with the

21

amended complaint's allegations going to other *Arlington Heights* factors,  surely should entitle plaintiffs to survive a motion to dismiss for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.

Respectfully submitted,

Dated:  June 12, 2017

/s/ Joyce White Vance
Joyce White Vance

Pamela S. Karlan, Esq.
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 725-4851
karlan@stanford.edu

Joyce White Vance, Esq.
829 Linwood Road
Birmingham, AL 35222
Telephone: (205) 531-9511
joycevance4@gmail.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 29(a)(5), because this brief contains 4,837 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4.

Dated:  June 12, 2017                 /s/ Pamela S. Karlan
                                      Pamela S. Karlan
                                      559 Nathan Abbott Way
                                      Stanford, CA 94305
                                      Telephone: (650) 725-4851
                                      karlan@stanford.edu

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2017, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the counsel of record in this matter. On that same date, I caused

physical copies of the foregoing BRIEF OF AMICI CURIAE to be filed with the

Clerk of Court and served upon the following counsel by U.S. First Class Mail:

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005

Barbara J. Chisholm, Esq.
Eric P. Brown, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203

*Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries*

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201

24

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham, AL 35209

U. W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, AL 35222

*Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Rep. Louise Alexander, Rep. Marika Coleman-Evans, Sen. Priscilla Dunn, Rep. Juandalynn Givan, Rep. Mary Moore, Oliver Robinson, Rep. John Rogers, Sen. Rodger Smitherman, and William Muhammad*

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203

*Counsel for all Plaintiffs-Appellants*

Andrew Brasher, Esq.
James W. Davis, Esq.
William Glenn Parker, Jr., Esq.
State of Alabama Attorney General's Office
501 Washington Ave
PO BOX 300152
Montgomery, AL 36130-0152

*Counsel for Defendants-Appellees State of Alabama and Alabama Attorney General Steve Marshall*

Fredric L. Fullerton, II, Esq.
Kayla S. Lawrence, Esq.
City of Birmingham Law Department

25

710 N 20th Street, Fl. 6
Birmingham, AL 35203

*Counsel for Defendants-Appellees City of Birmingham and Mayor Bell*

Dated:  June 12, 2017                         /s/ Joyce White Vance
                                              Joyce White Vance
                                              829 Linwood Road
                                              Birmingham, AL 35222
                                              Telephone: (205) 305-9511
                                              joycevance4@gmail.com

26