No. 17-11009

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

MARNIKA LEWIS, *et al.*,
*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, *et al.*,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

_____

**BRIEF OF *AMICI CURIAE* THE PARTNERSHIP FOR WORKING
FAMILIES AND THE SOUTHERN POVERTY LAW CENTER
IN SUPPORT OF THE APPELLANTS SEEKING REVERSAL**

_____

Benjamin Beach, Esq.[*]
Miya Saika Chen, Esq.[*]
THE PARTNERSHIP FOR
WORKING FAMILIES
1939 Harrison Avenue, Suite 150
Oakland, CA 94612
Telephone: (510) 201-0081 ext. 2
ben@forworkingfamilies.org
miya@forworkingfamilies.org

Samuel Brooke, Esq.
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
samuel.brooke@splcenter.org

[*] Application to appear *pro hac vice* submitted

# CERTIFICATE OF INTERESTED PERSONS

### *Lewis et al. v. State of Alabama et al.*
### No. 17-11009

*Amici Curiae* file this Certificate of Interested Persons and Corporate Disclosure Statement, as required by Eleventh Circuit Rules 26.1-1, 28-1(b), and 29-2.

Partnership for Working Families (*Amicus curiae*)

Southern Poverty Law Center (*Amicus curiae*)

Pursuant to Eleventh Circuit Rule 26.1-2(b), this Certificate includes only persons and entities omitted from the Certificate contained in Appellants' Opening Brief.

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* Partnership for Working Families and Southern Poverty Law Center are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in *amici curiae*.

/s/ Samuel Brooke
Samuel Brooke, Esq.
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481
samuel.brooke@splcenter.org

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS…………………………...........C-1

CORPORATE DISCLOSURE STATEMENT………………………………C-2

TABLE OF AUTHORITIES………………………………………………..iii

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* ……….1

STATEMENT OF THE ISSUE……………………………………………2

SUMMARY OF ARGUMENT.....................................................................2

ARGUMENT…………………………………………………..................3

I.    There Is Ample Evidence that the Alabama Legislature Acted with Discriminatory Intent in Adopting Act 2016-18, which Foreseeably Operates to Preserve a Longstanding Racial Wage Gap…………………………………………………..............3

    A.    Act 2016-18 Has a Disparate Impact by Preserving a Racial Wage Gap Whereby African American Workers Earn the Lowest Wages………………………………………………..5

    B.    Alabama Legislators Had Ample Reason to Foresee that Act 2016-18 Would Preserve the Racial Wage Gap……………..10

II.   The Alabama Legislature's Proffered Non-Discriminatory Interest in "Uniformity" of Wage Standards Is Neither Substantial Nor Substantially Advanced by Act 2016-18……………………………......17

    A.    Defendant's Asserted Non-Discriminatory Reason for the Adoption of Act 2016-18 Lacks Evidentiary Support…………………………………………………...................18

    B.    Act 2016-18 Does Not Advance the Legislature's Stated Goal of Preserving Wage Uniformity……………………...................20

i

1.      There Exists Great Variation in Market Wage Rates
        Across Alabama…………………………………………...20

2.      Alabama Businesses Must Navigate a "Patchwork" of
        Divergent Business Regulations Across the
        State……………………………………………..............23

CONCLUSION…………………………………………………………..27

CERTIFICATE OF COMPLIANCE………………………………………….29

CERTIFICATE OF SERVICE…………………………………………...30

ii

# TABLE OF AUTHORITIES

**Cases**

*Columbus Board of Education v. Penick*,
    443 U.S. 449, 99 S. Ct. 2941, 61 L. Ed. 2d 666 (1979)..........................10

*Hunter v. Underwood*,
    471 U.S. 222, 105 S. Ct. 1916, 85 L.Ed.2d 222 (1985)…………….17, 20

*I.L. v. Alabama*,
    739 F.3d 1273 (11th Cir. 2014)……………………………………19

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983)……………………………...........10

*Lewis v. Bentley*,
    No. 2:16-CV-690-RDP, 2017 U.S. Dist. LEXIS 13565 (N.D. Ala. Jan.
    31, 2017)…………………………………………………………..4, 17

*Personnel Admin. of Mass. v. Feeney,*
    406 F. App'x 376 (11th Cir. 2010)………………………………..26

*Reno v. Bossier Parish Sch. Bd.*,
    520 U.S. 471, 117 S.Ct. 1491 (1977)…………………………………5

*Schuette v. Coalition to Defend Affirmative Action*,
    134 S. Ct. 1623 (2014)…………………………………...............4

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,*
    429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)……………...4, 5

*Washington v. Seattle School Dist. No. 1*,
    458 U.S. 457, 102 S. Ct. 3187, 73 L.Ed.2d 896 (1982)…………………4

*Young Apts., Inc. v. Town of Jupiter,*
    406 F. App'x 376, 378 (11th Cir. 2010)……………………...........20

## Statutory Authorities

Alabama Act No. 2016-18…………………………………………........*passim*

Alabama House Joint Resolution No. 321 (2007)…………………….............12

Albertville Municipal Code, Sec. 7-39.2………………………….................23

Birmingham City Ordinance No. 15-124 (Aug. 18, 2015)……………………12

Birmingham Municipal Code,
     Sec. 26-207………………………………………………………………25
     Sec. 58-30………………………………………………………………25

Dothan Municipal Code,
     Sec. 18-3…………………….........................................................24
     Sec. 18-22…………………….......................................................23
     Sec. 18-196………………….........................................................24

Huntsville Municipal Code,
     Sec. 14-99…………………….......................................................25
     Sec. 15-85……………………..................................................23, 24

Mobile Municipal Code, Sec. 27-67……………………………………..…25

Montgomery Municipal Code,
     Sec. 14-215………………………………………………………...25
     Sec. 16-74……………………………………………………….....24
     Sec. 16-106……………………………………………………...23

Tuscaloosa Municipal Code,
     Sec. 7-16……………………........................................................24
     Sec. 7-18……………………........................................................24
     Sec. 12-5……………………........................................................24

## Legislative Materials

Ala. HB 174 (2016)…………………………………………………4, 9-10

**Other Sources**

Alabama Possible, Alabama Poverty Data Sheet 2016
http://alabamapossible.org/programs/povertydatasheet/..........................13

Julie Anderson, M.A. et al, *The Status of Women in the South*, Status
of Women in the States (2016)
http://statusofwomendata.org/wp-content/uploads/2016/02/SWSouth-
Employment-and-Earnings-2.24.pdf......................................................11

Alex Aubuchon, *Minimum Wage May See House Votes, Alabama
Names Failing Schools*, Alabama Public Radio, Feb. 15, 2016
http://apr.org/post/minimum-wage-bill-may-see-house-vote-alabama-
names-failing-schools#stream/0.............................................................13

Mike Cason, *Bill to Block Birmingham's Minimum Wage Clears House*,
Alabama News Group, Feb. 16, 2016
http://www.al.com/news/index.ssf/2016/02/bill_to_block_birminghams_
mini.html............................................................................................19

Bryan Lyman, *Bentley Signs Bill Blocking Birmingham Minimum
Wage*, Montgomery Advisory, Feb 25, 2016
http://www.montgomeryadvertiser.com/story/news/politics/southunionstr
eet/2016/02/25/alabama-legislature-blocks-birmingham-minimum-
wage/80941854/..................................................................................19

National Partnership for Women & Families, *Alabama Women and
the Wage Gap* (2015)
http://www.nationalpartnership.org/research-library/workplace-
fairness/fair-pay/9-2015-al-wage-gap.pdf...............................................11

Jeff Rickert and Howard Wial, *The State of Working Alabama*,
Working for Alabama Institute (2003)
https://www.doleta.gov/usworkforce/communityaudits/docs/Files%20for
%20CA%20Website/AL-Statewide/AL-Statewide-Product-
Final%20WAI%20Report.pdf................................................................11

John Sharp, *Alabama's Second Largest County Considers Raising Minimum Wage*, Al.com, Feb. 4, 2016
http://www.al.com/news/mobile/index.ssf/2016/02/minimum_wage_debate_reignites.html..............................................................13

Kelsey Stein, *Advocates for Higher Minimum Wage to Rally in Tuscaloosa, Speak Before City Council*, Al.com, Oct. 13, 2015
http://www.al.com/news/tuscaloosa/index.ssf/2015/10/advocates_for_higher_minimum_w.html..............................................................13

U.S. Bureau of Labor Statistics, *Birmingham Area Economic Summary*, May 31, 2017
https://www.bls.gov/regions/southeast/summary/blssummary_birmingham.pdf..............................................................21

U.S. Bureau of Labor Statistics, May 2016 State Occupational Employment and Wage Estimates, March 31, 2017
https://www.bls.gov/oes/current/oes_al.htm#00-0000............................6

U.S. Bureau of Labor Statistics, Southeast Information Office, County Employment and Wages in Alabama - Second Quarter 2016, Dec. 20, 2016
https://www.bls.gov/regions/southeast/news-release/countyemploymentandwages_alabama.htm..............................21

U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Birmingham-Hoover – May 2015, June 1, 2017
https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_huntsville.htm....................21

U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Mobile – May 2015, June 30, 2016
https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_mobile.htm...................21, 22

U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Montgomery – May 2015, June 29, 2016
https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_montgomery.htm...............22

vi

U.S. Bureau of Labor Statistics, Table D-6.  Average hours and
earnings of all employees on private nonfarm payrolls by State and
metropolitan area, not seasonally adjusted
https://www.bls.gov/web/laus/tabled6.pdf...............................................9

U.S. Census Bureau, Quick Facts
www.census.gov/quickfacts/table/IPE120213/00,1304000 (last visited
May 31, 2017)…………………………………………..................13, 14

U.S. Census Bureau, QWI Explorer, Alabama
https://qwiexplorer.ces.census.gov (last visited June 1, 2017)……*passim*

Gillian B. White, *Searching for the Origins of the Racial Wage Gap
Disparity in Jim Crow America,* The Atlantic, Feb. 9, 2016
https://www.theatlantic.com/business/archive/2016/02/the-origins-of-the-
racial-wage-gap/461892/.................................................................14

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Partnership for Working Families ("PWF") is a national network of seventeen regional affiliate organizations that support innovative solutions to the nation's economic and environmental problems. PWF provides original research, advocacy, legal support, and strategic communications to its affiliates and allies, who advance policies at the city, state, and federal level that improve lives and create quality jobs and healthy, sustainable, and democratic communities.

The Southern Poverty Law Center ("SPLC") has provided *pro bono* civil rights representation to low income persons in the Southeast since 1971, with particular focus on combating unlawful discrimination and ending poverty. SPLC provides educational materials, engages in policy reform, and develops litigation to minimize the burdens placed on the poor, to ensure meaningful access to social safety nets, and to enable upward mobility.

PWF and SPLC as *amici curiae* respectfully submit this brief to provide factual evidence that the challenged state law, Act 2016-18, preserves a longstanding racial wage gap among low-wage workers and that the state's proffered non-discriminatory motive is not advanced by the Act.

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), *amici* state that all parties have consented to the filing of this *amicus* brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that no party's counsel wrote this brief in whole or in part and that no person (other than counsel for *amici*) contributed money that was intended to fund preparing or submitting the brief.

## STATEMENT OF THE ISSUE

Whether the District Court erred in ignoring evidence of the foreseeable disparate impact of Act 2016-18 on African American low-wage workers and in crediting the Alabama legislature's stated non-discriminatory reason for adopting Act 2016-18.

## SUMMARY OF ARGUMENT

Poverty and low wages among African Americans are inextricably linked in Alabama and obstruct the ability of African Americans to overcome the effects of historical and institutionalized racism. In many counties in Alabama, the rate of African American poverty exceeds that of the general population by more than 60 percent. In these same jurisdictions, data shows African American workers earn up to 27 percent *less* than their white counterparts in the lowest earning sector of the workforce.

Plaintiffs' allegations to the effect that Act 2016-18 has a disparate negative impact on African American workers in Birmingham are supported by overwhelming evidence that Act 2016-18 preserves a racial wage gap that dates back to the Jim Crow era and in which African American workers earn the lowest wages among low-wage workers. This racial wage gap among low-wage workers is so stark, consistent, and long-standing in Alabama and across the South as to

2

render Act 2016-18's disparate impact reasonably foreseeable by the Alabama legislature and therefore probative of the legislature's intent in enacting Act 2016-18.

Further, the Alabama Legislature's stated non-discriminatory interest in uniformity of wage standards was neither substantial nor substantially furthered by Act 2016-18. The Act does not advance the goals related to uniformity of wages allegedly sought by the Act's chief proponents in the Alabama legislature.

Accordingly, the District Court erred in its dismissal of Plaintiffs' equal protection claims through its refusal to consider evidence of both discriminatory impact and intent and its reflexive acceptance of Defendants' claimed non-discriminatory motive for adopting Act 2016-18.

## ARGUMENT

**I.    There Is Ample Evidence that the Alabama Legislature Acted with Discriminatory Intent in Adopting Act 2016-18, which Foreseeably Operates to Preserve a Longstanding Racial Wage Gap.**

In Alabama, since the Jim Crow era, African American workers have consistently received the lowest wages among low wage workers and dramatically lower wages than white workers in the same occupations. The evidence of this longstanding racial wage gap is overwhelming: it appears in Census data for every major city in Alabama and for major cities across the South going as far back as

3

that data is available and in major statewide studies and historical analysis.

Birmingham's minimum wage ordinance posed a serious and significant threat to

this racial wage gap, and Act 2016-18 eliminated that threat.

This evidence bolsters the numerous allegations set forth in Plaintiffs'

Amended Complaint evidencing the racial animus behind the legislature's adoption

of HB 174 (which became Act 2016-18), including the fact that the vast majority

of workers negatively impacted by the Act were African American. Am. Compl.

¶102. These allegations are more than sufficient to meet the standards articulated

by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing*

*Development Corp.*, in which Court recognized that a facially neutral law that is

motivated by racial discrimination violates the Equal Protection Clause of the

Fourteenth Amendment. 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).[2]

Challengers to such laws need only show that discriminatory purpose was a

"motivating factor," *id*. at 265-66, and plaintiffs have plainly done so.

The District Court below erroneously determined that Plaintiffs' equal

protection claims were "unsupported by any specific factual allegations" *Lewis v.*

*Bentley*, No. 2:16-CV-690-RDP, 2017 U.S. Dist. LEXIS 13565, at *31-32 (N.D.

Ala. Jan. 31, 2017). The magnitude of the court's error is greatly amplified when

---

[2] This evidence also supports the conclusion that preempting Birmingham's minimum wage is a "racial" issue for purposes of the political process doctrine under *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457 (1982), and *Schuette v. Coalition to Defend Affirmative Action*, 134 S. Ct. 1623 (2014).

one considers the overwhelming evidence that Act 2016-18 preserves a long-standing wage disparity and that this effect was foreseeable in light of all of the evidence available and relevant to the legislature.

### A. Act 2016-18 Has a Disparate Impact by Preserving a Racial Wage Gap Whereby African American Workers Earn the Lowest Wages.

The Supreme Court has instructed courts evaluating claims that a facially neutral measure is motivated by racial discrimination to consider the "impact of the official action" -- that is, whether "it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. Impact is "often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Parish Sch. Bd*., 520 U.S. 471, 487, 117 S.Ct. 1491, 137 L. Ed. 2d 730 (1997). In Alabama, wages in the lowest wage occupations, where African American workers are concentrated, are uniformly, substantially lower for African American workers than for their white counterparts. Birmingham's fledgling $10.10 minimum wage requirement would have disrupted this long-standing racial wage disparity. By voiding Birmingham's wage law, and preempting any like it, while not raising the statewide minimum wage, Act 2016-18 ensures that Black workers remain the lowest paid among low-wage workers.

The food service and accommodation occupations offer the lowest wages of all major occupational sectors in Alabama. At $1443, the average monthly earnings

in that sector are nearly $400 per month lower than the those in the next lowest-paying sector and a full 144% below the statewide average figure of $3538.[3] Other data shows that this sector had by far the lowest mean hourly wage of all occupational categories in Alabama. At $9.88, the mean hourly wage for these occupations was nearly a full dollar per hour below the figure for the next lowest occupational category, $10.70, and significantly below the $20.44 average across all occupations.[4]

Within this lowest wage occupational sector, African American workers earn substantially less than white workers. In the first quarter of 2016, African American workers in these occupations had by far the lowest average monthly earnings of workers of any race.[5] In particular, white workers' average monthly earnings in this sector statewide were nearly *twenty percent greater* than those of African American workers.[6] This disparity between white and African American workers occurs with striking uniformity *across localities within the state*, even as

---

[3] U.S. Census Bureau, QWI Explorer, Alabama's Full Quarter Employment (Stable): Average Monthly Earnings by NAICS Sectors, https://qwiexplorer.ces.census.gov/exp-r/fd0d8.html (last visited June 1, 2017).

[4] U.S. Bureau of Labor Statistics, May 2016 State Occupational Employment and Wage Estimates, March 31, 2017, https://www.bls.gov/oes/current/oes_al.htm#00-0000.

[5] U.S. Census Bureau, QWI Explorer, Alabama's Full Quarter Employment (Stable): Average Monthly Earnings by Worker Race and NAICS Sectors, 2016 Q1, https://qwiexplorer.ces.census.gov/exp-r/fd0d3.html (last visited June 1, 2017).

[6] U.S. Census Bureau, QWI Explorer, Alabama's Full Quarter Employment (Stable): Average Monthly Earnings by Worker Race and NAICS Sectors, 2016 Q1, https://qwiexplorer.ces.census.gov/exp-r/fd0d3.html (last visited June 1, 2017).

the earnings themselves, as noted below, vary across those localities.

Figure 1 compares average monthly earnings by white and African American workers in the food service and accommodation occupations in the five largest metropolitan areas in Alabama for the first quarter of 2016.

**Figure 1: Average Monthly Earnings in the Alabama Food Service and Accommodation Sector, Q1 2016**[7]

|  | White | African American | Percent Difference |
|---|---|---|---|
| Huntsville | $1,456 | $1,270 | 15% |
| Mobile | $1,563 | $1,250 | 25% |
| Montgomery | $1,605 | $1,340 | 20% |
| Tuscaloosa | $1,451 | $1,257 | 15% |
| Birmingham | $1,715 | $1,420 | 21% |

As Figure 1 illustrates, at the time the Alabama legislature adopted HB 174, African American workers earned fifteen to twenty-five percent less than their white counterparts in the lowest wage occupations across the state.

This racial wage gap is longstanding. Figure 2 compares average monthly earnings for African American and white workers in the food service and accommodation occupations in the five largest metropolitan areas in Alabama for the years 2012, 2007 and 2002, the oldest date for which such data is available through the U.S. Census.

---

[7] U.S. Census Bureau, QWI Explorer, Alabama's Full Quarter Employment (Stable): Average Monthly Earnings by Worker Race and NAICS Sectors, 2016 Q1, https://qwiexplorer.ces.census.gov/exp-r/fd0d3.html (last visited June 1, 2017).

**Figure 2: Average Monthly Earnings in the Alabama Food Service and Accommodation Sector: 2002, 2007, 2012[8]**

| Metro Area | Year | White | African American | Percent Difference | Number of African American Workers in the Sector |
|---|---|---|---|---|---|
| Huntsville | 2002 | $1,161 | $1,009 | 15% | 4,247 |
| | 2007 | $1,334 | $1,148 | 16% | 5,035 |
| | 2012 | $1,401 | $1,226 | 14% | 4,591 |
| Mobile | 2002 | $1,240 | $973 | 27% | 5,846 |
| | 2007 | $1,445 | $1,137 | 27% | 6,418 |
| | 2012 | $1,550 | $1,247 | 24% | 5,706 |
| Montgomery | 2002 | $1,238 | $989 | 25% | 5,905 |
| | 2007 | $1,425 | $1,160 | 23% | 7,215 |
| | 2012 | $1,502 | $1,275 | 18% | 6,276 |
| Tuscaloosa | 2002 | $1,082 | $906 | 19% | 3,434 |
| | 2007 | $1,208 | $1,055 | 15% | 3,776 |
| | 2012 | $1,389 | $1,184 | 17% | 3,819 |
| Birmingham | 2002 | $1,299 | $1,106 | 17% | 13,705 |
| | 2007 | $1,491 | $1,258 | 19% | 14,702 |
| | 2012 | $1,609 | $1,355 | 19% | 13,329 |

As Figure 2 makes plain, the racial wage gap among the lowest-paid workers in Alabama was a consistent feature of the state's economic landscape during the entire fifteen-year period prior to the adoption of Act 2016-18 for which the relevant Census data is available. Figure 2 shows that this gap holds across geographic and temporal variations in the wage levels, affecting tens of thousands of African American workers. Even in those instances where African American

---

[8] U.S. Census Bureau, QWI Explorer, Full Quarter Employment (Stable): Average Monthly Earnings by Worker Race and Yearly Averages, 2001 Q1 - 2016 Q4, https://qwiexplorer.ces.census.gov/ (last visited June 1, 2017).

workers' earnings rise over time, or are relatively higher than those of African American workers in other metro areas, they are still substantially lower than those of their white counterparts. These statistics also support and reinforce Plaintiffs' allegations regarding the existence of a racial wage gap in Alabama.

Birmingham's adopted $10.10 minimum wage would have dramatically altered this long-standing racial wage gap. Figure 3 expresses the average monthly earnings data shown in Figure 1 above as an average hourly wage figure.

**Figure 3: Average Hourly Wages in the Alabama Food Service and Accommodation Sector, Q1 2016[9]**

|  | Average White Hourly Wage | Average African American Hourly Wage |
| --- | --- | --- |
| Huntsville | $9.53 | $8.30 |
| Mobile | $10.16 | $8.13 |
| Montgomery | $10.80 | $9.02 |
| Tuscaloosa | $9.57 | $8.29 |
| Birmingham | $11.12 | $9.21 |

While Figure 3 can only approximate hourly wage rates (because of potential variations in hours worked across occupational sectors, the data for which is not available), it does strongly suggest that a $10.10 minimum wage in Birmingham or any of the other jurisdictions of concern to the proponents of

---

[9] Amici used Bureau of Labor Statistics data regarding average weekly hours worked to convert average monthly earnings figures from Figure 1. U.S. Bureau of Labor Statistics, Table D-6.  Average hours and earnings of all employees on private nonfarm payrolls by State and metropolitan area, not seasonally adjusted. https://www.bls.gov/web/laus/tabled6.pdf (last visited June 10, 2017)

HB174 in the Alabama legislature would have had a powerful impact on the racial wage gap in the lowest wage occupations and would have equalized wages for many of the lowest-paid white and African American workers.

But one does not even need this data to appreciate the threat that an increase in the minimum wage in Birmingham would pose to the racial wage gap. Because African American workers uniformly earn the lowest wages among low wage workers, *any* increase in the minimum wage would almost necessarily cause some reduction in the gap between what African American workers earn and the higher amount earned by their white counterparts.

### B. Alabama Legislators Had Ample Reason to Foresee that Act 2016-18 Would Preserve the Racial Wage Gap.

The foreseeability of discriminatory impact is among the factors courts should consider in deciding whether a facially neutral measure is motivated by discriminatory intent. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983) (citing *Columbus Board of Education v. Penick*, 443 U.S. 449, 464-65, 99 S. Ct. 2941, 2950, 61 L. Ed. 2d 666 (1979)). Here, Alabama lawmakers had ample reason to foresee that Act 2016-18 would operate to preserve the racial wage gap in the state and otherwise negatively impact African American workers.

First, as shown in Figure 2, African American workers in all five of Alabama's major cities had consistently received, by significant degrees, the lowest wage among low-wage workers for the entire fifteen-year period for which

Census data was available prior to the adoption of Act 2016-18.

Second, Alabama's racial wage gap was well documented through statewide studies published prior to adoption of Act 2016-18. In 2003, the Working for America Institute, in partnership with the U.S. Department of Labor, found in their "The State of Working Alabama" study that African American workers earned 74 cents for every dollar that white workers earned.[10] The National Partnership for Women & Families' annual study of Alabama Women and the Wage Gap, published in September 2015, found that African American women in Alabama are paid 60 cents on the dollar compared to white men.[11] Similarly, the Institute for Women's Policy Research (IWPR) found in their *The Status of Women in the South* report that African American women in Alabama earn 57 cents for every dollar that white men earn.[12] The same study found that across the entire South, African American women only earn 60% compared to white male earnings.[13]

The Alabama legislature has also acknowledged the historical link between

---

[10] Jeff Rickert and Howard Wial, *The State of Working Alabama*, Working for America Institute (2003), https://www.doleta.gov/usworkforce/communityaudits/docs/Files%20for%20CA%20Website/AL-Statewide/AL-Statewide-Product-Final%20WAI%20Report.pdf.

[11] National Partnership for Women & Families, *Alabama Women and the Wage Gap* (2015), http://www.nationalpartnership.org/research-library/workplace-fairness/fair-pay/9-2015-al-wage-gap.pdf

[12] Julie Anderson, M.A. et al, *The Status of Women in the South*, Status of Women in the States (2016), http://statusofwomendata.org/wp-content/uploads/2016/02/SWSouth-Employment-and-Earnings-2.24.pdf

[13] *Id*.

slavery and present day economic disparities like the racial wage gap. More than ten years ago, in May 2007, the legislature passed resolution that expressly affirmatively acknowledged the economic impact of "virulent and rabid racism...Black Codes designed to reimpose the subordination of African Americans...and Jim Crow laws" on the African American community.[14] The resolution also contained findings that slavery continues to have rippling negative effects "decades after the Civil Rights movement" and that the "vestiges of slavery" persist in "transacting business" and other aspects of public life.[15]

Third, there is evidence that the legislature adopted Act 2016-18 to specifically prevent *those very jurisdictions* with pronounced racial wage gaps and racial poverty gaps from raising wages for the lowest-paid workers. Defendants, in their Motion to Dismiss, point to the threat of other jurisdictions, specifically identifying Huntsville and Tuscaloosa, adopting minimum wages. Def.'s Mot. to Dismiss 3, 17. Plaintiffs' Amended Complaint alleges that Senator Dick Brewbaker was specifically concerned about Montgomery raising its wage. Am. Compl. ¶ 100. Indeed, following the passage of Ordinance No. 15-124 in Birmingham, officials in Huntsville, Tuscaloosa, and Mobile were also considering

---

[14]Alabama House Joint Resolution No. 321 (2007).
[15] *Id.*

12

raising the minimum wage in their cities.[16] These cities all share three material facts in common: (1) African Americans make up a higher proportion of the population than they do statewide[17]; (2) African American workers earn substantially less than their white counterparts in the lowest wage occupations[18]; and (3) as shown in Figure 4 below, poverty rates are higher for African Americans than for the general public.

**Figure 4: Poverty Rates for Selected Geographic Areas in Alabama[19]**

| County | Percent of All Persons living in Poverty | Percent of African Americans living in Poverty |
|---|---|---|
| Madison County (Huntsville) | 14.2% | 24.2% |
| Mobile County | 19.6% | 32.4% |
| Tuscaloosa County | 18% | 29.8% |
| Jefferson County (Birmingham) | 19.5% | 28.5% |

[16]Alex Aubuchon, *Minimum Wage Bill May See House Vote, Alabama Names Failing Schools,* Alabama Public Radio, Feb 15, 2016, http://apr.org/post/minimum-wage-bill-may-see-house-vote-alabama-names-failing-schools#stream/0; Kelsey Stein, *Advocates for Higher Minimum Wage to Rally in Tuscaloosa, Speak Before City Council*, Al.com, Oct. 13, 2015, http://www.al.com/news/tuscaloosa/index.ssf/2015/10/advocates_for_higher_minimum_w.html; John Sharp, *Alabama's Second Largest County Considers Raising Minimum Wage*, Al.com, Feb. 4, 2016, http://www.al.com/news/mobile/index.ssf/2016/02/minimum_wage_debate_reignites.html

[17] The figures, respectively, are 31.2 percent in Huntsville, 41.5 percent in Tuscaloosa, 56.6 percent in Montgomery, and 50.6 percent in Mobile. U.S. Census Bureau, Quick Facts, www.census.gov/quickfacts/table/IPE120213/00,1304000 (last visited May 31, 2017).

[18] See Figure 1, *supra*.

[19] Alabama Possible, Alabama Poverty Data Sheet 2016, http://alabamapossible.org/programs/povertydatasheet/.

13

Finally, further evidence that Alabama legislators could foresee that Act 2016-18's impact would bear more heavily on African American workers than white workers can be found by looking across Alabama's neighboring states. Historical analysis demonstrates that the racial wage gap in the South traces back to the Jim Crow era, during which African American workers earned as little as 50% of what white workers earned.[20]

As Figure 5 illustrates, African American workers have consistently earned substantially less than their white counterparts in the lowest wage occupations in the cities with the largest African American populations in Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee.[21] In the most disparate example, African American workers in the food service and accommodation industry in Memphis, Tennessee earned 47 cents for every dollar

---

[20] Gillian B. White, *Searching for the Origins of the Racial Wage Disparity in Jim Crow America*, The Atlantic, Feb. 9, 2016, https://www.theatlantic.com/business/archive/2016/02/the-origins-of-the-racial-wage-gap/461892/

[21] Each of the cities in Figure 5 has the largest population of African Americans in its respective state and African Americans make up a higher proportion of each city's population than they do statewide. The figures, respectively are 52 percent in Atlanta (vs. 30.9 percent in Georgia), 35 percent in Charlotte (vs. 21 percent in North Carolina), 42.2 percent in Columbia (vs. 27.9 percent in South Carolina), 79.4 percent in Jackson (vs. 37 percent in Mississippi), 76.3 percent in Miami Gardens (vs. 16 percent in Florida), 59.5 percent in New Orleans (vs. 32.1 percent in Louisiana), and 63 percent in Memphis (vs. 17 percent in Tennessee). U.S. Census Bureau, Quick Facts, www.census.gov/quickfacts/table/IPE120213/00,1304000 (last visited May 31, 2017).

earned by a white worker counterpart as recently as 1999, representing a 112.58 percent difference in wage rates for black and white workers in the lowest wage occupations.

**Figure 5: Average Monthly Earnings in the Alabama Food Service and Accommodation Sector: 1999, 2006, 2016[22]**

| Geography | Year | Average White Monthly Earnings | Average African American Monthly Earnings | Percent Difference | Number of Black Workers in the Sector |
|---|---|---|---|---|---|
| Atlanta, Georgia | 1999 | $1,496 | $1,107 | 35.14% | 53,574 |
| | 2006 | $1,869 | $1,379 | 35.53% | 64,570 |
| | 2016 | $1,959 | $1,577 | 24.22% | 85,487 |
| Charlotte, North Carolina | 1999 | $1,164 | $942 | 23.57% | 13,271 |
| | 2006 | $1,585 | $1,231 | 28.76% | 16,698 |
| | 2016 | $1,834 | $1,387 | 32.23% | 24,681 |
| Columbia, South Carolina | 1999 | $1,052 | $830 | 26.75% | 9662 |
| | 2006 | $1,238 | $1,013 | 22.21% | 11,301 |
| | 2016 | $1,492 | $1,238 | 20.52% | 13,226 |
| Jackson, Mississippi | 1999 | Data not available | | | |
| | 2006 | $1,391 | $1,001 | 38.96% | 11,790 |
| | 2016 | $1,598 | $1,239 | 28.97% | 12,906 |
| Miami Metropolitan Area, Florida | 1999 | $1,619 | $1,145 | 41.40% | 41,300 |
| | 2006 | $2,607 | $1,566 | 66.48% | 51,125 |
| | 2016 | $2,533 | $1,831 | 38.34% | 59,961 |
| New Orleans, Louisiana | 1999 | $1,404 | $1,024 | 37.11% | 30,923 |
| | 2006 | $2,151 | $1,692 | 27.13% | 14,515 |
| | 2016 | $2,108 | $1,707 | 23.49% | 28,649 |
| Memphis, Tennessee | 1999 | $2,230 | $1,049 | 112.58% | 15,243 |
| | 2006 | $2,385 | $1,213 | 96.62% | 18,856 |
| | 2016 | $1,952 | $1,361 | 43.42% | 18,838 |

That is, the racial wage gap among low wage workers is a pervasive, well-

---

[22] U.S. Census Bureau, QWI Explorer, each county's Full Quarter Employment (Stable): Average Monthly Earnings by Worker Race and NAICS Sectors, 1999 Q1, 2006 Q1, and 2016 Q1, https://qwiexplorer.ces.census.gov (last visited May 31, 2017).

documented constant across the labor markets most relevant and likely most familiar to Alabama lawmakers.

**II.    The Alabama Legislature's Proffered Non-Discriminatory Interest in "Uniformity" of Wage Standards Is Neither Substantial Nor Substantially Advanced by Act 2016-18.**

Defendants cannot demonstrate that the state's purported interest in "uniformity" spurred adoption of Act 2016-18. Even if this case had not been dismissed at the initial pleading stage, when all of plaintiffs' allegations are to be taken as true, there is negligible evidence to substantiate that alleged interest. Moreover, the Act itself does not substantially advance that alleged interest because the Act leaves untouched the wide variation across localities in both market wages and regulations impacting businesses.

Under the *Arlington Heights* framework, where challengers are able to make a showing that a law was motivated at least in part by a discriminatory purpose, the burden shifts to the law's defenders to show that the law would have been enacted without a racially discriminatory motive. *Hunter v. Underwood*, 471 U.S. 222, 228, 105 S. Ct. 1916, 85 L.Ed.2d 222 (1985). A court assesses whether a law would have been enacted without a racially discriminatory motive by considering the substantiality of the state's proffered non-racial interest and how well the law furthers that interest. *Id* at 229. Here, the District Court, while applying an incorrect legal standard, and without explanation, determined that the legislature

17

had an "'obvious alternative explanation'" for adopting Act 2016-18. *Lewis,* 2017

U.S. Dist. LEXIS 13565, at *32 (citations omitted). Because the District Court's

opinion does not specifically identify that alternative explanation, one must rely on

the court's lone observation regarding the purpose of the Act, which was that

"[t]he purpose of the Act was to 'ensure that [labor] regulation and policy is

applied uniformly throughout the state.'" *Id.* at *5. The court appeared to consider

this statement of purpose sufficient evidence of the legislature's non-

discriminatory intent to allow for dismissal of Plaintiffs' equal protection claims.

However, the strength of the legislature's *actual* interest in uniformity of wage

standards is called into question by a lack of evidentiary support and the fact that

Act 2016-18 does not advance wage uniformity because it addresses neither

existing variation in market wages across localities nor the existing variation in

other local regulations impacting businesses.

### A. Defendant's Asserted Non-Discriminatory Reason for the Adoption of Act 2016-18 Lacks Evidentiary Support.

The Alabama Legislature expressed its purpose in enacting Act 2016-18 in

the text of the statute:

> The purpose of this section is to establish within the Legislature complete control over regulation and policy pertaining to . . . the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor *in order to ensure that such regulation and policy is applied uniformly throughout the state*.

Act 2016-18, Sec. 6 (emphasis added). The statute contains no findings or other indicators as to the reasons for this policy goal. However, Rep. David Faulkner, the sponsor of HB 174, was reported to say that the state needed to maintain a uniform minimum wage "because a patchwork of minimums would cause problems."[23] Sen. Jabo Wagonner, who led the effort to pass the legislation in the Alabama Senate, expressed a similar reason for seeking uniformity of wage standards: "'[w]hat a hodgepodge we would have in this state if Birmingham passed a minimum wage and Montgomery passed one.'"[24] Defendants contend in their Motion to Dismiss that the law aims to "preserve consistency in  the wage market". Def.'s Mot. Dismiss 4.

In *I.L. v. Alabama*, this court favorably reviewed a district court's weighing of evidence regarding non-discriminatory intent. 739 F.3d 1273, 1287 (11th Cir. 2014). There, this court observed, substantial record evidence supported the legislature's proffered non-discriminatory reason for measures maintaining low property taxes, including evidence of "massive resistance to substantial property tax increases." *Id., see also Young Apts.,*

---

[23] Mike Cason, *Bill to Block Birmingham's Minimum Wage Clears House*, Alabama News Group, Feb. 16, 2016, available at http://www.al.com/news/index.ssf/2016/02/bill_to_block_birminghams_mini.html.
[24] Bryan Lyman, *Bentley Signs Bill Blocking Birmingham Minimum Wage*, Montgomery Advisory, Feb 25, 2016, available at http://www.montgomeryadvertiser.com/story/news/politics/southunionstreet/2016/02/25/alabama-legislature-blocks-birmingham-minimum-wage/80941854/.

*Inc. v. Town of Jupiter,* 406 F. App'x 376, 378 (11th Cir. 2010) (noting

record of public meetings related to challenged law was "replete" with

concerns directly addressed by legislation). By contrast, here, the district

court accepted Defendants' assertion of a permissible purpose *at the*

*pleading stage*, without any evidence supporting the proffered explanation

and without permitting Plaintiffs to develop a factual record undermining

that asserted motive.

### B. Act 2016-18 Does Not Advance the Legislature's Stated Goal of Preserving Wage Uniformity.

Important to the inquiry regarding the intent behind a law challenged on

equal protection grounds is how well the law furthers the legislature's claimed

non-discriminatory interest. *Hunter*, 471 U.S. at 229. Act 2016-18 does little to

address the legislature's apparent interest in preserving "consistency in the wage

market," Def.'s Mot. to Dismiss 4, because there existed no such consistency prior

to the Act's adoption.  Similarly, the asserted goal of protecting businesses from a

patchwork of regulations is belied by the fact that such a patchwork currently

exists.

### 1. There Exists Great Variation in Market Wage Rates Across Alabama.

The alleged concern with preserving uniformity of wage standards appears

grounded in the idea that an individual business operating in or seeking to operate

20

in multiple locations within the state is currently able to pay whatever wage it chooses across those locations without having to navigate unique local requirements. Or, perhaps, as Defendants have put it, the aim is to "preserve" alleged "consistency in the wage market." Mot. to Dismiss at 4.

Yet, businesses in Alabama must already engage in precisely this sort of navigation of market wage standards, which vary dramatically across the state. Across the state's 67 counties, the average weekly wage varies significantly from $571 to $1050.[25] For the seven counties immediately surrounding and including Birmingham alone the figure varies from $648 to $1010.[26] Importantly, this wide variation across geographies occurs *within individual occupations*. For example, the mean hourly wage for a person working in protective services is $15.63 in Mobile[27] and $18.94 in Huntsville[28], a difference of twenty one percent. In

[25] U.S. Bureau of Labor Statistics, Southeast Information Office, County Employment and Wages in Alabama - Second Quarter 2016, Dec. 20, 2016, https://www.bls.gov/regions/southeast/news-release/countyemploymentandwages_alabama.htm.

[26] U.S. Bureau of Labor Statistics, *Birmingham Area Economic Summary*, May 31, 2017, https://www.bls.gov/regions/southeast/summary/blssummary_birmingham.pdf

[27] U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Mobile – May 2015, June 30, 2016, https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_mobile.htm.

[28] U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Birmingham-Hoover – May 2015, June 1, 2017, https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_huntsville.htm.

construction, the mean hourly wage is $17.09 in Montgomery[29] but $20.76 in Birmingham[30], also a difference of twenty one percent.

Perhaps most significantly, this variation occurs within the occupational sector with the lowest wages in the state, the food preparation and serving sector. There, (again looking only at data for the five largest metropolitan areas) the mean hourly wage is $9.48 in Mobile[31] but $10.31 in Birmingham[32], a nine percent difference.

A business looking to employ construction workers, security guards, or cooks in multiple locations around the state will necessarily have to take account of these substantial differences in local wage levels if it hopes to offer a wage adequate to employ qualified workers. Because it does nothing to curb this variation in market wages, *including in the lowest wage occupations*, Act 2016-18

---

[29]  U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Montgomery – May 2015, June 29, 2016, https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_montgomery.htm.

[30] U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Birmingham-Hoover – May 2016, June 1, 2017, https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_birmingham.htm.

[31] U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Mobile - May 2015, June 30, 2016, https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_mobile.htm.

[32] U.S. Bureau of Labor Statistics, Southeast Information Office, Occupational Employment and Wages in Birmingham-Hoover - May 2016, June 1, 2017, https://www.bls.gov/regions/southeast/news-release/occupationalemploymentandwages_birmingham.htm.

does not maintain a uniform minimum wage, or protect businesses from having to navigate a patchwork of varying wage levels city-by-city. Indeed, if the goal was to maintain *uniform* (or at least consistent) wages in low-wage occupations throughout the state, the legislature would have been far better served by establishing a statewide minimum wage that raised the wage floor to a degree that at least eliminated city-to-city variation at the bottom of the wage scale.

### 2. Alabama Businesses Must Navigate a "Patchwork" of Divergent Business Regulations Across the State.

The notion that Act 2016-18 operates to protect Alabama businesses from having to navigate varying standards across localities is further belied by the variation in business regulations across cities within the state. The experience of businesses in the food service and gasoline service industries, which both operate in multiple locations and have a significant share of their workforce that would be impacted by minimum wage increases, offers a telling example.  A restaurant owner could pay anywhere from $50 (Albertville[33]) to $770 (Huntsville[34]) in licensing fees, with additional fees based on a gross receipts sliding scale formula that varies from city to city. Gasoline retail licensing fees range from $30 (Dothan[35]) to $250 (Montgomery[36]), with some cities using different sliding scales

---

[33] Albertville Municipal Code, Sec. 7-39.2.
[34] Huntsville Municipal Code, Sec. 15-85.
[35] Dothan Municipal Code, Sec. 18-22.
[36] Montgomery Municipal Code, Sec. 16-106

based on the number of additional pumps. Further complicating matters, some cities have subcategories for restaurant and gasoline business fees, with some cities like Tuscaloosa distinguishing between a restaurant with full service and a sidewalk cafe[37], while other cities like Huntsville distinguish between single nozzle dispensers and multiple nozzle dispensers for gasoline[38].

Further still, businesses need to manage different licensing fee payment schedules, with some cities like Tuscaloosa starting in March[39], while others like Dothan[40] and Montgomery[41] start in July. Restaurants also have to undergo varying permitting processes: cities like Dothan[42] and Tuscaloosa[43] require a county health certificate while cities like Birmingham[44] have their own certification, rules, and inspection system.

Smoking regulations, of major importance to restaurants, also differ across localities. In Huntsville, employers must create a smoking policy that defers to nonsmoking employees.[45] In contrast, in Montgomery, employers must create a

---

[37] Tuscaloosa Municipal Code, Sec. 7-18.
[38] Huntsville Municipal Code, Sec. 15-85.
[39] Tuscaloosa Municipal Code, Sec. 7-16.
[40] Dothan Municipal Code, Sec. 18-3.
[41] Montgomery Municipal Code, Sec. 16-74.
[42] Dothan Municipal Code, Sec. 18-196.
[43] Tuscaloosa Municipal Code, Sec. 12-5.
[44] Birmingham Municipal Code, Sec. 58-30.
[45] Huntsville Municipal Code, Sec. 14-99.

smoking policy that accommodates both nonsmoking *and* smoking employees.[46] In Mobile, smoking is prohibited entirely in enclosed spaces of employment.[47] In Birmingham, smoking is prohibited only in dance halls and schools.[48]

Because it addresses none of these local requirements, Act 2016-18 neither protects Alabama businesses against variation in labor costs across localities nor against variation in applicable regulations. Indeed, the mismatch between the legislature's claimed objective and what Act 2016-18 accomplishes is remarkable. First, as shown, preempting local wage requirements does nothing to address the fact that Alabama businesses must already navigate widely divergent market wages within a single occupation and therefore does nothing to address variation in labor costs.

Second, if the legislature was truly concerned with protecting businesses from varying regulations, it had little reason to focus on labor and employment, which enjoy almost nonexistent local regulation in Alabama when compared with numerous other matters affecting in-state businesses, such as those described above. Act 2016-18 focuses on the former and does nothing about the latter.

Third, we can find no evidence in the legislative record or in any of Rep. Faulkner's reported statements regarding Act 2016-18 that navigating (presently

---

[46] Montgomery Municipal Code, Sec. 14-215.
[47] Mobile Municipal Code, Sec. 27-67.
[48] Birmingham Municipal Code, Sec. 26-207.

nonexistent) variations in wage *regulation* is any more costly or burdensome to a business than navigating variations any other type of regulation, which businesses still must do.

In sum, there is good reason to doubt the strength of the legislature's interest in its claimed goal of uniformity of wage standards.

As the Supreme Court has counseled, "[w]hat a legislature . . . . is 'up to' may be plain from the results they achieve, or the results they avoid." *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 n.24, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979). Here, Act 2016-18 does *not* achieve its stated goal of uniform wage standards across the state, which, due to the large wage gaps that already exist, would have been achieved only by either raising the minimum wage statewide or permitting municipalities to do so to address local variances.  Rather, Act 2016-18 perpetuates dissimilarity in wage standards by preserving the status quo that has existed since Jim Crow --- a status quo in which the lowest wages go to African American workers. The legislature's apparent disinterest in helping African American workers' wages catch up to those of whites belies its purported interest in uniformity, and further suggests that the Act was motivated, at least in part, by an intent to discriminate.

## CONCLUSION

The District Court's erroneous dismissal of Plaintiffs' equal protection claims rests on a breezy weighing of the legislature's stated purpose for Act 2016-18 as against what it characterized as negligible evidence of discriminatory intent. In trying to understand the intent behind Act 2016-18, however, the clarity and foreseeability of the discriminatory impact of the Act stands in marked contrast to the tenuousness of the claimed "uniformity" goal and its connection to the Act. Yet, the extensive data presented herein by *amici* to establish the foreseeable discriminatory impact of Act 2016-18 only scratches the surface. Plaintiffs, who have certainly pled facts sufficient to show both the discriminatory impact of and intent behind Act 2016-18, should be permitted to further develop the factual record.

For the foregoing reasons, *Amici Curiae* respectfully request that this Court reverse the decision below.

Respectfully submitted,

Dated:  June 12, 2017

 /s/ Samuel Brooke

Benjamin Beach, Esq.[*]
Miya Saika Chen, Esq.[*]
THE PARTNERSHIP FOR
WORKING FAMILIES
1939 Harrison Avenue, Suite 150
Oakland, CA 94612
Telephone: (510) 201-0081

Samuel Brooke, Esq.
SOUTHERN POVERTY LAW
CENTER
400 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 956-8200
Facsimile: (334) 956-8481

ben@forworkingfamilies.org           samuel.brooke@splcenter.org
miya@forworkingfamilies.org

\* Application to appear *pro hac vice* submitted


Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 29(a)(5), because this brief contains 5,687 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  June 12, 2017          /s/ Samuel Brooke
                               Samuel Brooke, Esq.
                               SOUTHERN POVERTY LAW CENTER
                               400 Washington Avenue
                               Montgomery, AL 36104
                               Telephone: (334) 956-8200
                               Facsimile: (334) 956-8481
                               samuel.brooke@splcenter.org

29

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter.

I further certify that arrangements have been made to deliver seven physical copies of this pleading to the Clerk of Court through a third-party commercial carrier, which copies are scheduled to arrive within three business days.

Dated:  June 12, 2017                    /s/ Samuel Brooke
                                         Samuel Brooke, Esq.
                                         SOUTHERN POVERTY LAW CENTER
                                         400 Washington Avenue
                                         Montgomery, AL 36104
                                         Telephone: (334) 956-8200
                                         Facsimile: (334) 956-8481
                                         samuel.brooke@splcenter.org