**No. 17-11009**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

MARNIKA LEWIS, et al.,
*Plaintiffs-Appellants,*
v.
STATE OF ALABAMA, et al.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

**BRIEF FOR *AMICI CURIAE* NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC. AND CAMPAIGN LEGAL CENTER IN SUPPORT OF PLAINTIFFS-APPELLANTS**

SHERRILYN IFILL
  Director-Counsel
JANAI NELSON
CHRISTINA A. SWARNS
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and
  Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006

COTY MONTAG
ELIZABETH A. REESE
NAACP Legal Defense and
  Educational Fund, Inc.
1444 I St NW, 10th Floor
Washington, DC 20005

PAUL M. SMITH
J. GERALD HEBERT
DANIELLE LANG*
  *Eleventh Circuit application
   for admission pending*
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200

*Counsel for Amici Curiae*

## *AMICI CURIAE'S* CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1-1, undersigned counsel for *amici curiae* the NAACP Legal Defense and Educational Fund, Inc. (LDF) and Campaign Legal Center (CLC) certify that they believe that the certificate of interested persons and corporate disclosure statement accompanying the brief of Plaintiffs-Appellants filed on June 5, 2017, is complete with the following exceptions:

### A. Interested Parties

NAACP Legal Defense and Educational Fund, Inc. (*amicus curiae*)

Campaign Legal Center (*amicus curiae*)

Sherrilyn Ifill (counsel for *amici curiae*)

Janai Nelson (counsel for *amici curiae*)

Christina Swarns (counsel for *amici curiae*)

Coty Montag (counsel for *amici curiae*)

Leah Aden (counsel for *amici curiae*)

Elizabeth A. Reese (counsel for *amici curiae*)

Deuel Ross (counsel for *amici curiae*)

J. Gerald Hebert (counsel for *amici curiae*)

-i-

Danielle Lang (counsel for *amici curiae*)

Paul Smith (counsel for *amici curiae*)

## B. Corporate Disclosure Statement

LDF is a non-profit, non-partisan corporation. It has no parent corporation and no publicly held corporation has any form of ownership interest in LDF.

CLC is a non-profit, non-partisan corporation. CLC has no parent corporation and no publicly held corporation has any form of ownership interest in the CLC.

## TABLE OF CONTENTS

**PAGE**

*AMICI CURIAE'S* CERTIFICATE OF INTERESTED PERSON AND CORPORATE DISCLOSURE STATEMENT ...................................i

    A.    Interested Parties ...........................................................i

    B.    Corporate Disclosure Statement.............................................ii

TABLE OF AUTHORITIES.........................................................v

INTEREST OF *AMICI CURIAE*...................................................1

STATEMENT OF THE ISSUES.....................................................2

SUMMARY OF ARGUMENT ........................................................3

ARGUMENT ....................................................................5

I.    THE VOTING RIGHTS ACT ABROGATES SOVEREIGN IMMUNITY. ..............................................................5

    A.    The Voting Rights Act Allows Private Citizens to Sue States in Order to Protect the Rights of Voters of Color..........8

    B.    The VRA Contains a Sufficiently Clear Statement Abrogating Sovereign Immunity in Creating a Private Cause of Action to Sue States for Racial Discrimination in Voting. ...............................................................13

    C.    The District Court Misconstrued the Text and Design of the VRA. ..............................................................20

II.    REGARDLESS OF SOVEREIGN IMMUNITY, PLAINTIFFS CAN SUE OFFICERS FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO *EX PARTE YOUNG*. ...............................................................25

**PAGE**

III. THE CONTINUED IMPORTANCE OF PRIVATE ENFORCEMENT OF THE VOTING RIGHTS ACT AND OF THE *EX PARTE YOUNG* DOCTRINE ......................................... 30

CONCLUSION ................................................................... 32

CERTIFICATE OF COMPLIANCE ....................................... 33

CERTIFICATE OF SERVICE .............................................. 34

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

*Ala. Legis. Black Caucus v. Ala.*,
  135 S. Ct. 1257 (2015) ....................................................................16

*Ala. Legis. Black Caucus v. Ala.*,
  No. 2:12-CV-1081, 2017 WL 378674 (M.D. Ala. Jan. 20, 2017) ......6, 16

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969) .............................................................. 10, 27, 31

*Arizona State Legislature v. Arizona Independent Redistricting
  Commission*,
  135 S. Ct. 2652 (2015) ......................................................................2

*Bd. of Trustees of Univ. of Ala. v. Garrett*,
  531 U.S. 356 (2001) ........................................................................14

*Bethune Hill v. Virginia State Board of Elections*,
  137 S. Ct. 788 (2017) ........................................................................2

*Christiansburg Garment Co. v. EEOC*,
  434 U.S. 412 (1978) ........................................................................27

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ........................................................................14

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986) .....................................................................27-28

*City of Rome v. United States*,
  446 U.S. 156 (1980) ....................................................................6, 14

*Dekom v. New York*,
  No. 12-cv-1318, 2013 WL 3095010 (E.D.N.Y. Jun. 18, 2013),
  *aff'd*, 583 F. App'x 15 (2d Cir. 2014) ...................................................7

**PAGE(S)**

*Dellmuth v. Muth,*
  491 U.S. 223 (1989) ........................................................................12

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ........................................................................27

*Ex Parte Young,*
  209 U.S. 123 (1908) ........................................................................26

*Fitzpatrickv. Bitzer,*
  427 U.S. 445 (1976) ........................................................................19

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs,*
  775 F.3d 1336 (11th Cir. 2015) .........................................................1

*George v. City of Cocoa,*
  78 F.3d 494 (11th Cir. 1996) .............................................................1

*Georgia Latino All. for Human Rights v. Governor of Georgia,*
  691 F.3d 1250 (11th Cir. 2012) .......................................................29

*Gingles v. Edmisten,*
  590 F. Supp. 345 (E.D.N.C. 1984), *aff'd in part, rev'd in part
  sub nom., Thornburg v. Gingles,* 478 U.S. 30 (1986)..........................19

*Gonzalez v. Arizona,*
  677 F. 3d 383 (9th Cir. 2012), *aff'd sub nom., Arizona v. Inter
  Tribal Council of Ariz., Inc.,* 133 S. Ct. 2247 (2013) ..........................15

*Greater Birmingham Ministries v. Merrill,*
  No. 2:15-CV-02193, 2017 WL 2471065 (N.D. Ala. April 6, 2017) ..30-31

*Greater Birmingham Ministries v. Alabama,*
  No. 2:15-CV-02193, 2017 WL 782776 (N.D. Ala. Mar. 1, 2017).........22

*Grizzle v. Kemp,*
  634 F.3d 1314 (11th Cir. 2011) .......................................................26

**PAGE(S)**

*Hall v. Louisiana,*
    983 F. Supp. 2d 820 (M.D. La. 2013) .................................................... 7

*Jeffers v. Clinton,*
    740 F. Supp. 585 (E.D. Ark. 1990) ..................................................... 23

*Kimel v. Florida Bd. of Regents,*
    528 U.S. 62 (2000) ................................................................... *passim*

*League of Women Voters of N.C. v. N. Carolina,*
    769 F. 3d 224 (4th Cir. 2014), *cert. denied,* 135 S. Ct. 1735 (2015) ..... 15

*Lewis v. Bentley,*
    No. 2:16 -cv- 690, 2017 WL 432464 (Feb. 1, 2017) ............. 16, 20-21, 26

*Lopez v. Merced Cty.,*
    473 F. Supp. 2d 1072 (E.D. Cal. 2007) ................................................ 15

*Lopez v. Monterey Cty.,*
    525 U.S. 266 (1999) ....................................................................... 14

*Mayfield v. Texas Dep't of Crim. Just.,*
    529 F.3d 599 (5th Cir. 2008) ............................................................ 28

*McMillan v. Escambia Cty.,*
    559 F. Supp. 720 (N.D. Fla. 1983) ..................................................... 23

*Mixon v. Ohio,*
    193 F.3d 389 (6th Cir. 1999) ................................................... 7, 20, 21

*Morse v. Republican Party,*
    517 U.S. 186 (1996) ...................................................... 12, 15, 22, 31

*N. Carolina State Conf. of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016), *cert. denied,* 137 S. Ct. 27 (2017) ...... 6, 30

*Nevada Dep't of Human Res. v. Hibbs,*
    538 U.S. 721 (2003) ................................................................. *passim*

**PAGE(S)**

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
557 U.S. 193 (2009) ..............................................................................1

*Patino v. City of Pasadena,*
No. CV H-14-3241, 2017 WL 68467 (S.D. Tex. Jan. 6, 2017).............23

*Perez v. Abbott,*
No. 11-cv-360, 2017 WL 1787454 (W.D. Tex. May 2, 2017) .................6

*Presley v. Etowah Cty. Comm'n,*
502 U.S. 491 (1992) ..............................................................................1

*Reaves v. U.S. Dep't of Just.,*
355 F. Supp. 2d 510 (D.D.C. 2005).......................................................7

*Rice v. Cayetano,*
528 U.S. 495 (2000) ..............................................................................8

*Roberts v. Wamser,*
883 F.2d 617 (8th Cir. 1989) ....................................................... 10, 15

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) ...................................... 16, 17, 18, 19, 20

*Shelby County v. Holder,*
133 S. Ct. 2612 (2013) ...........................................................1, 2, 30

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966) ..........................................................................5, 14

*Summit Med. Assocs., P.C. v. Pryor,*
180 F.3d 1326 (11th Cir. 1999) ....................................................28, 29

*Terrebonne Par. NAACP v. Jindal,*
154 F. Supp. 3d 354 (M.D. La. 2015) ...................................................7

*Thornburg v. Gingles,*
478 U.S. 30 (1986) ...............................................................................13

**PAGE(S)**

*United States v. Berks Cty.*,
  277 F. Supp. 2d 570 (E.D. Pa. 2003) ...................................................23

*United States v. Brown*,
  No. 4:05CV33TSL, 2007 WL 2461965 (S.D. Miss. Aug. 27, 2007),
  *aff'd*, 561 F.3d 420 (5th Cir. 2009) .....................................................23

*United States v. Marengo Cty. Comm'n*,
  731 F.2d 1546 (11th Cir.), *cert. denied*, 469 U.S. 976 (1984) .....7, 24-25

*United States v. McGregor*,
  824 F. Supp. 2d 1339 (M.D. Ala. 2011) .................................................6

*United States v. Sandoval Cty.*,
  797 F. Supp. 2d 1249 (D. N.M. 2011) ...................................................23

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016), *cert. denied*,
  137 S. Ct. 612 (2017) .............................................................. 1, 15, 30

*Veasey v. Abbott*,
  No. 2:13-cv-193, 2017 WL 1315593 (S.D. Tex. Apr. 10, 2017).........6, 30

*Verity v. Scott*,
  No. 2:12-CV-609-FTM-38, 2014 WL 3053171
  (M.D. Fla. July 7, 2014).........................................................................7

*Virginia Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) ......................................................................28, 29

*Ward v. Alabama*,
  31 F. Supp. 2d 968 (M.D. Ala. 1998).....................................................16

*White v. Alabama*,
  867 F. Supp. 1519 (M.D. Ala. 1994),
  *vacated on other grounds by* 74 F.3d 1058 (11th Cir. 1996)............7, 16

*Windy Boy v. Big Horn Cty.*,
  647 F. Supp. 1002 (D. Mont. 1986) .......................................................23

**PAGE(S)**

*Wright v. Sumter County Board of Elections,*
657 F. App'x 871 (11th Cir. 2016) ..........................................................2

**PAGE(S)**

**STATUTES & OTHER AUTHORITIES:**

U.S. Const. amend. XV § 1 ....................................................................8

29 U.S.C. §
§ 203(x) ...........................................................................................18
§ 216(b) ...........................................................................................18
§ 2611(4)(A)(iii) ..............................................................................18
§ 2617(a)(2) .....................................................................................18

52 U.S.C.A.
§ 10301(a) ................................................................................ 10, 19
§ 10302.................................................................................................6
§ 10302(a) ............................................................................... 10, 22
§ 10302(b) ................................................................. 10, 11, 15, 22
§ 10302(c)..................................................................... 10, 11, 22
§ 10310(e).......................................................................................19

H. R. Rep. No. 97–227 (1981) ..............................................................12

S. Rep.
No. 94–295 (1975)......................................................................11-12
No. 97–417 (1982).............................................................12-13, 31

122 Cong. Rec. 33313 (1976) ...............................................................28

Jefferies, John C. Jr. et al., Civil Rights Actions: Enforcing the
Constitution 7 (2d. ed. 2007)..........................................................27

**PAGE(S)**

NAACP LDF, *Democracy Diminished: State and Local Threats to Voting Post*-Shelby County, Alabama v. Holder (2016), https://goo.gl/sg5NFu ........................................................................ 31

President Lyndon B. Johnson, Remarks at the Signing of the Voting Rights Act (Aug. 6, 1965) ......................................................... 8-9

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* LDF is a non-profit civil rights legal organization that was established to assist Black people in the full, fair, and free exercise of their civil and constitutional rights. LDF has been involved in nearly all of the precedent-setting litigation relating to the voting rights of Black people before state and federal courts and currently represents the plaintiffs in *Greater Birmingham Ministries v. Merrill*, No. 2:15-cv-02193 (N.D. Ala.). *See, e.g., Shelby County v. Holder*, 133 S. Ct. 2612 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009); *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491 (1992); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017); *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336 (11th Cir. 2015); *George v. City of Cocoa*, 78 F.3d 494 (11th Cir. 1996). As such, LDF has a significant interest in ensuring the full and proper enforcement of the Voting Rights Act of 1965 and the United States Constitution.

*Amicus curiae* CLC is a non-partisan, non-profit organization that works in the area of election law, generally, and voting rights law, specifically, generating public policy proposals and participating in state

and federal court litigation throughout the nation regarding voting rights. CLC has served as *amicus curiae* or counsel in voting rights and redistricting cases at the Supreme Court and this Court, including *Wright v. Sumter County Board of Elections*, 657 F. App'x 871 (11th Cir. 2016), *Bethune Hill v. Virginia State Board of Elections*, 137 S. Ct. 788 (2017), *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), and *Shelby County v. Holder*, 133 S. Ct. 2612, among others. CLC currently represents minority voters in several actions under the Voting Rights Act including *Veasey*, 830 F.3d 216, and *Thompson v. Alabama*, No. 2:16-cv-783 (M.D. Ala.). CLC is deeply committed to preserving the right of minority voters under the Voting Rights Act for the equal opportunity to participate in the political process.

The parties consent to the filing of this brief.[1]

### Statement of the Issues

This appeal raises numerous important issues that were improperly decided by the district court at the motion to dismiss stage of

---

[1]    Pursuant to Fed. R. App. P. 29(c)(5), *amici* state that no party's counsel authored this brief either in whole or in part, and further, that no party or party's counsel, or person or entity other than amici, amici's members, and their counsel, contributed money intended to fund preparing or submitting this brief.

this civil rights challenge to Alabama's Uniform Minimum Wage and Right-to-Work Act, Alabama Act No. 2016-18, which nullified Birmingham City Council's local minimum wage legislation.

In this brief, *Amici* urge this Court to reverse two erroneous holdings from the district court that threaten to undermine the effectiveness of the Voting Rights Act ("VRA"): (1) the district court's holding that the VRA—a law passed for the explicit purpose of ensuring that states do not deny or abridge the right to vote based on race—does not abrogate state sovereign immunity; and (2) the district court's failure to recognize *Ex Parte Young* claims against state officers, effectively shutting the door on all private VRA enforcement actions brought by minority voters against the states.

### Summary of Argument

It is indisputable that when Congress passed the VRA, it created an instrument designed to prevent state governments from enacting or enforcing unconstitutional election laws motivated by race. Acting within its broad power to enforce the protections of the Fourteenth and Fifteenth Amendments, Congress explicitly gave private citizens the power to challenge state government actions and laws that had the results or

purpose of discriminating against voters on the basis of race. The text and history of the VRA make it clear that a core function of the statute is to abrogate state sovereign immunity and allow for such suits directly against the States.

Nevertheless, the district court below ignored this history and misconstrued the text of the VRA in order to hold that the VRA does not authorize a private right of action or abrogate state sovereign immunity. In doing so, the district court ignored over 50 years of decisions from the the Supreme Court and countless other federal courts which never raised the issue despite private plaintiffs repeatedly and successfully bringing VRA suits against States as defendants. This holding attempts to defang a key provision of the VRA without any support from text, history, or precedent. Contrary to the ruling below, the Supreme Court has held that Congress has made a sufficiently clear statement of abrogation by doing precisely what it did in passing the VRA: creating a private right of action as part of a statutory scheme aimed at the States.

Furthermore, the district court's decision risks even more damage to vital voting rights protections. By holding that state officers are similarly immune from suit the district court turned a blind eye to over

a hundred years of Supreme Court case law. Since *Ex Parte Young*, it has been well established that private plaintiffs can bring suits against state officials in their official capacities for injunctive relief, notwithstanding state sovereign immunity. Without even performing the requisite analysis, the district court dismissed *Ex Parte Young* and attempted to effectively shut the door on *all* private actions challenging discriminatory state voting practices under the VRA. The holding below—unprecedented, unsupported, and dangerous—must be overturned by this Court.

**Argument**

**I.    The Voting Rights Act Abrogates Sovereign Immunity.**

Congress enacted the VRA in 1965 as constitutionally-sanctioned enforcement legislation to deliver the unfulfilled promise of the Fourteenth and Fifteenth Amendments and to eliminate the "insidious and pervasive evil" of state-sanctioned racial discrimination in voting. *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). The text and history of the VRA and its subsequent amendments make it clear that a core function of the statute is to limit state sovereignty and allow for robust enforcement of federal protections. Indeed, the Supreme Court of

the United States has long held that the VRA, like the Reconstruction Amendments, was "specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome v. United States*, 446 U.S. 156, 179 (1980). The VRA has always included a private right of action—initially implied, now explicit—that allows private litigants to challenge states that enact racially discriminatory voting laws. *See* 52 U.S.C.A. § 10302. Because states continue to enact unconstitutional election laws motivated by race and because such racial discrimination undermines a fundamental right, the VRA remains a vital limit on state sovereignty. *See, e.g.*, *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 230 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 27 (2017); *Perez v. Abbott*, No. 11-cv-360, 2017 WL 1787454, at *56 (W.D. Tex. May 2, 2017); *Veasey v. Abbott*, No. 2:13-cv-193, 2017 WL 1315593, at *5 (S.D. Tex. Apr. 10, 2017); *Ala. Legis. Black Caucus v. Ala.*, No. 2:12-CV-1081, 2017 WL 378674, at *106 (M.D. Ala. Jan. 20, 2017); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-46 (M.D. Ala. 2011).

Unfortunately, the district court below ignored this history and misconstrued the text of the VRA, dismissing years of precedent established by the Supreme Court and numerous other federal courts.

Without any support from text, history, or precedent, the district court below held that the VRA does not abrogate state sovereign immunity. In fact, until now, every court to consider this issue has held that the VRA lawfully abrogates state sovereign immunity. *See, e.g.*, *Mixon v. Ohio*, 193 F.3d 389, 398-99 (6th Cir. 1999); *Terrebonne Par. NAACP v. Jindal*, 154 F. Supp. 3d 354, 359 (M.D. La. 2015); *Verity v. Scott*, No. 2:12-CV-609-FTM-38, 2014 WL 3053171, at \*6 (M.D. Fla. July 7, 2014); *Hall v. Louisiana,* 983 F. Supp. 2d 820, 830 (M.D. La. 2013); *Dekom v. New York*, No. 12-cv-1318, 2013 WL 3095010, at \*10 (E.D.N.Y. Jun. 18, 2013), *aff'd*, 583 F. App'x 15 (2d Cir. 2014); *Reaves v. U.S. Dep't of Just.*, 355 F. Supp. 2d 510, 515 (D.D.C. 2005); *White v. Alabama*, 867 F. Supp. 1519, 1540 (M.D. Ala. 1994), *vacated on other grounds by* 74 F.3d 1058 (11th Cir. 1996); *see also United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1560-61 (11th Cir.), *cert. denied*, 469 U.S. 976 (1984).

This ruling attempts to defang a key provision of the VRA without any legal basis.  But clear legislative history and repeated precedent by the Supreme Court and all other federal courts since the VRA was passed more than 50 years ago, support the uncontroverted conclusion that the

VRA abrogates state sovereignty as a valid exercise of congressional authority. This Court should not upend this well-settled precedent.

## A.    The Voting Rights Act Allows Private Citizens to Sue States in Order to Protect the Rights of Voters of Color.

Congress passed the VRA with the clear *purpose* of authorizing lawsuits against states to eliminate racial discrimination in voting to enforce the protections of the Fourteenth and Fifteenth Amendments. In language "as simple in command as it was comprehensive in reach," *Rice v. Cayetano,* 528 U.S. 495, 512 (2000), the Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . .  by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV § 1. Yet, the reality of that command long went unrealized for millions of Black people and other voters of color who were denied the right to vote at the hands of their state and local governments. In the aftermath of the brutal beatings of Black protestors by state police officers on "Bloody Sunday" in Selma, Alabama, the Fifteenth Amendment was finally given force in 1965 when Congress passed the VRA with overwhelming bipartisan support. The VRA was enacted after "smaller and more gradual measures . . . had been tried [f]or years and years . . . and they had failed" to prevent States from

-8-

passing and enforcing election laws designed to disenfranchise Black voters. President Lyndon B. Johnson, Remarks at the Signing of the Voting Rights Act (Aug. 6, 1965). It is no great mystery whose conduct the VRA was intended to correct—the unconstitutional conduct of Alabama and other states that flagrantly and persistently erected racialized barriers to the exercise of the franchise.

In passing the law, Congress and President Johnson in 1965—and each Congress that subsequently reauthorized the law in 1970, 1975, 1982 and 2006 with increasing bipartisan support—understood that they were carefully crafting an instrument that would limit the power of state governments. Congress put the authority to enforce the VRA into the hands of not only the U.S. Department of Justice, but also private actors and the courts. In his speech in the Capitol rotunda at the signing of the VRA, President Johnson stated: "[T]he heart of the act is plain. Wherever, by clear and objective standards, States and counties are using regulations, or laws, or tests to deny the right to vote, then they will be struck down. . . through this act, and its enforcement, an important instrument of freedom passes *into the hands of millions of our citizens*." President Johnson, *supra* (emphasis added). Without allowing

private individuals to sue states to prevent the enforcement of racially discriminatory election laws, the guarantees of the VRA that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by *any State* . . . in a manner which results in a denial or abridgement of the right of *any citizen* of the United States to vote on account of race," 52 U.S.C.A. § 10301(a) (emphasis added), "might well [have] prove[n] an empty promise." *Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969).

Although the VRA as enacted in 1965 contained only an "implied" right of action, *Allen*, 393 U.S. at 557, Congress amended the VRA in 1975 to make it explicit that it contains—and has always contained—a private right of action against state governments. *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989). Tellingly, the amended Section 3 is entitled "[p]roceeding to enforce right to vote" and it unambiguously permits "an aggrieved person" to bring suit under the VRA to seek remedies against the States. 52 U.S.C.A. § 10302(a), (b), and (c).  Section 3(a) provides for remedies under the VRA for suits occurring in "any State" where violations have occurred, and contemplates that violations could be "corrected by State . . . action."  52 U.S.C.A. § 10302(a).  Section 3(b)

permits federal courts "in a proceeding instituted by . . . an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State" to enjoin States from employing "a test or device [that] has been used for the purpose or with the effect of denying or abridging the right of any citizen of the United States to vote on account of race . . . in such State." 52 U.S.C.A. § 10302(b). And Section 3(c) establishes that "in any proceeding instituted by . . . an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State," courts can impose a preclearance requirement upon States to remedy constitutional violations. 52 U.S.C.A. § 10302(c).

When describing the purpose of the 1975 amendments, the Senate Judiciary Committee expressly stated:

> Section 401 of S. 1279 amends Section 3 of the Voting Rights Act to afford to private parties the same remedies which Section 3 now affords only to the Attorney General. . . . In enacting remedial legislation, Congress has regularly established a dual enforcement mechanism. It has, on the one hand, given enforcement responsibility to a governmental agency, and on the other, has also provided remedies to private persons acting as a class or on their own behalf. The Committee concludes that it is sound policy to *authorize private remedies* to assist the process of enforcing voting rights.

-11-

S. Rep. No. 94–295 at 39-40 (1975) (emphasis added).[2]

Moreover, the Supreme Court has acknowledged that the effect of the 1975 Amendments to Section 3 was to make explicit that a private right of action exists under the VRA—to "provide the same remedies to private parties as had formerly been available to the Attorney General alone." *Morse v. Republican Party*, 517 U.S. 186, 233 (1996) (Op. of Stevens, J.); *see also id.* at 240 (Breyer, J., concurring) (recognizing that, through the amended Section 3, "Congress intended to establish a private right of action to enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5."); *id.* at 289 (Thomas, J. dissenting) ("As appellants accurately state, § 3 *explicitly* recognizes that private individuals can sue under the Act.") (emphasis added, internal quotation marks and alterations omitted).

And, in 1982, Congress again expressly stated that "the existence of the private right of action under Section 2 . . . has been clearly intended

---

[2]    The stated purpose and legislative history of the VRA inform the abrogation inquiry. Even in those cases cited by the district court, the Supreme Court searched the "textual provisions," the "legislative purpose in the Act's preamble," and subsequent amendments for a clear indication of abrogation. *Dellmuth v. Muth*, 491 U.S. 223, 231 (1989). Here, it is indisputable that Congress carefully crafted the VRA as a tool intended to be wielded by private citizens against States. *Supra* Section I.A.

by Congress since 1965." S. Rep. No. 97–417, at 30 (1982); *see also* H. R. Rep. No. 97–227, p. 32 (1981); *see Thornburg v. Gingles*, 478 U.S. 30, 43-44 & n.7 (1986) (acknowledging the Senate Report as the "authoritative source for legislative intent" regarding the amended Section 2).

To protect voters of color from both subtle and overt discriminatory laws and policies, the VRA was structured to empower private citizens to sue states to vindicate their rights. To ignore the text and purpose of the VRA would undermine decades of precedent and progress and is anathema to established congressional intent and enforcement authority in eradicating racial discrimination in voting.

**B.    The VRA Contains a Sufficiently Clear Statement Abrogating Sovereign Immunity in Creating a Private Cause of Action to Sue States for Racial Discrimination in Voting.**

It is unquestioned that Congress may abrogate state sovereignty by enacting federal statutes designed to enforce the Reconstruction Amendments. Congressional abrogation of state sovereignty is permitted when such intrusions serve as "appropriate prophylactic legislation" responding to constitutional wrongs. *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003). This requires a clear statement of

abrogation and sufficient evidence of a "pattern of constitutional violations on the part of the States in this area." *Hibbs*, 538 U.S. at 729.

As discussed above, the VRA was clearly passed in the wake of a "pattern of constitutional violations." *See Lopez v. Monterey Cty.*, 525 U.S. 266, 284-85 (1999) (the VRA "by its nature, intrudes on state sovereignty"); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001) (pointing to the VRA as an example of a clear congressional response "to a serious pattern of constitutional violations" (citing *Katzenbach*, 383 U.S. at 308)); *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (recognizing that "measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments"); *City of Rome*, 446 U.S. at 179–80 (holding that the Reconstruction Amendments gave Congress the power to impinge on state sovereignty through the VRA); *Katzenbach*, 383 U.S. at 308 ("Congress assumed the power to prescribe these [VRA's] remedies from § 2 of the Fifteenth Amendment"). After the 1975 Amendments, the VRA's text authorized a clear private right of action as part of a statutory scheme aimed at the States. The existence of a private right of action provides a clear statement of Congress' intent to abrogate the States'

sovereign immunity. *See Morse*, 517 U.S. at 233; *Roberts*, 883 F.2d at 621 ("Congress amended the Voting Rights Act in 1975 to reflect the standing of 'aggrieved persons' to enforce their right to vote."); *Lopez v. Merced Cty.*, 473 F. Supp. 2d 1072, 1078 (E.D. Cal. 2007) ("The VRA contains a citizen-suit provision and a strong policy supporting enforcement of the Act to protect voters against infringement of their right to vote.") (citing 52 U.S.C.A. § 10302(b)).

This issue is so uncontroversial that it has rarely been raised, despite private plaintiffs repeatedly and successfully bringing suit against States as defendants in litigation under the VRA. *See, e.g., Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 612 (2017) (VRA suit against the State of Texas and others); *Gonzalez v. Arizona*, 677 F. 3d 383 (9th Cir. 2012) (en banc), *aff'd sub nom., Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247 (2013) (VRA suit against the State of Arizona); *League of Women Voters of N.C. v. N. Carolina*, 769 F. 3d 224 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015) (suit against the State of North Carolina). Where it has been raised, courts have uniformly found that the VRA abrogates state sovereignty. *See supra at* 7 (collecting cases). And, in Alabama alone, numerous federal courts have

permitted VRA suits to proceed against the State. *See, e.g., Ala. Legis. Black Caucus v. Ala.* ("*ALBC*"), 135 S. Ct. 1257 (2015) (suing the State under Section 2 and the Constitution);[3] *Ward v. Alabama*, 31 F. Supp. 2d 968 (M.D. Ala. 1998) (3-judge court) (naming the State as a defendant in a suit pursuant to Section 5 of the VRA); *White*, 867 F. Supp. at 1540 (suing Alabama under Section 2 of the VRA).

Nonetheless, the district court below—citing *Seminole Tribe*—held that the VRA is "ambiguous" because the text of the statute does not include an express abrogation clause, similar to the one in Title IX, that "[a] state shall not be immune under the Eleventh Amendment.", *Lewis v. Bentley*, No. 2:16 -cv- 690, 2017 WL 432464 *10 (Feb. 1, 2017), (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56 (1996) as creating a "stringent" standard for valid abrogation). However, Supreme Court precedent makes clear that an express "abrogation clause" is not required

---

[3]    The Supreme Court's decision in *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), a private challenge brought against the State of Alabama under Section 2, is particularly instructive. Neither the Supreme Court nor the three-judge district court ever suggested that the State of Alabama was immune to suit, even though that defense was raised in Alabama's answer to the complaint. Answer to Amended Complaint of ALBC Plaintiffs, *ALBC v. Alabama*, No. 2:12-cv-691, 2013 WL 328168, at *23 (M.D. Al. Jan. 25, 2013). The *ALBC* litigation continues to this day without a noted challenge to the federal court's jurisdiction. *See ALBC*, 2017 WL 378674, at *106.

and the text of the VRA makes Congress' intent to abrogate unambiguous. *See Hibbs*, 538 U.S. at 726; *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000).

In fact, the very case the district court relied on demonstrates that an "abrogation clause" or similarly explicit language is not required to clearly abrogate sovereign immunity. The statute at issue in *Seminole Tribe*, the Indian Gaming Regulatory Act, did not have an abrogation clause and yet the Supreme Court still found that Congress' intent to abrogate was "unmistakably clear." *Seminole Tribe*, 517 U.S. at 56. That statute described the conduct of States that could give rise to a cause of action in federal court and the remedial scheme for such actions. Based on those provisions, the Court found that it was "indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit." *Id.* at 56-57. The Court in *Seminole Tribe* required that "Congress' intent to abrogate . . . be obvious from a 'clear legislative statement.'" *Id.* at 55. But that clarity may come in many other ways than an abrogation clause. The Court considered the clarity offered by the entire text of the remedial statute as a whole. *Id.* at 57. It found that the numerous references to "States" as the obvious object of litigation

-17-

throughout the remedial scheme "dispelled" "[a]ny conceivable doubt" about Congress' intentions. *Id.*

Supreme Court precedent since *Seminole* has reaffirmed that affirmed that abrogation may be unmistakably clear even in the absence of an express abrogation clause. Neither the Family Medical Leave Act ("FMLA"), nor the Age Discrimination in Employment Act ("ADEA") contain express abrogation clauses. Yet, the Supreme Court has recognized that both statutes contain sufficiently clear statements of Congress' intent to abrogate sovereign immunity. *Hibbs*, 538 U.S. at 726 (FMLA); *Kimel*, 528 U.S. at 73 (ADEA). In both *Hibbs* and *Kimel,* the laws at issue enabled employees to seek damages "against any employer (including a public agency)" and defined "public agency" to include both "the government of a State or political subdivision thereof" and "any agency of . . . a State, or a political subdivision of a State." *Hibbs*, 538 U.S. at 726 (quoting 29 U.S.C. §§ 2617(a)(2), 203(x), 2611(4)(A)(iii)); *see Kimel*, 528 U.S. at 73-74 (citing 29 U.S.C. §§ 216(b), 203(x)). According to the Court, the fact that these laws allowed plaintiffs to seek equitable relief or damages from the States served as an "unmistakably clear"

-18-

statement of congressional intent to abrogate state sovereign immunity. *Hibbs*, 538 U.S. at 726; *Kimel* 528 U.S. at 74.

While the VRA does not have an explicit abrogation clause, it does contain a sufficiently clear statement of abrogation recognized by Supreme Court precedent. As with the statute at issue in *Seminole Tribe,* the VRA clearly proscribes state conduct, insofar as it includes numerous references to "State[s]" as subject to the Act in a way which dispels "[a]ny conceivable doubt as to the identity of the defendant" as a state. 517 U.S. at 57. Section 2 explicitly identifies and forbids "any State" from acting to deny or abridge the "right of any citizen . . . to vote on account of race."[4] 52 U.S.C.A. § 10301(a); *see also Gingles v. Edmisten*, 590 F. Supp. 345, 355–56 (E.D.N.C. 1984) (describing Section 2 as creating a "judicial remedy by *private action* . . . . Specifically, this remedy is designed to provide a means for bringing *[S]tates* . . . into compliance with constitutional guarantees of equal voting rights") (emphasis added), *aff'd in part, rev'd in part sub nom.*, *Thornburg v. Gingles*, 478 U.S. 30 (1986). "With respect to whether Congress intended to abrogate the States'

---

[4]     The VRA also permits a "prevailing party, *other than the United States*," to seek attorney's fees. 52 U.S.C. § 10310(e) (emphasis added); *see Fitzpatrickv. Bitzer*, 427 U.S. 445, 456-57 (1976) (referencing an attorney's fees provision in determining whether Title VII abrogated state sovereign immunity).

-19-

sovereign immunity under the [VRA], we believe the language and purpose of the statute indicate an affirmative response." *Mixon*, 193 F.3d at 398.

Furthermore, as described *supra* at 9-13, and as was deemed sufficiently clear abrogation in *Kimel*, together Sections 2 and 3 of the VRA "clearly provide[ ] for suits by individuals against States." *Kimel*, 528 U.S. at 73.

As the Supreme Court has repeatedly recognized, Congress' intent to abrogate sovereign immunity is just as obvious when it clearly allows for private actions against a State as when it includes an "abrogation clause." The VRA's clear private enforcement provisions, its proscription of state conduct, and its remedial scheme are predicated on suits against States and demonstrate "not debatable" that the VRA abrogates state sovereign immunity. *Hibbs*, 538 U.S. at 726; *see Seminole Tribe*, 517 U.S. at 57; *Kimel* 528 U.S. at 74.

## C.    The District Court Misconstrued the Text and Design of the VRA.

Despite the VRA's explicit authorization of private actions against state actors in terms that are nearly identical to the statutes at issue in *Hibbs* and *Kimmel*, the district court held that the VRA was "ambiguous."

*Lewis*, 2017 WL 432464, at \*10. In so finding, it rejected all of the prevailing authority on the issue, including *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999), where the Sixth Circuit held that the VRA abrogates state sovereign immunity. The district court criticized the Sixth Circuit for only considering the issue briefly and failing to "even mention that the plaintiffs were proceeding under an *implied* right of action." *Lewis*, 2017 WL 432464, at \*10. However, contrary to the district court's mischaracterizations, the Sixth Circuit considered the issue in depth because it was necessary to resolve whether the court had proper jurisdiction. *Mixon*, 193 F.3d at 397. The Sixth Circuit held that both the "language and purpose" of Section 2—which, explicitly prohibits state conduct, *see supra* at 19-20—demonstrate that Congress abrogated state sovereign immunity in passing the VRA. *Id.* at 398. Furthermore, the district court's heavy reliance on the private right of action as merely "implied" in its reasoning is—as discussed *supra* at 9-13, 19—neither a current, nor a fair reading of the VRA. *Lewis*, 2017 WL 432464, at \*10 ("Notably, when private plaintiffs sue under Section 2 of the VRA, they do so only through an 'implied private right of action.'"). Thus, the district

court's split with precedent from a sister circuit was without justification and based on an erroneous reading of the VRA's current text.

Unfortunately, the district court's erroneous holding may already have had ramifications outside this case. Shortly after the decision below, another district court in Alabama erroneously held that Section 3 did not create a private right of action under Section 2 and relied on that finding to hold that the VRA does not abrogate sovereign immunity. *Greater Birmingham Ministries v. Alabama*, No. 2:15-CV-02193, 2017 WL 782776, at *12 & n.18 (N.D. Ala. Mar. 1, 2017) ("[T]he implication is that after the 1975 amendments, individuals may name States as defendants in suing under Section 3, it is just that: an implication, and not even one regarding Section 2.").

But that argument is without merit because it ignores how the various sections of the VRA are complimentary and reinforce one another. Section 3 of the VRA is an enforcement provision that defines the remedies for suits brought under other provisions of the VRA or "any [other] statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State." 52 U.S.C.A. § 10302(a), (b), (c); *see also Morse*, 517 U.S. at 233-34. Indeed, courts have repeatedly invoked

the Section 3 remedial measures for violations of the VRA or the Constitution. *See, e.g.*, *Patino v. City of Pasadena*, No. CV H-14-3241, 2017 WL 68467, at \*49-50 (S.D. Tex. Jan. 6, 2017) (ordering preclearance under Section 3(c) after finding a violation of Section 2 and the Constitution); *United States v. Sandoval Cty.*, 797 F. Supp. 2d 1249, 1256 (D. N.M. 2011) (ordering election observers under Section 3(a) after finding a violation of Section 203); *United States v. Brown*, No. 4:05CV33TSL-LRA, 2007 WL 2461965, at \*4 (S.D. Miss. Aug. 27, 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) (ordering relief under Section 3(a) to address a violation of Section 2); *United States v. Berks Cty.*, 277 F. Supp. 2d 570, 581 (E.D. Pa. 2003) (ordering federal observers under Section 3(a) after finding a violation of Section 2); *Jeffers v. Clinton*, 740 F. Supp. 585, 601 (E.D. Ark. 1990) (ordering relief under Section 3(c) in a remedial hearing on a Section 2 violation); *Windy Boy v. Big Horn Cty.*, 647 F. Supp. 1002, 1023 (D. Mont. 1986) (ordering relief under Section 3 after finding a violation of Section 2); *McMillan v. Escambia Cty.*, 559 F. Supp. 720, 729 (N.D. Fla. 1983) (ordering relief under Section 3 after finding Section 2 and constitutional violations). Thus, a strained reading of the

-23-

VRA that severs Sections 2 and 3 not only misreads the plain text of Section 3, but also contradicts precedent from across the federal courts.

Similar attempts to find ambiguity concerning abrogation by severing portions of a statute have been rejected. In *Kimel,* respondents attempted to characterize the ADEA as ambiguous by arguing that its enforcement provision should be read separately from the rest of the statute and that—standing alone—the enforcement provision did not sufficiently restate the availability of suits against States. 528 U.S. at 74. The Court rejected this argument, categorically finding that there was no ambiguity since the statute at issue must be considered as a whole. *Id*. Here, this Court should similarly reject any attempt to argue that Section 2 is ambiguous when the enforcement provisions of Section 3 explicitly create a private right of action to enforce the entirety of the VRA.

In sum, the conclusion that the VRA abrogates sovereign immunity is compelled by the statute's text and history. On numerous occasions and through multiple amendments to the VRA, Congress has been unequivocal in its desire to abrogate state sovereign immunity. Prior to the district court's decision below, this conclusion was also unanimous among the courts. As this Court has previously said of the VRA: "it is a

small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process." *Marengo Cty. Comm'n*, 731 F.2d at 1561. *Amici* urge this to correct this error of law before it further damages private parties' ability to vindicate their voting rights in the states where they reside.

## II. Regardless of Sovereign Immunity, Plaintiffs Can Sue Officers for Declaratory and Injunctive Relief Pursuant to *Ex Parte Young.*

As discussed above, the district court's failure to recognize the clear abrogation of sovereign immunity within the VRA is a serious error with potential significant negative ramifications in the enforcement of voting rights. The district court has compounded its error by failing to recognize and apply the century-old *Ex Parte Young* exception to sovereign immunity for injunctive relief actions against state officials. The result is a federal district court opinion that closes the door on private actions challenging discriminatory state voting practices pursuant to the VRA in contravention of the text and history of the statute. These errors must be corrected.

The opinion below states: "Even if Plaintiffs had Article III standing (and they do not), and even if Plaintiffs' claim was cognizable under

Section 2 of the Voting Rights Act (and, again, it is not), their *claims against the Attorney General and the State* are still barred by the doctrine of Sovereign Immunity." *Lewis*, 2017 WL 432464, at *9 (emphasis added). Thus, the district court concluded that its determination that the VRA does not abrogate sovereign immunity (again, incorrect) automatically barred claims not only against the State, but also against officers of the State, such as the Attorney General. In so doing, the Court ignored over a hundred years of Supreme Court case law establishing that private plaintiffs can bring suits against state officials in their official capacities for injunctive relief, notwithstanding state sovereign immunity. *Ex Parte Young*, 209 U.S. 123 (1908); *see also Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011) ("Under the doctrine enunciated in *Ex Parte Young,* however, a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." (internal citation omitted)).

While the district court cited *Ex Parte Young* once separately in its discussion on standing, *Lewis*, 2017 WL 432464, at *5, it conducted no independent or meaningful *Ex Parte Young* analysis. Moreover, by its

-26-

own terms, it held that sovereign immunity barred Plaintiffs' claims against the Attorney General *regardless* of its standing analysis. *Id*. at *9, (concluding that sovereign immunity barred claims against the Attorney General "[e]ven if Plaintiffs had Article III standing"). Thus, it bypassed *Ex Parte Young* altogether in its sovereign immunity analysis.

The *Ex Parte Young* doctrine has been instrumental in allowing private plaintiffs to vindicate their constitutional rights and protect themselves from all types of unlawful and unconstitutional state action for over 100 years. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974) ("[*Young*] has permitted the Civil War Amendments . . . to serve as a sword, rather than merely as a shield, for those whom they were designated to protect."); John C. Jefferies, Jr. et al., Civil Rights Actions: Enforcing the Constitution 7 (2d. ed. 2007) (arguing that without *Young* "the entire class of modern civil rights litigation would be excluded from the federal courts"). This is particularly important because private-attorney-general actions, like this one, are "the chosen instrument of Congress" to vindicate most civil-rights laws. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418 (1978); *Allen*, 393 U.S. at 556. Without robust private enforcement of civil rights statutes, not only do individual

wrongs go uncorrected, but "the congressional polic[ies] which [private plaintiffs] seek[] to assert and vindicate go[] unvindicated; and the entire Nation, not just the individual citizen[s], suffer." *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) (quoting 122 Cong. Rec. 33313 (1976)).

To invoke the *Ex parte Young* doctrine, "the complaint [must] include claims against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect." *Mayfield v. Texas Dep't of Crim. Just.*, 529 F.3d 599, 605 (5th Cir. 2008) (citation and quotation marks omitted). If properly invoked, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 248 (2011) (citation omitted). The requirement of an allegation of an ongoing violation of federal law "does not mean that the enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit" but rather only requires "the relief sought [to be] prospective in nature." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999). In other words, the

doctrine "does not demand that a plaintiff first risk . . . enforcement in order to test the validity of a state law." *Id.*

Plaintiffs' amended complaint alleges claims of ongoing violations of the VRA against then-Alabama Attorney General Luther Strange (now Attorney General Steve Marshall) in his official capacity and seeks declaratory and injunctive relief. Amended Complaint at 6-7, 36-37, 48, *Lewis v. Bentley*, No. 2:16 -cv- 690 (June 30, 2016), ECF No. 18 (seeking a declaration that Act 2016-18 "violates . . . § 2 of the Voting Rights Act" and an order "[d]irecting [the Attorney General] to give notice to Alabama legislators and to members of the public that Act 2016-18 contravenes § 2 of the Voting Rights Act"). Therefore, Plaintiffs should have satisfied this "straightforward inquiry." *Virginia Office for Prot. & Advocacy*, 563 U.S. at 248. At a minimum, the district court erred in failing to engage in this analysis. *See Georgia Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1260 n.5 (11th Cir. 2012) (holding that the Governor is a proper party in a challenge to the State's immigration law because he had sufficient, albeit indirect, responsibility for its enforcement).

-29-

### III.   The Continued Importance of Private Enforcement of the Voting Rights Act and of the *Ex Parte Young* Doctrine

In the wake of *Shelby County v. Holder*—invaliding the "coverage formula" in Section 4(b) of the VRA and thus gutting its preclearance mechanism—Section 2 is the primary vehicle available for protecting every citizen's right to vote free from racial discrimination. 133 S. Ct. 2612, 2631 (2013) ("Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2."). Immediately after the decision in *Shelby County*, several formerly covered states changed their voting practices to the detriment of minority voters, demonstrating the absolute necessity of robust Section 2 enforcement in the absence of preclearance. *See, e.g., McCrory*, 831 F.3d at 214-16 (discussing the adoption of various discriminatory voting restrictions that targeted voters of color with "surgical precision" immediately after *Shelby County*); *Veasey,* 830 F.3d at 216 (finding that Texas' voter photo identification law, put into force immediately after *Shelby County*, violates the VRA), 2017 WL 1315593 (finding that Texas' voter ID law was intentionally discriminatory); *Greater Birmingham Ministries v. Merrill*, No. 2:15-CV-02193, 2017 WL 2471065, at *4 (N.D. Ala. April 6, 2017) (finding, on a motion to dismiss, that Alabama's failure

-30-

to preclear its voter photo identification law was one of many facts that "plausibly demonstrat[ed]" discriminatory intent); NAACP LDF, *Democracy Diminished: State and Local Threats to Voting Post*-Shelby County, Alabama v. Holder (2016), https://goo.gl/sg5NFu (collecting examples of post-*Shelby County* changes).

Yet, the district court's opinion below effectively closes the door on private Section 2 suits against state actors by ignoring the VRA's clear abrogation of sovereign immunity and refusing to engage in a proper *Ex Parte Young* analysis. This directly contravenes the text, spirit, and intent of Section 2. *See* S. Rep. 97–417 at 30 ("The committee reiterates the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965"); *see also Morse*, 517 U.S. at 233; *Allen*, 393 U.S. at 556 ("The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General."). This Court should reverse the district court and reaffirm the availability of private rights of action pursuant to the VRA and *Ex Parte Young*.

-31-

## Conclusion

For the foregoing, reasons, we urge this Court to correct the district court's errors and clarify that Section 2 abrogates state sovereign immunity and *Ex Parte Young* officer liability applies as usual. Because the district court made numerous other errors of law in its opinion below, as illustrated in Appellants' brief and other the briefs of other *amici*, *Amici* urge this Court to reverse and remand.

Dated: June 12, 2017                      Respectfully submitted,

/s/ *Elizabeth A. Reese*                    /s/ *Danielle Lang*
SHERRILYN IFILL                         PAUL M. SMITH
  Director-Counsel                      J. GERALD HEBERT
JANAI NELSON                            DANIELLE LANG
CHRISTINA SWARNS                         *Eleventh Circuit application
LEAH C. ADEN                              for admission pending*
DEUEL ROSS                              Campaign Legal Center
NAACP LEGAL DEFENSE &                   1411 K Street NW, Suite 1400
  EDUCATIONAL FUND, INC.                Washington, DC  20005
40 Rector Street, 5th Floor             (202) 736-2200
New York, NY 10006
Telephone: (212) 965-2200

COTY MONTAG
ELIZABETH A. REESE
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
1444 I Street NW
Washington, DC 20005
Telephone: (202) 682-1300          *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-face and volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(g)(1). The type face is fourteen-point Century Schoolbook font, and there are 6,700 words.

/s/ Elizabeth A. Reese
ELIZABETH A. REESE
NAACP Legal Defense &
　Educational Fund, Inc.
1444 I Street, NW
Washington, D.C. 10005
Telephone: (202) 682-1300

## CERTIFICATE OF SERVICE

I certify that on June 12, 2017, I filed the foregoing brief of *Amici Curiae*

NAACP Legal Defense and Educational Fund, Inc. and Campaign Legal

Center using the Court's CM/ECF system, which will serve a copy of the

document on all counsel of record.

*/s/ Elizabeth A. Reese*
ELIZABETH A. REESE
NAACP Legal Defense &
  Educational Fund, Inc.
1444 I Street, NW
Washington, D.C. 10005
Telephone: (202) 682-1300

-34-