No. 17-11009

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

◆

MARNIKA LEWIS, et al.,
*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, et al.,
*Defendants-Appellees*.

◆

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP

## BRIEF OF APPELLEES STATE OF ALABAMA AND ALABAMA ATTORNEY GENERAL STEVE MARSHALL

Steve Marshall
    *Attorney General*

Andrew L. Brasher
    *Solicitor General*

William G. Parker, Jr.
    *Chief Deputy General Counsel*

James W. Davis
    *Deputy Attorney General*

STATE OF ALABAMA
OFFICE OF THE GOVERNOR
600 Dexter Avenue
Montgomery, AL 36130
(334) 353-7581

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300

*Counsel for Appellee State of Alabama*

*Counsel for Appellees State of Alabama
& Attorney General Steve Marshall*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, the following persons and entities are all persons and entities known to undersigned counsel to have an interest in the outcome of this appeal:

1.    Adams, Antoin – Plaintiff-Appellant

2.    Aden, Leah – Counsel for *Amicus Curiae*

3.    Alabama Legislative Black Caucus – Plaintiff-Appellant

4.    Alabama State Conference of the National Association for the Advancement of Colored People – Plaintiff-Appellant

5.    Alexander, Louise – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

6.    Ashmore, Susan – *Amicus Curiae*

7.    Bandy, George – Member of the Alabama Legislative Black Caucus

8.    Beach, Benjamin, The Partnership for Working Families – counsel for *Amicus Curiae*

9.    Bell, William A., Mayor of Birmingham, AL – Defendant-Appellee

10.    Bentley, Robert J., former Governor of the State of Alabama - Defendant

11.    Blacksher, James U. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof

12.    Boyd, Barbara – Member of the Alabama Legislative Black Caucus.

13.    Bracy, Napoleon – Member of the Alabama Legislative Black Caucus

*Lewis v. Alabama*
No. 17-11009

14.  Brasher, Andrew Lynn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall

15.  Brooke, Samuel, Southern Poverty Law Center, Counsel for *Amicus Curiae*

16.  Brown, Eric P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

17.  Buskey, James – Member of the Alabama Legislative Black Caucus

18.  Byrne, David B., Jr. – former Counsel for former Governor Robert J. Bentley

19.  Carlson, Mary Joyce – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

20.  Campaign Legal Center – *Amicus Curiae*

21.  Chen, Miya Saika, The Partnership for Working Families (counsel for *Amicus Curiae*)

22.  Chisholm, Barbara J. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

23.  Chrishon, Jamie – Member of NAACP, resident of the City of Birmingham (see Amended Complaint, Doc. 18, ¶ 2)

24.  City of Birmingham, Alabama – Defendant-Appellee

25.  Clarke, Adline – Member of the Alabama Legislative Black Caucus.

26.  Clemon, U.W. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof

27.  Coleman, Linda – Member of the Alabama Legislative Black Caucus

28.    Coleman-Evans, Merika – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

29.    Connor, Glen M. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

30.    Cornelius, Staci G. – U.S. Magistrate Judge, Northern District, Alabama

31.    Daniels, Anthony – Member of the Alabama Legislative Black Caucus

32.    Davies, George N. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

33.    Davis, James W. – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall

34.    Drummond, Barbara – Member of the Alabama Legislative Black Caucus

35.    Dunn, Priscilla – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

36.    Edward Still Law Firm, LLC - Firm of Appellants' counsel (Edward Still)

37.    England, Chris – Member of the Alabama Legislative Black Caucus

38.    Figures, Vivian – Member of the Alabama Legislative Black Caucus

39.    Flynt, J. Wayne – *Amicus Curiae*

40.    Forte, Berry – Member of the Alabama Legislative Black Caucus

41.    Freeman-Wilson, Karen – *Amicus Curiae*

42.    Fullerton, Fredric – Counsel for Defendants-Appellees the City of Birmingham and Mayor William A. Bell

43.    Givan, Juandalynn – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

44.    Greater Birmingham Ministries – Plaintiff-Appellant

45.    Greenbaum, Jon – Counsel for *Amicus Curiae*

46.    Grimsley, Dexter – Member of the Alabama Legislative Black Caucus

47.    Hall, Laura – Member of the Alabama Legislative Black Caucus

48.    Handley, Dr. Lisa R. – Plaintiffs' expert

49.    Hebert, J. Gerald –  Counsel for *Amicus Curiae*

50.    Hollis, Rolanda – Member of the Alabama Legislative Black Caucus

51.    Holmes, Alvin – Member of the Alabama Legislative Black Caucus

52.    Howard, Ralph – Member of the Alabama Legislative Black Caucus

53.    Ifill, Sherrilyn – Counsel for *Amicus Curiae*

54.    Jackson, Thomas – Member of the Alabama Legislative Black Caucus

55.    Jeffries, Hasan – *Amicus Curiae*

56.    Karlan, Pamela S. – Counsel for *Amicus Curiae*

57.    Knight, Jr., John – Member of the Alabama Legislative Black Caucus

58.    Kousser, J. Morgan – *Amicus Curiae*

59.    Lang, Danielle – Counsel for *Amicus Curiae*

60.    Law Office of Mary Joyce Carlson - Firm of Appellants' counsel (Mary Joyce Carlson)

61.   Lawrence, Kayla – Counsel for Defendants-Appellees the City of Birmingham and Mayor William A. Bell

62.   Lawrence, Kelvin – Member of the Alabama Legislative Black Caucus

63.   Lawyers' Committee for Civil Rights *Amicus Curiae*

64.   Lee, Bill Lann, Civil Rights Education and Enforcement Center – Counsel for *Amicus Curiae*

65.   Levy Ratner, PC - Firm of Appellants' counsel (Robert H. Stroup)

66.   Lewis, Marnika – Plaintiff-Appellant

67.   Local Progress – *Amicus Curiae*

68.   Marshall, Steve – Attorney General of Alabama, Defendant-Appellee

69.   McCampbell, A.J. – Member of the Alabama Legislative Black Caucus

70.   McClammy, Thad – Member of the Alabama Legislative Black Caucus

71.   McCrary, Peyton – *Amicus Curiae*

72.   Montag, Coty – Counsel for *Amicus Curiae*

73.   Moore, Mary – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

74.   Muhammad, William - Appellant

75.   NAACP Legal Defense and Educational Fund, Inc. – *Amicus Curiae*

76.   Nelson, Janai – Counsel for *Amicus Curiae*

77.   New Pilgrim Baptist Church - (see Amended Complaint, Doc. 18, ¶ 5)

78.   Parker, William Glenn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

79.    Partnership for Working Families – *Amicus  Curiae*

80.    Proctor, R. David, U. S. District Court Judge, Northern District, Alabama

81.    Quinn Connor Weaver Davies & Rouco, LLP - Firm of Appellants' counsel (Glen M. Connor)

82.    Reed, Kasim – *Amicus Curiae*

83.    Reese, Elizabeth A. – Counsel for *Amicus Curiae*

84.    Robertson, Amy F., Civil Rights and Education Center – Counsel for *Amicus Curiae*

85.    Robinson, Oliver - Appellant

86.    Rodriguez, Dariely – Counsel for *Amicus Curiae*

87.    Rogers, John – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

88.    Rosenberg, Ezra – Counsel for *Amicus Curiae*

89.    Ross, Deuel – Counsel for *Amicus Curiae*

90.    Ross, Quinton – Member of the Alabama Legislative Black Caucus

91.    Rouco, Richard P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

92.    Sanders, Hank – Member of the Alabama Legislative Black Caucus

93.    Scott, Rod – Member of the Alabama Legislative Black Caucus

94.    Silverstein, Thomas – Counsel for *Amicus Curiae*

95.    Singleton, Bobby – Member of the Alabama Legislative Black Caucus

96.  Smith, Paul – counsel for *Amicus Curiae*

97.  Smitherman, Rodger – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

98.  Southern Poverty Law Center – *Amicus Curiae*

99.  State of Alabama – Defendant-Appellee

100.  Still, Edward – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof

101.  Stroup, Robert H. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

102.  Sullivan, Patricia – *Amicus Curiae*

103.  Swarns, Christina – Counsel for *Amicus Curiae*

104.  U.W. Clemon, LLC - Firm of Appellants' counsel

105.  Vance, Joyce White – Counsel for *Amicus Curiae*

106.  Warren, Pebblin – Member of the Alabama Legislative Black Caucus

107.  Whatley, Joe R. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

108.  Whatley Kallas, LLP – Firm of Appellants' counsel

109.  White, Arnold and Dowd – Former law firm of Appellants' counsel (U.W. Clemon)

No publicly traded company or corporation has an interest in the outcome of the

case.

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is unnecessary in this case. At issue is the validity of a race- and voting-rights-based challenge to an Alabama law prescribing a uniform, statewide minimum wage. Evaluating its jurisdiction, the District Court recognized this as an attempt to manufacture an unauthorized federal lawsuit, given that each of the defendants either (a) play no role in enforcing the challenged law or (b) enjoy absolute sovereign immunity. Beyond that, on the merits, the District Court also recognized the appellants' lawsuit as an attempt, through clever pleading, to circumvent the deferential rational-basis standard to which the minimum-wage law would ordinarily be entitled. For these reasons, it granted both Rule 12(b)(1) and Rule 12(b)(6) dismissal of the amended complaint in its entirety.

The public policy issues involved in this case may merit more public discussion. But the legal issues do not. Each one involves a straightforward application of existing legal doctrine. Granting oral argument would simply prolong the inevitable outcome in this case, which is to affirm on all counts.

# TABLE OF CONTENTS

Certificate of Interested Persons and  Corporate Disclosure Statement.................C1

Statement Regarding Oral Argument ......................................................................... i

Table of Citations................................................................................................... iv

Introduction ...........................................................................................................1

Statement of the Issues............................................................................................2

Statement of the Case..............................................................................................4

      A.    Following other States' lead, Alabama enacted a uniform minimum wage to maintain stability in the State's business climate. ...........................................................................................5

      B.    Suing defendants who do not enforce the minimum-wage law, the plaintiffs claimed racial discrimination. ...................9

      C.    The District Court dismissed the amended complaint. ........................11

      D.    This Court should affirm unless the amended complaint contained allegations "showing" the appellants' entitlement to relief.............................................................................13

Summary of the Argument......................................................................................15

Argument..............................................................................................................16

I.    The Court properly dismissed the amended complaint for lack of jurisdiction. ..................................................................................................16

      A.    The plaintiffs lack standing to sue the Alabama Attorney General, the City of Birmingham, or Mayor Bell. .............................17

      B.    The plaintiffs' one claim against the State of Alabama is barred by sovereign immunity...........................................................21

II.    The complaint fails to state a valid claim on the merits.............................26

      A.    The Minimum Wage Act does not discriminate based on race. ...............................................................................................26

ii

1.      The law does not facially discriminate based on race (Count IX). ....................................................................................26

2.      The law does not effectively discriminate based on race (Counts I, IV, VII, VIII). .....................................................30

B.    The Minimum Wage Act does not implicate voting rights (Counts I, IV). ...................................................................36

Conclusion ...............................................................................................40

Certificate of Filing and Service ............................................................41

Certificate of Compliance with Type-Volume Limit,  Typeface Requirements, and Type-Style Requirements ...........................................41

## TABLE OF CITATIONS

**<u>Cases</u>**

*Ala. Democratic Conf. v. Strange*,
No. 5:11-cv-2449-JEO (N.D. Ala. Dec. 14, 2011) ............................................. 38

*Alabama v. Pugh*,
438 U.S. 781 (1978) ........................................................................................... 22

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ................................................................... 13, 14

*\*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... passim

*Atascadero State Hosp. v. Scanlon*,
473 U.S. 234 (1985) ........................................................................................... 23

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) ........................................................................................... 22

*\*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................. 13, 14, 31

*Beneficial Consumer Disc. Co. v. Poltonowicz*,
47 F.3d 91 (3d Cir. 1995) ................................................................................. 23

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993) ........................................................................................... 36

*City of Vestavia Hills v. Gen. Fid. Ins. Co.*,
676 F.3d 1310 (11th Cir. 2012) ......................................................................... 20

*Crawford v. Bd. of Educ. of City of L.A.*,
458 U.S. 527 (1982) ........................................................................................... 31

*Cressman v. Thompson*,
719 F.3d 1139 (10th Cir. 2013) ................................................................... 18, 25

*DeBartolo Corp. v. Fla. Gulf Coast Trades Council*,
485 U.S. 568 (1988) ........................................................................................... 39

*Dillard v. Chilton Cty. Comm'n*,
495 F.3d 1324 (11th Cir. 2007) ......................................................................... 17

*Doe v. Pryor,
  344 F.3d 1282 (11th Cir. 2003) ...............................................21

Dorsey v. U.S. Dep't of Labor,
  41 F.3d 1551 (D.C. Cir. 1994)................................................23

E&T Realty v. Strickland,
  830 F.2d 1107 (11th Cir. 1987) ..............................................26

Ex parte Young,
  209 U.S. 123 (1908)......................................................... 23, 25

Flemming v. Nestor,
  363 U.S. 603 (1960)...............................................................32

Focus on the Family v. Pinellas Suncoast Trans. Auth.,
  344 F.3d 1263 (11th Cir. 2003) ..............................................19

Ford v. Strange,
  580 Fed. App'x 701 (11th Cir. 2014) .....................................22

Hall v. Louisiana,
  983 F. Supp. 2d 820 (M.D. La. 2013).....................................24

Hare v. Kennerly,
  3 So. 683 (Ala. 1888)...............................................................5

Hayden v. Paterson,
  594 F.3d 150 (2d Cir. 2010) ...................................................32

Hoffman–Pugh v. Ramsey,
  312 F.3d 1222 (11th Cir. 2002) ..............................................13

Holder v. Hall,
  512 U.S. 874 (1994)................................................................38

Hunter v. Erickson,
  393 U.S. 385 (1969)................................................................27

Hunter v. Underwood,
  471 U.S. 222 (1985)....................................................... 32, 33, 34

I.L. v. Alabama,
  739 F.3d 1273 (11th Cir. 2014) ..............................................32

*Jabary v. City of Allen*,
   547 F. App'x 600 (5th Cir. 2013) ........................................................12

*Johnson v. Governor of Fla.*,
   405 F.3d 1214 (11th Cir. 2005) .........................................................39

*Lord Abbett Mun. Income Fund, Inc. v. Tyson*,
   671 F.3d 1203 (11th Cir. 2012) .........................................................13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)..........................................................................18

*McCleskey v. Kemp*,
   481 U.S. 279 (1987).................................................................... 33, 34

*Meriwether v. Garrett*,
   102 U.S. 472 (1880).............................................................................5

*Mixon v. Ohio*,
   193 F.3d 389 (6th Cir. 1999) ...................................................... 24, 38

*Morse v. Republican Party of Va.*,
   517 U.S. 186 (1996)..........................................................................22

*Mulhall v. UNITE HERE Local 355*,
    618 F.3d 1279 (11th Cir. 2010) ........................................................21

*N.C. State Conf. of the N.A.A.C.P. v. McCrory*,
   156 F. Supp. 3d 683 (M.D.N.C. 2016) .............................................35

*New Orleans Campaign for a Living Wage v. City of New Orleans*,
   825 So. 2d 1098 (La. 2002) .......................................................... 8, 33

*Personnel Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979).................................................................... 31, 32

*Phillips v. Snyder*,
   836 F.3d 707 (6th Cir. 2016) ............................................................38

*Planned Parenthood of Idaho, Inc. v. Wasden*,
   376 F.3d 908 (9th Cir. 2004) ............................................................18

*Presley v. Etowah County Commission*,
   502 U.S. 491 (1992)..........................................................................37

vi

*Raines v. Byrd*,
   521 U.S. 811 (1997)......................................................................17

*Rivell v. Private Health Care Sys., Inc.*,
   520 F.3d 1308 (11th Cir. 2008) ..................................................13

*Schuette v. Coal. to Defend Affirmative Action*,
   572 U.S. ___, 134 S. Ct. 1623 (2014)............................. 27, 28, 29, 30

*Seminole Tribe of Fla. v. Florida*,
   517 U.S. 44 (1996)......................................................................22

*Sinaltrainal v. Coca–Cola Co.*,
   578 F.3d 1252 (11th Cir. 2009) ..................................................13

*Smith v. Doe*,
   538 U.S. 84 (2003)......................................................................32

*Socialist Workers Party v. Leahy*,
   145 F.3d 1240 (11th Cir. 1998) ..................................................18

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)....................................................................17

*Summit Med. Assocs., P.C. v. Pryor*,
   180 F.3d 1326 (11th Cir. 1999) ..................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................5

*Terrebonne Parish NAAACP v. Jindal*,
   154 F. Supp. 3d 354 (M.D. La. 2015)..........................................24

*United States v. Armstrong*,
   517 U.S. 456 (1996)....................................................................30

*Va. Office for Prot. & Advocacy v. Stewart*,
   563 U.S. 247 (2011).............................................................. 22, 23

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).............................................................. 34, 35

*W. Coast Hotel Co. v. Parrish*,
   300 U.S. 379 (1937)......................................................................1

vii

*Washington v. Seattle Sch. Dist. No. 1,*
    458 U.S. 457 (1982)................................................................ 27, 28, 29

*White v. State of Alabama,*
    867 F. Supp. 1519 (M.D. Ala. 1994) ..............................................24

*Women's Emergency Network v. Bush,*
    323 F.3d 937 (11th Cir. 2003) .......................................................25

## Constitutional Provisions

Ala. Const. art. I, § 14 ...............................................................................22

Ala. Const. art. IV, § 89 ..............................................................................5

Ala. Const. art. IV, § 106 ..........................................................................35

Ala. Const. art. IV, § 110 ..........................................................................35

U.S. Const. amend. XI ...............................................................................22

U.S. Const. amend. XV, § 1.......................................................................36

## Statutes

29 U.S.C. § 206(a) .......................................................................................6

52 U.S.C. § 10301(a) ........................................................................... 23, 37

52 U.S.C. § 10301(b). .................................................................................37

52 U.S.C. § 10308(d) ..................................................................................23

Ala. Code § 11-45-1......................................................................................5

Ala. Code § 13A-11-61.3 ..................................................................... 5, 8, 33

Ala. Code § 34-5-5........................................................................................5

Ala. Code § 40-17-357..................................................................................5

Ala. Code § 5-25-4........................................................................................5

Ark. Code Ann. § 11-4-221(b)......................................................................8

Colo. Rev. Stat. § 8-6-101(3)........................................................................8

Fla. Stat. § 218.077(2)................................................................................8

Ga. Code § 34-4-3.1(b) .............................................................................8

Idaho Code § 44-1502(4) ..........................................................................8

Ind. Code § 22-2-2-10.5(b) .......................................................................8

Iowa Code § 331.304(12) ..........................................................................8

Iowa Code § 364.3(12)...............................................................................8

Kan. Stat. Ann. § 12-16,131(a)(3) ............................................................8

La. Stat. § 23:642(B)..................................................................................8

Mich. Comp. Laws Ann. § 123.1385 .........................................................8

Miss. Code § 17-1-51(1) ............................................................................8

Mo. Ann. Stat. § 290.528 ...........................................................................8

N.C. Gen. Stat. § 95-25.1(c) ......................................................................8

Ohio Rev. Code § 4111.02..........................................................................8

40 Okla. Stat. Ann. § 160...........................................................................8

Or. Rev. Stat. § 653-017(2)........................................................................8

R.I. Gen. Laws § 28-12-25.........................................................................8

S.C. Code § 6-1-130(B) .............................................................................8

Tenn. Code § 50-2-112(a)(1) .....................................................................8

Tex. Lab. Code Ann. § 62.0515(a) .............................................................8

Utah Code § 34-40-106(1) .........................................................................8

Wis. Stat. § 104.001 ...................................................................................8

## Rules

Fed. R. Civ. P. 8(a)(2)........................................................................ 13, 15

Fed. R. Civ. P. 25(d) ................................................................................10

ix

Fed. R. Evid. 201 advisory committee's note.............................................................4

Fed. R. Evid. 201(b)..................................................................................................4

## Other Authorities

Alex Aubuchon, *Minimum Wage Bill May See House Vote, Alabama Names Failing Schools*,
Alabama Public Radio (Feb. 15, 2016) ..................................................................7

Alex Aubuchon, *Tuscaloosa Considers Minimum Wage Hike, Teachers May See Salary Increases*,
Alabama Public Radio (Jan. 25, 2016) ..................................................................7

Debra Burke et al., *Minimum Wage and Unemployment Rates: A Study of Contiguous Counties*,
46 GONZ. L. REV. 661 (2011) ........................................................................ 6, 33

Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES (3d ed. 2006)............................................................................................36

Kelsey Stein, *After Birmingham Minimum Wage Increase, Can It Happen Elsewhere? Tuscaloosa Rally Planned*,
AL.com (Sept. 23, 2015) ......................................................................................7

\* indicates authorities principally relied upon.

### INTRODUCTION

The District Court properly dismissed the plaintiffs' claims as implausible. At issue is the validity of a race- and voting-rights-based challenge to an Alabama law prescribing a uniform, statewide minimum wage. That law is reasonable, as demonstrated by empirical research. It was routine, as demonstrated by other Alabama preemption laws and some twenty-two similar laws enacted in other States. And it was timely, in light of one city's decision to pass its own local minimum-wage ordinance and rumblings that other cities would soon follow suit.

Every first-year law student learns that serious federal-court oversight of economic regulations like these ended with the *Lochner* era. *See, e.g., W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 400 (1937) (upholding a state minimum-wage law). To get around this, the appellants asserted a dizzying array of legal theories casting Alabama's minimum-wage law as state-sponsored racial discrimination. Although the plaintiffs have abandoned some of these theories on appeal, *see* Bl. Br. at 3 n.2, the claims that have survived are, as the District Court recognized, constructed on the untenable premise that virtually all laws enacted by the Alabama Legislature are rooted in intentional racism.

The amended complaint's most fundamental flaw, however, was far more basic: It failed to name any appropriate defendant who plays any role in actually enforcing the minimum-wage law. This deficiency, as the District Court also

properly concluded, deprived it of jurisdiction to reach the merits of the plaintiffs' claims.

The proper course here, in light of these realities, is to affirm the District Court's judgment dismissing the plaintiffs' claims. Any other decision would erroneously set the parties and the District Court itself down a path of costly and time-consuming, but ultimately meritless, litigation.

## STATEMENT OF THE ISSUES

The District Court dismissed the amended complaint, in its entirety, for lack of jurisdiction over the various defendants. Affirming on this basis would require this Court to decide the following two issues:

*1. Standing—Alabama Attorney General & City Defendants.* Article III of the Constitution requires federal-court plaintiffs to identify an injury that is fairly traceable to the defendants' action and likely to be redressed by a favorable decision. Neither the Alabama Attorney General nor the City Defendants enforce the minimum-wage law. Was the District Court correct to hold that the appellants lack standing to sue these defendants?

*2. Eleventh Amendment—State of Alabama.* Even where Congress has the power to abrogate a State's sovereign immunity, it may do so only through an "unmistakably clear" statutory command. The Voting Rights Act authorizes the federal government to sue a State to enforce Section 2 of that Act, but it does not

2

say anything at all about private litigants' ability to do so, and private plaintiffs must instead rely on an implied right of action. Was the District Court correct to hold that the State of Alabama is immune from the only claim against it—i.e., the appellants' claim under Section 2 of the Voting Rights Act?

*    *    *

If this Court disagrees with the District Court's jurisdictional holdings, then it must consider the sufficiency of the amended complaint on the merits. Although the plaintiffs have abandoned several of their claims on appeal, three overarching merits issues remain:

***3. Equal Protection Clause—Political Process Doctrine.*** Under the "political process" doctrine, a State may not remove from local decisionmakers authority over an issue that is inherently racial in nature. Alabama's minimum-wage law applies uniformly, regardless of race. Did the District Court correctly hold that the appellants have no valid political-process claim?

***4. Equal Protection Clause—Intentional Discrimination.*** A facially race-neutral statute will be treated as racial discrimination, and be struck down, if it (a) was motivated by intentional racism and (b) creates racially disparate results. Alabama's minimum-wage law applies uniformly across the State, approximates similar laws enacted by numerous other States and other preemption laws enacted in Alabama, and finds support in social-science research. Did the District Court cor-

3

rectly hold that the minimum-wage law does not plausibly discriminate based on race?

**5. *Voting Rights.*** The Fifteenth Amendment and Section 2 of the Voting Rights Act prohibit certain state actions that deny the right to vote. Alabama's minimum-wage law regulates employment conditions. Did the District Court correctly hold that the appellants have no voting-rights claim?

STATEMENT OF THE CASE

This section of the brief seeks first to summarize the minimum-wage law and place it in context and then, after that, to recount the relevant procedural history and set forth the standard of review.

To accomplish the first of these objectives, this brief does not confine itself to the four corners of the amended complaint. It instead includes facts of which this Court may take judicial notice. Some of these facts are "legislative facts"—i.e., facts relevant to the "lawmaking process" and broadly subject to judicial notice. *See* Fed. R. Evid. 201 advisory committee's note to 1972 proposed rules. Others may be judicially noticeable "adjudicative" facts—i.e., facts specific to this case but which are nevertheless beyond "reasonable dispute." *See* Fed. R. Evid. 201(b). To be clear, the state appellees' dismissal arguments do not *depend* on acceptance of any particular judicially noticeable fact. Nevertheless, such matters are among the "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to

4

dismiss." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). And these judicially noticeable facts, in particular, help demonstrate the implausibility of the appellants' claims.

> ### A.    Like twenty-two other States, Alabama enacted a uniform minimum wage to promote economic stability.

In Alabama, when it comes to matters of public policy, the state legislature reigns supreme—subject, of course, to state and federal constitutional limitations. Cities, on the other hand, exist as "mere creatures of the legislative power, established as political agencies for the more convenient administration of local government, with such powers . . . as the [legislature] may, from time to time, see fit to confer." *Hare v. Kennerly*, 3 So. 683, 684 (Ala. 1888) (citing *Meriwether v. Garrett*, 102 U.S. 472 (1880)). Emblematic of this relationship, Alabama cities are subject to a state version of the Supremacy Clause prohibiting them from "pass[ing] any laws inconsistent with the general laws of this state." Ala. Const. art. IV, § 89; *see also* Ala. Code § 11-45-1 (authorizing cities to "adopt ordinances" except as "inconsistent with the laws of the state"). The Legislature routinely enacts general preemption laws under this Clause. It has set uniform state policies on all manner of issues, from the licensure of barbers (Ala. Code § 34-5-5) and mortgage brokers (*id.* § 5-25-4) to the taxation of aviation fuel (*id.* § 40-17-357). Additionally, in 2013, it established a new, uniform state firearm policy. *See id.* § 13A-11-61.3.

5

The minimum-wage dispute described in the amended complaint played out against this backdrop of state legislative supremacy. Congress last adjusted the federal minimum wage in 2007. *See* 29 U.S.C. § 206(a). And in the ensuing years, the Alabama Legislature saw no reason to exceed that federal minimum, or even to enact any legislation addressing the issue at all. The Legislature's decision in this regard comported with empirical studies suggesting that minimum-wage policies may be ineffective in alleviating poverty and may actually reduce employment. *See, e.g.*, Debra Burke et al., *Minimum Wage and Unemployment Rates: A Study of Contiguous Counties*, 46 GONZ. L. REV. 661, 672-76 (2011) (surveying various economic studies).

The first salvo in the minimum-wage dispute came in the form of an April 2015 resolution by the Birmingham City Council urging the Legislature to exceed the federal minimum wage on a statewide basis. *See* doc. 18, ¶ 82. This initial action by the City Council set off a back-and-forth between the state legislature and local governments. When the Legislature did not immediately accede to the Council's proposal, the Council responded with a series of ordinances first adopting, and later expediting, a local minimum wage of its own. *See id.* ¶¶ 21, 24-25, 85, 90-92. Indeed, other cities, such as Huntsville and Tuscaloosa, threatened to adopt their

own local minimum-wage policies.[1] *Cf. id.* ¶ 100 ("speculation" that Montgomery may follow suit).

Faced with this looming economic disruption, state legislators proposed bills that would require statewide *adherence* to the federal minimum. These efforts did not succeed in the 2015 regular session or at a special session held later that year. *See id.* ¶¶ 84, 86-87. But then, in the early days of the Legislature's 2016 regular session—just as Birmingham's ordinance was set to go into effect—the Legislature enacted the Alabama Uniform Minimum Wage and Right-to-Work Act at issue in this lawsuit. *See* doc. 30-2 (Ala. Act No. 2016-18, *codified at* Ala. Code §§ 25-7-40 *et seq.*).

As its name suggests, the purpose of this Act is to "ensure that [labor] regulation and policy is applied uniformly throughout the state." Act No. 2016-18, § 6(a). It serves to establish the Legislature's "complete control" over not just minimum-wage policy but also other issues such as "collective bargaining under federal

---

[1] *See, e.g.*, Alex Aubuchon, *Minimum Wage Bill May See House Vote, Alabama Names Failing Schools*, Alabama Public Radio (Feb. 15, 2016), http://apr.org/post/minimum-wage-bill-may-see-house-vote-alabama-names-failing-schools; Alex Aubuchon, *Tuscaloosa Considers Minimum Wage Hike, Teachers May See Salary Increases*, Alabama Public Radio (Jan. 25, 2016), http://apr.org/post/tuscaloosa-considers-minimum-wage-hike-teachers-may-see-salary-increase; Kelsey Stein, *After Birmingham Minimum Wage Increase, Can It Happen Elsewhere? Tuscaloosa Rally Planned*, AL.com (Sept. 23, 2015), http://www.al.com/news/tuscaloosa/index.ssf/2015/09/after_birmingham_minimum_wage.html. These articles served an exhibit to the defendants' Rule 12 motion below. *See* doc. 30-1.

labor laws," and "the wages, leave, or other employment benefits provided by an employer" to its employees. *Id.* As courts have recognized, this would "preserve consistency in the wage market" and avoid a "competitive situation . . . lead[ing] to businesses locating in areas with [more favorable local labor regulations]." *New Orleans Campaign for a Living Wage v. City of New Orleans*, 825 So. 2d 1098, 1105-06 (La. 2002).

In these respects, the Act is run-of-the-mill preemption legislation. Indeed, much of the language in the Act's statement of purpose and general preemption provisions appear almost verbatim in the Legislature's 2013 gun law. *See* Ala. Code § 13A-11-61.3(a), (c), (e). In addition, the Act parallels similar legislation in at least twenty-two other States prohibiting localities from enacting their own minimum-wage ordinances.[2] Like Alabama, many of these States have tied their own statewide minimum wage to the federal standard.

With respect to the minimum wage in particular, the Act accomplishes its goals in two separate but overlapping ways. First, it prohibits local "mandate[s]"

---

[2] *See, e.g.*, Ark. Code Ann. § 11-4-221(b); Colo. Rev. Stat. § 8-6-101(3); Fla. Stat. § 218.077(2); Ga. Code § 34-4-3.1(b); Idaho Code § 44-1502(4); Ind. Code § 22-2-2-10.5(b); Iowa Code §§ 331.304(12) & 364.3(12); Kan. Stat. Ann. § 12-16,131(a)(3); La. Stat. § 23:642(B); Mich. Comp. Laws Ann. § 123.1385, § 5; Miss. Code § 17-1-51(1); Mo. Ann. Stat. § 290.528; N.C. Gen. Stat. § 95-25.1(c); Ohio Rev. Code § 4111.02; 40 Okla. Stat. Ann. § 160; Or. Rev. Stat. § 653-017(2); R.I. Gen. Laws § 28-12-25; S.C. Code § 6-1-130(B); Tenn. Code § 50-2-112(a)(1); Tex. Lab. Code Ann. § 62.0515(a); Utah Code § 34-40-106(1); Wis. Stat. § 104.001.

requiring employers to give their employees "any employment benefit, including . . . wage[s] . . . that is not required by state or federal law." Act No. 2016-18, § 2(b). Any local mandates "inconsistent" with this prohibition are "void." *Id.* § 2(c). Second, the Act contains a more general preemption clause:

> Except as otherwise provided in this act or as expressly authorized by a statute of this state, the Legislature hereby occupies and preempts the entire field of regulation in this state touching in any way upon collective bargaining under federal labor laws or the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor to the complete exclusion of any policy, ordinance, rule, or other mandate promulgated or enforced by any county, municipality, or other political subdivision of this state.

*Id.* § 6(b). Again, any "contrary" "existing" local mandate is "null and void," and "any future policy, ordinance, rule, or other mandate shall comply with this [requirement]." *Id.* § 6(d).

### B. Suing defendants who do not enforce the minimum-wage law, the plaintiffs claimed racial discrimination.

A couple of months after the Minimum Wage Act's passage, two low-wage workers and two public-interest groups sued Alabama's Governor and Attorney General claiming racial discrimination by the Alabama Legislature. *See* doc. 1 (original complaint). When the original defendants moved to dismiss, the original plaintiffs, adding various other new plaintiffs, chose to amend their complaint rather than to defend it. *See* doc. 18. Most prominently, the amended complaint ex-

panded the theories of liability, asserting a flurry of novel claims under the Thirteenth Amendment, the Fourteenth Amendment's Privileges or Immunities Clause, the Fifteenth Amendment, and Section 2 of the Voting Rights Act—all in addition to their original, more conventional equal-protection theories. *Compare* doc. 1, ¶¶ 48-64 (original complaint) *with* doc. 18, ¶¶ 104-45 (amended complaint).

Just as notable as these substantive revisions was the new lineup of defendants and their relationship (or lack thereof) to the minimum-wage law. The amended complaint dropped the Alabama Governor as a defendant but retained then-Alabama Attorney General Luther Strange, who was sued in his official capacity based on his general duties as Alabama's "chief legal officer" as well as a "press release" he issued concerning the Birmingham minimum-wage ordinance "prior to [its] effective date." Doc. 18, ¶¶ 12-13; *see also id.* ¶¶ 14-15. (While this case was pending on appeal, Steve Marshall became Alabama Attorney General and is thus "automatically substituted as a party." Fed. R. Civ. P. 25(d).) Joining the Alabama Attorney General as defendants were the State of Alabama, the City of Birmingham, and Birmingham Mayor William Bell. *See id.* ¶¶ 11, 16-17. The amended complaint named the State of Alabama as a defendant, but only for purposes of the Voting Rights Act claim. *See id.* ¶ 11. The Birmingham city defendants, meanwhile, were purportedly sued "only for the purpose of providing complete relief" to the plaintiffs. *Id.* ¶ 18 (emphasis omitted).

### C.    The District Court dismissed the amended complaint.

After extensive briefing and oral argument, the District Court dismissed the amended complaint in its entirety. As an initial matter, the District Court concluded that it lacked jurisdiction to proceed against the various defendants. The plaintiffs lacked Article III standing to sue the Alabama Attorney General and the City Defendants, the Court held, because those defendants were not directly responsible for the plaintiffs' asserted injuries. *See* doc. 52 at 6–13. (The Court included Mayor Bell in this standing analysis even though it had already concluded that the claims against him in his official capacity were due to be dismissed as "entirely duplicative" of the claims against the City of Birmingham. *Id.* at 6.) The Court's Article III holding did not include the State of Alabama, which the plaintiffs had named only for purposes of their Voting Rights Act claim. But the Court held that the State is immune from that claim under principles of sovereign immunity and the Eleventh Amendment. *See id.* at 17–20. Thus, in the District Court's view, the amended complaint identified no appropriate defendant and was due to be dismissed in its entirety on that basis alone.

Notwithstanding its various jurisdictional conclusions, the District Court proceeded briefly to address the merits of the plaintiffs' claims. According to the Court, many of the claims failed on threshold legal grounds. For example, the Court concluded that the minimum-wage law did not have "any impact whatsoever

11

on Plaintiffs' right to vote" and thus did not "implicate" Section 2 of the Voting Rights Act or the Fifteenth Amendment. *Id.* at 17, 13; *see also id.* at 22 (Fifteenth Amendment holding). It found similar threshold legal reasons to dismiss the plaintiffs' Thirteenth Amendment involuntary-servitude claim and their Fourteenth Amendment claim under the political-process doctrine. *See id.* at 22–23, 24–25. And it noted that the plaintiffs had "expressly conceded that their claim under the Fourteenth Amendment's Privileges or Immunities Clause (Count III) is foreclosed by Supreme Court precedent." *Id.* at 21.

On the other hand, the Court concluded that the plaintiffs' other claims failed for lack of sufficient supporting factual allegations. As the plaintiffs had conceded, these remaining claims each require proof of intentional racism motivating the minimum-wage law's enactment. *See, e.g., id.* at 21. But to the District Court, the allegations in the amended complaint did not suffice to clear this high standard. The plaintiffs had not adequately alleged that the "uniform" minimum-wage law has a discriminatory effect. *See id.* at 23. And there were "legitimate reasons supporting the legislature's decision." *Id.* at 24. That being the case, the Court had no difficulty discerning an "'obvious alternative explanation'" for the law's passage "other than intentional discrimination." *Id.* at 21 (quoting *Jabary v. City of Allen*, 547 F. App'x 600, 605 (5th Cir. 2013)). The Court therefore dismissed these claims as implausible.

12

**D.    This Court should affirm unless the amended complaint contained allegations "*showing*" the appellants' entitlement to relief.**

One standard of review, the *de novo* standard, applies to each of the District Court's holdings below. "'A district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is a question of law [this Court] review[s] *de novo*." *Lord Abbett Mun. Income Fund, Inc. v. Tyson*, 671 F.3d 1203, 1205 (11th Cir. 2012) (quoting *Sinaltrainal v. Coca–Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009)). Similarly, this Court reviews *de novo* a Rule 12(b)(6) dismissal for failure to state a claim "applying the same standard as did the district court." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (citing *Hoffman–Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002)).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified—and substantially tightened—the standard district courts must apply for evaluating the sufficiency of a complaint's allegations. The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). Under prior doctrine, even a "'wholly conclusory'" claim would survive a motion to dismiss if the pleadings "'left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 561). Now, by con-

13

trast, a complaint must go beyond that mere possibility and "'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

Courts applying the facial-plausibility standard must adhere to "[t]wo working principles." *Iqbal*, 556 U.S. at 678. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "A claim has facial plausibility," the Court explained, only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. For example, where a plaintiff's claim turns on the existence of "purposeful, invidious discrimination," the factual content must foreclose any "'obvious alternative explanations[s]'" for the challenged action. *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567)

Courts applying the facial-plausibility standard, moreover, are not confined to the complaint itself. Instead, they may also consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Ultimately, when "the well-pleaded facts do not permit the court

14

to infer more than the mere *possibility* of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2) (emphasis added)).

## SUMMARY OF THE ARGUMENT

The District Court was right to dismiss the amended complaint for lack of jurisdiction. Neither the Alabama Attorney General nor the City of Birmingham nor the Birmingham Mayor play any role in enforcing the minimum-wage law at issue here. That law regulates the economic relationships of private parties; as such, it will be enforceable, if at all, in state court. Similarly, the only other defendant, the State of Alabama, is immune from suit under Section 2 of the Voting Rights Act—which is the only claim asserted against it. To abrogate a State's Eleventh Amendment and sovereign immunity, Congress must make its intention "unmistakably clear" in the statutory language. But Section 2 contains no such language.

The District Court was also right to dismiss the amended complaint for failure to state any valid claim. The appellants have abandoned some of their claims on appeal, but the ones they press here are just as invalid as the ones they have abandoned. First, the appellants have no valid claim under the political-process doctrine of the Equal Protection Clause. This doctrine prohibits reallocations of government authority over issues that are inherently racial in nature. Because the

15

minimum-wage law affects persons of all races equally, it does not implicate the political-process doctrine. Second, the appellants have no valid claim (regardless of the particular constitutional or statutory basis) that the minimum-wage law implicitly discriminates based on race. To succeed on such a claim, the plaintiffs must demonstrate both that the law creates racially discriminatory effects and that it was motivated by intentional racism. The amended complaint's factual allegations are insufficient to satisfy the *Twombly-Iqbal* facial-plausibility standard as to either of these elements. Finally, the minimum-wage law does not implicate Section 2 of the Voting Rights Act or the Fifteenth Amendment. The law regulates economic conditions, not voting.

## ARGUMENT

This Court should affirm. The primary basis for doing so is on jurisdictional grounds, because the appellants failed to bring their challenge against any appropriate defendant. Alternatively, the Court should affirm because the appellants failed to state any valid legal claim.

## I.    The Court properly dismissed the amended complaint for lack of jurisdiction.

Two independent doctrines—Article III standing and sovereign immunity—support dismissal of the amended complaint for lack of jurisdiction. The appellants' only relevant asserted injury was that low-wage workers in Birmingham are

16

not being paid according to that city's local minimum-wage ordinance due to an allegedly racist state minimum-wage law.[3] But neither the Alabama Attorney General, nor the City of Birmingham, nor Mayor Bell are causing this injury, and a judgment against them would not provide the plaintiffs any relief. In an attempt to get around this problem, the plaintiffs named the State of Alabama as a defendant as to one claim. But the State is immune from that one claim under principles of sovereign immunity, just as it is immune from virtually all claims that may be leveled against it.

### A.   The plaintiffs lack standing to sue the Alabama Attorney General, the City of Birmingham, or Mayor Bell.

Plaintiffs lack Article III standing to sue the Alabama Attorney General, the City of Birmingham, or Mayor Bell over the Minimum Wage Act. To bring a suit in federal court, a plaintiff must establish three elements—"injury in fact," "causa-

---

[3] Only two of the plaintiffs, low-wage workers Marnika Lewis and Antoin Adams, stand to directly benefit from the invalidation of the Minimum Wage Act. *See* doc. 18, ¶ 1. The other plaintiffs are not low-wage workers and thus lack a separately valid Article III injury. For example, the legislative plaintiffs, including their caucus, lack a valid injury as legislators. *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811 (1997). The same thing is true for the "registered Birmingham voter" plaintiff, insofar as he relies on his generalized interests as a voter. *See, e.g.*, *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1330-36 (11th Cir. 2007). To the extent the organizational plaintiffs may validly represent the rights of their members, they are asserting the same injury as Plaintiffs Lewis and Adams. *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (requiring associations asserting their members' rights to "make specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm"); doc. 18, ¶ 2 (allegations concerning NAACP member Jaime Chisom).

17

tion," and "redressability"—as to each defendant. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-62 (1992). The "causation" element requires the plaintiffs to show that their asserted injury—being paid less than the putative Birmingham minimum wage—is "fairly trace[able] to each defendant's action." *Id.* at 560. And the "redressability" element requires the plaintiffs to show "that the injury will be 'redressed by a favorable decision'" against that defendant. *Id.* at 561. These principles limit the defendants in an action to those who, "at a minimum, have some connection with enforcement of the provision at issue." *Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1248 (11th Cir. 1998). This is so because only when there is a "causal connection between" a defendant's "responsibilities and any injury that the plaintiffs might suffer" does an injunction "redress" the plaintiffs' asserted injuries. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004); *accord Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013).

The District Court was right to hold that the plaintiffs failed to meet this burden. As an initial matter, the amended complaint made no valid allegations of causation. It cited various *general* duties of the Attorney General, such as his duty to tend to the State's interests in litigation or advise the Legislature on the constitutionality of state laws. *See* doc. 18, ¶¶ 12, 15. But these conclusory allegations do not show how the Attorney General affected, or even could affect, the plaintiffs' pay or alleged discriminatory treatment. The complaint also cited a "press release"

18

then-Attorney General Strange issued discussing the Birmingham minimum-wage issue. *Id.* ¶ 13. But the plaintiffs then admitted, in the very same paragraph, that the press release came out "prior to the effective date of the [Birmingham] ordinance" (let alone the Minimum Wage Act itself)—and, even then, that it amounted to his "advi[ce]" as opposed to a formal enforcement action. *Id.* On appeal, the plaintiffs emphasize that even harms "'flow[ing] indirectly from the action in question can be said to be fairly traceable to that action for standing purposes.'" Bl. Br. at 48 (quoting *Focus on the Family v. Pinellas Suncoast Trans. Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)). But this ignores the what the plaintiffs themselves have framed as the "action in question." The action in question is not the issuance of a press release or the Attorney General's failure to advise the Legislature. The action in question is the enforcement of the Minimum Wage Act. And that action is simply not an action that falls within the Attorney General's job description, whether under the Act itself or general state statutes.

The Birmingham city defendants did not cause the plaintiffs' injury either. According to the amended complaint, they were "not enforcing" the Birmingham minimum-wage ordinance, but that is not the same thing as affirmatively enforcing the Minimum Wage Act. *Id.* ¶ 16; *see also id.* ¶ 17. Indeed, if anything, the District Court should have "realign[ed] the [city defendants] in [this] action to reflect their [true] interests in the litigation." *City of Vestavia Hills v. Gen. Fid. Ins. Co.*, 676

19

F.3d 1310, 1313 (11th Cir. 2012). After all, it is a city ordinance that became inoperative as a result of the Minimum Wage Act, and the plaintiffs admitted that they sued the City Defendants "*only*" for purposes of "relief," doc. 18, ¶ 18 (emphasis in original).

As one might expect given these deficiencies on the causation front, the amended complaint also reveals glaring redressability problems. Imagine if the District Court were to enter a judgment, as the plaintiffs requested, directing the Alabama Attorney General to put up a billboard or run a television ad notifying the public of the Minimum Wage Act's unlawfulness. *See id.* at 48-49 (request B). How would that decision redress the plaintiffs' asserted wage shortfall? And what if the District Court ordered the Birmingham city defendants to "enforce" its minimum-wage ordinance? Under such an injunction, the City might enforce its ordinance by "initiat[ing] a civil action" against an employer in state court to collect a penalty. Doc. 30-3 at 3. But it could not prevent the employer from simply invoking the Minimum Wage Act as an affirmative defense to that action in state court. The City could in theory revoke an employer's business license, *see id.* at 4, but taking that step obviously would not remedy the plaintiffs' injuries either. To satisfy the redressability requirement, the requested relief must "'*directly* redress the injury suffered,'" as acknowledged in the plaintiffs' own cited cases. Bl. Br. at 53 (quoting *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir.

2010)). But given the line-up of defendants in this case, there is no conceivable re-lief that fits this description.

These causation and redressability problems were no drafting oversight. The problem is that the Minimum Wage Act will remain in force regardless of any ac-tion the Attorney General, the City of Birmingham, or Mayor Bell might take. In that sense, this case looks much like this Court's decision in *Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003). There, this Court held that a plaintiff lacked Article III standing to sue the Alabama Attorney General over injuries she allegedly suffered in "a state court custody proceeding in which the Attorney General played no role." *Id.* at 1285. There, as here, the legal dispute before the Court involved the relationship of private parties and would be enforced, if at all, in state-court litiga-tion between those private parties. *See id.* at 1285–86. And there, as here, "[n]othing the Attorney General [or city defendants] could be ordered to do or re-frain from doing would redress the injuries [plaintiffs] allege[]." *Id.* The plaintiffs thus lack standing to sue the Alabama Attorney General, the City of Birmingham, and Mayor Bell.

### B.    The plaintiffs' one claim against the State of Alabama is barred by sovereign immunity.

Apparently recognizing their standing problems, the amended complaint added the State of Alabama as a defendant, albeit only for their one claim under

Section 2 of the Voting Rights Act. The problem with this tack, however, is that it is barred by sovereign immunity. *See, e.g.*, U.S. Const. amend. XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). And the Alabama Constitution makes clear that Alabama has not consented to this suit. *See* Ala. Const. art. I, § 14; *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The key question is thus whether Congress has validly "abrogate[d]" Alabama's immunity "by appropriate legislation." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011). It has not. The standard for finding a valid abrogation is "stringent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56 (1996) (internal quotation marks omitted). Even where Congress has the *power* to abrogate state immunity (such as it does here, when legislating under the Fourteenth and Fifteenth Amendments), it may do so "only by making its intention *unmistakably clear* in the language of the statute." *Id.* (emphasis added; internal quotation marks omitted).

The Voting Rights Act does not meet this stringent "clear statement" test with respect to Section 2. When private plaintiffs sue under that section, they do so only through an "*implied* private right of action." *See, e.g., Ford v. Strange*, 580 Fed. App'x 701, 705 n.6 (11th Cir. 2014) (emphasis added) (citing *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996)). And implied private rights of action,

22

as that label suggests, by definition do not amount to an "unmistakably clear" waiver of sovereign immunity: Indeed, even an express, "*general* authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985) (emphasis added).[4] For this reason, it does not matter that the Voting Rights Act authorizes the United States Attorney General to "institute for the United States, or in the name of the United States" an action against a State to prevent a Section 2 violation. 52 U.S.C. § 10308(d). The very language of that clause confirms that the Voting Rights Act does not authorize *private* litigants to sue a State under Section 2. Nor does it matter that Section 2 covers certain policies "applied by any State or political subdivision." 52 U.S.C. § 10301(a). That language describes what is prohibited under Section 2. But it says nothing about whether someone may sue the States themselves to enforce it. In fact, Section 2 is routinely enforced through suits against state officials under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). There is thus no reason, let alone an "unmistakably clear" one, to believe that Section 2's mere reference to States means to abrogate their immunity. *Va. Office for Prot. & Advocacy*, 563 U.S. at 254.

---

[4] *See also, e.g., Beneficial Consumer Disc. Co. v. Poltonowicz*, 47 F.3d 91, 95 (3d Cir. 1995) (explaining, in an analogous context, that "[a] waiver of sovereign immunity cannot be implied"); *Dorsey v. U.S. Dep't of Labor*, 41 F.3d 1551, 1555 (D.C. Cir. 1994) (explaining, in an analogous context, that "[w]hile private rights of action may be implied, waivers of sovereign immunity may not").

Although a few nonbinding precedents suggest that States lack sovereign immunity from a Section 2 claim, those decisions were wrongly decided and are not remotely persuasive. *See Mixon v. Ohio*, 193 F.3d 389, 398 (6th Cir. 1999); *Hall v. Louisiana*, 983 F. Supp. 2d 820, 829-30 (M.D. La. 2013); *Terrebonne Parish NAAACP v. Jindal*, 154 F. Supp. 3d 354, 359 (M.D. La. 2015). The Sixth Circuit's discussion of whether Congress had employed language abrogating States' immunity to these actions consisted of a single paragraph that did not mention that the plaintiffs were proceeding under an implied right of action. *See Mixon*, 193 F.3d at 398. Even less persuasive, the Middle District of Louisiana simply adopted the Sixth Circuit's rule with little elaboration. *See Hall*, 983 F. Supp. 2d at 829-30; *Terrebonne Parish NAACP*, 154 F. Supp. 3d at 359.

On appeal, the plaintiffs do not seriously argue this point. They identify a few district-court decisions that they claim further support their position. But these cases are even less persuasive than ones the District Court considered below. Take *White v. State of Alabama*, 867 F. Supp. 1519, 1540 (M.D. Ala. 1994). *White* held only that there is "no eleventh amendment bar to a federal court examining the extent to which a voting rights settlement conforms to state law." *Id.* at 1540. The *White* Court did mention the Voting Rights Act in dicta. But it did not mention Section 2 of that Act and in fact said only that the Voting Rights Act "was passed

24

pursuant to the enforcement authority of the fifteenth amendment." *Id.* This is hardly a ringing endorsement of the plaintiffs' abrogation theory.

*  *  *

There are other reasons that the doctrines of Article III standing and Eleventh Amendment immunity deprive the Court of jurisdiction. Recall, for example, that the Alabama Attorney General does not actually enforce the Minimum Wage Act. Under long-settled, binding Eleventh Amendment precedent, a lawsuit against him in these circumstances amounts to a prohibited suit against the State itself.[5] Separately, the amended complaint identifies no "imminent" injury caused by the State of Alabama as required by Article III, because the State will enforce the Minimum Wage Act, if at all, through state-court proceedings between employees and their employers. Regardless, the foregoing considerations suffice to support dismissal of the amended complaint in its entirety. The State of Alabama is immune from the only claim it faces. And neither the Alabama Attorney General, nor the City of Birmingham, nor Mayor Bell are proper defendants for any of the claims they face.

---

[5] *See Ex parte Young,* 209 U.S. 123, 157 (1908) (to proceed against a state official, the official must "have some connection with the *enforcement* of the [allegedly unconstitutional] act" (emphasis added)); *Cressman v. Thompson,* 719 F.3d 1139, 1146 n.8 (10th Cir. 2013); *Summit Med. Assocs., P.C. v. Pryor,* 180 F.3d 1326, 1336-42 (11th Cir. 1999); *Women's Emergency Network v. Bush,* 323 F.3d 937, 950 (11th Cir. 2003).

25

## II.    The complaint fails to state a valid claim on the merits.

To any extent the Court has jurisdiction, it should dismiss on the merits. The Minimum Wage Act is not expressly or implicitly racist. And it does not in any sense implicate the plaintiffs' voting rights.

### A.    The Minimum Wage Act does not discriminate based on race.

To begin, the Minimum Wage Act is not racially discriminatory under traditional equal-protection principles. Under these principles, courts review most laws under the deferential standard known as rational-basis review—a standard the minimum-wage law easily satisfies. *See E&T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987). But courts will more closely scrutinize laws that discriminate against a protected class such as racial minorities. A law can do this in one of two ways. It might discriminate against racial minorities directly—i.e., on its face. *See id.* Or it might do so implicitly: A facially "neutral" law will be deemed racially discriminatory if a plaintiff shows both that it has a "disparate impact" *and* that it is the product of "purposeful discrimination." *Id.* As demonstrated below, the Minimum Wage Act does not discriminate in either of these ways.

#### 1.    *The law does not facially discriminate based on race (Count IX).*

As an initial matter, the Act quite obviously does not draw racial classifications on its face. The law does not discriminate among persons at all. As its name

26

suggests, it instead imposes a "uniform" state economic policy among local governments.

This fact alone defeats the plaintiffs' so-called "political process" equal protection claim. *See* doc. 18, ¶¶ 142-45 (count IX). The political process doctrine holds that States "may not alter the procedures of government to *target* racial minorities." *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. ___, 134 S. Ct. 1623, 1632 (2014) (plurality op.) (citing *Hunter v. Erickson*, 393 U.S. 385, 394 (1969) (Harlan, J., concurring) (emphasis added)). This is essentially just another way of saying that the Court will closely scrutinize facially discriminatory statutes. *Cf.* Bl. Br. at 33 (acknowledging that the political-process doctrine invalidates "*de facto* racial classification[s]"). As the Supreme Court recently explained, the only political restrictions that it has invalidated under this doctrine were "designed to be used, or w[ere] likely to be used, to encourage infliction of injury *by reason of race*." *Id.* at 1638 (emphasis added). In *Hunter v. Erickson*, for example, the Court invalidated a provision restricting a City's authority to adopt policies against racial discrimination in housing. *See* 393 U.S. at 387. And in *Washington v. Seattle School District No. 1*, the Court invalidated a provision restricting local school districts from taking steps to end racial segregation. *See* 458 U.S. 457, 462-63 (1982). Each time, the State took away "'the authority to address a racial problem—and

27

only a racial problem—from the existing decisionmaking body.'" *Schuette*, 134 S. Ct. at 1633 (quoting *Seattle*, 458 U.S. at 474).

The Minimum Wage Act obviously does not remove the City of Birmingham or any other municipality's authority to address a problem that is inherently "racial" in nature. Indeed, the Supreme Court expressly recognized that "wage regulations" are not tantamount to racial issues. *Id.* at 1635. In an attempt to bolster their claims, the plaintiffs alleged that the Birmingham minimum-wage ordinance "primarily inured to the benefit of [that city's] African-American community" and that Birmingham's "African-American community . . . strongly considered the ordinance to be in their interest." Doc. 18, ¶ 143. But the Supreme Court has expressly rejected any theory along these lines as well. *See Schuette*, 134 S. Ct. at 1634. As Justice Kennedy explained for a Supreme Court plurality in *Schuette*, such a reading of the political-process doctrine lacks any "limiting standards" about what constitutes a "racial" issue. *Id.* at 1635. *Schuette* involved university admissions policies, but according to him, that issue would join "[t]ax policy, housing subsidies, *wage regulations*, and even the naming of public schools, highways, and monuments" as "just a few examples of what could become . . . beyond the power of a legislature to decide when enacting limits on the power of local authorities or other governmental entities to address certain subjects." *Id.* (emphasis added).

28

Even Justice Sotomayor's dissent in *Schuette* understood the plurality opinion as the state appellees do, criticizing it for making the doctrine "about nothing more than the intentional and invidious infliction of a racial injury." 134 S. Ct. at 1664 (Sotomayor, J., dissenting). Having said that, the plaintiffs' claim is implausible even under Justice Sotomayor's more generous interpretation of the political-process doctrine. Under her view, for example, there is no violation unless the challenged government action "has a racial *focus*, targeting a policy or program that 'inures *primarily* to the benefit of the [racial] minority.'" *Schuette*, 134 S. Ct. at 1659 (Sotomayor, J., dissenting) (quoting *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 472 (1982) (emphasis added)). Contrary to the plaintiffs' arguments, moreover, Justice Sotomayor would not have required a "factual record" in this case. Doc. 40 at 45; *see also* Bl. Br. at 31. In *Schuette*, her analysis of this element turned only on what was "clear from [the challenged provision's] text." 134 S. Ct. at 1659 (Sotomayor, J., dissenting). More importantly, she reaffirmed that the doctrine is implicated by reallocations of power that "'deal[] *in explicitly racial terms* with legislation designed to benefit minorities *as minorities*, not legislation intended to benefit some larger group of underprivileged citizens among whom minorities were disproportionately represented.'" *Id.* at 1674 (quoting *Seattle*, 458 U.S. at 485 (emphasis added)). Justice Sotomayor even expressly endorsed legislation like the Alabama law at issue here, noting that "[Michiganders] were . . . free to remove

from the [university] boards the authority to make *any* decisions with respect to admissions policies, as opposed to only decisions concerning race-sensitive admissions policies." *Id.* at 1670 (emphasis added).

Unlike the expressly "race-sensitive" policy at issue in *Schuette*, Alabama's Minimum Wage Act, does not on its face "draw[] a racial distinction." *Id.* at 1674. It thus does not violate the political-process doctrine under any interpretation of that doctrine, let alone Justice Kennedy's controlling one. To hold otherwise would be to transform a doctrine in search of limits into a doctrine with no limits at all.

### 2.    *The law does not effectively discriminate based on race (Counts I, IV, VII, VIII).*

Nor does the Minimum Wage Act *effectively* discriminate against racial minorities on the grounds that it "ha[s] a discriminatory effect and . . . was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (citations, quotation marks omitted). The plaintiffs' implausible allegations to the contrary fail not only to state a valid claim under the Equal Protection Clause but also, relevant to this appeal, Section 2 of the Voting Rights Act and the Fifteenth Amendment. *See* doc. 18, ¶¶ 131-41 (Counts VII & VIII). As explained below, claims under these latter provisions suffer from additional threshold failings. But to the extent discriminatory purpose and effects are relevant to these provisions, the amended complaint contains insufficient allegations.

***No discriminatory effect.*** First, the amended complaint contained no plausible allegations of racially disparate effects. This is because the plaintiffs' frame of reference, alleging disparate effects on "*Birmingham's* black citizens," is mistaken. Doc. 18, ¶ 132 (emphasis added); *see also id.* ¶¶ 28-30; *cf.* Bl. Br. at 20-21. The effects that are relevant for this purpose are those that "can be traced to a discriminatory purpose." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). But the Minimum Wage Act applies statewide, prohibiting "*[a]ny* [local] ordinance, policy, rule, or other mandate" that is inconsistent with its prescribed, uniform minimum wage. Ala. Act No. 2016-18, § 2(b); *see also id.* § 6(d). The plaintiffs should not be allowed to cherry-pick one subset of the law's effects for these purposes. Statewide, African-Americans may in fact be more likely than whites to be affected by the Act. But the amended complaint did not include any allegations to that effect. The only allegations it contains, in *Twombly-Iqbal* terms, are thus "'merely consistent with'" liability, not probative of it. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

***No discriminatory purpose.*** "Absent discriminatory effect, judicial inquiry into legislative motivation is unnecessary, as well as undesirable." *Crawford v. Bd. of Educ. of City of L.A.*, 458 U.S. 527, 544 n.31 (1982) (citation omitted) (equal protection case). Nevertheless, the District Court was right to dismiss the plaintiffs' discriminatory-purpose claims on this separate basis. *Cf. Hayden v. Paterson*, 594

31

F.3d 150, 161-69 (2d Cir. 2010) (affirming the Rule 12(b)(6) dismissal of racial-motivation challenge to a state law). Dismissal was especially appropriate given the plaintiffs' untenable presumption of racist motives whenever a majority-white legislature regulates in response to the actions of a majority-black locality. That cannot be the law, and as demonstrated below, it is *not* the law. The plaintiffs' racist-motive-based claims are facially implausible.

"'Discriminatory purpose,'" in this context, "implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 278. "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part '*because of*' . . . its adverse effects upon an identifiable group." *Id.* at 279 (emphasis added). Demonstrating this kind of purpose is hard enough where the decisionmaker is a single government official. *See Iqbal*, 556 U.S. at 680-83. But as the Supreme Court has explained, plaintiffs face even more "difficulties" where the decisionmaker is a legislative body as large as the Alabama Legislature. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also I.L. v. Alabama*, 739 F.3d 1273, 1286 (11th Cir. 2014). Where, as here, there are obvious legitimate reasons supporting the legislature's decision, "only the clearest proof will suffice" to establish an illicit motive. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quotation marks omitted); *accord Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (clearest-proof re-

32

quirement); *see also McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987) (judicial deference in the face of legitimate legislative reasons).

As an initial matter, the plaintiffs cannot deny various facts *negating* any inference of deliberate racism. Empirical studies support the Legislature's decision. *See* Burke, et al., 46 GONZ. L. REV. at 672-76. And at least twenty-two other States had enacted similar uniform minimum-wage laws—some of which had received judicial approval. *See supra* note 2; *New Orleans Campaign for a Living Wage*, 825 So. 2d at 1105-06. Closer to home, one Alabama city had already adopted its own minimum-wage ordinance, and others were threatening to follow suit. *See supra* note 1. Finally, when the Legislature ultimately enacted legislation, it did so by borrowing critical language almost verbatim from another preemption law, the one prohibiting local gun ordinances. *Cf.* Ala. Code § 13A-11-61.3. For these reasons, this case clearly is one where "the legitimate noninvidous purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275. Indeed, these facts support an alternative ground for affirmance—that the Minimum Wage Act "would have been enacted [even] without [racism as a] factor." *Hunter v. Underwood*, 471 U.S. at 228.

Against the Legislature's plainly legitimate rationales for the law, the plaintiffs have not identified, and cannot produce, the requisite "clearest proof" of racist purpose. For one thing, the plaintiffs have not alleged any *direct* evidence of such a purpose. There is no allegation of a racist floor speech in favor of the Act. Nor are

33

there other allegations of openly racist public or even private statements—whether by legislators or other, outside advocates for the Act. The plaintiffs did allege that one Senator discussed the Birmingham ordinance's adverse employment effects on "young people from poorer families," as if that somehow implied a racist intent. Doc. 18, ¶ 97. But that statement in fact reflects a legitimate, nondiscriminatory rationale for the Act and is thus just the opposite of direct evidence of racism. They also allege racist comments by a handful of legislators about *different* legislation (and in a *different* quadrennium of the Legislature). *See* doc. 18, ¶¶ 79-80. But these allegations, by their very nature, cannot establish the plausibility of the plaintiffs' claim. *See Hunter v. Underwood*, 471 U.S. at 228 (observing that the Supreme Court will not invalidate a facially valid statute "on the basis of what fewer than a handful of [legislators] said about it" (citations, quotation marks omitted)).

Without allegations that directly support their claim, the plaintiffs allege facts purporting to indirectly support it under the so-called *Arlington Heights* factors—the law's historical background, the specific events preceding its enactment, and so on. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977). But many of these allegations are scarcely even relevant under the *Arlington Heights* analysis. For example, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey*, 481 U.S. at 298 n.20; *cf.* doc. 18, ¶¶ 38-70. Similarly, disparate-impact

34

allegations are not helpful unless they show a "clear pattern, *unexplainable* on grounds other than race." *Arlington Heights*, 429 U.S. at 266 (emphasis added); *cf., e.g.*, doc. 18, ¶¶ 28-30, 136-38. Finally, allegations of racially polarized voting on the Act are not probative given the Supreme Court's refusal to assume "that all individuals of the same race think alike." *Schuette*, 134 S. Ct. at 1634; *cf., e.g.*, doc. 18, ¶¶ 89, 93.

The plaintiffs attempt to cast doubt on the integrity of the legislative process, but this effort does not help them either. They complain that the Act's proponents "fast-tracked [it] in approximately 36 hours," but they give no reason to believe doing this was improper or even "uncommon" in similar situations. *N.C. State Conf. of the N.A.A.C.P. v. McCrory*, 156 F. Supp. 3d 683, 704 n.28 (M.D.N.C. 2016). Indeed, by highlighting other, failed precursor proposals, the amended complaint affirmatively undermines this argument and demonstrates the Legislature's compliance with its rules. *Cf.* doc. 18, ¶¶ 84, 86-87. The plaintiffs also see a procedural infirmity in the Legislature's failure to provide local notice of the Act given their belief that the Act "applied only to the City of Birmingham" at the time of its enactment. Doc. 18, ¶¶ 94-96, 141 (citing Ala. Const. art. IV, §§ 106, 110). That premise is wrong as a matter of Alabama state constitutional law. *See* Ala. Const. art. IV, § 110 (defining a "general law" as "a law which in its *terms and effect* applies . . . to the whole state" (emphasis added)). But this kind of oversight, if

it is one, would not support an inference of racism in any event. Given Birmingham's determination to expedite its own local minimum-wage ordinance, there was a legitimate, race-neutral reason for dispensing with any notice requirement.

In response to all of this, one might ask how the plaintiffs could *ever* meet their pleading burden when challenging a state law on grounds of intentional racism. But the better question is how to enforce the Equal Protection Clause without finding racist motives behind every law. On this big-picture matter, the Supreme Court has already sided with the State: It has "rejected the tort definition of intent . . . and instead adopted a criminal law definition of intent meaning the desire to cause [discriminatory] results." Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 714 (3d ed. 2006). This is not to say that a law can never be shown to be the result of racist motives. *Cf. Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993). But the standard of proof (and correspondingly, the pleading standard, under *Twombly* and *Iqbal*) is a high one—and rightfully so.

### B.    The Minimum Wage Act does not implicate voting rights (Counts I, IV).

Finally, the Minimum Wage Act does not implicate voting rights, as is necessary to implicate Section 2 of the Voting Rights Act or the Fifteenth Amendment. *Cf.* doc. 18, ¶¶ 104-07, 116-19 (Counts I & IV). The Fifteenth Amendment forbids race-based denials of "[t]he right . . . to *vote*." U.S. Const. amend. XV, § 1

36

(emphasis added). And Section 2—enacted pursuant to Congress' enforcement authority under the Fifteenth Amendment—prohibits certain "*voting* qualification[s]," "prerequisite[s] to *voting*," or "standard[s], practice[s], or procedure[s]" abridging "the right . . . to *vote*." 52 U.S.C. § 10301(a) (emphasis added). Section 2, moreover, is concerned with "the political processes leading to nomination or election in the State or political subdivision." *Id.* § 10301(b). A uniform state economic policy does not fit the bill.

The Supreme Court's decision in *Presley v. Etowah County Commission*, 502 U.S. 491 (1992), supports this common-sense conclusion. *Presley* explained that an analogous provision of the Voting Rights Act applies only to policies that have "a direct relation to voting and the election process." *Id.* at 503. Policies that meet the direct-relation test include those that (1) "involve[] the manner of voting"; (2) "involve candidacy requirements and qualifications"; (3) "concern[] changes in the composition of the electorate that may vote for candidates for a given office"; and (4) "affect[] the creation or abolition of an elective office." *Id.* at 502-03. Conversely, "reallocations of authority within government" (at least so long as the affected officials "retain[] substantial authority") do *not* meet that test. *Id.* at 508.

Although *Presley* concerned Section 5 of the Voting Rights Act, its reasoning applies here as well, as various courts have recognized—including at the mo-

37

tion-to-dismiss stage.[6] As the Sixth Circuit recently explained, "[*Presley*'s] reasoning applies *a fortiori* to the § 2 claim here":

> [T]he § 5 language that the Supreme Court focused upon in *Presley* was "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," language indistinguishable from that of § 2 ("voting qualification or prerequisite to voting, or standard, practice, or procedure . . . [resulting] in a denial or abridgement of the right . . . to vote . . ."). The *Holder* Court, in distinguishing § 2 and § 5, held that "we do not think that the fact that a change in a voting practice must be precleared under § 5 necessarily means that the voting practice is subject to challenge in a dilution suit under § 2." [512 U.S. at 883.] In other words, for purposes of interpreting these words, § 5 if anything is *broader* than § 2.

*Phillips v. Snyder*, 836 F.3d 707, 719–20 (6th Cir. 2016). The Sixth Circuit in fact identified a further threshold reason to dismiss any voting-rights claim here: If Section 2 does not apply to "changing the selection of [a governing body] from an elective system to an appointive one," then it surely does not cover a law like the Minimum Wage Act. *Id.* (citing *Mixon v. Ohio*, 193 F.3d 389, 394 (6th Cir. 1999)).

If the plaintiffs are right that the Minimum Wage Act implicates voting, then there is no end to the Fifteenth Amendment's and Section 2's reach. This does not

---

[6] *See Holder v. Hall*, 512 U.S. 874, 883 (1994) (opinion of Kennedy, J.) ("[T]he coverage of §§ 2 and 5 is presumed to be the same."); *id.* at 887 (O'Connor, J., concurring in part and concurring in the judgment) ("[A]t least for determining threshold coverage, §§ 2 and 5 have parallel scope."); *Ford v. Strange*, No. 2:13–CV–214–WKW, 2013 WL 6804191 at *11-16 (M.D. Ala. Dec. 23, 2013) (dismissing similar Section 2 claim), *aff'd* 580 Fed. App'x 701 (11th Cir. 2014); *Ala. Democratic Conf. v. Strange*, No. 5:11-cv-2449-JEO, slip op. at 23-26 (N.D. Ala. Dec. 14, 2011) (dismissing similar Section 2 claim) (in the record at doc. 30-4).

38

only create untold practical problems. In the case of Section 2, it also raises ques-

tions about whether that statute is a valid exercise of congressional authority. *See,*

*e.g.*, *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1230-31 (11th Cir. 2005) (en

banc). The Court should "construe [Section 2] to avoid such problems" and hold

that the plaintiffs failed to state a valid claim. *DeBartolo Corp. v. Fla. Gulf Coast*

*Trades Council*, 485 U.S. 568, 575 (1988).

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment dismissing the amended complaint—either because the appellants failed to sue any party over which the courts may exercise jurisdiction or because they failed to state any valid legal claim.

Respectfully submitted this 4th day of August, 2017.

|  |  |
|---|---|
|  | Steve Marshall<br>    *Attorney General* |
|  | Andrew L. Brasher<br>    *Solicitor General* |
| s/William G. Parker, Jr. | James W. Davis |
| William G. Parker, Jr.<br>    *Chief Deputy General Counsel* | *Deputy Attorney General* |
| STATE OF ALABAMA<br>OFFICE OF THE GOVERNOR<br>600 Dexter Avenue<br>Montgomery, AL 36130<br>(334) 353-7581 | STATE OF ALABAMA<br>OFFICE OF THE ATTORNEY GENERAL<br>501 Washington Avenue<br>Montgomery, AL 36130<br>(334) 242-7300 |
| *Counsel for Appellee State of Alabama* | *Counsel for Appellees State of Alabama<br>& Attorney General Steve Marshall* |

CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 4, 2017, I filed the foregoing motion electronically using the Court's CM/ECF system, which will serve all counsel of record.

  s/William G. Parker, Jr.
*Counsel for Appellee the State of Alabama*

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that that this document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,557 /13,000 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

  s/William G. Parker, Jr.
*Counsel for Appellee the State of Alabama*

41