No. 17-11009

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

MARNIKA LEWIS, *et al.*,

*Plaintiffs-Appellants,*

v.

STATE OF ALABAMA, *et al.*,

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

**BRIEF OF AMICI CURIAE ALABAMA RETAIL ASSOCIATION,
BUSINESS COUNCIL OF ALABAMA, ALABAMA RESTAURANT &
HOSPITALITY ASSOCIATION, ALABAMA GROCERS ASSOCIATION,
ALABAMA POLICY INSTITUTE, NATIONAL RESTAURANT
ASSOCIATION, ASIAN AMERICAN HOTEL OWNERS ASSOCIATION
AND THE NATIONAL FEDERATION OF INDEPENDENT BUSINESS
IN SUPPORT OF DEFENDANTS-APPELLEES SEEKING AFFIRMANCE**

Albert L. Vreeland, II
Richard I. Lehr
LEHR MIDDLEBROOKS VREELAND
    & THOMPSON, P.C.
2021 Third Avenue North
Birmingham, Alabama 35203
(205) 326-3002
*Attorneys for Amici Curiae*

<u>Lewis v. State of Alabama</u>
Appeal No. 17-11009

## <u>AMICI CURIAE'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to ELEVENTH CIRCUIT RULE 26.1-1, the undersigned counsel for Amici Curiae certifies that the Certificates of Interested Persons filed by Plaintiffs-Appellants on June 5, 2017 and by Defendants-Appellees on August 4, 2017 are complete with the following exceptions:

Alabama Grocers Association – Amicus Curiae;

Alabama Policy Institute – Amicus Curiae;

Alabama Restaurant & Hospitality Association – Amicus Curiae;

Alabama Retail Association – Amicus Curiae;

Asian American Hotel Owners Association – Amicus Curiae;

Business Council of Alabama – Amicus Curiae;

Lehr, Richard – Attorney for Amici Curiae;

Lehr Middlebrooks Vreeland & Thompson, P.C. – Attorneys for Amici Curiae;

National Federation of Independent Business – Amicus Curiae;

National Restaurant Association – Amicus Curiae;

Vreeland, Albert L., II – Attorney for Amici Curiae.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to FEDERAL RULE OF APPELLATE PROCEDURE 26.1 and ELEVENTH

CIRCUIT RULE 26.1-1, Amici Curiae states that none of these entities are publicly-

traded and no publicly-traded entity owns 10% or more of their stock.

Respectfully submitted,

_____

Counsel for Amici Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C1

TABLE OF AUTHORITIES .............................................................. ii

INTEREST OF AMICI CURIAE ......................................................... 1

STATEMENT OF THE ISSUE ............................................................ 5

SUMMARY OF ARGUMENT ............................................................ 5

ARGUMENT ..................................................................................... 6

I.   An "Obvious Alternative Explanation" – Statewide Uniformity of Employment Laws – Forecloses Plaintiffs' Claims of Race Discrimination Over This Facially Neutral Economic Legislation. .... 6

    A.   The Supreme Court's *Iqbal* Decision Requires Courts to Apply "Common Sense" and Evaluate Whether There is an "Obvious Alternative Explanation" for the Statute. .....................................7

    B.   As Twenty-Two Other States Have Concluded, There is an "Obvious Alternative Explanation" for State Minimum Wage Preemption. ...........................................................................10

    C.   This "Obvious Alternative Explanation" Is Supported By Economic Research on the Effect of Changes to the Minimum Wage. .................................................................................17

CONCLUSION ................................................................................ 19

CERTIFICATE OF COMPLIANCE .................................................. 21

CERTIFICATE OF SERVICE .......................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*American Dental Association v. Cigna Corp.,*
  605 F.3d 1283 (11th Cir. 2010) ................................................................. 9

*\*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................ 7, 8

*Bell Atlantic Corporation v. Twombly,*
  550 U.S. 544 (2007) ................................................................................ 9

*Evans v. St. Lucie Cty. Jail,*
  448 F. App'x 971 (11th Cir. 2011) ........................................................ 9

*Wilson v. Arkansas Dept. of Human Services,*
  850 F.3d 368 (8th Cir. 2017) ........................................................... 9, 10

**State Statutes**

ALA. CODE § 25-7-40 ............................................................................ 5, 10

ALA. CODE § 25-7-45 ............................................................................ 10, 12

ALA. CODE §13A-11-61.3(a) ..................................................................... 10

ARK. CODE ANN. § 11-4-221(b) ................................................................ 12

2017 ARKASNAS LAWS ACT 643 (S.B. 668) ........................................... 15

COLO. REV. STAT. ANN. § 8-6-101(3) ..................................................... 12

COLO. REV. STAT. ANN. § 8-6-101(2) ..................................................... 13

FLA. STAT. ANN. § 218.077(2) .................................................................. 12

GA. CODE ANN. § 34-4-3.1(b) ................................................................... 12

IND. CODE ANN. § 22-2-2-10.5(b) ............................................................ 12

ii

IOWA CODE ANN. §§ 331.304(12) & 364.3(12) ...................................... 12

KAN. STAT. ANN. § 12-16,131(a) .......................................................... 12

LA. STAT. ANN. § 23:642(A) ................................................................ 16

LA. STAT. ANN. § 23:642(B) ................................................................ 12

MICH. COMP. LAWS ANN. § 123.1382, Sec. 2 ....................................... 14

MICH. COMP. LAWS ANN. § 123.1385 .................................................. 12

MISS. CODE ANN. § 17-1-51(1) ........................................................... 12

MISS. CODE. ANN. § 17-1-51(2) ........................................................... 16

MO. ANN. STAT. § 290.528 .................................................................. 12

N.C. GEN. STAT. § 95-25.1(c) .............................................................. 12

40 OKL. ST. ANN. § 160 ...................................................................... 12

OR. REV. STAT. ANN. § 653-017 (2) ..................................................... 12

R.I. GEN. LAWS ANN. § 28-12-25 ........................................................ 12

S.C. CODE ANN. § 6-1-130(B) ............................................................. 13

TENN. CODE ANN. § 50-2-112(a)(1) ...................................................... 13

TEX. LABOR CODE ANN. § 62.0515(a) .................................................. 13

UTAH CODE ANN. § 34-40-106(1) ........................................................ 13

WIS. STAT. ANN. § 104-001 ................................................................. 13

WIS. STAT. ANN. § 104.001(1) ............................................................. 14

**Federal Rules**

11th CIR. R. 25-3(a) ........................................................................................ 22

11th CIR. R. 26.1-1 ...................................................................................... 1, 2

FED. R. APP. P 25(a)(2)(d) ............................................................................. 22

FED. R. APP. P.  29(a)(2) .................................................................................. 1

FED. R. APP. P.  29(a)(4)(E) ............................................................................. 1

FED. R. APP. P. 26.1 ........................................................................................ 2

FED. R. APP. P.  32(a)(5) ................................................................................ 21

FED. R. APP. P. 32(a)(7)(C) ........................................................................... 21

**Other Authorities**

Clemens, Jeffrey and Wither, Michael, "The Minimum Wage and the Great
  Recession: Evidence of Effects on the Employment and Income Trajectories of
  Low-Skilled Workers," September 7, 2016 ....................................................... 18

Jardim, Ekaterina, et al., "Minimum Wage Increases, Wages, and Low Wage
  Employment: Evidence from Seattle," National Bureau of Economic Research,
  June, 2017 .................................................................................................. 17

U.S. Census Bureau, 2010 Census of Population and Housing, *Population
  and Housing Unit Counts,* CPH-2-2, Alabama,
  U.S. Government Printing Office, Washington, DC, 2012 ................................. 12

## INTEREST OF AMICI CURIAE

Pursuant to FED. R. APP. P. 29(a)(2), all parties have consented to the filing of this brief on behalf of the Amici Curiae listed below.[1] The Amici represent thousands of Alabama employers and regularly advocate for consistent statewide legislation related to employment issues. Many of these Amici lobbied for the passage of the Alabama Uniform Minimum Wage and Right to Work Act, and did so without any consideration of race, but solely because they consider the Act to be the most prudent economic wage policy for the State of Alabama.

The Alabama Retail Association ("ARA") represents 4,000 retail businesses with 6,000 locations throughout Alabama, ranging from small, family-owned retail stores to large national chains. The primary objective of the Alabama Retail Association is to lobby the Alabama Legislature and the U.S. Congress on behalf of retailers, including regarding issues of minimum wage legislation. As Alabama employers with multiple locations throughout the state, ARA members have a direct interest in the uniform application of the minimum wage laws and avoiding patchwork local minimum wage ordinances.

---

[1] Pursuant to FED. R. APP. P. 29(a)(4)(E), the Amici certify that this brief was not authored in whole or in part by either party's counsel; that neither party nor their counsel contributed money to fund preparing or submitting this brief; and that no person other than Amici contributed money to fund preparing or submitting this brief.

The Business Council of Alabama ("BCA") is a non-partisan statewide business association representing the interests and concerns of nearly one million working Alabamians through its member companies and organizational partnerships. While BCA's membership includes many of Alabama's largest companies, including more than 1,300 manufacturers, 85 percent of BCA members are small businesses. BCA member businesses, which employ Alabama citizens in all 67 counties, are vitally affected by judicial decisions that impact business dealings in the state. Thus, BCA frequently seeks permission to appear as amicus curiae where the litigation involves significant issues concerning the economic stability of business in Alabama.

The Alabama Restaurant & Hospitality Association ("ARHA") represents over 1,200 members including restaurants, lodging, tourism, and hospitality service companies throughout Alabama. As Alabama employers with multiple locations throughout the state, ARHA members have a direct interest in the uniform application of the minimum wage laws and avoiding patchwork local minimum wage ordinances.

The Alabama Grocers Association ("AGA") a state trade association representing the retail food industry, with over 125 retail member companies, representing over 1,000 retail outlets, and over 225 manufacturers, brokers,

wholesalers and other members. AGA represents over 90% of grocery food retailers in the state of Alabama. AGA lobbies on key bills and issues affecting the food industry at the federal, state and local levels, including minimum wage legislation. As Alabama employers with multiple locations throughout the state, AGA members have a direct interest in the uniform application of the minimum wage laws and avoiding patchwork local minimum wage ordinances.

The Alabama Policy Institute (API) is a 501(c)(3) non-partisan, non-profit research and education organization dedicated to influencing public policy in the interest of the preservation of free markets, limited government and strong families, which are indispensable to a prosperous society.

The National Restaurant Association (NRA) is the leading business association for the restaurant and foodservice industry. Nationally, the industry is made up of one million restaurant and foodservice outlets employing fourteen million people -- about ten percent of the American workforce. Despite being an industry of mostly small businesses, the restaurant industry is the nation's second-largest private-sector employer.

The Asian American Hotel Owners Association (AAHOA) is the largest hotel owners association in the world. AAHOA represents more than 12,500 small business owners, who own more than 20,000 properties, amounting to more than

3

40% of all hotels in the United States. AAHOA members employ nearly 600,000 workers, accounting for over $9.4 billion in payroll annually. The vast majority of AAHOA members are franchisees of national hotel brands. The impact of the law at issue and the instant litigation directly impacts the businesses and livelihoods of these franchisees. As an organization, AAHOA represents its members in matters relating to government affairs and is participating in this brief on behalf of the community of hoteliers.

The National Federation of Independent Business (NFIB) is the nation's leading small business association, representing members in Washington, D.C., and all 50 state capitals, including Alabama. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate and grow their businesses. NFIB represents small businesses nationwide, and its membership spans the spectrum of business operations, ranging from sole proprietor enterprises to firms with hundreds of employees. While there is no standard definition of a "small business," the typical NFIB member employs 10 people and reports gross sales of about $500,000 a year. The NFIB membership is a reflection of American small business. To fulfill its role as the voice for small business, the NFIB frequently files amicus briefs in cases that will impact small businesses.

4

## STATEMENT OF THE ISSUE

Whether the District Court correctly dismissed Plaintiffs' race discrimination challenges to the Uniform Minimum Wage and Right to Work Act, ALA. CODE § 25-7-40, based upon the "obvious alternative explanation" that the legislature intended to establish a uniform statewide economic policy on wages and labor and avoid a patchwork of inconsistent local regulations – the very same reason 22 other states have adopted similar laws.

## SUMMARY OF ARGUMENT

Together, Amici represent thousands of Alabama employers, large and small, across almost every facet of the Alabama economy and in almost every county, city and town in the state. Amici's respective members have an obvious interest in Alabama maintaining uniform employment laws, including minimum wage requirements, across the state. The burden to employers of complying with different employment laws in every local jurisdiction would be significant. As part of Amici's representation of this large cross-section of Alabama employers, Amici have lobbied the Alabama legislature to secure this needed uniformity and to avoid a patchwork of inconsistent local employment regulation. The result was the Uniform Minimum Wage and Right to Work Act, ALA. CODE § 25-7-40, (hereinafter the "Uniform Minimum Wage Act").

5

Plaintiffs have challenged the Uniform Minimum Wage Act, purely economic legislation, as racially discriminatory. The Supreme Court has directed that courts should evaluate such challenges in context and using common sense. More specifically, the Supreme Court has directed courts to evaluate whether there is an "obvious alternative explanation" which is more plausible than the alleged intentional discrimination. If the court finds an "obvious alternative explanation," a plaintiff's challenge is due to be dismissed.

When Alabama enacted the Uniform Minimum Wage Act, it clearly stated its purpose: to set a consistent statewide economic policy on wages and labor. Alabama is not alone in recognizing the importance of consistent statewide wage and labor policy; 22 other states have adopted very similar preemption laws for this same reason. As there is an "obvious alternative explanation" – so obvious that is has been followed by 22 other states – Plaintiffs' race discrimination challenges to the Uniform Minimum Wage Act were properly dismissed by the District Court.

## ARGUMENT

I.  **An "Obvious Alternative Explanation" – Statewide Uniformity of Employment Laws – Forecloses Plaintiffs' Claims of Race Discrimination Over This Facially Neutral Economic Legislation.**

In a feat of creative, but contorted pleading, Plaintiffs have attempted to cast their challenge to this purely economic, uniformly applicable minimum wage law

6

as an issue of racial discrimination.[2]  As the District Court recognized, an equal protection claim, such as Plaintiffs', is not "plausible" where there is an "obvious alternative explanation" other than intentional discrimination. (Doc. 52, p. 21).  As we discuss below, the explanation for Alabama's adoption of the Uniform Minimum Wage Act is not just obvious; it is logical, clearly-stated and widely-accepted across the country.

### A. The Supreme Court's *Iqbal* Decision Requires Courts to Apply "Common Sense" and Evaluate Whether There is an "Obvious Alternative Explanation" for the Statute.

In *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the Supreme Court observed that '[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  In the specific context of an intentional discrimination claim under Constitution, the *Iqbal* court held that a plaintiff must plead "sufficient factual matter to show that [the defendants] adopted and implemented" the policies at issue "not for a neutral … reason but for the purpose of discrimination on account of race, religion or national origin." *Id.* at 677.

---

[2] To further stretch their theory of the case beyond any bounds of plausibility, Plaintiffs rely upon Alabama's civil rights history as their primary basis to satisfy their burden to show intentional race discrimination.  Such a theory, if accepted, would render any legislation ever enacted by the Alabama legislature, however neutral, automatically suspect.

In *Iqbal*, the plaintiff alleged that federal officials had adopted and implemented a detention policy for persons of high interest after September 11th, and that they designated him as a person of high interest on account of his race, religion, or national origin. *Id.* at 699. The Supreme Court acknowledged that the factual allegations of the complaint — that FBI had a policy of arresting and detaining thousands of Arab Muslim men as part of its investigation into the events of September 11— were "consistent with" the plaintiff's claims of purposeful, invidious discrimination. *Id.* at 681   These allegations, however, were not sufficient to survive dismissal under Rule 12(b)(6) "given the more likely explanations." *Id.*

Employing a "context-specific" analysis and drawing on "judicial experience and common sense," the Supreme Court evaluated the sufficiency of the complaint in light of the events surrounding the September 11th attacks. Although the allegations of the *Iqbal* complaint were "consistent with" the plaintiff's claims of discrimination, the Court determined that alternative inferences could be drawn from these same facts—namely, that the arrests were likely lawful and justified by a nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. *Id.* at 682. In light of this "obvious alternative

explanation," the Supreme Court held that "discrimination is not a plausible conclusion" and directed that the complaint be dismissed.[3] *Id.*

The Eleventh Circuit applied this "obvious alternative explanation" analysis in *American Dental Association v. Cigna Corp.,* 605 F.3d 1283 (11th Cir. 2010). This Court noted "[i]mportantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* at 1290 (citations omitted). Using this standard, the Eleventh Circuit affirmed the dismissal of a RICO complaint because the defendant's alleged conduct was "equally indicative" of legal motive as possible illegal motive. *Id.* at 1295; *see also Evans v. St. Lucie Cty. Jail,* 448 F. App'x 971, 975 n. 3 (11th Cir. 2011) (affirming 12(b)(6) dismissal and noting the alternative grounds that the plaintiff's "factual allegations equally support the possibility" that conduct at issue was not a constitutional violation).[4]

---

[3] The Supreme Court applied this same "obvious alternative explanation" analysis in *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 567-570 (2007), to require the dismissal of an antitrust complaint at the pleading stage.

[4] Plaintiffs' only counter to this binding authority is a snippet quote from a Title VII case out of the Eighth Circuit, *Wilson v. Arkansas Dept. of Human Services,* 850 F.3d 368 (8th Cir. 2017). *See* Plaintiffs' Opening Brief at p. 18. In *Wilson*, the Eighth Circuit did not hold that a complaint should not be dismissed based on an "obvious alternative explanation." Indeed, it simply held that "[n]ot every potential lawful explanation for the defendant's conduct renders the plaintiff's

9

In this case, the District Court was therefore correct in applying *Iqbal's* "obvious alternative explanation" analysis to Plaintiffs' claims of race discrimination in the adoption of the Uniform Minimum Wage Act.

### B. As Twenty-Two Other States Have Concluded, There is an "Obvious Alternative Explanation" for State Minimum Wage Preemption.

Plaintiffs attempt to paint the Alabama Uniform Minimum Wage Act, ALA. CODE, § 25-7-40, as a lingering vestige of the state's history of race relations. The plain text of the Act, however, belies this strained theory and offers an "obvious alternative explanation." As part of the Uniform Minimum Wage Act, the legislature declared its intent to create a consistent wage and labor policy, applicable statewide:

> The purpose of this section is to establish within the Legislature complete control over regulation and policy pertaining to collective bargaining under federal labor laws or the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor **in order to ensure that such regulation and policy is applied uniformly throughout the state.**

ALA. CODE § 25-7-45(a) (**emphasis** added). This is similar to the stated purpose of other local preemption statutes adopted by the Alabama Legislature –which were expressly for the purpose of creating statewide uniformity in regulation. *See, e.g.,*

theory implausible" and found, based upon the facts before it, "[t]hese facts are not an obvious alternative explanation." *Id.* at 373.

10

ALA. CODE §13A-11-61.3(a) ("The purpose of this section is to . . . ensure that such regulation and policy is applied uniformly throughout this state. . . .").

Consistent with this stated purpose, the substantive provisions of the Uniform Minimum Wage Act are directed to uniformity; they admit of no exceptions and offer no favoritism to any quarter:

> (b) Except as otherwise provided in this article or as expressly authorized by a statute of this state, the Legislature hereby occupies and preempts the entire field of regulation in this state touching in any way upon collective bargaining under federal labor laws or the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor to the complete exclusion of any policy, ordinance, rule, or other mandate promulgated or enforced by any county, municipality, or other political subdivision of this state.

> (c) The authority of a county, municipality, or other political subdivision of this state to regulate collective bargaining under federal labor laws or the wages, leave, or other benefits provided by an employer to an employee, class of employees, or independent contractor shall not be inferred from its proprietary authority, home rule status, or any other inherent or general power.

> (d) Any existing policies, ordinances, rules, or other mandates promulgated or enforced contrary to the terms of this section are null and void, and any future policy, ordinance, rule, or other mandate shall comply with this section.

11

ALA. CODE § 25-7-45. These provisions single out no group or local government. They apply to every county, city, town, village and hamlet – regardless of the local demographics.[5]

But the Court need not rely solely on the Alabama legislature's explanation of its purpose for the preemption of local minimum wage laws. Twenty-two other states have enacted very similar laws prohibiting local governments from imposing local minimum wage standards for very similar reasons. *See* ARK. CODE ANN. § 11-4-221(b) (Arkansas); COLO. REV. STAT. ANN. § 8-6-101(3) (Colorado); FLA. STAT. ANN. § 218.077(2) (Florida); GA. CODE ANN. § 34-4-3.1(b) (Georgia); IDAHO CODE ANN. § 44-1502(4) (Idaho); IND. CODE ANN. § 22-2-2-10.5(b) (Indiana); IOWA CODE ANN. §§ 331.304(12) & 364.3(12) (Iowa); KAN. STAT. ANN. § 12-16,131(a) (Kansas); LA. STAT. ANN. § 23:642(B) (Louisiana); MICH. COMP. LAWS ANN. § 123.1385 (Michigan); MISS. CODE ANN. § 17-1-51(1) (Mississippi); MO. ANN. STAT. § 290.528 (as amended by 2017 Mo. Legis. Serv. H.B. 1194 & 1193 (VERNON'S) (West's No. 52)) (Missouri); N.C. GEN. STAT. § 95-25.1(c) (North Carolina); R.C. § 4111.02 (Ohio); 40 OKL. ST. ANN. § 160 (Oklahoma); OR. REV. STAT. ANN. § 653-017 (2) (Oregon); 28 R.I. GEN. LAWS ANN. § 28-12-25

---

[5] Alabama has 67 counties and 460 incorporated municipalities, each of which could adopt its own different minimum wage ordinance in the absence of the Uniform Minimum Wage Act. *See* U.S. Census Bureau, 2010 Census of Population and Housing, *Population and Housing Unit Counts,* CPH-2-2, Alabama, at p. III-3, U.S. Government Printing Office, Washington, DC, 2012.

(Rhode Island); S.C. CODE ANN. § 6-1-130(B) (South Carolina); TENN. CODE ANN. § 50-2-112(a)(1) (Tennessee); TEX. LABOR CODE ANN. § 62.0515(a) (Texas); UTAH CODE ANN. § 34-40-106(1) (Utah); WIS. STAT. ANN. § 104-001 (Wisconsin).

These twenty-two other states – from Oregon to Wisconsin to Rhode Island, which are not alleged to have the same historical baggage – adopted very similar laws for the same rational, nondiscriminatory reason. For example, like Alabama, the Colorado legislature expressly found a need for statewide uniformity in minimum wage laws:

> The general assembly hereby finds and determines that issues related to the wages of workers in Colorado have important statewide ramifications for the labor force in this state. The general assembly, therefore, declares that the minimum wages of workers in this state are a matter of statewide concern.

COLO. REV. STAT. ANN. § 8-6-101(2). Moving east, the Wisconsin legislature also found that minimum wage policy was a matter of "statewide concern" and further concluded that permitting local minimum wage regulation "would be logically inconsistent with" and "would defeat" its intended purpose of uniformity:

> The legislature finds that the provision of a minimum wage that is uniform throughout the state is a matter of statewide concern and that the enactment of a minimum wage ordinance by a city, village, town, or county would be logically inconsistent with, would defeat the purpose of, and would go against the spirit of this chapter. Therefore, this chapter shall be construed as an enactment of statewide concern for the purpose of

13

> providing a minimum wage that is uniform throughout the state.

WIS. STAT. ANN. § 104.001(1).  As did Michigan:

> The legislature finds and declares that regulation of the employment relationship between a nonpublic employer and its employees is a matter of state concern and is outside the express or implied authority of local governmental bodies to regulate, absent express delegation of that authority to the local governmental body.

MICH. COMP. LAWS ANN. § 123.1382, Sec. 2.

Some of the twenty-two other state legislatures made detailed findings about the economic importance of statewide uniformity in employment laws.  For example, this year, Arkansas concluded that "a patchwork of local regulations" would "frustrate" economic development and "discourage" investment.

> The General Assembly finds that:
>
> (1)(A) Arkansas employers are best able to grow and invest in their communities when operating under a clear, consistent regulatory system that imposes only those burdens absolutely necessary to promote the public welfare.
>
> (B) Allowing localities to mandate employer-provided benefits would create a patchwork of local regulations discouraging employers from growing and investing and imposing significant compliance burdens on them; and
>
> (C) Furthermore, locally mandated benefits frustrate the General Assembly's goal of a thriving statewide economy and place Arkansas employers at a competitive disadvantage to employers in other states not burdened with unnecessary local regulations; and

14

> (2) Preemption of burdensome and unnecessary local government mandates on employers to provide employee benefits provides a stable environment for Arkansas employers and promotes economic development.

2017 ARKANSAS LAWS ACT 643 (S.B. 668).

Likewise, Louisiana found that "local variation in the legally required minimum wage" would create "economic instability and decline and a decrease in the standard of living for the citizens of the state."

> (1) The Legislature of Louisiana finds that economic stability and growth are among the most important factors affecting the general welfare of the people of this state and are, therefore, among its own most important responsibilities. Economic stability and growth contribute to the standard of living enjoyed by citizens as employment and income are both dependent on the ability and willingness of businesses to operate in the state.
>
> (2) The legislature further finds that wages and employee benefits comprise the most significant expense of operating a business. It also recognizes that neither potential employees nor business patrons are likely to restrict themselves to employment opportunities or goods and services providers in any particular parish or municipality. Consequently, local variation in legally required minimum wage rates or mandatory, minimum number of vacation or sick leave days would threaten many businesses with a loss of employees to areas which require a higher minimum wage rate and many other businesses with the loss of patrons to areas which allow for a lower wage rate and more or less vacation or sick leave days. The net effect of this situation would be detrimental to the business environment of the state and to the citizens, businesses, and governments of the

15

various local jurisdictions as well as the local labor market.

> (3) The legislature concludes from these findings that, in order for a business to remain competitive and yet to attract and retain the highest possible caliber of employees, and thereby to remain sound, an enterprise must work in a uniform environment with respect to minimum wage rates and mandatory, minimum number of vacation or sick leave days. The net impact of local variation in mandated wages and mandatory, minimum number of vacation or sick leave days would be economic instability and decline and a decrease in the standard of living for the citizens of the state. Consequently, decisions regarding minimum wage and employee benefit policy must be made by the state so that consistency in the wage market is preserved.

LA. STAT. ANN. § 23:642(A).

The Mississippi legislature similarly found that uniform statewide wage laws are necessary to "ensure an economic climate conducive to new business development and job growth."

> The Legislature finds that the prohibitions of subsection (1) of this section are necessary to ensure an economic climate conducive to new business development and job growth in the State of Mississippi. We believe that inconsistent application of wage and benefit laws from city to city or county to county must be avoided. While not suggesting a state minimum wage or minimum benefit package, any debate and subsequent action on these matters should be assigned to the Mississippi Legislature as provided in Section 25-3-40, and not local counties or municipalities.

MISS. CODE. ANN. § 17-1-51(2).

16

As these examples from across the nation make clear, Alabama is not a renegade state in adopting a statewide policy on the minimum wage. It is squarely in the mainstream in concluding that uniformity in wage laws is an important economic development concern which should be legislated on a statewide basis.

### C. This "Obvious Alternative Explanation" Is Supported By Economic Research on the Effect of Changes to the Minimum Wage.

The concerns of these 23 states – including Alabama – about the economic impact of minimum wage legislation are not illusory. Several recent economic research studies have shown that increases in minimum wage do not increase the income of low wage earners and, conversely, can have long term negative impact on total income, total employment and economic mobility.

A team of researchers from the University of Washington studied the impact of the City of Seattle's adoption in 2014 of a higher minimum wage. Jardim, Ekaterina, et al., "Minimum Wage Increases, Wages, and Low Wage Employment: Evidence from Seattle," National Bureau of Economic Research, June 2017, p. 3.[6] The study, released in June 2017, concluded that although Seattle wage rates increased by 3.1%, low wage workers experienced a 9.4% decrease in scheduled hours. *Id.* at 35. The net effect was a decrease in total pay by 6.6%, which

---

[6] Available at:
https://evans.uw.edu/sites/default/files/NBER%20Working%20Paper.pdf and also
http://www.nber.org/papers/w23532.

translated to a loss of $125 per month for the average low wage worker. *Id.* at 36. The report also estimated that there are now 6.8% (approximately 5,000) fewer jobs in the City of Seattle than there would have been without the local minimum wage hike. *Id.* at 35.

Another research team from the University of California at San Diego conducted a broader economic study on the effect of changes in the minimum wage nationwide. Jeffrey Clemens and Michael Wither, "The Minimum Wage and the Great Recession: Evidence of Effects on the Employment and Income Trajectories of Low-Skilled Workers," September 7, 2016.[7]   Their economic analysis yielded similar conclusions on the impact of increases in the minimum wage over time:

> (1) the employment of low-skilled workers decreased by 6.6% (*Id.* at p. 40);
>
> (2) low-skilled workers' average incomes decreased by $140 per month (*Id.* at p. 5);
>
> (3) there was no statistically significant change in the incidence of poverty (*Id.* at p. 35); and

---

[7] Available at: http://econweb.ucsd.edu/~j1clemens/pdfs/ClemensWitherMinimumWageGreatRecession.pdf.

18

(4) the economic mobility (the opportunity for income growth) of low wage workers declined significantly because of reduced opportunity to accumulate experience and develop skills (*Id.* at p. 36-38).

These studies demonstrate that the concerns of the 23 states – including Alabama – about the economic impact of changes to the minimum wage are legitimate and the risks of patchwork local regulation are real.

## **CONCLUSION**

Amici's members include thousands of Alabama employers, many with multiple locations throughout the state and in multiple cities, towns and counties. As part of their representation of their members, Amici lobbied for and support uniform statewide legislation setting uniform employment standards, including the minimum wage. As twenty-two other states have concluded, there is a legitimate need for uniformity in minimum wage legislation. The District Court was correct in finding that this "obvious alternative explanation" was the more plausible reason for the Uniform Minimum Wage Act. Amici urge this Court to follow *Iqbal's* directive to consider the context of this purely economic legislation and affirm the dismissal of Plaintiffs' Amended Complaint.

19

Respectfully submitted,

Albert L. Vreeland, II  ASB-0066-V78A
avreeland@lehrmiddlebrooks.com

OF COUNSEL:
LEHR MIDDLEBROOKS VREELAND & THOMPSON, P.C.
P.O. Box 11945
Birmingham, Alabama 35202-1945
(205) 326-3002
Fax: (205) 326-3008

20

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the FEDERAL RULES OF APPELLATE PROCEDURE, Amici Curiae hereby certify that Amici Curiae's brief contains 4,247 words (as calculated by Microsoft Word) presented in 14 point Times New Roman font in compliance with Rule  32(a)(5) and Rule 29(A)(5).

_____
Counsel

21

22

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2017, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the counsel of record in this matter pursuant to FED. R. APP. P

25(a)(2)(d) and 11th CIR. R. 25-3(a).

OF COUNSEL

572639

22