No. 17-11009

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

MARNIKA LEWIS, et al.,

Plaintiffs-Appellants,

v.

STATE OF ALABAMA, et al.,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

_____

**EN BANC BRIEF OF PLAINTIFFS-APPELLANTS
ALABAMA LEGISLATIVE BLACK CAUCUS,
LOUISE ALEXANDER, MARIKA COLEMAN-EVANS,
PRISCILLA DUNN, JUANDALYNN GIVAN, MARY MOORE,
JOHN ROGERS, RODGER SMITHERMAN,
AND  WILLIAM MUHAMMAD**

_____

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham, AL 35209
Telephone: (205) 320-2882
still@votelaw.com

James U. Blacksher, Esq.
P.O Box 636
Birmingham, AL 35201
Telephone: (205) 591-7238
jblacksher@ns.sympatico.ca

*[Additional Counsel on Inside Cover]*

U.W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, AL 35222
Telephone: (205) 837-2898
clemonu@bellsouth.net

*Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad*

## PLAINTIFFS-APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1, Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad hereby state that none has any parent corporation or issues shares to the public.  Pursuant to Eleventh Circuit Rules 26.1-1 and 28-1(b), Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad hereby certify that, to the best of their knowledge, the following individuals and entities have an interest in the outcome of this appeal:

1.	Adams, Antoin - Plaintiff-Appellant.

2.	Alabama Legislative Black Caucus - Plaintiff-Appellant.

3.	Alabama State Conference of the National Association for the Advancement of Colored People - Plaintiff-Appellant.

4.	Alexander, Louise - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

5.	Beasley, William - Member of the Alabama Legislative Black Caucus.

6.	Bell, William A. - former Mayor of Birmingham, AL, Defendant-Appellee.

7.	Blacksher, James U. - Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad.

8.	Boyd, Barbara - Member of the Alabama Legislative Black Caucus.

9.	Bracy, Napoleon - Member of the Alabama Legislative Black Caucus.

i

10.    Brasher, Andrew Lynn - Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

11.    Brown, Eric P. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

12.    Burkette, David - Member of the Alabama Legislative Black Caucus.

13.    Carlson, Mary Joyce - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

14.    Chestnut, Prince – Member of the Alabama Legislative Black Caucus.

15.    Chisholm, Barbara J. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

16.    City of Birmingham, Alabama - Defendant-Appellee.

17.    Clarke, Adline - Member of the Alabama Legislative Black Caucus.

18.    Clemon, U.W. - Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad .

19.    Coleman, Linda - Member of the Alabama Legislative Black Caucus.

20.    Coleman-Evans, Merika - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

21.    Connor, Glen M. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

ii

22.    Daniels, Anthony - Member of the Alabama Legislative Black Caucus.

23.    Davies, George N. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

24.    Davis, James W. - Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

25.    Drummond, Barbara - Member of the Alabama Legislative Black Caucus.

26.    Dunn, Priscilla - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

27.    England, Chris - Member of the Alabama Legislative Black Caucus.

28.    Figures, Vivian - Member of the Alabama Legislative Black Caucus.

29.    Forte, Berry - Member of the Alabama Legislative Black Caucus.

30.    Fullerton, Fredric - Counsel for Defendants-Appellees the City of Birmingham and Mayor Randall Woodfin.

31.    Givan, Juandalynn - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

32.    Gray, Jeremy – Member of the Alabama Legislative Black Caucus.

33.    Greater Birmingham Ministries - Plaintiff-Appellant.

34.    Grimsley, Dexter - Member of the Alabama Legislative Black Caucus.

35.    Hall, Laura - Member of the Alabama Legislative Black Caucus.

36.    Hatcher, Kirk – Member of the Alabama Legislative Black Caucus.

37.    Hollis, Rolanda - Member of the Alabama Legislative Black Caucus.

iii

38.     Howard, Ralph - Member of the Alabama Legislative Black Caucus.

39.     Jackson, Thomas - Member of the Alabama Legislative Black Caucus.

40.     Jones, Sam - Member of the Alabama Legislative Black Caucus.

41.     Lawrence, Kayla - Counsel for Defendants-Appellees the City of Birmingham and Mayor Randall Woodfin.

42.     Lawrence, Kelvin - Member of the Alabama Legislative Black Caucus.

43.     Lewis, Marnika - Plaintiff-Appellant.

44.     Marshall, Steve - Attorney General of Alabama, Defendant-Appellee.

45.     McCampbell, A.J. - Member of the Alabama Legislative Black Caucus.

46.     McClammy, Thad - Member of the Alabama Legislative Black Caucus.

47.     Moore, Mary - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

48.     Morris, Tashina - Member of the Alabama Legislative Black Caucus.

49.     Parker, William Glenn - Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

50.     Rafferty, Neil - Member of the Alabama Legislative Black Caucus.

51.     Rogers, John - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

52.     Rouco, Richard P. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

53.     Sanders-Fortier - Member of the Alabama Legislative Black Caucus.

iv

54.    Scott, Rod - Member of the Alabama Legislative Black Caucus.

55.    Singleton, Bobby - Member of the Alabama Legislative Black Caucus.

56.    Smitherman, Rodger - Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

57.    State of Alabama - Defendant-Appellee.

58.    Still, Edward - Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad .

59.    Stroup, Robert H. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

60.    Warren, Pebblin - Member of the Alabama Legislative Black Caucus.

61.    Whatley, Joe R. - Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

62.    Woodfin, Randall – Mayor of Birmingham, Defendant-Appellee.

## STATEMENT REGARDING ORAL ARGUMENT

In its February 12, 2019, briefing notice, the Court indicated that oral argument will be heard by the en banc Court during the week of June 24, 2019.

# TABLE OF CONTENTS

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ADOPTION OF BRIEFS
     OF OTHER PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF SUBJECT-MATTER AND
     APPELLATE JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.     The Course of Proceedings and Dispositions in the Court Below  6

    II.    Statement of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         A. *Overview* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         B. *Anti-Home Rule Provisions in the 1875 Constitution* . . . . . . . . . 10

         C. *The 1901 Constitution Further Restricts Home Rule*. . . . . . . . . 20

    III.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ARGUMENT AND CITATION OF AUTHORITIES . . . . . . . . . . . . . . . . . 33

    I.    The Plaintiffs-Appellants Have Article III Standing, and Both the
        City of Birmingham and the Alabama Attorney General Are
        Proper Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    II.    On the Merits, Plaintiffs-Appellants Have Plausibly Alleged That

**Act 2016-18 Is An Unconstitutional Exercise of Alabama's Ongoing, Historical Policy of Suppressing the Ability of Local Black Majorities To Govern Themselves**. . . . . . . . . . . . . . . . . . . . 39

A.  *The Amended Complaint Plausibly Alleges That Act 2016-18 Was Enacted For a Racially Discriminatory Purpose in Violation of the Equal Protection Clause*. . . . . . . . . . . . . . . 39

B.  *The Amended Complaint Plausibly Alleges That Act 2016-18 Perpetuates Alabama's Official Policy of Maintaining White Control over Local Black Majorities in Violation of the Equal Protection Clause*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**CERTIFICATE OF COMPLIANCE**. . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## TABLE OF CITATIONS

**Cases**:

*Alabama Legislative Black Caucus v. Alabama*, 988 F.Supp.2d 1285 (M.D. Ala. 2013) (three-judge court) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Alabama Legislative Black Caucus v. Alabama*, 989 F.Supp.2d 1227 (M.D. Ala. 2013) (three-judge court), vacated and remanded on other grnds, 135 S.Ct. 1257 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-29

*Alvarez v. Atty. Gen. of Fla.*, 679 F.3d 1257 (11th Cir. 2012). . . . . . . . . . . . . . . 31

*Baker v. Carr*, 369 U.S. 186 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . 5, 31

*Bolden v. City of Mobile*, 542 F.Supp. 1050 (S.D. Ala. 1982) . . . . . . . . . . . . . 11, 21

*Brown v. Board of Education,* 347 U.S. 483 (1954) . . . . . . . . . . . . . . . . . . . . . . . 22

*Burton v. Hobbie*, 561 F.Supp. 1029 (M.D. Ala. 1983) (three-judge court). . . . . 26

*Dillard v. Baldwin County Comm'rs* (Baldwin V), 376 F.3d 1260 (11th Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Dillard v. Chilton County Com'n*, 495 F.3d 1324 (11th Cir. 2007). . . . . . . . . 34, 38

*Dillard v. Crenshaw County*, 640 F.Supp. 1358 (M.D. Ala. 1986). . 15, 21, 22, 38, 42

*Ex Parte Young*, 209 U.S. 123 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hardy v. Wallace*, 603 F.Supp. 174 (N.D. Ala. 1985) (three-judge court) . . . 26, 27

*Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 31

*Hunter v. Underwood*, 471 U.S. 222 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . 41

*Iqbal v. Ashcroft*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 31

*Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005) (*en banc*) . . . 40, 45

*Knight v. Alabama*, 458 F.Supp.2d 1273 (N.D. Ala. 2004), aff'd 476 F.3d 1219 (11th Cir.), cert. denied, 551 U.S. 1146 (2007) . . . . . . . . . . . . . . . . 9, 12, 15, 16, 42

*Knight v. Alabama*, 787 F.Supp. 1030 (N.D. Ala. 1991), aff'd in relevant part, 14 F.3d 1534 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 14

*Lynch v. Alabama*, __ F.Supp.2d __, 2011 U.S. Dist. LEXIS 155012 (N.D. Ala., Nov. 7, 2011), aff'd, 739 F.3d 1273 (11th Cir.), cert. denied, 135 S.Ct. 53 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-24, 28, 42

*Montiel v. Davis*, 215 F.Supp.2d 1279 (S.D. Ala. 2002) (three-judge court) . . . . 28

*Presley v. Etowah County*, 502 U.S. 491 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir.1979) . . . . . . . . . . . . . . . . . . . . 34

*Smith v. Allwright*, 321 U.S. 649 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Socialist Workers Party v. Leahy*, 145 F.3d 1240 (11th Cir. 1998) . . . . . . . . . . . 34

*United States v. Alabama*, 252 F.Supp. 95 (M.D. Ala. 1966) (three-judge court) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429

U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 40, 41, 45

*Whitcomb v. Chavis*, 403 U.S. 124 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


**Constitutions and Statutes**:

1819 Constitution of Alabama . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1868 Constitution of Alabama . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

1875 Constitution of Alabama . . . . . . . . . . . . . . . . . . . . 8-10, 15-19, 21, 25, 42

1901 Constitution of Alabama . . . . . . . . . . . . . . . . . . . . 2, 7, 8, 20, 25, 42, 44, 45

1901 Constitution of Alabama, Amendment 325 . . . . . . . . . . . . . . . . . . . . . . . 24

1901 Constitution of Alabama, Amendment 373 . . . . . . . . . . . . . . . . . . . . . . . 24

1901 Constitution of Alabama, Article IV, § 89 . . . . . . . . . . . . . . . . . . . . . . . 46

28 U.S.C. § 1443(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. §1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

52 U.S.C. §10302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Ala.Code § 11-50-300 et seq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Alabama Apportionment Act of 1891 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Alabama Memorial Preservation Act, Ala. Code § 41-9-231 et seq. . . . . . . . . . . 30

Constitution of the United States, Amendment XI . . . . . . . . . . . . . . . . . . . . . . . . . 6

Constitution of the United States, Amendment XIII . . . . . . . . . . . . . . . . . . . . . . . 5

Constitution of the United States, Amendment XIV, Equal Protection Clause . . 1-4

Constitution of the United States, Amendment XIV, Privileges or Immunities
Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Constitution of the United States, Amendment XV . . . . . . . . . . . . . . 3-7, 15, 39, 40

Constitution of the United States, Article III . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 6, 35

Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301 . . 3-7, 23, 39, 40

Section 5 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10304 . . 27, 39

**Other Authorities**:

DOUGLAS A. BLACKMON, SLAVERY BY ANOTHER NAME: THE RE-ENSLAVEMENT
OF BLACK AMERICANS FROM THE CIVIL WAR TO WORLD WAR II (2008) . . . . . . 17

Fed. R. App. P. 4(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

GRETA DE JONG, YOU CAN'T EAT FREEDOM: SOUTHERNERS AND SOCIAL JUSTICE
AFTER THE CIVIL RIGHTS MOVEMENT (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

https://www.census.gov/quickfacts/fact/table/huntsvillecityalabama,tuscaloosacity
alabama,montgomerycityalabama/PST045217 . . . . . . . . . . . . . . . . . . . . . . . . . 45

J. MILLS THORNTON III, POLITICS AND POWER IN A SLAVE SOCIETY, ALABAMA

1800-1860 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

JEFFREY J. FREDERICK, STAND UP FOR ALABAMA: GOVERNOR GEORGE C. WALLACE (Tuscaloosa: The University of Alabama Press 2007) . . . . . . . . . . . . . 22

MALCOLM COOK MCMILLAN, CONSTITUTIONAL DEVELOPMENT IN ALABAMA, 1798-1901: A STUDY IN POLITICS, THE NEGRO, AND SECTIONALISM (1955) . . . . 42

MARY ELLEN CURTIN, BLACK PRISONERS AND THEIR WORLD, ALABAMA, 1865-1900 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

MIKE HUBBARD, STORMING THE STATE HOUSE: THE CAMPAIGN THAT LIBERATED ALABAMA FROM 136 YEARS OF DEMOCRAT RULE (2012) . . . . . . . . . . . . . . . . . . 28

Peyton McCrary et al., *Alabama* in Quiet Revolution in the South: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990 (Chandler Davidson & Bernard Grofman eds. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

ROBERT J. NORRELL, REAPING THE WHIRLWIND: THE CIVIL RIGHTS MOVEMENT IN TUSKEGEE (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Samuel L. Webb, *The Populist Revolt in Alabama: Prelude to Disfranchisement*, in BAILEY THOMSON, ED., A CENTURY OF CONTROVERSY: CONSTITUTIONAL REFORM IN ALABAMA 5 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

SUSAN YOUNGBLOOD ASHMORE, CARRY IT ON: THE WAR ON POVERTY AND THE CIVIL RIGHTS MOVEMENT IN ALABAMA 1964-1972 (2008) . . . . . . . . . . . . . . . . 23

Wayne Flynt, *Alabama's Shame: The Historical Origins of the 1901 Constitution*, 53 ALA. L. REV. 67 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Whose Heritage?: Public Symbols of the Confederacy, http://www.splcenter.org/whoseheritage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Will Parker, *Still Afraid of "Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 Are Unconstitutional*, 57 ALA. L. REV. 545, 546 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 25, 26, 42, 43

"AG files lawsuit against Birmingham over Confederate monument,"
https://www.al.com/news/birmingham/2017/08/ag_files_lawsuit_against_birmi.ht
ml (Aug. 16, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

"Judge rules Alabama Confederate monument law is void; city of Birmingham
didn't break the law,"
https://www.al.com/news/birmingham/2019/01/judge-rules-alabama-confederate-
monument-law-is-void-city-of-birmingham-didnt-break-the-law.html (Jan. 16,
2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**INTRODUCTION**

This brief is submitted on behalf of plaintiffs-appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad, who are separately represented by undersigned counsel. They joined this action in the amended complaint. None of them is a minimum wage worker. Each of these persons is a registered black voter; all but William Muhammad are elected representatives of black citizens in the Alabama Legislature. They will be referred to in this brief as the "ALBC Plaintiffs" to distinguish them from the separately represented "Lewis Plaintiffs," who are both black minimum wage workers and registered voters. Collectively, they will be referred to as "Plaintiffs-Appellants."

The ALBC Plaintiffs are submitting a separate *en banc* brief, rather than joining the *en banc* brief of the Lewis Plaintiffs, because their Equal Protection claims as black voters were virtually overlooked in the opinions of both the district court and the panel of this Court. Different analyses apply to the Article III standing of black voters and black workers, and the analyses of their Equal Protection claims place different emphases on the historical background of the challenged statute.

1

The ALBC Plaintiffs' claims are encapsulated in the second paragraph of the amended complaint: "Act 2016-18 has the purpose and effect of transferring control over minimum wages and all matters involving private sector employment in the City of Birmingham from municipal officials elected by a majority-black local electorate to legislators elected by a statewide majority-white electorate. It perpetuates an official policy of political white supremacy that has been maintained in Alabama since it became a state in 1819, whereby white control is preserved by state government over the governing bodies of majority-black counties, cities, and educational institutions."  Doc. 18, p. 2.  The ALBC Plaintiffs' claims are a direct challenge to Alabama's judicially acknowledged policy, embedded in its 1901 Constitution, of restricting the ability of local black majorities to govern themselves, preventing them in particular from taxing white wealth or interfering with policies that preserve cheap black labor for businesses owned by whites.

The panel's holding that the amended complaint plausibly alleged an Equal Protection violation includes the claims shared by all the plaintiffs.  But neither the district court nor the panel opinion explicitly addressed Plaintiffs-Appellants' Equal Protection claim that Act 2016-18 intentionally discriminates against them as African-American voters.  The conclusions of the district court and panel,

which Appellants still dispute, that Act 2016-18 did not involve voting rights actionable under the Voting Rights Act or the Fifteenth Amendment do not foreclose the plaintiff black voters' claims under the Equal Protection Clause of the Fourteenth Amendment.

The district court held that the amended complaint failed plausibly to state a claim that the Act violated Plaintiffs-Appellants' Equal Protection rights, focusing exclusively on their standing as minimum wage workers. The panel disagreed. It concluded that the amended complaint plausibly alleges economic injury to the plaintiff workers' Equal Protection rights, and it held "that the circumstances of the Minimum Wage Act reflect a motivation consistent with Alabama's many historical 'barriers [erected] to keep black persons from full and equal participation in the social, economic, and political life of the state.'" Panel op. at 23 (citation omitted). The ALBC Plaintiffs believe the panel got it right, for the reasons set out in their joint principal brief and in the *en banc* brief filed separately by the Lewis Plaintiffs. The purpose of this brief is to focus more attention on the violation of all Plaintiffs-Appellants' Equal Protection rights to equal political representation that heretofore have not been squarely addressed.

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

The ALBC Plaintiffs adopt all sections of the *en banc* brief submitted by Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries (hereafter the "Lewis Plaintiffs"). This brief will emphasize Plaintiffs-Appellants' mutual claim that Act 2016-18 is an exercise of Alabama's intentionally discriminatory policy of suppressing the electoral power of local black majorities, in violation of the Fourteenth Amendment, Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the Fifteenth Amendment.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) & (4), and 52 U.S.C. §10302, because this matter arises, inter alia, under the Fourteenth and Fifteenth Amendments to the United States Constitution and the Voting Rights Act of 1965.

The district court entered final judgment on February 1, 2017, Doc. 53, and Plaintiffs-Appellants jointly filed a Notice of Appeal on March 2, 2017, Doc. 54. This Court has appellate jurisdiction under 28 U.S.C. §1291. Plaintiffs-Appellants' appeal is timely under Fed. R. App. P. 4(a)(1)(A) and the letter of this Court's clerk dated February 12, 2019, scheduling briefs for the *en banc* Court.

## STATEMENT OF THE ISSUES

(1) Whether plaintiffs have standing under Article III of the Constitution.

(2) Whether plaintiffs have standing to pursue claims against the City of Birmingham.

(3)  Whether the Attorney General of Alabama is a proper defendant under *Ex Parte Young*, 209 U.S. 123 (1908).

(4) Whether the amended complaint states a claim of racial discrimination, in violation of the Equal Protection Clause, that is plausible under the pleading standard established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal v. Ashcroft*, 556 U.S. 662 (2009).

(5)  Whether the amended complaint states a claim of racial discrimination, in violation of the Voting Rights Act and the Fifteenth Amendment, that is plausible under the pleading standard established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal v. Ashcroft*, 556 U.S. 662 (2009).  This issue will not be addressed in this *en banc* brief.  The ALBC Plaintiffs rely on their briefs submitted to the panel.[1]

## STATEMENT OF THE CASE

---

[1] Plaintiffs-Appellants do not pursue on appeal their claims under the Thirteenth Amendment or the Privileges or Immunities Clause of the Fourteenth Amendment.

5

## I.    The Course of Proceedings and Dispositions in the Court Below.

This is an appeal from the dismissal of Plaintiffs-Appellants' amended complaint on grounds that, on its face, it fails to state any claim on which federal court relief can be granted.  The district court's opinion, Doc. 52, treated the amended complaint as involving only claims by minimum wage workers that Act 2016-18, by voiding Birmingham's minimum wage ordinance, had injured them economically for racially discriminatory reasons.  Accordingly, it accepted the State Appellees' arguments that none of the Plaintiffs-Appellants had Article III standing to assert their Equal Protection and Fifteenth Amendment claims, because, the State argued, neither the Alabama Attorney General nor the City of Birmingham caused or could redress the Lewis Plaintiffs' economic injuries.  It held that Plaintiffs-Appellants' claim against the defendant State of Alabama based on Section 2 of the Voting Rights Act was barred by the Eleventh Amendment.

Notwithstanding its holding that none of the Plaintiffs-Appellants has Article III standing, the district court proceeded to address the merits.  It held that none of the claims of intentional discrimination was supported by specific factual allegations and must be dismissed in the face of legitimate alternative explanations and the absence of alleged direct evidence that any particular legislators were

6

motivated by race.  It failed even to consider the 40 paragraphs of factual

allegations detailing Alabama's policy of suppressing local black electoral

majorities (Doc. 18, ¶¶ 38-78).  Nor did the district court mention, much less

address the standards for alleging purposeful discrimination set out in *Village of*

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252

(1977).  It dismissed the claims under Section 2 of the Voting Rights Act and the

Fifteenth Amendment based on its conclusion, as a matter of law, that state

legislative override of policies adopted by majority-black local governments

categorically can have nothing to do with the right to vote.

Read in its entirety, and given the extensive factual allegations in the

amended complaint, the district court's opinion appears to hold there are no

circumstances whatsoever in which black citizens of Alabama can seek relief in

federal court from Alabama's continuing exercise of the 1901 Constitution's

racially motivated denial of home rule for local governments serving majority-

black electorates.  This conclusion should not be allowed to stand, when

suppression of local black majorities was the main reason for disfranchising black

Alabamians in 1901, and when all the structural barriers erected to accomplish this

racist objective remain in place and have even been enhanced.  If left undisturbed,

the district court's ruling that, as a matter of law, the systematic withdrawal of the

7

powers majority-black local governments may exercise is not actionable under any of the federal statutory or constitutional guarantees of equal rights, regardless of the particular facts or circumstances, would have a devastating impact on black Alabamians "civil rights journey," Doc 52 at 1, and would perpetuate the policy of white supremacy on which the current Alabama Constitution is founded.

## II.    Statement of the Facts.

The ALBC Plaintiffs adopt the statement of facts in the *en banc* brief of the Lewis Plaintiffs, and we will attempt not to repeat them here.  The following statement emphasizes the facts alleged in the amended complaint that most directly address the State's official policy of suppressing the political powers of local black majorities.

### A. Overview

The amended complaint alleges that the purpose of Alabama's official anti-home rule policy, embedded first in the 1875 Redemption Constitution, then in the disfranchising 1901 Constitution that still governs the state today, is to prevent local black majorities from exercising any power to interfere with whites' property or their access to the subservient, cheap labor needed to create wealth. Doc. 18, ¶¶ 45-48, 51-54.  This is not a conclusory allegation; it is clearly established by prior judicial precedents.  "This general hostility to home rule in the 1901 Constitution,

8

as well as the 1875 Constitution, was motivated at least in part by race: 'white control of the state government ... is an important fall-back provision for guaranteeing the maintenance of white supremacy in majority black counties.'"[2] Legal scholarship agrees: "This well-documented sentiment that blacks were somehow inherently unsuited for democratic participation – and particularly unsuited for the exercise of governmental power as officeholders – undoubtedly informed the delegates' restriction of local government power."[3]

To demonstrate that these allegations are not conclusory, the following is a summary of historical facts alleged in the amended complaint, annotated with prior judicial decisions and scholarly authorities on which they are based. It shows that the extent to which the federal government protected or withdrew protection of black Alabamians' voting rights determined how state policies would be shaped to preserve a subservient, low-wage, black labor force that could sustain the property and profits of white landowners and employers. The State's home rule policies were always central to achieving this objective. Only two African

---

[2] *Knight v. Alabama*, 458 F.Supp.2d 1273, 1284-85 (N.D. Ala. 2004), aff'd 476 F.3d 1219 (11th Cir.), cert. denied, 551 U.S. 1146 (2007) (quoting Prof. J. Mills Thornton).

[3] Will Parker, *Still Afraid of "Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 Are Unconstitutional*, 57 ALA. L. REV. 545, 546 (2005).

Americans have ever been elected to statewide office.  Both were elected to the

Alabama Supreme Court: Oscar Adams in 1982 and 1988 and Ralph Cook in

1994.  Doc. 18, ¶ 35.  Today, black political power has its greatest influence in

local governments, with twelve counties and two of the state's largest

municipalities having black majorities.  Doc. 18, ¶¶ 36-37.

The most important service provided by state and local government is

public education.  Education is a primary determinant of economic opportunity;

denying Alabama's black citizens equal access to education has always been

intended to keep them in subordinate roles in social and economic life.[4]  Doc. 18,

¶¶ 48, 50.  Consequently, the main purpose historically of state restrictions on

home rule in Alabama has been to deny local black majorities power to tax white

property for the benefit of black students.  The anti-home rule policy that underlies

the suppression of Birmingham's power to raise the minimum wage cannot be

understood without taking account of how it is intertwined with taxation,

education, and, above all, blacks' voting rights.

*B. Anti-Home Rule Provisions in the 1875 Constitution*[5]

---

[4]  *Knight v. Alabama*, 787 F.Supp. 1030, 1053 (N.D. Ala. 1991), aff'd in relevant part, 14 F.3d 1534 (11th Cir. 1994).

[5]  See Amended Complaint, ¶¶ 39-52.

10

Before the Civil War enslaved blacks were disfranchised, of course. The 1819 Constitution guaranteed "all freemen" equal rights and privileges,[6] but free blacks nevertheless were disfranchised, even the Creoles in Mobile,[7] while "[e]very white male person above the age of twenty one years" became a qualified elector regardless of whether he owned property.[8]

Non-slave-owning white settlers dominated the 1819 Constitutional Convention, and by apportioning seats in the Legislature to cities, towns, and counties on the basis of "white inhabitants,"[9] they drafted one of the most liberal, democratic state constitutions of the era.[10] With slaves, who became nearly half the state's population, disfranchised, "the choice of legislators and local officials was directly in the hands of the [white] people," who enjoyed *de facto* home rule powers.[11] The citizens of townships and counties determined for themselves how

---

[6] 1819 Ala. Const., Art. I, § 1.

[7] *Bolden v. City of Mobile*, 542 F.Supp. 1050, 1055 (S.D. Ala. 1982).

[8] 1819 Ala. Const., Schedule, § 6.

[9] 1819 Ala. Const., Art. III, § 8.

[10] *Lynch v. Alabama*, __ F.Supp.2d __, 2011 U.S. Dist. LEXIS 155012 (N.D. Ala., Nov. 7, 2011) at *701-02, aff'd, 739 F.3d 1273 (11th Cir.), cert. denied, 135 S.Ct. 53 (2014).

[11] J. MILLS THORNTON III, POLITICS AND POWER IN A SLAVE SOCIETY, ALABAMA 1800-1860, 145 (1978).

to raise revenues for schools and other public services.[12]  "[T]he slave tax and ad valorem taxes on land were the principal source of revenue for county governments."[13]  The Black Belt counties had eighty percent of the slaves and the most valuable land, so the progressive slave tax allowed non-slave owners in the white counties to avoid paying state taxes on their land.[14]  Doc. 18, ¶¶ 40-42.

The end of slavery and Reconstruction made restricting the power of large black majorities in Alabama's Black Belt counties an urgent issue.  During Reconstruction, black citizens participated widely in local governance throughout the Black Belt counties.  The freedmen helped elect black local officials, including tax assessors, who assessed white-owned property at its fair market value, and county commissioners, who determined how to spend the revenue thus collected, most of which was allocated to public education.[15]  Doc. 18, ¶ 43.

The 1868 Radical Reconstruction Constitution changed the basis of apportioning House and Senate seats to each county from white population to the

---

[12]  *Lynch* at *720-27.

[13]  *Knight v. Alabama*, 458 F.Supp. at 1281.

[14]  *Lynch* at *714-17.

[15]  See *Lynch* at *786-*790; *Knight v. Alabama*, 458 F. Supp. 2d at 1283.

12

total "number of inhabitants in them respectively."[16]  This shifted control to the populous majority-black Black Belt counties, which during Reconstruction were dominated by black voters and their white Republican supporters.  It also created the first centralized state system of education, governed by a State Board of Education that included one black member,[17] and was funded with ad valorem taxes on land that were increased to pay for the education not only of whites but now of black students.  State tax revenues were distributed fairly between the white schools and black schools in proportion to the number of all school children in each county.  White landowners bitterly resented having to pay for black schools.[18]  State taxes tripled, county taxes quadrupled, and many poor white farmers lost their land due to their inability to pay taxes.[19]  But the political reforms of the Radical Republicans soon failed, because the freedmen remained propertyless and their labor was left to the control of white Black Belt planters,

---

[16]  1868 Ala. Const., Art. VIII, § 1.

[17]  *Knight v. Alabama*, 787 F.Supp. at 1070.

[18]  "Black participation in the political process was viewed as an affront to white authority and the kind of control that whites assumed they should have over Alabama society."  *Lynch* at *793 (footnote omitted).

[19]  *Lynch* at *788-89.  "Thus, black schools were firmly connected in the minds of whites to increased land taxes, wasteful government spending, official corruption, and intense hostility, anger and violence from whites."  Id. at *793 (footnote omitted).

13

who used both violence and the threat of being thrown off the land to deny their black sharecroppers political independence.[20]  Doc. 18, ¶ 44.

The Conservative Democratic Party, led by white Black Belt planters, "drew the color line"[21] in 1874, gained control of most county offices, both Houses of the Legislature, and the Governor's office, and "redeemed" Alabama from "black rule."[22]  "With apportionment based on total population, and whites in the populous Black Belt[, now free of federal army oversight,] able fraudulently to manipulate the majority-black vote, a small number of whites were able to harness a hugely disproportionate share of power in state government," which the Black Belt would continue to dominate until the 1970s.[23]  White landowners were "intent on ... using that new control to protect themselves from the possibility that the black majority in their counties would ever again be able to use that political power ... to tax them in a way that would force them as the property holders to cough up the funds, ... which would be used to the benefit of the majority of the

---

[20]  *Lynch* at *794, 798.

[21]  *Knight v. Alabama*, 787 F.Supp. at 1068-70.

[22]  *Lynch* at *794-95, 802.

[23]  *Lynch* at *798, 822-23.

people in the Black Belt who were black and essentially nonproperty holding."[24] Doc. 18, ¶ 45.

While the drafters of the 1875 "Redeemer" Constitution did not dare disfranchise blacks for fear of federal enforcement of the recently adopted Fifteenth Amendment, they placed in it "mechanisms to remove authority from local officeholders to a statewide authority like the governor when blacks were elected to local office."[25] Under the 1875 Constitution the Alabama Legislature passed statutes that revoked the ability of majority-black electorates in Dallas, Montgomery, and Wilcox Counties to elect their county commissioners and gave the Governor power to appoint them instead.[26] Doc. 18, ¶ 46.

The primary purpose of white control and suppression of the black vote was to deny local black electorates the power to raise taxes for education and other public services so vital to the freedmen. The "dreaded black tax assessor" was the worst nightmare of Black Belt whites,[27] because tax assessors "had the legal ability to appraise and assess property at a figure 'injurious to the economic interest of

---

[24] *Knight*, 458 F. Supp.2d at 1283.

[25] *Lynch* at *807 (quoting Prof. Robert J. Norrell).

[26] *Lynch* at *826-27; *Dillard v. Crenshaw County*, 640 F.Supp. 1358 (M.D. Ala. 1986).

[27] *Lynch* at *825.

15

planters': i.e., at a monetary value that was actually close to the property's fair and reasonable market value."[28]  So caps on millage rates that could be levied by state, county, or municipal governments were placed in the 1875 Constitution.  Doc. 18, ¶ 47.

As Judge Harold Murphy found in *Knight v. Alabama*, "[r]acial motives permeated the establishment of constitutional caps on millage rates" in the 1875 Constitution.[29]  If the children of field hands were educated, planters feared, they would be "much more likely to leave [the Black Belt] and go to Birmingham . . . an industrial magnet, that offer[ed] alternative economic opportunities to the black child."[30]  In 1888 U.S. Senator John Tyler Morgan of Dallas County helped defeat the Blair Bill, which would have provided federal aid to education, by arguing that Congress would be interfering with Alabama's "economic system" by letting the black man "get beyond himself."[31]  Doc. 18, ¶¶ 47-50.

White legal and extra-legal control over the majority-black counties generated barbaric oppression of black workers all over the state.  Because over

---

[28]  *Lynch* at * 807 (footnote omitted).

[29]  *Lynch* at *815 (quoting *Knight v. Alabama*, 458 F. Supp. 2d at 1283).

[30]  *Lynch* at *839 (quoting Prof. Wayne Flynt).

[31]  *Lynch* at *839-40.

half of Black Belt land, the most valuable property in Alabama, was able to evade any taxation, and the constitutional millage caps were applied to the remaining land assessed by white officials far below its fair market value, state government was deprived of its single-most important source of revenue, property taxes.[32]  So the Legislature created the infamous convict lease system, which "was in reality a re-invention of slavery, and a reinstitution of the Antebellum slave tax."[33]  The property taxes evaded by Black Belt planters were replaced to some extent by state and county leasing of captive black labor.  "By 1920, one-fifth of the total revenue funding the entire state of Alabama is being generated by the convict lease system."[34]  The mines and mills in the Birmingham area were primary consumers of the mostly black convict laborers and the notorious sites of their highest mortality rates.[35]  Doc. 18, ¶ 51.

The 1875 Constitution also was the first Alabama constitution explicitly to

---

[32]  *Lynch* at *961-63.

[33]  *Lynch* at *836.

[34]  *Lynch* at *838 n.1126 (quoting Professor Wayne Flynt).

[35]  See generally, DOUGLAS A. BLACKMON, SLAVERY BY ANOTHER NAME: THE RE-ENSLAVEMENT OF BLACK AMERICANS FROM THE CIVIL WAR TO WORLD WAR II (2008); MARY ELLEN CURTIN, BLACK PRISONERS AND THEIR WORLD, ALABAMA, 1865-1900 (2000).

require racial segregation of schools.[36]  School segregation was a crucial component of the Black Belt economic system, because it enabled governing whites to divert to the white schools both state and local revenues intended for black schools.  This illegal racial diversion was effectively made legal by the Apportionment Act of 1891, which gave local school boards authority to apportion school funds as was deemed "just and equitable."[37]  "The result was the collection of property taxes for the education of all school-age children, both white and black, but allocation of an overwhelming proportion of that revenue for the benefit of white children."[38]  The Apportionment Act had "an enormous and devastating impact on black education."[39]  This was a direct result of the suppression of blacks' voting rights.  "Blacks, obstructed by whites at every turn from exercising political rights, were powerless to increase funding for their schools."[40]  In this way, state law facilitated white control over a subservient black labor force by

---

[36] 1875 Ala. Const., Art. XIII, § 1 ("separate schools shall be provided for the children of citizens of African descent").  Schools had been unofficially segregated under Radical Republican rule.

[37] *Lynch* at *843-45.

[38] *Lynch* at *845 (footnote omitted).

[39] *Lynch* at *846 (quoting Prof. Thornton).

[40] *Lynch* at *847.

giving white local governing bodies power to exercise unfettered discretion over the distribution of state school revenues.  Doc. 18, ¶¶ 48-50.

Conversely, where the exercise of local government powers could threaten the maintenance of a cheap labor force, "Bourbon" planters and "Big Mule" industrialists used their control of state government to deny home rule powers.[41] They thwarted efforts of the white counties and Birmingham labor unions to circumvent the 1875 Constitution's millage caps and raise revenues for their schools.  White schools in the Black Belt were the best in Alabama, because their relatively small numbers of white students were enjoying the state funds that were supposed to benefit their large black populations.  They had no need of higher millage rates, and they defeated the majority-white counties' attempts to amend the constitutional millage caps or redirect to schools property taxes constitutionally earmarked for other purposes.[42]  Doc. 18, ¶¶ 48-50.

---

[41]  "[T]he interest that tied together the various elements of the Black Belt—Big Mule political partnership was their common desire 'to control the tenant farmers, sharecroppers, farm laborers, textile workers, lumber millhands, coal and iron ore miners, and workers in iron and steel mills who produced the wealth for the state's upper classes.'" *Lynch* at *860 (quoting Samuel L. Webb, *The Populist Revolt in Alabama: Prelude to Disfranchisement*, in BAILEY THOMSON, ED., A CENTURY OF CONTROVERSY: CONSTITUTIONAL REFORM IN ALABAMA 5 (2002)).

[42]  *Lynch* at *849-56.

19

### *C. The 1901 Constitution Further Restricts Home Rule*

The Populist revolt in the 1890s convinced Black Belt whites to give up fraudulent control of their large black majorities and agree to a new Constitution that would disfranchise blacks almost totally.[43]  Today, Alabama is still governed by the 1901 Alabama Constitution that established white supremacy as the official policy of Alabama.[44]  It used a "most intricate" set of devices, including payment of poll taxes, a literacy test, property requirements, and crimes tailored to disqualify blacks, to disfranchise almost all black Alabamians and many poor whites as well.[45]  But the price Black Belt whites demanded and received for relinquishing their captive black votes was constitutional assurance of their continued control of the Alabama Legislature for the indefinite future and

---

[43]  *Dillard*, 640 F.Supp. at 1358.  "Fundamentally, the Populist Revolt of the 1890s gave birth to a fear among wealthy Planter elites and their Big Mule allies that poor whites and blacks would come to the realization that they shared common economic, political, and social interests, and that they then would unite in common purposes and gain control of state governance."  *Lynch* at *885 (footnote omitted).

[44]  *Hunter v. Underwood*, 471 U.S. 222, 229 (1985); *Lynch* at *900.

[45]  *Lynch* at *941-44.  "In 1900 there were 181,000 registered black male voters; in 1903 there were less than 5,000. . . .  In the first election held after enactment of the 1901 Constitution, overall voter turnout declined by 38% (the white turnout by 19%, black voting by 96%)."  Id. at *943-44.

20

retention of the 1875 Constitution's millage caps and other restrictions on home rule.[46]  Doc. 18, ¶¶ 52-56.

The disfranchisement of blacks and creation of the all-white Democratic primary allowed the Legislature to restore some local political autonomy in the early Twentieth Century.  Counties were allowed to replace the at-large election methods mandated by the Redeemer Legislature to dilute black voting strength with single-member districts and voting by wards.[47]  But when the U.S. Supreme Court struck down the white primary in 1944[48] and the threat of increased black voting rose, the Legislature began curtailing local autonomy in county and city elections by restoring at-large elections and enacting anti-single shot voting laws to deny black minorities the opportunity to take advantage of a split white vote.[49]  Doc. 18, ¶ 57.

---

[46]  *Lynch* at *888-90, *896-97.

[47]  *Bolden*, 542 F.Supp. at 1061-62.

[48]  *Smith v. Allwright*, 321 U.S. 649 (1944).

[49]  *Dillard v. Crenshaw County*, 640 F.Supp. 1347, 1356-59 (M.D. Ala. 1986).  The *Dillard* opinion catalogues the long list of federal court decisions striking down barriers to black voter registration and racial segregation in every aspect of Alabama life.  It concludes by quoting Judge Richard Rives: "from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society." *United States v. Alabama*, 252 F.Supp. 95, 101 (M.D. Ala. 1966) (three-judge court)."  640 F.Supp. at 1359-60.

*Brown v. Board of Education,* 347 U.S. 483 (1954), ushered in the Civil Rights Movement, and Black Belt politicians initiated Alabama's campaign of massive resistance.[50]  Macon County Senator Sam Engelhardt authored the bill that gerrymandered black residents out of Tuskegee's municipal boundaries, and he tried unsuccessfully to dissolve Macon County altogether and get unwilling neighboring counties to annex its black populations.[51]  Engelhardt "was determined to preserve disfranchisement, because he assumed that if blacks got the right to vote, especially in his county and similar Black Belt counties, that they would gain control of the tax assessor's office and would raise the property tax on whites."[52]  Doc. 18, ¶ 58.

Throughout the 1960s and 1970s Governor George Wallace resisted federal efforts to provide African Americans the right to vote and an equal opportunity to participate in the political process.[53]  The Voting Rights Act had its greatest

---

[50]  *Lynch* at *966-70.

[51]  *Dillard*, 640 F.Supp. at 1357; *Lynch* at *992; *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); ROBERT J. NORRELL, REAPING THE WHIRLWIND: THE CIVIL RIGHTS MOVEMENT IN TUSKEGEE 96-97 (1986).

[52]  *Lynch* at *993.

[53]  E.g., see JEFFREY J. FREDERICK, STAND UP FOR ALABAMA: GOVERNOR GEORGE C. WALLACE (Tuscaloosa: The University of Alabama Press 2007).  He also used his executive state government powers to frustrate the efforts of black farmers to take advantage of the several federal programs established by President

impact on local governments, where the number of African Americans elected to county and municipal offices increased dramatically after passage of the 1982 Voting Rights Amendments.  Doc. 18, ¶¶ 60-63.

Federal court school desegregation and voting rights decrees threatened to collapse the racially discriminatory economic system Alabama had maintained since Redemption.  In the 1970s enforcement of school desegregation orders caused whites to flee en masse from public schools in the Black Belt,[54] federal enforcement of the Voting Rights Act was rapidly increasing black voter registration in the majority-black counties, federal court-ordered reapportionment was undermining Black Belt domination of the Legislature,[55] and a three-judge district court ordered statewide equalization of assessed land values for tax

---

Lyndon Johnson's War on Poverty that tried to develop stable land ownership and marketing opportunities for former black sharecroppers in the Black Belt.  The planters were no longer growing labor-intensive cotton but trees and other crops that were mechanically harvested, and Wallace helped wealthy whites, who for generations had kept low-wage black workers tied to the land, reverse course and try to drive out African Americans whose labor was no longer wanted and whose votes were feared.  See generally GRETA DE JONG, YOU CAN'T EAT FREEDOM: SOUTHERNERS AND SOCIAL JUSTICE AFTER THE CIVIL RIGHTS MOVEMENT (2016); SUSAN YOUNGBLOOD ASHMORE, CARRY IT ON: THE WAR ON POVERTY AND THE CIVIL RIGHTS MOVEMENT IN ALABAMA 1964-1972 (2008).

[54] *Lynch* at *995-96.

[55] *Lynch* at *1008-09.

purposes.  Doc. 18, ¶¶ 64-65.

This confluence of events was about to leave whites' land in the Black Belt counties vulnerable to increased taxation levied by officials elected by black voters to pay for public schools attended only by black students.[56]  But before any "nigger tax assessor"[57] could take office, Governor Wallace guided through the Legislature and ratification by the state's voters amendments to the Alabama Constitution that for the first time in history took away the power of local officials to determine the taxable value of land and required them to use mathematical formulas imposed by statute that to this day preserve farm and timber land assessments at historically low levels.[58]  By the time black tax assessors and majority-black county commissions and school boards were elected in the 1980s, their all-black schools were almost totally stripped of any tax base on which to raise local school revenues.[59]  Doc. 18, ¶ 69.

---

[56]  *Lynch* at *994.  "Faced with the reality of integration, whites were fleeing the public school system, and they were opposed to funding not only integrated schools, but schools that their children were not even attending. Racial tensions were high, and the political powers that had 'redeemed' the state a century before were once again threatened by the specter of 'black rule.'" Id. at 1010.

[57]  *Lynch* at *993 (footnote omitted).

[58]  *Lynch* at *1017-50.

[59]  The *Lynch* district court concluded that Amendments 325 and 373 were driven by "greed or powerlust," not by intentional racial discrimination.  *Lynch* at

24

The 1901 Constitution retained all the restrictions on home rule in the 1875 Constitution. In addition to capping local governments' power to raise taxes, it prohibited counties and municipalities from lending their credit for economic development, and in general it denied local governments most significant powers, making their local state legislative delegations the *de facto* county legislatures.[60] "This Local Delegations system has existed in some form for decades at least, if not since the enactment of the 1901 State Constitution. It is, in short, the mostly unwritten law of county governance in Alabama."[61] Under the informal rule of "local courtesy" the entire Legislature routinely adopts any local bill applicable only to one county if that county's local delegation approves it.[62] Until 1974, when for the first time House and Senate members were elected from court-ordered single-member districts, seats were apportioned among whole counties, so

---

\*1157. This Court affirmed, saying: "Although the evidence presented could have supported a finding of discriminatory intent, sufficient evidence also rendered permissible the district court's finding that these Amendments were financially, and not discriminatorily, motivated." 739 F.3d at 1288.

[60] Parker, 57 ALA. L. REV. at 550-51.

[61] *Alabama Legislative Black Caucus v. Alabama*, 988 F.Supp.2d 1285, 1317 (M.D. Ala. 2013) (three-judge court) (Thompson, J., concurring and dissenting).

[62] *Alabama Legislative Black Caucus v. Alabama*, 988 F.Supp.2d at 1290, 1316.

each county's legislative delegation was elected only by that county's voters. With some single-member districts necessarily crossing county boundaries, the Legislature has adjusted its local courtesy rule by making each legislator elected even partly by a county a member of its delegation with equal voting rights for approving its local laws.[63]  This has allowed majority-white legislative control to deny majority-black local governments an equal opportunity to pursue economic development for their residents.[64]  Doc. 18, ¶¶ 64-67.

Federal court-supervised redistricting of the Legislature after the 1980 census threatened to undermine the ability of Black Belt whites to maintain control of local laws for their counties.  The reapportionment plans finally approved by the three-judge district court for the first time gave black voter majorities control over the local legislative delegations in many Black Belt counties, including Greene County.[65]  The race track in sparsely populated Greene County was the largest source of revenue for its property tax-starved general fund and was the

---

[63] *Alabama Legislative Black Caucus v. Alabama*, 988 F.Supp.2d at 1315-16.

[64] Parker, 57 ALA. L. REV. at 562.

[65] *Hardy v. Wallace*, 603 F.Supp. 174, 176 (N.D. Ala. 1985) (three-judge court), citing *Burton v. Hobbie*, 561 F.Supp. 1029 (M.D. Ala. 1983) (three-judge court).

county's largest employer.  As was the case for race tracks elsewhere in Alabama,

the Greene County Racing Commission was appointed by its county legislative

delegation.  But when it became obvious that the previously all-white local

delegation was about to become majority-black, the Legislature resorted to the

safeguard of white control it had used in the late nineteenth century and passed a

statute transferring the power to appoint Greene County's racing commissioners to

the Governor.[66]  When the newly-elected black members of Greene County's local

delegation introduced a repealer bill, the white-dominated Alabama Senate broke

the rule of local courtesy and refused to report the bill out of committee.  A three-

judge district court held that the gubernatorial appointment statute could not be

enforced unless it received preclearance under Section 5 of the Voting Rights

Act.[67]  Doc. 18, ¶ 70.

During the two decades when representatives of majority-black districts

held leadership positions,[68] there was little or no state interference with actions

---

[66]  *Hardy v. Wallace*, 603 F.Supp. at 176.

[67]  Id. at 179.

[68]  *Alabama Legislative Black Caucus v. Alabama*, 989 F.Supp.2d 1227, 1236 (M.D. Ala. 2013) (three-judge court), vacated and remanded on other grnds, 135 S.Ct. 1257 (2015) ("the districts adopted in 2001 [were] a lawful partisan gerrymander that enabled black legislators to serve in positions of unprecedented leadership").

taken by local black governments.[69]  A biracial coalition redrew House and Senate

redistricting plans after the 2000 census "that would preserve their respective

Democratic majorities."[70]  But in the 2010 elections white Republicans

successfully executed a strategy to regain all-white Republican control of both

houses for the first time since Reconstruction.[71]  They did not openly announce

they were drawing the color line, as Conservative Democrats did in 1874, but they

based their strategy on "an in-depth study of voting patterns in various districts

represented by white Democratic legislators across the state."[72]  Doc. 18, ¶ 72.

With filibuster-proof white Republican majorities in both the House and

Senate, the Legislature resumed implementing Alabama's historical practice of

denying majority-black local governments substantial home rule powers.  There

was a particular focus on Birmingham, whose over $400 million operating budget

---

[69]  E.g., *Lynch* at \*260-61 ("since 1978, counties and other local taxing authorities have been successful in obtaining Legislative approval in substantially all the instances where a county local legislative delegation has sought such approval to hold a referendum on local property tax increases") (citation omitted).

[70]  *Montiel v. Davis*, 215 F.Supp.2d 1279, 1283 (S.D. Ala. 2002) (three-judge court).

[71]  *Alabama Legislative Black Caucus v. Alabama*, 989 F.Supp.2d at 1236.

[72]  MIKE HUBBARD, STORMING THE STATE HOUSE: THE CAMPAIGN THAT LIBERATED ALABAMA FROM 136 YEARS OF DEMOCRAT RULE (Kindle Locations 2262-2263) Kindle Edition (2012).

28

is by far the largest in the state controlled by a black majority.[73]  The House redistricting plan the Legislature passed in 2012 eliminated the nine majority-black and nine majority-white balance in the Jefferson County House Delegation, which had provided black legislators the ability to block unwanted local bills, and replaced it with ten majority-white and only eight majority-black districts.[74]  In 2015, over the objections of black members of Jefferson County's delegation, the Legislature passed a statute giving majority-white municipalities in Jefferson County and neighboring majority-white county governments power to appoint members to the Birmingham Water Works Board, which previously had been appointed solely by the Birmingham City Council.  Ala.Code § 11-50-300 et seq.  This diluted the political power of a majority-black electorate over one of the most profitable water systems in Alabama and a valuable asset for Birmingham's economic development.  Doc. 18, ¶¶ 73-78.

---

[73]  See http://www.birminghamal.gov/download/budget_&_finance/FY-2017-ADOPTED-BUDGET-FOR-WEB.08-31-2016.FINAL_.pdf (last visited 29 March 2017).  The Birmingham City Council had a white majority elected at large until 1985, when black candidates won five of the nine Council seats.  See http://www.bhamwiki.com/w/Birmingham_City_Council at 7.  Whites seeking "to preserve minority (white) political representation in an increasingly African-American city" got a court to order single-member districts in 1989.  Id. at 1.

[74]  *Alabama Legislative Black Caucus v. Alabama*, 989 F.Supp.2d at 1249 (Thompson, J., dissenting).

29

In 2017, after entry of the district court's decision in the instant case, the Legislature enacted the Alabama Memorial Preservation Act, Ala. Code § 41-9-231 et seq.  The Act provides that "[n]o architecturally significant building, memorial building, memorial street, or monument which is located on public property and has been so situated for 40 or more years may be relocated, removed, altered, renamed, or otherwise disturbed." Ala. Code § 41-9-232(a).[75]  After the Mayor of Birmingham ordered a black plywood shell to be placed around the base of a Confederate memorial at an entrance to Linn Park (the park between City Hall and the Jefferson County Courthouse), the Alabama Attorney General sued the City for a declaratory judgment that it had violated the Act plus a $25,000/day fine.[76]  The Jefferson County Circuit Court ruled that the state law was invalid.[77]

---

[75]  Most memorials to the Confederacy were erected in the periods during the first three decades of the Twentieth Century (coinciding with the passage of Jim Crow laws) and during the 1950s and 1960s (during resistance to the Civil Rights Movement) -- well within the time period protected by the Act, but no memorials on public property celebrating the Civil Rights Movement are 40 years old.  Whose Heritage?: Public Symbols of the Confederacy, http://www.splcenter.org/whoseheritage at 11.

[76]  "AG files lawsuit against Birmingham over Confederate monument," https://www.al.com/news/birmingham/2017/08/ag_files_lawsuit_against_birmi.html (Aug. 16, 2017). The complaint was assigned the docket number CV 17-903426.

[77]  "Judge rules Alabama Confederate monument law is void; city of Birmingham didn't break the law,"

The Attorney General has appealed to the Alabama Supreme Court.

## III.    Standard of Review

This Court reviews the dismissal of a complaint under Fed. R. Civ. P.

12(b)(6) de novo. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 (11th Cir. 1999). "To

survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim for relief that is plausible on its face.' ... A claim

has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not require that

a plaintiff demonstrate probable success. *Twombly*, 550 U.S. at 556. At the

pleading stage, courts "are required to accept the factual allegations in the

complaint as true and construe them in the light most favorable to the plaintiff."

*Alvarez v. Atty. Gen. of Fla.*, 679 F.3d 1257, 1261 (11th Cir. 2012).

## SUMMARY OF THE ARGUMENT

The district court completely ignored 40 paragraphs of alleged facts

supporting Counts II, VI, VII, and VIII in the amended complaint, in which the

---

https://www.al.com/news/birmingham/2019/01/judge-rules-alabama-confederate-monument-law-is-void-city-of-birmingham-didnt-break-the-law.html (Jan. 16, 2019).

31

plaintiff registered black voters allege that, in violation of the Equal Protection Clause of the Fourteenth Amendment, Act 2016-18 was an application of Alabama's official state policy of suppressing the powers of local governments controlled by black majorities.  Apparently, the district court thought it was not necessary to address these Equal Protection claims after it had ruled that the Plaintiffs-Appellants lacked Article III standing and that the racially discriminatory, constitutionally embedded state policy was not actionable under Section 2 of the Voting Rights Act or the Fifteenth Amendment.  This was reversible error.

As black voters, Plaintiffs-Appellants have standing to sue the City of Birmingham as well as the Alabama Attorney General.  Their Equal Protection claims against the City are not constrained by their ability to obtain higher wages for the Lewis Plaintiffs.  Rather, as black voters, Plaintiffs-Appellants have standing to require the defendant City *not* to enforce the racially discriminatory statute and to enforce instead its ordinance the statute has overriden.  The City acknowledges that Act 2016-18 violates Plaintiffs-Appellants' federally protected rights, Doc. 27 at 2, so it has a duty not to comply with it.  It can proceed to enforce its minimum wage ordinance in state court, and if an employer or the Alabama Attorney General invokes the Act as an affirmative defense, the action

32

can be removed to federal court, where a definitive ruling regarding black voters'

equal rights can be obtained.  The City is not an innocent bystander.

The district court gave no consideration at all to the plaintiff black voters'

Equal Protection claims that Act 2016-18 was enacted for a racially discriminatory

purpose.  Its holding that these allegations were merely conclusory is patently

incorrect.  It did not address the allegations of historical fact, because it

erroneously declined to employ the governing standards of *Arlington Heights* for

evaluating a claim that a facially neutral statute is purposefully discriminatory.

This was reversible error.  The findings of other federal courts that the anti-home

rule policy contained in the governing 1901 Constitution is racially motivated

make more than plausible Plaintiffs-Appellants' claims that Act 2016-18 was an

exercise of that racist policy.

## ARGUMENT AND CITATION OF AUTHORITIES

**I.      The Plaintiffs-Appellants Have Article III Standing, and Both the City
of Birmingham and the Alabama Attorney General Are Proper
Defendants.**

The ALBC Plaintiffs adopt the standing arguments in the *en banc* brief of

the Lewis Plaintiffs.  Here we emphasize the standing of all plaintiffs as registered

voters.[78]

Black registered voters have standing to challenge a state statute that allegedly dilutes their voting strength or that denies them equal representation in government in violation of the Constitution or the Voting Rights Act. *Dillard v. Chilton County Com'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (citing *Baker v. Carr*, 369 U.S. 186 (1962); *Whitcomb v. Chavis*, 403 U.S. 124 (1971)). To satisfy the requirements of Article III standing, the plaintiff voters must name as a defendant a state actor who has "some connection with enforcement of the provision at issue." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) (citing *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir.1979)).

The statute ALBC Plaintiffs challenge in the instant action designates the City of Birmingham as the state actor required to enforce its provisions: "A county, municipality, or any other political subdivision of this state shall not enact or administer any ordinance, policy, rule, or other mandate requiring an employer to provide any employee, class of employees, or independent contractor with any employment benefit, including, but not limited to, paid or unpaid leave, vacation,

---

[78] Plaintiffs Marnika Lewis and Antoin Adams also are registered voters, Doc. 18, ¶ II.1., and the argument presented here applies as well to them and to their organizational representatives, the NAACP and Greater Birmingham Ministries.

wage, or work schedule, that is not required by state or federal law...."  Ala. Code § 25-7-41(b) (2016 Repl. Vol.).

The district court's discussion of Plaintiffs-Appellants' Article III standing inexplicably does not address their standing as voters.  Instead, the opinion concludes (erroneously) only that the plaintiffs lack standing as wage earners, because none of the defendants directly controls the amount of his or her wages.[79] This was reversible error, and the two Lewis Plaintiffs and their representatives do in fact have Article III standing to assert all economic injury claims in the amended complaint.  But all the plaintiffs also have standing as registered voters and representatives of voters.  They suffer individualized, concrete, and particularized injury in fact when their right to vote is denied or abridged and they are denied equal access to the political process by Act 2016-18's nullification of the Birmingham minimum wage ordinance, a violation that would be fully redressed by an injunction requiring Birmingham to enforce its ordinance, whether

---

[79] E.g., Op. at 7 ("the Amended Complaint do[es] not show how Defendants' actions affected, or even could affect, Plaintiffs' pay."); id. at 8 ("Defendants respond that it is employers and the Alabama courts -- i.e., parties not before this court -- who will decide whether the Act 2016-18 controls the wages payable to employees in the City of Birmingham."); id. at 9 (plaintiffs allege a "purported economic injury"); id. ("To be sure, nothing prohibits employers from paying the minimum wage set forth in the city's ordinance...."); id. at 11 ("nothing this court could order Attorney General Strange or the City Defendants to do will affect Plaintiffs' wages.").

35

or not enforcement led to higher wages.

The State argues that the City is not enforcing Act 2016-18, because "not enforcing the Birmingham minimum-wage ordinance . . . is not the same thing as affirmatively enforcing the Minimum Wage Act."  State Appellees' Brief at 19. But where affirmative compliance with Act 2016-18 requires refusing to enforce the City's ordinance, there is no principled basis for this distinction, and the State cites no authority for it.  In its answer to the amended complaint, the City "does not contest that [Act 2016-18] violates the rights of Birmingham citizens and the citizens of other majority-black municipalities guaranteed by the Constitution and laws of the United States...."  Doc. 27, p. 2.  The City Appellee's Brief acknowledges that "[a]t issue in this case is who has the authority to establish a minimum wage," Br., p. 3, and that "[b]ut for State's Act 2016-18, the City of Birmingham" would be enforcing its minimum wage ordinance.  Br., p. 4.

The City contends it has "no choice" but to comply with Act 2016-18 and refuse to enforce its ordinance.  Br., p. 4.  That simply is incorrect.  The City may not comply with (i.e., enforce) a state law that it acknowledges violates the Constitution and laws of the United States.  The State recognizes that "the City might enforce its ordinance by 'initiat[ing] a civil action' against an employer in state court to collect a penalty.  Doc. 30-3 at 3.  But it could not prevent the

36

employer from simply invoking the Minimum Wage Act as an affirmative defense to that action in state court." State Appellees' Brief, p. 20. That may be true. But once the City begins to enforce the ordinance the most likely scenario is that employers or the Alabama Attorney General would sue in state court for declaratory and injunctive relief based on Act 2016-18, and Birmingham could remove the action to federal court. 28 U.S.C. § 1443(2) empowers the City to remove to federal court [a]ny . . . civil actions or criminal prosecutions, commenced in a State court . . . [f]or any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law." That is what the City of Decatur did, for example, when it refused to enforce a state statute because it would dilute the voting strength of its black citizens, and removed to federal court a civil action filed by one of its citizens. *Voketz v. City of Decatur*, 904 F.3d 902 (11th Cir. 2018). This Court reversed summary judgment for Decatur based on its defense that it was barred from enforcing the state statute by Section 5 of the Voting Rights Act, 52 U.S.C. § 10304, but it remanded for consideration of Decatur's defense based on Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

Political subdivisions are the proper defendants in an action brought to challenge state statutes that allegedly require those subdivisions to violate the

37

federally protected equal rights of their citizens.  The *Dillard* cases, one of which is cited above,[80] are leading examples.  When the Alabama Legislature passed a racially motivated law requiring all at-large election systems to use numbered places, all local governments complied.  Instead of refusing to enforce the unconstitutional statute, they stopped enforcing their existing election methods, which permitted minorities to use single-shot voting to better their chances of electing candidates of their choice; instead they complied with the Legislature's demand for statewide uniformity. *Dillard v. Crenshaw County*, 640 F.Supp. 1347, 1357 (M.D. Ala. 1986).  See also *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (challenging a state statute that redrew the boundaries of the City of Tuskegee); *Bolden v. City of Mobile*, 542 F.Supp. 1050 (S.D. Ala. 1982) (challenging a state statute requiring city commissioners to be elected at large).  There is no principled basis for distinguishing those circumstances from the allegations in the instant action, and the City of Birmingham is a proper defendant to give Plaintiffs-Appellants Article III standing to seek and to obtain federal court relief.

The ALBC Plaintiffs adopt herein the arguments in the *en banc* brief of the

---

[80] "We need not provide yet another extensive recapitulation of the *Dillard* litigation's lengthy history. See *Dillard v. Baldwin County Comm'rs* (Baldwin V), 376 F.3d 1260, 1262-63 (11th Cir.2004)." *Dillard v. Chilton County Com'n*, 495 F.3d at 1327.

38

Lewis Plaintiffs that the Attorney General of Alabama also is a proper defendant to afford all plaintiffs Article III standing.

**II.    On the Merits, Plaintiffs-Appellants Have Plausibly Alleged That Act 2016-18 Is An Unconstitutional Exercise of Alabama's Ongoing, Historical Policy of Suppressing the Ability of Local Black Majorities To Govern Themselves.**

The district court held that the amended complaint alleges insufficient facts plausibly to establish violations of the Plaintiffs-Appellants' rights guaranteed by Section 2 of the Voting Rights Act, both the results (Count I) and intentional discrimination (Count VII) standards; the Equal Protection Clause of the Fourteenth Amendment (Counts II, VI, and VII); and the Fifteenth Amendment (Counts IV and VII).  ALBC Plaintiffs readopt the arguments in their panel briefs supporting their claims under Section 2 of the Voting Rights Act and Fifteenth Amendment.[81]  As requested by the *en banc* court, this brief will focus on violations of the Equal Protection Clause.

> A.    *The Amended Complaint Plausibly Alleges That Act 2016-18 Was Enacted For a Racially Discriminatory Purpose in Violation of the Equal Protection Clause.*

---

[81]  In particular, we emphasize that even if Act 2016-18 was not a change "with respect to voting" within the meaning of Section 5, the majority opinion in *Presley v. Etowah County*, 502 U.S. 491 (1992), warns "[n]othing we say implies that the conduct at issue in these cases is not actionable under a different remedial scheme."

The district court held that the Plaintiffs-Appellants' claims had too tenuous a connection with voting to make them actionable under Section 2 of the Voting Rights Act (Count I) or the Fifteenth Amendment (Counts IV and VII). Doc. 52, pp. 13-17, 22. But it did not squarely address their Fourteenth Amendment claims that Act 2016-18 purposefully discriminated against black voters by stripping their majority-black municipal government's authority to regulate wages and other aspects of the local economy (Count VII) and perpetuated Alabama's official policy of maintaining white control over local black majorities (Count II). Doc. 52, pp. 23-24.

In dismissing the Plaintiffs-Appellants' intentional discrimination claims the district court completely ignored the correct standards for determining whether Act 2016-18 has a racially discriminatory purpose. "Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment...." *Johnson v. Governor of Florida*, 405 F.3d 1214, 1223 (11th Cir. 2005) (*en banc*). The opinion below does not even mention *Arlington Heights*. This was reversible error.

The disparate impact of Act 2016-18 on the plaintiff black voters – not just

40

on black workers – is indisputable.  And, as Appellants' principal brief, pp. 20-24, and the Historians' amicus brief, pp. 20-22, pointed out, by completely ignoring the extensive allegations of historical facts in the amended complaint, the district court failed to consider that the "historical background of the decision" may support claims of intentional racial discrimination. *I.L. v. Alabama*, 739 F.3d 1273, 1286 (11th Cir. 2014) (citing *Arlington Heights*, 429 U.S. at 266-68).  Coupled with all the allegations going to the other *Arlington Heights* factors, which are detailed in the Lewis Plaintiffs' en banc brief, the history allegations are more than sufficient to state a plausible claim of intentional discrimination.

But here the history allegations provide more than an on-going pattern of discrimination.  The direct evidence, based on prior judicial findings, that Act 2016-18 is an exercise of a purposefully discriminatory state policy provide compelling grounds for violation of the Equal Protection Clause.

B.    *The Amended Complaint Plausibly Alleges That Act 2016-18 Perpetuates Alabama's Official Policy of Maintaining White Control over Local Black Majorities in Violation of the Equal Protection Clause.*

The district court dismissed the Plaintiffs-Appellants' perpetuation claim in Count II on the ground that it makes "a conclusory allegation, unsupported by any specific factual allegations...." Doc. 52, p. 21.  This was reversible error.  It is not

41

a conclusory allegation that Alabama established and maintains an official policy

of suppressing black voter majorities.  The amended complaint alleges at length

that after Reconstruction the State of Alabama abandoned its antebellum policy of

local government autonomy and placed in its 1875 and 1901 Constitutions strict

limits on home rule for the purpose of suppressing the ability of black majorities in

the Black Belt counties to control their local governments.  This allegation is

supported by judicial precedents and scholarly works.  See the Statement of Facts

*supra*, citing *Lynch v. Alabama*, 2011 U.S. Dist. LEXIS 155012 (N.D. Ala., Nov.

7, 2011), aff'd, 739 F.3d 1273 (11th Cir.), cert. denied, 135 S.Ct. 53 (2014);

*Knight v. Alabama*, 458 F.Supp.2d 1273 (N.D. Ala. 2004), aff'd 476 F.3d 1219

(11th Cir.), cert. denied, 551 U.S. 1146 (2007); *Dillard v. Crenshaw County*, 640

F.Supp. 1358 (M.D. Ala. 1986); Will Parker, *Still Afraid of "Negro*

*Domination?": Why County Home Rule Limitations in the Alabama Constitution*

*of 1901 Are Unconstitutional*, 57 ALA. L. REV. 545 (2005); See also Wayne Flynt,

*Alabama's Shame: The Historical Origins of the 1901 Constitution*, 53 ALA. L.

REV. 67, 68 (2001); Peyton McCrary et al., *Alabama* in QUIET REVOLUTION IN THE

SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990, at 38, 42 (Chandler

Davidson & Bernard Grofman eds. 1994); MALCOLM COOK MCMILLAN,

CONSTITUTIONAL DEVELOPMENT IN ALABAMA, 1798-1901: A STUDY IN POLITICS,

THE NEGRO, AND SECTIONALISM 222 n.28 (1955) (Alabama's "very strong antebellum tradition" of democracy at the county level was "sacrificed to 'white supremacy.'"). Here is one definitive statement about the 1901 Constitution: "This well-documented sentiment that blacks were somehow inherently unsuited for democratic participation--and particularly unsuited for the exercise of governmental power as officeholders--undoubtedly informed the delegates' restriction of local government power." Parker, 57 ALA. L. REV. at 546.

All the barriers to home rule are still in place. The millage caps first placed in the 1875 Constitution have been amended, but they still severely restrict the ability of county and municipal governments to raise local taxes, for their schools in particular. Governor Wallace restricted black citizens' access to federal anti-poverty programs in the Black Belt, and his constitutional amendments in 1972 and 1978 stripped local tax assessors of authority to assess taxable property at its fair market value and required them to apply mathematical formulas that drastically reduce the tax bases of counties and municipalities.

County legislative delegations are still the *de facto* legislators for their respective counties and municipalities, and decennial redistricting has given representatives of majority-white counties seats in the delegations of counties with black majorities and large black pluralities. Efforts to strip black majorities of

43

power to control local governments in Macon and Greene counties were rebuffed by federal courts. Birmingham, the largest majority-black municipality in Alabama, has been the majority-white Legislature's special target. A recent statute stripped Birmingham, and only Birmingham, of exclusive control over its water works board. The Alabama Attorney General has sued Birmingham for failing to comply with a new law that prohibits removing historical markers. The instant action, of course, addresses the Legislature's rush to void Birmingham's effort to raise the minimum wage for its majority-black residents.

In short, Alabama's historical policy of suppressing majority-black local electorates, which is embedded in the 1901 Constitution, has never been repudiated and continues unabated. Without question, Act 2016-18 was an execution of that policy. An ordinance of the City of Birmingham aimed at improving the economic circumstances of its majority-black electorate was overridden by the white majority who controlled the Alabama Legislature. The unanimous adoption of the ordinance by Birmingham's majority-black City Council and the unanimous opposition of every black House and Senate member made it crystal clear to white legislators that they were overruling the political will of the state's African-American citizens. One of the three other municipalities the State says were also threatening to adopt minimum wage hikes is majority-black

44

(Montgomery is 60% black), and the other two have substantial black plurality populations (Tuscaloosa is 44.2% black, and Huntsville is 30.8% black).[82]  State Appellees' Brief, pp. 6-7.

Thus the Plaintiffs-Appellants' Equal Protection challenge to the racially motivated provisions of the 1901 Alabama Constitution restricting home rule is similar to the claim in *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005) (*en banc*), "that racial animus motivated the adoption of Florida's [felon] disenfranchisement law in 1868 and this animus remains legally operative today...."  Id. at 1223.  But the Plaintiffs-Appellants' claim in the instant action does not suffer from the reasons that led this *en banc* Court, "applying the approach of *Arlington Heights*," id. at 1223, to reject the claim of the *Johnson* plaintiffs, who cited no evidence that Florida's 1868 constitutional disfranchisement provision was racially motivated, and who conceded that the 1968 amendment of the provision "was not enacted with discriminatory intent." Id. (footnote omitted).  Here the discriminatory intent behind the anti-home rule restrictions in the 1901 Alabama Constitution has been affirmed by federal courts, and they remain in force today.  Moreover, the facts alleged in the amended

---

[82] https://www.census.gov/quickfacts/fact/table/huntsvillecityalabama,tuscaloosacity alabama,montgomerycityalabama/PST045217 (last visited March 19, 2019).

complaint show these constitutional restrictions on home rule have only been broadened and made more racially discriminatory in their application.  When the State Appellees say "the state legislature reigns supreme," and "Alabama cities are subject to a state version of the Supremacy Clause prohibiting them from 'pass[ing] any laws inconsistent with the general laws of this state,'" State Appellees' Brief at 5 (citing Ala. Const. art. IV, § 89), they fail to acknowledge judicial findings that this historical policy is a "White" Supremacy Clause.

## CONCLUSION

For the foregoing reasons the decision below should be reversed.

Respectfully submitted this 25th day of March, 2019.

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham, AL 35209
Telephone: (205) 320-2882
still@votelaw.com

/s/ James U. Blacksher
James U. Blacksher, Esq.
P.O Box 636
Birmingham, AL 35201
Telephone: (205) 591-7238
jblacksher@ns.sympatico.ca

U.W. Clemon, Esq.
5202 Mountain Ridge Pkwy
Birmingham, AL 35222
Telephone: (205) 837-2898
clemonu@bellsouth.net

*Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary*

*Moore, John Rogers, Rodger Smitherman, and William Muhammad*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B)(i), because this brief contains 10,066 words,

excluding the parts of the brief exempted by 11th Cir. R. 32-4.

> /s/ James U. Blacksher
> James U. Blacksher, Esq.
> P.O Box 636
> Birmingham, AL 35201
> Telephone: (205) 591-7238
> jblacksher@ns.sympatico.ca

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2019, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the counsel of record in this matter. On that same date, I caused

physical copies of the foregoing to be filed with the Clerk of Court and

served upon the following counsel by United Parcel Service delivery:

Andrew Brasher
James W. Davis
William Glenn Parker, Jr.
State of Alabama Attorney General's Office
501 Washington Ave
PO BOX 300152
Montgomery, AL 36130-0152
Phone: (334) 242-7300

47

*Counsel for Defendants-Appellees State of Alabama and Alabama Attorney General Steve Marshall*

Fredric L. Fullerton, II
Kayla S. Lawrence
City of Birmingham Law Department
710 N 20th Street, Fl. 6
Birmingham, AL 35203
Phone: (205) 254-2369
*Counsel for Defendants-Appellees City of Birmingham and Mayor Woodfin*

/s/ James U. Blacksher
James U. Blacksher

48