No. 17-11009

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

MARNIKA LEWIS, et al.,

*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, et al.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP (Hon. R. David Proctor)

---

## EN BANC BRIEF OF PLAINTIFFS-APPELLANTS MARNIKA LEWIS, ANTOIN ADAMS, ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AND GREATER BIRMINGHAM MINISTRIES

---

Barbara J. Chisholm, Esq.
Eric P. Brown, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
bchisholm@altber.com
ebrown@altber.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
Telephone: (202) 230-4096
carlsonmjj@yahoo.com

*[Additional Counsel on Inside Cover]*

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Telephone: (205) 488-1226
jwhatley@whatleykallas.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Telephone: (212) 627-8100
rstroup@levyratner.com

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

*Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 26.1, Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries (collectively "Lewis Plaintiffs") hereby state that none has any parent corporation or issues shares to the public.  Pursuant to Eleventh Circuit Rules 26.1-1 and 28-1(b), the Lewis Plaintiffs hereby certify that, to the best of their knowledge, the following individuals and entities have an interest in the outcome of this appeal:

1. Adams, Antoin – Plaintiff-Appellant.

2. Alabama Legislative Black Caucus – Plaintiff-Appellant.

3. Alabama State Conference of the National Association for the Advancement of Colored People – Plaintiff-Appellant.

4. Alexander, Louise – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

5. Beasley, William – Member of the Alabama Legislative Black Caucus.

6. Blacksher, James U. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof.

7. Boyd, Barbara – Member of the Alabama Legislative Black Caucus.

8. Bracy, Napoleon – Member of the Alabama Legislative Black Caucus.

i

9.        Brasher, Andrew Lynn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

10.        Brown, Eric P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

11.        Burkette, David – Member of the Alabama Legislative Black Caucus.

12.        Carlson, Mary Joyce – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

13.        Chestnut, Prince, Member of the Alabama Legislative Black Caucus.

14.        Chisholm, Barbara J. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

15.        City of Birmingham, Alabama – Defendant-Appellee.

16.        Clarke, Adline – Member of the Alabama Legislative Black Caucus.

17.        Clemon, U.W. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof.

18.        Coleman, Linda – Member of the Alabama Legislative Black Caucus.

19.        Coleman-Evans, Merika – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

20.        Connor, Glen M. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

21.        Daniels, Anthony – Member of the Alabama Legislative Black Caucus.

22.     Davies, George N. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

23.     Davis, James W. – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

24.     Drummond, Barbara – Member of the Alabama Legislative Black Caucus.

25.     Dunn, Priscilla – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

26.     England, Chris – Member of the Alabama Legislative Black Caucus.

27.     Figures, Vivian – Member of the Alabama Legislative Black Caucus.

28.     Forte, Berry – Member of the Alabama Legislative Black Caucus.

29.     Fullerton, Fredric – Counsel for Defendants-Appellees the City of Birmingham and Mayor Randall Woodfin.

30.     Givan, Juandalynn – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

31.     Gray, Jeremy – Member of the Alabama Legislative Black Caucus.

32.     Greater Birmingham Ministries – Plaintiff-Appellant.

33.     Grimsley, Dexter – Member of the Alabama Legislative Black Caucus.

34.     Hall, Laura – Member of the Alabama Legislative Black Caucus.

35.     Hatcher, Kirk – Member of the Alabama Legislative Black Caucus.

36.     Hollis, Rolanda – Member of the Alabama Legislative Black Caucus.

37.     Howard, Ralph – Member of the Alabama Legislative Black Caucus.

iii

38. Jackson, Thomas – Member of the Alabama Legislative Black Caucus.

39. Jones, Sam – Member of the Alabama Legislative Black Caucus.

40. Lawrence, Kayla – Counsel for Defendants-Appellees the City of Birmingham and Mayor Randall Woodfin.

41. Lawrence, Kelvin – Member of the Alabama Legislative Black Caucus.

42. Lewis, Marnika – Plaintiff-Appellant.

43. Marshall, Steve – Attorney General of Alabama, Defendant-Appellee.

44. McCampbell, A.J. – Member of the Alabama Legislative Black Caucus.

45. McClammy, Thad – Member of the Alabama Legislative Black Caucus.

46. Moore, Mary – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

47. Morris, Tashina – Member of the Alabama Legislative Black Caucus.

48. Parker, William Glenn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

49. Rafferty, Neil – Member of the Alabama Legislative Black Caucus.

50. Rogers, John – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

51. Rouco, Richard P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

52. Sanders-Fortier, Malika – Member of the Alabama Legislative Black Caucus.

iv

53.     Scott, Rod – Member of the Alabama Legislative Black Caucus.

54.     Singleton, Bobby – Member of the Alabama Legislative Black Caucus.

55.     Smitherman, Rodger – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

56.     State of Alabama – Defendant-Appellee.

57.     Still, Edward – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof.

58.     Stroup, Robert H. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

59.     Warren, Pebblin – Member of the Alabama Legislative Black Caucus.

60.     Whatley, Joe R. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

61.     Woodfin, Randall – Mayor of Birmingham, AL, Defendant-Appellee.

## STATEMENT REGARDING ORAL ARGUMENT

In its February 12, 2019 briefing notice, the Court indicated that oral argument will be heard by the en banc Court during the week of June 24, 2019.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT .........................................................................i

STATEMENT REGARDING ORAL ARGUMENT ..............................................vi

TABLE OF AUTHORITIES ................................................................................ix

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER
PARTIES.............................................................................................................xv

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION .........................................................................xv

STATEMENT OF THE ISSUES..........................................................................1

STATEMENT OF THE CASE..............................................................................2

FACTUAL BACKGROUND .................................................................................4

    I.     Birmingham's Efforts To Raise The Minimum Wage Addressed
         Significant Racial Disparities In Workers' Wages .....................................4

    II.    The State Legislature Targeted Birmingham In Adopting Act 2016-18
         And Its Ban On Local Governments' Ability To Raise Minimum
         Wages ..........................................................................................................6

PROCEDURAL HISTORY..................................................................................10

STANDARD OF REVIEW ..................................................................................13

SUMMARY OF THE ARGUMENT ...................................................................15

ARGUMENT .......................................................................................................17

    I.     Plaintiffs Have Standing To Assert Their Claims...................................17

        A.    Plaintiffs Have Suffered An Injury-In-Fact .......................................17

B.      Plaintiffs' Injury Is Traceable To Defendants' Conduct......................18

C.      Plaintiffs' Injury Is Redressable.........................................................25

II.    The Alabama Attorney General Is A Proper Defendant Under *Ex Parte Young* ........................................................................................28

III.   Plaintiffs' Complaint Adequately Alleges Equal Protection Violations...........................................................................................36

A.      The District Court Ignored The Legal Standard Governing Fourteenth Amendment Claims Of Intentional Discrimination..........37

B.      Applying The *Arlington Heights* Factors, Plaintiffs Have Plausibly Pleaded Facts Sufficient To Support A Finding Of Intentional Racial Discrimination .......................................................41

C.      The Standard Applied By The District Court Bears No Resemblance To Four Decades Of Supreme Court Jurisprudence Governing Claims Of Intentional Racial Discrimination ..................50

CONCLUSION .............................................................................................56

CERTIFICATE OF COMPLIANCE.................................................................58

CERTIFICATE OF SERVICE .........................................................................59

# TABLE OF AUTHORITIES

## Cases

*Adinolfe v. United Technology Corp.*,
  768 F.3d 1161 (11th Cir. 2014) ........................................................................18

*Allen v. Wright*,
  468 U.S. 737 (1984).........................................................................................24

*Alvarez v. Atty. General of Florida*,
  679 F.3d 1257 (11th Cir. 2012) ........................................................................14

*Aman v. Cort Furniture Rental Corp.*,
  85 F.3d 1074 (3d Cir. 1996)..............................................................................53

*Animal Legal Defense Fund, Inc. v. Glickman*,
  154 F.3d 426 (D.C. Cir. 1998)..................................................................... 24, 26

*\*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................. *passim*

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................. *passim*

*Bennett v. Spear*,
  520 U.S. 154 (1997)........................................................................... 23, 39, 41

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ............................................................................54

*Browning-Ferris Indus. of Ala. v. Ala. Dept. of Environ. Mgmt.*,
  799 F.2d 1473 (11th Cir. 1986) ................................................................ *passim*

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) ........................................................................40

*Citizens for Equal Protection v. Bruning*,
  455 F.3d 859 (8th Cir. 2006) ............................................................................22

*Curling v. Secretary of Georgia*,
  _ F. App'x _, 2019 WL 480034 (11th Cir. Feb. 7, 2019) ....................................33

*Dillard v. Chilton Cnty. Commission*,
  495 F.3d 1324 (11th Cir. 2007) ........................................................................18

*Doe v. Pryor*,
  344 F.3d 1282 (11th Cir. 2003) .................................................................. 27, 28

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ..........................................................................26

*\*Ex Parte Young*,
  209 U.S. 123 (1908)................................................................................. *passim*

*Focus on the Family v. Pinellas Suncoast Trans. Auth.*,
  344 F.3d 1263 (11th Cir. 2003) .................................................................. 20, 21

*Ford v. Strange*,
  580 F. App'x 701 (11th Cir. 2014) ...................................................................21

*Frank Krasner Enterprises, Ltd. v. Montgomery County, MD*,
  401 F.3d 230 (4th Cir. 2005) ............................................................................23

*Garza v. County of Los Angeles*,
  918 F.2d 763 (9th Cir. 1990) ............................................................................55

*Georgia Latino All. for Human Rights v. Governor of Georgia*,
  691 F.3d 1250 (11th Cir. 2012) ........................................................................35

*Green v. Mansour*
  474 U.S. 64 (1985)............................................................................................29

*Grizzle v. Kemp*,
  634 F.3d 1314 (11th Cir. 2011) ........................................................... 29, 32, 34

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) .................................................................. 13, 15

*Hein v. Freedom From Religion Foundation*,
  551 U.S. 587 (2007)..........................................................................................15

x

*Houston Lawyers' Association v. Attorney General of Texas*,
   501 U.S. 419 (1991) .................................................................. 20, 32, 59

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) ..............................................................................37

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ..............................................................................44

*I.L. v. Alabama*,
   739 F.3d 1273 (11th Cir. 2014) ................................................... *passim*

*Jeffers v. Clinton*,
   740 F.Supp. 585 (E.D. Ark. 1990) .......................................................48

*Lawrence v. Texas*,
   539 U.S. 558 (2003) ..............................................................................27

*Loggerhead Turtle v. County Council*,
   148 F.3d 1231 (11th Cir. 1998) ............................................................21

*Luckey v. Harris*,
   860 F.2d 1012 (11th Cir. 1988) ............................................................33

*\*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................... *passim*

*Lujan v. National Wildlife Federal*,
   497 U.S. 871 (1990) ..............................................................................14

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ......................................................................... 20, 21

*Mhany Mgmt., Inc. v. County of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ............................................................ 40, 46

*Mulhall v. UNITE HERE Local 355*,
   618 F.3d 1279 (11th Cir. 2010) ....................................................... 25, 28

*N.C. State Conf. NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ........................................................... 46, 54

xi

*Obergefell v. Hodges*,
   135 S.Ct. 2584 (2015) .................................................................................22

*Papasan v. Allain*,
   478 U.S. 265 (1986) ...................................................................................34

*Parker v. Scrap Metal Processors, Inc.*,
   386 F.3d 993 (11th Cir. 2004) ...................................................................18

*Perez v. Abbott*,
   253 F.Supp.3d 864 (W.D. Tex. May 2, 2017) ...........................................55

*Randall v. Scott*,
   610 F.3d 701 (11th Cir. 2010) ................................................... 15, 40, 56

*Reno v. Bossier Parish Sch. Bd.*,
   520 U.S. 471 (1997) ................................................................... 37, 38

*Resnick v. AvMed, Inc.*,
   693 F.3d 1317 (11th Cir. 2012) .................................................................14

*Riordan v. Kempiners*,
   831 F.2d 690 (7th Cir. 1987) .....................................................................38

*S. Christian Leadership Conf. of Alabama v. Sessions*,
   56 F.3d 1281 (11th Cir. 1995) ...................................................................20

*San Diego County Gun Rights Committee v. Reno*,
   98 F.3d 1121 (9th Cir. 1996) .....................................................................24

*Smith v. Doe*,
   538 U.S. 84 (2003)......................................................................................55

*Speaker v. U.S. Dept. of Health and Human Servs.*,
   623 F.3d 1371 (11th Cir. 2010) ................................................. 45, 48, 49

*State ex rel. Young v. Robinson*,
   112 N.W. 269 (Minn. 1907)........................................................................31

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)......................................................................................20

xii

*Underwood v. Hunter*,
  730 F.2d 614 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985)......................... 52, 54

*Utah v. Evans*,
  536 U.S. 452 (2002)................................................................................26

*\*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ....................................................... *passim*

*\*Village of Arlington Heights v. Metropolitan Development Corp.*,
  429 U.S. 252 (1977)........................................................................ *passim*

*Warth v. Seldin*,
  422 U.S. 490 (1975)................................................................................18

*Washington v. Davis*,
  426 U.S. 229 (1976)........................................................................... 38, 40

*Wilson v. Ark. Dept. of Human Servs.*,
  850 F.3d 368 (8th Cir. 2017) ................................................................51

*Woody v. St. Clair Cnty. Comm'n*,
  885 F.2d 1557 (11th Cir. 1989) ............................................................56

*Young Apartments, Inc. v. Town of Jupiter, FL*,
  529 F.3d 1027 (11th Cir. 2008) ......................................................... 39, 40, 43

## Federal Statutory Authorities

28 U.S.C. §1291 ................................................................................ xviii

28 U.S.C. §1331 ................................................................................ xviii

28 U.S.C. §1343(a)(3).......................................................................... xviii

52 U.S.C. §10301 ....................................................................................1

52 U.S.C. §10302.................................................................................. xviii

## State Statutory And Constitutional Authorities

Ala. Const. art. IV, §89 ...............................................................................43

Ala. Const. art. V, §137 ..............................................................................19

Ala. Code §36-15-1(1)(a)............................................................................19

Ala. Code §36-15-1(7) ........................................................................ 19, 20

Ala. Code §36-15-12............................................................... 19, 32, 33

Ala. Code §41-9-231 ...................................................................................33

## Rules and Regulations

Fed. R. App. P. 4(a)(1)(A) ..................................................................... xviii

Fed. R. App. P. 32(a)(7)(B)(i)....................................................................58

Fed. R. Civ. P. 8(a)(2) ...............................................................................13

Fed. R. Civ. P. 12(b)(6)...............................................................................13

Fed. R. Civ. P. 25(d) ..................................................................................29

Fed. R. Civ. P. 26.1 ..................................................................................... i

11th Cir. R. 32-4 ........................................................................................58

11th Cir. R. 35-7 ......................................................................................1, 4

## Other Authorities

John C. Jefferies, Jr. et al., Civil Rights Actions: Enforcing the Constitution
7 (2d ed. 2007) .....................................................................................58

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries adopt all sections of the en banc brief filed by Plaintiffs-Appellants Alabama Legislative Black Caucus, Louise Alexander, Marika Coleman-Evans, Priscilla Dunn, Juandalynn Givan, Mary Moore, John Rogers, Rodger Smitherman, and William Muhammad (collectively "ALBC Plaintiffs").

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) & (4), and 52 U.S.C. §10302 because this matter arises under the Fourteenth and Fifteenth Amendments to the United States Constitution and the Voting Rights Act of 1965.

The district court entered final judgment on February 1, 2017, and Plaintiffs-Appellants filed the Notice of Appeal on March 2, 2017. This Court has appellate jurisdiction under 28 U.S.C. §1291. Plaintiffs-Appellants' appeal is timely under Fed. R. App. P. 4(a)(1)(A).

xv

## STATEMENT OF THE ISSUES

In its February 12, 2019 briefing notice, the Court instructed the parties to focus their en banc briefs on the following issues:

1.    Whether plaintiffs have standing under Article III of the Constitution.

2.    Whether the Attorney General of Alabama is a proper defendant under *Ex Parte Young*, 209 U.S. 123 (1908).

3.    Whether the complaint states a claim of racial discrimination, in violation of the Equal Protection Clause, that is plausible under the pleading standard established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal v. Ashcroft*, 556 U.S. 662 (2009).

This appeal also presents issues regarding whether Plaintiffs plausibly alleged claims under the Political Process Doctrine of the Fourteenth Amendment, Section 2 of the Voting Rights Act of 1965 ("VRA"), as amended, 52 U.S.C. §10301, and the Fifteenth Amendment.  Plaintiffs refer the Court to their briefs filed before the three-judge panel, which are submitted herewith pursuant to 11th Cir. Rule 35-7, for a discussion of these additional issues.

## STATEMENT OF THE CASE

This appeal challenges the district court's pleading-stage dismissal of Plaintiffs' constitutional and federal statutory claims challenging the Alabama Uniform Minimum Wage and Right-to-Work Act, Ala. Act No. 2016-18.[1]  In direct response to Birmingham's adoption of an Ordinance raising the minimum wage for workers in the City, Act 2016-18 strips local officials in majority-African-American Birmingham of the power to regulate minimum wages and transfers all control over these issues to legislators elected by the statewide majority-white electorate.  Although Act 2016-18 nominally applies to other Alabama cities, Birmingham, its officials and its citizens were the clear target: Birmingham was the only political subdivision in Alabama to raise its minimum wage above the federal floor, and it remains so today.

Act 2016-18 is the latest example of a pattern of Alabama state actions that intentionally minimize African-American political and economic power in the state by removing power from local governments in African-American majority jurisdictions in favor of a white-dominated state government.  In this case, the state

---

[1] This en banc brief is submitted on behalf of Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries (collectively "Lewis Plaintiffs").  The remaining Plaintiffs-Appellants are represented by separate counsel and are submitting their own en banc brief.

2

intentionally removed the ability of Birmingham, with a population that is 73% African-American, to regulate minimum wages and benefits – an issue of great significance to the city's African-American community, which is disproportionately represented among the low-wage workers who would directly benefit from Birmingham's effort to raise the minimum wage.

In the amended complaint (hereinafter "complaint"), Plaintiffs assert that Act 2016-18 violates fundamental rights of Birmingham citizens, and citizens of other majority-black municipalities in Alabama, secured by the Fourteenth Amendment to the United States Constitution.[2]  In dismissing this action at the pleading stage, the district court failed to identify, let alone apply, the correct legal standards governing Plaintiffs' claims and thus ignored the detailed allegations in Plaintiffs' complaint supporting their claim of intentional racial discrimination. The district court also wrongly held that Plaintiffs lack standing to bring their claims.  In light of these legal errors in the district court's analysis, this Court should reverse the district court's judgment.  Plaintiffs should be provided an opportunity to prove their well-pleaded case.

Before the three-judge panel in this case, Plaintiffs further explained that the district court wrongly rejected Plaintiffs' Fourteenth Amendment claim pursuant to

---

[2] Plaintiffs do not pursue on appeal their claims under the Thirteenth Amendment or the Privileges and Immunities Clause of the Fourteenth Amendment.

3

the Political Process Doctrine, their Fifteenth Amendment voting rights claim, and

their claim under Section 2 of the Voting Rights Act of 1965 ("VRA").  The

district court also erred in holding that Section 2 of the VRA does not abrogate

Eleventh Amendment state sovereign immunity.  The Lewis Plaintiffs stand by

those arguments and refer the Court to the briefs filed before the three-judge panel

for a discussion of those issues.[3]  In accordance with this Court's February 12,

2019 briefing notice, however, the Lewis Plaintiffs do not directly address those

issues in this en banc brief.

## FACTUAL BACKGROUND

**I.     Birmingham's Efforts To Raise The Minimum Wage Addressed
        Significant Racial Disparities In Workers' Wages**

In 2015 and 2016, the Birmingham City Council, a body composed of nine

elected councilors, all but two of whom were African-American, took steps to

address the low wages and poverty persistent in this predominantly African-

American city.  Despite a long history of racial discrimination in Alabama, *see*

*infra* at 43-46, African-Americans have been able to build political power in urban

areas where they are a majority of the population.  Alabama's three largest cities

are majority-African-American.  Birmingham is Alabama's largest city and has a

---

[3] Pursuant to the February 12, 2019 briefing notice and 11th Cir. Rule 35-7, copies
of Plaintiffs' briefs before the panel have been submitted to the en banc Court.

population that is 73% African-American.  ER048 (First Amended Compl. ("FAC") ¶31).[4]

The minimum wage is an important issue in Birmingham and especially among the African-American community.  Approximately 28% of Birmingham's residents live below the poverty line,[5] and approximately 19% of all Birmingham workers earn less than $10.10/hour.  ER047 (FAC ¶29).  Of hourly wage earners in Birmingham, 37% of African-American workers earn $10.10/hour or less, while only 27% of white hourly wage workers fall below the same threshold.  ER047-48 (FAC ¶30).

Birmingham did not immediately raise its minimum wage.  First, on April 21, 2015, the City Council unanimously passed a resolution asking the State Legislature to raise the minimum wage to $10/hour across Alabama.  ER066 (FAC ¶82).  The majority-white State Legislature refused to raise the minimum wage. Accordingly, on August 18, 2015, the Birmingham City Council adopted Ordinance No. 15-124.  Ordinance 15-124 went into effect on August 30, 2015, and initially raised the minimum wage for Birmingham workers to $8.50/hour,

---

[4] Excerpts of record, cited as "ER###," are included in the Plaintiffs-Appellants' Appendix (filed June 5, 2017).

[5] U.S. Census Bureau, Birmingham, AL, QuickFacts, available at: https://www.census.gov/quickfacts/fact/table/birminghamcityalabama/PST045217 (last visited March 15, 2019).

effective July 1, 2016, and also provided for a second increase to $10.10/hour, effective July 1, 2017.  ER067-68 (FAC ¶85).

Because the State Legislature indicated in early February 2016 that it would block Birmingham's efforts to raise the minimum wage for its residents, *see infra* at 7-9, on February 23, 2016, the Birmingham City Council adopted Ordinance No. 16-28 (the "Ordinance"), which accelerated implementation of the higher minimum wage.  ER068-70 (FAC ¶¶86-92).  The Ordinance raised the minimum wage within Birmingham to $10.10/hour, effective February 24, 2016.  ER070 (FAC ¶¶91-92); ER122.

Birmingham's City Council made several findings supporting the Ordinance, including that because "[p]overty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our economy."  ER121; *see also* ER070 (FAC ¶90).

At the time it adopted its ordinances, Birmingham was the only political subdivision in Alabama to raise its minimum wage above the federal floor of $7.25/hour.  ER047 (FAC ¶27).  It remains so today.

## II.    The State Legislature Targeted Birmingham In Adopting Act 2016-18 And Its Ban On Local Governments' Ability To Raise Minimum Wages

When Birmingham took steps to raise the minimum wage, Alabama State officials, including the Legislature, Governor, and Attorney General, responded

with unusual speed by enacting legislation – Act 2016-18 – to strip the City of its power to do so.  ER067 (FAC ¶84).

The bill that became Act 2016-18, HB 174, was introduced on February 9, 2016, after Birmingham had adopted its first minimum wage ordinance, but before wage increases took effect.  ER068-69 (FAC ¶88).  The proposed law preempted all local minimum wage laws, and to stop Birmingham's ordinance from taking effect, the leadership of the House of Representatives fast-tracked HB 174.  A short public hearing was held on February 11, 2016, and the bill was voted out of the Committee on State Government by a vote of 10-3, all ten votes in favor coming from white representatives.  *Id.* (FAC ¶88).  On February 16, 2016, just seven days after it had been introduced, HB 174 passed the full House of Representatives by a vote of 71-31 and was sent to the Senate.  ER069 (FAC ¶89).  The vote in the House was also highly racially polarized, with all those voting in favor being white legislators, and all African-American legislators voting against.  *Id.* (FAC ¶¶88-89).

The Alabama Senate also fast-tracked HB 174, passing the bill through the assigned Senate committee in approximately 36 hours, without the requisite public notice of the hearing or allowing public comment.  ER070-71 (FAC ¶93); ER083 (FAC ¶¶139, 141).  The full Senate approved the bill in a racially-polarized 23-12 roll call vote on February 25, 2016, two days after the Birmingham City Council

7

adopted the Ordinance, and a day after the Ordinance took effect.  ER069-70 (FAC ¶¶90-93).

The bill was delivered to Governor Robert Bentley the same day as Senate approval, and it was signed by the Governor approximately ninety minutes after being passed by the Senate.  ER070-71 (FAC ¶93).  Alabama thus introduced, passed and enacted the bill that would become Act 2016-18 in an extraordinary sixteen days.

As the State Legislature was hurrying to invalidate Birmingham's Ordinance, the Alabama Attorney General was acting in tandem to prevent Birmingham's minimum wage from rising, even temporarily.  In particular, on February 23, 2016, the day that the Birmingham City Council adopted the Ordinance, the Attorney General issued a press release indicating to Birmingham employers that they likely would not have to comply with the city's minimum wage law.  ER044 (FAC ¶13).  The Attorney General directly addressed Birmingham businesses (including those that employed Plaintiffs Marnika Lewis and Antoin Adams), and indicated that the Attorney General expected the Legislature to soon invalidate Birmingham's minimum wage law such that Birmingham employers would not need to raise their wages: "[T]he Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham."  ER044 (FAC ¶13).  The

8

press release also reflected the Attorney General's opposition to Birmingham's Ordinance, noting that the Ordinance "could greatly disrupt the Birmingham economy."[6]

Act 2016-18 extinguished Birmingham's minimum wage law, providing: "Any ordinance, policy, rule, or other mandate of a county, municipality, or any other political subdivision of this state that is inconsistent with this section is void."  ER113; *see also* ER117 ("Legislature hereby occupies and preempts the entire field of regulation in this state touching in any way upon ... the wages ... provided by an employer to an employee").  The Act further provides that "any political subdivision of [the] state shall not enact or administer any ordinance … or other mandate requiring an employer to provide" a minimum wage or other employment benefit "not required by state or federal law."  ER113.

Section 6 of Act 2016-18 explains the Legislature's supposed intent:

> The purpose of this section is to establish within the Legislature complete control over regulation and policy pertaining to ... the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor in order to ensure that such regulation and policy is applied uniformly throughout the state.

ER116.

---

[6] The full text of the February 23, 2016 press release, entitled "Attorney General Statement on Enforceability of Birmingham Minimum Wage Ordinance," is available at: https://ago.alabama.gov/documents/news/780.pdf (last visited March 15, 2019).

Of course, at the time Act 2016-18 was adopted, Birmingham was the only "political subdivision" in the state that had adopted a minimum wage above the federal floor.  ER047 (FAC ¶27).

## PROCEDURAL HISTORY

Two Birmingham low-wage workers (who are also registered voters) and two public interest organizations, filed this lawsuit on April 28, 2016, alleging that Act 2016-18 was racially discriminatory.  ER016-37.  Plaintiffs filed an amended complaint on June 30, 2016, adding the Alabama Legislative Black Caucus and several of its members and another African-American registered voter as plaintiffs and including more detailed allegations.  ER038.  The 49-page amended complaint included extensive allegations of the racially disparate impact of Act 2016-18, Alabama's history of shifting power from majority-African-American localities to State government to undermine African-American political power, and the unusual haste and procedural irregularities of Act 2016-18.  *See infra* at 42-49.

On Defendants' motion, the district court dismissed Plaintiffs' claims with prejudice and granted Defendants judgment as a matter of law.  ER139-65.  The district court held that Plaintiffs lack standing to sue the Alabama Attorney General, the Mayor of Birmingham, and the City of Birmingham, finding that Act

10

2016-18 had no effect on individual worker Plaintiffs' wages. ER147-51.[7] The district court further held that it did not have jurisdiction to hear Plaintiffs' claim under Section 2 of the VRA against the State of Alabama because it believed the VRA did not abrogate Eleventh Amendment state sovereign immunity. ER155-58.

The district court also held that Plaintiffs failed to allege sufficient facts to support their claims, including their claims of race discrimination under the Equal Protection Clause of the Fourteenth Amendment, and Section 2 of the VRA and the Fifteenth Amendment. ER151-55, ER158-63. In so holding, the district court relied on the mistaken premise that, so long as it could hypothesize a legitimate explanation for Act 2016-18, no factual allegations would be sufficient to support an inference of intentional discrimination or discriminatory effect. ER159, ER163. Because the district court failed to identify, let alone apply, the governing legal standards, its decision also ignored the numerous factual allegations in the complaint supporting Plaintiffs' claims. The district court's order also did not explain the basis for dismissing Plaintiffs' claims with prejudice. ER165.

Plaintiffs timely filed a notice of appeal on March 2, 2016. ER166. After briefing, a panel of this Court heard oral argument on April 13, 2018. On July 25,

---

[7] The district court also dismissed Plaintiffs' claims against the Mayor as duplicative of those against the City of Birmingham. ER0143-44. Plaintiffs do not challenge the dismissal of the Mayor on appeal.

11

2018, the panel issued a unanimous opinion, affirming in part and reversing in part the district court's decision. The panel held that Plaintiffs have standing to bring their claims against the State and Attorney General ("State Defendants"). Panel Opinion at 7-12 (issued July 25, 2018) ("Panel Op."). In particular, the panel held that all three elements of the standing analysis – injury-in-fact, causation and redressability – are present here with respect to the State Defendants, *id.*, and that the Alabama Attorney General is an appropriate defendant by virtue of his statutory authority to enforce Act 2016-18. *Id.* at 9-12. The panel also reversed the district court's dismissal of Plaintiffs' Fourteenth Amendment Equal Protection Claim of intentional discrimination, explaining that the complaint is replete with factual allegations relevant under the governing *Arlington Heights* framework and, thus, "plausibly alleged a discriminatory motivation behind the Minimum Wage Act." *Id.* 25; *see also id.* at 19-25.

Nonetheless, the panel held that the City of Birmingham is not a proper defendant because both the causation and redressability elements of the standing analysis are lacking with respect to the City, *id.* at 12, and that Plaintiffs had failed to state claims under the Fourteenth Amendment's Political Process Doctrine, the Fifteenth Amendment, and Section 2 of the VRA, *id.* at 26-30.[8]

---

[8] Although it found that Plaintiffs had failed to state a claim under Section 2 of the VRA, the panel also held that the VRA validly abrogated Eleventh Amendment

On August 29, 2019, the State Defendants filed a Petition for Rehearing En Banc and, on January 30, 2019, this Court ordered rehearing en banc and vacated the panel opinion.

## STANDARD OF REVIEW

This Court reviews the dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) de novo. *Harris v. Ivax Corp.*, 182 F.3d 799, 802 (11th Cir. 1999). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces *does not* require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (internal quotation marks omitted).

Part of the showing required by Rule 8 is establishing that "the party invoking federal jurisdiction" has Article III standing to pursue their claims. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Article III standing is evaluated in light of the stage of the case at which the issue considered. "At the pleading stage, general factual allegations of injury resulting from the defendants conduct may suffice, for on a motion to dismiss we 'presum[e] that general

state sovereign immunity. Panel Op. at 15-18; *see also* Brief for *Amici Curiae* NAACP Legal Defense and Educational Fund and Campaign Legal Center at 5-25 (filed June 12, 2017) ("LDF *Amici* Br.") (explaining that the VRA abrogates Eleventh Amendment immunity).

allegations embrace those specific facts that are necessary to support the claim.'"

*Id.* (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990)); *see also*

*Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323-24 (11th Cir. 2012) (same).

With respect to the merits of Plaintiffs' claims, "[t]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to

'state a claim for relief that is plausible on its face.' ...  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  Although this means a pleading must do more than "'formulaic[ly]

recit[e] ... the elements of a cause of action,'" this pleading standard does not

require that a plaintiff demonstrate *probable* success.  *Id.*  "[A] well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of th[e]

facts is improbable, and that a recovery is very remote and unlikely." *Twombly*,

550 U.S. at 556.  This is because, at the pleading stage, courts "are required to

accept the factual allegations in the complaint as true and construe them in the light

most favorable to the plaintiff." *Alvarez v. Atty. Gen. of Fla.*, 679 F.3d 1257, 1261

(11th Cir. 2012).  This Court has explained that "[a]fter *Iqbal* it is clear that there is

no heightened pleading standard as it relates to cases governed by Rule 8(a)(2),

14

including civil rights complaints." *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010) (internal quotation marks omitted).

When a district court dismisses a complaint with prejudice on the ground that the proposed amendment would be futile, such a conclusion is reviewed de novo. *Harris*, 182 F.3d at 802.

## SUMMARY OF THE ARGUMENT

In dismissing this action, the district court wrongly closed the door on an important civil rights issue without providing Plaintiffs the opportunity to develop a factual record supporting the detailed allegations of their complaint. The district court made several mistakes in doing so.

First, the district court wrongly held that Plaintiffs lack standing to bring claims against all Defendants but the State of Alabama. Plaintiffs suffered two concrete injuries-in-fact: (1) economic loss because they will not benefit from the preempted minimum wage (a quintessential "wallet injury" sufficient to confer standing, *Hein v. Freedom From Religion Found.*, 551 U.S. 587, 619 (2007) (Scalia, J., concurring)), and (2) a loss of voting power implicating their fundamental Constitutional right to equal treatment under the law. Plaintiffs' injuries are fairly traceable to the conduct of the Attorney General and the City of Birmingham. The Attorney General refused to perform his statutory duty to inform the Legislature and the Governor of Act 2016-18's unconstitutionality.

15

And due to Act 2016-18, Birmingham is failing to enforce its Ordinance. Plaintiffs' injuries would be redressed by a decision holding Act 2016-18 invalid because the Birmingham Ordinance could then go into effect. *See infra* at 18-28.

Second, the district court also held that even if Plaintiffs have standing to pursue their claims, the Attorney General is not a proper defendant under *Ex Parte Young*, 209 U.S. 123 (1908), because he has "no duty at all with regard to ... [Act 2016-18]." ER149. But the Supreme Court and this Court have been clear that a public official is a proper defendant under *Ex Parte Young* as long as the official has some connection with enforcement of the challenged law, whether that enforcement authority is assigned by the challenged law itself or the general law. Here, the Attorney General indisputably has the authority under the Alabama Constitution and statutory law to sue the City of Birmingham to enforce Act 2016-18. *See infra* at 29-36. The State Defendants admitted as much at oral argument before the panel. *See infra* at 32.

Third, the district court made two critical errors in assessing Plaintiffs' Equal Protection claim of intentional racial discrimination. Contrary to the Supreme Court's instruction, *see Iqbal*, 556 U.S. at 675, the district court ignored the legal standard governing the claim – the Supreme Court's multi-factor *Arlington Heights* framework. Then, as a result of this error, the district court completely disregarded the complaint's numerous, detailed factual allegations

16

relevant under *Arlington Heights*, and instead wrongly asserted that Plaintiffs made only a single "conclusory allegation, unsupported by any specific factual allegations" concerning intentional discrimination.  ER159.

## ARGUMENT

### I.     Plaintiffs Have Standing To Assert Their Claims

The district court properly held that Plaintiffs have standing to pursue their claims against the State of Alabama.  But it erred in holding that Plaintiffs lack standing to sue the three remaining defendants: the State Attorney General, Mayor Bell, and the City of Birmingham.  ER144-51.  In fact, Plaintiffs satisfy all three elements of the standing analysis: injury-in-fact, traceability/causation, and redressability.  *Lujan*, 504 U.S. at 560-61.

### A.     Plaintiffs Have Suffered An Injury-In-Fact

It is settled law that a plaintiff has suffered an injury-in-fact if the asserted injury is "(a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).  Here, Plaintiffs Lewis and Adams have alleged that they are employed in Birmingham at wages that are less than what they would be making had Act 2016-18 not been adopted.  ER040.  "Economic harm ... [is a] well-established injur[y]-in-fact under federal standing jurisprudence."  *Adinolfe v. United Tech. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014).  Plaintiffs also assert

17

they have suffered a "denial[] of equal treatment" under the law, in particular with respect to their voting rights and participation in the political process. Several of the Plaintiffs are registered voters in the City of Birmingham. ER040, 43 (FAC ¶¶1, 8-10). Their ability to participate in setting the minimum wage laws in Birmingham was diminished by Act 2016-18. This is also sufficient to confer standing. *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007).[9]

In their briefing before the panel, Defendants did not seriously contest Plaintiffs' injury-in-fact. Brief of Appellees State of Alabama and Alabama Attorney General Steve Marshall at 7-12 (filed August 4, 2017).

### B.    Plaintiffs' Injury Is Traceable To Defendants' Conduct

The district court also erred in failing to recognize that Plaintiffs' injury is "fairly traceable" to Defendants' conduct. ER147-48. The centerpiece of the district court's analysis was its belief that Act 2016-18 and Defendants' actions

---

[9] Although only one plaintiff need demonstrate standing, *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1003 n.10 (11th Cir. 2004), Plaintiffs Alabama NAACP, Greater Birmingham Ministries, and Alabama Legislative Black Caucus have also suffered cognizable injuries-in-fact. Each alleges that it has members or represents constituents harmed by Act 2016-18, and each alleges that its mission also confers standing to pursue the amended complaint's claims. ER040-43 (FAC ¶¶2-9); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) (organization may have standing based on injury to itself or its members).

18

have no effect on the wages payable to employees in Birmingham.  ER146-48.

That supposition is both illogical and contrary to allegations of the complaint.

Plaintiffs' injuries are a result of Act 2016-18, which extinguished an existing legal entitlement to higher wages, and the Attorney General's conduct with respect to the Act.  Plaintiffs have alleged that the Attorney General "has broad common law and statutory powers to direct and oversee all litigation, civil or criminal, which concerns the interest of the state of Alabama."  ER043; *see also* ER044.  In particular, he "is authorized to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state."  Ala. Code §36-15-12.  He is also charged with "giv[ing] his ... opinion ... on any question of law connected with the interests of the state," *id.* §36-15-1(1)(a), and "as to any question of law connected with the duties of … [certain] county or city officers," *id.* §36-15-1(1)(b); *see also* Ala. Const. art. V, §137 ("The attorney-general ... shall perform such duties as may be prescribed by law.").  Further, the Attorney General "may carefully examine all of the general statutes now in force ... as to their clarity and constitutional validity," Ala. Code §36-15-1(7), and may report to the Governor and State Legislature "pointing out the laws or parts of laws of Alabama which have been held invalid by courts of last resort."  *Id.* §36-15-1(8).

19

In this case, the Attorney General declined to exercise his statutory authority to inform the Legislature and Governor that Act 2016-18 is unlawful. Quite the contrary: the Attorney General issued a press release suggesting to Birmingham employers that they likely would not have to comply with the City's minimum wage law because he anticipated and supported the State Legislature's preemption of the Ordinance. ER044. The Attorney General's failure to perform his statutory duty is sufficient to confer standing. Indeed, attorneys general are often proper defendants for civil rights lawsuits challenging unlawful state practices. *See, e.g.*, *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014); *Houston Lawyers' Ass'n v. Attorney General of Texas*, 501 U.S. 419 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986); *S. Christian Leadership Conf. of Alabama v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (en banc).

No doubt the State will again argue, as it did before the panel, that the Attorney General did not pass Act 2016-18 or sign it into law. But that quibble is irrelevant. It is well-established that a failure to act may be sufficient to establish causation for standing purposes. *See Massachusetts v. EPA*, 549 U.S. 497, 523-24 (2007) (agency's refusal to regulate greenhouse gas emissions contributes to alleged injuries from global warming); *Focus on the Family v. Pinellas Suncoast Trans. Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("complaint must indicate that

20

the injury is indeed fairly traceable to the defendant's acts *or omissions*") (quoting *Arlington Heights*, 429 U.S. at 261) (emphasis added).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan*, 504 U.S. at 561; *see also Ford v. Strange*, 580 F. App'x 701, 710 (11th Cir. 2014) (inferring economic harm to employees and associated business caused by state law eliminating gambling operations). Indeed, the Supreme Court has explained that even "incremental" steps in chain of causation are sufficient for standing purposes). *Massachusetts v. EPA*, 549 U.S. at 524; *see also Focus on the Family*, 344 F.3d at 1273 ("[E]ven harms that flow indirectly from the action in question can be said to be fairly traceable to that action for standing purposes."); *Loggerhead Turtle v. County Council*, 148 F.3d 1231, 1251 n.23 (11th Cir. 1998) ("[N]o authority even remotely suggests that proximate cause applies to the doctrine of standing."). Moreover, a plaintiff "is not required to prove causation beyond a reasonable doubt or by clear and convincing evidence." *Focus on the Family*, 344 F.3d at 1273.

The Attorney General caused Plaintiffs' injuries because had he acted otherwise – e.g., by performing his statutory duty to advise the State Legislature and the Governor that Act 2016-18 is unconstitutional, indicating his intent not to enforce the Act, and refraining from suggesting that Birmingham employers need

21

not comply with the minimum wage law – Plaintiff workers would be receiving higher wages under Birmingham's minimum wage ordinance and, free from Act 2016-18's unlawful targeting, they would also retain the ability to engage in local political activity to regulate wages and other working conditions in the future.

This case is similar to *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 135 S.Ct. 2584 (2015).  In that case, plaintiffs challenged a Nebraska constitutional amendment rendering same-sex marriages and civil unions invalid in the state. There, as here, the law "[did] not require affirmative enforcement by any state official; it function[ed] as a barrier to the government action that [plaintiffs] desire[d]." *Id.* at 864.  But, as is also the case here, the Nebraska law gave the Governor and Attorney General "broad powers to enforce the State's constitution and statutes." *Id.*  In particular, the Eighth Circuit pointed to the Attorney General's power to issue opinions on the legality of state laws potentially in conflict with the challenged constitutional amendment as evidence of his "power[] ... [to] polic[e] compliance." *Id.*  The court concluded that this was sufficient to satisfy the requirements of Article III.  *Id.*

Plaintiffs' injury is also directly traceable to Birmingham's compliance with Act 2016-18.  Cities such as Birmingham have primary responsibility for implementing Act 2016-18, which directs Birmingham (as the only political

22

subdivision with a minimum wage ordinance) "not [to] administer any ordinance ... requiring an employer to provide any employee ... any employment benefit, including ... wage[s] ... that is not required by state or federal law."  ER113.  In its brief before the panel, Birmingham explained that "[b]ut for" Act 2016-18 it would be enforcing its minimum wage Ordinance, and other counties and municipalities could "enact[] and enforc[e] their own minimum wage ordinances."  Brief of Defendants-Appellees City of Birmingham and Mayor William A. Bell, Sr. at 4 (filed July 5, 2017).  For purposes of causation, this is sufficient.  *See generally Bennett v. Spear*, 520 U.S. 154, 171 (1997) (burden of alleging injury is "fairly traceable" to defendant and redressable is "relatively modest at [pleading] stage").

Here, the district court's remarkable insistence that Act 2016-18 has no connection to Plaintiffs' injury is based on the mischaracterization of this case as involving an injury "depend[ent] on the unfettered choices made by independent actors not before the courts."  ER148.  The district court's reliance on *Frank Krasner Enterprises, Ltd. v. Montgomery County, MD*, 401 F.3d 230 (4th Cir. 2005), cannot support its conclusion.  There, a plaintiff gun-show promoter and exhibitor lacked standing to challenge a county law denying public funding to gun-show venues, in part because the withholding of funding from the non-party venue had only a potential, indirect effect on the prices plaintiffs would be charged.  *Id.* at

23

236.[10]  By contrast, Act 2016-18 did not merely realign incentives such that injury to Plaintiffs became more likely.  Rather, Act 2016-18 *extinguished an existing legal obligation* to pay Plaintiffs higher wages.

To be sure, Birmingham employers currently have the choice to pay Plaintiffs any amount above the federal minimum wage, and if they choose to pay Plaintiffs what Plaintiffs would have been entitled to under the Birmingham Ordinance then Plaintiffs would suffer no economic harm.  But the path those employers have chosen – to pay less than that amount, ER040 – is available to them *only because Act 2016-18 makes it legally possible*.  *See Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 442 (D.C. Cir. 1998) (en banc) ("[T]he Supreme Court ... ha[s] repeatedly found causation where a challenged government action *permitted* the third party conduct that allegedly caused a plaintiff injury, when that conduct would have otherwise been illegal.").  Standing based on economic harm cannot be defeated by the speculative possibility that

---

[10] The same is true of *Allen v. Wright*, 468 U.S. 737 (1984), and *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), cited by the district court.  ER147-48.  In *Allen*, the Court held that plaintiffs claiming injuries arising from segregated schools were unable to show that, absent tax-exempt status for private schools, white students would have attended public schools.  468 U.S. at 758.  In *Gun Rights Committee*, the court found, on the facts of that case, that it was "sheer speculation" that the challenged statute had a significant impact on weapons prices.  98 F.3d at 1130.  Here, no such speculation is required for there is no question that Plaintiffs would be entitled to higher wages but for Act 2016-18.

24

some third-party may voluntarily choose to make plaintiffs whole; otherwise, such standing would never exist.

### C.    Plaintiffs' Injury Is Redressable

The district court further erred in concluding that "nothing this court could order [the] Attorney General or the City Defendants to do will affect Plaintiffs' wages." ER149. Plaintiffs seek, *inter alia*, declaratory relief confirming the unlawfulness of Act 2016-18, as well as injunctive relief directing the Attorney General to give notice to Alabama legislators and the public of the same, and directing the City of Birmingham to enforce the city's minimum wage Ordinance. ER085-86. There can be no doubt that the district court is empowered to grant each element of relief requested and that this relief would make it "likely" that Plaintiffs' injuries – the economic harm of lower wages and the inherent harm in unequal treatment – will be redressed. *See Lujan*, 504 U.S. at 561. This satisfies the requirement that Plaintiffs allege "*a significant increase in the likelihood*" that at decision in their favor would "redress[] the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (internal quotation marks omitted) (emphasis added); *see also Lujan*, 504 U.S. at 561.

Indeed, declaratory relief is available because Act 2016-18's constitutionality is "fit ... for judicial decision" and Plaintiffs will suffer the "hardship" of lower wages and continued unequal treatment if consideration is

25

withheld. *Browning-Ferris Indus. of Ala. v. Ala. Dept. of Environ. Mgmt.*, 799 F.2d 1473, 1475-76 (11th Cir. 1986). In *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999), this Court explained that even where a plaintiff may lack standing to pursue injunctive relief because the named defendant "has no enforcement authority over the ... statute at issue," declaratory relief may be available. *Id.* at 887 n.6. In *Doe*, this Court explained that the redressability prong of the standing analysis is met when "a favorable ruling could result in a declaratory judgment against the Attorney General holding the [State] statute invalid." *Id.* So too here.

The relief requested in this case – declaratory relief confirming the unlawfulness of Act 2016-18, as well as injunctive relief directing the Attorney General to give notice to Alabama legislators and the public of the same, ER085-86 – would significantly increase the likelihood that Birmingham employers would comply with the minimum wage Ordinance.[11] Indeed, Defendants have never been able to explain how employers would be entitled to ignore the Birmingham

---

[11] By press release and public statement, the Attorney General has already used his power to notify the public that the Act could void Birmingham's Ordinance. ER044. As a practical matter, many Birmingham employers no doubt relied upon that authoritative statement, and would similarly rely on a statement that compliance with the Ordinance is required. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (redressability is a matter of "practical consequence"). And courts, including the Supreme Court, have repeatedly found standing to challenge laws permitting injurious third-party conduct. *See Animal Legal Defense Fund*, 154 F.3d at 442 (collecting cases).

26

Ordinance were Act 2016-18 declared unconstitutional.  Such compliance will redress Plaintiffs' economic injuries, and a declaration that Act 2016-18 is unconstitutional will redress the abridgement of Plaintiffs' right to equal access to the political process (including their right to elect local officials capable of regulating issues of local importance), and the harm of unequal treatment.  That is sufficient for redressability, especially at the pleading stage.  *See Lujan*, 504 U.S. at 561.

Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003), cited by the district court, ER0148-49, does not require a different result.  There the plaintiff's injury occurred when Alabama state courts relied on a statute criminalizing "all homosexual conduct" as a basis for a custody determination.  344 F.3d at 1283-84. In the interim between that state-court decision and this Court's decision in *Doe*, the Supreme Court decided *Lawrence v. Texas*, 539 U.S. 558 (2003).  Recognizing the effect of *Lawrence*, the Alabama Attorney General conceded that the challenged state statute was unconstitutional.  *Doe*, 344 F.3d at 1285.  It was only on the basis of this concession that this Court concluded: "An injunction preventing the Attorney General from enforcing a statute that he concedes cannot be enforced would do nothing to change the result ...."  *Id.*  The standing issue in this case would be analogous to *Doe* only if this Court or the Supreme Court had *already* struck down Act 2016-18 and the Alabama Attorney General had

27

*conceded* the Act is unconstitutional and unenforceable. The Attorney General's continued defense of the Act belies any such notion.

On the facts of this case, a declaratory judgment from a federal court would "significant[ly] increase … the likelihood" that Birmingham employers would comply with their legal obligations under the city's minimum wage Ordinance and that Plaintiffs' injuries would thereby be redressed. *Mulhall*, 618 F.3d at 1290.[12] Moreover, such a judgment would also redress the harm of unequal treatment that Plaintiffs suffered when Act 2016-18 targeted Birmingham and diminished the power of Birmingham's African-American majority to regulate in an area of especial importance to them.

## II.    The Alabama Attorney General Is A Proper Defendant Under *Ex Parte Young*

The Alabama Attorney General is an appropriate defendant under *Ex Parte Young* for Plaintiffs' claims.[13] Although the Eleventh Amendment generally

---

[12] Similarly, unlike cases cited by the district court where redress depended on the unpredictable actions of a third-party, *see* ER149, Birmingham's Ordinance gives individual workers the right to enforce it through a civil action. ER123. Thus, if employers do not comply with their legal obligations under the Ordinance following a declaration that Act 2016-18 is unlawful, there can be no dispute that Plaintiffs' requested declaratory relief would "significant[ly] increase the likelihood" that Plaintiffs will be able successfully to enforce their right to a higher wage. *Mulhall*, 618 F.3d at 1290.

[13] Steve Marshall was appointed Alabama Attorney General after the amended complaint was filed and is "automatically substituted as a party." Fed. R. Civ. P. 25(d).

prohibits the federal courts from hearing suits against the States, "[u]nder the doctrine enunciated in *Ex Parte Young* ... , a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). The Supreme Court has explained that *Ex Parte Young* "gives life to the Supremacy Clause" because "[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

This case is on all fours with *Ex Parte Young*. In that case, the Supreme Court permitted Fourteenth Amendment claims challenging railroad rates established by state statute to proceed against, *inter alia*, the Minnesota Attorney General in his official capacity. *Ex Parte Young*, 209 U.S. 123 (1908). In doing so, the Court rejected the argument that a suit against the Attorney General was functionally a suit against the State in violation of the Eleventh Amendment. It reasoned that if the challenged act is unconstitutional, as alleged, then it is not legitimate state action; rather, "[i]t is simply an illegal act upon the part of a state official in attempting, by use of the name of the state, to enforce a legislative enactment which is void because unconstitutional." *Id.* at 159. In such circumstances there is no Eleventh Amendment immunity because "[t]he state has

29

no power to impart to [the Attorney General] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160.

Of course, the Court also explained that the Eleventh Amendment may not be circumvented simply by naming *any* state official as a defendant. To be a proper defendant, "such officer must have some connection with the enforcement of the [challenged] act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Id.* at 157. Importantly, however, no special or specific enforcement authority with respect to the challenged law is necessary: "It has not ... been held that it was necessary that such duty should be declared in the same act which is to be enforced.... The fact that the state officer, by virtue of his office, has *some connection* with the enforcement of the act, is the important and material fact, and *whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists*." *Id.* at 157 (emphasis added).

In *Ex Parte Young*, the Supreme Court held that the Minnesota Attorney General was a proper defendant on the basis of his general statutory duty to enforce Minnesota law, not because any special authority was assigned by the challenged rate-setting statute itself. The Court explained that under Minnesota statutory and common law, the Attorney General "had a general duty imposed upon him, which includes the right and the power to enforce the statutes of the

30

state, including, of course, the act in question, if it were constitutional." *Id.* at 161; *see also id.* at 160-61 (citing Minn. Gen. Laws Sec. 3, ch. 227; *State ex rel. Young v. Robinson*, 112 N.W. 269 (Minn. 1907)). Accordingly, the Court held that the Attorney General was a proper defendant because "[h]is power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party." *Id.* at 161.

The Attorney General of Alabama is a proper defendant in this case for precisely the same reason that the Attorney General of Minnesota was a proper defendant in *Ex Parte Young*.[14] As Plaintiffs alleged, the Alabama Attorney General "has broad common law and statutory powers to direct and oversee all litigation, civil or criminal, which concerns the interest of the state of Alabama." ER043; *see also* Ala. Code §36-15-12 ("The Attorney General is authorized to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state."). Under this authority, the Attorney General may enforce Act 2016-18 by bringing a civil action

---

[14] The district court cited *Ex Parte Young* only once, in the context of addressing Plaintiffs' standing. ER149. Moreover, the district court held that sovereign immunity barred Plaintiffs' claims against the Attorney General regardless of the outcome of the standing analysis, essentially bypassing the question of whether the Attorney General is a proper defendant under *Ex Parte Young*. ER155.

against any city that seeks to regulate the minimum wage (namely, Birmingham, as the only city in Alabama to do so).

At oral argument before the panel, Defendants conceded that if Birmingham implemented its minimum wage ordinance, the Alabama Attorney General could sue the City to compel compliance with Act 2016-18. Panel Opinion at 10. This is sufficient to make the Alabama Attorney General a proper defendant under *Ex Parte Young.* *See Grizzle*, 634 F.3d at 1319 ("A state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit.").

Indeed, the Attorney General recently sued the City of Birmingham in the name of the State to enforce a state law and specifically invoked his general authority to enforce State laws under Ala. Code §36-15-12. After Birmingham covered a monument to Confederate soldiers in a City park, the Attorney General sued the City to enforce a State law prohibiting removal or alteration of monuments more than 40 years old. Complaint, *State of Alabama ex rel. Attorney General Steve Marshall v. City of Birmingham*, No. 01-CV-2017-903426.00 (Jefferson County Cir. Ct.) (filed Aug. 16, 2017) ("Monuments Complaint").[15]

---

[15] Plaintiffs submitted the Monuments Complaint to the panel with a Request for Judicial Notice. Plaintiffs-Appellants' Request for Judicial Notice (filed Sept. 1, 2017). The panel "independently [took] judicial notice of the attorney general's recently filed complaint" and thus denied Plaintiffs' Request for Judicial Notice as

32

Nothing in the State law the Attorney General sought to enforce, Ala. Code §41-9-231 *et seq.*, expressly authorizes civil suits against cities.  Instead the Attorney General asserted his general authority under Ala. Code §36-15-12 to "institute and prosecute" civil actions "to protect the rights and interests of the state" as grounds for his right to ensure that Confederate monuments remain on display in the majority African-American city.  Monuments Complaint ¶2.  The Attorney General can invoke the same authority to enforce Birmingham's compliance with Act 2016-18.

This Court has consistently applied this principle to hold state officials proper *Ex Parte Young* defendants in cases in which they have broad authority under generally applicable state law for enforcement of the challenged law.[16]  For example, in *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), which concerned alleged problems with Georgia's indigent defense services severe enough to violate the Sixth Amendment right to counsel, this Court held that the Governor of Georgia was sufficiently connected to the allegedly unlawful conduct to be named

---

moot.  Panel Op. at 11.  This en banc Court should similarly take judicial notice of the Monuments Complaint and, to the extent the Court deems it necessary, Plaintiffs hereby renew their Request for Judicial Notice.

[16] Earlier this year, this Court explained that "even if [a] complaint[] were premised solely on the State Defendants' inaction, that would be enough under *Ex Parte Young*."  *Curling v. Secretary of Georgia*, __ F. App'x __, 2019 WL 480034, at *4 (11th Cir. Feb. 7, 2019).

a defendant under *Ex Parte Young*.  The Court identified no particular

gubernatorial responsibilities with respect to the systemic deficiencies at issue –

"inadequate resources, delays in the appointment of counsel, pressure on attorneys

to hurry their clients' case to trial or to enter a guilty plea, and inadequate

supervision in the Georgia indigent criminal defense system."  *Id.* at 1013.

Nonetheless, this Court held that the Governor was a proper defendant under *Ex*

*Parte Young* by virtue of his general "responsib[ility] for law enforcement in that

state" and his duty to "execut[e] the laws faithfully," as well as his "residual power

to commence criminal prosecutions ... [and] to direct the Attorney General to

'institute and prosecute' on behalf of the state."  *Id.* at 1016.

       Similarly, in *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011), this Court

held that the Georgia Secretary of State was a proper defendant for a lawsuit

challenging a state statute disqualifying individuals related to local school

administrators from serving on school boards.  This Court's holding was based on

the Secretary's general authority to enforce election laws, even though, under

Georgia law, the Secretary lacked the power to "qualify or challenge candidates for

local boards of education or certify the results of those elections."  *Id.* at 1319; *see*

*also Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986) (Mississippi Secretary of

State responsible for "general supervision" of administration by local school

officials of lands set aside for educational purposes subject to suit under *Ex Parte*

34

*Young* in suit alleging violation of equal protection in distribution of funds from land); *Georgia Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1260 n.5 (11th Cir. 2012) (rejecting argument that state officials lack specific enforcement authority and thus are not appropriate defendants under *Ex Parte Young* for challenge to state law criminalizing certain conduct in aid of undocumented immigrants).

The *Ex Parte Young* doctrine has been instrumental in allowing private plaintiffs to vindicate their constitutional rights and protect themselves from unlawful and unconstitutional state action for over 100 years. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974) ("[*Ex Parte Young*] has permitted the Civil War Amendments ... to serve as a sword, rather than merely as a shield, for those whom they were designated to protect."); John C. Jefferies, Jr. et al., Civil Rights Actions: Enforcing the Constitution 7 (2d ed. 2007) (arguing that without *Ex Parte Young* "the entire class of modern civil rights litigation would be excluded from the federal courts").[17]  Here, by virtue of his undisputed statutory duties, as well as defendants' own admission, the Alabama Attorney General has authority to enforce Act 2016-18.  Thus, under more than a century of Supreme Court and Eleventh Circuit precedent, he is a proper defendant pursuant to *Ex Parte Young*.

---

[17] *See also* LDF *Amici* Br. at 25-32 (explaining continued importance of *Ex Parte Young* doctrine).

### III.    Plaintiffs' Complaint Adequately Alleges Equal Protection Violations

The district court's evaluation of Plaintiffs' Equal Protection claim covers just over one page of its Opinion, ER158-59,[18] and completely fails to acknowledge – let alone apply – the governing framework for assessing claims of intentional race discrimination laid out by the Supreme Court in *Village of Arlington Heights v. Metropolitan Development Corp.*, 429 U.S. 252 (1977).  As a result, the district court failed to accord proper weight to the detailed factual allegations supporting Plaintiffs' claims of intentional racial discrimination. Evaluated in light of the proper underlying legal framework, Plaintiffs' allegations easily meet the "plausibility" threshold laid out by the Supreme Court in *Iqbal*.

Instead of applying the correct legal framework, the district court advanced the proposition that an Equal Protection claim can never be plausible where the government defendant has asserted a legitimate motive for the complained-of action, unless plaintiffs demonstrate racial discrimination by the "clearest proof." ER159, ER162.  Such a standard (which the district court imported from an unrelated doctrine) is plainly inconsistent with the *Twombly/Iqbal* "plausibility" standard and would run afoul of established equal protection doctrine.

---

[18] The district court's opinion repeats much of the same analysis at ER161-62 without further development.

**A.    The District Court Ignored The Legal Standard Governing Fourteenth Amendment Claims Of Intentional Discrimination**

*Iqbal* cautions courts to begin their analysis by "taking note of the elements a plaintiff must plead to state a claim," and "discuss[ing] the ... [doctrinal] principles implicated by the complaint." 556 U.S. at 675. Yet in this case, the district court failed entirely to acknowledge the governing legal framework. That framework, arising from the Supreme Court's decision in *Arlington Heights*, is well-established and designed to account for the unique circumstances presented by claims of intentional racial discrimination by public officials. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997) (In *Arlington Heights* "we set forth a framework for analyzing whether invidious discriminatory purpose was a motivating factor in a government body's decisionmaking.") (internal quotation marks omitted). The district court's analytical error in this case – and its consequent decision to dismiss the case – illustrates the importance of the Supreme Court's instruction to evaluate a motion to dismiss in light of the underlying legal principles "implicated by the complaint." *Iqbal*, 556 U.S. at 675.

The Supreme Court's jurisprudence on Fourteenth Amendment claims of intentional racial discrimination by public officials flows from the observation that today, unlike when the Fourteenth Amendment was adopted, "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see*

37

*also Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016) (en banc) ("In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence."); *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir. 1987) ("Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it."). Cognizant of this reality, the Supreme Court has consistently reiterated that courts should also consider circumstantial evidence in assessing claims of intentional racial discrimination.

In *Arlington Heights*, the Supreme Court described the type of evidence courts should consider probative of discriminatory intent, in light of its then-recent decision in *Washington v. Davis*, 426 U.S. 229 (1976), holding that discriminatory effect alone is insufficient to establish a violation of the Fourteenth Amendment's Equal Protection guarantee. The Court explained that its summary "identifie[d], without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed," 429 U.S. at 268, noting that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *id.* at 266; *see also Reno*, 520 U.S. at 488 (same).

Initially, the Court explained that, even when proof of intent is required, a discriminatory effect – i.e., whether the "impact of the official action ... bears more

heavily on one race than another" – is an "important starting point" for the analysis. *Arlington Heights*, 429 U.S. at 266 (internal quotation marks omitted); *see also Reno*, 520 U.S. at 489 (same); *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1045 (11th Cir. 2008) (same).

From that starting point, the Supreme Court went on to identify a non-exhaustive list of factors that may support a finding of intentional discrimination, including: (1) the "historical background of the decision," (2) the "specific sequence of events leading up to the challenged decision," (3) procedural or substantive "departures from the normal ... sequence," and (4) "legislative or administrative history." *Arlington Heights*, 429 U.S. at 266–68. Under *Arlington Heights* all of this evidence, together with discriminatory impact, is necessarily relevant to the question of discriminatory intent, although no particular evidence is necessary and each case must be evaluated on its own unique facts. *See, e.g.*, *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (affirming finding of intentional discrimination where court relied primarily on two of the *Arlington Heights* factors). Ultimately, discriminatory purpose "may often be inferred from the totality of the relevant facts." *Washington*, 426 U.S. at 242.

Aside from identifying the types of evidence relevant to the question of discriminatory intent, in *Arlington Heights*, the Supreme Court also cautioned that plaintiffs need not show that racial discrimination was the "sole[]" or "primary"

motive for the challenged action, just that it was "*a* motivating factor."  *Arlington Heights*, 429 U.S. at 265-66 (emphasis added).  Indeed, "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."  *Id.* at 265.

As it must, this Court has consistently followed the Supreme Court's instruction and applied the *Arlington Heights* framework in evaluating claims of intentional racial discrimination.  *See, e.g.*, *I.L. v. Alabama*, 739 F.3d 1273, 1286 (11th Cir. 2014); *Young Apartments*, 529 F.3d at 1045; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999).

The "plausibility" analysis on a motion to dismiss must be evaluated in light of this legal framework, *Iqbal*, 556 U.S. at 675, against which Plaintiffs' Equal Protection claim will ultimately be measured.  And, of course, *Twombly* and *Iqbal* do not circumscribe the scope of evidence the Supreme Court recognized as relevant to the intentional discrimination inquiry in *Arlington Heights*, or the analytic principles articulated in that decision, because those later cases concerning the Rule 8 pleading standard did not change any aspect of substantive law.  *See Randall*, 610 F.3d at 710 ("After *Iqbal* it is clear that there is no heightened pleading standard as it relates to cases governed by Rule 8(a)(2), including civil rights complaints.") (internal quotation marks omitted).

40

**B.    Applying The *Arlington Heights* Factors, Plaintiffs Have Plausibly Pleaded Facts Sufficient to Support A Finding Of Intentional Racial Discrimination**

The district court believed that the sole allegation in Plaintiffs' amended complaint relevant to their assertion of intentional racial discrimination is the statement: "Defendant's actions constitute intentional discrimination on the basis of race." ER159 (quoting ER081). Had the district court identified the proper framework for evaluating claims of intentional discrimination, however, it would have understood that the complaint was filled with factual allegations relevant to the *Arlington Heights* inquiry and sufficient to meet Plaintiffs' burden at the pleading stage.

*First*, as explained above, the "starting point" for an inquiry into discriminatory intent is an assessment of whether the challenged action has a disparate racial impact. *See supra* at 39. It is impossible to credit the district court's assertion that Plaintiffs made no factual allegations "indicat[ing] that Act 2016-18 has a discriminatory effect." ER161. For example, consider Paragraph 30, which asserts just such a disparate racial impact and alleges specific facts in support:

> The legislature's pre-emption of the Birmingham wage law adversely impacted black workers. On average, white wage earners in Birmingham earn $1.41 more per hour than black wage earners. While 37% of black wage workers in Birmingham earn wages of $10.10 or less, only 27% of white wage workers earn at or below that level.

41

ER047-48 (FAC ¶30).  Plaintiffs further alleged: "The persons denied the benefits of the Birmingham minimum wage legislation are predominantly African-American.  Approximately 32% of Birmingham's African-American residents had annual earnings below what they could have earned had the minimum wage ordinance become effective."  ER081 (FAC ¶136); *see also* ER073 (FAC ¶102) ("The enactment of HB 174 resulted in approximately 40,000 low wage workers in Birmingham being denied a wage increase; the vast majority of these workers are African-American.").

Moreover, Birmingham, whose minimum wage law was the motivation and target of Act 2016-18, ER047, ER066-73, is 73% African-American, whereas Alabama is overall 26% African-American.  ER048 (FAC ¶31).  That Act 2016-18, although facially neutral, "bears more heavily on one race than another," *Young Apts.*, 529 F.3d at 1045, is undeniable and is certainly supported by Plaintiffs' allegations.[19]

*Second*, both this Court and the Supreme Court have held that the "historical background of the decision" may support claims of intentional racial

---

[19] *See also* Brief of *Amici Curiae* Mayors and Local Progress at 10-12 (filed June 12, 2017) (describing disparate racial impact of preemption of local minimum wage laws); Brief of *Amici Curiae* The Partnership for Working Families and the Southern Poverty Law Center at 5-17 (filed June 12, 2017) (describing foreseeability of Act 2016-18's disparate racial impact).

discrimination.  *I.L.*, 739 F.3d at 1286 (citing *Arlington Heights*, 429 U.S. at 266-68).  Here, the complaint contains more than *fifteen pages* of factual allegations recounting Alabama's history of efforts to maintain white supremacy, "in particular" by using the "suppression of local black majorities through imposition of white control by state government."  ER049 (FAC ¶38); *see also* ER049-66 (FAC ¶¶38-81) (recounting history of intentional race discrimination in structure and function of Alabama government).

Among other things, the complaint explains that Alabama's 1901 Constitution – the source of the state supremacy clause undergirding the state Legislature's actions to preempt local regulations benefiting black-majority cities[20] – was motivated by an openly acknowledged desire "to establish white supremacy in this State."  ER055 (quoting *Hunter v. Underwood*, 471 U.S. 222, 229 (1985)).  It was effective in doing so.  In 1900 there were 181,000 registered black male voters in Alabama; in 1903, there were fewer than 5,000.  ER056 (FAC ¶56).  As the Complaint explains, "[l]ittle progress was made providing black voters equal access to election of their county and municipal governing bodies until 1982 ... [with *City of Mobile v. Bolden*], and Congress amended the Voting Rights Act to

---

[20] *See* Ala. Const. art. IV, §89 ("The legislature shall not have power to authorize any municipal corporation to pass any laws inconsistent with the general laws of this state.").

43

outlaw election methods that resulted in dilution of black voting strength." ER057-58 (FAC ¶61); *see also* Brief of *Amicus Curiae* Historians (filed June 12, 2017) (describing history of restructuring government powers to deny decision-making authority to local African-American majorities). This Court has recognized "Alabama's deep and troubled history of racial discrimination." *I.L.*, 739 F.3d at 1288. This pattern of vesting control in the white-dominated state Legislature reinforces Plaintiffs' contention that the purpose of Act 2016-18 was discriminatory and the Act intended to strip majority-black cities such as Birmingham of their ability to legislate for the benefit of their residents.

The complaint further recounts *recent* events that provide context for Act 2016-18's removal of authority from local black majorities as they gain and assert power. Particularly with respect to Birmingham, it describes the 2015 state reconstitution of the profitable and powerful Birmingham Water Board, which, as a result of state legislative action, is now "the *only* municipal water board in Alabama whose governance ... must be shared with neighboring cities and counties, all of which are majority-white." ER064 (FAC ¶77) (emphasis added).

The complaint also describes legislative redistricting in 2012, which in both intent and purpose, diluted the voting power of black voters. ER062-63 (FAC ¶¶72-76). Further, the complaint identifies a 2011 federal district court decision finding "substantial evidence of racial animus [by the Alabama State Legislature]"

44

in the adoption of a law targeting undocumented immigrants.  ER065-66 (FAC

¶80) (citing *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F.Supp.2d 1165, 1182 &

n.14, 1191-94 & nn.20-21 (M.D. Ala. 2011), *vacated on other grounds by* 2013

WL 2372302 (11th Cir. 2013)).  The complaint explains that thirteen of the state

legislators who sponsored that immigration bill were also sponsors of Act 2016-18,

and that two specific Representatives whose "race-based statements were reviewed

by the Court in *Magee*, were also among the co-sponsors" of Act 2016-18.

ER066.[21]

Accordingly, Plaintiffs have alleged a historical, *and on-going*, pattern of

Alabama legislative action taken with racially discriminatory purpose to racially

discriminatory effect.  At this stage, these allegations must be taken as true and

every reasonable inference drawn in Plaintiffs' favor.  *Speaker v. U.S. Dept. of*

*Health and Human Servs.*, 623 F.3d 1371, 1380 (11th Cir. 2010).  These

allegations of a pattern of racial discrimination by the Alabama Legislature are

probative of intent under both Supreme Court and Eleventh Circuit precedent.  *See*

---

[21] In fact, while the parties were briefing the appeal before the panel, white
legislators disparaged their African-American colleagues by circulating racially-
charged emails.  *See* Mike Cason, "Email referencing monkeys angers black
Alabama legislators," AL.com (May 17, 2017), available at:
https://www.al.com/news/2017/05/alabama_legislature_email_blac.html.

45

*Arlington Heights*, 429 U.S. at 267; *I.L.*, 739 F.3d at 1286.  The district court clearly erred in ignoring these allegations completely.

*Third*, under *Arlington Heights*, the "specific sequence of events" leading to the decision can shed light on whether legislative action was taken with a discriminatory purpose.  *I.L.*, 739 F.3d at 1286 (citing *Arlington Heights*, 429 U.S. at 267).  Here, the complaint contains detailed allegations regarding the way that Act 2016-18 was fast-tracked specifically to block the City of Birmingham from raising the minimum wage within the city.  ER048, ER067-72 (FAC ¶¶84-96).  In particular, the bill that became Act 2016-18 was introduced and signed into law in a period of just sixteen days.  It spent just seven days in the House of Representatives, 36 hours in its assigned Senate committee (without notice or public comment), and was signed by the Governor 90 minutes after passage in the Senate.  ER069-71 (FAC ¶¶88-93).  In fact, the Governor signed the bill *the day after Birmingham's mayor signed the minimum wage ordinance*.  ER070-71 (FAC ¶¶92-93).  The extreme haste with which Act 2016-18 was passed "strongly suggests an attempt to avoid in-depth scrutiny," and is evidence of discriminatory intent.  *McCrory*, 831 F.3d at 228; *see also Mhany*, 819 F.3d at 607-08 ("oddness and abruptness" of timing of city ordinance supported finding of race-based animus).

46

*Fourth*, the adoption of Act 2016-18 involved significant "departures from the normal procedural sequence [that] also might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267.  In particular, the complaint alleges: "The Alabama legislative committees considering HB 174 deviated from normal practices with respect to the consideration of legislation by, inter alia, failing to give the public proper information on the scheduling of hearings, failing to allow public testimony at the Senate hearing, and by rushing the bill to final votes and the Governor's signature after years of indifference to the issue." ER083 (FAC ¶139).  The district court wholly failed to give these allegations their proper weight.

*Fifth*, the complaint's allegations concerning Act 2016-18's legislative history, and its specific allegations that the Act's stated purpose was pretextual, support an inference that the Act was adopted for racially discriminatory purposes. *See I.L.*, 739 F.3d at 1286 (legislative history relevant factor in assessing intent). In particular, the complaint states:

> [C]ontrary to the assertions of Act 2016-18's supporters that passage of a minimum wage ordinance would be detrimental to Birmingham residents, economic studies show that increasing the minimum wage to $10.10 would not result in job loss or economic instability. *The Legislature cited no economic studies in support of its position and instead relied on stereotypes about race and other pretexts to justify its actions....*

ER083 (FAC ¶140) (emphasis added).  Similarly, the complaint alleges:

> Defendants' assertions of the need for uniformity in application of minimum wage requirements throughout Alabama are pretextual, in light of the Legislature's history of less favorable treatment of predominantly African-American jurisdictions in the Legislature's granting of economic development authority to local jurisdictions ... and in light of the Legislature's acceptance of non-uniformity in other areas of economic regulation, including but not limited to the sales tax.

ER082-83 (FAC ¶139).[22]  Rather than credit these allegations, as it was required to do, *Speaker*, 623 F.3d at 1380, the district court simply ignored them.

*Sixth*, the complaint raised allegations of profound racial polarization in the Alabama Legislature with respect to Act 2016-18.  At the time the Act was passed, the Alabama House of Representatives had 27 black members, of a total of 105 members.  Yet, all 53 of HB 174's sponsors were white.  ER069.  All ten HB 174 supporters in the House Committee on State Government were white.  *Id.*  The final vote in the House of Representatives was 71-31.  *Id.*  All 71 members of the House voting in favor of the bill were white; all 27 black Representatives voted against the bill.  *Id.*  In the Senate, HB 174 passed by a vote of 23-12.  ER070.  All 23 Senators voting in favor of the bill were white; all seven African-American members of the Senate voted against the bill.  ER071.[23]

---

[22] *See also infra* at 53 n.25 (describing evidence that supposed interest in uniformity was pretextual).

[23] Although voting among the general electorate in Alabama is also racially polarized, as the amended complaint alleges, ER048, this near-categorical polarization *within the Alabama Legislature* is striking.  *Cf. Jeffers v. Clinton*, 740

48

The amended complaint thus provides specific factual allegations going to every one of the categories of evidence that *Arlington Heights* holds relevant to the discriminatory intent analysis.  At this stage, these allegations must be taken as true and all inferences drawn in Plaintiffs' favor.  *Speaker*, 623 F.3d at 1380.  Taken together, there is no question that Plaintiffs' detailed factual allegations meet their burden at the pleading stage to demonstrate that their claims are "plausible."  *Iqbal*, 556 U.S. at 678; *see also McCrory*, 831 F.3d at 233 ("Any individual piece of evidence can seem innocuous when viewed alone, but gains an entirely different meaning when considered in context.").

Indeed, Alabama's history, and the history of Act 2016-18, demonstrate that African-Americans have sought to counteract past discrimination by building power at the local level, such as in the City of Birmingham, where African-Americans make up almost three-quarters of the population.  Act 2016-18 is a direct reaction to – and attempt to quash these efforts.  Plaintiffs should be permitted to gather and present evidence in support of their well-pleaded claims.

---

F.Supp. 585, 616 (E.D. Ark. 1990) (Eisele, J., dissenting) (fact black legislators voted for statutes made it less likely that statutes were enacted with discriminatory intent).

49

**C.    The Standard Applied By The District Court Bears No Resemblance To Four Decades Of Supreme Court Jurisprudence Governing Claims Of Intentional Racial Discrimination**

The district court's approach in this case stands in stark contrast to the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" called for by Supreme Court precedent. *Arlington Heights*, 429 U.S. at 266. The district court thought that "an equal protection claim is not plausible where there is an obvious alternative explanation for the conduct other than intentional discrimination," and that where "there are legitimate reasons supporting the legislature's decision, only the clearest proof [of illicit motive] will suffice." ER0159, ER0162 (internal quotation marks omitted).

The district court was wrong. By adopting these improper assumptions at the pleading stage, the district court essentially held that it did not matter what allegations Plaintiffs pleaded because the state's avowed, untested interest in uniformity would legitimize Act 2016-18 and necessarily trump any inference of intentional discrimination that could be drawn from the facts alleged in Plaintiffs' complaint. But this turns *Iqbal*'s plausibility standard on its head. Instead of asking whether Plaintiffs' claim of intentional discrimination is plausible in light of the facts alleged, the district court held that the claim is necessarily and always implausible when the State simply *advances* an alternative explanation (without any adversarial testing of that alternative explanation). This is not the law because

50

"requiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges ... would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject." *Wilson v. Ark. Dept. of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (internal citation and quotation marks omitted).

It is true that in *Iqbal*, which concerned claims of unconstitutional racial and religious discrimination, the Supreme Court noted that there was an "obvious alternative explanation" for the fact that counter-terrorism arrests following the September 11th attacks disproportionately affected Arab Muslims. *Iqbal*, 556 U.S. at 682; *see also id.* ("It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims."). But the Supreme Court did not hold that *any* alternative explanation necessarily negates allegations of invidious discrimination. If that were the case, the Court could have stopped its analysis after concluding that disproportionate detention of Muslims following the September 11th attacks was explainable because of the circumstances of the attack and investigation. Rather, the Court explained that the plaintiff's allegations in that case were conclusory and otherwise insufficient to support a plausible inference of discriminatory animus. *Id.* at 681

51

("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *id.* at 681-82 (facts alleged were merely "consistent" with discriminatory animus, and do not plausibly establish discrimination).[24]

In this case, even if the Legislature's motivations for Act 2016-18 were in part legitimate, which the district court presumed (in violation of the requirement that *plaintiffs'* allegations be taken as true on a motion to dismiss), that would not mandate dismissal of Plaintiffs' claims. Indeed, this Court has expressly *rejected* the proposition that "a permissible purpose will always defeat an impermissible motive" in intentional discrimination cases. *Underwood v. Hunter*, 730 F.2d 614, 617 n.7 (11th Cir. 1984), *aff'd*, 471 U.S. 222 (1985); *see also Veasey*, 830 F.3d at 231 ("No one questions the legitimacy of ... [the State's *stated* purpose]. The disagreement centers on whether SB 14 was passed with impermissible motives as well."); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996)

---

[24] The allegations of bias in this case could not be more dissimilar from those in *Iqbal*. The *Iqbal* plaintiff alleged discrimination in the face of the first major attack on the United States since Pearl Harbor. By contrast, Plaintiffs' allegations here are consistent with a judicially-recognized history of racial discrimination by the State of Alabama, including a pattern of disempowering local African-American majorities in favor of a white-dominated State government. *See* ER049-66 (allegations in complaint recounting history of intentional race discrimination in structure and function of Alabama government); Brief of *Amicus Curiae* Historians (filed June 12, 2017) (describing history of restructuring government powers to deny decision-making authority to local African-American majorities).

52

("Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct.").

The reasoning urged by the State Defendants would lead to an analysis akin to rational basis review – i.e., as long as a court can imagine a possible legitimate purpose for state action, claims of intentional racial discrimination must be dismissed at the pleading stage – but this is not the law.  *See Arlington Heights*, 429 U.S. at 266-68.  The Supreme Court has explained that a legislative decision is rarely "motivated solely by a single concern," *Arlington Heights*, 429 U.S. at 265, and only one purpose need be impermissibly discriminatory to render a legislative act unconstitutional, *id.* at 265-66.

The district court's error in accepting an alternative explanation of motive is especially unjustifiable at the pleading stage, where Defendants have offered no evidence to support their proffered explanation and Plaintiffs have had no opportunity to develop a factual record to test that explanation.[25]  Particularly at the

---

[25] In fact, Act 2016-18 does not advance the Legislature's stated goal of ensuring "uniformity" across jurisdictions within the State.  *See Amici* Brief of National Partnership for Working Families and Southern Poverty Law Center at 17-26 (filed June 12, 2017) (explaining that there exists great variation in market wage rates across Alabama, as well as a "patchwork" of business regulations not related to the minimum wage or other subjects regulated by Act 2016-18); Brief of *Amici Curiae* Mayors and Local Progress at 12-20 (filed June 12, 2017) (explaining that higher local minimum wages do not have adverse economic impacts).

pleading stage, where plaintiffs' allegations must be taken as true, it is error for a court to accept without question an alternative explanation of motive. *See Underwood*, 730 F.2d at 617 n.7. "*Twombly* and *Iqbal* did not change [the] fundamental tenet of Rule 12(b)(6) practice" that "inferences are to be drawn in favor of the non-moving party." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

The district court also remarkably required that Plaintiffs allege facts showing that particular legislators acted with discriminatory motives. It stated: "Without specific factual allegations of an intent to discriminate on the part of any particular legislators, Plaintiffs' equal protection claims fail." ER0159. The district court's standard is baffling not only because of its departure from the *Arlington Heights* framework, but also because courts regularly refuse to infer discriminatory intent based solely on statements of individual legislators. *See, e.g.*, *N.C. State Conf. NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016); *Veasey*, 830 F.3d at 234. As a three-judge district court in Texas recently explained, to prove intentional discrimination "[p]laintiffs ... need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race." *Perez v. Abbott*, 253 F.Supp.3d 864, 948 (W.D. Tex. May 2, 2017); *accord Garza v. County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kosinski, J., concurring and dissenting).

54

Finally, the "clearest proof" standard the district court applied here has no place in Equal Protection jurisprudence. As the Fifth Circuit, sitting en banc, has recently explained, the "'clearest proof' standard [is] grafted from cases involving the determination of whether a legislature meant to impose criminal punishment through a civil law when the law faces an *ex post facto* challenge." *Veasey*, 830 F.3d at 230 n.12. And the Panel Opinion explains: "Even a slightest bit of context illustrates the danger of extracting this law from its intended setting: 'only the clearest proof will suffice *to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty*." Panel Op. at 24 (quoting *Smith v. Doe*, 538 U.S. 84, 92 (2003)) (emphasis added by Panel Opinion). In *Veasey*, the Fifth Circuit noted that "[t]he Supreme Court has not applied ... [the 'clearest proof'] standard in the voting rights context," and itself declined to apply the standard to claims alleging intentional racial discrimination. *Veasey*, 830 F.3d at 230 n.12.

The "clearest proof" standard is incompatible with the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" that the Supreme Court has required for claims of intentional racial discrimination. *Arlington Heights*, 429 U.S. at 266; *see also supra* at 37-41. The "clearest proof" standard is also incompatible with the "plausibility" standard applicable at the pleading stage, *see Iqbal*, 556 U.S. at 678-79, and with plaintiffs' burden to prove

55

their claims by a preponderance of the evidence, *see Woody v. St. Clair Cnty. Comm'n*, 885 F.2d 1557, 1560 (11th Cir. 1989). The district court's reasoning would subject claims of racial discrimination to a more restrictive pleading standard than most other claims, but *Iqbal* makes it clear that this is not the law. *Iqbal*, 556 U.S. at 678-79; *see also Randall*, 610 F.3d at 710 (no heightened pleading standard for civil rights complaints).

The standard applied by the district court in this case bears no resemblance to four decades of Supreme Court and Eleventh Circuit jurisprudence governing claims of intentional racial discrimination.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in Plaintiffs' briefing before the panel and the panel opinion, the decision below should be reversed.

Respectfully submitted,

Dated: March 25, 2019
/s/ Barbara J. Chisholm
Barbara J. Chisholm

Barbara J. Chisholm, Esq.
Eric P. Brown, Esq.
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
bchisholm@altber.com
ebrown@altber.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC 20005
Telephone: (202) 230-4096
carlsonmjj@yahoo.com

56

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Telephone: (205) 488-1226
jwhatley@whatleykallas.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Telephone: (212) 627-8100
rstroup@levyratner.com

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Telephone: (205) 870-9989
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

*Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries.*

57

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of

Fed. R. App. P. 32(a)(7)(B)(i), because this brief contains 12,934 words, excluding

the parts of the brief exempted by 11th Cir. R. 32-4.


Dated:  March 25, 2019                    /s/ Barbara J. Chisholm
                                          BARBARA J. CHISHOLM
                                          ALTSHULER BERZON LLP
                                          177 Post Street, Suite 300
                                          San Francisco, CA  94108
                                          Tel:   (415) 421-7151
                                          Fax:   (415) 362-8064
                                          bchisholm@altber.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter.  On that same date, I caused physical copies of the foregoing to be filed with the Clerk of Court and served upon the following counsel by U.S. First Class Mail:

Andrew Brasher
James W. Davis
William Glenn Parker, Jr.
State of Alabama Attorney General's Office
501 Washington Ave
PO BOX 300152
Montgomery, AL 36130-0152

*Counsel for Defendants-Appellees State of Alabama and Alabama Attorney General Steve Marshall*

Fredric L. Fullerton, II
Kayla S. Lawrence
City of Birmingham Law Department
710 N 20th Street, Fl. 6
Birmingham, AL 35203

*Counsel for Defendants-Appellees City of Birmingham and Mayor Woodfin*

Dated:  March 25, 2019

/s/ Sally Mendez
Sally Mendez