**No. 17-11009**

# In the United States Court of Appeals
# for the Eleventh Circuit

Marnika Lewis, Antoin Adams, National Association for the Advancement of Colored People, Greater Birmingham Ministries, Marika Coleman, John Rogers, Priscilla Dunn, Juandalynn Givan, Louise Alexander, William Muhammad, Rodger Smitherman, Oliver Robinson, Alabama Legislative Black Caucus, Mary Moore,

*Plaintiffs-Appellants.*

*v.*

State of Alabama, Governor of Alabama, in his Official Capacity as Governor of the State of Alabama, Attorney General, State of Alabama, in his Official Capacity as Attorney General of the State of Alabama, City of Birmingham, William A. Bell, Sr.,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the Northern District of Alabama

**BRIEF FOR STATES OF TEXAS, ARKANSAS, GEORGIA, INDIANA, LOUISIANA, AND MISSOURI AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

*Counsel listed on inside cover*

LESLIE RUTLEDGE
Attorney General of Arkansas

CHRISTOPHER M. CARR
Attorney General of Georgia

CURTIS T. HILL, JR.
Attorney General of Indiana

JEFF LANDRY
Attorney General of Louisiana

ERIC S. SCHMITT
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

KYLE D. HAWKINS
Solicitor General

MATTHEW H. FREDERICK
Deputy Solicitor General

JASON R. LAFOND
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
jason.lafond@oag.texas.gov

No. 17-11007, *Lewis v. Alabama*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, undersigned counsel for amici curiae certifies that the Certificates of Interested Persons filed by the State Appellees on August 29, 2018, and by the Plaintiffs-Appellants on March 25, 2019, are complete with the following exceptions:

1.  Carr, Christopher M.—Attorney General of Georgia, Counsel for *Amicus Curiae*

2.  Frederick, Matthew H.—Counsel for *Amici Curiae*

3.  Hawkins, Kyle D.—Counsel for *Amici Curiae*

4.  Hill, Curtis T., Jr.—Attorney General of Indiana, Counsel for *Amicus Curiae*

5.  LaFond, Jason R.—Counsel for *Amici Curiae*

6.  Landry, Jeff—Attorney General of Louisiana, Counsel for *Amicus Curiae*

7.  Mateer, Jeffrey C.—Counsel for *Amicus Curiae*

8.  Paxton, Ken—Attorney General of Texas, Counsel for *Amicus Curiae*

9.  Rutledge, Leslie—Attorney General of Arkansas, Counsel for *Amicus Curiae*

10. Schmitt, Eric S.—Attorney General of Missouri, Counsel for *Amicus Curiae*

11. State of Arkansas—*Amicus Curiae*

12. State of Georgia—*Amicus Curiae*

13. State of Indiana—*Amicus Curiae*

14. State of Louisiana—*Amicus Curiae*

15. State of Missouri—*Amicus Curiae*

16. State of Texas—*Amicus Curiae*

# Table of Contents

Page

Certificate of Interested Persons ........................................................................ C-1

Table of Authorities ............................................................................................. ii

Identity and Interest of Amici Curiae ................................................................. 1

Introduction ......................................................................................................... 1

Argument ............................................................................................................. 4

    I.   It is Vital to Cull Meritless Discriminatory-Purpose Claims at the
        Motion-to-Dismiss Stage. ......................................................................... 4

    II.  Plaintiffs' Discriminatory-Purpose Claim Does Not Cross the
        Threshold of Plausibility, and the District Court Was Correct to
        Dismiss It. ................................................................................................. 8

        A.   The presumed good faith of the Alabama Legislature can be
              overcome only with the clearest proof of invidious purpose. ............... 9

        B.   None of plaintiffs' factual allegations create a plausible
              inference of intentional racial discrimination, and several
              point in the other direction. ................................................................13

Conclusion ......................................................................................................... 24

Certificate of Service .......................................................................................... 25

Certificate of Compliance .................................................................................. 25

# Table of Authorities

**Page(s)**

**Cases:**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) ........................................................9, 10, 19, 21

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
817 F.3d 755 (Fed. Cir. 2016) ........................................................13

*Ambassador Books & Video, Inc. v. City of Little Rock*,
20 F.3d 858 (8th Cir. 1994) ........................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................*passim*

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................ 8, 9

*Brown v. Allen*,
344 U.S. 443 (1953) ........................................................ 2-3

*Brown v. Vance*,
637 F.2d 272 (5th Cir. 1981) (per curiam) ........................................................13

*Central Alabama Fair Housing Center v. Magee*,
835 F. Supp. 2d 1165 (M.D. Ala. 2011), *vacated*, No. 11-16114,
2013 WL 2372302 (11th Cir. May 17, 2013)........................................................ 21

*Chudasama v. Mazda Motor Corp.*,
123 F.3d 1353 (11th Cir. 1997)........................................................ 8

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........................................................ 16, 17, 20

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................ 6

*City of Mobile, Ala. v. Bolden*,
446 U.S. 55 (1980)........................................................ 20

*Dandridge v. Williams*,
  397 U.S. 471 (1970).................................................................. 3

*Davis v. Dep't of Labor & Indus.*,
  317 U.S. 249 (1942) ............................................................... 10

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011) ....................................................15

*Easley v. Cromartie*,
  532 U.S. 234 (2001)................................................................ 12

*Elgin v. U.S. Dep't of Treasury*,
  641 F.3d 6 (1st Cir. 2011), *aff'd*, 567 U.S. 1 (2012) ........................11

*Flemming v. Nestor*,
  363 U.S. 603 (1960) .......................................................... 10, 11

*Fletcher v. Peck*,
  10 U.S. (6 Cranch) 87 (1810) ...................................... 5, 10, 11

*FindWhat Inv'r Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ............................................... 18

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ................................................... 14

*Hunter v. Underwood*,
  471 U.S. 222 (1985) ..............................................................8, 12

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
  No. 17-10943, 2019 WL 1529692 (5th Cir. Apr. 9, 2019)............... 12

*Jefferson v. Hackney*,
  406 U.S. 535 (1972) ................................................................. 3

*Johnson v. Governor of State of Florida*,
  405 F.3d 1214 (11th Cir. 2005) (en banc).................................16, 21

*Lewis v. Governor of Alabama*,
  896 F.3d 1282 (11th Cir. 2018), *reh'g en banc granted*, 914 F.3d
  1291 (11th Cir. 2019).......................................................... 5, 10, 12

*McCleskey v. Kemp*,
　481 U.S. 279 (1987) ............................................................................ 21

*Miller v. Johnson*,
　515 U.S. 900 (1995). .........................................................................9, 10

*Moore v. Detroit Sch. Reform Bd.*,
　293 F.3d 352 (6th Cir. 2002) ...............................................................19

*News Am. Publ'g, Inc. v. F.C.C.*,
　844 F.2d 800 (D.C. Cir. 1988) ............................................................. 21

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
　557 U.S. 193 (2009) ............................................................................ 23

*Palmer v. Thompson*,
　403 U.S. 217 (1971)........................................................................12, 16

*Pers. Adm'r of Mass. v. Feeney*,
　442 U.S. 256 (1979) ....................................................................... 15, 16

*Printz v. United States*,
　521 U.S. 898 (1997) .............................................................................11

*Richardson v. Honolulu*,
　802 F. Supp. 326 (D. Haw. 1992), *aff'd*, 124 F.3d 1150 (9th Cir.
　1997) .............................................................................................15-16

*Scott v. United States*,
　890 F.3d 1239 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 842 (2019) ..................11

*Session v. Perry*,
　298 F. Supp. 2d 451 (E.D. Tex. 2004) (per curiam), *vacated on
　other grounds sub nom. Henderson v. Perry*, 543 U.S. 941 (2004) ........................ 3

*Shelby County v. Holder*,
　570 U.S. 529 (2013). ........................................................................ 22

*S.C. Educ. Ass'n v. Campbell*,
　883 F.2d 1251 (4th Cir. 1989) ................................................................ 6, 9

*Tenney v. Brandhove,*
    341 U.S. 367 (1951) ................................................................. 3

*Territory of Alaska v. Am. Can Co.*,
    358 U.S. 224 (1959) ............................................................ 18

*United States v. Gregory-Portland Indep. Sch. Dist.*,
    654 F.2d 989 (5th Cir. 1981) ...............................................15

*United States v. Navarro-Camacho,*
    186 F.3d 701 (6th Cir. 1999) ...............................................13

*United States v. O'Brien,*
    391 U.S. 367 (1968) .............................................................19

*United States v. Texas*,
    457 F.3d 472 (5th Cir. 2006) ...............................................15

*United States v. Windsor*,
    570 U.S. 744 (2013) ............................................................ 21

*U.S. Dep't of Labor v. Triplett*,
    494 U.S. 715 (1990) ............................................................. 9

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) (en banc) ...............................7-8, 20, 21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................*passim*

*Whole Woman's Health v. Lakey*,
    769 F.3d 285 (5th Cir. 2014), *vacated in part on other grounds*, 135
    S. Ct. 399 (2014) ...............................................................11

**Other Authorities:**

Joseph D. Bryant, *Birmingham City Council endorses campaign to in-crease minimum wage as legislators move to restrict local authority to do so*, Birmingham Real-Time News (Apr. 21, 2015) ...................................... 18

Eleventh Circuit Rule 35-8 ....................................................... 1

Bryan A. Garner, *A Dictionary of Modern American Usage* (2003)........................13

Megan Hayes, *Birmingham City Council approves more than 200% pay raise*, WRBC.com (Aug. 7, 2015), https://perma.cc/32JJ-SAY5....................19

Nat'l League of Cities, *City Rights in an Era of Preemption: A State-by-State Analysis* 1 (2018 Update)...............................................13-14

Lauren E. Phillips, Note, *Impeding Innovation: State Preemption of Progressive Local Regulations*, 117 Colum. L. Rev. 2225 (2017)..........................2

Video: Birmingham City Council Meeting (Apr. 21, 2015) ............................17-18

Video: Birmingham City Council Meeting (Aug. 18, 2015) ................................ 18

## Identity and Interest of Amici Curiae

The States of Texas, Arkansas, Georgia, Indiana, Louisiana, and Missouri file this brief as *amici curiae* pursuant to Eleventh Circuit Rule 35-8. *Amici* have a substantial interest in ensuring that courts quickly dispose of meritless challenges to state laws, particularly challenges that rest on charges of intentional racial discrimination. The charge of intentional racial discrimination is among the most serious that can be leveled against a state legislature, not only for the gravity of the wrong alleged, but also for the consequences of a false accusation. Racial discrimination by a legislative body violates the fundamental right of every citizen to be treated equally by their government. But unfounded claims of discrimination can have damaging effects on the legislative process. The *amici* States are subject to such claims and their attendant effects on a regular basis.

## Introduction

The Birmingham City Council picked and lost a political fight with the Alabama Legislature over minimum-wage policy. In response to a legislative push to prevent cities from enacting a patchwork of wage-and-hour policies, the Birmingham City Council rushed through a hike in the city's minimum wage. Its concern having been validated, the Legislature moved forward with a bill to set state-wide standards. In response, the City Council moved up the effective date of the wage hike. The Legislature, in turn, moved swiftly to enact its state-wide law, which finally occurred nearly a year after the push began.

Fights like this are nothing new. In Texas, for example, the state legislature has battled with city councils on policies ranging from ride-sharing to the use of plastic bags to sick leave. In fact, Alabama is just one of *twenty-eight* states to have enacted some form of preemption of minimum-wage ordinances.

Plaintiffs maintain, however, that this political battle exposes racial discrimination by the State of Alabama. After all, they say, the fight over minimum-wage policy pitted whites against blacks, and Alabama has a long history of official racial discrimination. But race commonly overlaps with political preference, in Alabama and elsewhere. Alabama's two largest cities are majority-black. And as of 2018, all but two Democrats in the Alabama Legislature are black, while all the Republicans are white. Because "[t]he role of the local preemption dynamic . . . falls into a greater framework of partisan conflict," Lauren E. Phillips, Note, *Impeding Innovation: State Preemption of Progressive Local Regulations*, 117 Colum. L. Rev. 2225, 2237 (2017), ordinary political battles pitting cities versus the State can be expected to divide along racial lines to some degree. That cannot be sufficient to state a valid claim of intentional racial discrimination.

Natural solicitude for the victims of alleged racial discrimination, together with an indeterminate standard of proof, makes intentional-discrimination claims unusually powerful and unusually susceptible to abuse. In ordinary circumstances, the steady flow of unfounded claims works against the claimants. As Justice Jackson observed in the context of federal habeas litigation: "It must prejudice the occasional meritorious application to be buried in a flood of worthless ones. He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth

the search." *Brown v. Allen*, 344 U.S. 443, 537 (1953) (Jackson, J., concurring in the result). But racial discrimination is no ordinary charge; racial discrimination in all of its forms is roundly condemned—and rightly so—giving such charges special force, particularly in the federal courts. *See, e.g.*, *Session v. Perry*, 298 F. Supp. 2d 451, 473 (E.D. Tex. 2004) (per curiam), *vacated on other grounds sub nom. Henderson v. Perry*, 543 U.S. 941 (2004); *cf. Tenney v. Brandhove*, 341 U.S. 367, 378 (1951). But claims of intentional discrimination can cause real harm to the political process—not only because accusations of racial discrimination poison public discourse, but because the hope of ultimate victory in court tends to displace legitimate policy debate.

Unless the courts keep meritless claims from proceeding to discovery, claims of racial discrimination threaten to "inject the federal courts into a political game for which they are ill-suited, and indeed in which they are charged not to participate under the most basic principles of federalism and separation of power." *Session*, 298 F. Supp. 2d at 473. Allowing cases like this to go forward will "pass [policy debates] from the state legislatures . . . to the federal courts." *Id.*; *Jefferson v. Hackney*, 406 U.S. 535, 551 (1972) (noting that social welfare policy involves "intractable economic, social, and even philosophical problems" that are poorly suited to resolution by the courts) (quoting *Dandridge v. Williams*, 397 U.S. 471, 487 (1970)); *cf.* Amended Complaint ¶ 140, *Lewis v. Alabama*, No. 2:16-cv-00690 (N.D. Ala. June 30, 2016), ECF No. 18 (hereinafter "FAC") (alleging that Act 2016-18 reflects intentional discrimination because its economic justification lacks merit).

Courts can avoid this quagmire by applying well-established principles of procedure and constitutional law. The Supreme Court has established, for instance, that

3

(1) plaintiffs may not proceed to burdensome discovery until they have pleaded a plausible claim; (2) to be plausible, a claim must include factual allegations that exclude obvious alternative explanations for the challenged conduct; (3) the good faith of a state legislature must be presumed; (4) imputing a single motive to a large body of legislators is exceedingly difficult; and (5) decades- or centuries-old discrimination says nothing about a legislature's motive today. Faithful application of these principles will go a long way toward preserving the line between ordinary political disputes and genuine instances of race-based discrimination, thereby maintaining the constitutional division of power between legislatures and the courts. The district court properly applied those principles to dispose of plaintiffs' claim here.

**ARGUMENT**

## I.  It is Vital to Cull Meritless Discriminatory-Purpose Claims at the Motion-to-Dismiss Stage.

Claims of racial discrimination against state legislatures impose significant burdens on the courts, the States, and federal-state comity. Texas's experience in defending a challenge to its voter-ID law provides a cautionary tale. To pursue an intentional-discrimination claim that was twice rejected on appeal, the plaintiffs in that case were allowed to eviscerate legislative privilege, probe the thoughts of legislators who supported the bill, and compel production of thousands of pages of privileged documents. The result: no evidence of intentional discrimination. It is a sobering reminder of what can happen when courts ignore the legal standards discussed below.

**A.** Insisting that they would find racism hiding behind the public record, plaintiffs in the Texas Voter-ID case pressed the district court to intrude on the State's

4

legislative process to the greatest possible degree. The now-vacated panel opinion in this case shows why this has become a common refrain. The panel insisted that although "no longer pledged from the portico of the capitol," racism remains, "cloaked beneath ostensibly neutral laws and legitimate bases, steering government power toward no less invidious ends." *Lewis v. Governor of Alabama*, 896 F.3d 1282, 1296-97 (11th Cir. 2018), *reh'g en banc granted*, 914 F.3d 1291 (11th Cir. 2019); *see also, e.g.*, Lewis Pls.' Br. 37-38. On this view, every law is suspect. But starting with an assumption of intentional racial discrimination—the belief that evil still lurks in the hearts of legislators, though better concealed—conflicts directly with the presumption of good faith accorded all state legislatures, *see infra* pp. 9-10, and casts aside the caution the Supreme Court requires in evaluating legislative motive.

When charges of unspoken discriminatory intent suffice to open legislative files—and legislators' subjective thoughts—to probing by political opponents, basic principles of separation of powers and federalism are eroded. The Supreme Court "has recognized . . . that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) (citing *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 130-31 (1810)). Although the Court has identified "legislative or administrative history" as a "subject[] of proper inquiry in determining whether racially discriminatory intent existed," it made clear that the inquiry should ordinarily be limited to public sources—"contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268. In all cases against state entities and officials, "[l]itigation, though

5

necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government." *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).

Cases like this present still greater concern. The panel's pernicious bromide—racism creeps in the shadows, so all neutral laws enacted by the wrong people are suspect—furnishes an easy excuse to compel sworn testimony and otherwise confidential documents from members of the legislature. That is bad enough: "[P]robing inquiries by federal courts into the motivations of legislatures by calling representatives to testify concerning their motivations and those of their colleagues will doubtlessly have a chilling effect on the legislative process." *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1262 (4th Cir. 1989). But when combined with an indeterminate and frequently misinterpreted standard of proof, the conviction that racial discrimination exists even if it is undetected virtually guarantees that false accusations will succeed.

**B.** Recognizing that the legislative record held no indicia of discriminatory purpose, plaintiffs Texas's voter-ID law insisted that their case hinged on the private thoughts and communications of Texas legislators. *E.g.*, Transcript at 29:19-22, *Veasey v. Abbott*, No. 2:13-cv-193 (S.D. Tex. Feb. 14, 2014), ECF No. 168; Response in Opposition at 1-2, *Veasey*, *supra* (S.D. Tex. Apr. 29, 2014), ECF No. 254; Transcript at 28:8-9, *Veasey*, *supra* (S.D. Tex. May 5, 2014), ECF No. 263. This conflicted with the Supreme Court's caution in *Arlington Heights* that "[p]lacing a decisionmaker on the stand is . . . 'usually to be avoided.'" 429 U.S. at 268 n.18 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). While members of the

governmental body might be called to testify in "extraordinary instances," even then, testimony about the purpose of government action "frequently will be barred by privilege." *Id.* at 268. Yet the district court cast judicial restraint aside and abrogated legislative privilege because plaintiffs insisted that unrestricted access to confidential and privileged materials was essential to their "ability to present a complete record." Transcript at 30:13-14, *Veasey*, *supra* (Feb. 14, 2014), ECF No. 168.

Over the defendants' objection, Texas legislators and their staff produced thousands of documents containing their confidential communications and impressions concerning the voter-ID law. Legislators—including the Lieutenant Governor and the Speaker of the House—and legislative staff were also forced to sit for depositions, where plaintiffs asked about their conversations with other legislators, their mental impressions, and their motives for passing the challenged law. *See, e.g.*, Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action at 4-5, *Veasey*, *supra* (Nov. 17, 2014), ECF No. 740-12 (exemplar subpoena to legislator requesting, among other documents, production of "[a]ll documents related to communications between, among, or with you, the office of the Governor, the office of the Lieutenant Governor, the office of the Secretary of State, the Department of Public Safety, the office of the Texas Attorney General, any Legislator or Legislators, their staff or agents . . ."). Plaintiffs who received these once-privileged documents included legislative opponents and counsel for the Texas Democratic Party. After all the cost in time and money and damage to federal-state relations, the intrusive discovery demanded by plaintiffs to show the hidden racism of Texas legislature did nothing but confirm its good faith. *See Veasey v. Abbott*, 830

F.3d 216, 241 (5th Cir. 2016) (en banc) (noting "the absence of direct evidence" of invidious purpose).

As the Supreme Court explained in *Twombly*, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). As Texas's experience with its voter-ID law shows, "the success of judicial supervision in checking discovery abuse has been on the modest side." *Id.* at 559. Thus, in cases like this—where the presumption of a state legislature's good faith is at stake and federal intrusion into the internal affairs of a state legislature is on the horizon—a district court has not only the power but the responsibility to rigorously test the plausibility of allegations of that a legislature engaged in intentional racial discrimination. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (explaining that "the stakes are sufficiently high" in judging the motivations of state legislature that courts must "eschew guesswork").

## II.  Plaintiffs' Discriminatory-Purpose Claim Does Not Cross the Threshold of Plausibility, and the District Court Was Correct to Dismiss It.

Rule 12(b)(6) serves a vital gatekeeping function. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367-68 (11th Cir. 1997). And, because of the inevitable demands for intrusive discovery that accompany claims of hidden discriminatory intent, Rule 12(b)(6)'s standards must be applied rigorously. The district court did so and reached the correct result.

"Determining whether a complaint states a plausible claim" is "a context-specific task." *Iqbal*, 556 U.S.at 679. The district court viewed plaintiffs' purpose claim

through the appropriate lens, asking whether their factual allegations, if true, would amount to the "clearest proof" of invidious motive, which is necessary to overcome the presumption of good faith to which state legislatures are entitled. But even ignoring the proper, demanding standard that the context of plaintiffs' purpose claim requires, their allegations still come up short. Plaintiffs have alleged no facts "plausibly suggesting (not merely consistent with)" discriminatory purpose, because, among other reasons, none of their factual allegations undermine the "obvious alternative explanation" for a State preempting local minimum wage laws: legitimate policy preference. *Twombly*, 550 U.S. at 557, 567. The panel's contrary holding ignored the obvious explanation, turned the presumption of good faith on its head, and contravened the Supreme Court's precedent on pleading standards.

## A. The presumed good faith of the Alabama Legislature can be overcome only with the clearest proof of invidious purpose.

As plaintiffs concede, the first step in fulfilling the courts' gatekeeper role is identifying the "context" of a plaintiff's claim. *Iqbal*, 556 U.S. at 679; *see* Lewis Pls.' Br. 40. Plaintiffs' purpose claims ask the Court to "[d]etermin[e] the subjective intent of legislators and the collective motivation of legislatures"—"a perilous enterprise indeed." *Campbell*, 883 F.2d at 1262. The Supreme Court has long held that a "heavy presumption" of constitutionality and good faith applies in the context of a legislature's enactments. *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990); *accord, e.g. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018); *Miller v. Johnson*, 515 U.S. 900, 915 (1995). This presumption traces its origins at least as far back as Chief Justice Marshall's 1810 opinion in *Fletcher v. Peck*, a case, like this one, that turned on

9

the motives of those who enacted the challenged law, 10 U.S. (6 Cranch) at 131. The Chief Justice made clear that such an inquiry was "a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Id.* at 128; *accord Arlington Heights*, 429 U.S. at 268 n.18 (citing *Fletcher*).

At the motion-to-dismiss stage, this presumption requires that the facts alleged to support a purpose claim against a legislature "give rise to . . . an inference that is strong enough to overcome the presumption of legislative good faith." *Perez*, 138 S. Ct. at 2328-29. What is "strong enough"? *Id.* Because this presumption requires courts to exercise "extraordinary caution" when considering claims that a legislature enacted a statute with an unlawful purpose, *Miller*, 515 U.S. at 916, and to "resolv[e] all doubts in favor of" a law's validity, *Davis v. Dep't of Labor & Indus.*, 317 U.S. 249, 258 (1942), only factual allegations that, if true, would constitute "the clearest proof" of impermissible motive can survive a motion to dismiss, *Flemming v. Nestor*, 363 U.S. 603, 617 (1960).

The district court properly applied this standard when evaluating the adequacy of plaintiffs' allegations. In turn, the panel condemned the district court for "[r]ecklessly pluck[ing]" this standard "from an unrelated line of precedent . . . dealing with ex post facto challenges to civil statutes." *Lewis*, 896 F.3d at 1296 (citing *Flemming*, 363 U.S. 603). But it was the panel that misapplied precedent. The Supreme Court has never limited the "clearest proof" standard to a subset of legislative motives. To the contrary, the premises relied on by the Court in *Flemming* to justify the standard apply equally to claims of discriminatory purpose:

10

> Judicial inquiries into [legislative] motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it.

363 U.S. at 617 (citing *Fletcher*, 10 U.S. (6 Cranch) at 128, which had nothing to do with ex post facto laws). Thus, courts have recognized that claims premised on invidious purpose, whether punitive, personal, or discriminatory, are all of the same genus. *See, e.g.*, *Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 21 (1st Cir. 2011), *aff'd*, 567 U.S. 1 (2012); *Campbell*, 883 F.2d at 1259. The Fifth Circuit, for example, has applied the "clearest proof" standard to charges that the Texas Legislature enacted a law "for the purpose of imposing an undue burden on women seeking abortions." *Whole Woman's Health v. Lakey*, 769 F.3d 285, 295 (5th Cir. 2014), *vacated in part on other grounds*, 135 S. Ct. 399 (2014). And the Eighth Circuit has applied the standard to purpose-based First Amendment challenges. *See Ambassador Books & Video, Inc. v. City of Little Rock*, 20 F.3d 858, 863 (8th Cir. 1994).

The panel "not so much distinguishe[d] [*Flemming*] as disembowel[ed] it." *Printz v. United States*, 521 U.S. 898, 931 (1997). Had *Flemming* been an opinion of this Court, the panel would have been required to "follow the reasoning behind [its] holding." *Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 842 (2019). Because *Flemming*'s reasoning applies with equal force to an inquiry into whether a legislature acted with discriminatory purpose, the prior-panel-precedent rule would compel the Court to conclude that the same standard should

apply here. The same respect should be given to the reasoning behind the Supreme Court's holding in *Flemming*.

The panel and the plaintiffs complain that "clearest proof" is inconsistent with the standard set forth in *Arlington Heights*. *See Lewis*, 896 F.3d at 1296-97; Lewis Pls.' En Banc Br. 37-40. But there is no conflict. First, *Arlington Heights* did not concern the motive of a large legislative body representing a sovereign state. Divining the intent of a political body grows ever more "problematic" as "we move from an examination of" small, local boards, like that in *Arlington Heights*, "to a body the size of the" Alabama Legislature. *Hunter*, 471 U.S. at 228; *see Palmer v. Thompson*, 403 U.S. 217, 225 (1971) ("It is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators."). Adding to this difficulty is the need to "to eschew guesswork," *Hunter*, 471 U.S. at 228 (quotation marks omitted), and to "exercise *extraordinary caution* in adjudicating claims that a State has" enacted a facially neutral law on a topic within the legislature's competence "on the basis of race." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). Second, the Court had no occasion in *Arlington Heights* to consider the quantum of proof necessary in this circumstance. The Court merely set forth categories of "evidentiary source[s]" that shed light on purpose. 429 U.S. at 266-71; *see* Lewis Pls.' Br. 39-40. Those same categories remain relevant under the clearest-proof standard, but the quantum of that evidence—or factual allegations accepted as true—must constitute the clearest proof of impermissible motive. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, No. 17-10943, 2019 WL 1529692, at *6-15 (5th Cir. Apr. 9, 2019)

(determining the quantum of proof necessary for disparate-impact liability under the governing statute before applying the plausibility standard).

### B. None of plaintiffs' factual allegations create a plausible inference of intentional racial discrimination, and several point in the other direction.

"As Ockham's Razor advises, the simpler path is usually best." *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 765 (Fed. Cir. 2016); *accord United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999); *Brown v. Vance*, 637 F.2d 272, 281 (5th Cir. 1981) (per curiam). This maxim is known as the principle of parsimony. *See* Bryan A. Garner, *A Dictionary of Modern American Usage* 565 (2003). That principle finds expression in the Supreme Court's requirement that, to survive a motion to dismiss, a plaintiff's factual allegations must undermine any "obvious alternative explanation" for a defendant's challenged conduct. *Iqbal*, 556 U.S. at 682.

Whatever quantum of proof is required to show a legislature's invidious purpose, plaintiffs' factual allegations, if proven, would not meet it. The obvious alternative explanation for Alabama's minimum-wage-preemption law is that Republicans in the Alabama Legislature opposed patchwork regulations and a higher minimum wage as a policy matter. To wit, the National League of Cities, of which Birmingham is a member, frequently complains about "aggressive moves by state legislatures nationwide to usurp local authority." Nat'l League of Cities, *City Rights in an Era of Preemption: A State-by-State Analysis* 1 (2018 Update), *available at*

https://perma.cc/LL7Y-NZYE. It has observed that "[c]onsistently, state legislators have stricken down laws passed by city leaders in four crucial areas of local governance: *economics*, social policy, health[,] and safety." *Id.* (emphasis added). Most relevant to this case, the League observed that 2016, the year the challenged law was enacted, "was the year of the minimum wage increase. It was also the year of minimum wage preemption." *Id.* 6. What spurred this rise in preemption? As the League recognized, "[t]he rise of preemptive legislation suggests that state governments are concerned about increased local autonomy *and the patchwork of regulations that may exist within the state*." *Id.* 24 (emphasis added); *cf. Hayden v. Paterson*, 594 F.3d 150, 167 (2d Cir. 2010) (explaining that a law's adoption in many other states suggests that it is "more likely the product of legitimate motives than invidious discrimination").

Plaintiffs maintain that a handful of circumstances belie this obvious alternative explanation: the disparate impact of the law, the sequence of events leading to the law, and Alabama's history of state-sponsored discrimination. None pass muster. The impact of the challenged law, far from helping plaintiffs, belies their claim because too many white workers are affected to allow an inference that the law was a pretext for purposeful discrimination against black workers. The sequence of events likewise undermines plaintiffs' claim, as it turns out that Birmingham's minimum-wage hike was a response to the Alabama Legislature's action on the issue, not the other way around, as plaintiffs suggest. And Alabama's unfortunate history is just that—history; long past bad acts by others cannot undermine the obvious policy reasons motivating today's legislators.

14

1.   **Too many white workers are affected by the minimum-wage law to permit an inference of discriminatory purpose.**

The Court in *Arlington Heights* observed that the "impact of the official action . . . may provide an important starting point." 429 U.S. at 266. Here, that starting point is also an end. Too many white workers are impacted by the challenged minimum-wage law to permit an inference that the Alabama Legislature enacted the law to harm black workers.

This conclusion necessarily follows from *Personnel Administrator of Massachusetts v. Feeney*, where the Supreme Court concluded that "[t]oo many men are affected by [the challenged statute] to permit the inference that the statute is but a pretext for preferring men over women." 442 U.S. 256, 275 (1979). Justice Stevens's concurrence put it succinctly: "the fact that the number of males disadvantaged by [the statute] (1,867,000) is sufficiently large—and sufficiently close to the number of disadvantaged females (2,954,000)—to refute the claim that the rule was intended to benefit males as a class over females as a class." *Id.* at 281; *see also United States v. Texas*, 457 F.3d 472, 483-84 (5th Cir. 2006) (district court erred, in evaluating intent of school district, by failing to analyze the total class of students accepted for transfer); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 552 (3d Cir. 2011) (rejecting claim of discriminatory purpose where minorities and whites were both adversely affected by the policy at issue); *United States v. Gregory-Portland Indep. Sch. Dist.*, 654 F.2d 989, 1004-05 (5th Cir. 1981) (discounting value of evidence suggesting that school board targeted a school based on race because "21 percent of the students . . . were Anglo"); *Richardson v. Honolulu*, 802 F. Supp. 326, 343 (D. Haw.

15

1992), *aff'd*, 124 F.3d 1150 (9th Cir. 1997); *compare Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 536 (1993) (law drafted in such a way that "the burden . . ., in practical terms, falls on" one religion "but almost no others" suggests that the religion was targeted).[1]

So too here. Accepting plaintiffs' allegations as true, the challenged minimum-wage law impacted 27% of white wage-earners and 37% of black wage-earners in Birmingham. FAC ¶ 137. The marginal difference in the percentage of workers affected cannot support an inference that purposeful discrimination, and not the obvious alternative, motivated the Alabama Legislature. As in *Feeney*, "significant numbers of" those affected are not in a suspect class, and all wage-earners making below $10.10 are affected regardless of race. 442 U.S. at 275; *accord Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1226 & n.23 (11th Cir. 2005) (en banc) (holding that "the racial effects of the" challenged law were too "minor" to suggest intention where "3.13% of voting age African–Americans were" affected "as compared to 1.24% of non African–Americans").

### 2. The sequence of events does not create a plausible inference of intentional discrimination.

The Supreme Court has suggested that courts also look to "[t]he specific sequence of events leading up the challenged decision" to "shed some light on the

---

[1] The same holds true if local power is the focus: *no* municipality in Alabama, whether majority white or majority black, may enact its own minimum wage law. *See Palmer*, 403 U.S. at 226-27; *contra* FAC ¶ 97 (alleging that the law is "targeted only at Birmingham"); ALBC En Banc Br. 4.

decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. Plaintiffs portray the minimum-wage-preemption law as a reaction to Birmingham's enactment of a raise in the minimum wage. *See, e.g.*, FAC ¶ 83; Lewis Pls.' Br. 6-9. But the slightest scrutiny of the facts alleged and incorporated in plaintiffs' complaint shows that the opposite is true.

Birmingham enacted its minimum-wage hike in August 2015. FAC ¶ 85. But plaintiffs concede that the challenged law was the culmination of an effort that began in *April 2015*. *See* FAC ¶ 88 ("HB 174 . . . combined Representative Mooney's HB 495 introduced in April of 2015 and Representative Faulkner's HB 27 introduced in September of 2015."). One way to overcome the obvious alternative explanation for the enactment of the challenged law would be to allege facts suggesting that the Alabama Legislature favored a patchwork of local laws, but then "suddenly . . . changed" course to enact minimum wage law when Birmingham enacted its minimum-wage law. *Arlington Heights*, 429 U.S. at 267; *see Church of the Lukumi*, 508 U.S. at 541 (plurality op.). Plaintiffs allege nothing of the sort. And what they do allege establishes that the Alabama Legislature—including the Speaker of the House, a cosponsor of HB 495—was on the path to enacting the challenged law before Birmingham acted. *See* HB 495, *available at* https://perma.cc/7MYJ-58SE.

Further scrutiny shows that Birmingham reacted to the Legislature, not the other way around. HB 495 was introduced on April 14, 2015. *Id.* One week later, at a meeting of the Birmingham City Council, a group of Jefferson County Young Democrats showed up to warn the Council of the pending legislation. *See* Video: Birming-

17

ham City Council Meeting (Apr. 21, 2015), at 4:58:44-4:59:52, http://bhamal.granicus.com/MediaPlayer.php?view_id=6&clip_id=864 (imploring the Council to not let the Legislature "take away your power").[2] In response, the Council passed a non-binding resolution calling for a raise in the minimum wage. FAC ¶ 84. But "[c]ouncil members said they needed more information about what they could legally require before pursuing an ordinance mandating a city-wide minimum wage." Joseph D. Bryant, *Birmingham City Council endorses campaign to increase minimum wage as legislators move to restrict local authority to do so*, Birmingham Real-Time News (Apr. 21, 2015) (incorporated at FAC ¶ 82 n.1). The Council intended to add the "issue to its 2016 legislative agenda." *Id.*

Rather than waiting until 2016, Birmingham rushed to enact a minimum-wage hike in August 2015. FAC ¶ 85. The Council did so without waiting for its legal counsel to issue a requested opinion as to whether the Council even had the power to set a minimum wage. *See* Video: Birmingham City Council Meeting (Aug. 18, 2015), at 4:55:35-56:12, http://bhamal.granicus.com/MediaPlayer.php?view_id=6&clip_id =911. The Council concluded that it needed to "go quickly" in order to show that it was a "progressive council" willing to "push the envelope." *Id.* 4:39:32-37, 4:47:34-37, 4:50:13-16. And the Council acknowledged that it was picking a fight with the Legislature. *See id.* 5:04:12-5:05:00. When the Legislature moved towards passage of

---

[2] The Council's proceedings are judicially noticeable and incorporated by reference into plaintiffs' complaint. *See Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27 (1959); *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1291 (11th Cir. 2011).

its preemption law, the Council responded by moving up the effective date of its minimum wage law, which then spurred the Legislature to accelerate passage of the challenged law. *See* FAC ¶¶ 88-93; Lewis Pls' En Banc Br. 7-8.

This sequence conclusively establishes that it was the Birmingham City Council that went out of its way to pick a fight with the Legislature. If plaintiffs' view of the *Arlington Heights* factors were correct—if an unusual process, or mere haste to pass legislation, supported an inference of racial discrimination—then the facts of this case would create a plausible claim of intentional racial discrimination *by the Birmingham City Council*. Of course, plaintiffs' view is not correct; the fact of an unusual legislative process, by itself, is probative of nothing; and no one would suggest that the Birmingham City Council's effort to outflank the Legislature would entitle a plaintiff alleging intentional racial discrimination to survive a motion to dismiss.

Contrary to plaintiffs' suggestion, *see* Lewis Pls.' Br. 46, "the brevity of the legislative process" does not "give rise give rise to an inference of bad faith." *Perez*, 138 S. Ct. at 2328-29; *accord United States v. O'Brien*, 391 U.S. 367, 384-86 (1968); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369-70 (6th Cir. 2002); *cf. Cf.* Megan Hayes, *Birmingham City Council approves more than 200% pay raise*, WRBC.com (Aug. 7, 2015), https://perma.cc/32JJ-SAY5 (reporting that the City Council (shortly before raising the minimum wage) gave itself a 200% pay raise without discussion and with "less than a minute" of consideration). And the fact that "Birmingham was the only 'political subdivision' in the state that had" hiked the minimum wage, Lewis Pls.' Br. 10, proves nothing except for the Legislature's genuine opposition to local variations in minimum-wage policy. It is not as if the Legislature ignored a majority-white

city's hike in the minimum wage. *See Church of the Lukumi*, 508 U.S. at 541 (plurality op.). Only Birmingham upset the status quo, and only Birmingham rushed to undermine the Legislature. Whatever Birmingham's motivation, however, "[t]he specific sequence of events leading up the challenged decision," *Arlington Heights*, 429 U.S. at 267, does not support a plausible inference of intentional discrimination by the Alabama Legislature.

### 3. Bad acts by prior legislators or those outside the Legislature are not probative.

The Supreme Court in *Arlington Heights* also suggested that "a series of official actions taken for invidious purposes" could evidence invidious purpose underlying the action challenged. *Id.* According to plaintiffs, "the history allegations" in their complaint "are more than sufficient state a plausible claim of intentional discrimination," ALBC En Banc Br. 41, so they may survive a motion to dismiss simply by reciting their State's unfortunate past. This view ignores the limited probative value of historical evidence and the equal sovereignty enjoyed by all States.

### a. The Supreme Court and this Court have rejected plaintiffs' "original sin" theory.

Historical discrimination as an evidentiary source is limited. First, it is limited to actions taken by the state entity whose action is under review—in this case the Alabama Legislature. *See City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 n.20 (1980) (plurality op.); *Veasey*, 830 F.3d at 232. Second, it is limited temporally. "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent

20

has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question." *Bolden*, 446 U.S. at 74 (plurality op.); *accord Veasey*, 830 F.3d at 232; *Johnson*, 405 F.3d at 1223, 1225-26. Accordingly, discriminatory acts by entities other than the Alabama Legislature or by the Alabama Legislature decades or more ago cannot nudge plaintiffs' claim towards plausibility. *See Iqbal*, 556 U.S. at 677 ("[E]ach Government official . . . is only liable for his or her own misconduct.")

Plaintiffs spend much of their complaint recounting discriminatory acts from fifty to one-hundred-and-fifty years ago. FAC ¶¶ 51-70; Lewis Pls.' En Banc Br. 32-35. This "long-ago history" does nothing for plaintiffs' claims because it says nothing about the Alabama Legislature's purpose in 2016. *Veasey*, 830 F.3d at 232; *accord Perez*, 138 S. Ct. 2325-27; *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). And despite their allegation of "*on-going*" discrimination. *See* Lewis Pls.' En Banc Br. 44-46, Plaintiffs have failed to point to any recent claim of discriminatory purpose proven against the Alabama Legislature. No discrimination has been proven regarding the "reconstitution of the . . . Birmingham Water Board." *Id.* 44. And the district court's decision in *Central Alabama Fair Housing Center v. Magee*, 835 F. Supp. 2d 1165 (M.D. Ala. 2011), was *vacated*, No. 11-16114, 2013 WL 2372302 (11th Cir. May 17, 2013), meaning that "its ruling and guidance" were "erased," *United States v. Windsor*, 570 U.S. 744, 761 (2013); *cf. Johnson*, 405 F.3d at 1219 ("The existence of racial discrimination behind some provisions of Florida's 1868 Constitution does not, however, establish that racial animus motivated the criminal disenfranchisement provision . . . ."); *News Am. Publ'g, Inc. v. F.C.C.*, 844 F.2d 800, 810 n.12 (D.C.

Cir. 1988) ("Any judicial use of legislators' remarks for imputing an unconstitutional motive to the legislative majority . . . raises troubling questions.").

### b. The guarantee of equal sovereignty forecloses reliance on decades-old discriminatory acts to tie the hands of today's legislators.

If history alone is sufficient to state a plausible claim of intentional discrimination, certain States will face significant obstacles before they may enforce policies that are common throughout the country. Texas experienced this with its voter-ID law just as Alabama is now experiencing this with its minimum-wage-preemption law. Such "disparate treatment of States" implicates the "the fundamental principle of equal sovereignty." *Shelby County v. Holder*, 570 U.S. 529, 544 (2013).

Allowing claims to survive a motion to dismiss based on acts by long-dead legislators would result in the same disparate treatment that led the Supreme Court to condemn Section 4 of the Voting Rights Act: "While one State waits months or years and expends funds to implement a validly enacted law, its neighbor can typically put the same law into effect immediately, through the normal legislative process." *Id.* at 544-45. In effect, plaintiffs in these types of cases are asking courts to apply "substantive standards quite different from those governing the rest of the nation." *Id.* at 545. To give effect to the guarantee of equal sovereignty, the Court must reject this invitation.

"[H]istory did not end in 1965." *Id.* at 552. The Fourteenth Amendment, like the Fifteenth, "is not designed to punish for the past; its purpose is to ensure a better

22

future." *Id.* at 553. Because "40–year–old facts hav[e] no logical relation to the present day," "'current burdens' must be justified by 'current needs.'" *Id.* at 550, 554. Plaintiffs' claims and others like them are "premised on outdated assumptions about racial attitudes in" southern States. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 226 (2009). Courts must remain cognizant of the fact that "[p]unishment for long past sins is not a legitimate basis for" burdening a state's effort to pursue to facially neutral policy goals. *Id.*

## Conclusion

The Court should affirm the judgment of the district court.

Respectfully submitted.

Leslie Rutledge
Attorney General of Arkansas

Christopher M. Carr
Attorney General of Georgia

Curtis T. Hill, Jr.
Attorney General of Indiana

Jeff Landry
Attorney General of Louisiana

Eric S. Schmitt
Attorney General of Missouri

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Kyle D. Hawkins
Solicitor General

Matthew Frederick
Deputy Solicitor General

/s/ Jason R. LaFond
Jason R. LaFond
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Amici Curiae

24

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that on April 24, 2019, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ Jason R. LaFond
JASON R. LAFOND

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,155 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Jason R. LaFond
JASON R. LAFOND