No. 17-11009

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

—————————◆—————————

MARNIKA LEWIS, et al.,
*Plaintiffs-Appellants*,

v.

STATE OF ALABAMA, et al.,
*Defendants-Appellees*.

—————————◆—————————

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:16-cv-690-RDP

EN BANC BRIEF OF APPELLEES STATE OF ALABAMA AND
ALABAMA ATTORNEY GENERAL STEVE MARSHALL

|  |  |
|---|---|
|  | Steve Marshall<br>*Attorney General* |
|  | Edmund G. LaCour Jr.<br>*Deputy Solicitor General* |
| William G. Parker, Jr.<br>*Chief Deputy General Counsel* | James W. Davis<br>*Deputy Attorney General* |
| STATE OF ALABAMA<br>OFFICE OF THE GOVERNOR<br>600 Dexter Avenue<br>Montgomery, AL 36130<br>(334) 353-7581 | STATE OF ALABAMA<br>OFFICE OF THE ATTORNEY GENERAL<br>501 Washington Avenue<br>Montgomery, AL 36130<br>(334) 242-7300 |
| *Counsel for Appellee State of Alabama* | *Counsel for Appellees State of Alabama*<br>*& Attorney General Steve Marshall* |

*Lewis v. Alabama*
No. 17-11009

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, the following persons and entities are all persons and entities known to undersigned counsel to have an interest in the outcome of this appeal:

1.  Adams, Antoin – Plaintiff-Appellant

2.  Aden, Leah – Counsel for *Amicus Curiae*

3.  Alabama Grocers Association – *Amicus Curiae*

4.  Alabama Legislative Black Caucus – Plaintiff-Appellant

5.  Alabama Restaurant & Hospitality Association – *Amícus Curiae*

6.  Alabama Retail Association — *Amicus Curiae*

7.  Alabama State Conference of the National Association for the Advancement of Colored People – Plaintiff-Appellant

8.  Alexander, Louise – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

9.  Amador, Angelo – Counsel for Amici Curiae Restaurant Law Center and the Alabama Restaurant & Hospitality Association

10. Ashmore, Susan – *Amicus Curiae*

11. Asian American Hotel Owners Association — *Amicus Curiae*

12. Bandy, George – Member of the Alabama Legislative Black Caucus

13. Beach, Benjamin, The Partnership for Working Families – counsel for *Amicus Curiae*

14. Bell, William A., Mayor of Birmingham, AL – Defendant-Appellee

15.    Bentley, Robert J., former Governor of the State of Alabama - Defendant

16.    Blacksher, James U. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof

17.    Boyd, Barbara – Member of the Alabama Legislative Black Caucus.

18.    Bracy, Napoleon – Member of the Alabama Legislative Black Caucus

19.    Brasher, Andrew Lynn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall

20.    Brooke, Samuel, Southern Poverty Law Center, Counsel for *Amicus Curiae*

21.    Brown, Eric P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

22.    Business Council of Alabama — *Amicus Curiae*

23.    Buskey, James – Member of the Alabama Legislative Black Caucus

24.    Byrne, David B., Jr. – former Counsel for former Governor Robert J. Bentley

25.    Carlson, Mary Joyce – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

26.    Campaign Legal Center – *Amicus Curiae*

27.    Carr, Christopher M.—Attorney General of Georgia, Counsel for Amicus Curiae

28.    Center for Individual Rights – *Amicus Curiae*

29.    Chen, Miya Saika, The Partnership for Working Families (counsel for *Amicus Curiae*)

30.   Chisholm, Barbara J. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

31.   Chrishon, Jamie – Member of NAACP, resident of the City of Birmingham (see Amended Complaint, Doc. 18, ¶2)

32.   City of Birmingham, Alabama – Defendant-Appellee

33.   Clarke, Adline – Member of the Alabama Legislative Black Caucus.

34.   Clemon, U.W. – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof

35.   Coleman, Linda – Member of the Alabama Legislative Black Caucus

36.   Coleman-Evans, Merika – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant.

37.   Connor, Glen M. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

38.   Cornelius, Staci G. – U.S. Magistrate Judge, Northern District, Alabama

39.   Daniels, Anthony – Member of the Alabama Legislative Black Caucus

40.   Davies, George N. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

41.   Davis, James W. – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall

42.   DeCamp, Paul – Counsel for Amici Curiae Restaurant Law Center and the Alabama Restaurant & Hospitality Association

43.   Drummond, Barbara – Member of the Alabama Legislative Black Caucus

44.     Dunn, Priscilla – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

45.     Edward Still Law Firm, LLC - Firm of Appellants' counsel (Edward Still)

46.     England, Chris – Member of the Alabama Legislative Black Caucus

47.     Figures, Vivian – Member of the Alabama Legislative Black Caucus

48.     Flynt, J. Wayne – *Amicus Curiae*

49.     Forte, Berry – Member of the Alabama Legislative Black Caucus

50.     Frederick, Matthew H.—Counsel for Amici Curiae

51.     Freeman-Wilson, Karen – *Amicus Curiae*

52.     Fullerton, Fredric – Counsel for Defendants-Appellees the City of Birmingham and Mayor William A. Bell

53.     Givan, Juandalynn – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

54.     Greater Birmingham Ministries – Plaintiff-Appellant

55.     Greenbaum, Jon – Counsel for *Amicus Curiae*

56.     Grimsley, Dexter – Member of the Alabama Legislative Black Caucus

57.     Hall, Laura – Member of the Alabama Legislative Black Caucus

58.     Handley, Dr. Lisa R. – Plaintiffs' expert

59.     Hawkins, Kyle D.—Counsel for Amici Curiae

60.     Hebert, J. Gerald –  Counsel for *Amicus Curiae*

61.  Hill, Curtis T., Jr.—Attorney General of Indiana, Counsel for Amicus Curiae

62.  Hollis, Rolanda – Member of the Alabama Legislative Black Caucus

63.  Holmes, Alvin – Member of the Alabama Legislative Black Caucus

64.  Howard, Ralph – Member of the Alabama Legislative Black Caucus

65.  Ifill, Sherrilyn – Counsel for *Amicus Curiae*

66.  Jackson, Thomas – Member of the Alabama Legislative Black Caucus

67.  Jeffries, Hasan – *Amicus Curiae*

68.  Karlan, Pamela S. – Counsel for *Amicus Curiae*

69.  Knight, Jr., John – Member of the Alabama Legislative Black Caucus

70.  Kousser, J. Morgan – *Amicus Curiae*

71.  LaCour Jr., Edmund G. – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall

72.  LaFond, Jason R.—Counsel for Amici Curiae

73.  Landry, Jeff—Attorney General of Louisiana, Counsel for Amicus Curiae

74.  Lang, Danielle – Counsel for *Amicus Curiae*

75.  Law Office of Mary Joyce Carlson - Firm of Appellants' counsel (Mary Joyce Carlson)

76.  Lawrence, Kayla – Counsel for Defendants-Appellees the City of Birmingham and Mayor William A. Bell

77.  Lawrence, Kelvin – Member of the Alabama Legislative Black Caucus

78.  Lawyers' Committee for Civil Rights *Amicus Curiae*

79.    Lee, Bill Lann, Civil Rights Education and Enforcement Center – Counsel for *Amicus Curiae*

80.    Lehr Middlebrooks Vreeland & Thompson, P.C. — Attorneys for *Amici Curiae*

81.    Levy Ratner, PC - Firm of Appellants' counsel (Robert H. Stroup)

82.    Lewis, Marnika – Plaintiff-Appellant

83.    Local Progress – *Amicus Curiae*

84.    Marshall, Steve – Attorney General of Alabama, Defendant-Appellee

85.    Mateer, Jeffrey C.—Counsel for Amicus Curiae

86.    McCampbell, A.J. – Member of the Alabama Legislative Black Caucus

87.    McClammy, Thad – Member of the Alabama Legislative Black Caucus

88.    McCrary, Peyton – *Amicus Curiae*

89.    Montag, Coty – Counsel for *Amicus Curiae*

90.    Moore, Mary – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

91.    Muhammad, William - Appellant

92.    NAACP Legal Defense and Educational Fund, Inc. – *Amicus Curiae*

93.    National Federation of Independent Business — *Amicus Curiae*

94.    Nelson, Janai – Counsel for *Amicus Curiae*

95.    New Pilgrim Baptist Church - (see Amended Complaint, Doc. 18, ¶5)

96.    Parker, William Glenn – Counsel for Defendants-Appellees the State of Alabama and Attorney General Steve Marshall.

97.    Partnership for Working Families – *Amicus Curiae*

98.    Paxton, Ken—Attorney General of Texas, Counsel for Amicus Curiae

99.    Proctor, R. David, U. S. District Court Judge, Northern District, Alabama

100.    Quinn Connor Weaver Davies & Rouco, LLP - Firm of Appellants' counsel (Glen M. Connor)

101.    Reed, Kasim – *Amicus Curiae*

102.    Reese, Elizabeth A. – Counsel for *Amicus Curiae*

103.    Restaurant Law Center – Amicus Curiae

104.    Robertson, Amy F., Civil Rights and Education Center – Counsel for *Amicus Curiae*

105.    Robinson, Oliver - Appellant

106.    Rodriguez, Dariely – Counsel for *Amicus Curiae*

107.    Rogers, John – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

108.    Rosenberg, Ezra – Counsel for *Amicus Curiae*

109.    Rosman, Michael – Counsel for *Amicus Curiae*

110.    Ross, Deuel – Counsel for *Amicus Curiae*

111.    Ross, Quinton – Member of the Alabama Legislative Black Caucus

112.    Rouco, Richard P. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries.

113.    Rutledge, Leslie—Attorney General of Arkansas, Counsel for Amicus Curiae

114.    Sanders, Hank – Member of the Alabama Legislative Black Caucus

115.    Scott, Rod – Member of the Alabama Legislative Black Caucus

116.    Schmitt, Eric S.—Attorney General of Missouri, Counsel for Amicus Curiae

117.    Silverstein, Thomas – Counsel for *Amicus Curiae*

118.    Singleton, Bobby – Member of the Alabama Legislative Black Caucus

119.    Smith, Paul – counsel for *Amicus Curiae*

120.    Smitherman, Rodger – Member of the Alabama Legislative Black Caucus, Plaintiff-Appellant

121.    Southern Poverty Law Center – *Amicus Curiae*

122.    State of Alabama – Defendant-Appellee

123.    State of Arkansas – *Amicus Curiae*

124.    State of Georgia – *Amicus Curiae*

125.    State of Indiana – *Amicus Curiae*

126.    State of Louisiana – *Amicus Curiae*

127.    State of Missouri – *Amicus Curiae*

128.    State of Texas – *Amicus Curiae*

129.    Still, Edward – Counsel for Plaintiffs-Appellants Alabama Legislative Black Caucus and certain members thereof

130.   Stroup, Robert H. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

131.   Sullivan, Patricia – *Amicus Curiae*

132.   Swarns, Christina – Counsel for *Amicus Curiae*

133.   U.W. Clemon, LLC - Firm of Appellants' counsel

134.   Vance, Joyce White – Counsel for *Amicus Curiae*

135.   Vreeland, Albert L., II — Attorney for *Amici Curiae*.

136.   Warren, Pebblin – Member of the Alabama Legislative Black Caucus

137.   Whatley, Joe R. – Counsel for Plaintiffs-Appellants Marnika Lewis, Antoin Adams, NAACP Alabama State Conference, and Greater Birmingham Ministries

138.   Whatley Kallas, LLP – Firm of Appellants' counsel

139.   White, Arnold and Dowd – Former law firm of Appellants' counsel (U.W. Clemon)

No publicly traded company or corporation has an interest in the outcome of the case.

s/Edmund G. LaCour Jr.<br>
Edmund G. LaCour Jr.<br>
*Counsel for Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for the week of June 24, 2019.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement................C-1

Statement Regarding Oral Argument ........................................................ i

Table of Authorities ............................................................................... iv

Introduction ........................................................................................1

Statement of the Issues...........................................................................4

Statement of the Case.............................................................................5

    A.    Like Twenty-Two Other States Before It, Alabama Enacted a Uniform Minimum Wage to Promote Economic Stability. ..................5

    B.    Suing Defendants Who Do Not Enforce the Minimum Wage Act, Plaintiffs Claimed Racial Discrimination. ...........................................10

    C.    The District Court Dismisses the Amended Complaint.......................11

    D.    The Panel Holds That the Racial Discrimination Claim Should Proceed. .................................................................................12

Summary of the Argument.......................................................................14

Argument...........................................................................................16

I.    Plaintiffs Do Not Have Standing To Sue The Alabama Attorney General Or City Of Birmingham. ...........................................................16

    A.    The ALBC Plaintiffs Have Not Suffered A Legally Cognizable Harm. .....................................................................................18

    B.    Neither the Attorney General nor the City Have Caused Plaintiffs' Harms. ........................................................................19

    C.    Plaintiffs' Injuries Are Unlikely to Be Redressed By Relief Against the Attorney General or Birmingham. ................................28

II.    The Attorney General Is Not A Proper Defendant Under *Ex Parte Young*. ..............................................................................................32

III.    Plaintiffs Have Not Plausibly Alleged That The 2016 Legislature Set A Statewide Minimum Wage To Intentionally Discriminate Against African-Americans. ..................................................................42

    A.    Plaintiffs Have Not Plausibly Alleged That the Act Has a Discriminatory Effect on African-Americans....................................45

    B.    Plaintiffs Have Not Plausibly Alleged That The Act Was Passed To Harm African Americans............................................................46

Conclusion ..................................................................................................53

Certificate of Filing and Service...............................................................54

Certificate of Compliance with Type-Volume Limit,  Typeface Requirements, and Type-Style Requirements ........................................54

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*1st Westco Corp. v. School Dist. of Philadelphia*,
6 F.3d 108 (3d Cir. 1993) .................................................................................41

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)................................................................. passim

*Alden v. Maine*,
527 U.S. 706 (1999)................................................................. 32, 33

*Allen v. Wright*,
468 U.S. 737 (1984)................................................................. 18, 31

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015).................................................................................43

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................. passim

*Bailey v. Patterson*,
369 U.S. 31 (1962).................................................................................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................. 44, 45, 51

*Bronson v. Swensen*,
500 F.3d 1099 (10th Cir. 2007) ................................................................. 20, 25

*Chacon v. Granata*,
515 F.2d 922 (5th Cir. 1975) .................................................................................26

*Citizens for Equal Protection v. Bruning*,
455 F.3d 859 (8th Cir. 2006) .................................................................................24

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).................................................................................17

*Digital Recognition Network, Inc. v. Hutchinson*,
  803 F.3d 952 (8th Cir. 2015) ............................................................ 21, 24

*Doe v. Pryor*,
  344 F.3d 1282 (11th Cir. 2003) ...................................................... 22, 23, 31

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ........................................................ 31, 32

*Edwards v. Prime, Inc.*,
  602 F.3d 1276 (11th Cir. 2010) ..............................................................32

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 (6th
  Cir. 2019) ...............................................................................................41

*Ex Parte Young*
  209 U.S. 123 (1908)............................................................................ passim

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979)........................ 46, 49, 51

*Fitts v. McGhee*,
  172 U.S. 516 (1899 ................................................................ 33, 34, 36, 38

*Flemming v. Nestor*,
  363 U.S. 603 (1960)........................................................................ 46, 48

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)................................................................................29

*Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011).  ........................................ 39, 40

*Hare v. Kennerly*,
  3 So. 683 (Ala. 1888)................................................................................6

*Harris v. Bush*,
  106 F. Supp. 2d 1272 (N.D. Fla. 2000) ..............................................................37

*Hewitt v. Helms*,
  482 U.S. 755 (1987)................................................................................29

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*,
  641 F.3d 1259 (11th Cir. 2011) ............................................................. 19, 22, 28

*Hope Clinic v. Ryan*,
  249 F.3d 603 (7th Cir. 2001) ........................................................................21

*Hunter v. Underwood*,
  471 U.S. 222 (1985).............................................................................. passim

*Idaho v. Coeur d'Alene Tribe of Idaho*,
  521 U.S. 261 (1997)......................................................................................43

*Kelley v. Metropolitan County Bd. of Educ.*,
  836 F.2d 986 (6th Cir. 1987) ......................................................................41

*Lewis v. Governor of Alabama*,
  896 F.3d 1282 (11th Cir. 2018) ............................................................. 13, 25, 28

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973)......................................................................................27

*Luckey v. Harris*,
  860 F.2d 1012 (11th Cir. 2003) ................................................................. 36, 40

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................... 17, 18, 25, 28

*McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*,
  851 F.3d 1076 (11th Cir. 2017) ................................................................. 41, 42

*McCleskey v. Kemp*,
  481 U.S. 279 (1987)................................................................................. 47, 51

*Miller v. Johnson,*
  515 U.S. 900 (1995)......................................................................................47

*Mobile v. Bolden*,
  446 U.S. 55 (1980).......................................................................................51

*Mock v. Bell Helicopter Textron, Inc.*,
    373 F. App'x 989 (11th Cir. 2010) ..................................................................... 18

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ...................................................................................... 27

*Muskrat v. United States*,
    219 U.S. 346 (1911) ............................................................................... 27, 28, 30

*N.C. State Conf. of the N.A.A.C.P. v. McCrory*,
    156 F. Supp. 3d 683 (M.D.N.C. 2016) .............................................................. 52

*Nat'l Audubon Soc'y, Inc. v. Davis*,
    307 F.3d 835 (9th Cir. 2002) .............................................................................. 41

*New Orleans Campaign for a Living Wage v. City of New Orleans*,
    825 So. 2d 1098 (La. 2002) .................................................................................. 9

*Nova Health Sys. v. Gandy*,
    416 F.3d 1149 (10th Cir. 2005) ................................................................... 20, 29

*Okpalobi v. Foster*,
    190 F.3d 337 (5th Cir. 1999) .............................................................................. 21

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ..................................................................... passim

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................... 19

*San Diego Cty. Gun Rights Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996) .............................................................................. 26

*Shaw v. Reno*,
    509 U.S. 630 (1993) ................................................................................. 4, 51, 53

*Smith v. Doe*,
    538 U.S. 84 (2003) ............................................................................................. 47

vii

*Socialist Workers Party v. Leahy*,
145 F.3d 1240 (11th Cir. 1998) ...............................................................17

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998 .....................................................................................19

*Summit Medical Associates, P.C. v. Pryor*,
180 F.3d 1326 (11th Cir. 1999) .................................................... passim

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)...................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................5

*Thomas v. Tenneco Packaging Co.*,
293 F.3d 1306 (11th Cir. 2002) .....................................................2, 50

*Thornburg v. Gingles*,
478 U.S. 30 (1986)......................................................................................48

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005)............................................................................. 27, 30

*United States v. Armstrong*,
517 U.S. 456 (1996)....................................................................................43

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ..................................................................48

*Village of Arlington Heights v. Metropolitan Housing Development
Corp.*, 429 U.S. 252 (1977) ......................................................... passim

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989)....................................................................................45

*Washington v. Davis*,
426 U.S. 229 (1976)....................................................................................53

viii

*Women's Emergency Network v. Bush*,
   323 F.3d 937 (11th Cir. 2003) ................................................................. 36, 37, 38

## **Statutes**

Ala. Code §11-45-1 ............................................................................................6

Ala. Code §13A-11-61.3 ............................................................................ 6, 9, 49

Ala. Code §34-5-5 ............................................................................................6

Ala. Code §36-15-12 ........................................................................................38

Ala. Code §40-17-357 ......................................................................................6

29 U.S.C. §206(a) ............................................................................................6

40 Okla. Stat. Ann. § 160 ..............................................................................9

Act No. 2016-18, §6(a) ..............................................................................8, 43

Ala. Act No. 2016-18, §2(b) ..........................................................................45

Ala. Act No. 2016-18, *codified at* Ala. Code §§25-7-40 *et seq.* .............................8

Ark. Code Ann. § 11-4-221(b) ........................................................................9

Colo. Rev. Stat. § 8-6-101(3) ..........................................................................9

Fla. Stat. § 218.077(2) ....................................................................................9

Ga. Code § 34-4-3.1(b) ..................................................................................9

Ga. Code Ann. §21-2-33.1(a)(2) ....................................................................40

Idaho Code § 44-1502(4) ................................................................................9

Ind. Code § 22-2-2-10.5(b) ............................................................................9

Iowa Code §§ 331.304(12) & 364.3(12) ..........................................................9

Kan. Stat. Ann. § 12-16,131(a)(3) ..................................................................9

La. Const. art. IV, §8 ......................................................................................21

La. Stat. § 23:642(B)..................................................................................9

Mich. Comp. Laws Ann. § 123.1385, § 5....................................................9

Miss. Code § 17-1-51(1) .............................................................................9

Mo. Ann. Stat. § 290.528 ............................................................................9

N.C. Gen. Stat. § 95-25.1(c) .......................................................................9

Ohio Rev. Code § 4111.02 ..........................................................................9

Or. Rev. Stat. § 653-017(2).........................................................................9

R.I. Gen. Laws § 28-12-25 ..........................................................................9

S.C. Code § 6-1-130(B) ..............................................................................9

Tenn. Code § 50-2-112(a)(1) .......................................................................9

Tex. Lab. Code Ann. § 62.0515(a) ..............................................................9

Utah Code § 34-40-106(1) ...........................................................................9

Wis. Stat. § 104.001 ....................................................................................9

## Other Authorities

Ala. Const. art. IV, §110 ...........................................................................53

Ala. Const. art. IV, §89 ...............................................................................6

Debra Burke et al., *Minimum Wage and Unemployment Rates: A
    Study of Contiguous Counties*, 46 GONZ. L. REV. 661 (2011)..............7

## Rules

Fed. R. Civ. P. 25(d) .................................................................................11

Fed. R. Evid. 201(b)....................................................................................5

Rule 12(b)(6)................................................................................................5

x

## INTRODUCTION

This case is about implausible charges of racism made against a State Legislature for its decision to enact an economic policy that nearly half the States in the Union have previously passed. Worse still, the claims were brought against parties who have no role in enforcing the law and cannot provide Plaintiffs relief. The Court should reject Plaintiffs' request for an advisory opinion and should make clear that "the good faith of the state legislature must" still "be presumed," even if most of those legislators are white and even if they hale from Alabama. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

At issue is an Alabama law prescribing a uniform, statewide minimum wage. That law is reasonable, as demonstrated by empirical research. It was routine, as demonstrated by other Alabama preemption laws and some twenty-two similar laws enacted in other States. And it was timely, in light of Birmingham's rash decision to raise the City's minimum wage by 39% *overnight* and rumblings that other cities would soon follow suit. In short, this is the ordinary stuff of politics.

But in Plaintiffs' telling, this law is actually the latest chapter in a 200-year-old tale of "political white supremacy." ER039. The proof? Well, the Legislature moved quickly after Birmingham surprised its employers with new regulations and penalties. Also, Alabama has a history of racial discrimination. Perhaps most important, Birmingham is majority black, as were the City officials who voted for the

1

Ordinance, while Alabama is majority white, as were the legislators who voted to preempt the City's Ordinance. And don't forget, "a white senator from … Mountain Brook" said "that increases in the minimum wage especially hurt young people from poorer families," which Plaintiffs deem an *obvious* invocation of "racial stereotyping to justify denial of a living wage to African-American residents of" Birmingham. ER072 ¶97.

These ugly accusations that legislators enacted the Minimum Wage Act *because* they wanted to deny a living wage to African Americans are unfounded and outrageous. *Cf. Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1331 (11th Cir. 2002) (affirming sanctions against attorney who made "unsubstantiated claims that defense counsel was a racist"). They are also insufficient to state a claim. To plausibly allege "purposeful, invidious discrimination," Plaintiffs needed to rule out "obvious alternative explanation[s]" for the Legislature's action. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). But merely citing history books and noting the skin color of legislators does not rule out the "more likely" explanation that the Legislature acted for its stated reasons, rather than to harm African Americans. *Id.* at 681.

Plaintiffs' claims are not just implausible, they were brought against the wrong defendants. Litigation over a preemption law like the Minimum Wage Act typically occurs between private parties. In this case, Plaintiffs could have sued their employers for not paying the City's minimum wage, and employers could have

2

enforced the Act by raising it as a defense. Then these private parties with adverse interests could have litigated whether the Act preempted the City's Ordinance and, if so, whether the Act was lawful. Instead, Plaintiffs sued the Attorney General, arguing that he was a proper defendant because he has a general duty to report invalidated laws to the Legislature and Governor. The relief they seek? A public announcement from the Attorney General that the law is unconstitutional. But such a declaration would not be binding on Plaintiffs' employers or on the state courts that would hear disputes over their wages. The Attorney General's opinion would be merely advisory, as would a federal court's opinion telling him to issue it. Article III thus forecloses Plaintiffs' claims.

For similar reasons, sovereign immunity bars this suit against the Attorney General because the suit is actually one against the State. Private parties, not the Attorney General, are responsible for enforcing the Act. And Plaintiffs never alleged that the Attorney General threatened or enforced the Act against them or anyone else. Because the Attorney General lacks a "close official connection with the" Act, and he has not enforced or "threaten[ed] … to enforce" it, the *Ex Parte Young* exception to the State's sovereign immunity does not apply. 209 U.S. 123, 156 (1908).

In sum, Plaintiffs ask a federal court to issue an advisory opinion declaring that the Legislature acted with racist intent. Their only grounds for this suit are the Legislature's understandably prompt response to the City's steep overnight wage

3

hike, the State's past history of discrimination, and the race of the men and women who voted on these laws. But "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324. And this Court does not judge elected officials "by the color of their skin." *Shaw v. Reno*, 509 U.S. 630, 657 (1993). Plaintiffs' baseless accusations of racism do not entitle them to relief, and this Court lacks the power to grant it.

## STATEMENT OF THE ISSUES

1. The Minimum Wage Act grants employers an affirmative defense to employers who face suits from employees or municipalities over a failure to pay a minimum wage set by local law. As a result, employers have not paid Plaintiffs the $10.10 per hour mandated by Birmingham's minimum wage ordinance. Neither the Attorney General nor the City enforce the Minimum Wage Act. Are Plaintiffs' harms traceable to the Attorney General or City and can either Defendant remedy those harms?

2. The Attorney General has no close official connection with the Minimum Wage Act, and he has not enforced or threatened to enforce it. Is he a proper defendant under *Ex Parte Young*, 209 U.S. 123 (1908)?

3. The Minimum Wage Act reduces regulation by setting a uniform minimum wage for the entire State, and at least twenty-two other States have enacted similar laws. Plaintiffs allege that the 2016 Legislature passed this law because it wanted

4

to harm African Americans.  In support of that claim, Plaintiffs note that the Act was passed to preempt Birmingham's minimum wage ordinance, Birmingham is majority black, Alabama has a history of discrimination, and white officials supported the Minimum Wage Act while black officials opposed it.  Did Plaintiffs plausibly allege that the Legislature passed the Act to harm African Americans, or are there "more likely explanations" (*Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)) for the Legislature's action?[1]

STATEMENT OF THE CASE[2]

### A.    Like Twenty-Two Other States Before It, Alabama Enacted a Uniform Minimum Wage to Promote Economic Stability.

In Alabama, when it comes to matters of public policy, the state legislature reigns supreme—subject to state and federal constitutional limitations.  Cities exist as "mere creatures of the legislative power, established as political agencies for the more convenient administration of local government, with such powers … as the

---

[1] As to Plaintiffs' other claims, the State rests on its panel-stage brief and is prepared to address these issues at oral argument.  In particular, the en banc Court should consider whether the Voting Rights Act, which contains no express private right of action, contains the sort of unmistakably clear text needed to abrogate State sovereign immunity.

[2] The brief relies on the allegations in Plaintiffs' amended complaint, as well as facts of which this Court may take judicial notice, including "legislative facts" and "adjudicative" facts.  *See* Fed. R. Evid. 201(b) & advisory committee's note to 1972 proposed rules.  While such matters are among the "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), the State's arguments do not depend on acceptance of any such fact.

5

[legislature] may, from time to time, see fit to confer." *Hare v. Kennerly*, 3 So. 683, 684 (Ala. 1888). Consistent with this relationship, Alabama cities are subject to a state version of the Supremacy Clause prohibiting them from "pass[ing] any laws inconsistent with the general laws of this state." Ala. Const. art. IV, §89; *see also* Ala. Code §11-45-1 (authorizing cities to "adopt ordinances" except as "inconsistent with the laws of the state"). The Legislature routinely enacts general preemption laws under this Clause. It has set uniform state policies on all manner of issues, from the licensure of barbers (Ala. Code §34-5-5) and mortgage brokers (*id.* §5-25-4) to the taxation of aviation fuel (*id.* §40-17-357). Additionally, in 2013, it established a new, uniform state firearm policy. *See id.* §13A-11-61.3.

The minimum-wage dispute described in Plaintiffs' complaint played out against this backdrop of state legislative supremacy. Congress last adjusted the federal minimum wage in 2007. *See* 29 U.S.C. §206(a). And in the ensuing years, the Legislature saw no reason to exceed that federal minimum, or even to enact any legislation addressing the issue. The Legislature's decision in this regard comported with empirical studies suggesting that minimum-wage policies may be ineffective in alleviating poverty and may actually reduce employment. *See, e.g.*, Debra Burke et al., *Minimum Wage and Unemployment Rates: A Study of Contiguous Counties*, 46 GONZ. L. REV. 661, 672-76 (2011) (surveying various economic studies).

6

The first salvo in the minimum-wage dispute came in the form of an April 2015 resolution by the Birmingham City Council urging the Legislature to exceed the federal minimum wage on a statewide basis. *See* ER066-67 ¶82. This resolution set off a back-and-forth between the Legislature and local governments. When the Legislature did not immediately accede to the Council's proposal, the Council responded with a series of ordinances. The first was adopted on August 18, 2015. It raised the minimum wage to $10.10 per hour, but gave the City's employers nearly a year to prepare for this substantial increase. ER046 ¶21. Meanwhile, other cities —including majority-white cities Huntsville and Tuscaloosa—threatened to adopt their own local minimum-wage policies. *See* ER104-09; *see also* ALBC.Br.45 (noting demographics of Huntsville and Tuscaloosa).

Faced with this looming economic disruption, legislators proposed bills that would require statewide adherence to the federal minimum. These efforts did not succeed in the 2015 regular session or at a special session held later that year. *See* ER067-68 ¶¶84, 86-87.

On February 9, 2016, Representative David Faulkner (who, Plaintiffs note, is "a white representative of the Birmingham suburb of Mountain Brook") introduced HB 174, which would set a uniform minimum wage for the State. ER068-69 ¶86, 88. By February 16, the House had approved the bill. ER069 (¶89).

Birmingham then responded. Though the City had previously saw fit to give employers considerable time to prepare for a higher minimum wage, the City tossed that concern aside. On February 23, 2016, the City adopted Ordinance 16-28, which accelerated the effective date of the City's 39% minimum wage hike from July 1, 2016, to February 24, 2016—*i.e.*, the very next day. ER069-70 ¶¶90-91. The mayor signed the Ordinance on February 24, though the City did not publish the Ordinance in the Birmingham News until February 28. ER070 ¶92. The Ordinance thus raised the minimum wage *39% overnight* and imposed new penalties on employers, without even providing employers notice of the Ordinance until four days *after* it was enacted.

On February 25, the Alabama State Senate passed HB 174, and the governor signed the bill later that day. ER070-71 ¶93.

The law is entitled the Alabama Uniform Minimum Wage and Right-to-Work Act. *See* doc. 30-2 (Ala. Act No. 2016-18, *codified at* Ala. Code §§25-7-40 *et seq.*). As its name suggests, the Act's purpose is to "ensure that [labor] regulation and policy is applied uniformly throughout the state." Act No. 2016-18, §6(a). It establishes the Legislature's control over not just minimum-wage policy but also issues such as "collective bargaining under federal labor laws," and "the wages, leave, or other employment benefits provided by an employer" to its employees. *Id.* As courts have recognized, such laws "preserve consistency in the wage market" and

8

avoid a "competitive situation … lead[ing] to businesses locating in areas with [more favorable local labor regulations]." *New Orleans Campaign for a Living Wage v. City of New Orleans*, 825 So. 2d 1098, 1105-06 (La. 2002).

In these respects, the Act is run-of-the-mill preemption legislation. Indeed, much of the language in the Act's statement of purpose and general preemption provisions appear almost verbatim in the Legislature's 2013 gun law. *See* Ala. Code §13A-11-61.3(a), (c), (e). In addition, the Act parallels similar legislation in at least twenty-two other States prohibiting localities from enacting their own minimum-wage ordinances.[3] Like Alabama, many of these States have tied their own statewide minimum wage to the federal standard.

With respect to the minimum wage in particular, the Act accomplishes its goals in two separate but overlapping ways. First, it prohibits local "mandate[s]" requiring employers to give their employees "any employment benefit, including … wage[s] … that is not required by state or federal law." Act No. 2016-18, §2(b).

---

[3] *See, e.g.*, Ark. Code Ann. §11-4-221(b); Colo. Rev. Stat. §8-6-101(3); Fla. Stat. §218.077(2); Ga. Code §34-4-3.1(b); Idaho Code §44-1502(4); Ind. Code §22-2-2-10.5(b); Iowa Code §§331.304(12) & 364.3(12); Kan. Stat. Ann. §12-16,131(a)(3); La. Stat. §23:642(B); Mich. Comp. Laws Ann. §123.1385, §5; Miss. Code §17-1-51(1); Mo. Ann. Stat. §290.528; N.C. Gen. Stat. §95-25.1(c); Ohio Rev. Code §4111.02; 40 Okla. Stat. Ann. §160; Or. Rev. Stat. §653-017(2); R.I. Gen. Laws §28-12-25; S.C. Code §6-1-130(B); Tenn. Code §50-2-112(a)(1); Tex. Lab. Code Ann. §62.0515(a); Utah Code §34-40-106(1); Wis. Stat. §104.001.

Any local mandates "inconsistent" with this prohibition are "void." *Id.* §2(c). Second, the Act contains a more general preemption clause:

> Except as otherwise provided in this act or as expressly authorized by a statute of this state, the Legislature hereby occupies and preempts the entire field of regulation in this state touching in any way upon collective bargaining under federal labor laws or the wages, leave, or other employment benefits provided by an employer to an employee, class of employees, or independent contractor to the complete exclusion of any policy, ordinance, rule, or other mandate promulgated or enforced by any county, municipality, or other political subdivision of this state.

*Id.* §6(b). Again, any "contrary" "existing" local mandate is "null and void," and "any future policy, ordinance, rule, or other mandate shall comply with this [requirement]." *Id.* §6(d).

### B. Suing Defendants Who Do Not Enforce the Minimum Wage Act, Plaintiffs Claimed Racial Discrimination.

Shortly after the Act's passage, two low-wage workers and two public-interest groups sued Alabama's Governor and Attorney General claiming racial discrimination by the Alabama Legislature. ER016-37. When the original defendants moved to dismiss, the original plaintiffs, adding various other new plaintiffs, amended their complaint. ER038-89. The amended complaint expanded the theories of liability, asserting a flurry of novel claims under the Thirteenth Amendment, the Fourteenth Amendment's Privileges or Immunities Clause, the Fifteenth Amendment, and Section 2 of the Voting Rights Act—all in addition to their original equal-protection theories.

10

The amended complaint dropped the Alabama Governor as a defendant but retained then-Alabama Attorney General Luther Strange, who was sued in his official capacity based on his general duties as Alabama's "chief legal officer" as well as a "press release" he issued concerning the Birmingham Ordinance "prior to [its] effective date." ER043-44 ¶¶12-15.[4] Joining the Attorney General as defendants were the City of Birmingham and Birmingham Mayor William Bell. *See* ER043, 45 ¶¶11, 16-17. The amended complaint also named Alabama as a defendant, but only for purposes of the VRA claim. *See* ER043 ¶11. The City Defendants, meanwhile, were purportedly sued "only for the purpose of providing complete relief" to Plaintiffs. ER045 ¶18.

## C.    The District Court Dismisses the Amended Complaint.

After briefing and oral argument, the District Court dismissed the amended complaint. The court concluded that it lacked jurisdiction to proceed against the Defendants. Plaintiffs lacked Article III standing to sue the Attorney General and the City Defendants because those defendants were not directly responsible for Plaintiffs' asserted injuries. *See* ER144-151. And the court held that sovereign immunity bars Plaintiffs' VRA claim against the State. *See* ER155-158.

---

[4] Steve Marshall has since become Attorney General and is thus "automatically substituted as a party." Fed. R. Civ. P. 25(d).

11

The District Court also addressed Plaintiffs' claims.  The court concluded that the minimum-wage law did not have "any impact whatsoever on Plaintiffs' right to vote" and thus did not "implicate" Section 2 of the VRA or the Fifteenth Amendment. ER151, 155, 160.  The court found similar threshold legal reasons to dismiss Plaintiffs' Thirteenth Amendment involuntary-servitude claim and their Fourteenth Amendment claim under the political-process doctrine. *See* ER160-63. And the court noted that Plaintiffs had "expressly conceded that their claim under the Fourteenth Amendment's Privileges or Immunities Clause (Count III) is foreclosed by Supreme Court precedent."  ER159.

Finally, the Court concluded that Plaintiffs' racial discrimination claims were not plausible.  As Plaintiffs had conceded, these claims require proof of intentional racism motivating the minimum-wage law's enactment.  *See, e.g.*, ER159.  But the District Court concluded that Plaintiffs had not adequately alleged that the "uniform" minimum-wage law has a discriminatory effect.  ER161.  And in light of the "legitimate reasons supporting the legislature's decision," ER162, the court had no difficulty discerning an "obvious alternative explanation" for the law's passage "other than intentional discrimination."  ER159.

### D.    The Panel Holds That the Racial Discrimination Claim Should Proceed.

A panel of this Court reversed in part.  On standing, the panel held that "[t]he attorney general's broad authority to interpret and enforce the Minimum Wage Act

illustrates his Article III connection to the defendants' harm, which is the direct consequence of the Act's continued enforcement." *Lewis v. Governor of Alabama*, 896 F.3d 1282, 1290 (11th Cir. 2018). The panel, however, never identified who was enforcing the Act or how its "continued enforcement" was being carried out against Plaintiffs. Instead, the panel noted that "the attorney general *could* sue the city to compel compliance." *Id.* (emphasis added). But neither Plaintiffs nor the panel ever alleged that the Attorney General had even threatened to the sue City. The panel then declared that it "ha[d] little doubt that an injunction declaring the Minimum Wage Act unconstitutional and prohibiting the attorney general from enforcing it— thereby requiring him to announce its invalidity to the governor and the legislature— would go a long way toward redressing the plaintiffs' injuries," *id.* at 1291, presumably because Plaintiffs' employers would be persuaded to start paying higher wages.

The panel held that Plaintiffs' harms were not traceable to Birmingham's refusal to implement its Ordinance, and that Birmingham could not redress those harms. *Id.*

On sovereign immunity, the panel held that the Attorney General's "broad authority to interpret, enforce, and defend the laws and interests of the state," sufficiently connected him to the Act's enforcement to satisfy *Ex Parte Young*. *Id.* And the panel held that Alabama itself could be subject to Plaintiffs' VRA claim because, while the VRA "only provides an *implied* right of action," "the statute explicitly

13

prohibits 'any State' from" engaging in certain conduct, which shows that Congress "'clearly intended' § 2 to be enforceable by private action … directly against the states." *Id.*

On the racial discrimination claim, the panel held that Plaintiffs "stated a plausible claim that the Minimum Wage Act had the purpose and effect" of discriminating against Birmingham's black citizens "on the basis of race," *id.* at 1299.  In support of this conclusion, the panel relied on three allegations:

- The Act "denied 37% of Birmingham's black wage workers a higher hourly wage, compared to only 27% of white wage workers."  *Id.* at 1294.

- The Act was the product of a "rushed, reactionary, and racially polarized" vote in the Legislature.  *Id.* at 1295.

- And the Act "reflects Alabama's longstanding history of official actions taken for invidious purposes."  *Id.* (quotation marks omitted).

In the panel's view, these allegations were not merely consistent with purposeful racial discrimination; they *showed* that Plaintiffs are entitled to relief.

The panel otherwise affirmed the District Court's ruling.

### SUMMARY OF THE ARGUMENT

Plaintiffs' claims fail several times over.  First, Plaintiffs have the wrong defendants.  Plaintiffs allege they are being harmed because their employers are not complying with the Birmingham Ordinance mandating a minimum hourly wage of

14

$10.10. According to Plaintiffs, employers think the State's allegedly unconstitutional Minimum Wage Act provides them a valid defense against any claims brought under the Ordinance. Plaintiffs, however, have not sued their employers to put this defense to the test. Instead, they sued the Attorney General and Birmingham.

But these defendants do not set Plaintiffs' wages. Nor do they enforce the Minimum Wage Act; that job falls to employers who might raise it in litigation. Thus, neither the Attorney General nor the City have caused Plaintiffs' harms. And neither Defendant can remedy those harms either. Plaintiffs demand that the Court order the City to violate the Act by enforcing its Ordinance, but Plaintiffs have no judicially cognizable interest in the prosecution of the City's Ordinance. Plaintiffs also assert that if a federal court declared the Act unconstitutional and ordered the Attorney General to announce the decision to the world, Plaintiffs' employers would fall in line. But that is rank speculation, and even if true, it is not enough to satisfy Article III. Redress must flow from the court's *judgment* over *defendants*, not from the persuasive force of the court's *opinion* over *non-parties*. Were it otherwise, courts would be free to issue advisory opinions—as long as they were persuasive. That is not the law.

For similar reasons, sovereign immunity bars Plaintiffs' claims against the Attorney General. Because the Attorney General lacks a "close official connection

15

with the" Act, and he has not enforced or "threaten[ed] … to enforce" it, he should be dismissed from this case. *Ex Parte Young*, 209 U.S. at 156.

Finally, Plaintiffs have failed to plead a plausible racial discrimination case. Their claim is that the Act setting a statewide minimum wage is racist because it preempted majority-black Birmingham's higher local minimum wage. But while their complaint is long on long-past history and references to the skin color of various legislators, the complaint lacks any factual allegations that tend to foreclose obvious alternative explanations for the Legislature's actions. Thus, even if Plaintiffs' allegations are "consistent with" a Legislature determined to harm African Americans, they "stop[] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.  Plaintiffs Do Not Have Standing To Sue The Alabama Attorney General Or City Of Birmingham.

Plaintiffs assert that they have been injured because employers are not paying low-wage workers in Birmingham what they are entitled to under the City's minimum wage Ordinance. Plaintiffs blame the preemptive effects of the State's Minimum Wage Act, which gave employers an affirmative defense to claims brought under the Ordinance. And that is a fine dispute for those employees and their employers to work out. But neither the Attorney General nor the City are causing

Plaintiffs' injury, and a judgment against them would not provide Plaintiffs any relief.  Plaintiffs thus lack standing to bring this case.

To bring a suit in federal court, a plaintiff must establish three elements—"injury in fact," "causation," and "redressability"—as to each defendant.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-62 (1992).  The "causation" element requires Plaintiffs to show that their asserted injury is "fairly trace[able] to each defendant's action."  *Id.* at 560.  And the "redressability" element requires Plaintiffs to show "that the injury will be 'redressed by a favorable decision'" against that defendant. *Id.* at 561.  These principles limit the defendants in an action to those who, "at a minimum, have some connection with enforcement of the provision at issue."  *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998).

When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed." *Lujan*, 504 U.S. at 562.  Causation and redressability then "depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Id.*  Courts are thus "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).  It "becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in

17

such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. This is a "substantially more difficult" showing to make. *Id.*

### A. The ALBC Plaintiffs Have Not Suffered A Legally Cognizable Harm.

The ALBC Plaintiffs do not have standing to pursue their claims because their alleged "injury [is] too abstract, or otherwise not appropriate, to be considered judicially cognizable." *Allen v. Wright*, 468 U.S. 737, 752 (1984). They assert that Birmingham is denying them "their right to vote" or denying them "equal access to the political process" by not enforcing its Ordinance against employers, "whether or not enforcement led to higher wages." ALBC.Br.35-36. But the Supreme "Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen*, 468 U.S. at 754. For example, the *Allen* Court dismissed a challenge by black plaintiffs to the IRS's decision to grant tax exemptions to racially discriminatory private schools "because the plaintiffs were not personally subject to the challenged discrimination." *Id.* at 755. The same reasoning applies here.[5]

---

[5] The organizational Plaintiffs have no independent standing either. Their complaint makes only conclusory allegations about the steps the organizations have taken in response to the Minimum Wage Act. *See* ER041-42. Moreover, Plaintiffs have now filed *three* opening briefs, but their argument as to organizational standing is limited to two sentences "in passing in a footnote only." *Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x 989, 992 (11th Cir. 2010); *see* Lewis.Br.18 n.9; Pls.Op.Panel.Br.47 n.21. The Court should "deem this argument waived." *Id.* The

## B.    Neither the Attorney General nor the City Have Caused Plaintiffs' Harms.

All Plaintiffs lack standing because their alleged injuries were not caused by the Attorney General or City.  The Lewis Plaintiffs "allege[] that they are employed in Birmingham at wages that are less than what they would be making had Act 2016-18 not been adopted," and the ALBC Plaintiffs allege that the Act has "diminished" "[t]heir ability to participate in setting the minimum wage laws in Birmingham…." Lewis.Br.17-18.  But neither the Attorney General nor the City "played [any] role in [those] action[s]." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011).  Plaintiffs therefore have failed to allege "a fairly traceable connection between the plaintiff[s'] injury and the complained-of conduct of the defendant[s]." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).

Plaintiffs assert that the decrease in their wages has two causes:  [1] "Act 2016-18, which extinguished an existing legal entitlement to higher wages, and [2] the Attorney General's conduct with respect to the Act." Lewis.Br.19.  But the Attorney General did not pass the Act, and he has not enforced it against Plaintiffs or the City.  Plaintiffs' real gripe is with their employers, who they could still sue under the City's Ordinance.  *See* Ordinance §3, ER0123.  After all, the Minimum Wage

---

legislative plaintiffs also lack a valid injury as legislators. *See Raines v. Byrd*, 521 U.S. 811 (1997).

Act "extinguished" Plaintiffs' "existing legal entitlement to higher wages" (Lewis.Br.19) only if the Act is constitutional—a question no state court has yet considered.[6]

Thus, the real cause of Plaintiffs' harm is that their employers have not raised wages to $10.10 because these employers think that the Act provides a valid (and constitutional) defense to any claim that they are violating Birmingham's Ordinance. In this way, Plaintiffs' theory of causation looks like the theories rejected in multiple cases in which plaintiffs sued government officials for alleged harms caused by statutes creating private rights of action. In each case, there was no standing because "it was the *statute's* coercive effect, rather than the effect of the *defendants'* actual or threatened conduct, that caused the [plaintiff's] injury-in-fact." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007) (citing *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005)).

For example, *Okpalobi v. Foster* involved a state tort statute that provided a private cause of action against medical doctors performing abortions. *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc). Abortion providers sued the Louisiana Governor and Attorney General seeking to have the law permanently enjoined. *Id.* The panel noted that the Louisiana Constitution provided the attorney

---

[6] That Plaintiffs have not sued their employers suggests they may not have much confidence in their constitutional arguments—and for good reason. *See infra* Part III.

general broad "authority … to institute, prosecute, or intervene in any civil action or proceeding[.]" *Okpalobi v. Foster*, 190 F.3d 337, 346 (5th Cir. 1999) (quoting La. Const. art. IV, §8). And the panel found causation because, though neither defendant had "enforced or threatened to enforce" the private right of action, the "statute [wa]s immediately and coercively self-enforcing." *Id.* at 349.

The en banc Fifth Circuit reversed, explaining that the panel had "confuse[d] the *statute*'s immediate … effect on the plaintiffs with any … effect that might be applied by the *defendants*." *Okpalobi*, 244 F.3d at 426. The en banc court noted that the law, to the extent it would be enforced against defendants, would be enforced by private parties, not the government defendants. *Id.* "Once the coercive impact of the statute (coercive in that it exposes plaintiffs to unlimited tort liability by individual plaintiffs) is understood to be distinct from the coercive power of state officials (for example, if the State could institute criminal or civil proceedings under the Act)," there was no basis for causation. *Id.*

The same was true in *Hope Clinic v. Ryan*, where the Seventh Circuit dismissed similar challenges against the attorneys general of Illinois and Wisconsin. 249 F.3d 603, 605 (7th Cir. 2001). Plaintiffs lacked standing against the government officials "because the defendants cannot cause the plaintiffs injury by enforcing the private-action statutes." *Id.*; *see also Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) (holding Arkansas Attorney General

does not cause injury under statute creating private right of action, for while he "may intervene and defend the constitutionality of the Act in a private damages suit, … the attorney general does not initiate enforcement or seek relief against a putative defendant"). And in *Summit Medical Associates, P.C. v. Pryor*, this Court dismissed a similar suit against the Alabama Attorney General, albeit on *Ex Parte Young* grounds because only sovereign immunity was at issue in that interlocutory appeal. 180 F.3d 1326, 1342 (11th Cir. 1999).

This case is thus strikingly similar to *Doe v. Pryor*, which involved a plaintiff's attempt to use an injury from a private rights dispute to obtain standing to sue the Alabama Attorney General over a law he was not enforcing against the plaintiff. 344 F.3d 1282 (11th Cir. 2003). J.B. had lost her state custody dispute against her ex-husband because she was in an open lesbian relationship. *Id.* at 1284. The state court that ruled against her cited a state statute that criminalized "homosexual conduct." *Id.* J.B. then sued the Attorney General, seeking to enjoin him from enforcing the statute. The Court dismissed the case, as "[t]he only defendant in this case is the Alabama Attorney General, and the only injuries J.B. has alleged stem from a state court custody proceeding in which the Attorney General played no role." *Id.* at 1285. The Attorney General caused no injury where he had neither threatened nor taken any action "to enforce the statute against her." *Id.*; *see also Hollywood Mobile*, 641

22

F.3d at 1266 (holding that lessee who had been forcibly evicted by Seminole Tribe had no standing to sue Secretary of Interior who "played no role in that action").

The same logic applies here. Plaintiffs *never alleged* that either the Attorney General or the City enforced or threatened to enforce the Minimum Wage Act. That is because the preemption law has not been "enforced" by anyone. It exists as an affirmative defense to an action employees or local governments might bring against an employer for violating a local minimum wage ordinance, and in that sense, an employer (or a court) might be said to "enforce" the Act. But Plaintiffs do not allege that any Defendant in this case has "enforced" or threatened to "enforce" the Act. *See Okpalobi*, 244 F.3d at 426 (existence of "self-enforcing" law did not give plaintiffs standing to sue government officials).

The complaint instead cites various general duties of the Attorney General, such as his duty to tend to the State's interests in litigation or advise the Legislature on the constitutionality of State laws. *See* ER043-44. The complaint also cites a "press release" then-Attorney General Strange issued "regarding the enforcement of the Birmingham wage ordinance" and a possible State preemption law. ER044. Thus, the best Plaintiffs can do is point to a press release that came out "prior to the effective date of the [Birmingham] ordinance" and Minimum Wage Act that amounted to mere "advi[ce]." *Id*. This falls far short of alleging threats or "action to enforce" the Act against anyone, much less Plaintiffs. *Doe*, 344 F.3d at 1285.

23

Plaintiffs rely on *Citizens for Equal Protection v. Bruning*, which involved a suit against the Nebraska Governor and Attorney General challenging a provision of the Nebraska Constitution that banned same-sex unions. 455 F.3d 859, 863 (8th Cir. 2006). The court held that the officials' "broad powers to enforce the State's Constitution and statutes … include[d] policing compliance with this constitutional amendment," which made them proper defendants for standing purposes. *Id.* at 864. But the decision runs counter to the precedent discussed above, including precedent of this Court. And in any event, the Eighth Circuit's later decision in *Digital Recognition* shows that Plaintiffs overread *Bruning*. *Digital Recognition* involved a law that gave private parties the right to sue other private parties for damages. 803 F.3d at 955-56. Parties who feared litigation sued the Arkansas Governor and Attorney General on the ground that, like the officials in *Bruning*, the Arkansas officials had broad authority. But the court explained that, "[i]n a private suit for damages, … the provisions of the Act are enforced by the private plaintiff who invokes the jurisdiction of the court and seeks damages from a particular defendant for violations of the Act." *Id.* at 962. The same is true here, where the Act is enforced primarily by private parties.

Plaintiffs thus contend that the Attorney General harmed them, not by enforcing the Act, but by "declin[ing] to exercise his statutory authority to inform the Legislature and Governor that Act 2016-18 is unlawful." Lewis.Br.20. In other words,

24

had the Attorney General embarked on a public campaign to cast doubt on the Act's validity, maybe employers would have given Plaintiffs a raise. *Id.* at 21-22. But "Plaintiffs' theory of causation is based upon the alleged *benefits* that would flow to them as a consequence of" the Attorney General taking other actions—"not an alleged *injury* that [the Attorney General's] actions have inflicted or, in imminent fashion, will inflict upon them." *Bronson*, 500 F.3d at 1111 (emphasis added). Moreover, these benefits would not flow from the Attorney General's enforcement of the Minimum Wage Act, but rather from him relying on other authority to take actions to which Plaintiffs enjoy no entitlement. *Id.*[7] Finally, the presumption that the Attorney General's opinions—as persuasive as they might be—would affect Plaintiffs' paychecks is just the sort of speculation about the "independent action[s] of some third party not before the court" that has never been enough to confer standing. *Lujan*, 504 U.S. at 560.

Going outside the complaint, the panel noted "that if Birmingham implemented its minimum wage ordinance in spite of the Minimum Wage Act, the attorney general could sue the city to compel compliance." *Lewis*, 896 F.3d at 1290. But that is no basis for standing for at least two reasons. First, Plaintiffs never alleged

---

[7] The Attorney General's alleged "omissions" (*see* Lewis.Br.20) are thus distinguishable from omissions at issue in cases like *Massachusetts v. EPA*, 549 U.S. 497 (2007), where the EPA had a statutorily assigned duty to "prescribe … standards applicable to the emission of any air pollutant." *Id.* at 506 (quoting 42 U.S.C. § 7521(a)(1)).

that the Attorney General had threatened action against Birmingham.  While there are cases where "the threatened enforcement of a law creates an Article III injury," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), this is not one of them. Second, and more fundamentally, even if the Attorney General's "threatened enforcement" became "sufficiently imminent," *id.*, at most, that might provide *Birmingham* standing to sue the Attorney General.  But Plaintiffs cannot enjoin an enforcement action that could never be brought against them (and might never be brought at all).  *Cf. Bailey v. Patterson*, 369 U.S. 31, 32 (1962) ("Appellants lack standing to enjoin criminal prosecutions under Mississippi's breach-of-peace statutes, since they do not allege that they have been prosecuted or threatened with prosecution under them.").  And even if Plaintiffs could have standing to bring such a claim, it is not ripe.  *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) ("Any injury plaintiffs might suffer from abuse of the City's eminent domain power can be remedied when the City formally exercises that power."); *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) ("[T]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III.").

Birmingham did not cause Plaintiffs' injury either.  According to the amended complaint, Birmingham is "not enforcing" its Ordinance, but that is not the same thing as affirmatively enforcing the Minimum Wage Act.  ER045.  A state, for

26

example, does not "enforce" federal preemption laws when it refrains from enforcing contrary state laws. Were it otherwise, any preemption law would arguably "commandeer the … States by directly compelling them to … enforce a federal regulatory program." *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018); *but see id.* at 1479-81 (distinguishing preemption from commandeering). Moreover, Plaintiffs cannot complain about Birmingham's decision not to enforce the Ordinance against employers, for "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 767 n.13 (2005) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). And most fundamentally, the City "has no interest adverse to the claimants." *Muskrat v. United States*, 219 U.S. 346, 361 (1911).

Nor does the Attorney General. "The whole purpose of" this lawsuit is to test the constitutionality of the Minimum Wage Act "in a suit not arising between parties concerning a property right necessarily involved in the decision in question, but in a proceeding against the government in its sovereign capacity, and concerning which the only judgment required is to settle the doubtful character of the legislation in question." *Id.* at 361-62. The Supreme Court dismissed such a suit more than a century ago, and this Court should do the same here. "The questions involved in this proceeding as to the validity of the legislation may arise in suits between individuals, and when they do," courts may consider such cases. *Id.* at 362. But any

decision by this Court now would be offering no more than "advice concerning legislative action—a function never conferred upon it by the Constitution, and against the exercise of which this court has steadily set its face from the beginning." *Id.*

**C.      Plaintiffs' Injuries Are Unlikely to Be Redressed By Relief Against the Attorney General or Birmingham.**

Plaintiffs have also failed to allege that their injuries can be redressed by the District Court's judgment against these Defendants. "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Hollywood Mobile*, 641 F.3d at 1266.  Plaintiffs must show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotation marks omitted).

The panel declared that it had "little doubt that an injunction [1] declaring the Minimum Wage Act unconstitutional and [2] prohibiting the attorney general from enforcing it—thereby requiring him to announce its invalidity to the governor and the legislature—would go a long way toward redressing the plaintiffs' injuries." *Lewis*, 896 F.3d at 1291.  But Plaintiffs have never requested an injunction "prohibiting the attorney general from enforcing" the Minimum Wage Act, and such an injunction could not redress Plaintiffs' harms because the Attorney General was never enforcing the Act in the first place.  Without that possible relief, the panel's entire theory of redressability turned on the fact that a federal court could publish an

28

opinion "declaring the Minimum Wage Act unconstitutional." *Id.* But "it must be the effect of the court's *judgment* on the *defendant*"—not the effect of an *opinion* on *other people*—"that redresses the plaintiff's injury." *Nova Health*, 416 F.3d at 1159. In other words, "[r]edressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring)). Because the panel's proposed "judicial pronouncement" would not settle a "dispute *which affects the behavior of the defendant towards the plaintiff*" it would be merely "an advisory opinion." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987).

And that opinion would remain advisory, even if a court "direct[ed] the Attorney General to give notice to Alabama legislators and the public" of the court's opinion. Lewis.Br.26. An advisory opinion remains an advisory opinion—even if a court orders someone else to read it aloud.

Plaintiffs nevertheless take up this bankrupt theory, contending that an opinion from the District Court declaring "the unlawfulness of Act 2016-18," combined with an order requiring the Attorney General to publicize that decision, "would significantly increase the likelihood that Birmingham employers would comply with the minimum wage Ordinance." Lewis.Br.26. But the complaint includes no basis for thinking that employers would feel bound by a non-binding district court

29

decision—even *if* they heard about it through a court-ordered, Attorney-General-run ad campaign. "For all practical purposes, the injunction" would be "utterly meaningless," as the "defendants have no authority to prevent a private plaintiff from invoking the statute in a civil suit." *Okpalobi*, 244 F.3d at 426-27. This judgment will not bind "private parties, when actual litigation brings to the court the question of the constitutionality of such legislation," and the judgment would thus "amount[] in fact to no more than an expression of opinion upon the validity of the acts in question." *Muskrat*, 219 U.S. at 362.

That remains true even if the Court had the authority to "direct[] the City of Birmingham to enforce the city's minimum wage Ordinance." Lewis.Br.25; *but see Town of Castle Rock* ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). For even if a federal court placed the City between a rock and a hard place by "enjoining" the City to "enforce" its Ordinance in contravention of State law, employers would remain free to raise the Minimum Wage Act as a defense to those enforcement actions. Plaintiffs have not pleaded any facts suggesting that employers would abandon their legal rights.

Apparently confused about basic tenets of federalism, Plaintiffs fault Defendants for not "explain[ing] how employers would be entitled to ignore the Birmingham Ordinance were Act 2016-18 declared unconstitutional." Lewis.Br.26-27. This Court has already explained. Neither the District Court's nor this Court's "decisions

30

bind the Alabama courts to decide cases in accordance with them…. The only federal court whose decisions bind state courts is the United States Supreme Court." *Doe*, 344 F.3d at 1286. Thus, if the District Court had declared the Act unconstitutional and the Attorney General had advertised that fact, an employer who declined to follow their advice would not be held in contempt or subjected to enforcement proceedings. He would have the same right then as he does today to ignore the Birmingham Ordinance.

Plaintiffs' statement also ignores a basic tenet of standing law—namely, it was *their* burden to explain how a non-binding judgment from the District Court would cause their employers—"third part[ies] not before the court"—to redress their harms. *Allen*, 468 U.S. at 757. Plaintiffs necessarily failed to carry this "substantially … difficult" burden when they failed to even try. *Id.* at 758.

Finally, Plaintiffs offer a snippet of dicta from *Doe v. Stincer*, in which an organization sued the Florida Attorney General challenging a Florida statute that concerned the availability of medical records. 175 F.3d 879, 880 (11th Cir. 1999). The Court agreed with the attorney general that the plaintiff lacked standing because it had failed to establish that its member's "injury was caused by the Florida statute." *Id.* at 887. But the Court nevertheless went on to opine in a footnote that a declaration of invalidity could redress plaintiff's harm, "even assuming that the Attorney General lacks the necessary enforcement authority to support the grant of injunctive

relief enjoining the statute's enforcement." *Id.* at 887 n.6. Citing no authority, the Court simply declared that the plaintiff could show redressability, "[e]ven if injunctive relief is not appropriate," because "a favorable ruling could result in a declaratory judgment against the Attorney General holding the Florida statute invalid under the ADA." *Id.* Because that statement was "not necessary to deciding the case then before" this Court, it "is dicta," which is "not binding on anyone for any purpose." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) (cleaned up). Even so, this case presents the Court a good opportunity to make clear that redressability cannot be grounded merely on a court's ability to issue an opinion.

## II.    The Attorney General Is Not A Proper Defendant Under *Ex Parte Young*.

Sovereign immunity bars this suit against the Attorney General because it is private parties, not the Attorney General, who have the responsibility to enforce the Minimum Wage Act, and the Attorney General has never enforced or threatened to enforce the Act against anyone. Because there is no allegation that the Attorney General has relied on the purportedly unlawful Act to threaten or harm Plaintiffs, their suit is actually against Alabama, and this Court has no power to entertain it.

"[T]he Constitution's structure, its history, and the authoritative interpretations by this Court make clear" that "the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today … except as altered by the plan of the

32

Convention or certain constitutional Amendments." *Alden v. Maine*, 527 U.S. 706, 713 (1999). Sovereign immunity bars private plaintiffs' suits against not only States, but also "against state officials where the state is, in fact, the real party in interest." *Summit Med. Assocs.*, 180 F.3d at 1336. Thus, when a private plaintiff sues a state official in federal court, the court must determine whether the suit is really one against the state. Fortunately, there is more than a century of guidance available. As the Supreme Court remarked in *Fitts v. McGhee*, the question "has so frequently been the subject of consideration by this court that nothing of importance remains to be suggested on either side…." 172 U.S. 516, 525 (1899).

The *Fitts* Court explained that to distinguish between a suit against a state and one against "defendants as individuals," courts look to the defendants' actions. *Id.* at 527. When state officials seek to "execut[e] the provisions of state enactments void by reason of repugnancy to the constitution of the United States" and thereby harm plaintiffs, they are not acting on behalf of the state. *Id.* They "personally and individually [a]re wrongdoers," and they cannot avail themselves of the state's immunity "because the authority under which they professed to act was void." *Id.* Likewise, if the officials "were about to take possession of … property belonging to … the plaintiffs, in violation of the latter's constitutional rights," they would have no claim to be acting on behalf of the state. *Id.* at 529. Thus, when the Court has allowed suits to proceed, it has been against state officials who (1) were "specially

charged with the execution of a state enactment alleged to be unconstitutional, but under the authority of which, it was averred" they (2) "were committing, or were about to commit, some specific wrong or trespass to the injury of the plaintiffs' rights." *Id.* The Court contrasted such suits with suits "against officers of a state merely to test the constitutionality of a state statute, in the enforcement of which those officers will act only by formal judicial proceedings in the courts of the state." *Id.* at 530.

The suit in *Fitts* fell into this latter category. The Alabama Legislature passed a law that set a maximum toll a bridge owner could charge and gave parties who were overcharged the right to sue the owner for each offense. *Id.* at 516. The law, therefore, would be enforced by private parties. Bridge owners could have raised their purported constitutional rights as a defense to such private actions, but instead they sued Alabama's Governor and Attorney General. The Supreme Court held that sovereign immunity applied. It was not enough that the Governor, "as the executive of the state, was, in a general sense, charged with the execution of all its laws," or that the Attorney General "might represent the state in litigation involving the enforcement of its statutes." *Id.* at 530. After all, by those theories, "the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general." *Id.* Because "neither of the state officers named held any special relation to the particular statute," "[t]hey were not expressly

34

directed to see to its enforcement," and they had neither threatened nor "commit[ed] acts of trespass or wrong" against the plaintiffs, the suit was one against Alabama. *Id.*

Nine years later in *Ex Parte Young*, the Court applied this same test and held that plaintiffs could sue the Minnesota Attorney General, who had "threatened" to sue the railroad that plaintiffs owned and take other actions under a criminal law that gave him the authority to seek fines from the company and imprisonment for the its officers and agents. 209 U.S. 123, 128, 131 (1908). The Supreme Court held that plaintiffs' federal suit against the attorney general could go forward because state officials (1) who "have some connection with the enforcement of the act," *id.* at 157, and (2) "who threaten and are about to commence proceedings … to enforce against parties affected an unconstitutional act … may be enjoined by a Federal court of equity from such action." *Id.* at 156.

*Fitts* and *Ex Parte Young* make clear that Plaintiffs' suit against the Attorney General is actually a suit against the State. The Attorney General has not been "specially charged with the execution of" the Minimum Wage Act, and he has not relied on "the authority of" the Act to threaten or "commit … some specific wrong … to the injury of the plaintiffs' rights." *Fitts*, 172 U.S. at 529. In *Ex Parte Young*'s framing, he does not have "some connection with the enforcement of the act," nor has he "threaten[ed] … to enforce" the Act. 209 U.S. at 156-57.

35

*First*, when it comes to the necessary "close official connection with the" challenged statute, *id.* at 156, this case is *Fitts* all over again. An Alabama law gave Plaintiffs certain rights vis-à-vis other private parties, and rather than litigate their constitutional theory in a suit between private parties, Plaintiffs sued the Attorney General. In both cases, the Attorney General bore no "close official connection with the" challenged statute, and "the making of such officer a party defendant was a simple effort to test the constitutionality of such act in that way …." *Id.* at 156 (discussing *Fitts*, 172 U.S. 516). Plaintiffs' modern-day version of *Fitts*, like its predecessor, should be dismissed.

This Court has repeatedly rejected similar claims against high-ranking state officials who were not "'responsible for' [the] challenged action." *Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) (quoting *Luckey v. Harris*, 860 F.2d 1012, 1015-16 (11th Cir. 2003)). In *Summit Medical*, for example, this Court cited *Fitts* to reject claims against the Alabama Attorney General over a state tort statute that, like the one at issue here, would be enforced in private litigation in state court. *See id.* at 1341-42.

And in *Women's Emergency Network v. Bush* the Court held that plaintiffs could not sue the Florida Governor over the distribution of certain state funds even though he possessed "shared authority" over the responsible state agency. 323 F.3d at 949. Plaintiffs pointed to the "governor's 'general executive power,'" but this

36

Court recognized that such general power "is not a basis for jurisdiction in most circumstances." *Id.* (citing *Harris v. Bush*, 106 F. Supp. 2d 1272, 1276-77 (N.D. Fla. 2000)). The Court reasoned that if such general "power provided a sufficient connection to a state law to permit jurisdiction over him, any state statute could be challenged simply by naming the governor as a defendant." *Id.* The Court thus held that if "enforcement of a statute is the responsibility of parties other than the governor," then "the governor's general executive power is insufficient to confer jurisdiction." *Id.* at 1249-50.

That reasoning controls here, for the only connection Plaintiffs draw between the Minimum Wage Act and the Attorney General is his "general authority to enforce State laws under Ala. Code §36-15-12." Lewis.Br.32. That is not a "a sufficient connection" to make the Attorney General "responsible for the enforcement of" the Act. *Women's Emergency Network*, 323 F.3d at 949. Rather, "enforcement of" the Act "is the responsibility of" private parties like Plaintiffs' employers, who would raise the Act as a preemption defense to suits based on local wage or labor laws. *Id.* at 949-50. The Attorney General, of course, has no authority to enforce the Act against Plaintiffs. *See Ex Parte Young*, 209 U.S. at 156 (focusing on a state official's threats "to enforce *against parties affected* an unconstitutional act") (emphasis added). Plaintiffs thus note that the Attorney General could possibly sue Birmingham if the City started enforcing its own Ordinance. But at most, this general

37

authority to institute civil actions against local governments gives the Attorney General a secondary connection to the Act that is every bit as "attenuated" as the Florida Governor's connection to the law challenged in *Women's Emergency Network*. 323 F.3d at 949. Allowing such suits "would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law …, but it is a mode which cannot be applied to the states of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons." *Fitts*, 172 U.S. at 530.

*Second*, even if the Attorney General's broad authority to initiate civil suits were deemed a "close official connection with the" Act, the *Ex Parte Young* exception would not apply because the Attorney General has not enforced the Act, he is not "about to" enforce it, nor has he even "threaten[ed] … to enforce" it. *Ex Parte Young*, 209 U.S. at 156. The mere existence of the Act on the books does not "strip[]" the Attorney General "of his official or representative character." *Id.* at 160. Rather, he first must "seek[] to enforce" the Act before he can "come[] into conflict with the superior authority of that Constitution." *Id.* at 159-60. Only that conflict—caused by the state official's actions—suffices to remove "his official or representative character" and subject him "in his person to the consequences of his individual conduct." *Id.* at 159-60.

The cases Plaintiffs cite are not to the contrary. For example, in *Grizzle v. Kemp*, Plaintiffs sued the Georgia Secretary of State, challenging a new state anti-nepotism law that made them ineligible to run for seats on their local school boards because they had relatives who were employees of schools in those districts. 634 F.3d 1314, 1316 (11th Cir. 2011). The Secretary of State argued that *Ex Parte Young* did not apply because he could not "directly qualify or challenge candidates for local boards of education or certify the results of those elections." *Id.* at 1319. The Court noted, however, that he did have "the power and the duty to ensure that the entities charged with those responsibilities comply with Georgia's election code in carrying out those tasks." *Id.* Those entities the secretary of state oversaw *had already enforced the law* by disqualifying one plaintiff based on the challenged statute. *Id.* at 1316. And the election code gives Georgia's election board, which is chaired by the secretary of state, the power to level fines of up to $5,000 for each violation of the code and its related rules and regulations. *See* Ga. Code Ann. §21-2-33.1(a)(2). As such, the Court held that these powers "sufficiently connect[ed] him with the duty of enforcement to make him a proper party to" the suit. *Id.* at 1319 (quoting *Ex Parte Young*, 209 U.S. at 161). Here, of course, the Attorney General has no "duty of enforcement" when it comes to the Minimum Wage Act and Plaintiffs. And even if he has authority to enforce the Act against Birmingham, he has not threatened to

39

do so, unlike the election officials in *Grizzle*, who had disqualified one of the plaintiffs from running for office

Plaintiffs reliance on *Luckey v. Harris* (Lewis.Br.33-34) is also misplaced, as that case involved allegations of ongoing violations of constitutional rights in criminal proceedings overseen by the Georgia Governor. 860 F.2d 1012, 1013 (11th Cir. 1988).  The *Luckey* plaintiffs included a "class consisting of all indigent persons presently charged … with criminal offenses in the courts of Georgia …."  *Id.*  They alleged that when the governor enforced criminal statutes against them without providing them adequate counsel, due process, and non-excessive bail, he was violating their constitutional rights.  *Id.*  By enforcing Georgia's criminal laws, albeit through lower-ranking law enforcement officials, the governor had engaged in conduct that allegedly violated plaintiffs' rights and exposed the governor to individual liability.  *Luckey* is inapplicable here though, as Plaintiffs have not alleged any misconduct under the Minimum Wage Act by the Attorney General or anyone he oversees, and not even the possibility of enforcement against Plaintiffs.

To be sure, this Court in *Summit Medical* held that plaintiffs could sue state officials based on "only the responsibilities such officers have in their status as state officials into federal court," even if the officials have not "undertaken or … threatened to undertake" any action.  180 F.3d at 1337.  In the panel's view, *Ex Parte Young*'s requirement of an "allegation of an ongoing and continuous violation of

40

federal law … merely distinguishes between cases where the relief sought is prospective" from those "where relief is retrospective." *Id.* at 1338.

But "[t]he requirement that there be some actual or threatened enforcement action before *Young* applies has been repeatedly applied by" other federal courts. *Okpalobi*, 244 F.3d at 415 (plurality) (citing *1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993); *Kelley v. Metropolitan County Bd. of Educ.*, 836 F.2d 986, 990-91 (6th Cir. 1987)); *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019) ("There must be a realistic possibility the official will take legal or administrative actions against the plaintiff's interests.") (quotation marks omitted); *but see Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002) ("We decline to read additional 'ripeness' or 'imminence' requirements into the *Ex Parte Young* exception to Eleventh Amendment immunity in actions for declaratory relief…."). This makes sense, for theory behind *Ex Parte Young* is that the official's actions or threats—or those of the people he oversees—"strip[]" him "of his official or representative character." 209 U.S. at 160. There is no reason to "subject[]" and official "in his person to the consequences of his individual conduct" merely because the legislature has passed a law. *Id.*

To be sure, "overturning precedent is and should be a rare occurrence. *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1095 (11th Cir. 2017). But the rule in *Summit Medical* does not "align with a uniform

41

interpretation" of *Ex Parte Young* by other courts, and there are no obvious "reliance interests" for plaintiffs seeking to sue state officials who have never threatened them any harm. *Id.* at 1097.

Finally, by allowing suits like this one, the *Summit Medical* rule "does more harm than good." *Id.* at 1098. Here, for example, Plaintiffs faced no possible threat of direct enforcement and no threat that the Attorney General would enforce the Act against the City. Indeed, there is nothing for the Attorney General to enforce, as Birmingham has never enforced its Ordinance. Even so, Plaintiffs claim the right to hale Alabama's Attorney General into the court of another sovereign. Such suits undermine "the dignity and respect afforded a State." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997). To be sure, courts must balance the need to "ensure that the doctrine of sovereign immunity remains meaningful," with "the need to prevent violations of federal law." *Id.* at 269. But when there is no allegation that "state officers … are violating, or planning to violate, federal law," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), that balance tip in favor of the States.

## III. Plaintiffs Have Not Plausibly Alleged That The Legislature Set A Statewide Minimum Wage To Intentionally Discriminate Against African-Americans.

For nearly a year, the Alabama Legislature considered making Alabama the twenty-third state to enact a uniform, statewide minimum wage. Then in early 2016,

Birmingham officials rushed through an ordinance that raised the minimum wage in the State's largest city by almost 40% overnight. The Legislature responded by moving promptly to enact the Minimum Wage Act. The Act's stated purpose is the same as many similar Alabama preemption laws and many similar minimum wage laws across the country—to provide statewide uniform regulation for certain important policies. Act No. 2016-18, §6(a).

Though twenty-two other States have enacted similar laws, Alabama's was the first to be challenged as racist. Plaintiffs charge that what is standard economic legislation in Arkansas or Oregon is a loathsome attempt to "perpetuate[] … white supremacy" when enacted in Alabama. ER039. Their grounds for this grave accusation? Birmingham is mostly black, and Alabama is mostly white. Black legislators voted against the Act, and white legislators for it. After Birmingham rushed its minimum wage hike into effect, the Legislature responded with similar speed. And, of course, Alabama is Alabama—with a history of discrimination dating back to 1819. ER039.

But this is not enough for any judge or jury to conclude that Alabama's ordinary economic regulation is a tool of racial discrimination. The Act does not discriminate against anyone on its face, so Plaintiffs must show that the Act "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Plaintiffs fail on both fronts.

As an initial matter, the statewide preemption act applies *statewide*, not just in Birmingham. And while Plaintiffs allege that in Birmingham the Act has harmed a higher proportion of black workers, the complaint says nothing about whether black workers statewide fair better or worse than their white counterparts.

And on intent, courts are not quick to assume invidious purposes behind the actions of legislatures; rather, "the good faith of the state legislature must be presumed," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), for inquiries into "motives or purposes are a hazardous matter." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Under *Twombly* and *Iqbal*, Plaintiffs' amended complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "plausibility standard … asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* But Plaintiffs' "complaint pleads facts that are 'merely consistent with' a defendant's liability," and thus "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). By alleging a secret racist purpose behind the Act without ruling out "more likely explanations," Plaintiffs "do not plausibly establish [that] purpose." *Id.* at 681.

### A.    Plaintiffs Have Not Plausibly Alleged That the Act Has a Discriminatory Effect on African-Americans.

Plaintiffs' amended complaint does not contain a plausible allegation of racially disparate effects.  To be sure, Plaintiffs allege disparate effects on "Birmingham's black citizens," ER081 ¶132, asserting that Birmingham is 73% black and that 37% of black wage workers in Birmingham earn wages under $10.10 per hour while only 27% of white wage workers fall into this category.  ER047 ¶¶28-30; *see also* Lewis.Br.41-42.  But the Minimum Wage Act does not apply only in Birmingham; it applies statewide to "*[a]ny* [local] ordinance, policy, rule, or other mandate" that is inconsistent with its uniform minimum wage.  Ala. Act No. 2016-18, §2(b) (emphasis added); *see also id.* §6(d).  While only the Birmingham Ordinance has been preempted, the Act stands as a similar obstacle for majority-white municipalities.  Thus, the Act halted efforts by majority-white cities like Huntsville and Tuscaloosa to enact local minimum wages, *see* ER104-09; ALBC.Br.44-45, and white wage workers there and everywhere else in Alabama are covered by the Act.

The Court thus should reject Plaintiffs' attempt to focus solely on the Act's effects in Birmingham.  *Cf. Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989) ("Racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions ….").  Because the Act applies statewide, the relevant comparison class is low-wage workers across the State.

45

And because Plaintiffs never alleged that black low-wage workers were more likely than white low-wage workers to be affected by the Act, their allegations about the Act's effect in Birmingham are "merely consistent with" such an effect, not probative of it. *Iqbal*, 556 U.S. at 678.

> **B.** **Plaintiffs Have Not Plausibly Alleged That The Act Was Passed To Harm African Americans.**

Plaintiffs likewise fail to plausibly allege a discriminatory purpose. "'Discriminatory purpose' … implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

This is a difficult showing to make. "[T]he 'good faith of the state legislature must be presumed.'" *Abbott*, 138 S. Ct. at 2324 (quoting *Miller v. Johnson,* 515 U.S. 900, 915 (1995)). Thus, the Court has warned when considering both equal protection and ex post facto attacks on legislative purpose that "[i]nquiries into congressional motives or purposes are a hazardous matter." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *accord Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed."). Demonstrating an illicit purpose is hard enough where the decisionmaker is a single government

official.  *See Iqbal*, 556 U.S. at 680-83.  But Plaintiffs face even greater "difficulties" where the decisionmaker is a legislative body as large as the Alabama Legislature.  *Hunter*, 471 U.S. at 228.  Where, as here, there are obvious legitimate reasons supporting the Legislature's decision, "only the clearest proof will suffice" to establish an illicit motive. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quotation marks omitted); *see also McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987) (judicial deference in the face of legitimate legislative reasons).

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Court provided several hypothetical situations that might suffice to prove a hidden, discriminatory motive.  For example, if the government always zoned land for residential purposes, but then "suddenly" changed a parcel's zoning upon learning it would be used for integrated housing, that would be clear proof of discriminatory purpose.  *Id.* at 267.  Or if "there was no reason 'from a zoning standpoint' why the land should not be classified" for residential purposes other than to block integrated housing, the proof of improper motive would be sufficiently clear.  *Id.* at 267 n.17.  These examples demonstrate that the "sensitive inquiry" into a legislature's "true" purpose is not easy, and a plaintiff's burden when leveling such a claim is not easily satisfied.  *Id.* at 266.

Plaintiffs thus are mistaken to assert that the level of proof needed to impugn a legislature's motives should turn on the constitutional provision underlying a

claim. *See* Lewis.Br.55-56. The legislature enjoys the "presumption" of "good faith," whether a plaintiff brings an equal protection claim, *see Abbott*, 138 S. Ct at 2324, or an ex post facto claim. *See Flemming*, 363 U.S. at 617 (noting "the presumption of constitutionality with which this enactment, like any other, comes to us"). And in both types of cases, the Supreme Court has recognized that "[i]nquiries into congressional motives or purposes are a hazardous matter." *Hunter*, 471 U.S. at 228; *accord Flemming*, 363 U.S. at 617 ("Congressional motives are at best a hazardous matter…."). Thus, cases like *Flemming* are not in tension with *Arlington Heights*; rather they shine light on it, making clear that while circumstantial evidence can overcome the presumption of constitutionality, it must be evidence that provides the "clearest proof" of the legislature's hidden intent. That is precisely why "in each case" the *Arlington Heights* Court "cited to exemplify its listed factors, discriminatory motive could be easily inferred." *Veasey v. Abbott*, 830 F.3d 216, 283 (5th Cir. 2016) (Jones, J., dissenting).[8]

Even if *Arlington Heights* created a more relaxed standard, Plaintiffs have failed to plausibly allege that the 2016 Legislature enacted the Minimum Wage Act

---

[8] The difficulty of satisfying this standard was not lost on Congress, which amended the VRA to relieve plaintiffs of the burden of proving discriminatory purpose. In Congress' view, overcoming the presumption of constitutionality "placed an 'inordinately difficult burden' on §2 plaintiffs." *Thornburg v. Gingles*, 478 U.S. 30, 72 (1986). Another reason for Congress' amendments: Accusations that officials were "motivated by invidious racial considerations" would "only be divisive, threatening to destroy any existing racial progress in a community." *Id.*

48

out of racially discriminatory motives. As an initial matter, there are several obvious, non-discriminatory reasons explaining the Legislature's action. While Plaintiffs have their favorite empirical studies about the optimal minimum wage, there are many other studies that support the Legislature's decision. *See* Burke, et al., 46 Gonz. L. Rev. at 672-76. And at least twenty-two other States had enacted similar uniform minimum-wage laws—some of which had received judicial approval. *See* *supra* note 3. Closer to home, Alabama's largest city had dramatically increased its minimum wage overnight, and other cities were threatening to follow suit. *See* ER104-09. Finally, when the Legislature enacted legislation, it did so by borrowing language almost verbatim from a preemption law prohibiting local gun ordinances. Ala. Code §13A-11-61.3. This is a case where "the legitimate noninvidious purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275.

Against the Legislature's obvious, legitimate rationales for the Act, Plaintiffs have not pleaded facts that would show a racist purpose. For one thing, Plaintiffs have not alleged any *direct* evidence of such a purpose. There are no allegations of racist public or private statements—whether by legislators or other, outside advocates for the Act. Plaintiffs allege racist comments by a handful of legislators about *different* legislation (and in a *different* quadrennium of the Legislature). *See* ER065-66 ¶¶79-80. But these allegations do not make Plaintiffs' claims plausible, for if the Supreme Court will not invalidate a statute "on the basis of what fewer than a handful

49

of [legislators] said about it," *Hunter*, 471 U.S. at 228 (quotation marks omitted), *a fortiori* what a few legislators said about a *different law* cannot suffice.

Plaintiffs did allege that "Senator Slade Blackwell, (a white senator from the wealthy Birmingham suburb of Mountain Brook)" stated "that increases in the minimum wage especially hurt young people from poorer families." ER072 ¶97. In their view, this "white senator" was not speaking in good faith, but was instead "invok[ing] racial stereotyping to justify" his true purpose—"denial of a living wage to African-American residents of the City of Birmingham." *Id.* Notably, Plaintiffs plead *no* facts to back up this calumny other than the color of Blackwell's skin. Thus, if anything, it is *Plaintiffs* who are dealing in pernicious stereotypes by assuming that the true reason any white legislator would vote for a statewide minimum wage is a deep-seated animus toward African Americans. *Cf. Thomas*, 293 F.3d at 1330 (recognizing that "because allegations of racism are taken so seriously in our society, allegations that are baseless … are particularly offensive").

Lacking direct evidence, Plaintiffs turn to the Act's historical background and the specific events preceding its enactment. *See Arlington Heights*, 429 U.S. at 266-67. But Plaintiffs' allegations fail to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs scour the history books, dredging up ugly episodes from Alabama's past. ER049-061. But "unless historical evidence is reasonably contemporaneous with the challenged decision, it

50

has little probative value." *McCleskey*, 481 U.S. at 298 n.20.  As the Supreme Court has repeatedly reminded courts, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)).[9]

Similarly, Plaintiffs' claims of disparate impact are not enough because they do not show a "clear pattern, unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.  Rather, "[t]oo many [white workers] are affected by [the Act] to permit the inference that the statute is but a pretext for" harming African Americans.  *Feeney*, 442 U.S. at 275.  And allegations of racially polarized voting on the Act are not probative given the Supreme Court's refusal to assume "that all individuals of the same race think alike." *Schuette*, 134 S. Ct. at 1634; *see also Shaw*, 509 U.S. at 657; ER069-70 ¶¶89, 93.

Plaintiffs attempt to cast doubt on the integrity of the legislative process by complaining that the Act's proponents "fast-tracked" the bill, Lewis.Br.46, "[b]ut we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2328-29.  The allegations of "extreme haste" are particularly unhelpful as Plaintiffs give no reason to

---

[9] Plaintiffs' allegations about the structure of the Birmingham Water Board, while more recent in time, are unaccompanied by any allegation that race drove that decision.  *See* Lewis.Br.44.

believe that the timing or procedures were improper or even "uncommon" for similar situations. *N.C. State Conf. of the N.A.A.C.P. v. McCrory*, 156 F. Supp. 3d 683, 704 n.28 (M.D.N.C. 2016); *see also Arlington Heights*, 429 U.S. at 270 n.19 (plaintiffs failed to provide context needed to show that "apparent procedural departure" was in fact a material procedural departure).[10]  Indeed, by highlighting other, failed pre-cursor proposals from 2015, the amended complaint affirmatively undermines this "fast-track" argument and demonstrates the Legislature's compliance with its rules. ER067-68 ¶¶84 -87.  Moreover, given Birmingham's determination to hastily raise the minimum wage by over 39% in less than 24 hours, there was an obvious, race-neutral reason for the Legislature's commensurate speed.[11]

*    *    *

If Plaintiffs' gambit succeeds, federal judges should be prepared to review all manner of economic regulations, for soon "sales taxes, bail schedules, utility rates, bridge tolls, license fees, and other state-imposed charges" will be assailed as racist. *Washington v. Davis*, 426 U.S. 229 (1976).  Other "minimum wage and usury laws as well as professional licensing requirements" (*id.*) that cannot be defeated at the

---

[10] *See also* Ala. Retail Assoc. En Banc Br.16 n.5 (noting that Alabama's recent gas tax overhaul was introduced and passed in 14 days).

[11] Plaintiffs assert that the Legislature should have provided local notice of the Act because it "applied only to the City of Birmingham" at the time of its enactment. ER071-72 ¶¶94-96.  That premise is wrong as a matter of Alabama law because the Act applied statewide.  *See* Ala. Const. art. IV, §110.

ballot box or the Capitol will be brought before tribunals like this one, based solely on the assumption that legislators "should be judged by the color of their skin" and States by the darkest chapters in their history. *Shaw*, 509 U.S. at 657. Fortunately, the Constitution does not require this divisive result, and the pleading standards of the federal rules do not allow it.

### CONCLUSION

This Court should affirm.

Respectfully submitted this 24th day of April, 2019.

Steve Marshall
 *Attorney General*

 s/Edmund G. LaCour Jr.

Edmund G. LaCour Jr.
 *Deputy Solicitor General*

William G. Parker, Jr.
 *Chief Deputy General Counsel*

James W. Davis
 *Deputy Attorney General*

STATE OF ALABAMA
OFFICE OF THE GOVERNOR
600 Dexter Avenue
Montgomery, AL 36130
(334) 353-7581

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300

*Counsel for Appellee State of Alabama*

*Counsel for Appellees State of Alabama & Attorney General Steve Marshall*

53

### CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 24, 2019, I filed the foregoing motion electronically using the Court's CM/ECF system, which will serve all counsel of record.

                                        s/Edmund G. LaCour Jr.
                                        Edmund G. LaCour Jr.
                                        *Counsel for Appellees*

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that that this document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,927 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

                                        s/Edmund G. LaCour Jr.
                                        Edmund G. LaCour Jr.
                                        *Counsel for Appellees*