No. 17-11009

IN THE

# United States Court of Appeals for the Eleventh Circuit

MARNIKA LEWIS, ET AL.,

*Plaintiffs-Appellants,*

v.

STATE OF ALABAMA, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Alabama
No. 2:16-cv-690-RDP

**EN BANC BRIEF OF *AMICI CURIAE*
RESTAURANT LAW CENTER AND
ALABAMA RESTAURANT & HOSPITALITY ASSOCIATION
IN SUPPORT OF DEFENDANTS-APPELLEES**

ANGELO AMADOR
RESTAURANT LAW CENTER
2055 L Street, N.W.
Suite 700
Washington, D.C. 20036
(202) 331-5913
AAmador@restaurant.org

PAUL DECAMP
    *Counsel of Record*
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W.
Suite 700
Washington, D.C. 20037
(202) 861-1819
PDeCamp@ebglaw.com

*Counsel for* Amici Curiae *Restaurant Law Center
and Alabama Restaurant & Hospitality Association*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* Restaurant Law Center and the Alabama Restaurant & Hospitality Association hereby state that they have no parent corporation and that no publicly-held corporation owns 10% or more of their stock.

Pursuant to Rules 26.1-1 and 28-1(b) of the Eleventh Circuit Rules, *Amici Curiae* Restaurant Law Center and the Alabama Restaurant & Hospitality Association hereby certify that, to the best of their knowledge, the Certificate of Interested Persons filed by Defendants-Appellees on August 29, 2018, with their Petition for Rehearing En Banc is complete with the following exceptions:

1.    Alabama Restaurant & Hospitality Association—*Amicus Curiae*

2.    Amador, Angelo—Counsel for *Amici Curiae* Restaurant Law Center and the Alabama Restaurant & Hospitality Association;

3.    DeCamp, Paul—Counsel for *Amici Curiae* Restaurant Law Center and the Alabama Restaurant & Hospitality Association; and

4.    Restaurant Law Center—*Amicus Curiae*.

s/ Paul DeCamp
Counsel for *Amici Curiae*
Restaurant Law Center and Alabama
Restaurant & Hospitality Association

April 24, 2019

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................................... i

TABLE OF CITATIONS ............................................................................... iii

INTEREST OF THE *AMICI CURIAE* .......................................................... 1

STATEMENT OF THE ISSUE ....................................................................... 2

SUMMARY OF THE ARGUMENT ............................................................... 3

ARGUMENT ................................................................................................... 5

I.     A Substantial Body Of Economic Research Demonstrates That Increasing The Minimum Wage Involves A High Risk Of Harming Low-Wage Workers ..................................................................................... 5

II.    Recent Experiences With Local And State Minimum Wage Increases Underscore The Harm Low-Wage Workers Can Suffer ..................... 8

CONCLUSION ............................................................................................... 12

CERTIFICATE OF COMPLIANCE .............................................................. 14

CERTIFICATE OF SERVICE ....................................................................... 15

# TABLE OF CITATIONS

**Page(s)**

CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................4

*Jabary v. City of Allen*, 547 F. App'x 600, 605 (5th Cir. 2013) ...............4

*Lewis v. Bentley*, 2017 U.S. Dist. LEXIS 13565 (N.D. Ala. Feb. 1, 2017) ...............3

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ...............................................................................4

STATUTE

Alabama Uniform Minimum Wage and Right to Work Act,
    ALA. CODE § 25-7-40 ..................................................................... 2, 3, 5

RULE

Federal Rules of Appellate Procedure, Rule 29(a)(4)(E) ............................1

OTHER AUTHORITIES

Ben Gitis, *Update: 2015 Local Minimum Wage Increases and Restaurant Employment Trends* (American Action Forum Mar. 16, 2016),
    available at https://www.americanactionforum.org/research/update-2015-local-minimum-wage-increases-restaurant-employment-trends/ (last visited Apr. 23, 2019) ............................................... 10

*David Neumark & William Wascher, *Minimum Wages and Employment: A Review of Evidence from the New Minimum Wage Research* (Nat'l Bureau of Econ. Research, Working Paper

No. 12663, Nov. 2006), available at https://www.nber.org/pa-pers/w12663.pdf (last visited Apr. 23, 2019) ............................................. 6, 7

*Ekaterina Jardim et al., *Minimum Wage Increases, Wages, and Low-Wage Employment: Evidence from Seattle* (Nat'l Bureau of Econ. Research, Working Paper No. 23532, June 2017, revised May 2018), available at https://www.nber.org/papers/w23532.pdf (last visited Apr. 23, 2019) ...................................................................... 8, 9, 10

*Employment and Earnings Effects of Raising the Federal Minimum Wage to $15 per Hour: Hearing Before the H. Comm. On Education and Labor*, 116th Cong. (Feb. 7, 2019) (Statement of Douglas Holtz-Eakin, President, American Action Forum), available at https://ed-labor.house.gov/imo/media/doc/Testimony_Holtz-Ea-kin020719.pdf (last visited Apr. 23, 2019) ..........................................................6

*Jeffrey Clemens & Michael Wither, *The Minimum Wage and the Great Recession: Evidence of Effects on the Employment and Income Trajectories of Low-Skilled Workers* (Nat'l Bureau of Econ. Research, Working Paper No. 20724, Dec. 2014), available at https://www.nber.org/papers/w20724.pdf (last visited Apr. 23, 2019) ...................................................................................... 7, 8

NYC Hospitality Alliance, *Rising Labor Costs Survey* (2019), available at https://thenycalliance.org/assets/documents/infor-mationitems/021Ib.pdf (last visited Apr. 23, 2019).................................... 11

* indicates authorities principally relied upon

## INTEREST OF THE *AMICI CURIAE*

The Restaurant Law Center (the "RLC") and the Alabama Restaurant & Hospitality Association (the "ARHA") have interests that relate directly to the subject matter of this litigation.[*]

The RLC is a public policy organization created with the purpose of providing courts with the restaurant and foodservice industry's perspective on legal issues significantly affecting the industry. The RLC highlights the potential industry-wide consequences of pending federal, state, and local government actions, such as the state statute and local ordinance at issue here. One of the RLC's core functions is to provide collective advocacy for the industry and a national perspective, as it is doing in this litigation.

The restaurant and foodservice industry comprises more than one million establishments employing almost 15 million people, or approximately ten percent of the U.S. workforce. Restaurants and other foodservice providers constitute the na-

---

[*] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, the RLC and the ARHA certify that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting this brief; and (3) no person other than the RLC and the ARHA, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

tion's second largest non-governmental employment sector. Small businesses dominate the industry, and even larger chains are often collections of smaller franchised businesses.

Aside from direct membership in the National Restaurant Association, the RLC's membership-based affiliate, members of the Alabama Restaurant & Hospitality Association are automatically members of the National Restaurant Association with all its benefits. Many members have locations that operate within Birmingham, as well as the rest of Alabama, and the outcome of this case will significantly affect their businesses. The RLC routinely advocates on behalf of the industry on matters of labor and workforce policy and represents the interests of the National Restaurant Association members in matters before the courts.

The ARHA represents more than 1,200 members including restaurants, lodging, tourism, and hospitality service companies throughout Alabama. As Alabama employers with multiple locations throughout the State, ARHA members have a direct interest in the uniform application of the minimum wage laws and avoiding patchwork minimum wage ordinances.

## STATEMENT OF THE ISSUE

Whether the District Court correctly dismissed Plaintiffs' Fourteenth Amendment Equal Protection Clause challenge to Alabama's Uniform Minimum Wage and

Right to Work Act based on the law's obvious and nondiscriminatory purpose: ensuring uniform labor regulation and policy throughout the State.

## SUMMARY OF THE ARGUMENT

As nearly two dozen other States have done, Alabama enacted a statute, the Uniform Minimum Wage and Right to Work Act, ALA. CODE § 25-7-40, barring municipal governments from enacting local wage laws, including minimum wage laws. Plaintiffs challenged this law, contending that it violates federal law in various ways, but with the gravamen of their Complaint being the charge that this statute impermissibly discriminates against African-Americans on the basis of their race. The District Court dismissed the action, concluding *inter alia* that the Plaintiffs failed to allege facts sufficient to support a claim for violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, in light of the "obvious alternative explanation" for the law other than discrimination: the stated intention to establish uniform statewide economic policy. *See Lewis v. Bentley*, 2017 U.S. Dist. LEXIS 13565, at *32 (N.D. Ala. Feb. 1, 2017) (citation and quotation omitted).

Other briefs that this Court will receive, including from the State of Alabama and the Alabama Attorney General, address in detail the proper framework for analyzing the sufficiency of an equal protection claim at the pleading stage when a stat-

3

ute is economic in nature, is not facially discriminatory, and has "legitimate noninvidious purposes" that "cannot be missed." *See Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979). As discussed in those briefs, in such circumstances *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), require dismissal unless a complaint sets forth specific and compelling facts sufficient to raise an inference of unlawful discrimination notwithstanding the "obvious alternative explanation." *See Jabary v. City of Allen*, 547 F. App'x 600, 605 (5th Cir. 2013).

The RLC and the ARHA submit this *amici curiae* brief in order to demonstrate the solid economic grounding for the Alabama legislation at issue, and thus the legitimacy of the law's alternative, nondiscriminatory explanation. Specifically, numerous academic and industry studies over the years have addressed the economic consequences of local minimum wage ordinances, including within the restaurant and foodservice industry, which employs a substantial number of individuals at or near the minimum wage across the Nation and within Alabama. Although not all studies reach the same conclusion, the predominant view among those who have studied the matter appears to be that increases to the minimum wage, and in particular significant increases, often have negative results for low-wage workers, including reduced hours of work and even loss of jobs. These economic analyses demonstrate that Alabama had not merely a rational basis, but indeed a strong empirical

4

foundation for enacting this statute in order to protect its residents from these pernicious unintended consequences of local wage regulation.

The Complaint fails to allege facts sufficient to raise a plausible inference of racial discrimination in light of the clearly nondiscriminatory economic rationale for the Alabama Uniform Minimum Wage and Right to Work Act. The RLC and the ARHA, therefore, respectfully submit that this Court should affirm the judgment of the District Court dismissing the Complaint in its entirety.

## ARGUMENT

**I.    A Substantial Body Of Economic Research Demonstrates That Increasing The Minimum Wage Involves A High Risk Of Harming Low-Wage Workers.**

Like nearly two dozen other states, Alabama made the decision, supported by ample analysis, that its residents are better off with a single uniform minimum wage than with a patchwork of varying local minimum wages above the state-law minimum. The impulse to increase the minimum wage in order to help low-wage workers is both understandable and laudable. Yet it rests on an important assumption: that a higher minimum permissible hourly rate for work will not generate significant unintended consequences in the form of reduced working hours or job losses resulting in lower overall earnings for these same workers. As Congress heard earlier this year, "half a century of economic research concludes that minimum wage hikes come at significant costs to the very low-wage workers the policy is intended to help,

in the form of job loss or slower job creation." *Employment and Earnings Effects of Raising the Federal Minimum Wage to $15 per Hour: Hearing Before the H. Comm. On Education and Labor*, 116th Cong. (Feb. 7, 2019) (Statement of Douglas Holtz-Eakin, President, American Action Forum, at 3), available at https://ed-labor.house.gov/imo/media/doc/Testimony_Holtz-Eakin020719.pdf (last visited Apr. 23, 2019).

In their seminal 2006 study, Professor David Neumark of the University of California at Irvine and William Wascher, then the Deputy Associate Director in the Division of Research and Statistics at the Board of Governors of the Federal Reserve System, analyzed the methodology and results of 102 minimum wage studies from approximately the preceding fifteen years. They concluded that "nearly two-thirds [of those studies] give a relatively consistent (although by no means always statistically significant) indication of negative employment effects of minimum wages, while only eight give a relatively consistent indication of positive employment effects." David Neumark & William Wascher, *Minimum Wages and Employment: A Review of Evidence from the New Minimum Wage Research* 121 (Nat'l Bureau of Econ. Research, Working Paper No. 12663, Nov. 2006), available at https://www.nber.org/papers/w12663.pdf (last visited Apr. 23, 2019). Of the 33 studies they "view as providing the most credible evidence, 28 (85 percent) of these point to negative employment effects." *Id.* Indeed, "when researchers focus on the

6

least-skilled groups most likely to be adversely affected by minimum wages, the evidence for disemployment effects seem to be especially strong. In contrast, we see very few—if any—cases where a study provides convincing evidence of positive employment effects of minimum wages . . . ." *Id.*

More recently, in 2014, Associate Professor Jeffrey Clemens and then-doctoral candidate Michael Wither, both of the University of California at San Diego, examined how the most recent increases to the federal minimum wage—which went into effect in 2007, 2008, and 2009—affected low-wage workers, specifically those earning less than $7.50 per hour. *See* Jeffrey Clemens & Michael Wither, *The Minimum Wage and the Great Recession: Evidence of Effects on the Employment and Income Trajectories of Low-Skilled Workers* (Nat'l Bureau of Econ. Research, Working Paper No. 20724, Dec. 2014), available at https://www.nber.org/papers/w20724.pdf (last visited Apr. 23, 2019). They focused on, among other things, observable differences between states with a minimum wage at or below the federal level, and thus affected directly by the federal increases, and states with minimum wages at or above the new federal levels. They calculated that "[r]elative to low-skilled workers in" states unaffected by the federal minimum wage increases, "targeted workers' average [monthly] incomes fell by $100 over the first year and by an additional $50 over the following 2 years." *Id.* at 4-5, 27.

7

"Between December 2006 and December 2012," Clemens and Wither found, "minimum wage increases reduced the target population's employment rate by 6 percentage points." *Id.* at 34-35. They also determined that "minimum wage increases significantly reduced the likelihood that low-skilled workers rose to . . . lower middle class earnings. . . . Reductions in upward mobility thus appear to follow reductions in access to opportunities for accumulating work experience." *Id.* at 36.

## II.    Recent Experiences With Local And State Minimum Wage Increases Underscore The Harm Low-Wage Workers Can Suffer.

In 2014, the City of Seattle, Washington enacted a minimum wage ordinance that raised the local minimum wage from $9.47 per hour to as much as $11.00 per hour in 2015 and to as much as $13.00 per hour in 2016. In a study that has attracted national attention, six researchers from the University of Washington examined the effects of this ordinance on wages earned and hours worked by low-wage workers. *See* Ekaterina Jardim et al., *Minimum Wage Increases, Wages, and Low-Wage Employment: Evidence from Seattle* (Nat'l Bureau of Econ. Research, Working Paper No. 23532, June 2017, revised May 2018), available at https://www.nber.org/papers/w23532.pdf (last visited Apr. 23, 2019). Perhaps not surprisingly, the findings were in line with the economic literature concerning minimum wage increases affecting a larger area.

8

The study found that "the Seattle Minimum Wage Ordinance caused hours worked by low-skilled workers (i.e., those earning under $19 per hour) to fall by 6.9% during the three quarters when the minimum wage was $13, resulting in a loss of around 3 million hours worked per calendar quarter and more than 5,000 jobs." *Id.* at 38. In Seattle, "payroll expenses on workers earning under $19 per hour either rose minimally or fell as the minimum wage increased from $9.47 to $13 in just over nine months." *Id.* The data suggest that "low-wage labor is a more substitutable, expendable factor of production" than previously thought. *Id.*

The authors grappled with the issue of what happened to the hours of work that these lower-wage workers would have performed in the absence of the minimum wage increase. They observed that "[t]he work of least-paid workers might be performed more efficiently by more skilled and experienced workers commanding a higher wage. This work could, in some circumstances, be automated or delegated to consumers. In other circumstances, employers may conclude that the work of least-paid workers need not be done at all." *Id.*

Regardless of whether higher-wage employees ended up doing the work that the lower-wage workers lost, the study concluded that "the lost income associated with the hours reductions exceeds the gain associated with the net wage increase[.]" *Id.* The authors "compute[d] that the average low-wage employee was paid $1,900 per month[.]" *Id.* They determined that "[t]he reduction in hours would cost the

average employee $130 per month, while the wage increase would recoup only $56 of this loss, leaving a net loss of $74 per month, which is sizable for a low-wage worker." *Id.*

Analyses focusing on employment within the restaurant industry show a similar pattern. For example, one recent study examined the effects of local minimum wage increases in 2015 on restaurant workers in seven major cities, comparing restaurant industry job growth rates in the metropolitan areas with the local minimum wages against the rest of the state, looking at both 2014—i.e., the year before the increases—and 2015. Ben Gitis, *Update: 2015 Local Minimum Wage Increases and Restaurant Employment Trends* (American Action Forum Mar. 16, 2016), available at [https://www.americanactionforum.org/research/update-2015-local-minimum-wage-increases-restaurant-employment-trends/](https://www.americanactionforum.org/research/update-2015-local-minimum-wage-increases-restaurant-employment-trends/) (last visited Apr. 23, 2019). What the study determined was that across the seven cities with these local minimum wages, annual restaurant industry job growth fell from 4.2% in 2014 to 1.6% in 2015. *Id.* at 3. By contrast, annual restaurant industry job growth in the rest of the states involved increased from 3.4% in 2014 to 4.0% in 2015. *Id.* at 4. The author concludes that "in 2015, metropolitan areas where a major city raised the minimum wage consistently had slower restaurant job growth than in the surrounding areas." *Id.* at 3.

10

In November and December 2018, the New York City Hospitality Alliance conducted a survey to determine "how restaurants in the city of New York are addressing increasing labor costs." NYC Hospitality Alliance, *Rising Labor Costs Survey* 3 (2019), available at https://thenycalliance.org/assets/documents/informationitems/021Ib.pdf (last visited Apr. 23, 2019). The survey received responses from 574 establishments, and the results confirm the reality of unintended consequences for restaurant workers. Among the 324 full-service restaurants that responded to the survey, 76.5% reduced employee hours, and 36.3% eliminated jobs entirely, during 2018 in response to mandated minimum and other wage increases that went into effect at the end of 2017. *Id.* at 3, 6. In response to further mandatory wage increases that went into effect at the end of 2018, 74.5% of these same restaurants indicated that in 2019 they will reduce employee hours, while 47.1% plan to eliminate jobs entirely. *Id.* at 7. Among the 250 responding limited-service restaurants, 59.4% reduced employee hours, and 50.0% eliminated jobs, in 2018 in response to the mandatory wage increases implemented at the end of 2017. *Id.* at 12. These same restaurants anticipate that in 2019 75.0% of them will reduce employee hours, and 53.1% will eliminate jobs, in response to the mandatory wage increases implemented at the end of 2018. *Id.* at 13.

11

\* \* \*

The Restaurant Law Center and the Alabama Restaurant & Hospitality Association do not mean to suggest that the sources cited in this brief constitute the universe of authorities on the topic, or that there are not contrary views in academic circles regarding the effect of the minimum wage on employment. What these materials demonstrate, however, is that there is a substantial body of scholarly and empirical evidence for the proposition that minimum wage increases can and do harm a large number of the low-wage workers legislators are trying to help when they raise the minimum wage. More than twenty states, including Alabama, have made the informed and well-supported decision to protect their residents by barring local governments from tinkering with the minimum wage.

Against this backdrop of sensible, rational, facially nondiscriminatory economic regulation, Plaintiffs' Complaint falls far short of stating facts sufficient to support a claim for race discrimination. The District Court applied the correct legal standard to the Complaint, and it properly dismissed all of Plaintiffs' claims, including their equal protection claim.

## CONCLUSION

For these reasons, this Court should affirm the dismissal of the Complaint. Respectfully submitted.

12

s/ Paul DeCamp

ANGELO AMADOR
RESTAURANT LAW CENTER
2055 L Street, N.W.
Suite 700
Washington, D.C.  20036
(202) 331-5913
AAmador@restaurant.org

PAUL DECAMP
    *Counsel of Record*
EPSTEIN, BECKER & GREEN, P.C.
1227 25th Street, N.W.
Suite 700
Washington, D.C.  20037
(202) 861-1819
PDeCamp@ebglaw.com

*Counsel for* Amici Curiae *Restaurant Law Center
and the Alabama Restaurant & Hospitality Association*

April 24, 2019

13

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Rule 29(a)(5) of the Federal Rules of Appellate Procedure because it contains 2,613 words, excluding the material specified by Rule 32(f).

This document complies with the typeface and type style requirements of Rule 32(a)(5)-(6) of the Federal Rule of Appellate Procedure, as it uses a proportionally-spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

s/ Paul DeCamp
Counsel for *Amici Curiae*
Restaurant Law Center and Alabama
Restaurant & Hospitality Association

April 24, 2019

14

15

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing document to be filed electronically using the Court's CM/ECF system, which will serve all counsel of record.

s/ Paul DeCamp
Counsel for *Amici Curiae*
Restaurant Law Center and Alabama
Restaurant & Hospitality Association

April 24, 2019